NOT YET SCHEDULED FOR ORAL ARGUMENT
Nos. 25-5266, 25-5267

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee*,
v.
OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants*.
_____

PROTECT DEMOCRACY,
*Plaintiff-Appellee*,
*v.*
OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants*.
_____

On Appeal from the United States District Court
for the District of Columbia
_____

**PLAINTIFF-APPELLEE PROTECT DEMOCRACY'S OPPOSITION TO
MOTION FOR A STAY PENDING APPEAL**
_____

DANIEL F. JACOBSON
KYLA M. SNOW*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

* Not admitted in the District of
Columbia. Practice supervised by
members of the D.C. bar.

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiff-Appellee in the appeal from *Protect Democracy v. OMB*, No. 25-cv-1111, is Protect Democracy Project, Inc. Plaintiff-Appellee in the appeal from *CREW v. OMB*, No. 25-cv-1051, is Citizens for Responsibility and Ethics in Washington. Defendants-Appellants are the U.S. Office of Management and Budget and Russell Vought, in his official capacity as Director of the U.S. Office of Management and Budget.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Protect Democracy Project, Inc. does not have any parent companies, subsidiaries, or affiliates.

### B. Rulings Under Review

The ruling under review (issued by Judge Emmet G. Sullivan) is an order filed July 21, 2025 and an accompanying memorandum opinion filed July 21, 2025 granting Protect Democracy's Motion for Partial Summary Judgment in Case No. 25-cv-1111 and granting in part and denying in part CREW's motion for partial summary judgment in case No. 25-cv-1051.

*/s/ Daniel F. Jacobson*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT .......................................................................................................3

    I. Legal and Factual Background ......................................................................3

    II. This Action ................................................................................................6

STANDARD OF REVIEW ....................................................................................7

ARGUMENT .......................................................................................................8

    I. Defendants Have No Likelihood of Success on the Merits ...........................8

        A. Plaintiff Protect Democracy Has Standing ...............................................8

            1. Protect Democracy Established Informational Injury...........................8

            2. Protect Democracy Established Economic Injuries...........................12

            3. Defendants' New Test for Standing Is Not the Law...........................14

        B. The 2022 and 2023 Appropriations Acts Are Constitutional..................15

            1. Defendants Cannot Refuse to Comply with the Disclosure Requirements Absent an Applicable Privilege ...................................16

            2. The Deliberative Process Privilege Does Not Apply...........................17

            3. Defendants Cannot Evade the Requirements to Post Apportionments within Two Days, without Redactions ..................................................21

    II. Defendants Will Not be Irreparably Injured Absent a Stay...........................22

    III. A Stay Would Injure Plaintiff Protect Democracy and the Public..............23

CONCLUSION ..................................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................................25

# TABLE OF AUTHORITIES

## Cases

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34 (2d Cir. 2015).......14

*Bennett v. Spear*, 520 U.S. 154 (1997)...................................................................18

*Biden v. Nebraska*, 600 U.S. 477 (2023)...........................................................8, 15

*Ctr. for Biological Diversity v. Int'l Dev. Fin. Corp.*,
      77 F.4th 679 (D.C. Cir. 2023) ......................................................................10, 12

*Comm. on the Judiciary v. McGahn*, 407 F. Supp. 3d 35 (D.D.C. 2019) ..............22

*Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012)...............17

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
      878 F.3d 371 (D.C. Cir. 2017) ........................................................................9, 10

*Env't Def. Fund v. EPA*, 922 F.3d 446 (D.C. Cir. 2019)................................1, 9, 10

*Fed. Election Comm'n v. Akins,* 524 U.S. 11 (1998) ...............................................8

*Friends of Animals v. Jewell*, 824 F.3d 1033 (D.C. Cir. 2016)...............................9

*Hawaii v. Trump*, 871 F.3d 646 (9th Cir. 2017)....................................................14

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015).......................12

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ................................................17

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986).......................15

*Medina v. Planned Parenthood South Atlantic*, 145 S. Ct. 2219 (2025) ...............15

*Nken v. Holder*, 556 U.S. 418 (2009)......................................................................7

*Sackett v. EPA*, 566 U.S. 120 (2012).....................................................................20

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v.*
      *U.S. Dep't of Just.*, 823 F.2d 574 (D.C. Cir. 1987)......................................18,19

*T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Sup'rs*,
      748 F.3d 185, 197 (4th Cir. 2014).......................................................................14

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)......................................8, 10, 14

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261 (2021)..............18, 19

*United States v. Bland*, 472 F.2d 1329 (D.C. Cir. 1972).......................................16

*United State v. Matthews*, 54 F.4th 1, 4 (D.C. Cir. 2022) ......................................21

*United States v. Richardson*, 418 U.S. 166 (1974)................................................11

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
      429 U.S. 252 (1977) ..........................................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)............................17

**Statutes and Regulations**

4 U.S.C. § 3502 ................................................................................4

5 U.S.C. § 702 ................................................................................14

5 U.S.C. § 704 ................................................................................14

31 U.S.C. § 1513 ....................................................................3, 5, 18

31 U.S.C. § 1517 .........................................................................4, 18

31 U.S.C. § 1341 ...............................................................................3

31 U.S.C. § 1349 ...............................................................................3

31 U.S.C. §§ 1511-19 .......................................................................3

42 U.S.C. § 1983 .............................................................................14

44 U.S.C. § 3502(20)........................................................................21

Pub. L. No. 117-103, div. E, tit. II, § 204,
    136 Stat. 49 (2022) ...............................................................*passim*

90 Fed. Reg. 9737 (Feb. 18, 2025).....................................................3

**Other Sources**

GAO, B-331564 (Jan. 16, 2020) .......................................................19

L. Brandeis, *What Publicity Can Do*,
    Harper's Weekly (Dec. 20, 1913) .................................................23

OMB Circular No. A-11.................................................................*passim*

# GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation |
|---|---|---|
| Bagenstos Decl. | Declaration of Samuel Bagenstos | Dkt. 18-6 |
| Carlile Decl. | Declaration of Joseph Carlile | Dkt. 18-5 |
| Circular No. A-11 | OMB Circular No. A-11 (2024) | Dkt. 18-7 |
| CREW | Citizens for Responsibility and Ethics in Washington | |
| Dkt. | Docket entry in *Protect Democracy v. OMB, et al.*, No. 25-cv-1111 | |
| Ford Decl. | Declaration of William P. Ford | Dkt. 18-4 |
| Ford Supp. Decl. | Supplemental Declaration of William P. Ford | Dkt. 20-1 |
| July 23 Order | July 23, 2025 Minute Order Denying Stay Pending Appeal | July 23, 2025 Minute Order, *Protect Democracy v. OMB, et al.*, No. 25-cv-1111 |
| Mot. | Emergency Motion for Immediate Administrative Stay and for Stay Pending Appeal | Doc. No. 2126848 |
| OMB | Office of Management and Budget | |
| Op. | Memorandum Opinion Granting Plaintiff's Motion for Partial Summary Judgment | Dkt. 34 |
| Protect Democracy | Plaintiff Protect Democracy Project | |
| Resp. | Defendants' Response in Opp. to Plaintiff's Motion for Preliminary injunction or Partial Summary Judgment | Dkt. 19 |

## INTRODUCTION

Defendants remarkably seek an emergency stay from a district court order they effectively admit was correct under governing precedent. Defendants concede they are violating a law that requires OMB to post its apportionments. They do not dispute that multiple precedents of this Court establish that Protect Democracy is suffering cognizable information injury; Defendants instead contend those cases were wrong and "failed to grapple" with certain issues. Mot. 17. Defendants do not even address Protect Democracy's distinct economic injuries that the district court found and the Supreme Court has held constitute injury. On the merits, Defendants now admit that apportionment information does not "strictly" fall "within the four corners of" the deliberative process privilege, or any other privilege. Mot. 22-23. Rather, on the merits and standing, Defendants ask this Court to adopt new doctrines from whole cloth that have no legal foundation. The Court should not.

Defendants do not contest that Protect Democracy has informational standing under this Court's precedents for good reason. The "statute . . . requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Env't Def. Fund v. EPA*, 922 F.3d 446, 452, (D.C. Cir. 2019) (quotations omitted). Protect Democracy is indeed suffering unique informational injury; it built a custom website to ingest the apportionments and make them searchable and user friendly, which Protect

1

Democracy used to scrutinize the data and inform and educate others. Protect Democracy also clearly is suffering economic injuries because the substantial money and resources that it invested in developing its site are now wasted.

With respect to the merits, the apportionment information that must be disclosed categorically is not predecisional or deliberative. As OMB itself states in its authoritative guidance, apportionments are "legally binding" and place "legal limits" on how much agencies may spend and for what purposes. Documents definitionally are not predecisional or deliberative where they are legally binding and carry legal consequences. Apportionments do just that, including by subjecting officials to criminal and administrative penalties for violating them. Defendants nevertheless insist they should be able to violate the public disclosure laws because apportionments contain "sensitive" information they do not want to disclose. They cite no legal authority for that proposition, and there is none.

Defendants' claim that they will suffer harm without a stay should hold no purchase, not only because they have no likelihood of success, but also because history disproves their claim. OMB complied with these disclosure requirements for nearly three years, including during the current Administration, and OMB continued to function just fine. OMB remains free to communicate confidentially with agencies outside of apportionments; the law requires only that they disclose

apportionment information that is legally binding. Defendants' motion is simply an effort to hide information of critical importance, and it should be swiftly denied.

## STATEMENT

To avoid duplication with Appellee CREW's parallel brief in No. 25-5266, Protect Democracy briefly summarizes the relevant statutes, facts, and procedural history. Protect Democracy provides more details, however, regarding its unique use of the apportionment information that the statutes require to be disclosed, and its particularized injuries from Defendants' actions.

## I.     Legal and Factual Background

1. In the Anti-Deficiency Act, Congress prescribed a system by which appropriations must be "apportioned" to agencies before they may spend the funds. 31 U.S.C. §§ 1341, 1349, 1511-19. Pursuant to a presidential delegation, OMB apportions funds to Executive agencies. 90 Fed. Reg. 9737 (Feb. 18, 2025).

Under the Anti-Deficiency Act, OMB must make its apportionments "in writing," and "shall notify the head of the executive agency in writing of the action taken in apportioning the appropriation." 31 U.S.C. § 1513(b). When OMB issues an apportionment, it serves as both legal authorization and a legal prohibition. The apportionment authorizes the agency to spend the apportioned amounts, and it prohibits the agency from spending more than those amounts, and from violating other terms and conditions included in apportionment "footnotes." *See* Carlile

3

Decl. ¶ 6 (Dkt. 18-5); Bagenstos Decl. ¶ 11 (Dkt. 18-6). An agency official who makes an obligation or expenditure exceeding an apportioned amount is subject to administrative penalties and criminal liability. 31 U.S.C. §§ 1517-19.

OMB explains that apportionments are "legally binding" in its authoritative guidance known as OMB Circular A-11. *See* Circular No. A-11 § 120.1 (Dkt. 18-7). "[A]pportioned amounts," OMB explains, "are legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *Id.* § 120.10. OMB further explains that apportionment footnotes "have legal effect" in placing binding conditions and restrictions on spending the apportioned funds. *Id.* § 120.34.

2. In the Consolidated Appropriations Act of 2022 (the "2022 Appropriations Act"), Congress required that OMB publicly disclose its apportionments. Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note). The Act directed OMB to implement an "automated system to post each document apportioning an appropriation, . . . including any associated footnotes," "on a publicly accessible website" "not later than 2 business days after the date of approval" of the apportionment. *Id.* Each apportionment document must be posted "in a format that qualifies [it] as an Open Government Data Asset," *id.*, meaning it must be machine-readable, in an open format, [and] not encumbered by restrictions that

would impede its use or reuse." 44 U.S.C. § 3502(20). In the Consolidated

Appropriations Act of 2023 (the "2023 Appropriations Act"), Congress made these

requirements permanent, while not renewing a provision in the 2022 Act that

required disclosures to Congress while the public system was being developed.

Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (codified at

31 U.S.C. § 1513 note).

3. In July 2022, OMB began making apportionments public as required. *See*

Dkt. 18-11; *see also* Carlile Decl. ¶ 8. That continued until March 24, 2025, when

OMB took down the apportionments website. *See* Dkt. 18-18. Several days later,

Director Russell Vought informed members of Congress stating that OMB "will no

longer operate and maintain" the website mandated by law. Dkt. 18-19.

4. Protect Democracy is a nonpartisan, nonprofit organization dedicated to

preventing American democracy from declining into a more authoritarian form of

government. Ford Decl. ¶ 2 (Dkt. 18-4). In fulfilling its mission, Protect

Democracy places special focus on defending Congress's powers of the purse as a

check against abuses of executive authority. *Id.* ¶ 3.

After OMB created its public apportionment website, Protect Democracy

organized and led a virtual training for congressional staff in October 2022 on how

to locate and read apportionments. *Id.* ¶ 5.

But when it became clear that OMB's website was difficult to navigate, Protect Democracy spent ten months developing its own site, OpenOMB.org, to make OMB's apportionments more user friendly. *Id.* ¶¶ 7-10. The site, which Protect Democracy launched in October 2024, pulls the primary source data from OMB's website and stores the files in a manner that allows them to be searched, filtered, and indexed. *Id.* ¶ 10. OpenOMB has been widely used by Congress, journalists, and others. *Id.* ¶ 11. The site received approximately 41,000 page views between October 2, 2024 and March 24, 2025. *Id.* ¶ 12. At the time OMB stopped posting apportionments, Protect Democracy was preparing to launch a new "notification" feature that it had spent months developing. *Id.* ¶¶ 16-17.

Following OMB's removal of its apportionment website, Protect Democracy could no longer post new apportionments to OpenOMB. *Id.* ¶ 14. Nor could it monitor the apportionments to scrutinize OMB's activities. *Id.* As a result of Defendants' actions, the OpenOMB site for which Protect Democracy invested substantial resources is of little value, and Protect Democracy cannot carry out its mission-critical work to inform and educate the public if OMB is misusing its apportionment authority. *Id.* ¶ 20; Ford Supp. Decl. ¶ 2(a) (Dkt. 20-1).

## II.   This Action

On July 1, the district court granted Protect Democracy summary judgment on its claim under the Administrative Procedure Act (APA) that Defendants'

actions violate the 2022 and 2023 Appropriations Acts. The court vacated and set aside Defendants' actions, and entered a permanent injunction. Dkt. 33.

The court found that Protect Democracy had Article III standing, based on both informational and economic injuries. Op. 24-37 (Dkt. 34). On the merits, the court rejected Defendants' arguments that the 2022 and 2023 Acts impair the Executive's performance of its duties, and that apportionments are subject to the deliberative process. *Id.* at 44.

On July 23, the district court denied Defendants' motion for a stay pending appeal, finding that Defendants had waived their request to be exempt from the statute's two-day posting requirements to enable them to redact information.

## STANDARD OF REVIEW

In considering a stay request, courts look to "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## ARGUMENT

## I.   Defendants Have No Likelihood of Success on the Merits

### A. Plaintiff Protect Democracy Has Standing

Protect Democracy has standing under the well-established standards of Article III. Contrary to Defendants' newly invented standing test, a plaintiff has Article III standing whenever it has "suffered an injury in fact . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). A plaintiff has standing, in other words, where it has "personal stake" in the outcome of the litigation. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

As the district court held, Protect Democracy demonstrated two independent bases for standing: informational and economic injury. Dispositively, Defendants do not dispute that Protect Democracy established both forms of standing under governing precedent.

### 1.  Protect Democracy Established Informational Injury

The Supreme Court has held that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins,* 524 U.S. 11, 21 (1998) (citation omitted). Since *Akins*, this Court has repeatedly reaffirmed that a plaintiff incurs informational injury where: "(1) it has been deprived of information that . . . a

8

statute requires the government . . . to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). Stated differently, a plaintiff suffers informational injury where "a statute . . . requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Env't Def. Fund*, 922 F.3d at 452. Defendants do not dispute that these cases remain good law and binding.

Defendants further admit that "the district court primarily relied on the Supreme Court's and this Court's informational standing cases," Mot. 15, and they do not contend that the district court misapplied those precedents. Indeed, Defendants do not dispute that Protect Democracy established Article III informational injury under the governing standards of these cases.

Defendants thus have forfeited any argument that Protect Democracy does not have informational injury under Circuit precedent, but forfeiture aside, Protect Democracy clearly has shown such injury. First, the 2022 and 2023 Appropriations Acts "require[] that the information be publicly disclosed" *Env't Def. Fund*, 922 F.3d at 452. The Acts require Defendants to publicly post "each document apportioning an appropriation," "including any footnotes." 136 Stat. at 256-57.

That the law requires disclosure to the public at large, rather than to Protect Democracy in particular, is of no moment. The Supreme Court has recognized standing based on the "denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *See TransUnion*, 594 U.S. at 441. This Court, too, has repeatedly found informational injury from statutes that require disclosure to the entire public. *See, e.g.*, *Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (statute requiring the Secretary of Interior to publicly disclose information on a permit application); *Ctr. for Biological Diversity v. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685-86 (D.C. Cir. 2023) (Sunshine Act requiring multi-member federal agencies to hold their deliberations open to the public); *Env't Def. Fund* 922 F.3d at 452 (statute requiring EPA to publish inventory of certain chemicals).

Protect Democracy is also suffering "the type of harm that Congress sought to prevent by requiring disclosure," *EPIC*, 878 F.3d at 378 (citation omitted), and "there is no reason to doubt their claim that the information would help them," *Env't Def. Fund*, 922 F.3d at 452 (quotations omitted). Below, *Defendants themselves* described the purposes of the apportionment disclosure requirements as follows: "[t]he 2022 and 2023 Acts are intended to provide the public with insights into government spending." Resp. 14 (Dkt. 19). Protect Democracy fully agrees, and it was using the apportionment data in furtherance of these purposes.

10

Through OpenOMB, Protect Democracy's custom website, Protect Democracy "monitor[ed] the apportionments, footnotes, and the written explanations accompanying footnotes for potential violations of the law." Ford Decl. ¶ 19. Now, Protect Democracy can no longer scrutinize the information as Congress intended. *Id.* Protect Democracy also used OpenOMB to "provide updated information about apportionments to Congress, the press, and the public." *Id.* ¶ 19. Congress specifically required OMB to disclose apportionments "in a format that qualifies as an 'Open Government Data Asset,'" 136 Stat. at 257, to enable organizations such as Protect Democracy to disseminate apportionment information and educate the public. Protect Democracy thus used the apportionments to advance Congress's precise purposes in requiring disclosure. Ford Decl. ¶¶ 2, 8, 11. It can no longer do so.

This case bears no resemblance to *United States v. Richardson*, 418 U.S. 166 (1974). There, a taxpayer presented a "generalized grievance" about the government's failure to comply with the Constitution. *Id.* at 173-74. The Court held that "a taxpayer may not employ a federal court as a forum in which to air his generalized grievances about the conduct of government." *Id.* at 174 (quotations omitted). Here, in contrast, Congress enacted laws requiring Defendants to disclose particular information to the public to serve particular purposes. Protect Democracy spent months building a custom website to serve those purposes. There

11

is nothing "generalized" about Protect Democracy's stake in whether the apportionment information continues to be disclosed.

Defendants' other arguments regarding Protect Democracy's informational injury are all foreclosed by binding precedent. Defendants imply that a plaintiff must have "specifically requested, and been refused" information to have injury. Mot. 16. This Court has rejected this argument, holding that a plaintiff "need not receive a specific denial" of a request for information "to sustain an informational injury." *Ctr. for Biological Diversity*, 77 F.4th at 685. As described in more detail below, Defendants suggest that the disclosure statute must confer a right of action or personal right to information on Plaintiffs, but they acknowledge that at least three precedents of this Court "found standing on an informational injury theory in circumstances where the statute did not clearly confer such an individual right to the information." Mot. 17 (citing cases).

### 2. Protect Democracy Established Economic Injuries

Separate and apart from its informational injury, Protect Democracy established economic injury. "[E]conomic loss" is "a classic form of concrete and particularized harm." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015). The district court had an entire section of its opinion holding that "Protect Democracy is also suffering economic injuries," Op. 35, and yet Defendants entirely ignore the district court's findings on this quintessential injury-in-fact.

Defendants do not deny Protect Democracy's economic injuries because they are undeniable. Protect Democracy invested substantial time, money, and resources into building and operating its website, OpenOMB, in reliance on Defendants' compliance with the disclosure requirements. Ford Decl. ¶¶ 7-9. Building the website alone was a ten-month endeavor. *Id.* It took staff hundreds of hours to build and then expand the website's capabilities post-launch. *Id.* And at the time that Defendants stopped complying with the law, Protect Democracy was on the precipice of launching a new "notification" feature that it had spent months developing, which would have allowed users to subscribe to and receive notifications when particular apportionments are posted. As a Protect Democracy official attested below, and Defendants did not rebut, "OpenOMB is now of considerably less value because it cannot serve its core function of making it easier to track OMB's apportionments." Ford Supp. Decl. ¶ 2(a).

The severe diminution of value of Protect Democracy's investments is cognizable economic injury. The Supreme Court has explicitly held so, and in the context of a nonprofit organization. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Court found that a nonprofit suffered "economic injury" where it had "expended thousands of dollars" on plans and studies to support a rezoning request that the defendant denied. *Id.* at 262. The Court found the nonprofit had standing because the "plans and studies" on which it

13

had spent money would be "worthless" unless the request were granted. *Id.* The same is true here: Protect Democracy's expenditures are rendered nearly worthless because Defendants stopped posting the information upon which OpenOMB relied.[1] Again, there is nothing "generalized" about Protect Democracy's injuries.

### 3. Defendants' New Test for Standing Is Not the Law

Rather than confront the law of standing as it exists, Defendants invent a new test. They assert that, to have standing to challenge a statutory violation, "a plaintiff must identify . . . a statute that creates a particular right in the plaintiff." Mot. 13. Defendants cite no authority for this assertion, and there is none. Article III standing requires injury-in-fact, causation, and redressability, and nothing more.

Defendants are conflating the "important difference [that] exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion*, 594 U.S. at 426-27. The language that Defendants invoke relates only to a cause of action, and even then, to only to one particular type of cause of action—under 42 U.S.C. § 1983 to

---

[1] Numerous other cases have found injury where the plaintiff invested time, money, or resources on a project that was rendered of little value by the defendant's actions. *See, e.g.*, *Hawaii v. Trump*, 871 F.3d 646, 661 (9th Cir. 2017); *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015); *T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Sup'rs*, 748 F.3d 185, 197 (4th Cir. 2014).

challenge violations of federal laws that afford individual rights. *See Medina v. Planned Parenthood South Atlantic*, 145 S. Ct. 2219 (2025).

Here, as a party "adversely affected or aggrieved" by Defendants' final agency actions, the APA provides Plaintiffs the "right of action" to challenge Defendants' statutory violations." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986) (quoting 5 U.S.C. §§ 702, 704). Defendants ignore the APA's cause of action, and their position cannot be reconciled with the countless cases where the Supreme Court has upheld the standing of a private entity to challenge agency actions that violate a statute, even where the statute does not use "rights creating" language or "create[] a particular right in the plaintiff." Mot. 13. *See, e.g.*, *Nebraska*, 600 U.S. at 489. Their position would also render the APA's "zone-of-interests" obsolete, because a plaintiff would always fall into the zone of interests if the statute had to create a "personal right" in the plaintiff.

Defendants' view of standing has no legal foundation, and cannot form the basis of a stay.

### B. The 2022 and 2023 Appropriations Acts Are Constitutional

On the merits, Defendants do not deny their actions violate the 2022 and 2023 Appropriations Acts. Instead, their sole merits defense is that "the 2022 and 2023 Acts are unconstitutional." Mot. 17. Defendants do not come close to meeting

their "burden of establishing the unconstitutionality of [the] statute" that they

"assail[]." *United States v. Bland*, 472 F.2d 1329, 1334 (D.C. Cir. 1972) (en banc).

### 1. Defendants Cannot Refuse to Comply with the Disclosure Requirements Absent an Applicable Privilege

As with standing, Defendants cite no precedent or recognized doctrine to

support their contention that the Acts are unconstitutional. Defendants no longer

contend, as they did in the district court, that apportionment information falls under

the deliberative process privilege. They assert that the disclosure requirements are

unconstitutional "regardless of whether the deliberative process privilege strictly

applies," and "regardless whether specific apportionment information fits within

the four corners of that privilege." Mot. 22-23. Defendants also do not claim that

the information to be disclosed falls under any other privilege, or that disclosure

would impair the President's ability to perform some core Article II function.

In these circumstances, there is no basis to find that the 2022 and 2023

Appropriations Acts are unconstitutional. Defendants repeatedly describe

apportionments as containing "sensitive" information, and they cite to their own

employee's assertions that apportionments include "key information" or other facts

that OMB would prefer not to disclose. Mot. 18-21. Even if these self-serving

assertions were true, they are irrelevant for constitutional purposes. There is no

constitutional privilege over "sensitive" or "key" information. No case has ever

held that the Executive may refuse to comply with a statutory disclosure

requirement where the information did not fall under an established constitutional privilege or protection.

This case would be a particularly poor vehicle to recognize a new constitutional basis for the Executive to violate statutory disclosure requirements, because Congress enacted these requirements in furtherance of its exclusive constitutional power to appropriate funds. Any assertion that the Executive has inherent constitutional authority to withhold apportionments would fall under the third category of Justice Jackson's tripartite framework, because Defendants are acting contrary to the "expressed . . . will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). The President cannot possibly show that he has "conclusive and preclusive" authority over the manner of apportioning funds, *id.*, given that the Appropriations Clause provides Congress "exclusive power over the federal purse." *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quotations omitted). Congress may impose a disclosure requirement as a condition of the apportionment process that it created, in furtherance of Congress' control over appropriations.

## 2. The Deliberative Process Privilege Does Not Apply

To the extent that Defendants imply that the deliberative process privilege still has bearing here, *see* Mot. 23, the privilege categorically does not apply to any of the apportionment information that must be disclosed, including footnotes. The

information legally cannot fall under the deliberative process privilege because—as OMB admits—all approved apportionments and footnotes are "legally binding" and "have legal effect" the moment they are issued.

"Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). "Documents are 'predecisional' if they were generated before the agency's final decision on the matter." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). An agency action is "final" where "legal consequences will flow" from it, *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted), or where it has "real operative effect" legally, *Sierra Club*, 592 U.S. at 271 (quotations omitted).

Documents are "deliberative" if they "were prepared to help the agency formulate its position," *Id.* at 268, and "part of the agency give-and-take by which the decision itself is made," *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. Dep't of Just.*, 823 F.2d 574, 585 (D.C. Cir. 1987) (cleaned up).

OMB's apportionments are neither predecisional nor deliberative. Under the Antideficiency Act, an apportionment is a final decision regarding the funds an agency may spend at a point in time, and it has immediate legal consequences. The Act requires OMB to "apportion [an] appropriation in writing" and "notify the

18

head of the executive agency of the action taken." 31 U.S.C. § 1513(a), (b). Legal

consequences flow directly from that action. Agencies may obligate funds after,

but only after, they receive an apportionment, and agencies are prohibited from

"exceeding . . . an apportionment" in the amounts they spend. *Id.* § 1517(a)(1). The

legal consequences are very real for federal employees, who face administrative

discipline or criminal liability if they authorize obligations or expenditures greater

than the amount that OMB apportioned *Id.* §§ 1518-19.

OMB itself has made clear that apportionments are not predecisional or

deliberative in OMB Circular No. A-11, its definitive guidance on

apportionments,. There, OMB asserts that apportionments are "legally binding," in

part because "apportioned amounts are legal limits that restrict how much an

agency can obligate, when it can obligate, and what projects, programs, and

activities it can obligate for." Circular No. A-11, §§ 120.1; 120.10. OMB further

makes clear that footnotes included in apportionments "have legal effect," because

they impose binding conditions on how agencies may spend apportioned funds. *Id.*

§ 120.34.[2]

---

[2] The most famous example of such a footnote is when OMB apportioned military
assistance funds for Ukraine to the Department of Defense in 2019, but with a
footnote that prohibited DOD from actually obligating the funds. *See* GAO, B-
331564 (Jan. 16, 2020).

It is simply not possible for a "predecisional" document to be legally binding, let alone to expose individuals to prison time if they violate its directives. Nor are OMB's apportionments deliberative. They are not "prepared to help [OMB] formulate its position," *Sierra Club, Inc.*, 592 U.S. at 268, and are not "part of the agency give-and-take by which the decision itself is made," *Senate of the Com. of Puerto Rico*, 823 F.2d at 585 (quotations and alteration omitted). Apportionments *are the decisions* regarding how much agencies may spend from an appropriation at any point in time. *See* Bagenstos Decl. ¶ 11.

Defendants' arguments to the contrary fall flat. They argue that OMB may alter apportionments "at any moment," and that OMB's "directions to an agency that accompany one apportionment may well be predecisional with respect to future re-apportionment decisions." Mot. 23-24. That is not what predecisional and deliberative mean. "The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). By Defendants' logic, virtually every government decision would be considered predecisional and deliberative, because government decisions are always subject to change or may inform future decisions.

Defendants also err in characterizing apportionments as "communications," and in suggesting that disclosure will inhibit them from engaging in actual deliberative communications. Mot. 2, 4, 22-23. An apportionment is a legally

20

operative directive, not a mere "communication." And nothing in the laws requires OMB to disclose its separate "communications with agencies during the apportionment process." *Id.* at 22. OMB is free to communicate deliberative information however it wants; it only must disclose the approved apportionments and footnotes that are legally binding.

Defendants' other "objections to the burdens imposed by the 2022 and 2023 Acts" (Mot. 12) reflect nothing more than policy disagreements with Congress, or annoyance at the added work that the Acts require. Mot. 12. As the district court held: "This is a management issue; not a constitutional one." Op. 41.

### 3. Defendants Cannot Evade the Requirements to Post Apportionments within Two Days, without Redactions

Finally, Defendants request that "this Court should stay the provisions of the district court's injunctions requiring that OMB publish apportionments automatically and that it do so within two business days, in order to ensure that OMB retains the ability to effectively redact sensitive information on a case-by-case basis." Mot. 24. The district court correctly found this request waived, because Defendants never requested relief specific to these requirements until after the court's decision, and Defendants never previously argued that there was any lawful basis for them to "redact sensitive information." *See* July 23 Order. This Court does not consider arguments waived below. *United States v. Matthews*, 54 F.4th 1, 4 (D.C. Cir. 2022).

21

In any event, this eleventh hour request should be denied. It is not "the district court's injunctions" that require OMB to publish apportionments automatically within two business days, Mot. 24; it is the laws passed by Congress. The 2022 and 2023 Appropriations Acts also clearly do not permit Defendants to "redact sensitive information," other than classified information, before posting the apportionments online. The Acts require that Defendants post apportionments, including footnotes, through an automated system "in a format that qualifies [it] as an Open Government Data Asset." 136 Stat. at 257. That means the apportionments must be "machine-readable" and "not encumbered by restrictions." 4 U.S.C. § 3502. And permitting Defendants to redact any information they consider "sensitive" would undermine the entire purposes of the laws.

## II.    Defendants Will Not be Irreparably Injured Absent a Stay

"Where there is a low likelihood of success on merits, a movant must show a proportionally greater irreparable injury, in order to warrant the extraordinary remedy of a stay." *Comm. On the Judiciary v. McGahn*, 407 F. Supp. 3d 35, 39 (D.D.C. 2019) (cleaned up).

Here, Defendants have no likelihood of success on the merits, and their harm is minimal, if any. For all of their concerns that Article II will be endangered if they have to post this information, Defendants neglect that OMB complied with the statutes for nearly three years, including under the current Administration. *See* Op.

22

56. The district court's order merely requires Defendants to keep operating the automated system that they already had been.

Defendants' contention that the release of apportionments is not time-sensitive is wrong, *see infra*, but the Court need not make that determination because Congress already did. Congress deemed the immediate disclosure of apportionments to be essential by requiring OMB to post the information within two business days. 136 Stat. at 257.

## III. A Stay Would Injure Plaintiff Protect Democracy and the Public

As the district court concluded, Protect Democracy is suffering ongoing irreparable harm to its organizational mission and monetary investments that are exacerbated with each day Defendants continue to flout the law. Op. 53-54.

The harm to the public interest grows each day as well. OMB's current actions surrounding the withholding of federal appropriations is a matter of immense public debate and controversy. For instance, the unavailability of apportionments hampered the public's ability to evaluate the rescissions package that recently passed, and Defendants have said that more rescissions proposals will be released imminently. Cong. Rec. E720 (July 23, 2025). If there were ever a time that the sunlight Congress sought to shine on OMB's activities would serve Congress's goals, it is here and now. L. Brandeis, *What Publicity Can Do*, Harper's Weekly (Dec. 20, 1913).

## CONCLUSION

The Court should deny the government's motion.


          Respectfully submitted.

          */s/ Daniel F. Jacobson*
          DANIEL F. JACOBSON
          KYLA M. SNOW*
          JACOBSON LAWYERS GROUP PLLC
          *1629 K Street NW, Suite 300*
          *Washington DC, 20006*
          *(301) 823-1148*
          *dan@jacobsonlawyersgroup.com*

          * Not admitted in the District of Columbia.
          Practice supervised by members of the D.C.
          bar.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response in opposition to a stay complies

with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)

because the brief contains 5,198 words. The brief complies with the typeface and

type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6)

because it has been prepared using Microsoft Word in proportionally spaced 14-

point Times New Roman font.


*/s/Daniel F. Jacobson*
Daniel F. Jacobson



**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2025, I electronically filed the foregoing

response with the Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit by using the appellate CM/ECF system. Participants

in the case are registered CM/ECF users, and service will be accomplished by the

appellate CM/ECF system.


*/s/Daniel F. Jacobson*
Daniel F. Jacobson