**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 25-5266, 25-5267**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee,*
v.
OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee,*
v.
U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

**REPLY IN SUPPORT OF EMERGENCY MOTION FOR IMMEDIATE
ADMINISTRATIVE STAY AND FOR STAY PENDING APPEAL**

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

COURTNEY L. DIXON
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

# INTRODUCTION AND SUMMARY

The district court required the government to make available—automatically and within two business days—apportionments, including all sensitive or deliberative information they may contain. The court did so notwithstanding the Executive Branch's determination that such disclosures impair its ability to effectively carry out core Article II functions. And it acted at the behest of plaintiffs who concededly have no particularized right to receive the information. The court's orders should be stayed.

At the threshold, plaintiffs do not contest that courts routinely enter stays of similar disclosure orders, for fear of undermining the right to an effective appeal. Particularly given plaintiffs' failure to identify any specific, imminent harm, a stay is warranted to ensure that the government may properly seek full appellate review of its constitutional arguments. At the least, this Court should enter a stay of the most burdensome—and constitutionally problematic—aspects of the district court's injunction.

Regardless, plaintiffs' arguments are unpersuasive. Plaintiffs do not dispute that the relevant statutes vest no right to apportionment data in plaintiffs nor do they have any persuasive way to distinguish the Supreme Court's conclusion that an attempt to enforce an asserted disclosure

obligation divorced from any individualized right reflects an impermissible generalized grievance. On the merits, plaintiffs barely engage with the relevant legal principles or with the record evidence reflecting OMB's determination that the statutes have impaired its ability to effectively exercise the President's delegated authority to carry out core Article II responsibilities.

## ARGUMENT

### A. A Stay Pending Appeal Is Warranted

1. Plaintiffs do not dispute that courts routinely stay disclosure orders when compliance would vitiate the government's right to appellate review. *See* Mot.25-26. That is precisely the case here. And the harm that will befall the government absent a stay is particularly acute because, as explained, OMB has determined that complying with the statute (and, thus, the injunction) will impair its ability to effectively exercise delegated Presidential authority to carry out core Article II functions. Moreover, the district court's intrusion into this essentially interbranch conflict occasions its own separation-of-powers harm and risks pretermitting the political branches' ability to work through this dispute.

A stay is particularly warranted because plaintiffs nowhere articulate any imminent harm from their inability to access apportionment data. Instead, plaintiffs claim only generic "ongoing" harm, PD.Resp.23, to their ability "to continue their work monitoring and reporting on" the Executive Branch, CREW.Resp.26 (quotation omitted). Those generic assertions cannot justify denying the Executive Branch a full opportunity to obtain plenary appellate review of its constitutional objections. And Protect Democracy's (23) and amici's (10-12) focus on potential future rescissions is a red herring. The President is required to transmit any proposed rescission to Congress in a separate process. *See* 2 U.S.C. § 683(a). Nothing about the injunction or a stay will bear on plaintiffs', amici's, or the public's ability to receive information about proposed rescissions.

2. At the least, this Court should stay the injunction's provisions requiring the government to post apportionments automatically and within two days. As explained, these provisions work particularly acute harm on the government by removing the Executive Branch's ability—legally and practically—to redact particularly sensitive or deliberative information.

Plaintiffs have no persuasive response. Protect Democracy claims (21) that the government has forfeited this request. But the government's stay

3

motion in district court asked for exactly that relief, *CREW* Dkt. 35, at 3, and plaintiffs nowhere explain how the government could forfeit, at the merits stage, any request for limited stay relief. Regardless, the government addressed the constitutional infirmities of those requirements in district court. Plaintiffs' emphasis (PD.Resp.22; CREW.Resp.24) that the statutes require posting apportionments in full, with no redactions for sensitive information, only highlights the constitutional infirmities with the statutes.

### B. Plaintiffs Assert an Impermissible Generalized Grievance

1. Plaintiffs do not dispute that they have no particularized right to receive apportionment information. Instead, the relevant statutes purport to create an obligation on the part of the Executive Branch to disclose information without vesting any member of the public with a concomitant right to receive the information. But as the Supreme Court made clear in *United States v. Richardson*, 418 U.S. 166, 176-77 (1974), any attempt to enforce compliance with such a disclosure obligation divorced from any right inhering in the plaintiff reflects a "generalized grievance." *See* Mot.11-13.

Plaintiffs have no persuasive response to the clear import of *Richardson*. Protect Democracy primarily distinguishes (11) *Richardson* on the ground that *Richardson* involved an asserted "failure to comply with the

4

Constitution" but this case, "in contrast," involves a purported failure to comply with "laws." But Protect Democracy does not even attempt to explain how the violation of a statutory obligation could give rise to any more of a particularized injury than the violation of an analogous constitutional obligation. *See* Mot.12. And Protect Democracy's emphasis (11-12) on how it wishes to use apportionment information provides no firmer basis to distinguish *Richardson*—there too the plaintiff articulated specific ways in which he intended to use the information, *see* 418 U.S. at 176-77.

For its part, CREW attempts (15-16) to cabin *Richardson* to the context of "taxpayer standing," claiming that the Supreme Court's analysis turned on particular requirements of that doctrine that do not apply to asserted informational injuries. But that misreads *Richardson*, which both rejected the plaintiff's assertion of taxpayer standing under that doctrine's unique requirements, *see* 418 U.S. at 174-75, and also rejected his attempt to claim an informational injury, *see id.* at 176-77. Thus, the court of appeals in *Richardson* had rested its analysis on the proposition that the basis of the plaintiff's standing need not be "the spending of [his] money for an invalid purpose" but instead could be his "personal stake" in receiving "detailed information on CIA expenditures" as assertedly required by the

Constitution. *Id.* at 176 (quotation omitted). And that is the injury that the Supreme Court rejected as an impermissible "generalized grievance," relying on cases outside the taxpayer context. *See id.* at 177-78 (citing, among other cases, *Ex parte Levitt*, 302 U.S. 633 (1937), and *Baker v. Carr*, 369 U.S. 186 (1962)); *see also Federal Election Commission v. Akins*, 524 U.S. 11, 22-25 (1998) (cited at CREW.Resp.16) (discussing the taxpayer context of *Richardson* in some portions of its analysis but not relying on that context in addressing the generalized-grievance question).

2. Nor can plaintiffs evade *Richardson*'s logic by emphasizing (PD.Resp.8; CREW.Resp.14-15) that an injury may be particularized even though widely shared, as with "public-disclosure or sunshine laws that entitle all members of the public to certain information." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441 (2021). That misses the critical distinction between an obligation on the government and a right—even a broadly shared right—inhering in private parties.

Of course, Congress may vest many, or all, members of the public with an individual right to information whose asserted violation would give rise to a particularized injury. This is, for example, what Congress has done in FOIA by "requir[ing] an agency to make nonexempt records" "available to

any person upon that person's request." *Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017) (quotation omitted). That rights-creating scheme vests each individual who requests information with a particularized right to receive it. By contrast, as plaintiffs do not contest, the 2022 and 2023 Acts do not vest any member of the public with a right to receive apportionment information; instead, those statutes only purport to impose an obligation on the Executive Branch. And this Court has properly explained that the "alleged failure to publish" information that an agency is required by statute to disclose does not—in the absence of some "particularized" "right to receive" the information—generate Article III standing. *Id.* at 1116-17.

Nor do plaintiffs advance the ball by contending (PD.Resp.8; CREW.Resp.14-15) that this Court has recognized standing to challenge the asserted failure to comply with similar public disclosure obligations. The government acknowledged as much in its stay motion (17) but explained that those cases do not grapple with the generalized-grievance arguments raised here. Plaintiffs do not dispute the limited scope of the analysis in those cases and do not develop any contention that the outcomes in those cases can bind this Court with respect to an argument that they did not consider.

7

3. Plaintiffs also miss the mark when they contend (PD.Resp.14-15; CREW.Resp.16-17) that the government impermissibly conflates the existence of a cause of action with the existence of a concrete injury. That the 2022 and 2023 Acts contain no private right of action is relevant not because plaintiffs always need a specific right of action to have an Article III injury but because the lack of such a right of action supports the conclusion that Congress did not intend to create any substantive right to the information.

As the Supreme Court explained in *TransUnion*, "Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 594 U.S. at 425-26. For that reason, a statute that creates an individual right to the disclosure of specific information may form the proper basis of a claim to standing, even if the failure to disclose that information would not—in the absence of a statutory right—generate a particularized injury. Thus, plaintiffs' claim to standing properly turns on whether Congress has vested in them a right to the information. And it is that question to which the lack of any private right of action is relevant.

4. Finally, Protect Democracy cannot sidestep these problems by relying on purported economic injuries. Protect Democracy does not claim

that the government's actions have directly inflicted any economic harm on it. Instead, Protect Democracy claims (12-14) that it previously invested "substantial time, money, and resources into building and operating" a website to collect apportionment data and those investments have now diminished in value. But plaintiffs "cannot manufacture standing merely by inflicting harm on themselves"—such as by spending funds—in circumstances where the defendant's actions do not directly give rise to an Article III injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Because OMB's failure to disclose apportionment data does not inflict a particularized injury on Protect Democracy, the organization may not generate standing by spending funds in reliance on receiving that data.

C.  **The Disclosure Requirement Is Unconstitutional**

1. Plaintiffs do not dispute that Congress may violate the constitutional separation of powers by enacting legislation that "prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of General Servs.*, 433 U.S. 425, 443 (1977). Nor do plaintiffs meaningfully engage with the OMB Director's determination—expounded on by a declaration in the record from a high-ranking OMB official—that the 2022 and 2023 Acts have impeded OMB's ability to effectively execute the

9

apportionment laws and to exercise its delegated Presidential authority to supervise agency spending. *See* Mot.20-21. The record reflects that this impairment has occurred in a variety of ways, including by putting OMB to the untenable choice of either removing sensitive or deliberative information from apportionments (and thus forgoing the opportunity to exercise effective control over the President's subordinates) or having to disclose that information publicly (and thus chilling OMB's ability to candidly communicate with agencies through apportionments). *Id.*

2. Plaintiffs miss the mark when they focus (PD.Resp.17; CREW.Resp.22-23) on Congress's constitutional authority over federal spending. Of course, the underlying apportionment requirements and the disclosure requirements at issue here may be supported by Congress's Article I powers—as all legislation must be. Nonetheless, the 2022 and 2023 Acts may still unconstitutionally infringe on the Executive Branch's own constitutional authorities.

To the extent that Congress's spending authority is independently relevant, it is only because the Supreme Court has held that a statute that impairs the Executive Branch's functioning could be "justified by" some "overriding need to promote objectives within the constitutional authority of

Congress." *Nixon*, 433 U.S. at 443. But plaintiffs develop no argument that the 2022 and 2023 Acts' requirements reflect any "overriding" imperative to protect Congress's authority. Nor could any such argument persuade; Congress exercised its spending authority for centuries before first enacting those requirements three years ago.

CREW's brief suggestion (22) that Congress has "plenary power" to enact any reporting requirement "it considers appropriate in the public interest," CREW.Resp.22 (quoting *Richardson*, 418 U.S. at 178 n.11), misunderstands the relevant principles. The Supreme Court made that observation in emphasizing that, in *Richardson*, Congress had not required the disclosures that the plaintiff sought and it was unclear whether the plaintiff had a cause of action to enforce the constitutional requirement. The Court was not addressing the separate question whether any specific disclosure statute might infringe the separation of powers.

Indeed, although the Court rejected an argument in *Nixon* that a statute regulating "the disposition of Presidential materials" violated the separation of powers, it did not suggest that any statute requiring the disclosure of any Executive Branch information would fall within Congress's plenary authority. 433 U.S. at 441. Instead, the Court emphasized that the

statute contemplated that only "some of" the covered "materials may eventually be made available for public access" and that the statute contained provisions to "guard against disclosures barred by any defenses or privileges available to" the President. 433 U.S. at 443-44. The automatic two-day disclosure requirement at issue here contains no such limitations or safeguards.

3. Nor do plaintiffs advance the ball by focusing (PD.Resp.19-21; CREW.Resp.19-21) on the question whether apportionments contain information that falls strictly within the deliberative-process privilege. Although that privilege is constitutionally grounded, *see* Mot.18-19, it reflects but one specific instantiation of the broader principle that it violates the separation of powers for Congress to impair the President's ability to carry out his Article II responsibilities. Here, the record shows exactly that sort of impairment, as explained, and that constitutional violation does not turn on the precise application of any specific privilege.

Regardless, plaintiffs fail to support the district court's categorical conclusion that apportionments may not contain material subject to the deliberative-process privilege. Plaintiffs do not contest that apportionments reflect part of an inherently iterative process between OMB (exercising

12

delegated Presidential authority) and agencies and may contain information revealing internal Executive Branch policy deliberations and other sensitive, nonpublic information. *See* Mot.19-20. Instead, plaintiffs primarily contend (PD.Resp.19; CREW.Resp.19-20) that apportionments are not predecisional or deliberative because they have "legal consequences" for "agencies" and "federal employees." But all manner of internal Executive Branch directions are legally binding on the President's subordinates. That is an inherent feature of an Executive Branch where the President necessarily must exercise his constitutionally vested power by relying on subordinate officers who are expected to follow his direction. *See generally Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020).

Plaintiffs cite no support for the authority that such internally directed instructions are relevantly "final" simply because they bind officials within the Executive Branch. To the contrary, in assessing finality in the related context of the APA, this Court has focused on whether an agency action "impose[s] legally binding obligations or prohibitions on regulated parties"— not Executive Branch subordinates. *National Mining Ass'n v. McCarthy*, 785 F.3d 243, 251 (D.C. Cir. 2014). And here, plaintiffs do not dispute that

apportionments do not create legal rights or obligations on private parties. *See* Mot.23; App.67-68.

## CONCLUSION

For the foregoing reasons and those in the government's motion, the Court should stay the district court's orders pending appeal. At minimum, if the Court denies this motion, it should extend the administrative stay for 7 days to give the government sufficient time to determine whether to seek further review.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
COURTNEY L. DIXON

 /s/ *Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

July 2025

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing reply complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because the reply contains 2596 words. The reply complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point CenturyExpd BT typeface.

                                                  */s/ Sean R. Janda*
                                                  Sean R. Janda

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2025, I electronically filed the foregoing reply with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

                                            */s/ Sean R. Janda*
                                            SEAN R. JANDA