# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5266**                                 **September Term, 2024**

1:25-cv-01051-EGS
1:25-cv-01111-EGS

**Filed On: August 9, 2025**

Citizens for Responsibility and Ethics in
Washington,

        Appellee

    v.

Office of Management and Budget and
Russell T. Vought, in his official capacity as
Director, Office of Management and Budget,

        Appellants


------------------------------

Consolidated with 25-5267


**BEFORE:**    Henderson*, Wilkins, and Garcia, Circuit Judges

## O R D E R

       Upon consideration of the motion for a stay, the response thereto, and the reply; and the amicus brief, which the court construes as including a motion for leave to file, it is

       **ORDERED**, on the court's own motion, that the administrative stay entered on July 23, 2025, be dissolved effective August 15, 2025, to allow the government sufficient time to restore the database and disclose materials withheld since March, as required by the Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257, the Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667, and the district court's order.  It is


* A statement by Circuit Judge Henderson respecting the denial of a stay pending appeal is attached.  Circuit Judge Wilkins joins in the statement.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5266**                              **September Term, 2024**

       **FURTHER ORDERED** that the motion for leave to file the amicus brief be granted.  It is

       **FURTHER ORDERED** that the motion for a stay be denied.  Appellants have not satisfied the stringent requirements for a stay pending appeal.  <u>See</u> <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009); <u>D.C. Circuit Handbook of Practice and Internal Procedures</u> 33 (2024).

<u>**Per Curiam**</u>

                           **FOR THE COURT:**
                           Clifton B. Cislak, Clerk

                 BY:   /s/
                           Scott H. Atchue
                           Deputy Clerk

KAREN LECRAFT HENDERSON, *Circuit Judge*, statement respecting the denial of a stay pending appeal: Throughout the 1600s, the Stuart monarchs engaged in a titanic struggle with Parliament regarding who would reign supreme over the public purse. That struggle was marked by civil war, regicide and a new wellspring of liberty in the Glorious Revolution of 1688. By the end of the upheaval, Parliament emerged supreme in matters of taxation and spending. Our Constitution followed suit, granting the Congress plenary control over the public fisc. Recently, the Executive has once again locked horns in a struggle for control over the purse strings. Across a slew of cases, recipients of congressional funding have challenged the President's ability to unilaterally freeze or "impound" spending.[1] Today's case is but the latest chapter in the ongoing saga.

---

[1] *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. Dep't of State* (*AVAC I*), 766 F. Supp. 3d 74 (D.D.C. 2025); *AIDS Vaccine Advoc. Coal. v. Dep't of State* (*AVAC II*), 770 F. Supp. 3d 121 (D.D.C. 2025); *Am. Council of Learned Soc'ys v. McDonald*, No. 25-cv-3657, 2025 WL 2097738 (S.D.N.Y. July 25, 2025); *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, No. 25-cv-1128, 2025 WL 1795090 (D.D.C. June 30, 2025); *Am. Libr. Ass'n v. Sonderling*, No. 25-cv-1050, 2025 WL 1615771 (D.D.C. June 6, 2025); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-cv-999, 2025 WL 1568301 (D.D.C. June 3, 2025); *Rhode Island v. Trump*, No. 1:25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025); *S. Educ. Found. v. Dep't of Educ.*, No. 25-cv-1079, 2025 WL 1453047 (D.D.C. May 21, 2025); *U.S. Conf. of Cath. Bishops v. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. 2025); In re Dep't of Health and Human Servs.—Nat'l Insts. of Health—Application of Impoundment Control Act to Availability of Funds for Grants, B-337203 (Gov't Accountability Off. Aug. 5, 2025), [https://perma.cc/9524-MBWA]; In re Dep't of Transp., Fed. Highway Admin.— Application of the Impoundment Control Act to Memorandum Suspending Approval of State Elec. Vehicle Infrastructure Deployment Plans (Gov't Accountability Off. May 22, 2025), [https://perma.cc/YTQ3-HJPT].

In 2022, the Congress enacted a statute requiring the Executive to create and maintain a public database to track the expenditure of congressionally appropriated funds. The Executive complied until March of this year when, amidst the burgeoning fight over impoundment, it informed the Congress that it now deemed the statute unconstitutional and would no longer comply with it. Two nonprofit organizations sued to restore the now disabled website and the district court entered a permanent injunction requiring restoration of the withheld data.

The Executive now asks this Court to stay that decision. To hear the Government tell it, the separation of powers hangs in the balance and only this Court can set things right. But when it comes to appropriations, our Constitution has made plain that congressional power is at its zenith. Because the Executive has not made the requisite showing to support its motion for a stay pending appeal, the motion must be denied.

## I. BACKGROUND

The Congress appropriates money in one of two forms. A permanent appropriation makes funds available for a specific purpose indefinitely. *See, e.g.*, 31 U.S.C. § 1304. A current appropriation, by contrast, provides a capped lump sum for a finite period. Most current appropriations expire on an annual basis and require reauthorization each fiscal year. As part of its duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the Executive must manage those funds. It does so through apportionment: an internal executive branch process through which the Office of Management and Budget (OMB) divides appropriated funds by time or function to guarantee "the most effective and economical use" of money and to prevent "a deficiency or [need for a] supplemental

appropriation for the period."[2] 31 U.S.C. § 1512(a)–(b). OMB sometimes accompanies its apportionments with footnotes that guide an agency's discretion in expending appropriated funds. *See* OMB, Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, §§ 120.34–120.36 (2024), [https://perma.cc/PXY4-JTKB]. In the past, apportionment decisions—and OMB's guidance—were not ordinarily communicated outside the executive branch, hindering the Congress's ability to track and monitor its appropriations.

In 2022, the Congress chose to remedy that defect. As part of an omnibus spending bill, it required OMB to maintain a public website for fiscal year 2022 in order to "post each document apportioning an appropriation . . . including any associated footnotes . . . not later than 2 business days after the date of approval of such apportionment." Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257. The Congress also required that apportionments "include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *Id.* § 204(c). The following year, the Congress made publication of apportionment decisions a permanent fixture of the Executive's duties. *See* Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667.

In July 2022, OMB began posting its apportionment decisions and footnotes on a public website, https://apportionment-public.max.gov/. The process operated

---

[2] By statute, the President is the relevant apportioning official for appropriations to executive agencies. 31 U.S.C. § 1513(b). The President has delegated his responsibility to OMB, a component of the Executive Office of the President. *See* Exec. Order No. 6,166 (June 10, 1933), *as amended by* Exec. Order No. 12,608, 52 Fed. Reg. 34,617 (Sept. 9, 1987).

without hiccup or objection until March 2025, when the Executive—facing multiple lawsuits claiming that it was unlawfully impounding congressional funds—changed course. Three years in, OMB declared "that the disclosure requirements made OMB's administration of apportionments more difficult" and so it disabled the website and declared that it would no longer operate or maintain the website. Gov't Br. 7–8 (quotations omitted). The Government Accountability Office (GAO) requested that OMB restore the apportionment data, which "facilitates oversight of federal spending" and is critical to GAO's numerous investigations "of ongoing Impoundment Control Act inquiries."[3] Letter from Edda E. Perez, Gen. Couns., GAO, to Russell T. Vought, Dir., OMB 2 (Apr. 8, 2025) (citation modified), [https://perma.cc/H7UR-CAJ8].

Meanwhile, two nonprofit organizations, Citizens for Responsibility and Ethics in Washington (CREW) and Protect Democracy Project (PDP) (together, Appellees), sued OMB and its Director to restore access to the database. On summary judgment, the district court (i) held that OMB's action violated the 2022 and 2023 Consolidated Appropriations Acts (CAAs) and the Paperwork Reduction Act; (ii) vacated and set aside OMB's action; and (iii) entered a permanent injunction prohibiting OMB from removing the database or ceasing to post apportionment information in conformity with its statutory duty. *See CREW v. OMB*, No. 25-cv-1051, 2025 WL 2025114, at *20 (D.D.C. July 21, 2025). The Government seeks a stay pending appeal.

---

[3] The GAO is "an independent agency within the legislative branch that exists in large part to serve the needs of Congress." *Bowsher v. Merck & Co.*, 460 U.S. 824, 844 (1983).

## II. ANALYSIS

A stay "is an intrusion into the ordinary processes of administration and judicial review" and is thus never awarded as "a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation modified). Before granting a stay pending appeal, we consider (1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant faces irreparable injury absent a stay; (3) whether a stay will substantially injure the other parties; and (4) the public interest. *Id.* at 434. The Government bears the burden for making out a case for such extraordinary relief. *See id.* at 433–34. As explained below, it has failed to meet that burden.

### A. Likelihood of Success on the Merits

The Government advances two arguments in support of its likelihood of success on the merits. First, it argues that Appellees lack standing to challenge OMB's removal of the public database. Second, it argues that the CAAs unconstitutionally intrude on core Article II prerogatives. Each is addressed in turn.

### 1. Article III Standing

It is blackletter law that a plaintiff suing in federal court must satisfy the "irreducible constitutional minimum" of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotations omitted). Standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* The first of these elements, injury in fact, requires a plaintiff to suffer "an invasion of a legally protected interest that is concrete and

particularized and actual or imminent." *Id.* at 339 (citation modified).

Appellees assert an informational injury, a class of injury that has been the source of much doctrinal confusion. Informational injury first emerged in 1989 and crystalized in a pair of landmark Supreme Court cases, which held that the nondisclosure of certain information can constitute a concrete injury giving rise to Article III standing. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 448–49 (1989) (concluding that DOJ's denial of information regarding judicial candidates injured plaintiffs by preventing them from "participat[ing] more effectively in the judicial selection process"); *FEC v. Akins*, 524 U.S. 11, 13–14, 21 (1998) (holding that an FEC determination that a lobbying group was exempt from disclosing its contributions and expenditures imperiled plaintiffs' ability to "evaluate candidates for public office"). Although given its own doctrinal label, informational injury stems from basic Article III precepts: the denial of information can sometimes cause *de jure* harm just like any other injury in fact. But if stretched to its outermost limits, informational injury would support a boundless theory of standing. Almost any governmental policy might conceivably affect the information ecosystem. Every file not disclosed could be spun up into an individualized grievance. Without limits, a plaintiff need claim only an amorphous impediment to the free flow of information to have standing.

Two important principles therefore constrain the informational injury doctrine. First, it is not enough that the Government deny a plaintiff access to information he desires: federal law must require the Government "to disseminate such information." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024); *see also Akins*, 524 U.S. at 21 ("A plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain

information which must be publicly disclosed pursuant to statute."). Second, a plaintiff must allege some "downstream consequences from failing to receive the required information." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (citation modified).

We have combined those principles into a two-part test that asks whether the plaintiff has (1) "been deprived of information that, on its interpretation, a statute requires the government . . . to disclose to it" and (2) "suffer[ed] by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). In short, "a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022).

There is no dispute that the Government has a statutory duty to disclose apportionment data. That much is apparent from the face of the statutes. Appellees are also likely to succeed in showing "downstream consequences" from the Government's denial of that information. *TransUnion*, 594 U.S. at 442. Appellees use the withheld information to track the Executive's expenditures of public funds and to alert the public to a potential violation of the Impoundment Control Act, precisely "the type of harm Congress sought to prevent by requiring disclosure." *Jewell*, 828 F.3d at 992; *cf.* 1 Farrand, *The Records of the Federal Convention of 1787*, p. 546 (1911) (recounting Benjamin Franklin's view, shared by many Framers, that it is of central "importance that the people should know who had disposed of their money, & how it had been disposed of" as "those who feel, can best judge").

Moreover, PDP invested substantial time and resources in building a customized website that relies on OMB's disclosures to function. By removing the foundation on which PDP's design relies, the Government has injured PDP's investment. Its pocketbook harm is a quintessential Article III injury, which is enough to establish standing. *See, e.g.*, *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 765 (D.C. Cir. 2025). We need not decide whether Appellees' more abstract interests in the information—standing alone—suffice for standing. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (explaining that "we need only find one party with standing to satisfy [Article III's] requirement") (citation modified).

The Government points to *Clapper v. Amnesty International USA* in arguing that PDP's injury is self-inflicted and therefore cannot give rise to a judicially cognizable injury in fact. 568 U.S. 398, 416 (2013). Its authority is inapposite. In *Clapper*, a group of organizations sued to challenge the constitutionality of a provision of the Foreign Intelligence Surveillance Act. *Id.* at 401. No organization or member thereof had any evidence that its communications were being surveilled and the Supreme Court held that the chain of inferences necessary to infer that any organization's or member's communications might one day be surveilled were too speculative to give rise to a judicially cognizable injury. *Id.* at 410–14. Seeking to resist this conclusion, the challengers alleged that they had taken "costly and burdensome measures" to preemptively protect their communications. *Id.* at 415. But the Court explained that parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm." *Id.* at 416.

But PDP did not incur "costs as a . . . *reaction to*" what the Government *might* do. *Id.* (emphasis added). It incurred costs

*in reliance on* what the Government *did* do: disseminate information on which PDP built a website. Put another way, PDP does not allege a *Havens Realty* "divergence of resources" theory in response to Government action but a direct economic blow to a central "business activit[y]" that predated the challenged action. *Compare Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–80 (1982), *with All. for Hippocratic Med.*, 602 U.S. at 395. The Supreme Court has routinely found standing in comparable circumstances. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 426–27, 432 (1998) (farming cooperative formed in reliance on a tax provision had standing to challenge President's line-item-veto of that provision based on its "concrete plans to utilize the benefits of [the vetoed provision]"); *Cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 254, 261 (1977) (housing corporation had standing to challenge zoning laws after investing time and money on studies undercut by a zoning ordinance).

The Government offers two further arguments against standing. First, it asserts that Appellees raise a generalized grievance. The argument finds no foothold in precedent or in the record. A generalized grievance is "undifferentiated and common to all members of the public," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992) (citation modified), in contrast to a "particularized" injury that "affect[s] the plaintiff in a personal and individual way, *id.* at 560 n.1. So, for example, Maryland and Virginia residents whose organization was based in Washington, D.C. and who learned that the Government intended to transfer federal property in Pennsylvania to a Christian college lacked standing to assert an Establishment Clause violation because they suffered no "*injury* of *any* kind, economic or otherwise." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 467–68, 486–87 (1982). And, as the

Government notes, in *United States v. Richardson* the Supreme Court held that a taxpayer lacked standing to enforce the Statement and Account Clause.[4] 418 U.S. 166, 167–70 (1974). The throughline is a plaintiff lacks standing if his only injury is a bare interest that the Government follow the law. Appellees bring far more to the table. The district court found—and the Government does not contest—that PDP suffered and continues to suffer a pocketbook injury from the Government's alleged violation of the CAAs. *See CREW*, 2025 WL 2025114, at \*12. That pecuniary harm is in no way a generalized grievance.

Next, the Government argues that the CAAs lack the rights-creating language necessary for standing. Its theory is wrong twice over. As a threshold matter, the Government confuses jurisdiction with the merits. Whether Appellees have a right under the relevant statute goes to their cause of action— a merits inquiry—not their standing, a jurisdictional requisite. Courts once routinely conflated these two distinct areas of law. But in 2014, the Supreme Court rejected the notion that

---

[4] The Government repeatedly looks to *Richardson* for help but without success. *Richardson* predates modern standing doctrine and held that a plaintiff lacked taxpayer standing because no logical nexus existed between the plaintiff's taxpayer status and the claim raised: the Congress's failure to require a more detailed report from the Executive of an agency's expenditures. *Richardson*, 418 U.S. at 174–75. Subsequent Supreme Court precedent limited *Richardson* to "taxpayer standing" cases and explained "that the legal logic which critically determined *Richardson*'s outcome is beside the point" in informational injury cases. *Akins*, 524 U.S. at 22–23. Indeed, *Richardson*'s sweep as pressed by Government relies on the *Akins* dissenters' reading of the case. *See id.* at 32–37 (Scalia, J. dissenting). The dissenters themselves acknowledged that *Akins* "reduces [*Richardson*] from a landmark constitutional holding to a curio." *Id.* at 33.

so-called "prudential" or "statutory" standing implicates a court's subject matter jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 & n.4 (2014). *Lexmark* emphasized that whether a plaintiff has a viable cause of action constitutes "a matter of statutory interpretation," which seeks to "ascertain . . . the scope of the private remedy created by Congress." *Id.* (citation modified). By contrast, constitutional standing goes to whether a plaintiff has a case or controversy within the meaning of Article III. *Id.*

As relevant here, the standing inquiry turns on whether Appellees have suffered an injury as a matter of fact; not whether the Congress has vested them with a means to vindicate their injury as a matter of law. A party may suffer an Article III injury without possessing a corresponding cause of action to vindicate that injury. *See, e.g.*, *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (explaining that if "a plaintiff's claim under his preferred legal theory fails," that failure "has nothing to do with subject-matter jurisdiction"). And a party may possess a cause of action without suffering an Article III injury. *See TransUnion*, 594 U.S. at 426–27. The two are neither synonymous nor coextensive. Indeed, the Government's principal case for its rights-creating argument was itself resolved on the merits, not at the jurisdictional threshold. *See Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219 (2025).

Even taking the Government's argument on its own terms, it stumbles out of the gate. It insists that Appellees must identify "a statute that creates a particular right in the plaintiff" and highlights that "the relevant section [of the CAA] contains no rights-creating language." Gov't Br. 13 (citing *Medina*, 145 S. Ct. at 2229). The focus on rights-creating language that the Government extracts from *Medina* has no bearing here. *Medina* involved an attempt by private litigants to enforce a

provision of the Medicaid statute—which contains no private right of action—through 42 U.S.C. § 1983. *Medina*, 145 S. Ct. at 2226–28. "But § 1983 provides a cause of action only for the deprivation of rights, privileges, or immunities." *Id.* at 2229 (citation modified). Thus, for another federal statute to be enforceable via § 1983, a court must ascertain whether that statute vests the plaintiff with a right. The inquiry looks for rights-creating language only because § 1983 directs courts to look for that language.

The APA, by contrast, asks whether a party is aggrieved, adversely affected or suffering a legal wrong due to agency action. 5 U.S.C. § 702. If so, the party may challenge that action. Agency action may be substantively illegal because it violates another law, but that other law need not contain rights-creating language to support an APA challenge. Instead, a plaintiff need only fall "within the 'zone of interests' sought to be protected by the statut[e]," thus "enabling suit by any plaintiff with an interest arguably sought to be protected by the statute." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177–78 (2011); *see also id.* (explaining that the standard is not met only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit"). The Government has advanced no argument that Appellees fail to clear that low bar. And because the zone of interests inquiry is not jurisdictional, the Government's failure to raise it renders the issue forfeited.

## 2. The Constitutional Design

On the merits, the Government claims that the CAAs "impermissibly intrude on the Executive Branch's Article II authorities" by requiring public disclosure of "sensitive

information contained in apportionments." Gov't Br. 19. Its argument fails on constitutional first principles.

### a. Constitutional Text, Structure and History

The President lacks the inherent power to apportion money among agencies. Centuries of interbranch contests in England and the colonies cemented the legislature's plenary power over the purse and rejected any assertion of executive prerogative to the contrary. In dispensing apportionments, the Executive exercises authority contingent on the Congress's exercise of its appropriations power. And when it comes to appropriations, congressional power is at its zenith.

In the run up to the Revolution, colonists justified their opposition to the Stamp Act, Townshend Duties and Tea Act by pressing that only a body representative of the people could legitimately control the people's money. *See* Resolutions of the Stamp Act Congress (1765) (asserting "that no taxes ever have been, or can be constitutionally imposed on [the People], but by their respective legislatures."). Summarizing a common sentiment of the era, John Dickinson, the "penman of the Revolution," reasoned that:

> No free people ever existed, or ever can exist, without, keeping, to use a common but strong expression, "the purse strings" in their own hands. Where this is the case, they have a constitutional check upon the administration, which may thereby be brought into order without violence: but where such a power is not lodged in the people, oppression proceeds uncontrolled in its career, till the governed, transported into rage, seeks redress in the midst of blood and confusion.

John Dickinson, *Letters from a Farmer in Pennsylvania* IX (1768), [https://perma.cc/W7VB-58CU]. Following independence, "[m]any early state constitutions vested the legislative body with power over appropriations." *CFPB, v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 430 (2024). The Framers followed suit. The Constitution vests the power to raise revenue and appropriate funds in the Congress's exclusive purview, *see* U.S. Const. art. I, § 8, cl. 1; *id.* § 9, cl. 7, thus separating the "sword" in the Executive from "the purse" in the Legislature. The Federalist No. 78, at 465 (A. Hamilton) (C. Rossiter ed., 1961).[5]

The Appropriations Clause requires that "[n]o money . . . be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7, and the Take Care Clause "charges the Executive Branch with enforcing federal law," *Medina*, 145 S. Ct. at 2229 (citing U.S. Const., art. II, § 3), meaning the Executive may neither spend unappropriated money nor refuse to spend money appropriated by the Congress. The Chief Magistrate's role in appropriations is ministerial; he is an agent bound to faithfully execute the legislature's command. The Take Care Clause is, first and foremost, a duty imposed on the President. And when the President exercises his duty to "appl[y] and disburse[] . . . the public moneys," he must do so "in conformity to the general

---

[5] During the Ratification debates, one way that Federalists allayed fears of overweening presidential power was by underscoring that "[t]he purse is in the hands of the representatives of the people." 3 *Elliot's Debates on the Federal Constitution* 393 (1836). Indeed, among the three branches, the legislature was considered most likely to encroach on the powers of the other two because it "alone has access to the pockets of the people." The Federalist No. 48, at 310 (J. Madison) (C. Rossiter ed., 1961).

appropriations of the legislatures." The Federalist No. 72, at 435–36 (A. Hamilton) (C. Rossiter ed., 1961).

The Government insists that because it is "executing" the laws, the source of its power is Article II, not Article I, and thus the Congress cannot "impair" it "in the performance of its constitutional duties." Gov't Br. 18–19, 22 (quoting *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quotation omitted)); *see also* Gov't Reply 10 (acknowledging the disclosure requirement stems from the Congress's Article I power but insisting that power takes a back seat to Article II execution). As the Supreme Court underscored, the Congress may "impose upon any executive officer any duty they may think proper . . . and in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President." *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838). A contrary construction, in the Court's words, "would be an alarming doctrine." *Id.*

The Government claims that public disclosure of apportionment decisions risks intrusion into core Executive powers. And it insists that disclosure is unnecessary for the Congress to safeguard its authority because "Congress exercised its spending authority for centuries before first enacting" the CAAs. Gov't Reply 10. Our country's history teaches otherwise. Disclosure of the very information at issue here is not only a permissible exercise of legislative authority; at the Founding, it was considered a necessary exercise of that authority. Just three days before the close of the Philadelphia Convention, George Mason introduced the first draft of the Statement and Account Clause, which would have required an annual publicization of public expenditures. 2 Farrand, *supra*, at 618. Madison changed "annual" to its current form, "from time to time," to give "discretion [to] the *Legislature*" to control the release of appropriations information. *Id.* at 619

(emphasis added). As it now reads, the Clause provides that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." U.S. Const. art. I, § 9, cl. 7.

During the Virginia Ratifying Convention, Mason warned that Madison's capacious language might allow the "receipts and expenditures of the public money" to "be concealed forever. The people, he affirmed, had a right to know the expenditures of their money." 3 *Elliot's Debates on the Federal Constitution* 459 (1836). Patrick Henry similarly warned that "the national wealth is to be disposed of under the veil of secrecy." *Id.* at 462. Defenders of the Constitution assured the public that this would not be so. Madison reasoned that by giving the Congress discretion, its record "would be more full and satisfactory to the public, and would be sufficiently frequent." *Id.* at 460. Richard Henry Lee, the erstwhile president of the Continental Congress, dismissed the Antifederalists' concerns as "trivial" and emphasized that the plain import of the language was that information regarding public money was to be published at "short, convenient periods." *Id.* at 459. And Federalist James McHenry found the Clause praiseworthy for meeting "the Spirit of Economy and free Government"—that "the People who give their Money ought to know in what manner it is expended." 3 Farrand, *supra*, at 150.

Three principles emerge from the Ratification history. First is the centrality of public disclosure regarding appropriations. Second is the Congress's broad discretion to regulate those disclosures. Third is the danger of Executive overreach absent public scrutiny. Justice Story underscored each point in his overview of the Appropriations Clause, explaining:

> [I]t is highly proper, that congress should possess the power to decide, how and when any money should be applied for [its] purposes. If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure . . . . [A]nd to make [Congress's] responsibility complete and perfect, a regular account of the receipts and expenditures is required to be published, that the people may know, what money is expended, for what purposes, and by what authority.

2 Story, *Commentaries on the Constitution* § 1348, p. 215 (4th ed. 1873). St George Tucker similarly reasoned that public disclosure was the ultimate "check" against "the extravagance, and profusion, in which the executive department might otherwise indulge itself . . . [and] also against any misappropriation, which a rapacious, ambitious, or otherwise unfaithful executive might be disposed to make." 1 St. George Tucker, *Blackstone's Commentaries* 362 (1803). In a similar vein, Madison noted that the House of Representatives' "power over the purse" was "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58, at 359 (J. Madison) (C. Rossiter ed., 1961).

Early practice tracked their understanding. The First Congress inserted a mandatory disclosure in the legislation creating the Treasury Department, which required the Treasury Secretary "to prepare and report estimates of . . . the public expenditures . . . [and] to make report and give information to either branch of the Legislature . . . respecting all matters . . . which shall appertain to his office." An Act to establish the Treasury Department, ch. XII, § 2, 1 Stat. 65, 65–66 (1789).

Within months, the Treasury was providing the Congress with quarterly accounting statements of the sort the Government now deems unconstitutional. *See* 1 Annals of Congress 17, 1061 (1790). When Thomas Jefferson came into office, he declared it an "an object of great importance" that the Treasury Department "simplify our system of finance . . . so that every member of Congress, and every man of any mind in the Union should be able to comprehend [it]." Letter from Thomas Jefferson, President of the U.S., to Albert Gallatin, Sec'y of the Treasury (Apr. 1, 1802), [https://perma.cc/UQX6-MYNG].

Granted, Madison acknowledged during Ratification that, notwithstanding the Statement and Account Clause, the Government might occasionally need to "withhold from the public knowledge what in their judgment may require secrecy." 3 *Elliot's Debates*, *supra*, at 331. Reflecting the Clause's location in Article I, however, the only implicit withholding power resides squarely with the Congress. Thus, when President Madison later wished to make a secret expenditure to occupy parts of Spanish-controlled Florida, he asked the Congress for authorization—and the Congress, not the President, declared that the appropriation could be withheld temporarily from public disclosure. 3 Stat. 471, 471–72 (1811).

\*   \*   \*

In a Republic, "the people may have an opportunity of judging not only the propriety of . . . appropriations, but of seeing whether their money has actually expended only, in pursuance of the same." St. George Tucker, *supra*, at 362. Despite their differences, Antifederalists and Federalists agreed that the citizenry had a right to know how the Government manages its money, not a privilege contingent upon the whims of the Executive. Their dispute was only over

the wisdom of allowing the legislature to impose reasonable limitations on that right. Congressional power won out. And the Congress, as is its right, has opted to keep the citizenry informed by shedding more light on the appropriations process through the CAAs. The Constitution's text, structure and history uniformly cut against declaring the CAAs unconstitutional. The only question remaining is whether precedent compels a contrary result. It does not.

### b. Precedent

The courts have long recognized the Congress's "absolute control of the money of the United States." *Hart's Case*, 16 Ct. Cl. 459, 484 (1880), *aff'd sub nom. Hart v. United States*, 118 U.S. 62 (1886). And they have long recognized that a primary mechanism for the Congress to check unbridled Executive power is through the Constitution's "reservation of congressional control over funds in the Treasury." *OPM v. Richmond*, 496 U.S. 414, 425 (1990). The Government argues that OMB apportionments fall under the deliberative process privilege and are thus shielded from disclosure.

Set aside that the privilege applies only to material that is "predecisional and . . . deliberative," a requirement that apportionment decisions likely do not meet.[6] *In re Sealed*

---

[6] *Compare Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362 (D.C. Cir. 2021) (explaining that "[a] document is predecisional if it was generated before the agency's final decision on the matter" and "is deliberative when it is prepared to help the agency formulate its position, and it reflects the give-and-take of the consultative process"), *with Bennett v. Spear*, 520 U.S. 154, 178 (1997) (explaining that an agency decision is final when it has "real operative effect" and "legal consequences will flow"), OMB, Circular No. A-11, *supra*, at §§ 120.1, 120.34 (describing apportionments and their footnotes as "legally binding"), *and* 31

*Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Set aside that the Government itself obliquely acknowledges that the privilege may not "strictly appl[y]." Gov't Br. 23. And set aside that in neither of its briefs does the Government fully advance the deliberative process argument. *Cf. Stein v. FEC*, 77 F.4th 868, 873 (D.C. Cir. 2023) (noting that "woefully undeveloped arguments" or "argument[s] raised only summarily" are "forfeited") (citation modified). The only case the Government cites across two briefs, *Judicial Watch, Inc. v. FDA*, discusses the deliberative process privilege as codified in the Freedom of Information Act (FOIA)—and rejects the privilege. 449 F.3d 141, 150–52 (D.C. Cir. 2006).

The deliberative process privilege guards against agency "chill" by limiting public disclosure of "documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 361. It "originated as a common law privilege" and was subsequently codified by the Congress as an exception to FOIA disclosure. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *see* 5 U.S.C. § 552(b)(2). But just as the Congress may extend the privilege by statute, so too may it decline to do so. The Government points to no precedent from this Court or the Supreme Court that has ever held the privilege to be a constitutional baseline from which the legislature is not free to depart.[7] Moreover, even if we were to embrace the

---

U.S.C. §§ 1517–19 (imposing civil and criminal penalties on officials who expend or obligate in excess of an apportionment).

[7] In dicta, *In re Sealed Case* suggested in a footnote that some undefined aspects of the privilege might have constitutional roots. 121 F.3d at 737 n.4. But elsewhere, the opinion distinguished the presidential privilege—which it described as "rooted in constitutional separation of powers principles"—from the

Government's logical leap and constitutionalize the privilege as a matter of judicial fiat, "[t]he deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need." *In re Sealed Case*, 121 F.3d at 737; *accord Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 404 (D.C. Cir. 1984). Here, need would readily supersede any claim of privilege.

As the Supreme Court has explained, the "Congress has plenary power to exact any reporting and accounting it considers appropriate." *Richardson*, 418 U.S. at 178 n.11; *see also Harrington v. Bush*, 553 F.2d 190, 194–95 (D.C. Cir. 1977) (reasoning that the "Congress has plenary power to give meaning to the" Appropriations Clause). Against that plenary power, the Government asserts that the CAAs risk revealing vaguely defined "sensitive," "deliberative" or "policy" information, thereby chilling OMB's communications. Gov't Br. 19–22. Yet the Government never explains why OMB cannot communicate any privileged information to the relevant agencies outside the apportionment document itself. All it offers is an unhelpful line that doing so would be less "efficient[]." App. 70 ¶ 15. That objection is, as the district court noted, a "policy disagreement with the [CAAs] without a constitutional foundation." *CREW*, 2025 WL 2025114, at *14.

The current administration is not the first to wince at congressional oversight over spending. "As Alexander Hamilton learned to his dismay, the reporting requirements in the hands of political opponents could be a prodigious mechanism for harassment." Jerry L. Mashaw, *Recovering American Administrative Law*, 115 Yale L.J. 1256, 1287 (2006). But if the Executive finds disclosure burdensome, it must seek relief from the Congress, not from the unelected

---

deliberative process privilege, which it described as rooted in common law. *Id.* at 745.

judiciary. Our duty is to enforce the law—constitutional and statutory—and, absent an "irreconcilable variance" between the two, we cannot disregard a statute any more than we could the Constitution. The Federalist No. 78, at 467 (A. Hamilton) (C. Rossiter ed., 1961).

For these reasons, the Government has not shown that it is likely to succeed on the merits of its claim that the CAAs are unconstitutional.

## B. Irreparable Harm, Harm to Appellees & the Public Interest

The harm to the Government and the public interest factor "merge" when the Government is a party so they are considered together. *Nken*, 556 U.S. at 435. Assuming the sliding-scale approach to stays remains viable in our Circuit, a stay applicant that cannot meet its burden on the merits must show that the other three factors "strongly favor" a stay. *NAACP v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018) (citing *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). The Government does not make that showing.

As has become a theme in the Government's recent emergency motions practice, it "spends almost all of its brief arguing the merits." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *11 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring). The Government's opening brief devotes a mere two paragraphs to the issue of irreparable harm, one of which simply repackages its merits argument. Its reply brief is altogether silent on the issue. Insofar as the Government advances an independent irreparable harm argument, it is that disclosure cannot be undone so it should presumptively obtain relief. Its authority is a string of cases acknowledging that stays pending appeal are "routine in the analogous FOIA context."

Gov't Br. 25 (quoting *People for the Am. Way Found. v. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007)).

The Government's own authority shows why its cases do not control. A stay in FOIA litigation is common because "release of the documents would moot a defendant's right to appeal." *People for the Am. Way Found.*, 518 F. Supp. 2d at 177. In that context, disclosure is an all-or-nothing proposition. And a stay is entered for a quintessentially valid function of preliminary equitable relief: to preserve the remedial power of the court long enough to reach the merits. That is not the situation here. In the absence of a stay, the Government will have to restore the public website pending appeal. But should it prevail on the merits, it can take down the website and the information it contains and refuse to make future apportionment disclosures—just as it did after complying with the CAAs for three years.

Unlike its merits arguments, the Government's claims of injury have some intuitive force. That force, however, is not enough to meet the irreparable injury factor. As noted, the Government devotes only threadbare attention to its theory of irreparable harm before altogether abandoning the issue in reply. It is the Government's burden to establish irreparable harm; not the Court's responsibility to think of ways in which it might be harmed. *See Nken*, 556 U.S. at 434. As we have previously explained, the Government "must demonstrate the specific harm that would—not could—result from denying a stay," *Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022), as "[e]quity will not act against something merely feared as liable to occur at some indefinite time," *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (citation modified); *see also Nken*, 556 U.S. at 434–35 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor") (citation modified). Although the question is close, the

Government has failed to carry its burden on factor two at this stage in the litigation.

Appellees, for their part, have shown harm if a stay is entered. They will be deprived of information that the Founding generation—from Franklin to Jefferson to Madison to Mason—all thought vital to our Republic. And PDP will suffer additional pecuniary harm to its business

It is less clear how a court should weigh the public interest when the Executive challenges the constitutionality of a duly enacted congressional statute. *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *25 (D.C. Cir. Mar. 28, 2025) (Henderson, J., concurring), *vacated en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025), *abrogated sub nom.*, *Trump v. Wilcox*, 145 S. Ct. 1415. When the political branches are at loggerheads, assessing the public interest can be an exercise in asking "whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., dissenting). Insofar as we must offer an opinion, the public interest lies with Appellees. To grant the Executive a stay pending appeal in this separation-of-powers standoff would effectively cut the Congress's purse strings. No court would allow a losing party to defy its judgment. No President would allow a usurper to command our armed forces. And no Congress should be made to wait while the Executive intrudes on its plenary power over appropriations and disclosure thereof. The public interest is best served by maintaining the separation-of-powers balance struck by the Constitution and especially so if the challenged statutes keep the citizenry abreast regarding duly appropriated expenditures.

\* \* \*

For the foregoing reasons, the Government's motion for a stay pending appeal is denied and the administrative stay entered on July 23, 2025, is dissolved effective August 15, 2025, to allow the Government sufficient time to restore the database and disclosure materials withheld since March, as required by the Consolidated Appropriations Acts and the district court's order.