# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee,*

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee,*

v.

U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

## JOINT APPENDIX

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

Docket Sheet, *Citizens for Responsibility and Ethics in Washington v. Office of Management and Budget*, No. 1:25-cv-1051 (D.D.C.) ........ JA 1

Docket Sheet, *Protect Democracy Project v. U.S. Office of Management and Budget*, No. 1:25-cv-1111 (D.D.C.) ....................... JA 9

Memorandum Opinon (July 21, 2025),
Dkt. No. 33, No. 1:25-cv-1051
Dkt. No. 34, No. 1:25-cv-1111 .............................................................JA 17

Order (July 21, 2025),
Dkt. No. 32, No. 1:25-cv-1051 .............................................................JA 77

Order (July 21, 2025),
Dkt. No. 33, No. 1:25-cv-1111 .............................................................JA 80

Memorandum Opinon and Order (Jan. 28, 2026),
Dkt. No. 46, No. 1:25-cv-1051
Dkt. No. 48, No. 1:25-cv-1111 .............................................................JA 82


## Additional Docket Entries from No. 1:25-cv-1051

Complaint (Apr. 8, 2025), Dkt. No. 1 ........................................................JA 96

Exhibits Attached to Motion for Preliminary Injunction and Partial Summary Judgment (Apr. 18, 2025), Dkt. Nos. 9-3 to 9-6..............JA 107

Declaration of Kelly Kinneen (Apr. 30, 2025), Dkt. No. 18-1....................JA 131

Notice of Appeal (July 22, 2025), Dkt. No. 34............................................JA 156

Final Judgment (July 25, 2025), Dkt. No. 38..............................................JA 158

Supplemental Declaration of Christina L. Wentworth (Sept. 19, 2025),
Dkt. No. 39-1 ........................................................................................JA 159

Declaration of Kelly Kinneen (Oct. 20, 2025), Dkt. No. 44-1 ....................JA 164


**Additional Docket Entries from No. 1:25-cv-1111**

Complaint (Apr. 14, 2025), Dkt. No. 1 ........................................................JA 170

Exhibits Attached to Motion for Preliminary Injunction or in the
Alternative Partial Summary Judgment (Apr. 27, 2025),
Dkt. Nos. 18-3 to 18-21........................................................................JA 194

Supplemental Declaration of William P. Ford (May 5, 2025),
Dkt. No. 20-1 .......................................................................................JA 424

Notice of Appeal (July 22, 2025), Dkt. No. 35.............................................JA 427

Final Judgment (July 28, 2025), Dkt. No. 39...............................................JA 429

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–01051–EGS

CITIZENS FOR RESPONSIBILITY AND ETHICS IN
WASHINGTON v. OFFICE OF MANAGEMENT AND
BUDGET et al
Assigned to: Judge Emmet G. Sullivan
Related Case:  1:25–cv–01111–EGS
Case in other court:  USCA, 25–05266
Cause: 05:702 Administrative Procedure Act

Date Filed: 04/08/2025
Date Terminated: 07/28/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of
Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON**

represented by **Adina H. Rosenbaum**
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588–1000
Fax: (202) 588–7795
Email: arosenbaum@citizen.org
*ATTORNEY TO BE NOTICED*

**Allison Marcy Zieve**
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588–1000
Fax: (202) 588–7795
Email: azieve@citizen.org
*ATTORNEY TO BE NOTICED*

**Nikhel Sus**
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
1331 F St NW
Suite 900
Washington, DC 20004
(202) 408–5565
Fax: (202) 588–5020
Email: nsus@citizensforethics.org
*ATTORNEY TO BE NOTICED*

**Yoseph T. Desta**
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
PO Box 14596
Washington, DC 20044
415–416–7967
Email: ydesta@citizensforethics.org
*ATTORNEY TO BE NOTICED*

**Wendy Liu**
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202–588–1000
Email: wliu@citizen.org
*ATTORNEY TO BE NOTICED*

V.

**JA 1**

**Defendant**

**OFFICE OF MANAGEMENT AND BUDGET**   represented by   **Carmen M. Banerjee**
U.S. DEPARTMENT OF JUSTICE
Tax Division – Civil Trial Section
555 Fourth Street, NW
555 Fourth Street, NW
Suite 6810
Washington, DC 20001
202–353–3850
Email: carmen.m.banerjee@usdoj.gov
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidy L Gonzalez**
DOJ–Civ
1100 L St., N.W.
Ste #3528
Washington, DC 20005
202–598–7409
Email: heidy.gonzalez@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Kenneth Velchik**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
202–860–8388
Email: michael.velchik@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL T. VOUGHT**   represented by   **Carmen M. Banerjee**
*in his official capacity as Director, Office*          (See above for address)
*of Management and Budget*                              *TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidy L Gonzalez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Kenneth Velchik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/08/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11597329) filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Attachments: # 1 Civil Cover Sheet, # 2 Summons AG, # 3 Summons OMB, # 4 Summons USAO, # 5 Summons Vought)(Liu, Wendy) (Entered: 04/08/2025) |
| 04/08/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON (Liu, Wendy) (Entered: 04/08/2025) |
| 04/08/2025 | 3 | NOTICE of Appearance by Nikhel Sus on behalf of CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON (Sus, Nikhel) (Main Document 3 replaced on 4/8/2025) |

**JA 2**

| | | |
|---|---|---|
| | | (znmw). (Entered: 04/08/2025) |
| 04/08/2025 | | Case Assigned to Judge Emmet G. Sullivan. (znmw) (Entered: 04/08/2025) |
| 04/08/2025 | 4 | SUMMONS (4) Issued Electronically as to OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 04/08/2025) |
| 04/15/2025 | 5 | STANDING ORDER: The parties are directed to read the attached Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan in its entirety upon receipt. The parties are hereby ORDERED to comply with the directives in the attached Standing Order. Signed by Judge Emmet G. Sullivan on 04/15/25. (Attachment: # 1 Exhibit 1) (mac) (Entered: 04/15/2025) |
| 04/15/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Yoseph T. Desta, Filing fee $ 100, receipt number ADCDC–11617062. Fee Status: Fee Paid. by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Sus, Nikhel) (Entered: 04/15/2025) |
| 04/15/2025 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Emmet G. Sullivan on 4/15/2025. (lcegs1) (Entered: 04/15/2025) |
| 04/18/2025 | 7 | NOTICE of Appearance by Yoseph T. Desta on behalf of All Plaintiffs (Desta, Yoseph) (Entered: 04/18/2025) |
| 04/18/2025 | 8 | NOTICE of Appearance by Carmen M. Banerjee on behalf of All Defendants (Banerjee, Carmen) (Entered: 04/18/2025) |
| 04/18/2025 | 9 | MOTION for Preliminary Injunction *and Partial Summary Judgment* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts as to Which There is No Genuine Issue, # 3 Declaration of Christina L. Wentworth, # 4 Declaration of Samuel Bagenstos, # 5 Declaration of Joseph Carlile, # 6 Declaration of Kenneth Schwartz, # 7 Text of Proposed Order, # 8 Certificate of Service)(Liu, Wendy). Added MOTION for Partial Summary Judgment on 5/1/2025 (mg). (Entered: 04/18/2025) |
| 04/21/2025 | | MINUTE ORDER. Plaintiff is ORDERED TO SHOW CAUSE, by no later than 5:00 pm on April 21, 2025 why Protect Democracy Project, 25–1111 should not be consolidated with this case. Defendant shall respond to the OTSC by no later than 5:00 pm on April 22, 2025, and Plaintiff shall reply by no later than 5:00 pm on April 23, 2025. Signed by Judge Emmet G. Sullivan on 4/21/2025. (lcegs1) (Entered: 04/21/2025) |
| 04/21/2025 | | Set/Reset Deadlines/Hearings: Plaintiff's Show Cause due by 4/21/2025. Defendant's Response to Show Cause due by 4/22/2025. Plaintiff's Reply to Show Cause due by 4/23/2025. Defendant's Response due by 4/30/2025. Plaintiff's Reply due by 5/5/2025. Motion Hearing set for 5/9/2025 at 1:00 PM in Courtroom 24A– In Person before Judge Emmet G. Sullivan. (zalh) (Entered: 04/21/2025) |
| 04/21/2025 | 10 | RESPONSE TO ORDER TO SHOW CAUSE re 4/21/2025 MINUTE ORDER filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Liu, Wendy) Modified on 4/23/2025 to add link (mg). (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER. In view of 9 Motion for Preliminary Injunction and Partial Summary Judgment, the following deadlines shall govern this matter: (1) Defendant shall file its response by no later than April 30, 2025; (2) Plaintiff shall file its reply by no later than 9:00 am on May 5, 2025; and (3) a Hearing shall take place at 1:00 pm on May 9, 2025 in Courtroom 24A. Signed by Judge Emmet G. Sullivan on 04/21/25. (mac) (Entered: 04/23/2025) |
| 04/22/2025 | 11 | RESPONSE TO ORDER TO SHOW CAUSE re 4/21/2025 MINUTE ORDER filed by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Banerjee, Carmen) Modified event and added link on 4/23/2025 (mg). (Entered: 04/22/2025) |
| 04/23/2025 | 12 | REPLY re 11 *to Defendants' Response to Order to Show Cause* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Liu, Wendy) Modified on |

**JA 3**

| | | |
|---|---|---|
| | | 4/24/2025 to add link (mg). (Entered: 04/23/2025) |
| 04/24/2025 | | MINUTE ORDER. In view of 10 , 11 and 12 responses to order to show cause, as well as the responses from parties in Protect Democracy Project v. OMB, 25–cv–1111, the Court will not consolidate the cases as related pursuant to Federal Rule of Civil Procedure 42(a) at this time. It is ORDERED that the parties shall coordinate schedules to the extent possible subsequent to the Courts ruling on currently pending motions. Signed by Judge Emmet G. Sullivan on 4/24/2025. (lcegs1) (Entered: 04/24/2025) |
| 04/25/2025 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/8/2025. Answer due for ALL FEDERAL DEFENDANTS by 6/7/2025. (Liu, Wendy) (Entered: 04/25/2025) |
| 04/25/2025 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/16/2025. (Liu, Wendy) (Entered: 04/25/2025) |
| 04/25/2025 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF MANAGEMENT AND BUDGET served on 4/23/2025 (Liu, Wendy) (Entered: 04/25/2025) |
| 04/25/2025 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RUSSELL T. VOUGHT served on 4/23/2025 (Liu, Wendy) (Entered: 04/25/2025) |
| 04/25/2025 | 17 | NOTICE of Appearance by Heidy L Gonzalez on behalf of All Defendants (Gonzalez, Heidy) (Entered: 04/25/2025) |
| 04/30/2025 | 18 | RESPONSE re 9 MOTION for Preliminary Injunction *and Partial Summary Judgment* filed by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Attachments: # 1 Exhibit Declaration of Kelly Kinneen, # 2 Exhibit Defendants' Counter–Statement of Material Facts, # 3 Text of Proposed Order)(Gonzalez, Heidy) (Entered: 04/30/2025) |
| 05/01/2025 | | MINUTE ORDER directing Defendant to file a Sur–Reply addressing any issues raised for the first time in Plaintiff's forthcoming Reply briefing by no later than 9:00 am on May 6, 2025. There will be no further briefings. Signed by Judge Emmet G. Sullivan on 5/1/2025. (lcegs1) (Entered: 05/01/2025) |
| 05/01/2025 | 19 | NOTICE of Appearance by Allison Marcy Zieve on behalf of All Plaintiffs (Zieve, Allison) (Entered: 05/01/2025) |
| 05/01/2025 | 20 | NOTICE of Appearance by Adina H. Rosenbaum on behalf of CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON (Rosenbaum, Adina) (Entered: 05/01/2025) |
| 05/02/2025 | | Set/Reset Deadlines: Plaintiff Sur–Reply due no later than 9:00AM on 5/6/2025. (mac) (Entered: 05/02/2025) |
| 05/04/2025 | 21 | REPLY to opposition to motion re 9 Motion for Preliminary Injunction,,, Motion for Partial Summary Judgment,, filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Liu, Wendy) (Entered: 05/04/2025) |
| 05/05/2025 | 22 | SURREPLY re 9 to *Plaintiff's Motion for Preliminary Injunction and Partial Summary Judgment* filed by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Gonzalez, Heidy) Modified on 5/6/2025 to add link (mg). (Entered: 05/05/2025) |
| 05/06/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for May 9, 2025 at 1:00PM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833–990–9400, Meeting ID: 712190216. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). **Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 05/06/2025)** |

**JA 4**

| | | |
|---|---|---|
| 05/08/2025 | 23 | NOTICE of Appearance by Michael Kenneth Velchik on behalf of All Defendants (Velchik, Michael) (Entered: 05/08/2025) |
| 05/09/2025 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Motion Hearing held on 5/9/2025 re 9 Motion for Preliminary Injunction and Partial Summary Judgment and Motion for Partial Summary Judgment filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. The Court Had Colloquy With The Parties And Heard Oral Arguments. (Court Reporter SONJA REEVES.) (mac) (Entered: 05/09/2025) |
| 05/13/2025 | 24 | TRANSCRIPT OF MOTION HEARING before Judge Emmet G. Sullivan held on May 9, 2025; Page Numbers: 1–148. Date of Issuance: May 13, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/3/2025. Redacted Transcript Deadline set for 6/13/2025. Release of Transcript Restriction set for 8/11/2025.(Reeves, Sonja) (Entered: 05/13/2025) |
| 05/30/2025 | 25 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Banerjee, Carmen) (Entered: 05/30/2025) |
| 06/02/2025 | | MINUTE ORDER granting 25 Defendants' Unopposed Motion to Extend Deadline to Respond to the Complaint. Defendants shall file their responsive pleading and any identified administrative record by no later than July 9, 2025. Signed by Judge Emmet G. Sullivan on 6/2/2025. (lcegs3) (Entered: 06/02/2025) |
| 06/02/2025 | | Set/Reset Deadlines: Defendants Responsive Pleading And Any Identified Administrative Record due by 7/9/2025. (mac) (Entered: 06/02/2025) |
| 06/02/2025 | | MINUTE ORDER. In view of Plaintiff's request at the oral argument on May 9, 2025 that the Court forego a preliminary injunction analysis and rule on its motion for partial summary judgment, Plaintiff is directed to file, by no later than 5:00 pm on June 4, 2025, supplemental briefing with a revised proposed order. Assuming the Court agrees to consolidate Plaintiff's motion for a preliminary injunction and motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 65(a)(2), Plaintiff's supplemental briefing shall address: (1) why Plaintiff is entitled to the types of relief sought; (2) if plaintiff seeks permanent injunctive relief, whether the court must perform the balancing test for permanent injunctive relief prior to granting a permanent injunction as part of the final judgment on the merits; and (3) if the Court grants partial summary judgment to Plaintiff, how the Court should proceed on entering a final, appealable judgment given that at this time, Plaintiff has remaining claims before the Court. Defendants shall file their response by no later than 5:00 pm on June 6, 2025; and Plaintiff shall file its reply by no later than 9:00 am on June 9, 2025. Signed by Judge Emmet G. Sullivan on 6/2/2025. (lcegs2) (Entered: 06/02/2025) |
| 06/03/2025 | | Set/Reset Deadlines: Plaintiff Supplemental Briefing With A Revised Proposed Order due no later than 5:00PM on 6/4/2025. Defendants Response due no later than 5:00PM on 6/6/2025. Plaintiffs Reply due no later than 9:00AM on 6/9/2025. (mac) (Entered: 06/03/2025) |
| 06/03/2025 | 26 | Joint MOTION for Extension of Time to File *Supplemental Briefing* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Rosenbaum, Adina) (Entered: 06/03/2025) |
| 06/04/2025 | 27 | NOTICE of Proposed Order by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON re 26 Joint MOTION for Extension of Time to File *Supplemental Briefing* |

| | | |
|---|---|---|
| | | (Attachments: # <u>1</u> Text of Proposed Order)(Rosenbaum, Adina) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER granting in part <u>26</u> joint motion for extension of time. The following deadlines shall govern the supplemental briefing in this case: (1) Plaintiff's supplemental brief shall be filed by no later than 12:00 pm on June 9, 2025; (2) Defendants' response shall be filed by no later than 12:00 pm on June 16, 2025; and (3) Plaintiff's reply shall be filed by no later than 12:00 pm on June 18, 2025. Signed by Judge Emmet G. Sullivan on 6/4/2025. (lcegs2) (Entered: 06/04/2025) |
| 06/05/2025 | | Set/Reset Deadlines: Plaintiff's Supplemental Brief due no later than 12:00 pm on 6/9/2025. Defendants' Response due no later than 12:00 pm on 6/16/2025. Plaintiff's Reply due no later than 12:00 pm on 6/18/2025. (mac) (Entered: 06/05/2025) |
| 06/09/2025 | 28 | SUPPLEMENTAL MEMORANDUM to *Respond to June 2, 2025 Minute Order* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Attachments: # <u>1</u> Text of Proposed Order)(Rosenbaum, Adina) (Entered: 06/09/2025) |
| 06/16/2025 | 29 | RESPONSE *to Plaintiff's Supplemental Memorandum* filed by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Gonzalez, Heidy) (Entered: 06/16/2025) |
| 06/18/2025 | 30 | REPLY *to Defendants' Response to Plaintiff's Supplemental Brief* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Rosenbaum, Adina) (Entered: 06/18/2025) |
| 07/03/2025 | 31 | Unopposed MOTION for Extension of Time to File Answer re <u>1</u> Complaint, by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Attachments: # <u>1</u> Text of Proposed Order)(Gonzalez, Heidy) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting <u>31</u> unopposed motion to extend the deadline to respond to the complaint. Defendants shall respond to Plaintiff's complaint within 21 days from the Court's order on Plaintiff's Motion for a Preliminary Injunction and Partial Summary Judgment, ECF No. 9. Signed by Judge Emmet G. Sullivan on 7/3/2025. (lcegs1) (Entered: 07/03/2025) |
| 07/21/2025 | 32 | ORDER denying <u>9</u> Motion for Preliminary Injunction; granting in part and denying in part <u>9</u> Motion for Partial Summary Judgment. Signed by Judge Emmet G. Sullivan on 7/21/2025. (lcegs2) (Entered: 07/21/2025) |
| 07/21/2025 | 33 | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on 7/21/2025. (lcegs2) (Entered: 07/21/2025) |
| 07/22/2025 | 34 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>33</u> Memorandum & Opinion, <u>32</u> Order on Motion for Preliminary Injunction, Order on Motion for Partial Summary Judgment by RUSSELL VOUGHT, OFFICE OF MANAGEMENT AND BUDGET. Fee Status: No Fee Paid. Parties have been notified. (Gonzalez, Heidy) (Entered: 07/22/2025) |
| 07/22/2025 | 35 | MOTION to Stay *Pending Appeal* by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Attachments: # <u>1</u> Text of Proposed Order)(Gonzalez, Heidy) (Entered: 07/22/2025) |
| 07/23/2025 | 36 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re <u>34</u> Notice of Appeal to DC Circuit Court. (znmw) (Entered: 07/23/2025) |
| 07/23/2025 | | USCA Case Number 25–5266 for <u>34</u> Notice of Appeal to DC Circuit Court, filed by RUSSELL VOUGHT, OFFICE OF MANAGEMENT AND BUDGET. (mg) (Entered: 07/23/2025) |
| 07/23/2025 | 37 | Memorandum in opposition to re <u>35</u> MOTION to Stay *Pending Appeal* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Rosenbaum, Adina) (Entered: 07/23/2025) |
| 07/23/2025 | | MINUTE ORDER. Upon consideration of Defendants' <u>35</u> Motion for a Stay Pending Appeal and Plaintiff's <u>37</u> response thereto, the motion is DENIED. For all of the reasons articulated in the Court's July 21, 2025 Opinion, Defendants' conduct in removing the Public Apportionments Database unequivocally violates federal law. See Mem. Op., ECF No. 33. The Court's Opinion addressed each of the Defendants' arguments reiterated in the |

| | | Motion to Stay, concluding that the public disclosure requirement of the 2022 and 2023 Acts does not infringe upon Executive power nor does it "impede the Presidents constitutional authority over the implementation of appropriations[.]" Defs.' Mot., ECF No. 35 at 4. The Court further denies Defendants' requests to extend the administrative stay or stay the statutory time requirement of publishing apportionment decisions within two days of their approval. As to the first, CREW states that Defendants have already requested such relief from the Court of Appeals. As to the second, this is the first time Defendants have made the request–despite multiple rounds of briefing–and provide no points and authorities in support of it. The Court will not be complicit in further delaying Plaintiff and the public of information they are entitled to know as a matter of federal law!! Signed by Judge Emmet G. Sullivan on 7/23/2025. (lcegs2) (Entered: 07/23/2025) |
|---|---|---|
| 07/25/2025 | 38 | FINAL JUDGMENT in favor of Plaintiff against Defendants. Signed by Judge Emmet G. Sullivan on 07/25/25. (mac) (Entered: 07/28/2025) |
| 07/28/2025 | | CLERK'S JUDGMENT in favor of Plaintiff against Defendants. Signed by Judge Emmet G. Sullivan on 07/28/25. (mac) (Entered: 07/28/2025) |
| 09/19/2025 | 39 | MOTION to Enforce *Court's July 21, 2025, Order* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Rosenbaum, Adina) (Entered: 09/19/2025) |
| 09/29/2025 | 40 | NOTICE OF WITHDRAWAL OF APPEARANCE as to OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. Attorney Carmen M. Banerjee terminated. (Banerjee, Carmen) (Entered: 09/29/2025) |
| 10/14/2025 | 41 | MOTION to Lift Stay *and for a Briefing Schedule* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Attachments: # 1 Text of Proposed Order)(Rosenbaum, Adina) (Entered: 10/14/2025) |
| 10/14/2025 | 42 | RESPONSE re 41 MOTION to Lift Stay *and for a Briefing Schedule* filed by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Gonzalez, Heidy) (Entered: 10/14/2025) |
| 10/14/2025 | 43 | REPLY to opposition to motion re 41 Motion to Lift Stay *and for a Briefing Schedule* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Rosenbaum, Adina) (Entered: 10/14/2025) |
| 10/15/2025 | | MINUTE ORDER granting 41 Motion for Relief from the District Court's October 1 Standing Order ("Mot. For Relief"). On September 19, 2025, Plaintiff filed a Motion to Enforce the Court's July 21, 2025 Injunction. See Motion to Enforce, ECF No. 41. Pursuant to the local rules of the court, defendant's brief in opposition was due on October 3, 2025, but was not filed. See generally Docket for Civil Action No. 25–1051. On October 14, 2025, Plaintiff filed the instant motion seeking relief from the Standing Order extending deadlines and staying matters in civil cases involving the federal government, subject to certain exceptions, due to the current government shutdown. See In re: Stay of Civil Proceedings Involving the United States in Light of Lapse of Appropriations, Standing Order No. 25–55 (Oct. 1, 2025) (Boasberg, C.J.). The Standing Order applies to Plaintiff's Motion to Enforce since Plaintiff's motion is neither a motion for temporary restraining order nor preliminary injunction. See id. at 2. The government contends that the only exceptions to the general prohibition on the ability of Executive Branch employees to work during a lapse in appropriations are "emergencies involving the safety of human life or the protection of property." Opp'n, ECF No. 42 at 1 (quoting 31 U.S.C. § 1342). However, Plaintiff points out that the Department of Justice's own Contingency Plan provides that there are five categories of work that Executive Branch employees may perform during a lapse in appropriations. Reply, ECF No. 45 at 2 (citing U.S. Department of Justice FY 2026 Contingency Plan ("DOJ Contingency Plan") at 1 (Sept. 29, 2025), https://www.justice.gov/jmd/media/1377216/dl; see also OMB, Frequently Asked Questions During a Lapse in Appropriations at 14 (Oct. 3, 2025), https://www.whitehouse.gov/wpcontent/ uploads/2025/09/Frequently–Asked–Questions–During–a–Lapse–in–Appropriations.pdf.). Relevant here, Executive Branch employees may perform activities "for which there is an express authority to continue during an appropriations lapse." DOJ Contingency Plan at 1. The Contingency Plan explains that "[i]f a court... orders a case to continue, the Government will comply with the court's order, which would constitute express legal authorization for the activity to continue." Id. at 3. Accordingly, the Court lifts the stay imposed by the Standing Order and orders briefing on the Motion to Enforce the Court's |

| | | |
|---|---|---|
| | | July 21, 2025 Injunction. See, e.g., United States v. Google LLC, No. 1:20–cv–3010, Oct. 2, 2025 Minute Order (D.D.C.); Rhode Island Coal. Against Domestic Violence v. Kennedy, No. 1:25–cv–0342, Oct. 1, 2025 Text Order (D.R.I.); Camp Lejeune Water Litigation v. United States, No. 7:23–cv– 0897, 2025 WL 2827029, ECF No. 644 (E.D.N.C. Oct. 6, 2025); United States v. Live Nation Entertainment, Inc., No. 1:24–cv–03973, ECF No. 652 (S.D.N.Y. Oct. 1, 2025); Am. Fed'n of Gov't Emps. v. Trump, No. 3:25–cv–3698, ECF No. 276 (N.D. Ca. Oct. 3, 2025); Planned Parenthood Fed'n of Am., Inc. v. Kennedy, Nos. 25–1698, 25–1755, Doc. 00118347754 (1st Cir. Oct. 2, 2025); Natl TPS Alliance v. Noem, No. 25–5724, Doc. 29.1 (9th Cir. Oct. 2, 2025). The government shall file its Opposition brief to Plaintiff's Motion to Enforce by no later than October 20, 2025; and Plaintiff shall file its Reply brief by no later than October 27, 2025. Signed by Judge Emmet G. Sullivan on 10/15/2025. (lcegs1) (Entered: 10/15/2025) |
| 10/15/2025 | | Set/Reset Deadlines: Government Opposition Brief To Plaintiff's Motion To Enforce due by 10/20/2025. Plaintiff Reply Brief due no later than 10/27/2025. (mac) (Entered: 10/15/2025) |
| 10/20/2025 | 44 | RESPONSE re 39 MOTION to Enforce *Court's July 21, 2025, Order* filed by OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Attachments: # 1 Affidavit Supplemental Kelly Kinneen)(Gonzalez, Heidy) (Entered: 10/20/2025) |
| 10/27/2025 | 45 | REPLY to opposition to motion re 39 Motion to Enforce filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON. (Rosenbaum, Adina) (Entered: 10/27/2025) |
| 01/28/2026 | 46 | ORDER granting 39 Motion to Enforce. Signed by Judge Emmet G. Sullivan on 1/28/2026. (lcegs1) (Entered: 01/28/2026) |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–01111–EGS

PROTECT DEMOCRACY PROJECT v. U.S. OFFICE OF
MANAGEMENT AND BUDGET et al
Assigned to: Judge Emmet G. Sullivan
Related Case: 1:25–cv–01051–EGS
Case in other court: USCA, 25–05267
Cause: 05:702 Administrative Procedure Act

Date Filed: 04/14/2025
Date Terminated: 07/28/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **PROTECT DEMOCRACY PROJECT** | represented by | **Kyla Marie Snow**<br>JACOBSON LAWYERS GROUP<br>1629 K Street NW, Suite 300<br>Washington, DC 20006<br>301–823–1148<br>Email: kyla@jacobsonlawyersgroup.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Daniel F. Jacobson**<br>JACOBSON LAWYERS GROUP PLLC<br>5100 Wisconsin Ave. NW<br>Suite 301<br>Washington, DC 20016<br>301–823–1148<br>Email: dan@jacobsonlawyersgroup.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **U.S. OFFICE OF MANAGEMENT AND BUDGET** | represented by | **Carmen M. Banerjee**<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division<br>1100 L Street, NW<br>Washington, DC 20005<br>202–514–3183<br>Email: carmen.m.banerjee@usdoj.gov<br>*TERMINATED: 09/29/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Heidy L Gonzalez**<br>DOJ–Civ<br>1100 L St., N.W.<br>Ste #3528<br>Washington, DC 20005<br>202–598–7409<br>Email: heidy.gonzalez@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Kenneth Velchik**<br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br>202–860–8388<br>Email: michael.velchik@usdoj.gov |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL T. VOUGHT**
*Director of the U.S. Office of*
*Management and Budget*

represented by **Carmen M. Banerjee**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidy L Gonzalez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Kenneth Velchik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/14/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11612244) filed by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Russell T. Vought, # 3 Summons U.S. Office of Management and Budget)(Jacobson, Daniel) (Entered: 04/14/2025) |
| 04/14/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PROTECT DEMOCRACY PROJECT (Jacobson, Daniel) (Entered: 04/14/2025) |
| 04/14/2025 | 3 | NOTICE OF RELATED CASE by PROTECT DEMOCRACY PROJECT. Case related to Case No. 1:25−cv−1051. (Jacobson, Daniel) (Entered: 04/14/2025) |
| 04/14/2025 | 4 | REQUEST FOR SUMMONS TO ISSUE filed by PROTECT DEMOCRACY PROJECT. Related document: 1 Complaint, filed by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Summons Attorney General)(Jacobson, Daniel) (Entered: 04/14/2025) |
| 04/15/2025 | | Case Assigned to Judge Emmet G. Sullivan. (znmw) (Entered: 04/15/2025) |
| 04/15/2025 | 5 | SUMMONS (4) Issued Electronically as to U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 04/15/2025) |
| 04/15/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Kyla M. Snow, Filing fee $ 100, receipt number ADCDC−11616990. Fee Status: Fee Paid. by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of good standing, # 3 Text of Proposed Order)(Jacobson, Daniel) (Entered: 04/15/2025) |
| 04/15/2025 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Emmet G. Sullivan on 4/15/2025. (lcegs1) (Entered: 04/15/2025) |
| 04/15/2025 | 7 | NOTICE of Appearance by Kyla Marie Snow on behalf of PROTECT DEMOCRACY PROJECT (Snow, Kyla) (Entered: 04/15/2025) |
| 04/16/2025 | 8 | STANDING ORDER: The parties are directed to read the attached Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan in its entirety upon receipt. The parties are hereby ORDERED to comply with the directives in the attached Standing Order. Signed by Judge Emmet G. Sullivan on 04/16/25. (Attachment: # 1 Exhibit 1) (mac) (Entered: 04/16/2025) |
| 04/21/2025 | | MINUTE ORDER. In view of 3 Notice of Related Case, Plaintiff is ORDERED to serve Defendant FORTHWITH. Plaintiff is FURTHER ORDERED TO SHOW CAUSE, by no later than 5:00 pm on April 21, 2025, why this case should not be consolidated with CREW |

**JA 10**

| | | |
|---|---|---|
| | | v. OMB, 25–1051. Defendant shall respond to the OTSC within 24 hours of being served, and Plaintiff shall reply within 24 hours of the response. Signed by Judge Emmet G. Sullivan on 4/21/2025. (lcegs1) (Entered: 04/21/2025) |
| 04/21/2025 | | Set/Reset Deadlines: Plaintiff's Response to Show Cause due by 4/21/2025. (zalh) (Entered: 04/21/2025) |
| 04/21/2025 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/21/2025. Answer due for ALL FEDERAL DEFENDANTS by 6/20/2025. by PROTECT DEMOCRACY PROJECT (Attachments: # 1 Exhibit 1 – USPS Delivery Confirmation)(Jacobson, Daniel) Modified event on 4/23/2025 (mg). (Entered: 04/21/2025) |
| 04/21/2025 | 10 | RESPONSE TO ORDER TO SHOW CAUSE re Order, filed by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Exhibit 1 – USPS Delivery Confirmation)(Jacobson, Daniel) (Entered: 04/21/2025) |
| 04/21/2025 | 11 | NOTICE of Appearance by Carmen M. Banerjee on behalf of All Defendants (Banerjee, Carmen) (Entered: 04/21/2025) |
| 04/22/2025 | 12 | RESPONSE re 10 filed by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Banerjee, Carmen) Modified on 4/23/2025 to add link (mg). (Entered: 04/22/2025) |
| 04/22/2025 | 13 | WITHDRAWN PURSUANT TO NOTICE FILED 4/27/2025.....MOTION for Summary Judgment *(Expedited), or in the Alternative a Preliminary Injunction or a Writ of Mandamus* by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration Jacobson Decl., # 4 Exhibit 1 – Ford Decl., # 5 Exhibit 2 – Carlile Decl., # 6 Exhibit 3 – Bagenstos Decl., # 7 Exhibit 4 – OMB Circular A–11, # 8 Exhibit 5 – Project 2025, pp 43–45, # 9 Exhibit 6 – GAO, B=331564, # 10 Exhibit 7 – DeLauro Division by Division Summary, # 11 Exhibit 8 – Protect Democracy Press Release, # 12 Exhibit 9 – Using OMB's Apportionment Website, # 13 Exhibit 10 – The Power of the Purse, # 14 Exhibit 11 – OpenOMB homepage, # 15 Exhibit 12 – Ford et al., # 16 Exhibit 13 – Agenda47, # 17 Exhibit 14 – Vought hearing transcript excerpt, # 18 Exhibit 15 – Krawzak, # 19 Exhibit 16 – Vought Letter, # 20 Exhibit 17 – DeLauro & Murray, # 21 Exhibit 18 – GAO Letter to OMB, # 22 Text of Proposed Order)(Jacobson, Daniel). Added MOTION for Preliminary Injunction, MOTION for Writ of Mandamus on 4/23/2025 (mg). Modified on 4/28/2025 (mg). (Entered: 04/22/2025) |
| 04/23/2025 | 14 | REPLY re 12 *to Defendants' Response to Order to Show Cause* filed by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) Modified on 4/23/2025 to add link (mg). (Entered: 04/23/2025) |
| 04/23/2025 | | MINUTE ORDER. In view of 13 Motion for Summary Judgment (Expedited), or in the Alternative a Preliminary Injunction or a Writ of Mandamus, the following deadlines shall govern this matter: (1) Defendant shall file its response by no later than May 14, 2025; and (2) Plaintiff shall file its reply by no later than May 21, 2025. Signed by Judge Emmet G. Sullivan on 4/23/2025. (lcegs1) (Entered: 04/23/2025) |
| 04/24/2025 | | Set/Reset Deadlines: Defendant Response due by 5/14/2025. Plaintiff Reply due by 5/21/2025. (mac) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER. In view of 10 , 12 and 14 responses to order to show cause, as well as the responses from parties in CREW v. OMB, 25–cv–1051, the Court will not consolidate the cases as related pursuant to Federal Rule of Civil Procedure 42(a) at this time. It is ORDERED that the parties shall coordinate schedules to the extent possible subsequent to the Court's ruling on currently pending motions. Signed by Judge Emmet G. Sullivan on 4/24/2025. (lcegs1) (Entered: 04/24/2025) |
| 04/25/2025 | 15 | NOTICE of Appearance by Heidy L Gonzalez on behalf of All Defendants (Gonzalez, Heidy) (Entered: 04/25/2025) |
| 04/25/2025 | 16 | Unopposed MOTION for Scheduling Order *to Coordinate Preliminary Injunction Proceedings* by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) (Entered: 04/25/2025) |
| 04/26/2025 | | MINUTE ORDER granting 16 Protect Democracy Project's Unopposed Motion to Coordinate Preliminary Injunction Proceedings. The following deadlines shall govern this |

**JA 11**

| | | |
|---|---|---|
| | | matter: (1) Plaintiff shall withdraw its pending Motion for Summary Judgment, or in the Alternative a Preliminary Injunction or Writ of Mandamus, and within 24 hours of the posting of this Minute Order will file a new motion seeking relief that is identical to the pending motion in CREW v. OMB, 25–1051. Protect Democracy will not seek other forms of expedited relief in the district court until full resolution, including any appeals, of the forthcoming motion; (2) Defendant shall file its response by no later than May 2, 2025; and (3) Plaintiff shall file its reply by no later than May 5, 2025 at 9:00 am. The parties shall appear for a hearing on May 9, 2025 at 1:00 pm in Courtroom 24A. Counsel is reminded of the obligation to include a proposed order with each motion. See LCvR 7(c) ("Each motion and opposition shall be accompanied by a proposed order."). The scheduling order entered April 23, 2025 is HEREBY VACATED. Signed by Judge Emmet G. Sullivan on 4/26/2025. (lcegs1) (Entered: 04/26/2025) |
| 04/27/2025 | 17 | NOTICE OF WITHDRAWAL OF MOTION by PROTECT DEMOCRACY PROJECT re 13 MOTION for Summary Judgment *(Expedited), or in the Alternative a Preliminary Injunction or a Writ of Mandamus* MOTION for Preliminary Injunction MOTION for Writ of Mandamus (Jacobson, Daniel) (Entered: 04/27/2025) |
| 04/27/2025 | 18 | MOTION for Preliminary Injunction *or in the Alternative Partial Summary Judgment* by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration Jacobson Decl., # 4 Exhibit 1 – Ford Decl., # 5 Exhibit 2 – Carlile Decl., # 6 Exhibit 3 – Bagenstos Decl., # 7 Exhibit 4 – OMB Circular A–11, # 8 Exhibit 5 – Project 2025, pp 43–45, # 9 Exhibit 6 – GAO, B–331564, # 10 Exhibit 7 – DeLauro Division by Division Summary, # 11 Exhibit 8 – Protect Democracy Press Release, # 12 Exhibit 9 – Using OMB's Apportionment Website, # 13 Exhibit 10 – The Power of the Purse, # 14 Exhibit 11 – OpenOMB homepage, # 15 Exhibit 12 – Ford et al., # 16 Exhibit 13 – Agenda47, # 17 Exhibit 14 – Vought hearing transcript excerpt, # 18 Exhibit 15 – Krawzak, # 19 Exhibit 16 – Vought Letter, # 20 Exhibit 17 – DeLauro & Murray, # 21 Exhibit 18 – GAO Letter to OMB, # 22 Text of Proposed Order)(Jacobson, Daniel). Added MOTION for Partial Summary Judgment on 4/28/2025 (mg). (Entered: 04/27/2025) |
| 04/28/2025 | | Set/Reset Deadlines/Hearings: Defendant Response due by 5/2/2025. Plaintiff Reply due no later than 9:00AM on 5/5/2025. Preliminary Injunction Hearing set for 5/9/2025 at 1:00 PM in Courtroom 26A– In Person before Judge Emmet G. Sullivan. (Entered: 04/28/2025) |
| 05/01/2025 | | MINUTE ORDER directing Defendant to file a Sur–Reply addressing any issues raised for the first time in Plaintiff's forthcoming Reply briefing by no later than 9:00 am on May 6, 2025. There will be no further briefings. Signed by Judge Emmet G. Sullivan on 5/1/2025. (lcegs1) (Entered: 05/01/2025) |
| 05/02/2025 | | Set/Reset Deadlines: Plaintiff Sur–Reply due no later than 9:00AM on 5/6/2025. (mac) (Entered: 05/02/2025) |
| 05/02/2025 | 19 | RESPONSE re 18 MOTION for Preliminary Injunction *or in the Alternative Partial Summary Judgment* MOTION for Partial Summary Judgment filed by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Attachments: # 1 Exhibit Kinneen Declaration, # 2 Exhibit Defendants' Counter–Statement, # 3 Text of Proposed Order)(Gonzalez, Heidy) (Entered: 05/02/2025) |
| 05/05/2025 | 20 | REPLY to opposition to motion re 18 Motion for Preliminary Injunction,,,,, Motion for Partial Summary Judgment,,,, filed by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Exhibit A – Supplemental Ford Declaration)(Jacobson, Daniel) (Entered: 05/05/2025) |
| 05/05/2025 | | Set/Reset Hearings: Preliminary Injunction Hearing set for 5/9/2025 at 01:00 PM in Courtroom 24A– In Person before Judge Emmet G. Sullivan. (mac) (Entered: 05/05/2025) |
| 05/05/2025 | 21 | SURREPLY re 18 to *Plaintiff's Motion for Preliminary Injunction or in the Alternative Partial Summary Judgment* filed by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Gonzalez, Heidy) Modified on 5/6/2025 to add link (mg). (Entered: 05/05/2025) |
| 05/06/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for May 9, 2025 at 1:00PM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833–990–9400, Meeting ID: 712190216. Any use of the public access telephone line requires adherence to the general prohibition against |

| | | |
|---|---|---|
| | | photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). **Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 05/06/2025)** |
| 05/08/2025 | 22 | NOTICE of Appearance by Michael Kenneth Velchik on behalf of All Defendants (Velchik, Michael) (Entered: 05/08/2025) |
| 05/09/2025 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Motion Hearing held on 5/9/2025 re 18 Motion for Preliminary Injunction or in the Alternative Partial Summary Judgment and Motion for Partial Summary Judgment filed by PROTECT DEMOCRACY PROJECT. The Court Had Colloquy With The Parties And Heard Oral Arguments. (Court Reporter SONJA REEVES.) (mac) (Entered: 05/09/2025) |
| 05/13/2025 | 23 | TRANSCRIPT OF MOTION HEARING before Judge Emmet G. Sullivan held on May 9, 2025; Page Numbers: 1–148. Date of Issuance: May 13, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS:</span>** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/3/2025. Redacted Transcript Deadline set for 6/13/2025. Release of Transcript Restriction set for 8/11/2025.(Reeves, Sonja) (Entered: 05/13/2025) |
| 06/02/2025 | | MINUTE ORDER. In view of Plaintiff's request at the oral argument on May 9, 2025 that the Court forego a preliminary injunction analysis and rule on its motion for partial summary judgment, Plaintiff is directed to file, by no later than 5:00 pm on June 4, 2025, supplemental briefing with a revised proposed order. Assuming the Court agrees to consolidate Plaintiff's motion for a preliminary injunction and motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 65(a)(2), Plaintiff's supplemental briefing shall address: (1) why Plaintiff is entitled to the types of relief sought; (2) if plaintiff seeks permanent injunctive relief, whether the court must perform the balancing test for permanent injunctive relief prior to granting a permanent injunction as part of the final judgment on the merits; and (3) if the Court grants partial summary judgment to Plaintiff, how the Court should proceed on entering a final, appealable judgment given that at this time, Plaintiff has remaining claims before the Court. Defendants shall file their response by no later than 5:00 pm on June 6, 2025; and Plaintiff shall file its reply by no later than 9:00 am on June 9, 2025. Signed by Judge Emmet G. Sullivan on 6/2/2025. (lcegs2) (Entered: 06/02/2025) |
| 06/03/2025 | | Set/Reset Deadlines: Plaintiff Supplemental Briefing With A Revised Proposed Order due no later than 5:00PM on 6/4/2025. Defendants Response due no later than 5:00PM on 6/6/2025. Plaintiffs Reply due no later than 9:00AM on 6/9/2025. (mac) (Entered: 06/03/2025) |
| 06/03/2025 | 24 | Joint MOTION for Extension of Time to *File Supplemental Briefing* by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) (Entered: 06/03/2025) |
| 06/04/2025 | 25 | NOTICE of Proposed Order by PROTECT DEMOCRACY PROJECT re 24 Joint MOTION for Extension of Time to *File Supplemental Briefing* (Attachments: # 1 Text of Proposed Order)(Jacobson, Daniel) (Entered: 06/04/2025) |
| 06/04/2025 | 26 | WITHDRAWN PURSUANT TO NOTICE FILED 6/5/2025.....SUPPLEMENTAL MEMORANDUM to *Respond to June 2, 2025 Minute Order* filed by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Text of Proposed Order)(Jacobson, Daniel) Modified on 6/9/2025 (mg). (Entered: 06/04/2025) |

| | | |
|---|---|---|
| 06/04/2025 | | MINUTE ORDER granting in part 24 joint motion for extension of time. The following deadlines shall govern the supplemental briefing in this case: (1) Plaintiff's supplemental brief shall be filed by no later than 12:00 pm on June 9, 2025; (2) Defendants' response shall be filed by no later than 12:00 pm on June 16, 2025; and (3) Plaintiff's reply shall be filed by no later than 12:00 pm on June 18, 2025. Signed by Judge Emmet G. Sullivan on 6/4/2025. (lcegs3) (Entered: 06/04/2025) |
| 06/05/2025 | 27 | NOTICE *of Withdrawal* by PROTECT DEMOCRACY PROJECT re 26 Supplemental Memorandum (Snow, Kyla) (Entered: 06/05/2025) |
| 06/05/2025 | | Set/Reset Deadlines: Plaintiff's Supplemental Brief due no later than 12:00 pm on 6/9/2025. Defendants' Response due no later than 12:00 pm on 6/16/2025. Plaintiff's Reply due no later than 12:00 pm on 6/18/2025. (mac) (Entered: 06/05/2025) |
| 06/09/2025 | | NOTICE OF ERROR regarding 27 Notice (Other). Please note for future filing: signature on document must match PACER login. (mg) (Entered: 06/09/2025) |
| 06/09/2025 | 28 | SUPPLEMENTAL MEMORANDUM to *Respond to June 2, 2025 Minute Order* filed by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Text of Proposed Order)(Jacobson, Daniel) (Entered: 06/09/2025) |
| 06/16/2025 | 29 | RESPONSE re 28 Supplemental Memorandum, filed by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Gonzalez, Heidy) Modified on 6/18/2025 to add link (mg). (Entered: 06/16/2025) |
| 06/16/2025 | 30 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Banerjee, Carmen) (Entered: 06/16/2025) |
| 06/17/2025 | | MINUTE ORDER granting 30 Defendants' Unopposed Motion for Extension of Time. Defendants are directed to answer or otherwise respond to the complaint by no later than July 21, 2025. Signed by Judge Emmet G. Sullivan on 6/17/2025. (lcegs2) (Entered: 06/17/2025) |
| 06/17/2025 | | Set/Reset Deadlines: Defendant Answer Or Otherwise Response To The Complaint due by 7/21/2025. (mac) (Entered: 06/17/2025) |
| 06/18/2025 | 31 | REPLY re 28 Supplemental Memorandum, filed by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) Modified on 6/18/2025 to add link (mg). (Entered: 06/18/2025) |
| 07/18/2025 | 32 | Unopposed MOTION for Extension of Time to File Answer by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Banerjee, Carmen) (Entered: 07/18/2025) |
| 07/18/2025 | | MINUTE ORDER granting 32 unopposed motion for extension of time. Defendants shall respond to Plaintiff's Complaint within 21 days from the Court's order on Plaintiff's Motion for a Preliminary Injunction or in the Alternative Partial Summary Judgment, ECF No. 18. Signed by Judge Emmet G. Sullivan on 7/18/2025. (lcegs1) (Entered: 07/18/2025) |
| 07/21/2025 | 33 | ORDER denying 18 Motion for Preliminary Injunction; granting 18 Motion for Partial Summary Judgment. Signed by Judge Emmet G. Sullivan on 7/21/2025. (lcegs2) (Entered: 07/21/2025) |
| 07/21/2025 | 34 | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on 7/21/2025. (lcegs2) (Entered: 07/21/2025) |
| 07/22/2025 | 35 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 34 Memorandum & Opinion, 33 Order on Motion for Preliminary Injunction, Order on Motion for Partial Summary Judgment by RUSSELL VOUGHT, U.S. OFFICE OF MANAGEMENT AND BUDGET. Fee Status: No Fee Paid. Parties have been notified. (Gonzalez, Heidy) (Entered: 07/22/2025) |
| 07/22/2025 | 36 | MOTION to Stay *Pending Appeal* by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Gonzalez, Heidy) (Entered: 07/22/2025) |
| 07/23/2025 | 37 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 35 Notice of Appeal to DC Circuit Court. |

**JA 14**

| | | |
|---|---|---|
| | | (znmw) (Entered: 07/23/2025) |
| 07/23/2025 | | USCA Case Number 25–5267 for 35 Notice of Appeal to DC Circuit Court, filed by RUSSELL VOUGHT, U.S. OFFICE OF MANAGEMENT AND BUDGET. (mg) (Entered: 07/23/2025) |
| 07/23/2025 | 38 | RESPONSE re 36 MOTION to Stay *Pending Appeal* filed by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) (Entered: 07/23/2025) |
| 07/23/2025 | | MINUTE ORDER. Upon consideration of Defendants' 36 Motion for a Stay Pending Appeal and Plaintiff's 38 response thereto, the motion is DENIED. For all of the reasons articulated in the Court's July 21, 2025 Opinion, Defendants' conduct in removing the Public Apportionments Database unequivocally violates federal law. See Mem. Op., ECF No. 34. The Court's Opinion addressed each of the Defendants' arguments reiterated in the Motion to Stay, concluding that the public disclosure requirement of the 2022 and 2023 Acts does not infringe upon Executive power nor does it "impede the Presidents constitutional authority over the implementation of appropriations[.]" Defs.' Mot., ECF No. 36 at 4. The Court further denies Defendants' requests to extend the administrative stay or stay the statutory time requirement of publishing apportionment decisions within two days of their approval. As to the first, Protect Democracy states that Defendants have already requested such relief from the Court of Appeals. As to the second, this is the first time Defendants have made the request–despite multiple rounds of briefing–and provide no points and authorities in support of it. The Court will not be complicit in further delaying Plaintiff and the public of information they are entitled to know as a matter of federal law!! Signed by Judge Emmet G. Sullivan on 7/23/2025. (lcegs2) (Entered: 07/23/2025) |
| 07/28/2025 | 39 | FINAL JUDGMENT in favor of Plaintiff against Defendants. Signed by Judge Emmet G. Sullivan on 07/28/25. (mac) (Entered: 07/28/2025) |
| 07/28/2025 | 40 | CLERK'S JUDGMENT in favor of Plaintiff against Defendants on 07/28/25. (mac) (Entered: 07/28/2025) |
| 09/19/2025 | 41 | MOTION to Enforce by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Jacobson, Daniel) (Entered: 09/19/2025) |
| 09/29/2025 | 42 | NOTICE OF WITHDRAWAL OF APPEARANCE as to U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. Attorney Carmen M. Banerjee terminated. (Banerjee, Carmen) (Entered: 09/29/2025) |
| 10/06/2025 | 43 | MOTION Relief from the District Court's October 1 Standing Order by PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Text of Proposed Order)(Jacobson, Daniel) (Entered: 10/06/2025) |
| 10/07/2025 | 44 | RESPONSE re 43 MOTION Relief from the District Court's October 1 Standing Order filed by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Gonzalez, Heidy) (Entered: 10/07/2025) |
| 10/07/2025 | | MINUTE ORDER directing plaintiff to reply to 44 response by no later than 12:00 pm on 10/8/2025. Signed by Judge Emmet G. Sullivan on 10/7/2025. (lcegs1) (Entered: 10/07/2025) |
| 10/07/2025 | | Set/Reset Deadlines: |Plaintiff Reply To 44 Response due no later than 12:00 pm on 10/8/2025. (mac) (Entered: 10/07/2025) |
| 10/08/2025 | 45 | REPLY to opposition to motion re 43 Motion for Miscellaneous Relief filed by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) (Entered: 10/08/2025) |
| 10/10/2025 | | MINUTE ORDER granting 43 Motion for Relief from the District Court's October 1 Standing Order ("Mot. For Relief"). On September 19, 2025, Plaintiff filed a Motion to Enforce the Court's July 21, 2025 Injunction. See Motion to Enforce, ECF No. 41. Pursuant to the local rules of the court, defendant's brief in opposition was due on October 3, 2025, but was not filed. See generally Docket for Civil Action No. 25–1111. On October 6, 2025, Plaintiff filed the instant motion seeking relief from the Standing Order extending deadlines and staying matters in civil cases involving the federal government, subject to certain exceptions, due to the current government shutdown. See In re: Stay of Civil Proceedings Involving the United States in Light of Lapse of Appropriations, Standing Order No. 25–55 (Oct. 1, 2025) (Boasberg, C.J.). The Standing Order applies to Plaintiff's Motion to Enforce |

**JA 15**

| | | since Plaintiff's motion is neither a motion for temporary restraining order nor preliminary injunction. See id. at 2. The government contends that the only exceptions to the general prohibition on the ability of Executive Branch employees to work during a lapse in appropriations are "emergencies involving the safety of human life or the protection of property." Opp'n, ECF No. 44 at 1 (quoting 31 U.S.C. § 1342). However, Plaintiff points out that the Department of Justice's own Contingency Plan provides that there are five categories of work that Executive Branch employees may perform during a lapse in appropriations. Reply, ECF No. 45 at 2 (citing U.S. Department of Justice FY 2026 Contingency Plan ("DOJ Contingency Plan") at 1 (Sept. 29, 2025), https://www.justice.gov/jmd/media/1377216/dl; see also OMB, Frequently Asked Questions During a Lapse in Appropriations at 14 (Oct. 3, 2025), https://www.whitehouse.gov/wpcontent/ uploads/2025/09/Frequently–Asked–Questions–During–a–Lapse–in–Appropriations.pdf.). Relevant here, Executive Branch employees may perform activities "for which there is an express authority to continue during an appropriations lapse." DOJ Contingency Plan at 1. The Contingency Plan explains that "[i]f a court... orders a case to continue, the Government will comply with the court's order, which would constitute express legal authorization for the activity to continue." Id. at 3. Accordingly, the Court lifts the stay imposed by the Standing Order and orders briefing on the Motion to Enforce the Court's July 21, 2025 Injunction. See, e.g., United States v. Google LLC, No. 1:20–cv–3010, Oct. 2, 2025 Minute Order (D.D.C.); Rhode Island Coal. Against Domestic Violence v. Kennedy, No. 1:25–cv–0342, Oct. 1, 2025 Text Order (D.R.I.); Camp Lejeune Water Litigation v. United States, No. 7:23–cv– 0897, 2025 WL 2827029, ECF No. 644 (E.D.N.C. Oct. 6, 2025); United States v. Live Nation Entertainment, Inc., No. 1:24–cv–03973, ECF No. 652 (S.D.N.Y. Oct. 1, 2025); Am. Fed'n of Gov't Emps. v. Trump, No. 3:25–cv–3698, ECF No. 276 (N.D. Ca. Oct. 3, 2025); Planned Parenthood Fed'n of Am., Inc. v. Kennedy, Nos. 25–1698, 25–1755, Doc. 00118347754 (1st Cir. Oct. 2, 2025); Natl TPS Alliance v. Noem, No. 25–5724, Doc. 29.1 (9th Cir. Oct. 2, 2025). The government shall file its Opposition brief to Plaintiff's Motion to Enforce by no later than October 20, 2025; and Plaintiff shall file its Reply brief by no later than October 27, 2025. Signed by Judge Emmet G. Sullivan on 10/10/2025. (lcegs1) (Entered: 10/10/2025) |
| 10/14/2025 | | Set/Reset Deadlines: Government Opposition Brief To Plaintiff's Motion To Enforce due by 10/20/2025. Plaintiff Reply Brief due by 10/27/2025. (mac) (Entered: 10/14/2025) |
| 10/20/2025 | 46 | RESPONSE re 41 MOTION to Enforce filed by U.S. OFFICE OF MANAGEMENT AND BUDGET, RUSSELL T. VOUGHT. (Attachments: # 1 Affidavit Supplemental Kelly Kinneen)(Gonzalez, Heidy) (Entered: 10/20/2025) |
| 10/27/2025 | 47 | REPLY to opposition to motion re 41 Motion to Enforce filed by PROTECT DEMOCRACY PROJECT. (Jacobson, Daniel) (Entered: 10/27/2025) |
| 01/28/2026 | 48 | ORDER granting 41 Motion to Enforce. Signed by Judge Emmet G. Sullivan on 1/28/2026. (lcegs1) (Entered: 01/28/2026) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br> Plaintiff, <br><br> v. <br><br> OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Civil Action No. 25-1051 (EGS) |
| PROTECT DEMOCRACY PROJECT, <br><br> Plaintiff, <br><br> v. <br><br> U.S. OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Civil Action No. 25-1111 (EGS) |

<u>**MEMORANDUM OPINION**</u>

Under the United States Constitution, it is the job of Congress to decide how American taxpayer dollars are spent, including how many dollars to spend and on what priorities to spend them. Once Congress authorizes funding through an appropriations bill, and the President signs the bill into law, constitutional responsibility shifts to the Executive Branch to allocate the funds according to congressional instructions. The

**JA 17**

decisions about how to allocate funds are called "apportionments," and they are used to ensure that the Executive Branch does not spend more or less than Congress appropriated. Defendants in this lawsuit are the Executive Branch officials responsible for apportioning congressionally approved spending.

To facilitate congressional oversight of the apportionment decisions of the Executive Branch and provide the public with insight into the decisions, in 2022, Congress passed, and the President signed into law, a statute requiring the Executive Branch to publish its apportionment decisions on a publicly available online database within two days of the decision. Thereafter, the Executive Branch created a public database (the "Public Apportionments Database") and complied with this law until late March 2025 when, without notice, it took the database offline. Defendants argue that this public disclosure law is an unconstitutional encroachment on the Executive Branch's decision-making authority. Relying on an extravagant and unsupported theory of presidential power, Defendants claim that their apportionment decisions—which are legally binding and result in the actual spending of public funds—cannot be publicly disclosed because they are not final decisions about how to administer the spending of public funds.

However, the law is clear: Congress has sweeping authority to require public disclosure of how the Executive Branch is

**JA 18**

apportioning the funds appropriated by Congress. Under the law, the decision of the Executive Branch must be made public within two days of the decision. And if Defendants need to make a new decision, that new decision must also be made public within two days. Plaintiffs in this lawsuit monitor these decisions, and they have the right to report on and re-publish this information. As explained in this Memorandum Opinion, there is nothing unconstitutional about Congress requiring the Executive Branch to inform the public of how it is apportioning the public's money. Defendants are therefore required to stop violating the law!

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Protect Democracy Project ("Protect Democracy") filed these lawsuits against Defendants Office of Management and Budget ("OMB") and Director Russell Vought ("Director Vought") (collectively, "Defendants") to challenge Defendants' removal of the Public Apportionments Database. CREW's two-Count Complaint alleges, among other things, that Defendants' actions violate the Administrative Procedure Act ("APA") and the Paperwork Reduction Act ("PRA"). Compl., Civil Action No. 25-1051 ("CREW Compl."), ECF No. 1 ¶¶ 26-34.[1] Protect

---

[1] When citing electronic filings throughout this opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

**JA 19**

Democracy's six-Count Complaint alleges, among other things, that Defendants' actions violate the APA. Compl., Civil Action No. 25-1111 ("Protect Democracy Compl."), ECF No. 1 ¶¶ 44—77.

Pending before the Court are each Plaintiff's Motion for a Preliminary Injunction and/or Partial Summary Judgment.[2] *See* Mot. for Prelim. Inj. & Partial Summ. J. ("CREW Mot."), ECF No. 9 in 25-cv-1051; Mot. for Prelim. Inj. or in the Alternative Partial Summ. J. ("Protect Democracy Mot."), ECF No. 18 in 25-cv-1111. At oral argument, the parties agreed that there are no genuine issues of material fact that would preclude the Court from considering the merits of their claims. CREW Hr'g Tr., ECF No. 24 at 46:11-12, 97:7-22. Accordingly, Plaintiffs requested that the Court forego consideration of their requests for a preliminary injunction and address their requests for partial summary judgment.[3] *Id.* at 46:16-19. Both Plaintiffs represented that if the Court enters partial summary judgment in their favor and issues the requested injunction, there would be no need for

---

[2] CREW seeks partial summary judgment on its APA claim that Defendants' actions are unlawful and contrary to law. Hr'g Tr., ECF No. 24 in 25-cv-1051 (May 9, 2025) ("CREW Hr'g Tr.") at 45:20-25. CREW also seeks summary judgment on its PRA claims. Protect Democracy seeks partial summary judgment on Count One of its Complaint. *Id.* at 44:20-21.
[3] Defendants note that were the Court to address the merits, "we would want to make sure that the Court's order is consistent with the relief requested and does not go beyond the partial motion for summary judgment." CREW Hr'g Tr., ECF No. 24 at 95:6-8.

**JA 20**

the Court to address the remaining claims in their respective Complaints. *Id.* at 116:24-117:6, 120:10-15. The Court agrees that there are no genuine issues of material fact that would preclude ruling on Plaintiffs' motions for partial summary judgment at this juncture. Accordingly, the Court will forego the preliminary injunction analysis and address the merits of Plaintiffs' motions for partial summary judgment.

Upon careful consideration of the motions, responses and replies thereto, the parties' oral arguments, and the entire record herein, the Court **GRANTS IN PART** CREW's Motion for Partial Summary Judgment as to its claims that the Defendants' removal of the Public Apportionments Database violates the 2022 and 2023 Acts and violates the PRA's dissemination of information requirement, and **DENIES IN PART** CREW's Motion for Partial Summary Judgment as to its PRA notice claim. The Court **GRANTS** Protect Democracy's Motion for Partial Summary Judgment on its claim that Defendants' removal of the Public Apportionments Database violates the 2022 and 2023 Acts. The Court **DENIES AS MOOT** Plaintiffs' Motions for a Preliminary Injunction.

## I.   Background

### A. Overview of Apportionment Process

The Appropriations Clause of the United States Constitution grants Congress the exclusive power to appropriate funds. *See*

U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"). Congress's "power of the purse" is an important check on separation of powers, ensuring that the Executive does not have "unbounded power." *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) (citing *U.S. Dep't of Navy v. Fed. Lab. Relations Auth.*, 665 F.3d 1339, 1347 (2012)). "Under the Appropriations Clause, an appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 424 (2024).

To protect and enforce its power under the Appropriations Clause, Congress has enacted a number of "fiscal control" statutes. *See* Sean M. Stiff, CONG. RSCH. SERVS., R46417, CONGRESS'S POWER OVER APPROPRIATIONS: CONSTITUTIONAL & STATUTORY PROVISIONS (2020). Relevant here are the Anti-Deficiency Act and the Impoundment Control Act ("ICA"). The Anti-Deficiency Act "prevents federal officers from 'mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation.'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012) (alteration in original) (quoting 31 U.S.C. § 1341(a)(1)(A)). Additionally, once Congress appropriates funds, the Anti-Deficiency Act requires the President to apportion the funds. 31 U.S.C. § 1513(b)(1). The President has delegated this authority

**JA 22**

to OMB. *See* Exec. Order No. 6,166 (June 10, 1933), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987).

An apportionment is "an OMB-approved plan to use budgetary resources." OMB, Circular A-11 § 120.1. Apportionments are employed to "prevent federal officials from obligating or expending funds at a rate that would prematurely exhaust the funds." Taylor N. Riccard, et al., Cong. Rsch. Serv., RS21665, Office of Management and Budget (OMB): An Overview (updated June 2023). Accordingly, apportionments typically "release one part of an agency's appropriation . . . followed by one or more subsequent apportionments releasing the remainder of that appropriation." Decl. of Samuel Bagenstos ("CREW-Bagenstos Decl."), Ex. 3, ECF No. 9-4 in 25-cv-1051 ¶ 14.

In 1974, the ICA made it clear that the Executive Branch cannot use its apportionment authority to withhold congressionally appropriated funds from agencies or programs that do not comport with the Executive's plans or policies. *See* 31 U.S.C. § 1512(c) (establishing the only instances in which a reserve of funds may be created). *See generally* 2 GAO, Principles of Federal Appropriations Law (3d ed. 2006). The ICA requires the President to notify both Houses of Congress whenever he determines that appropriated funds will be withheld. 2 U.S.C. § 683.

**JA 23**

**1. The 2022 and 2023 Appropriations Acts**

Prior to 2022, the ability of Congress to identify whether the Executive Branch was withholding or misusing appropriated funds was limited. It often relied on complaints by whistleblowers or an agency's noncompliance with an apportionment. *See* Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359, 372 (2024). In response to growing concerns about the potential abuse of the apportionment process and misuse of apportioned funds,[4] Members of the House of Representatives proposed a series of reforms to strengthen government oversight and accountability. These efforts included the Protecting Our Democracy Act ("PODA"), a portion of which would have required OMB to post apportionment data for the public. *See* H.R. 5314, 117th Cong. § 2 (2021). Congress ultimately included the disclosure provision from PODA

---

[4] In 2020 the United States Government Accountability Office ("GAO") determined that "OMB withheld from obligation approximately $214 million appropriated to [the Department of Defense] for security assistance to Ukraine." GAO, *Withholding of Ukraine Security Assistance*: Decision File B-331564 (Jan. 16, 2020), https://www.gao.gov/assets/b-331564.pdf. The GAO concluded that the withholding of funds violated the ICA. *Id.* at 2. These actions were the basis for the first Impeachment of President Trump during his first term in office and came to the attention of Members of Congress by means of an August 2019 whistleblower complaint. *See e.g.*, Library of Congress Research Guides, Donald J. Trump, https://guides.loc.gov/federal-impeachment/donald-trump (last visited July 9, 2025).

in the Consolidated Appropriations Act, 2022 ("2022 Act") in

March 2022. Specifically, the 2022 Act required OMB to

> implement[] [] an automated system to post
> each document apportioning an appropriation .
> . . including any associated footnotes, in a
> format that qualifies each such document as an
> Open Government Data Asset (as defined in
> section 3502 of title 44, United States Code),
> not later than 2 business days after the date
> of approval of such apportionment[.]

Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 257

(codified at 31 U.S.C. § 1513 note).[5] In accordance with this

requirement, in July 2022, OMB created the Public Apportionments

Database, located at https://apportionment-public.max.gov, a

publicly available website. *See* OMB Circular No. A-11 § 120.4.

In December 2022, Congress made the posting requirement in

the 2022 Act permanent as part of the Consolidated

Appropriations Act, 2023 ("2023 Act"). *See* Pub. L. No. 117-328,

div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022)

(codified at 31 U.S.C. § 1513 note). The 2023 Act provided:

> In fiscal year 2023 and each fiscal year
> thereafter . . . [OMB] shall operate and
> maintain the automated system required to be
> implemented by [the 2022 Act] . . . and shall
> continue to post each document apportioning an
> appropriation, pursuant to section 1513(b) of
> title 31, United Sates Code, including any
> associated footnotes[.]

---

[5] "Footnotes appear as textual descriptions on specific tabs in
the apportionment file, and typically provide additional
information or direction associated with one or more lines on
the request." OMB Circular No. A-11 § 120.34. As such, the
footnotes are part of the apportionment. *Id*.

**JA 25**

*Id.*

### B. OMB's Removal of the Public Apportionments Database

From July 2022 until its removal, OMB operated and maintained the Public Apportionments Database. *See* OMB Circular No. A-11 § 120.4 ("OMB is required to post all approved apportionment documents on a public website. Those apportionments can be found here: https://apportionment-public.max.gov/."").

On or about March 24, 2025, Defendants removed the Public Apportionments Database from the publicly available website. *See* Decl. of Christina L. Wentworth ("CREW-Wentworth Decl."), Ex. 2, ECF No. 9-3 in 25-cv-1051 ¶ 23. When accessed now, the website displays a message indicating "Page Not Found." *See id.*; MAX Homepage, https://apportionment-public.max.gov (last visited July 16, 2025). On the same day, Members of Congress, including Democratic leaders on the Senate and House Appropriations Committees, issued press releases calling attention to the issue. *See* CREW Mot., ECF No. 9 at 16 (citing Press Release, Rosa DeLauro & Patty Murray, *What Are They Hiding? DeLauro, Murray Demand OMB Promptly Restore Access to Website Detailing Federal Spending Allocations, As Federal Law Requires*, DEMOCRATS APPROPRIATIONS COMMITTEE (Mar. 24, 2025), https://democrats-appropriations.house.gov/news/press-releases/what-are-they-hidingdelauro-murray-demand-omb-promptly-restore-access-website;

**JA 26**

Press Release, *Boyle Demands White House Comply with the Law, Restore Public Access to Budget Data*, HOUSE COMMITTEE ON THE BUDGET (Mar. 24, 2025)).

Five days later, on March 29, 2025, Director Vought sent a letter to Republican and Democratic leadership of the Senate and House Appropriations Committee, some of whom had raised concerns about the database's removal, informing them that OMB "will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023." *See* Decl. of Kelly Kinneen, Ex. C, Letters from Russell Vought to Committee on Appropriations (Mar. 29, 2025), ECF No. 18-1 in 25-cv-1051 at 22 ("OMB Letter"). The letter further stated:

> OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.
>
> Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending. Moreover, apportionments may contain sensitive information, the automatic public

**JA 27**

> disclosure of which may pose a danger to national security and foreign policy.

*Id.*

## C. The Plaintiffs and Their Interest in the Information

### 1. CREW

CREW is "a non-partisan, non-profit government watchdog organization based in Washington, D.C." CREW-Wentworth Decl., Ex. 2, ECF No. 9-3 ¶ 4. CREW's mission is to

> protect[] the rights of citizens to be informed about the activities of government officials and agencies; monitor[] and inform[] the public about key government activities, including the executive branch's use of appropriated funds; ensur[e] transparency, ethics, and integrity in government; and empower[] citizens to have an influential voice in government decisions and in the government's decision-making process.

*Id.* Relying on government records and data made available by Freedom of Information Act ("FOIA") requests or other statutes requiring public disclosure, CREW is able to "create public-facing reports, draft administrative complaints and requests for investigation, and craft targeted FOIA requests[,]" all of which CREW makes available to the public via its website. *Id.* ¶ 5.

CREW "uses a combination of research, litigation, and advocacy" to advance its mission of "protecting the rights of citizens to be informed about the activities of government officials and agencies," including how appropriated funds are used. *Id.* ¶¶ 4-5. To that end, CREW relies on the information

**JA 28**

uploaded to the Public Apportionments Database "to monitor apportionments for potential withholdings." *Id.* ¶¶ 9, 26, 27. CREW reports its findings on its publicly available website and utilizes the information to submit FOIA requests for further investigation. *Id.* ¶¶ 19–21. Without access to the apportionment information on the database, CREW is unable to ensure "[p]rompt public awareness of any use of the apportionment process to withhold funds[,]" or alert Congress or the GAO of improper withholdings, which are critical to CREW's mission. *Id.* ¶¶ 12, 14.

### 2. Protect Democracy Project

Protect Democracy is a "nonpartisan, nonprofit organization dedicated to preventing American democracy from declining into a more authoritarian form of government." Protect Democracy Mot., ECF No. 18 at 11. The organization works to "educat[e] the public about democratic norms and conduct[] research, analysis, and technology developments to promote fact-based debate[,]" including Congress's power of the purse. *Id.* After the creation of the Public Apportionments Database, Protect Democracy's work also included training congressional staff on how to utilize the database. *Id.* at 12.

Given "shortcomings" with OMB's database, Protect Democracy launched OpenOMB.org ("OpenOMB") in October 2024. *Id.* "OpenOMB aims to make oversight of OMB's apportionments easier for

Congress, the press, and the public by providing easier access to apportionment files." *Id.* Protect Democracy asserts that OpenOMB's search is more "user-friendly" because it "allows users to search for information in and across apportionments." *Id.* To feed its site, Protect Democracy pulled data from the Public Apportionments Database every day. *Id.* OpenOMB's users include "Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community." Decl. of William P. Ford ("Protect Democracy-Ford Decl."), Ex. 1, ECF No. 18-4 in 25-cv-1111 ¶ 11. OpenOMB received 41,000 page views between its launch on October 2, 2024, and the removal of the Public Apportionments Database on March 24, 2025. *Id.* ¶ 12. At the time the Public Apportionments Database was removed, Protect Democracy was developing a "notification feature" set to launch on OpenOMB. *Id.* ¶¶ 16–17. Without the apportionment data previously provided on the Public Apportionments Database, Protect Democracy is unable to make apportionments available via OpenOMB, thus "Protect Democracy can no longer provide updated information about apportionments to Congress, the press, and the public . . . or otherwise use the site to monitor . . . for potential violations of law." *Id.* ¶ 19.

**JA 30**

### D. Procedural History

CREW and Protect Democracy initiated actions against Defendants on April 8, 2025, and April 14, 2025, respectively, challenging Defendants' removal of the Public Apportionments Database. *See* CREW Compl., ECF No. 1; Protect Democracy Compl., ECF No. 1. On April 18, 2025, CREW filed a Motion for Preliminary Injunction and Partial Summary Judgment, requesting that the Court schedule a hearing. *See* CREW Mot., ECF No. 9. On April 21, 2025, the Court entered a briefing schedule and set a preliminary injunction hearing for May 9, 2025. Minute Order (Apr. 21, 2025).

On April 22, 2025, Protect Democracy filed a Motion for Expedited Summary Judgment, or in the Alternative a Preliminary Injunction or a Writ of Mandamus. *See* Pl.'s Mot. for Expedited Summ. J., or in the Alternative a Preliminary Inj. or Writ of Mandamus, ECF No. 13 in 25-cv-1111. The next day, the Court entered a briefing schedule. Minute Order (Apr. 23, 2025). On April 25, 2025, Protect Democracy filed an Unopposed Motion to Coordinate Preliminary Injunction Proceedings. *See* Mot. to Coordinate, ECF No. 16 in 25-cv-1111. Protect Democracy indicated that it "would withdraw its current motion for expedited summary judgment and instead file a preliminary injunction motion seeking identical relief as the pending motion in *CREW*, limited to the same [APA] claim that both [Plaintiffs]

**JA 31**

advanced in their motions." *Id.* at 1. The Court granted the Motion to Coordinate, and on April 27, 2025, Protect Democracy filed a Motion for a Preliminary Injunction or in the Alternative Partial Summary Judgment. *See* Protect Democracy Mot., ECF No. 18 in 25-cv-1111.

Defendants filed their oppositions to CREW and Protect Democracy's motions on April 30 and May 2, 2025, respectively. *See* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. & Partial Summ. J. ("CREW-Opp'n"), ECF No. 18 in 25-cv-1051; Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. & Partial Summ. J. ("Protect Dmocracy-Opp'n"), ECF No. 19 in 25-cv-1111. CREW and Protect Democracy filed reply briefs on May 4 and May 5, 2025, respectively. *See* Reply Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. & Partial Summ. J., ECF No. 21 in 25-cv-1051 ("CREW Reply"); Pl.'s Reply in Support of its Mot. for Prelim. Inj. or in the Alternative Partial Summ. J., ECF No. 20 in 25-cv-1111 ("Protect Democracy Reply"). Later the same day, Defendants filed a sur-reply in each case. *See* Defs.' Sur-Reply to Pl.'s Mot. for Preliminary Inj. & Partial Summ. J ("CREW-Sur-reply"), ECF No. 22 in 25-cv-1051; Defs.' Sur-Reply to Pl.'s Mot. for Preliminary Inj. & Partial Summ. J ("Protect Democracy-Sur-reply"), ECF No. 21 in 25-cv-1111.

On May 9, 2025, the Court held a hearing on CREW and Protect Democracy's Motions. Thereafter, on June 2, 2025, the

**JA 32**

Court directed Plaintiffs to file supplemental briefing addressing the type of relief sought if the Court were to forego a preliminary injunction analysis and rule on their motions for partial summary judgment. *See* Minute Order in 25-cv-1051 (June 2, 2025); Minute Order in 25-cv-1111 (June 2, 2025). Plaintiffs each filed a supplemental memorandum addressing the issue of relief on June 9, 2025. *See* Pl.'s Suppl. Br. in Resp. to Court's Min. Order ("CREW Suppl."), ECF No. 28 in 25-cv-1051; Protect Democracy's Suppl. Br. ("Protect Democracy Suppl."), ECF No. 28 in 25-cv-1111. Defendants filed their responses in each case on June 16, 2025, *see* Defs.' Resp. to Pl.'s Suppl. Br. ("Defs.' Suppl.—CREW"), ECF No. 29 in 25-cv-1051; Defs.' Resp. to Pl.'s Suppl. Br. ("Defs.' Suppl.—Protect Democracy"), ECF No. 29 in 25-cv-1111; and Plaintiffs filed their replies on June 18, 2015, *see* Pl.'s Reply to Defs.' Resp. to Pl.'s Suppl. Br. ("CREW Suppl. Reply"), ECF No. 30 in 25-cv-1051; Protect Democracy's Reply in Support of Suppl. Br. ("Protect Democracy Suppl. Reply"), ECF No. 31 in 25-cv-1111. The motions are now ripe for the Court's adjudication.

## II.  Legal Standard

### A. Administrative Procedure Act

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof." 5 U.S.C. § 702. The Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "in excess of [the agency's] statutory jurisdiction, authority, or limitations, or short of a statutory right[.]" *Id.* § 706(2)(A), (C).

### B. Paperwork Reduction Act

The PRA was enacted in 1980 to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government," 44 U.S.C. § 3501(2); and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public[.]" *Id.* § 3501(7). Relevant here, the PRA requires each agency to "ensure that the public has timely and equitable access to the agency's public information[.]" *Id.* § 3506(d)(1). "Public information" is defined as "any information regardless of form or format, that an agency discloses, disseminates, or makes available to the public[.]" *Id.* § 3502(12). Further, the Act requires that the agency "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products[.]" *Id.* § 3506(d)(3).

**JA 34**

## C. Summary Judgment

Federal Rule of Civil Procedure 56 governs motions for summary judgment, which are granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In APA cases, however, "the summary judgment standard functions slightly differently, because the reviewing court generally . . . reviews the agency's decision as an appellate court addressing issues of law." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (alteration in original) (quoting *Pol'y & Rsch, LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018)). "[T]he district judge sits as an appellate tribunal[,] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (citing *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## III. Analysis

Defendants argue that Plaintiffs are not entitled to partial summary judgment for two reasons: (1) Plaintiffs lack standing to challenge the removal of the database; and (2) the 2022 and 2023 Acts are an unconstitutional infringement on Executive power and privilege. *See* CREW-Opp'n, ECF No. 18 at 18-

**JA 35**

30.[6] Defendants also argue that CREW lacks standing for its PRA claim, CREW-Opp'n, ECF No. 18 at 23; and that on the merits, there was no violation of the PRA because: (1) "the apportionment documents are interim, deliberative documents that are exempt from public disclosure," and (2) "any failure to provide advance notice [] was harmless error because the letter notifying Congress was sent a short time afterward," *id*. at 30-31.

### A. Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. CONST. art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *see Lujan v. Nat'l Wildlife Fed'n*, 504 U.S. 555, 560 (1990) (calling standing "the irreducible constitutional minimum"); *see also Jibril v. Mayorkas*, No. 19-cv-2457, 2023 WL 2240271, at *4 (D.D.C. Feb. 27, 2023) ("One way a court might lack subject-matter jurisdiction is if a plaintiff lacks Article III

---

[6] Unless otherwise noted, Defendants' arguments in response to CREW and Protect Democracy's motions are substantially identical. For clarity, the Court only cites to one of the Defendants' oppositions.

standing." (citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987))). The law of Article III standing "is built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 573 U.S. at 157-58 (alteration in original) (quoting *Lujan*, 504 U.S. at 560-61). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). Courts have recognized that plaintiffs can establish standing based on an informational injury. *See Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011).

Under Supreme Court precedent, organizations may have standing "to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Food & Drug Admin. v.*

**JA 37**

*All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024) (citing *Havens Realty Corp.*, 455 U.S. at 378-79).

### 1. Informational Standing

"The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022) (quoting *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020)). To demonstrate an actionable informational injury, a plaintiff must show: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing FEC v. Akins, 524 U.S. 11, 21-22 (1998)); *see Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017).

"The scope of the second part of the inquiry may depend on the nature of the statutory disclosure provision at issue." *Jewell*, 828 F.3d at 992. "In some instances, a plaintiff suffers the type of harm Congress sought to remedy when it simply

**JA 38**

's[eeks] and [is] denied specific agency records.'" *Id.* (alteration in original) (quoting *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449–50 (1989)). "In others, a plaintiff may need to allege that nondisclosure has caused it to suffer the kind of harm from which Congress, in mandating disclosure, sought to protect individuals or organizations like it." *Id.* (citing *compare Akins*, 524 U.S. at 21–23, *and Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008), *with Nader v. FEC*, 725 F.3d 226, 230 (D.C. Cir. 2013)).

"[T]he fact that a number of people could be similarly injured does not render the claim an impermissible generalized grievance[.]" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). And "[t]he fact that other citizens or groups of citizens" are also deprived of the information a plaintiff seeks "does not lessen [a plaintiff's] asserted injury, any more than the fact that numerous citizens might request the same information under the Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue." *Pub. Citizen*, 491 U.S. at 449-50. Even if the statute "entitles the public generally to the disclosure of" the information, "that does not mean that the informational injury . . . is not particular to Plaintiff." *Elec. Priv. Info. Ctr. v. Presidential*

*Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017).

CREW and Protect Democracy argue that they have suffered "quintessential informational injuries" as a result of OMB's removal of the Public Apportionments Database. *See* CREW Reply, ECF No. 21 at 7; Protect Democracy Reply, ECF No. 20 at 7-11. Defendants respond that CREW and Protect Democracy fail to meet either prong of this test as to the 2022 and 2023 Acts, and that CREW fails to satisfy either prong as to the PRA. CREW-Opp'n, ECF No. 18 at 22-23, Protect-Democracy-Opp'n, ECF No. 19 at 19-23.

### a. Plaintiffs Have Been Deprived of Information That, on their Interpretation, a Statute Requires Defendants to Disclose to Them

The 2022 and 2023 Acts plainly require OMB to make apportionment decisions publicly available within two business days of the approval of such apportionment and in a format that qualifies as an Open Government Data Asset. *See* 31 U.S.C. § 1513 note. The PRA plainly requires the public dissemination of an "agency's public information." 44 U.S.C. § 3506(d).

Defendants argue that Plaintiffs do not satisfy this prong for two reasons. First, CREW's reliance on the FOIA cases it cites is misplaced because CREW does not allege that it requested apportionment documents and was denied the documents. CREW-Opp'n ECF No. 18 at 21. This is a non-sequitur; the

**JA 40**

informational standing precedents do not require a plaintiff to have specifically requested the information. *See supra*.

Second, Defendants argue that neither the 2022 nor the 2023 Acts, nor the PRA as to CREW, require disclosure of information specifically to CREW or Protect Democracy; rather they "require the government's disclosure of information to the public at large." CREW-Opp'n, ECF No. 18 at 22; Protect Democracy-Opp'n, ECF No. 19 at 22. However, Defendants cite no authority for the proposition that Plaintiffs must show that the laws require the information to be disclosed specifically to them. *See* CREW–Opp'n, ECF No. 18 at 22. And as Plaintiffs point out, the caselaw indicates that individualized entitlement to disclosure is not required. *See* CREW Reply, ECF No. 21 at 9-10 (citing *Campaign Legal Ctr.*, 31 F.4th at 790 (finding organization had informational standing because FECA requires that certain campaign finance information be made public); *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (plaintiff claimed that the statute at issue required disclosure to it and the public at large)); *see also* Protect Democracy Reply, ECF No. 20 at 8-9 (collecting cases). For these reasons, the Court concludes that Plaintiffs satisfy the first prong: the 2022 and 2023 Acts, and the PRA as to CREW, require the information to be disclosed to them as part of the public at large, and Defendants' removal of the Public Apportionments Database and failure to make public

**JA 41**

this information deprives Plaintiffs of the information. *See e.g., Akins*, 524 U.S. at 20-25 (emphasizing that an "inability to obtain information" that Congress required to make public constitutes an injury in fact for Article III); *Jewell*, 828 F.3d at 992 ("[T]he existence and scope of an injury for informational standing purposes is defined by Congress: a plaintiff seeking to demonstrate that it has informational standing, generally 'need not allege any *additional* harm beyond the one Congress identified.'" (quoting *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 342 (2016))).

> ### b. Plaintiffs Have Suffered, By Being Denied Access to the Information, the Type of Harm Congress Sought to Prevent by Requiring Disclosure

Defendants acknowledge that the type of harm Congress sought to prevent in the 2022 and 2023 Acts by requiring disclosure of apportionments was the lack of transparency to the public at large and to Congress about the Executive Branch's apportionment decisions. Citing the legislative history of the 2022 and 2023 Acts, Defendants state that "[t]he 2022 and 2023 Acts are intended to provide the public with insights into government spending and to enable Congress to oversee the Executive Branch's apportionment of appropriated funds." CREW-Opp'n, ECF No. 18 at 22 (citing Financial Services and General Government Appropriations for 2023: Hearings Before the Subcomm.

on Fin. Servs. & Gen. Gov't of the H. Comm. on Appropriations, 117th Cong., pt. 5, at 125 (2022) (The 2023 Act "will provide the public with insight into billions of dollars of federal spending, while ensuring this committee, and Congress, can perform its oversight work and ensure the executive branch is faithfully implementing appropriations law.")); *see also* Protect Democracy Mot., ECF No. 18 at 9–10 ("In a division-by-division summary of the [2022 Act], Representative Rosa DeLauro (then-Chairwoman of the House Appropriations Committee)" stated that the 2022 Act would make "apportionments of appropriations publicly available in a timely manner." (quoting Ex. 7, H.R. 2471, Funding for the People: Division-by-Division Summary of Appropriations Provisions, HOUSE COMMITTEE ON APPROPRIATIONS, ECF No. 18-10 in 25-cv-1111 at 19)). However, this purpose, Defendants claim, is distinct from CREW and Protect Democracy's interests in acting as "middlemen" or "government watchdogs." CREW-Opp'n, ECF No. 18 at 22; Protect Democracy-Opp'n, ECF No. 19 at 23.

With regard to CREW, Defendants argue that "CREW asserts an interest in using the database to play a watchdog function, as part of its [nonprofit] business plan." CREW Opp'n, ECF No. 18 at 23. "That is an interest that is distinct from providing the public with the apportionment materials directly, without any middleman, as Congress did in the 2023 Act, and of course it is also distinct from Congress's own interest in oversight." *Id.*

**JA 43**

The Court concludes that Defendants' argument is devoid of merit. CREW has a statutory entitlement to the information, as does the public at large. Congress did not place restrictions on what the public can do with the information. That CREW, as a member of the public, disseminates the information as part of its advocacy work is not contrary to the type of harm Congress sought to prevent by requiring disclosure. Rather it is in furtherance of the purpose for which Congress enacted the 2022 and 2023 Acts. Furthermore, the harm to CREW exists independent of harm to Congress in not having access to the information.

With regard to Protect Democracy, Defendants similarly argue that "the injury Protect Democracy seeks to vindicate is the injury to its own proprietary interest in OpenOMB. That is an interest that is distinct from providing the public with the apportionment materials directly, without any middleman, as Congress did in the 2023 Act, and of course it is also distinct from Congress's own interest in oversight." Protect Democracy–Opp'n, ECF No. 19 at 23. Again, the Court concludes that Defendants' arguments are meritless. Protect Democracy uses the information to provide further transparency to the public—and to Congress—by means of the OpenOMB website. As with CREW, the use Protect Democracy makes of the information is not contrary to the type of harm Congress sought to prevent by requiring disclosure, but in furtherance of Congress's purpose. And again,

**JA 44**

the harm to Protect Democracy exists independent of harm to Congress in not having access to the information.

In summary, CREW and Protect Democracy's use of the apportionment information fits squarely within Congress's goal of providing increased transparency into the Executive Branch's apportionment decisions. *Compare Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023) (finding plaintiff organization suffered type of harm Congress intended to prevent with the Sunshine Act where withheld meeting notices caused plaintiff to miss meetings it would have otherwise attended), *with EPIC*, 878 F.3d at 378 (concluding plaintiff organization failed to meet the second prong of the informational injury test where the underlying provision was "directed at individual privacy, which [was] not at stake for [the plaintiff]"). For all these reasons, the Court concludes that Plaintiffs are suffering the type of harm that Congress sought to prevent by requiring disclosure of the apportionment information.[7]

---

[7] To the extent the second prong requires Plaintiffs to establish that "there is no reason to doubt their claim that the information would help them," *Campaign Legal Ctr.*, 31 F.4th at 783 (quotation and citation omitted); there is no reason to doubt CREW's claim that the information would help it in its public education, legislative policy, and litigation work. *See* CREW Reply, ECF No. 21 at 10. Nor is there reason to doubt Protect Democracy's claim that the information would help it in its educational, research, and analytical work. Protect Democracy Mot., ECF No. 18 at 12.

With respect to CREW's dissemination of information claim pursuant to the PRA, Defendants argue that "the alleged harm to CREW's business model is not the type of harm Congress sought to prevent when enacting the PRA." CREW-Opp'n, ECF No. 18 at 23. The Court rejects this argument for the reasons explained above. With regard to CREW's notice claim pursuant to the PRA, Defendants argue that CREW "has not demonstrated any concrete harm stemming from Defendant's alleged non-compliance with the PRA's notice requirements." *Id*. CREW failed to respond to this argument. *See generally* CREW Reply, ECF No. 21. Accordingly, the Court considers it conceded. *Cf. Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries,* 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). CREW has therefore failed to satisfy its burden of establishing standing as to its PRA notice claim.

### c. Plaintiffs Have Established Particularized Injuries

Defendants argue that Plaintiffs lack standing because their grievance is common to members of the public, thus they do not have a particularized injury sufficient for Article III standing. CREW-Opp'n, ECF No. 18 at 9; Protect Democracy Opp'n,

**JA 46**

ECF No. 19 at 9; CREW-Sur-Reply, ECF No. 22 at 2. In support, Defendants cite *United States v. Richardson*, 418 U.S. 175 (1977), where the Supreme Court held that a taxpayer lacked standing to challenge an alleged "failure of the Congress to require the Executive to supply a more detailed report of the expenditures of [an] agency." *Id.* at 175.

The Court concludes that Defendants' reliance on *Richardson* is misplaced. First, the mere fact that all members of the public have the same injury "does not render the claim an impermissible generalized grievance." *Pub. Citizen, Inc.* 489 F.3d at 1292; *see also Pub. Citizen*, 491 U.S. at 449-50; *EPIC*, 266 F. Supp. 3d at 311. Second, each Plaintiff has articulated how their injuries are particularized. *See* CREW Hr'g Tr., ECF No. 24 at 19:5-18 (explaining that CREW's particularized injury is that by being deprived of the information it "cannot effectively do its work in monitoring and disseminating to the public any issues about potential misuses of government spending"); *id*. at 17:16-24 (explaining that Protect Democracy's particularized injury is that by being deprived of the apportionment information, it can no longer populate the OpenOMB website it spent ten months building to make that information more searchable and user-friendly as part of Protect Democracy's core mission to protect the American government from becoming authoritarian). Accordingly, the Court rejects Defendants'

**JA 47**

argument: Plaintiffs have established that they have a particularized injury sufficient for Article III standing.

### d. Informational Standing Does Not Require the Underlying Statute to Provide for a Private Right of Action

Defendants argue that this case is distinguishable from other informational standing cases because, unlike here, the underlying statutes in those cases included an explicit private right of action or had "hallmarks" indicating that Congress meant to confer informational standing to potential plaintiffs. *See* CREW-Sur-reply, ECF No. 221 at 3; CREW Hr'g Tr., ECF No. 24 at 57:1-14, 60:7-63:10. Thus, Defendants contend, to the extent that the Acts require public disclosure of apportionment information, it is merely "ancillary" and "does not rise to the level of evincing a level of intent to establish a forum in federal courts to allow private individuals . . . to demonstrate Article III standing sufficient under the [D.C.] [C]ircuit's informational standing test . . . ." CREW Hr'g Tr., ECF No. 24 at 111:8-18.

The Court concludes that the lack of an express private right of action in the 2022 and 2023 Acts is not fatal to Plaintiffs' claim that they have informational standing. Defendants have failed to point to any authority suggesting that the Court of Appeals for the District of Columbia ("D.C. Circuit") requires a public disclosure statute to include a

**JA 48**

private right of action for a plaintiff to establish informational standing. Rather, courts have concluded that plaintiffs have informational standing where, as here, the underlying statute did not include a private right of action. *See Pub. Citizen*, 491 U.S. at 449-50 (the Federal Advisory Committee Act ("FACA")); *Ctr. for Biological Diversity*, 77 F.4th at 686 (the Sunshine Act); *Env't Def. Fund v. EPA*, 922 F.3d 446 (D.C. Cir. 2019) (Toxic Substance Control Act). Moreover, courts examining whether plaintiffs had informational standing in Federal Election Campaign Act ("FECA") cases—where there is an express private right of action—focused on whether the statute conferred a right to information, not a right to sue. *See, e.g.*, *Campaign Legal Ctr.*, 31 F.4th at 790 (concluding plaintiffs suffered an informational injury where FECA required disclosure of specific campaign finance data); *Ctr. for Resp. & Ethics in Wash. V. Fed. Election Comm'n*, No. 22-cv-3281, 2023 WL 6141887, at *5-6 (D.D.C. Sept. 20, 2023) (emphasizing that "FECA creates an informational right").

Further, Defendants' claim that the disclosure requirement is "ancillary" because it was a rider in a large appropriations bill, *see* CREW Hr'g Tr., ECF No. 24 at 66:5-12; is wholly without merit. Defendants cite no authority where a court has ever held a law to be less forceful because it was passed as part of a larger piece of appropriations legislation. The

**JA 49**

requirement is the law, now codified as part of the Anti-Deficiency Act. *See* 31 U.S.C. § 1513 note.

### e. Plaintiffs Do Not Have an Adequate Alternative Source for Obtaining the Information

Finally, Defendants argue that Plaintiffs have alternative sources for obtaining the apportionment information such as submitting FOIA requests, or consulting other government databases and government reports that contain information about the Executive's spending decisions. *See* CREW-Opp'n, ECF No. 18 at 33. The Court agrees with Plaintiffs that these are not adequate alternatives. Although it is true that "a plaintiff cannot establish injury based on information that is already available 'from a difference source,' disclosure of which would only result in duplicative reporting,'" *Campaign Legal Ctr.*, 31 F.4th at 790 (quoting *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001)); none of Defendants' proposed alternatives provide Plaintiffs with timely information on each apportionment decision in the Open Government Data Asset format required.

Nor would any of Defendants' proposed alternatives provide the information in the required format within a two-day time frame. For example, the SF 133 Report on Budget Execution and Budgetary Resources is a quarterly report, *see* OMB Circular A-11 § 130.1; and the Financial Report of the United States government is a PDF document that is issued annually, *see* Dept.

**JA 50**

of the Treasury, Financial Report of the U.S. Government,
https://www.fiscal.treasury.gov/reports-statements/financial-report/current-report.html (last visited May 14, 2025).

Although Defendants point to the statutory deadlines in FOIA, they fail to acknowledge that those deadlines are rarely, if ever met, and that it can take months and even years for a party to actually receive documents. Furthermore, to obtain this information via FOIA requests, Plaintiffs would need to make never-ending, recurring FOIA requests, and the information would be provided in PDF-format documents. Also, given Defendants' argument that the apportionment information is predecisional and deliberative, they would likely invoke exemptions that would result in litigation, further delaying Plaintiffs' access to the information. In sum, Congress was well aware of the alternative sources of information when it enacted the disclosure requirements in the 2022 and 2023 Acts but chose to require the establishment of the Public Apportionments Database, thereby indicating that Congress did not view the alternatives as adequate.

### 2. Protect Democracy is Also Suffering Economic Injuries

Protect Democracy also argues that it is suffering economic injuries because the removal of the apportionment information has diminished the value of its investments in the OpenOMB

**JA 51**

database. Protect Democracy Reply, ECF No. 20 at 11-13. Defendants respond that Protect Democracy "cannot base an informational injury on its decision to establish a business around [c]ongressional oversight." Protect Democracy-Surreply, ECF No. 21 at 4. However, Protect Democracy contends that this is an organizational injury, not an informational injury, that "impacts [its] ability to carry out its core mission" and "is a direct economic injury based on time and money already spent." CREW Hr'g Tr., ECF No. 24 at 10:8-15. Protect Democracy explains that "OpenOMB is now of considerably less value because it cannot serve its core function of making it easier to track OMB's apportionments." Ex. A, Supp. Decl. of William P. Ford ("Protect Democracy-Ford Supp. Decl.), ECF No. 20-1 in 25-cv-1111 ¶ 2(a). "OpenOMB is now only an archive of apportionments from a fixed period of time" in the past, *id.;* rather than serving the purpose for which Protect Democracy invested substantial money and resources in it—to "make oversight of OMB's apportionments easier for Congress, the press, and the public" on an ongoing basis, *see AboutOpenOMB*, OPENOMB, https://OpenOMB.org/about (last visited May 27, 2025). The Court concludes that the diminution of the value of the investment in OpenOMB is a cognizable economic injury. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (finding cognizable economic injury where a nonprofit

**JA 52**

corporation "expended thousands of dollars" on certain plans, which would be "worthless" unless the request at issue in the case was granted).

### 3. Plaintiffs Have Established the Requisite Causal Connection and Redressability

Defendants do not contest causal connection or redressability, both of which are easily met here. Plaintiffs' injuries are traceable to Defendants' removal of the Public Apportionments Database, and a favorable ruling will resolve Plaintiffs' injuries by reinstating their access to the apportionment data. For all these reasons, the Court concludes that Plaintiffs have established that they have Article III standing, with the exception of CREW as to its notice claim under the PRA.

### B. The 2022 and 2023 Acts Do Not Unconstitutionally Infringe Upon Executive Power

"The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983). The Constitution vests in Congress the exclusive power to appropriate funds, *see* U.S. CONST. art. I, § 9, cl. 7; and in the Executive the exclusive power to "take Care that the Laws be faithfully executed," U.S. CONST. art.

**JA 53**

II, Sec. 3. Pursuant to its appropriations power, "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." *Richardson*, 418 U.S. at 178 n.11. The President's constitutional obligation "does not permit [him] to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974).

Defendants do not dispute that they are not complying with the 2022 and 2023 Acts: they removed the Public Apportionments Database from the OMB website on or around March 24, 2025, and now argue to the Court that the relevant provisions of the Acts are unconstitutional. At oral argument, Defendants clarified that their argument is that the 2022 and 2023 Acts are unconstitutional on the following grounds: (1) they impair the ability of the Executive Branch to take care that the laws are faithfully executed and impermissibly interfere with the Executive Branch's role; and (2) they require the disclosure of information that is subject to executive privilege. CREW Hr'g Tr., ECF No. 24 at 78:16-79:3.

**JA 54**

**1. The 2022 and 2023 Acts Do Not Impair the Ability of the Executive Branch to Take Care That the Laws are Faithfully Executed nor Do They Impermissibly Interfere in the Executive Branch's Role**

Defendants claim that requiring the disclosure of the apportionment information "impair[s]" the Executive's performance of its duties and interferes with its role for several reasons. First, they argue that it amounts to Congress having an active role in the execution of the appropriations laws. CREW-Opp'n, ECF No. 18 at 24. The Court rejects this argument. As explained in greater detail below, the 2022 and 2023 Acts require the public disclosure of OMB's final apportionment decisions; they do not amount to congressional involvement in the administration of the appropriation.

Defendants further argue that requiring the disclosure of the apportionment information has a "chilling effect on OMB's decision-making" in that the 2022 and 2023 Acts require them to: (1) "omi[t] [] key details regarding the agency action it seeks prior to making funds available for disbursement"; (2) "remove[] sensitive information from apportionment documents [resulting in] imped[ing] OMB's ability to most efficiently provide direction to and receive information from agencies"; and (3) "omit important context that could reveal information about the Executive Branch's internal planning and strategy." *Id.* at 28 (citations and quotations omitted); *see also* CREW Hr'g Tr., ECF

**JA 55**

No. 24 at 75:7-15. Defendants further argue that the requirement to publish the information within two business days "impermissibly burdens the administration of the apportionment process" and that as a result of the expedited timeline, they are "often forced to omit key policy information from apportionments." CREW-Opp'n, ECF No. 18 at 28-29. Defendants point to the FOIA process and the accommodation process for congressional requests for information and subpoenas as being preferable to the two-day timeline required by the 2022 and 2023 Acts. *Id*. at 29.

The Court concludes that Defendants' objections are a policy disagreement with the 2022 and 2023 Acts without a constitutional foundation. After the 2022 Act was signed into law in March 2022, the Biden Administration complied with it and the 2023 Act: OMB's then-General Counsel, who "participated in setting up the automated apportionment posting system required by the statute" and "advised OMB's budget staff on compliance with the statute" avers that in his experience, "compliance with the apportionment transparency law was straightforward, did not interfere with the President's constitutional or statutory responsibilities or OMB's supervision of the Executive Branch, and was fully consistent with effective and efficient governance." CREW-Bagenstos Decl., ECF No. 9-4 ¶ 7. At bottom, Defendants are complaining about the extra work the 2022 and

**JA 56**

2023 Acts require. This is a management issue; not a constitutional one.

Defendants claim—without citing any authority—that congressional "[o]versight generally is something that Congress engages in to inform future legislation" and that the automatic publication requirement in the 2022 and 2023 Acts is "miles away from the traditional oversight request or generic reporting requirement." CREW Hr'g Tr., ECF No. 24 at 87:9-12, 88:1-2. This argument is without merit: "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." *Richardson*, 418 U.S. at 178 n.11. Here, Congress has determined that OMB's apportionment decisions should be publicly available so that, among other things, it and the public can see whether they are consistent with congressional appropriations. As such, the 2022 and 2023 Acts aid Congress's exercise of its undisputed oversight role. The Acts do not dictate how OMB should apportion funds, nor do they establish a congressional management role in the administration of apportionments. The Acts merely require that the final apportionment decisions be made publicly available to provide transparency to Congress and the public.

For all these reasons, the Court rejects Defendants' arguments that the 2022 and 2023 Acts impair the ability of the Executive Branch to take care that the laws are faithfully

**JA 57**

executed or impermissibly interfere in the Executive Branch's role.

### 2. The Deliberative Process Privilege as a Form of Executive Privilege Does Not Apply to the Information at Issue, and the Apportionment Documents are not Deliberative, Predecisional Documents

"The most frequent form of executive privilege raised in the judicial arena is the deliberative process privilege; it allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.C. Cir. 1997)). "Although this privilege is most commonly encountered in [FOIA] litigation, it originated as a common law privilege." *Id.* (citing *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988)). "Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative." *Id.* (citing *Army Times Publ'n Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993)). "The deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need." *Id.*

Another form of executive privilege is the presidential communications privilege, a privilege that was "definitively established as a necessary derivation from the President's constitutional status in a separation of powers regime" arising out of the "Watergate-related lawsuits seeking access to President Nixon's tapes as well as other materials." *Id*. at 739-40.

Defendants assert that the 2022 and 2023 Acts require the disclosure of predecisional, deliberative information. CREW-Opp'n, ECF No. 18 at 28. At oral argument, Defendants argued that this makes the 2022 and 2023 Acts unconstitutional because the deliberative process privilege is a form of executive privilege, which, because it is "grounded and rooted in the separation of powers," cannot be abrogated by Congress. CREW Hr'g Tr., ECF No. 24 at 76:12-16. Consequently, according to Defendants, the 2022 and 2023 Acts are unconstitutional because they require the disclosure of privileged information. *Id.* at 78:16-18. Defendants hinted at this argument in their briefing materials by asserting that "[t]he deliberative process privilege—the most common executive privilege—is a privilege grounded in the separations of powers." CREW-Opp'n, ECF No. 18 at 26. However, the D.C. Circuit case they cite as supporting this assertion nowhere mentions the deliberative process privilege as being grounded in separation of powers. *See*

**JA 59**

*generally Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49 (D.C. Cir. 2021). Rather, D.C. Circuit authority is clear that the deliberative process privilege is primarily a common law privilege. *See In re Sealed Case*, 121 F.3d at 737. Defendants' support at oral argument for their remarkable proposition is *United States v. Nixon*, 418 U.S. 683 (1974), a case which involved presidential privilege (and which they failed to cite in their briefing materials). *See* CREW Hr'g Tr., ECF No. 24 at 120:25-121:2. There is no evidence in the record remotely supporting the notion that the apportionment documents are presidential communications or are in any way subject to the presidential communications privilege. Accordingly, the Court rejects this constitutional claim.

Aside from their constitutional argument, Defendants argue that the apportionment information cannot be disclosed because it is deliberative, predecisional information. The Court also rejects this argument. The information on the Public Apportionments Database is neither predecisional nor deliberative because apportionments, including footnotes, are final "OMB-approved plan[s]" that are "legally binding." OMB Circular No. A-11 § 120.1; *see id*. § 20.3 (stating that an "[a]pportionment is a plan, approved by OMB, to spend resources"). Defendants cite no precedent supporting the proposition that a legally binding document is predecisional and

**JA 60**

deliberative. Nor do they cite any prior instance in which OMB has claimed that an apportionment document is privileged. That Defendants' current position has never been previously claimed by OMB is consistent with Mr. Bagenstos's testimony:

> [Director Vought's] assertion [that 'apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change'] fundamentally misunderstands both the nature of apportionments and what it means to be 'predecisional.' Apportionments are not part of the give and take that precedes a binding legal decision; they are the binding legal decisions themselves.

CREW-Bagenstos Decl., ECF No. 9-4 ¶¶ 10-11 (quoting OMB Letter at 22); *see also* OMB Circular A-11 § 120.1.

Defendants also argue that in the Anti-Deficiency Act, "Congress afforded the President authority to apportion funds as he 'considers appropriate,'" and that apportionments are an iterative process subject to change. CREW-Opp'n, ECF No. 18 at 25 (quoting 15 U.S.C. § 1512(b)(2)). Consequently, according to Defendants, the interim apportionment decisions are privileged. The Court rejects this argument for the same reason as discussed above—even if an apportionment is later changed, this does not alter the legally binding nature of the apportionment once it is made.

**JA 61**

Similarly, Defendants' argument that OMB remains free to change apportionments does not make the information predecisional and deliberative. No matter how many times an apportionment changes, each generated apportionment is "legally binding," creating administrative and criminal consequences under the Anti-Deficiency Act. *See* OMB Circular A-11 §§ 120.1, 145.1. A review of examples of apportionment decisions confirms that the documents are not deliberative. *See* OMB Circular A-11, Ex. 4, ECF No. 18-7 in 25-cv-1111 at 37–58. Nothing within the apportionment decision shows OMB officials' discussions or thoughts about any policy considerations regarding how to apportion appropriated funds. *Id.* Finally, there is ample authority in support of the proposition that because an agency can change its decision, this does not make the decision any less final*. See e.g., U.S. Fish & Wildlife Serv. v. Sierra Club, Inc*., 592 U.S. 261, 271 (2021) (emphasizing that document is a "final" decision outside the scope of the deliberative process privilege if it has "real operative effect" leading to "direct and appreciable legal consequences"); *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future."). For all these reasons, the information at issue is neither predecisional nor deliberative.

**JA 62**

By removing the Public Apportionments Database, Defendants have acted contrary to the 2022 and 2023 Acts. For the reasons explained above, the applicable provisions of the 2022 and 2023 Acts are not unconstitutional. Accordingly, the Court will grant Plaintiffs' Motions for Partial Summary Judgment as to their respective APA claims.

### C. CREW is Entitled to Summary Judgment on its Dissemination of Public Information Claim Under the PRA

The Court also concludes that CREW is entitled to summary judgment on its dissemination of public information claim under the PRA. Defendants' removal of the Public Apportionments Database violates the PRA's requirement to provide the public with timely access to the information. *See* 44 U.S.C. § 3506(d)(1). As CREW points out, "Defendants do not dispute that the apportionment information in the database is 'public information' within the meaning of the [PRA], and they do not dispute that the information's removal deprives the public of timely access, as required by that statute." CREW Reply, ECF No. 21 at 17. Defendants' only argument in response is that "the apportionment documents are interim, deliberate documents that are exempt from public disclosure." CREW-Opp'n, ECF No. 18 at 31. However, for the reasons explained above, the Court rejects this argument. Accordingly, the Court will grant CREW's Motion

**JA 63**

for Partial Summary Judgment as to its dissemination of public information claim under the PRA.

### D. Remedies

Given the Court's conclusion that Defendants' removal of the Public Apportionments Database is contrary to law, the Court turns to the question of remedies. CREW and Protect Democracy request that the Court: (1) vacate and set aside Defendants' actions; (2) declare Defendants' actions unlawful; and (3) enter a permanent injunction prohibiting Defendants from removing the Public Apportionments Database in the future. *See* CREW Suppl., ECF No. 28 at 2; Protect Democracy Suppl., ECF No. 28 at 3.

### 1. Declaratory Relief

Under the Declaratory Judgment Act, a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Whether to issue declaratory relief "always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). There are many factors relevant to whether declaratory relief is necessary, but "[i]n the D.C. Circuit, two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving

**JA 64**

rise to the proceeding." *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016) (citing *Vance*, 627 F.2d at 364 n.76).

Defendants argue that Plaintiffs are not entitled to declaratory relief because the apportionment documents are predecisional and deliberative, but they fail to address whether a declaratory judgment would be improper if the Court rules in Plaintiffs' favor. *See* Defs.' Suppl.—CREW, ECF No. 29 at 2; Defs.' Suppl.—Protect Democracy, ECF No. 29 at 2. The Court rejected Defendants' predecisional and deliberative arguments above and concludes that it will exercise its discretion to award declaratory relief. Declaratory relief clarifies for the parties—and the public—that Defendants' knowing violation of the disclosure requirement in the 2022 and 2023 Acts is not legally justified by Executive powers or privileges. Importantly, a declaration provides authority on the central question in this litigation and guidance on what Defendants must do to comply with the law.

### 2. Vacating and Setting Aside Unlawful Conduct

Plaintiffs also request that the Court vacate and set aside Defendants' unlawful action by ordering Defendants to "restor[e] the database and mak[e] the apportionment information publicly available." CREW Suppl., ECF No. 28 at 3; Protect Democracy Suppl., ECF No. 28 at 3-4. Defendants assert that vacatur is not

**JA 65**

available here, but provide no argument in support of the assertion based on the case they cite. *See* Defs.' Suppl.—CREW, ECF No. 29 at 5 (citing *United States v. Texas*, 599 U.S. 670, 692-93 (2023) (Gorsuch, J. concurring)); Defs.' Suppl.—Protect Democracy, ECF No. 29 at 5 (citing *Texas*, 599 U.S. at 692-93 (Gorsuch, J. concurring)).

Title 5 U.S.C. § 706(2)(A) directs courts to "hold unlawful and set aside agency action" that is "not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "[T]o 'set aside' a rule is to vacate it." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 830 (2024) (Kavanaugh, J. concurring)). Thus, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *Id.* (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). The D.C. Circuit has held that remand without vacatur is proper "if an agency's error is 'curable.'" *Id.* (citing *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016)) (emphasizing that remand without vacatur is an "exceptional remedy"). "Because an agency can't 'cure' the fact that it lacks authority to take a certain action," *id.*; the Court concludes that vacatur is proper here. As discussed above, Defendants' removal of the Public Apportionments Database clearly violates the 2022 and 2023 Acts, and Defendants have no legal basis for failing to comply with the Acts. Accordingly,

**JA 66**

the Court will vacate and set aside Defendants unlawful action pursuant to the APA.

### 3. Permanent Injunction

Finally, Plaintiffs request that the Court permanently enjoin Defendants from removing the Public Apportionments Database and the apportionment information required to be disclosed by the 2022 and 2023 Acts without statutory authorization. *See* CREW Suppl., ECF No. 28 at 3-5; Protect Democracy Suppl., ECF No. 28 at 4-5.

A court may issue a permanent injunction where, in addition to establishing that it is entitled to prevail on the merits, a plaintiff demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In determining whether a permanent injunction is a proper remedy, courts in this district have considered the first two factors together. *See, e.g.*, *Grundmann v. Trump*, No. 25-cv-425, 2025 WL 782665, at *13 (D.D.C. Mar. 12, 2025); *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *15 n.20 (D.D.C. Mar. 6, 2025); *Ridgely v. Lew*, 55 F. Supp. 3d 89, 97 (D.D.C. 2014). And because

the government is the defendant, "factors (3) and (4) merge." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Defendants argue that Plaintiffs cannot meet the requirements for a permanent injunction because: (1) they have failed to establish irreparable harm; and (2) the balance of hardships in factors three and four tip in favor of the government "because any injunctive relief in this case would require unconstitutional infringement upon Executive power." Defs.' Suppl.—CREW, ECF No. 29 at 3-4; Defs.' Suppl.-Protect Democracy, ECF No. 29 at 4.

### a. Irreparable Harm and Inadequate Remedy at Law

Examining the first two factors together, the Court concludes that CREW and Protect Democracy have suffered irreparable harms that cannot be fully repaired absent an injunction.

To establish an irreparable injury, a plaintiff must show that the injury is "both certain and great" and "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). An organization satisfies the "irreparable harm" prong "if the actions taken by [the

**JA 68**

defendant] have 'perceptibly impaired' the [organization's] programs." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (alteration in original) (internal quotation marks omitted) (quoting *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). "If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).

The Court concludes that CREW and Protect Democracy's inability to continue their work monitoring and reporting on the Executive Branch's use of congressionally appropriated funds due to Defendants' removal of the Public Apportionments Database is an irreparable injury. Defendants argue that CREW has failed to demonstrate that the apportionment information "is indispensable to its core mission and that impaired access prevents it from fulfilling its organizational goals." Defs.' Suppl.—CREW, ECF No. 29 at 3-4. The Court disagrees. Without the database, CREW is unable to evaluate ongoing concerns regarding ICA violations or provide the public with insight into how the Executive is spending funds. *See* Wentworth Decl., ECF No. 9-3 ¶¶ 6-10. As to Protect Democracy, in addition to the harm to its organization's mission of "monitoring and reporting on the Executive Branch's compliance with Congress's directives and making that

**JA 69**

information more accessible to the public," Protect Democracy Mot., ECF No. 18 at 23; Protect Democracy's asserted economic loss stemming from the inability to maintain OpenOMB constitutes an irreparable injury.

When Defendants removed the Public Apportionments Database, they deprived CREW and Protect Democracy of information to which they are statutorily entitled, and which they relied on to monitor government funding, respond to possible legal violations, and provide transparency to the public. *See* Wentworth Decl., ECF No. 9-3 ¶¶ 14-16; Ford Decl., ECF No. 18-4 ¶¶ 19-22. The irreparable nature of these injuries is further supported by the fact that there are ongoing, imminent concerns of potential Executive Branch withholding or overspending. *See, e.g.*, GAO, *Institute of Museum and Library Services–Applicability of the Impoundment Control Act to Reduction of Agency Functions*: Decision File B-337375 (June 16, 2025), https://www.gao.gov/assets/880/878908.pdf. CREW and Protect Democracy cannot continue their efforts because they no longer have timely access to apportionment information as required by the 2022 and 2023 Acts.

Furthermore, the Court concludes, and Defendants do not dispute, that remedies at law are inadequate to compensate for these injuries. Monetary damages would not provide Plaintiffs with the apportionment information, nor would it allow

**JA 70**

Plaintiffs to fulfill their missions of educating the public and Congress about how the Executive Branch is allocating congressionally appropriated funds. Not only does a permanent injunction ensure that Plaintiffs regain access to the Public Apportionments Database, but it also prohibits Defendants from removing the database or failing to comply with the 2022 and 2023 Acts in any other way in the future.

### b. Public Interest and Balance of Hardships

Finally, the Court concludes that the public interest and balance of hardships weigh in favor of issuing a permanent injunction. Relying on its constitutional arguments that the 2022 and 2023 Acts infringe upon the Executive power, Defendants argue that these factors weigh against injunctive relief. *See* Defs.' Suppl.—CREW, ECF No. 29 at 4; Defs.' Suppl.—Protect Democracy, ECF No. 29 at 4.

The Court has already considered and rejected Defendants' arguments that the 2022 and 2023 Acts are unconstitutional. As explained above, Defendants' removal of the Public Apportionments Database violates the law and, contrary to Defendants' argument, their conduct is not justified by Executive power or privilege. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir.

**JA 71**

2013)). Moreover, OMB complied with the disclosure requirements for nearly three years before it removed the Public Apportionments Database, further diminishing any argument that complying with the disclosure requirement is overly cumbersome or places an impossible burden on Defendants.

A permanent injunction requiring Defendants to maintain the Public Apportionments Database as required by law directly serves the "substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (internal quotation marks omitted) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). This interest is also directly advanced by enforcing the disclosure requirements in the 2022 and 2023 Acts. As Congress intended when enacting the disclosure requirements, the Public Apportionments Database provides the public and their elected representatives with timely insight on how the Executive Branch is allocating taxpayer dollars. *See* GAO, Impoundment Control Act of 1974: Review of the President's Special Message of June 3, 2025, B-337581 (June 17, 2025), https://www.gao.gov/assets/880/878941.pdf ("Restoring [the Public Apportionments Database] and providing timely access to the apportionment information we request would enhance [Congress's] oversight and [the GAO's efficiency in supporting Congress."). The Public Apportionments Database provides the

**JA 72**

public with information about whether the Executive Branch is abiding by the laws governing the allocation of public funds, thereby enabling the public to hold the Executive Branch accountable if there is a misuse of appropriated funds.

For all these reasons, the balance of hardships and the public interest favor granting a permanent injunction.

### E. Plaintiffs' Remaining Claims

While Plaintiffs' Complaints include additional challenges to Defendants' removal of the Public Apportionments Database, *see* CREW Compl., ECF No. 1 ¶¶ 26-29; Protect Democracy Compl., ECF No. 1 ¶¶ 51-77; Plaintiffs agree that the Court's decision here—granting each form of requested relief—provides Plaintiffs with complete relief. *See* CREW Suppl., ECF No. 28 at 5-6; Protect Democracy Suppl., ECF No. 28 at 8. Accordingly, the Court exercises its discretion to dismiss without prejudice the remainder of CREW and Protect Democracy's claims as prudentially moot. *See City of New York v. Baker*, 878 F.2d 507, 509 (D.C. Cir. 1989) (explaining that "prudential mootness" "does not concern a court's power to grant relief, but rather its exercise of discretion in the use of that power"); *Ctr. for Biological Diversity v. Regan*, 729 F. Supp. 3d 37, 52 (D.D.C. 2024) ("The practice [of not deciding more than it must] permits courts to avoid the pointless . . . task of deciding a broad array of legal and factual issues . . . that, in the parlance of

**JA 73**

mootness, will 'make [no] difference to the legal interests of the parties[.]'" (quoting *Air Line Pilots Ass'n v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir. 1990))).

### F. Stay Pending Appeal

In the event the Court awarded Plaintiffs' requested relief, as it has done here, Defendants' supplemental briefing requests a stay of any permanent injunction pending appeal. *See* Defs.' Suppl.—CREW, ECF No. 29 at 5. Defendants' request is premature because at the time it was made, the Court had not yet ruled on Plaintiffs' motions. Accordingly, the Court **DENIES** without prejudice Defendants' request for a stay pending appeal. If, after considering the Court's Memorandum Opinion and Order, Defendants decide to renew this request, they may make a request consistent with Federal Rule of Appellate Procedure 8.

In the alternative, Defendants request that the Court issue a fourteen-day administrative stay "to allow for the Solicitor General to determine whether to appeal and seek a stay pending appeal." Defs.' Suppl.-CREW, ECF No. 29 at 6. A court may issue a brief "administrative stay" to "buy the court time to deliberate when issues are not easy to evaluate in haste." *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 16–17 (D.D.C. 2025) (quoting *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J. concurring) (internal quotation marks omitted)). "While administrative stays are more common in

**JA 74**

appellate courts, district courts have recognized their applicability in cases seeking emergency relief under the APA." *Id.* (citing Order, *Texas v. Dep't of Homeland Sec.*, No. 24-cv-306, at *2 (E.D. Tex. Aug. 26, 2024)) (noting that the authority for an administrative stay stems from the All Writs Act and the court's authority to manage its docket). Neither CREW nor Protect Democracy oppose a brief administrative stay. *See* CREW Suppl. Reply, ECF No. 30 at 4; Protect Democracy Suppl. Reply, ECF No. 31 at 5.

To allow Defendants time to review the Court's Memorandum Opinion and Order, and to allow the parties to properly brief any forthcoming, procedurally proper motion for a stay pending appeal, the Court administratively stays the permanent injunction for three days, until 10:00 am on July 24, 2025.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** CREW's Motion for Partial Summary Judgment as to its APA claims that the Defendants' removal of the Public Apportionments Database violates the 2022 and 2023 Acts and the PRA's dissemination of information requirement, and **DENIES IN PART** CREW's Motion for Partial Summary Judgment as to its APA claim that Defendants' conduct violated the PRA's notice requirement, ECF No. 9 in 25-cv-1051. The Court **GRANTS** Protect Democracy's Motion for Partial Summary Judgment on its APA claim that Defendants' removal of

**JA 75**

the Public Apportionments Database violates the 2022 and 2023 Acts, ECF No. 18 in 25-cv-1111. The Court **DENIES AS MOOT** Plaintiffs' Motions for a Preliminary Injunction, ECF No. 9 in 25-cv-1051 and ECF No. 18 in 25-cv-1111. The Court **DISMISSES WITHOUT PREJUDICE** Count One of CREW's Complaint as prudentially moot. The Court **DISMISSES WITHOUT PREJUDICE** Counts Two through Six of Protect Democracy's Complaint as prudentially moot.

The Court **DENIES WITHOUT PREJUDICE** Defendants' request for a stay pending appeal and enters an administrative stay through 10:00 am on July 24, 2025.

Separate, appropriate Orders for each case accompany this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**July 21, 2025**

**JA 76**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br>      Plaintiff, <br><br>    v. <br><br> OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br>      Defendants. |

Civil Action No. 25-1051 (EGS)

<u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 9, is **GRANTED IN PART** as to its Administrative Procedure Act ("APA") claims that the Defendants' removal of the Public Apportionment Database violates the Consolidated Appropriations Act, 2022, the Consolidated Appropriations Act, 2023 (collectively the "2022 and 2023 Acts"), and the Paperwork Reduction Act's ("PRA") dissemination of information requirement, and **DENIED IN PART** as to its APA claim that Defendants' conduct violated the PRA's notice requirement; and it is further

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction, ECF No. 9, is **DENIED** as moot; and it is further

**JA 77**

**DECLARED** that Defendants' removal of the Public Apportionments Database and public access to apportionment information violates the 2022 and 2023 Acts and the PRA; and it is further

**ORDERED** that Defendants' action removing the Public Apportionments Database and public access to apportionment information as required by the 2022 and 2023 Acts is **VACATED and SET ASIDE**; and it is further

**ORDERED** that Defendants shall restore the Public Apportionments Database and make publicly available the apportionment information required to be disclosed by the 2022 and 2023 Acts, including the apportionment information from the time the database was taken offline on or about March 24, 2025, through the time the database is restored; and it is further

**ORDERED** that Defendants are **PERMANENTLY ENJOINED** from removing the Public Apportionments Database or otherwise ceasing to post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts without statutory authorization; and it is further

**ORDERED** that Count One of Plaintiff's Complaint, ECF No. 1, is **DISMISSED WITHOUT PREJUDICE** as prudentially moot; and it is further

**ORDERED** that an administrative stay is entered in this case until 10:00 am on July 24, 2025. This Order will automatically

**JA 78**

go into effect, unless further stayed by this Court or an appellate court, on July 24, 2025 at 10:01 am.

This is a final appealable Order. *See* Fed. R. App. P. 4(a).

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**July 21, 2025**

**JA 79**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
PROTECT DEMOCRACY PROJECT,

          Plaintiff,

     v.                          Civil Action No. 25-1111 (EGS)

U.S. OFFICE OF MANAGEMENT AND
BUDGET, et al.,

          Defendants.
```

<u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 18, is **GRANTED** on its Administrative Procedure Act claim that Defendants' removal of the Public Apportionments Database violates the Consolidated Appropriations Act, 2022 and the Consolidated Appropriations Act, 2023 (collectively the "2022 and 2023 Acts"); and it is further

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction, ECF No. 18, is **DENIED** as moot; and it is further

**DECLARED** that Defendants' removal of the Public Apportionments Database and public access to apportionment information violates the 2022 and 2023 Acts; and it is further

**ORDERED** that Defendants' action removing the Public Apportionments Database and public access to apportionment

**JA 80**

information as required by the 2022 and 2023 Acts is **VACATED and SET ASIDE**; and it is further

**ORDERED** that Defendants shall restore the Public Apportionments Database and make publicly available the apportionment information required to be disclosed by the 2022 and 2023 Acts, including the apportionment information from the time the database was taken offline on or about March 24, 2025, through the time the database is restored; and it is further

**ORDERED** that Defendants are **PERMANENTLY ENJOINED** from removing the Public Apportionments Database or otherwise ceasing to post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts without statutory authorization; and it is further

**ORDERED** that Counts Two through Six of Plaintiff's Complaint, ECF No. 1, are **DISMISSED WITHOUT PREJUDICE** as prudentially moot; and it is further

**ORDERED** that an administrative stay is entered in this case until 10:00 am on July 24, 2025. This Order will automatically go into effect, unless further stayed by this Court or an appellate court, on July 24, 2025 at 10:01 am.

This is a final appealable Order. *See* Fed. R. App. P. 4(a).

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**July 21, 2025**

**JA 81**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br> Plaintiff, <br><br> v. <br><br> OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Civil Action No. 25-1051 (EGS) |
| PROTECT DEMOCRACY PROJECT, <br><br> Plaintiff, <br><br> v. <br><br> U.S. OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Civil Action No. 25-1111 (EGS) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the Court are Motions to Enforce the Court's July 21, 2025 Order filed by Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Protect Democracy Project ("Protect Democracy"). *See* CREW Mot. to Enforce, ECF No. 39 in Civil Action No. 25-1051; Protect Democracy Mot. to Enforce, ECF No. 41 in Civil Action No. 25-1111. Defendants Office of Management and Budget ("OMB") and

**JA 82**

Director Russell Vought ("Director Vought") (collectively, "Defendants") filed a consolidated Opposition[1] to the motions, *see* CREW Opp'n, ECF No. 44 in Civil Action No. 25-1051, Protect Democracy Opp'n, ECF No. 47 in Civil Action No. 25-1111; and Plaintiffs each filed a Reply, *see* CREW Reply, ECF No. 45 in Civil Action No. 25-1051, Protect Democracy Reply, ECF No. 47 in Civil Action No. 25-1111. For the reasons explained below, the Court **GRANTS** each motion.

## I.    Background

On July 21, 2025, the Court granted summary judgment to CREW and Protect Democracy on their claims that the Defendants' removal of the Public Apportionments Database ("database") violated the 2022 and 2023 Consolidated Appropriations Acts, and to CREW on its claim that the removal violated certain provisions of the Paperwork Reduction Act. *See Citizens for Responsibility and Ethics in Washington v. Office of Management and Budget*, 791 F. Supp. 3d 29 (D.D.C. 2025).

The 2022 Act required OMB to

> implement[ ] [ ] an automated system to post each document apportioning an appropriation ... including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code),

---

[1]Because Defendants filed a consolidated Opposition, the Court will cite only to the Opposition filed in Civil Action No. 25-1051, ECF No. 44.

> not later than 2 business days after the date of approval of such apportionment[.]

Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 257 (March 15, 2022) (codified at 31 U.S.C. § 1513 note).

The 2023 Act provides:

> In fiscal year 2023 and each fiscal year thereafter ... [OMB] shall operate and maintain the automated system required to be implemented by [the 2022 Act] ... and shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes[.]

Pub. L. No. 117-328, div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022) (codified at 31 U.S.C. § 1513 note).

The Court issued a separate Order in each case since the claims were not identical, but the following language in each Order was identical. Specifically, the Court

> **ORDERED** that Defendants shall restore the Public Apportionments Database and make publicly available the apportionment information required to be disclosed by the 2022 and 2023 Acts, including the apportionment information from the time the database was taken offline on or about March 24, 2025, through the time the database is restored; and . . . further

> **ORDERED** that Defendants are **PERMANENTLY ENJOINED** from removing the Public Apportionments Database or otherwise ceasing to post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts without statutory authorization . . .

**JA 84**

Order, ECF No. 32 in Civil Action No. 25-1051 at 2[2]; Order, ECF No. 33 in Civil Action No. 25-1111 at 2.

Defendants restored the database on August 15, 2025. *See* CREW Mot. to Enforce, ECF No. 39 in Civil Action No. 25-1051 at 4; Protect Democracy Mot. to Enforce, ECF No. 41 in Civil Action No. 25-1111 at 6. Plaintiffs filed their respective Motions to Enforce, however, because they claim that in certain legally-binding footnotes to the apportionment, OMB conditions the agency's use of apportioned funds on the contents on the latest "spend plan" that OMB must approve, but OMB has refused to publicly disclose the spend plans. *See* Protect Democracy Mot. to Enforce, ECF No. 41 in Civil Action No. 25-1111 at 2; CREW Mot. to Enforce, ECF No. 39 in Civil Action No. 25-1051 at 4.

"Spend plans are issued by agencies to provide information about the allocation of agency resources." *See* Suppl. Kelly Kinneen Decl. ("Kinneen Decl."), ECF No. 44-1 ¶ 9; *see also* Protect Democracy Mot. to Enforce, ECF No. 41-1 in Civil Action No. 25-1111 at 4 (explaining that a spend plan is a plan setting forth how the agency intends to use its appropriated funds). "OMB may from time-to-time request that an agency provide a spend plan, which "is generally at a more granular level than an

_____

[2]When citing electronic filings throughout this opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

apportionment and thereby provides greater insight into how an agency intends to utilize its apportioned funds." Kinneen Decl., ECF No. 44-1 ¶ 9. Spend plans provide information about "how the agency intends to spend their appropriated funds, including how much funding the agency needs to dedicate to particular programs and activities, furthering OMB's financial management and oversight responsibilities." *Id*. "Since OMB established the Public Apportionments Database in 2022, OMB has approved many apportionments that, in legally binding footnotes, provided that funds would become available for obligation upon OMB's receipt of a spend plan from the agency." Suppl. Christina Wentworth Decl. ("Wentworth Decl."), ECF No. 39-1 in Civil Action No. 25-1051 ¶ 9.

The footnote references to spend plans at issue in the pending motions contain language such as that set forth below, stating that the agency's ability to obligate apportioned funds is conditioned on OMB's approval of a forthcoming spend plan, subject to certain exceptions:

> Amounts apportioned, but not yet obligated as of the date of this reapportionment, are available for obligation consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the Department of Health and Human Services (HHS) and the Office of Management and Budget (OMB). Such spending plan submitted by HHS shall include: the anticipated obligations of such amounts by spending category (e.g., salaries and expenses, training and technical assistance,

**JA 86**

> basic block grant, etc.); detailed information on currently anticipated grants utilizing such obligated amounts, including projected amounts for each disbursement; and a detailed description of how such spending plan aligns with Administration priorities. Any revisions or additions to such spending plan shall be proposed to OMB in writing no later than five business days before the anticipated obligation of funds based on such revisions or additions. If OMB agrees to such revision or addition, the latest agreed-upon spend plan shall include that modification. In the absence of an agreed-upon spend plan between HHS and OMB, HHS may obligate funds on this line only as necessary for Federal salary and payroll expenses or making payments otherwise required by law. [Rationale: An agency spend plan or other documentation is necessary to better understand how the agency intends to obligate some or all of the apportioned funds.]

https://openomb.org/file/11424629.

In particular, CREW states that "at least 131 of the 2,245 apportionment documents in the database that OMB approved between March 24, 2025, and September 5, 2025, include a legally binding footnote that incorporates by reference the contents of an undisclosed spend plan." Wentworth Decl., ECF No. 39-1 ¶ 6.

## II.  Standard of Review

"In deciding a motion to enforce judgment, a district court has 'the authority to enforce the terms of [its] mandate[ ].'" *WildEarth Guardians v. Bernhardt*, No. CV 16-1724 (RC), 2019 WL 3253685, at *3 (D.D.C. July 19, 2019) (quoting *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014)). "A court asked

**JA 87**

to enforce a prior order should grant the motion when a 'prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it[ ].'" *Id.* (quoting *Heartland Hosp. v. Thompson,* 328 F. Supp. 2d 8, 11 (D.D.C. 2004)). "The key question for this Court, then, is whether Plaintiffs have 'received all relief required' by the Court's earlier order." *Id.* (quoting *Heartland Hosp.,* 328 F. Supp. 2d at 11).

### III. Analysis

#### A. Defendants Must Disclose Agency "Spend Plans" Where OMB Has Incorporated-By-Reference in a Legally-Binding Footnote the Terms of the Spend Plan as a Document Apportioning an Appropriation

Plaintiffs argue that where the contents of an agency's spend plan has been incorporated by reference in legally binding footnotes as a result of OMB's directive that funds are only available for obligation consistent with the latest agreed-upon spend plan, the spend plan must be disclosed under the 2022 and 2023 Acts because the spend plan is a "document apportioning an appropriation." Protect Democracy Mot. to Enforce, ECF No. 41 at 7 (noting that "OMB has made the agency's obligation of funds contingent upon the *contents* of the spend plan, and upon OMB's *approval* of the contents of the spend plan.") *see also* CREW Mot. to Enforce, ECF No. 39 in Civil Action No. 25-1051 at 7 (noting that "the apportionments at issue in this motion do not merely

**JA 88**

require agencies to submit spend plans to OMB; they provide that funds are available for obligation in accordance with the contents of the spend plans"). Defendants do not dispute that the footnotes at issue here that reference spend plans are legally binding. *See* Kinneen Decl., ECF No. 44-1 ¶ 6.

When a "secondary document" is incorporated by reference, it becomes "part of [the] primary document." Black's Law Dictionary, Incorporation by Reference (12th ed. 2024) Moreover, "[w]here a writing refers to another document, that other document . . . becomes constructively a part of the writing, and in that respect the two form a single instrument." 11 Richard A. Lord, *Williston on Contracts* § 30:25 (4th ed. 2008). Put otherwise, "[t]he incorporated matter is to be interpreted as part of the writing." *Id.* Defendants fail to respond to Plaintiffs' incorporation-by-reference argument, *see generally* Opp'n, ECF No. 44.

The Court agrees with Plaintiffs that when OMB conditions the ability of an agency to obligate funds upon OMB's agreement with the contents of a spend plan in a legally-binding footnote, OMB has incorporated-by-reference the terms of the spend plan into the apportionment and therefore the spend plan is a "document apportioning an appropriation" that must be disclosed under the 2022 and 2023 Acts.

**JA 89**

Defendants argue that spend plans "are not documents apportioning an appropriation"; rather, a footnote's reference to the spend plan "merely memorializes that the spending plan informed the manner in which the appropriation is apportioned." *Id*. at 3. However, the spend plans at issue here do not "merely memorialize[] that the spending plan informed the manner in which the appropriation is apportioned." Rather, these spend plans contain the terms of OMB's decisions about how to apportion the appropriated funds. And OMB does not refute that when it incorporates by reference the terms of spend plans in legally binding apportionment footnotes, it has made the terms of the spend plans legally binding. Indeed, OMB acknowledges that "[a]ttachments, such as spend plans, are … legally binding and subject to the Anti-deficiency Act [ADA] 'if they are specifically referenced in a footnote in the OMB Action column of the Application of Budgetary Resources section of the apportionment.'" Opp'n, ECF No. 44 at 3 (quoting OMB Circular A-11 § 120.36).

Defendants claim that there is no difference between OMB allowing an agency to obligate funds within a certain number of days after submission of a spend plan versus conditioning an agency's ability to obligate funds upon OMB's approval of a spend plan because in either case "OMB receives the information it needs to inform its apportionment." Opp'n, ECF No. 44 at 4.

**JA 90**

Defendants' claim is incorrect. As explained above, when OMB incorporates by reference the terms of the spend plan, the agency must obligate consistently with the spend plan pursuant to the ADA.

Defendants point to historical practice, arguing that the prior Administration did not include spend plans as part of the disclosure required under the 2022 and 2023 Acts. *See id*. at 5. The Court is unpersuaded by this argument because Defendants fail to distinguish between OMB allowing an agency to obligate funds within a certain number of days after submission of a spend plan versus conditioning an agency's ability to obligate funds upon OMB's approval of a spend plan. *See generally id*. Furthermore, CREW has demonstrated that prior to March 2025, OMB rarely incorporated the terms of spend plans by reference in legally binding apportionment documents. *See* Wentworth Decl., ECF No. 39-1 ¶ 10 (noting that "of the 22,361 apportionments approved between August 15, 2021, and March 21, 2025, I identified less than a quarter of one percent of apportionments that appeared to incorporate by reference the contents of a spend plan"). Defendants have not refuted this factual assertion. *See generally* Opp'n, ECF No. 44.

Finally, Defendants assert that spend plans contain sensitive and predecisional information not intended for public dissemination. *See id*. at 5, 6. However, Defendants do not claim

**JA 91**

that the spend plans are predecisional and deliberative, nor do they make any formal assertion of privilege. In any event, the Court has already rejected the argument that apportionment information cannot be disclosed because it is deliberative, predecisional information. See *CREW*, 791 F. Supp. 3d at 54 (holding that "[t]he information on the Public Apportionments Database is neither predecisional nor deliberative because apportionments, including footnotes, are final "OMB-approved plan[s]" that are "legally binding.") (citations omitted).

For all these reasons, when in a legally binding footnote OMB conditions the ability of an agency to obligate funds upon OMB's agreement with the contents of a spend plan, OMB has incorporated-by-reference the spend plan into the apportionment and therefore the spend plan is a "document apportioning an appropriation" that must be disclosed under the 2022 and 2023 Acts.

### B. Plaintiffs Have Not Sought to Improperly Expand the Scope of the Court's Order

As explained above, where OMB has incorporated-by-reference the spend plans, the spend plans are subject to the 2022 and 2023 Acts. The Court therefore rejects Defendants' argument that Plaintiffs seek to improperly expand the scope of the Court's Order. Rather, since Defendants have chosen to incorporate spend plans by reference but have not provided the spend plans,

**JA 92**

Plaintiffs have not "received all relief required by the Court's earlier order."  *WildEarth Guardians*, 2019 WL 3253685, at *3.

### C. Plaintiffs Have Not Waived Any Arguments With Respect to the Spend Plans

Defendants argue that Plaintiffs have waived any argument regarding the spend plans because "they have at all times been on notice of OMB's use of spend plans to inform agency apportionment decisions and OMB's practice of not publishing spend plans, a practice preexisting this administration." Opp'n, ECF No. 44 at 6. The Court concludes that Plaintiffs have not waived any arguments with respect to the spend plans.

First, CREW has demonstrated, and Defendants have not refuted, that prior to March 2025, OMB rarely incorporated the terms of spend plans by reference in legally binding apportionment documents. *See* Wentworth Decl., ECF No. 39-1 ¶ 10 (noting that "of the 22,361 apportionments approved between August 15, 2021, and March 21, 2025, I identified less than a quarter of one percent of apportionments that appeared to incorporate by reference the contents of a spend plan"). Second, because Defendants illegally removed the database, Plaintiffs could not have known that OMB is now with significantly greater frequency incorporating spend plans by reference into apportionment documents. Specifically, CREW has demonstrated that between March 24, 2025, and September 5, 2025, 5.8% of the

**JA 93**

apportionment documents incorporated by reference an undisclosed spend plan. *Id*. ¶ 6. Plaintiffs have not waived this argument because until the illegally removed database was restored, Plaintiffs could not have known that documents "required to be disclosed by the 2022 and 2023 Acts" were missing.

## IV.    Conclusion and Order

As explained above, OMB has incorporated-by-reference the terms of certain spend plans in legally binding footnotes. Since the terms of such spend plans contain legally binding limits on the agencies' ability to obligate funds, the spend plans are "documents apportioning an appropriation," 31 U.S.C. § 1513 note; and must be made publicly available under the 2022 and 2023 Acts and this Court's July 21, 2025, Order. Because the spend plans have not been made publicly available, Plaintiffs have not "received all relief required by the Court's earlier order." *WildEarth Guardians,* 2019 WL 3253685, at *3 (cleaned up). Accordingly, it is hereby

**ORDERED** that CREW's Motion to Enforce, ECF No. 39 in Civil Action No. 25-1051; and Protect Democracy's Motion to Enforce, ECF No. 41 in Civil Action No. 25-1111 are **GRANTED**; and it is further

**ORDERED** that Defendants Office of Management and Budget and Director Russell Vought **SHALL COMPLY** with this Court's July 21, 2025, Order by posting in the Public Apportionments Database,

**JA 94**

for all apportionments approved since March 24, 2025, and for all future apportionments, spend plans whose terms are incorporated by reference in legally binding apportionment documents, including revised and new spend plans whose terms are incorporated by reference in legally binding apportionment documents.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**January 28, 2026**

**JA 95**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br>     1331 F Street NW, Suite 900<br>     Washington, DC 20004,<br><br>               Plaintiff,<br><br>          v.<br><br>OFFICE OF MANAGEMENT AND BUDGET,<br>     725 17th Street NW<br>     Washington, DC 20503,<br><br>and<br><br>RUSSELL T. VOUGHT, in his official capacity as Director, Office of Management and Budget,<br>     725 17th Street NW<br>     Washington, DC 20503,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      By law, defendant Office of Management and Budget (OMB) is required to operate and maintain an automated system for posting on a publicly accessible website "each document apportioning an appropriation … including any associated footnotes" and a written explanation in each document explaining the rationale for any associated footnotes. Consolidated Appropriations Act, 2023, div. E, § 204; Consolidated Appropriations Act, 2022, div. E, § 204(b)–(c), *codified at* 31 U.S.C. § 1513 note. Pursuant to those statutes, OMB created and, until recently, operated and maintained an automated system for posting each apportionment document, including footnotes and written explanations, to a publicly accessible website (the Public Apportionments Database).

1

2.      The Public Apportionments Database is an important tool used by plaintiff Citizens for Responsibility and Ethics in Washington and other members of the public to understand how OMB controls and imposes conditions on agency spending. The information contained in the Public Apportionments Database is critical to understanding how OMB has apportioned funds appropriated by Congress, including any requirements or conditions imposed by OMB on an agency's spending of Congressionally appropriated funds.

3.      On or about March 24, 2025, defendants OMB and Russell Vought removed the Public Apportionments Database and the information that it contained. Several days later, Defendants stated in a letter to Congress that "OMB will no longer operate and maintain the publicly available automated system" as required by the 2023 Act. Defendants' action is unlawful.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. § 1331.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because OMB is an agency of the United States.

## PARTIES

6.      Plaintiff Citizens for Responsibility and Ethics in Washington (CREW) is a non-partisan, non-profit government watchdog organization based in Washington, D.C. CREW is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring transparency, ethics, and integrity in government. To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of those activities, CREW routinely relies on government records and data made available to it under the Freedom of Information Act (FOIA), the Ethics in Government Act, the Federal Advisory Committee Act, and other federal transparency laws. CREW uses that information to create public-

2

**JA 97**

facing reports, draft administrative complaints and requests for investigation, and craft targeted FOIA requests for additional information. CREW widely disseminates these materials to the public through its website, which receives hundreds of thousands of page views every month.

7. Monitoring how the Executive Branch utilizes appropriated funds has long been a core focus of CREW's public-facing work. As part of that work, CREW routinely relies on the Public Apportionments Database. For example, CREW monitors apportionment data for the potential withholding of appropriated funds, relies on apportionment data to identify the potential misuse of public money, has requested federal records based on information gathered from apportionment data, has referred the public and congressional leadership to the Public Apportionments Database as part of CREW's advocacy regarding the Impoundment Control Act, and has relied on information from the Public Apportionments Database in court filings. Without public access to the information contained in the Public Apportionments Database, including the documents, footnotes, and written explanations required by law, CREW will not be able to monitor apportionment data for possible impoundments, analyze the data as part of CREW's work in monitoring government operations and funding, and disseminate those findings to the public.

8. Defendant OMB is a federal agency with responsibility for overseeing the management of federal financial assistance, including by establishing policies and requirements. *See* 31 U.S.C. §§ 503(a), 504.

9. Defendant Russell T. Vought is the Director of OMB. He is sued in his official capacity.

**JA 98**

## STATUTORY BACKGROUND

**OMB's Apportionment of Appropriated Funds**

10.     Pursuant to the Anti-Deficiency Act, the President must "apportion in writing an appropriation available to an executive agency." 31 U.S.C. § 1513(b)(1). Appropriated funds are apportioned by "time period[]" or "activities, functions, projects, or objections," or a combination of both. *Id.* § 1512(b)(1). An apportionment is a "legally binding" budget decision. OMB, Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 120.1, at 5 (2024).[1] A federal officer or employee "may not make or authorize an expenditure or obligation exceeding … an apportionment," 31 U.S.C. § 1517(a)(1), and a federal official responsible for authorizing an expenditure or obligation exceeding an apportionment may be subject to adverse personnel actions or criminal penalties, *id.* §§ 1518, 1519.

11.     By executive order, the President delegated to OMB the authority to apportion appropriated funds to executive agencies. *See* Exec. Order No. 6,166 (June 10, 1933), *amended by* Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987).

12.     Through apportionments, OMB makes appropriated funds available for agency spending. In its apportionment documents, including in footnotes for apportioned amounts, OMB has imposed conditions on agency spending. For example, an apportionment footnote might direct agencies to take certain actions with respect to the appropriated funds or withhold those funds from agencies.[2]

---

[1] https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

[2] *See* U.S. Gov't Accountability Office, Decision, File No. B-331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance* (Jan. 16, 2020), https://www.gao.gov/assets/b-331564.pdf (describing OMB's withholding of funds appropriated for U.S. security assistance to Ukraine and concluding that OMB's withholding "for a policy reason" violated the Impoundment Control Act).

**JA 99**

**The 2022 and 2023 Consolidated Appropriations Acts**

13. In the Consolidated Appropriations Act, 2022 (the 2022 Act), Congress required OMB to post on a publicly accessible website a database with OMB's documents and associated footnotes apportioning appropriated funds. Specifically, the 2022 Act required OMB to "implement[] … an automated system to post each document apportioning an appropriation … including any associated footnotes … not later than 2 business days after the date of approval of such apportionment" and to "place on such website each document apportioning an appropriation … including any associated footnotes[] already approved the current fiscal year." Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257 (Mar. 15, 2022). Congress further required that "[e]ach document apportioning an appropriation … that is posted on a publicly accessible website pursuant to such section shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *Id.* § 204(c). In addition, the 2022 Act required that documents apportioning an appropriation be posted "in a format that qualifies each such document as an open Government data asset (as defined in [44 U.S.C. § 3502])." *Id*. § 204(b).

14. In the Consolidated Appropriations Act, 2023 (the 2023 Act), Congress required that "[i]n fiscal year 2023 and *each fiscal year thereafter*," OMB "*shall* operate and maintain the automated system required to be implemented" by the 2022 Act and "*shall* continue to post each document apportioning an appropriation … including any associated footnotes." Pub. L. No. 117-328, div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022) (emphases added). The 2023 Act further provided that, for each document posted on the publicly accessible website, the requirement of a written explanation of the rationale for footnotes for apportioned amounts "*shall* continue to apply." *Id.* § 204(2) (emphasis added). Like the 2022 Act, the 2023 Act also required that the

5

**JA 100**

documents apportioning an appropriation be posted "in a format that qualifies each such document as an open Government data asset (as that term is defined in [44 U.S.C. § 3502])." *Id.* § 204(2).

**The Paperwork Reduction Act**

15. Congress enacted the Paperwork Reduction Act to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7).

16. To accomplish those goals, the Paperwork Reduction Act mandates that every agency must "ensure that the public has timely and equitable access to the agency's public information" and must "regularly solicit and consider public input on the agency's information dissemination activities." *Id.* §§ 3506(d)(1), (2). The Paperwork Reduction Act further mandates that agencies must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.* § 3506(d)(3).

17. OMB has defined "information dissemination product" as "any recorded information, regardless of physical form or characteristics, disseminated by an agency, or contractor thereof, to the public." OMB, Circular No. A-130 Revised, 2016 WL 7664619, at *22 (July 28, 2016).

**FACTUAL BACKGROUND**

18. To implement the 2022 Act, OMB, in July 2022, posted on a publicly accessible website a database, at https://apportionment-public.max.gov/, containing apportionment

**JA 101**

documents, associated footnotes, and written explanations for footnotes for apportioned amounts (the Public Apportionments Database).

19.     To comply with the requirements of the 2022 Act and the 2023 Act, between July 2022 and on or about March 24, 2025, OMB continued to maintain and operate the Public Apportionments Database and the publicly accessible website that housed it. During that time, OMB posted to the Public Apportionments Database (i) documents and associated footnotes apportioning appropriated funds within two business days of the approval date of the apportionment and (ii) all documents apportioning an appropriation and associated footnotes that were already approved during the fiscal year. Further, in documents posted in the Public Apportionments Database, OMB included written explanations by the official approving the apportionment with the rationale for any footnotes for the apportioned amounts.

20.     On or about March 24, 2025, Defendants removed the Public Apportionments Database, the information it contained, and the website that housed the database and information. Defendants replaced the website that had housed the Public Apportionments Database and information with a "Page Not Found" error message.

21.     Defendants provided no notice or explanation prior to its removal of the Public Apportionments Database.

22.     On March 24, 2025, Congresswoman Rosa DeLauro, Ranking Member of the House Appropriations Committee, and Senator Patty Murray, Senate Appropriations Committee Vice Chair, issued a joint statement calling on Defendants to restore immediately public access to the Public Apportionments Database.[3]

---

[3] Press Release, Rep. Rosa DeLauro & Sen. Patty Murray, *What Are They Hiding? DeLauro, Murray Demand OMB Promptly Restore Access to Website Detailing Federal Spending Allocations, As Federal Law Requires* (Mar. 24, 2025), https://democrats-

**JA 102**

23.    Approximately five days after OMB removed the Public Apportionments Database, Defendant Vought stated in a letter to Congress that "[OMB] will no longer operate and maintain the publicly available system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023." Vought further stated that "OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information."[4]

24.    Defendants' statements in the letter are inconsistent with OMB's prior statement that apportionment footnotes reflect final agency decisions that are not themselves predecisional or deliberative.[5]

25.    The Public Apportionments Database and the information that it contains, including information about prior apportionments and any apportionments that have been made since the removal of that database, are not available on any other publicly accessible government website.

## CLAIMS FOR RELIEF

### Count One

26.    Under the Administrative Procedure Act (APA), a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

appropriations.house.gov/news/press-releases/what-are-they-hiding-delauro-murray-demand-omb-promptly-restore-access-website.

[4] Letter from Russell Vought to Sen. Patty Murray, Mar. 29, 2025, https://x.com/PattyMurray/status/1906821477959074083/photo/1.

[5] *See, e.g.*, Defs.' Mem. in Supp. of Mot. For Summ. J., at 3, 28–35, *Ctr. for Public Integrity v. U.S. Dep't of Def.*, No. 1:19-cv-3265, ECF No. 22 (D.D.C. Jan. 31, 2020).

**JA 103**

27.     Defendants' failure to maintain or operate the Public Appropriations Database on a publicly accessible website violates the requirements of the 2023 Act, which imposed on OMB a continuing obligation to publicly post the information required by the 2022 Act.

28.     Defendants' removal of the Public Apportionments Database and the information it contained from a publicly accessible website was done without reasoned decisionmaking.

29.     Defendants' removal of the Public Apportionments Database and the information it contained, failure to operate and maintain the Public Apportionments Database, and failure to make publicly accessible the information required by the 2022 Act are arbitrary, capricious, and not in accordance with the requirements of the 2023 Act.

### Count Two

30.     Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

31.     The Public Apportionments Database and the information it contained are significant information dissemination products. *See* 44 U.S.C. § 3506(d)(3).

32.     Because it provided no advance public notice before removing the Public Apportionments Database and the information it contained from the publicly available website, Defendants failed to comply with the Paperwork Reduction Act requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id*.

33.     In removing the Public Apportionments Database and the information it contained from the publicly available website, Defendants failed to comply with the Paperwork Reduction

**JA 104**

Act requirement that an agency "ensure that the public has timely and equitable access to the agency's public information." *Id.*

34.    By removing the Public Apportionments Database and the information contained in it from the publicly available website, Defendants failed to observe procedures required by law and took agency action not in accordance with the Paperwork Reduction Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.    Declare unlawful Defendants' failure to maintain and operate a publicly accessible automated system for posting OMB's documents apportioning appropriated funds, associated footnotes, and written explanations;

B.    Declare unlawful Defendants' removal of the Public Apportionments Database and the information it contained from the publicly accessible website;

C.    Enter a preliminary and permanent injunction requiring Defendants to restore the Public Apportionments Database, including the information contained within it, or otherwise to make available on a publicly accessible website the information about apportionments of appropriated funds described in the 2022 Act and the 2023 Act;

D.    Enter a preliminary and permanent injunction enjoining Defendants from removing the Public Apportionments Database and the information it contained from a publicly accessible website without statutory authorization;

E.    Award Plaintiff its reasonable costs and attorneys' fees; and

F.    Grant such other and further relief as this Court may deem just and proper.

**JA 105**

Dated: April 8, 2025

Respectfully submitted,

/s/ *Wendy Liu*

Wendy Liu (DC Bar No. 1600942)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Nikhel S. Sus (DC Bar No. 1017937)
Yoseph T. Desta (DC Bar No. 90002042)*
Citizens for Responsibility and Ethics in
Washington
1331 F St. NW, Suite 900
Washington, DC 20004
Phone: (202) 408-5565
Fax: (202) 508-5020
nsus@citizensforethics.org
ydesta@citizensforethics.org

*pro hac vice motion forthcoming

*Counsel for Plaintiff*

11

**JA 106**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 25-cv-1051 |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF CHRISTINA L. WENTWORTH**

I, Christina L. Wentworth, declare as follows:

1.     I am Senior Policy Counsel for Citizens for Responsibility and Ethics in Washington (CREW). At CREW, I develop resources to educate the public and lawmakers about government operations, provide technical assistance on legislation and oversight, advocate for ethics and transparency in government, seek government records and data under the Freedom of Information Act (FOIA), and draft written public-facing analyses, reports, and other materials to raise awareness of government activities. As part of this work, I analyze laws making appropriations and routinely monitor federal spending and the potential withholding of federal funds by the executive branch in violation of the Impoundment Control Act (ICA).

2.     Before working at CREW, I served as Counsel for the House Budget Committee and as an Appropriations Law Attorney at the U.S. Government Accountability Office.

3.     I make this declaration based on my personal knowledge, consultation with my colleagues at CREW, and review of CREW's files.

1

**JA 107**

4.      CREW is a non-partisan, non-profit government watchdog organization based in Washington, D.C. CREW is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies; monitoring and informing the public about key government activities, including the executive branch's use of appropriated funds; ensuring transparency, ethics, and integrity in government; and empowering citizens to have an influential voice in government decisions and in the government's decision-making process.

5.      To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of those activities, CREW routinely relies on government records and data made available to it under FOIA, the Ethics in Government Act, the Federal Advisory Committee Act, and other federal transparency laws. CREW uses that information to create public-facing reports, draft administrative complaints and requests for investigation, and craft targeted FOIA requests for additional information, including resources and requests related to federal government spending.[1] CREW widely disseminates these materials to the public through its website, which typically receives over 150,000 page views every month.

6.      In support of CREW's work monitoring how the executive branch utilizes appropriated funds, CREW routinely relies on the website through which the Office of Management and Budget (OMB)   until recently   publicly posted each document apportioning

---

[1] *See, e.g.*, CREW, *Mnuchin's Middle East business trips cost Secret Service up to
  ,*   (May   3,   2023),   https://www.citizensforethics.org/reports-investigations/crew-investigations/mnuchins-middle-east-business-trips-cost-secret-service-up-to-253000/;   CREW, *The Architect of the Capitol abused his authority. Congress should call for his resignation* (Nov. 17, 2022), https://www.citizensforethics.org/news/analysis/the-architect-of-the-capitol-abused-his-authority-congress-should-call-for-his-resignation/; CREW, *Pompeo's Madison Dinners cost taxpayers   nearly      ,*   (July   7,   2021),   https://www.citizensforethics.org/reports-investigations/crew-investigations/pompeo-madison-dinners-cost-taxpayers-nearly-65000/; CREW, *Congress told ICE to decrease detentions. Then ICE spent      million   expanding its network* (Oct.   13,   2020),   https://www.citizensforethics.org/reports-investigations/crew-investigations/congress-told-ice-to-decrease-detentions-20-million-expanding-lasalle-corrections/.

2

**JA 108**

an appropriation no later than two business days after approval of an apportionment (the Public Apportionments Database).[2]

7.      Because CREW compares new apportionments to prior apportionments to evaluate changes in government operations, access to all approved apportionments required to be made publicly available    that is, apportionments approved from fiscal year 2022 onward    is critical to CREW's work in monitoring federal government spending.

8.      Timely access to apportionments also is critical to CREW's work monitoring, analyzing, and reporting on issues related to impoundments and federal government spending.[3] Recipients of federal financial assistance may suffer immediate harm if the federal government withholds federal funding,[4] and without access to apportionments within the time mandated by law    "not later than 2 business days after the date of approval of such apportionment"[5]    CREW cannot contemporaneously monitor whether OMB is using the apportionment process to withhold appropriated funds. In addition to the need for CREW to have prompt access to apportionments to monitor potential impoundments, CREW's work analyzing executive branch spending, generally,

---

[2] *Approved Apportionments*, OMB, https://apportionment-public.max.gov/; 31 U.S.C. § 1513 note.

[3] An impoundment occurs "[w]hen the President (or any officer or employee of the executive branch), through action or inaction, delays or withholds enacted funding." U.S. Gov't Accountability Office, *Impoundment Control Act* (last visited Apr. 17, 2025), https://www.gao.gov/legal/appropriations-law/impoundment-control-act. Such enacted funding includes appropriations available for a fixed period, which "expire[]" at the end of their period of availability, and appropriations available for an indefinite period. *See* U.S. Gov't Accountability Office, GAO-05-734SP, *A    lossary of Terms Used in the Federal Budget Process* 21 (Sept. 2005) (defining "appropriations" as "[b]udget authority to incur obligations and to make payments from the Treasury for specific purposes"); *id.* at 22–23 (defining different durations of appropriations).

[4] "It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows    debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended." Mem. and Order, at 35,    *ew    ork v. Trump*, No. 1:25cv39 (D.R.I. Mar. 6, 2025), ECF No. 161.

[5] 31 U.S.C. § 1513 note.

is time-sensitive given the limited period of availability of many appropriated funds.[6] That is, because time-limited funds remain available for obligation, or new legal commitments, only during their period of availability, it is important that CREW alert the public to the potential misuse of such funds before they expire.[7] Accordingly, CREW typically accesses apportionments as soon as they are posted.

9.    CREW's ability to monitor apportionments through the Public Apportionments Database promptly and without delay is essential to its mission to promote government transparency and accountability and to disseminate information about government activity to the public. OMB does not post approved apportionments for executive agencies on any other publicly available government website or otherwise make apportionments publicly available. Without timely access to apportionments, CREW is unable to satisfy its mission to inform the public about matters of significant public interest and importance.

10.    CREW relies on the Public Apportionments Database to monitor potential withholdings of appropriated funds and to support its work related to the ICA.[8]

11.    Because apportionments are legally binding, and because federal officials who are responsible for obligating or expending more than OMB has apportioned may face administrative or criminal penalties, apportionments represent a powerful tool for OMB control of agency activity.[9]

---

[6] *See supra* note 3.

[7] *See* 31 U.S.C. § 1502(a); U.S. Gov't Accountability Office, GAO-05-734SP, *A lossary of Terms Used in the Federal Budget Process* 70 (Sept. 2005) (defining "obligation" as a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received").

[8] The ICA prohibits the president from unilaterally withholding congressionally appropriated funds, but gives the president strictly circumscribed authority to temporarily do so after proposing funds for "deferral" or "rescission" under the procedures outlined in the Act. 2 U.S.C. §§ 681–88.

[9] 31 U.S.C. §§ 1517–19.

12.     On January 20, 2025, President Trump issued a series of executive orders establishing the president's policy agenda for his second term and directing agencies to "pause," or withhold, funds appropriated by Congress.[10] This included an order to all department and agency heads to "immediately pause new obligations and disbursements" of foreign development assistance, and a direction that OMB "shall enforce this pause through its apportionment authority."[11] In response to these directives, CREW sent a letter to congressional leadership, alerting them to the fact that the president had directed these withholdings without complying with the procedures outlined in the ICA.[12] In the letter, CREW explained that during the first Trump administration OMB had violated the ICA by using apportionments to withhold funds for policy reasons, and that the president now had "directed OMB to attempt to use its limited apportionment authority to again withhold funds to further the president's policies."[13] CREW highlighted that Congress had passed a law requiring OMB to publish apportionments and cited the public website on which OMB posted such documents, "urg[ing] Congress to ensure that OMB continues to comply with" this law to "facilitate Congress's and GAO's review of any withholdings at OMB."[14]

13.     As of April 15, 2025, CREW's landing webpage for this letter had been viewed 18,244 times.[15]

---

[10] *See Reevaluating and Realigning United States Foreign Aid*, Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) (hereinafter *Reevaluating Foreign Aid*); *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025); *Protecting the American People Against Invasion*, Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025).

[11] *See Reevaluating Foreign Aid*.

[12] Letter from CREW to Sen. Thune, Sen. Schumer, Rep. Johnson, & Rep. Jeffries, *Re Potential Impoundment Control Act iolations*, at 1, 4 (Jan. 27, 2025), https://www.citizensforethics.org/wp-content/uploads/2025/01/Letter-to-Congress_-Potential-Impoundment-Control-Act-Violations.pdf.

[13] *Id.* at 5.

[14] *Id.* at 5–6; *id.* at 5 n.32.

[15] *See* CREW, *Trump's executive orders may violate the Impoundment Control Act* (Jan. 27, 2025), https://www.citizensforethics.org/legal-action/letters/trumps-executive-orders-may-violate-impoundment-control-act/.

14.    Prompt public awareness of any use of the apportionment process to withhold funds is critical to CREW's role in informing the national debate on government funding and to Congress's and the public's ability to promptly discuss or respond to any possible legal violations.

15.    If CREW gained access to apportionment data several months or years after an apportionment's approval  instead of within two business days as mandated by law  the information would have substantially less value to CREW and the public, and would frustrate CREW's ability to fulfill its mission-critical functions.

16.    In addition to CREW's work monitoring the potential use of the apportionment process to withhold funds, CREW has published other materials on the ICA, including an analysis related to the Act's procedures for reducing government spending and a resource on the ICA's " ey Concepts," which explains OMB's role in apportioning funds and outlines the requirement that OMB publicly post each document apportioning an appropriation.[16]

17.    As of April 15, 2025, CREW's ICA analysis and its landing webpage for the " ey Concepts" resource had been viewed 7,034 and 1,922 times, respectively.[17]

---

[16] CREW, *ey Concepts Related to the Impoundment Control Act of* (last visited Apr. 17, 2025), https://www.citizensforethics.org/wp-content/uploads/2025/01/ ey-ICA-Concepts.pdf; *see also* CREW, *Why Trump's confusion about the Impoundment Control Act is a problem for him, for Congress and for everyday Americans* (Feb. 4, 2025), https://www.citizensforethics.org/news/analysis/why-trumps-confusion-about-the-impoundment-control-act-is-a-problem-for-him-for-congress-and-for-everyday-americans/ (ICA Analysis).

[17] *See* ICA Analysis, *supra* note 16; *see also* CREW, *Understanding the Impoundment Control Act* (Feb. 4, 2025), https://www.citizensforethics.org/reports-investigations/crew-reports/understanding-the-impoundment-control-act/.

**JA 112**

18.    CREW also relies on the Public Apportionments Database to monitor funding for the U.S. DOGE Service (DOGE), which the president established on January 20, 2025.[18] CREW actively seeks and disseminates information about DOGE to the public.[19]

19.    I am unaware of any funding that Congress has appropriated specifically for DOGE. However, between January 27, 2025, and March 2, 2025, OMB approved a series of apportionments (the "DOGE apportionments"), totaling 41,121,156, for a "Software Modernization Initiative" for a United States DOGE Service account.[20] Many of the apportionments referred to the Economy Act or otherwise cited "reimbursements" as the source of the funds.[21]

20.    The only way for CREW to monitor funding apportioned to DOGE is by reviewing publicly posted apportionments.

---

[18] *See Establishing and Implementing the President's Department of overnment Efficiency,* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025).

[19] *See, e.g.*, CREW, C*REW requests records on DO E* (Jan. 9, 2025), https://www.citizensforethics.org/reports-investigations/foia-requests/crew-requests-records-on-doge/; CREW, *Attacks on the CFPB highlight DO E's pretense* (Feb. 28, 2025), https://www.citizensforethics.org/news/analysis/attacks-on-the-cfpb-highlight-doges-pretense/; Letter from CREW to National Archives and Records Administration, *Re Second otice of Potential Failure to Preserve, Removal or Destruction of Federal Records by DO E* (Mar. 3, 2025), https://www.citizensforethics.org/wp-content/uploads/2025/03/CREW-2nd-Letter-to-NARA-1-1.pdf.

[20] *See* Letter from CREW to OMB, *Re Expedited Freedom of Information Act Request* 5–6 (Mar. 28, 2025) https://www.citizensforethics.org/wp-content/uploads/2025/03/2025.03.28-OMB-DOGE-Apportionments-FOIA-Request.pdf; Letter from CREW to U.S. DOGE Service, *Re Expedited Freedom of Information Act Request* 5–6 (Mar. 28, 2025), https://www.citizensforethics.org/wp-content/uploads/2025/03/2025.03.28-DOGE-Apportionments-FOIA-Request.pdf.

[21] *See supra* note 20.

21.    Based on CREW's review of the DOGE apportionments, CREW identified potential legal issues with the sources of the funding and submitted FOIA requests to OMB and DOGE for additional information.[22]

22.    CREW also has relied on the DOGE apportionments in court filings.[23]

23.    When I attempted to access the Public Apportionments Database on March 24, 2025, the website displayed a "Page Not Found" error message.[24]

24.    I am unaware of any notice or explanation provided to the public before the removal of the Public Apportionments Database.

25.    As of April 17, 2025, the Public Apportionments Database still displayed a "Page Not Found" error message.[25]

26.    To the best of my knowledge, the Public Apportionments Database and the information that it contains, including information about apportionments approved from fiscal year 2022 onward, and any apportionments that OMB has approved since the removal of the Public Apportionments Database, have not been made available by OMB on any publicly available government website.

27.    Without access to the Public Apportionments Database, CREW cannot monitor apportionments for potential withholdings by OMB or monitor apportionments for DOGE.

---

[22] *See id.*

[23]  Mem. in Support of Mot. for Prelim. Inj., at 2 n.1, *CREW v. U.S. DO E Serv.*, No. 1:25cv511 (D.D.C. Feb. 20, 2025); Reply in Support of Mot. for Prelim. Inj., at 8, n.12, 9 n.15, *CREW v. U.S. DO E Serv.*, No. 1:25cv511 (D.D.C. Mar. 4, 2025).

[24] *See Approved Apportionments*, *supra* note 2.

[25] *Id.*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 18, 2025

_____

Christina L. Wentworth

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>OFFICE OF MANAGEMENT AND BUDGET, et al., )<br><br>Defendants. ) | Civil Action No. 25-cv-1051 |

## DECLARATION OF SAMUEL BAGENSTOS

I, Samuel Bagenstos, declare as follows:

1. My name is Samuel Bagenstos. I currently hold a joint appointment as the Frank G. Millard Professor of Law at the University of Michigan Law School and the Arlene Susan Kohn Professor of Social Policy at the University of Michigan Gerald R. Ford School of Public Policy. I submit this declaration in my individual capacity only.

2. From January 2021 to June 2022, I served as the General Counsel to the Office of Management and Budget. Among the other duties of that position, I was the principal legal advisor to the White House and the Executive Branch on appropriations and budget law. I advised OMB and the other executive departments and agencies on the apportionment process and compliance with the Antideficiency Act and the Impoundment Control Act, among other matters.

3. I left OMB in June 2022 to serve as the General Counsel to the Department of Health and Human Services, where I remained until December 2024. Among my many duties at HHS, I provided legal advice to the Department on budget and appropriations issues, and engaged with my former colleagues at OMB on those issues as needed.

4. I have also held other legal positions within the federal Executive Branch. From 2009 to 2011, I served as a Deputy Assistant Attorney General at the Department of Justice. From 1994 to 1997, I was a career attorney at the Department of Justice.

## The Apportionment Transparency Statute

5. On March 15, 2022, President Biden signed into law the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103. The Financial Services and General Government title of that

1

**JA 116**

law contained new provisions mandating transparency in the apportionment process. In particular, Section 204(b) required OMB, within 120 days, to "complete implementation of an automated system to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code), not later than 2 business days after the date of approval of such apportionment." In Section 204(c), Congress made clear that the posting of apportionments must occur on a "publicly accessible website" and that the posting "shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." Congress provided that classified information incorporated in an apportionment need not be posted on the website but instead must be "ma[de] available" at "the request of the chair or ranking member of any appropriate congressional committee or subcommittee."

6. Although the apportionment transparency provisions initially applied only to the 2022 fiscal year, Congress adopted them into permanent law in the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328.

7. I served as OMB General Counsel when Congress adopted the apportionment transparency provisions in 2022. I participated in setting up the automated apportionment posting system required by the statute, and I advised OMB's budget staff on compliance with that statute. In my experience at OMB and HHS, compliance with the apportionment transparency law was straightforward, did not interfere with the President's constitutional or statutory responsibilities or OMB's supervision of the Executive Branch, and was fully consistent with effective and efficient governance.

8. Since I left the government, I have consulted the OMB apportionments database to follow the actions of the new administration. I found that database to be an important tool to track whether the new administration is faithfully executing the appropriations laws enacted by Congress.

### The March 29, 2025, Vought Letter

9. I have reviewed the letter OMB Director Russell T. Vought sent to Senator Patty Murray on March 29, 2025. In that letter, Director Vought announces that OMB "will no longer operate and maintain the publicly available automated system to which apportionments are posted" as required by the apportionment transparency law.

10. Director Vought's letter asserts that "[b]y their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change."

**JA 117**

11. That assertion fundamentally misunderstands both the nature of apportionments and what it means to be "predecisional." Apportionments are not part of the give and take that precedes a binding legal decision; they are the binding legal decisions themselves.

12. In the Antideficiency Act, Congress required the President to apportion appropriations "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation." 31 U.S.C. § 1512(a); see id. § 1513(b). Congress added the apportionment requirement to the Antideficiency Act in 1905 because federal agencies had too often spent more than the amount appropriated to them. Rather than simply enact an annual appropriation and trust agencies to make adjustments throughout the year to remain within the appropriated amount, Congress required the President (in a duty he redelegated to OMB) to parcel out the money periodically (or by project or on another similar basis) to ensure the agencies would not overspend. Each apportionment legally unlocks a certain fraction of the appropriation; the statute bars agencies from making expenditures that exceed the apportionment. See id. § 1517. The apportionment is thus the legally binding decision of the Executive Branch that enables an agency to spend appropriated money.

13. OMB's principal resource on the budget and appropriations process, Circular A-11, makes clear that apportionments are binding decisions, rather than simply part of the give and take that precedes such decisions. In Circular A-11, OMB itself defines an apportionment as "an **OMB-approved** plan to use budgetary resources"—not a proposed plan to use those resources. Circular A-11 § 120.1 (emphasis added). And OMB describes that "approved plan" as itself "legally binding." *Id.*

14. The whole point of the apportionment process is to manage federal funds to ensure that an agency does not overspend its appropriation. Thus, it is typical for an apportionment to release one part of an agency's appropriation and to be followed by one or more subsequent apportionments releasing the remainder of that appropriation. But that does not make any of the apportionments "predecisional." Each apportionment stands on its own as a binding legal decision.

15. My own experience with the apportionments process, both at OMB and at HHS, is consistent with that understanding. Apportionments, and the footnotes that define their conditions and limits, convey the binding determinations made by OMB. They are not "predecisional" in anything but the trivial sense that in a perpetual government virtually any decision that is made today can be superseded or displaced at some subsequent point.

16. Director Vought's letter asserts that "apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy." But the apportionment transparency law already accounts for concerns about national security and foreign policy by permitting OMB to withhold classified information from the public database and provide that information separately to relevant congressional committee chairs. Based on my own experience, it would be a straightforward matter to follow that process

3

and redact from the public database any information in apportionments or associated footnotes that raises significant national security or foreign policy concerns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2025.

_____

Samuel Bagenstos

**JA 119**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY                )
AND ETHICS IN WASHINGTON,                   )
                                            )
           Plaintiff,                       )
                                            )
           v.                               )      Civil Action No. 25-cv-1051
                                            )
                                            )
OFFICE OF MANAGEMENT AND                    )
BUDGET, et al.,                             )
                                            )
           Defendants.                      )
                                            )

### DECLARATION OF JOSEPH CARLILE

I, Joseph Carlile, hereby declare as follows:

1.      I am currently the managing director and founder of Bluestem Consulting, LLC, a consulting firm in Alexandria, Virginia. In my role as managing director, I lead a specialized consulting practice that provides strategic planning, consulting, advisory, training and education services focused on the Federal budget and appropriations processes.

2.      I served on the staff of the Committee on Appropriations, U.S. House of Representatives from December 2007-January 2021. During my tenure on the Committee, I served in various roles, including clerk of the Subcommittee on Transportation, Housing and Urban Development and Related Agencies from January 2019-January 2021. In my capacity as clerk, in conjunction with my counterparts from the majority and minority staff of the House and Senate Committees on Appropriations, I drafted and negotiated the annual appropriations acts for the subcommittee, as well as supplemental appropriations acts for COVID-19 funding and funding for recovery from natural disasters.

1

**JA 120**

3.      I served as Senior Advisor for Budget, Policy, and Programs to the Secretary of Housing and Urban Development (HUD) from January 2021-December 2022.  In this role, I served as the Secretary's primary liaison with the Office of Management and Budget (OMB) and coordinated budget formulation and execution between the Secretary's office and the Office of the Chief Financial Officer.

4.      From January 2023—May 2023, I served as Associate Director for Housing, Treasury, Commerce at OMB.  From May 2023-January 2025, I served as the Associate Director for General Government Programs at OMB.  In these roles, I managed the budget execution of the Departments of Housing and Urban Development, Treasury, Commerce, Transportation, Homeland Security and Justice as well as the Small Business Administration, General Services Administration, Executive Office of the President and more than 30 small and independent agencies.

5.      Throughout my career in Federal service, I have interacted with apportionments, which (as defined by OMB Circular A-11, Section 120.1[1]) are OMB-approved plans to use budgetary resources. More specifically, apportionments are OMB-approved plans for making congressionally appropriated funds available for agency spending.  On the Appropriations Committee, I had a vested interest in ensuring that appropriated funds were being used for their statutory purposes.  Before the publicly available apportionment website (which I discuss in paragraph 8 below), this would require inquiring with the relevant agency budget offices to ask if the funds had been apportioned and allotted and were available for obligation.  In my role at HUD, I worked with the Office of the Chief Financial Officer to ensure that funds were apportioned after each enacted appropriations Act, so that the Department could allot funds internally and begin

_____

[1] https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

2

**JA 121**

obligating and expending appropriated funds. At OMB, I supervised two deputy associate directors who had been delegated the OMB Director's authority to approve apportionments. During my tenure at OMB, the approval of apportionments by the deputy associate directors was largely ministerial in nature and aimed at faithfully and responsibly executing the aims of the appropriation.

6.      Apportionment of funding represents a crucial step in the budget execution process. It starts the process through which the executive branch obligates and expends funds, and an approved apportionment is binding on the agency and has the force of law. Without an approved apportionment, the executive branch generally cannot obligate or expend an appropriation. In fact, obligating or expending funds without an approved apportionment violates the Antideficiency Act. (OMB Circular A-11, Section 120.8.)

7.      OMB Circular A-11, Section 120 specified the process under which an agency requested and OMB approved an apportionment during my tenure at OMB. In general, an agency requests an apportionment through OMB's apportionment system, OMB staff reviews the request and confers with the agency with questions about the request, OMB staff drafts an apportionment for the OMB approver, typically a deputy associate director, and then, after consultation with staff, the approver approves the apportionment and the agency is notified of the approval. An apportionment addresses all budgetary resources in an account—including annual discretionary appropriations, mandatory funding, carryover funds from prior fiscal years, recaptures, and transfers. An apportionment often divides the budgetary resources available in a fiscal year into amounts available each fiscal quarter or other time division (Category A) and makes funds available for specific purposes and programs specified within the appropriation (Category B). For multi-year funding or for funding available until expended, an apportionment might reserve funds

3

**JA 122**

for a future fiscal year (Category C). Additionally, an apportionment might include additional direction in a footnote that conditions the availability of funds on a certain agency action, like the submission of a spend plan. If budgetary conditions change throughout the year, the agency may submit a revised request to change the amounts and terms on the apportionment, which would then go through the same review and approval process outlined in this paragraph.

8.      Throughout my tenure at OMB, OMB maintained a publicly available website that provided digital copies of the information contained in apportionments for each Treasury Appropriation Fund Symbol (TAFS),[2] pursuant to 31 U.S.C. § 1513 note, formerly available at https://apportionment-public.max.gov/. The data posted on the publicly available apportionment website included only the final, OMB approved, legally binding amounts and the accompanying footnotes, which are part of the final, OMB-approved apportionment decisions.

9.      In my current capacity, I rely on the public apportionment website to obtain data about available funding and timelines for certain programs. The data provided on the website is not available from any other government source. I use the data to track the budget execution of funding that I have a personal interest in. I also use the data to help formulate strategic advice for colleagues and clients about the status of appropriations and budget execution. I estimate that, in the time since I left my position at OMB, I refer to the publicly available apportionment data weekly.

10.     For example, the Department of Housing and Urban Development Appropriations Act, 2020 included Section 231 (42 U.S.C. 11364a), which converts "recaptured"[3] funding from

---

[2] "TAFS" is a unique identifier for an appropriation in the Treasury and includes information on the agency responsible for the account and the period of availability.

[3] "Recaptured" funds are funds that were awarded to a grantee in a prior fiscal year and were unexpended at the end of the period of performance for the grant. The unexpended funds are returned to HUD.

4

**JA 123**

the Department of Housing and Urban Development's (HUD) Homeless Assistance Grants program into no year funding[4] available for specified purposes. Subsection (a) lists the purposes, which include: subparagraph (1), allowing HUD to use funding for grants under the Continuum of Care program; subparagraph (2), allowing HUD to use funding for grants under the Emergency Solutions Grant program; subparagraph (3), requiring HUD to reserve not less than 10 percent for grants in rural areas; and subparagraph (4), requiring HUD to reserve not less than 10 percent of the recaptured funding for grants in disaster areas. The funds recaptured pursuant to this section are the only source of budgetary resources available for the grants to disaster areas in subparagraph (4).

11. The information on the apportionment (TAFS: 086-0192/X) provides details on the amount of funding recaptured and how OMB has allocated the recaptured funds between the specified purposes. Because these funds are not appropriated annually, but instead are recaptured from unspent prior year funds, the apportionment provides the only source of publicly available information on the amount recaptured and the amount of recaptured funds available for each of the specified purposes.

12. One of the specified purposes for which recaptured funds are available is HUD's Rapid Unsheltered Survivor Housing (RUSH) program, which provides grants to communities affected by natural disasters.[5] People experiencing homelessness or at risk of homelessness prior to a natural disaster often struggle to obtain assistance in the Federal Emergency Management Agency's Stafford Act programs. The RUSH program provides resources that do not exist

---

[4] "No year funding" means that the funds are available until expended. In contrast, funds appropriated annually into the Homeless Assistance Grant account have a limited period of availability, typically two fiscal years.

[5] This funding uses funds recaptured from Section 231 pursuant to subsection (a) subparagraph (4) of the section under the authorities granted in subsection (c).

**JA 124**

elsewhere in the Federal government and is funded wholly from recaptures pursuant to Section 231. HUD published a notice of the terms and conditions for the funds in the Federal Register on July 18, 2024 (Docket No. FR-6315-N-01, "Allocation Formula, Applicable Requirements, and Waivers and Suspension of Requirements for Rapid Unsheltered Survivor Housing (RUSH)", 89 FR 58392). As HUD states in the notice: "RUSH is designed to provide immediate funding to States or local governments capable of acting quickly to meet the unmet homeless assistance and homeless prevention needs in declared disaster areas" and "Provided that data is available, HUD plans to notify States or local governments of their eligibility for a RUSH grant within 30 days of a major disaster." Given the quick timeline from a qualifying disaster to funding award, it is critical to know how much funding is available for the year from recaptures, how much was allocated to the RUSH program, how much has been awarded, how much funding has been obligated, and how much remains available for obligation.

13.    SF-133 data (available at: https://portal.max.gov/portal/document/SF133/Budget/ FY%202025%20-%20SF%20133%20Reports%20on%20Budget%20Execution %20and%20Budgetary%20Resources.html) provides information on obligations, by month, and HUD's press releases provide information on funding awards (https://www.hud.gov/news/hud-no-25-035). To the best of my knowledge, however, the only publicly available source of information for the total amount of unobligated funds available for RUSH for the year as well as any relevant footnotes or contingencies on the funding is from the apportionment. Because we cannot know when or where a disaster might strike, it is important that all potential grantees, and the public, know what funding is potentially available to assist people experiencing homelessness after a natural disaster and what conditions must be satisfied before funding could be available.

6

**JA 125**

14.     While the RUSH example provides useful insight, it is far from comprehensive. Without timely access to the publicly available data that was on OMB's public apportionment website, determining the total budgetary resources for a specific appropriation at any given moment—and understanding the terms and conditions governing those funds before an agency may obligate them—becomes nearly impossible. The statutory requirement that each apportionment be posted as an open government data asset allowed for other websites like OpenOMB.org to use that data and display it in more user-friendly ways. Taking a step back, the removal of this data from public view undermines transparency in how taxpayer dollars are allocated and spent. Other phases of budget execution offer robust, publicly accessible data, such as the SF-133 reports and spending.gov. However, the budget execution process in the executive branch begins with an OMB-approved apportionment, making it essential that the American people have visibility into how the process starts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2025

_____

Joseph Carlile

7

**JA 126**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 25-cv-1051 |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF KENNETH SCH ART**

I,  enneth Schwartz, declare as follows:

1.     I was an Office of Management Budget (OMB) employee from 1969 to 2005 (with three years absence). In total, I served at OMB for over 30 years. In my early years, I was a budget examiner. Later on, I was a branch chief and then, finally, a Deputy Associate Director (DAD). As a DAD, I served over 18 years. DADs are among the senior-most career officials at OMB.

2.     During my tenure at OMB, there were eight programmatic DADs. Each DAD was assigned responsibility for the budgets of a set of agencies. My set included three cabinet agencies – the Departments of Justice, Homeland Security, and Transportation – as well as several non-cabinet agencies, the most significant of which was the General Services Administration. My primary task, through staff reporting to me, was to prepare the President's budget requests for the agencies specified above prior to the submissions of those requests to Congress. DADs and their staffs were expected to be experts in the programs for which they had oversight responsibility.  I had about 30 professionals working for me.

1

**JA 127**

3.      Another responsibility that I had as a DAD was budget execution (as distinct from budgetary preparation). Part of that responsibility was processing apportionment requests from the agencies.  Apportionments release funds appropriated by Congress. Apportionment requests are prepared by the agencies for each and every budget account. Most agencies have multiple budget accounts. For example, one account may provide for the salaries and expenses associated with an agency's staff – e.g., staff of the Federal Highway Administration. Another account may provide funds for a grant program that the agency supports – e.g., Federal-aid highways (a grant program to states).

4.      As a DAD, I signed and approved, on behalf of OMB, hundreds, if not thousands, of apportionments. If an agency "overspent" the amount provided in the approved apportionment, it constituted a violation of the Anti-Deficiency Act, and the violation would be reported to the President for consideration of remedial actions.

General Background on Apportionments Process

5.      Every year, each agency would transmit to OMB its apportionment requests. The agency requests would show the funds available – that is, funds appropriated by Congress – on the top, and the suggested release of the funds on the bottom. The suggested release could either be by quarter – usually about 25    for each of the four quarters for accounts that were largely comprised of funds for Federal staffing (personnel accounts) – or by some other metric for non-personnel accounts, such as grant accounts. For example, if the account were for "Federal aid to highways," the proposed agency apportionment might show funding releases according to when the Federal Highway Administration actually distributes its funds to the States during the course of a year. Or perhaps they might show it by sub-category, such as Interstate construction and bridges.

2

**JA 128**

6.     My staff would review the incoming agency apportionment requests, and they would advise me of their recommendations. Almost invariably, they would recommend approval of the agency's request without change. I had to be careful to avoid "tinkering" with apportionment requests in a way that might be construed as improper, or unlawful, *de facto* deferrals or rescissions. As a general rule, we viewed apportionments as the simple release of funds duly appropriated by Congress. A typical example of a change to the request might be as follows: If the agency asked that 100 of available funds be released in the first quarter for a personnel account, my staff might view that as unreasonable on its face. Rather, common sense would suggest that it was more reasonable to assume that about 25 of available funding should be made available in each quarter to avoid the possibility of agency overspending in the early months of the year. In general, though, I would estimate that over 98 of apportionments were reasonable and approved as requested. My understanding is that upon the return of a signed apportionment to an agency, the agency would provide the apportionment to the Treasury Department for release of the funds.

7.     After apportionments are approved by OMB, they are binding on agencies. In my view and based on my experience, they are neither pre-decisional nor deliberative. Rather, they simply reflect the results of the Congressional appropriations process. It was often the case that there were multiple apportionments for an account over the course of a year. For example, the first apportionment under a Continuing Resolution would include only the funds made available from the first Continuing Resolution (plus carryover balances from the prior year). Subsequent re-apportionments would provide additional funding simply because added funding was available for added months, leading eventually to an apportionment for the entire year. But those are re-apportionments solely for the purpose of releasing the funds made available by appropriations laws. Apportionment and re-apportionments were neither predecisional nor deliberative.

3

**JA 129**

JA 130

8.      In my experience, I do not recall a single case of a classified apportionment, or where an apportionment revealed classified information, even in the cases of the Department of Homeland Security and the Department of Justice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2025.

_____
Kenneth Schwartz

4

**JA 130**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br> Plaintiff, <br><br> *v.* <br><br> OFFICE OF MANAGEMENT AND BUDGET *et al.*, <br><br> Defendant. | Case No. 1:25-cv-01051-EGS |

## DECLARATION OF KELLY KINNEEN

I, Kelly Kinneen, make the following declaration based upon my personal knowledge, upon information provided in my official capacity, and upon conclusions I reached based on that knowledge or information:

1. I am the Assistant Director for Budget of the Office of Management and Budget (OMB) in the Executive Office of the President, in Washington, D.C. I have served in this position since 2017, and have worked at OMB since 2006.

2. I am the senior-most career official responsible for supporting the OMB Director in developing all aspects of the President's Budget. Additionally, I advise OMB leadership and Federal agencies on matters of execution relating to OMB's apportionment authority, 31 U.S.C. § 1512 et seq.

3. In this declaration, I summarize OMB's apportionment authority and describe the nature of the interagency process by which appropriated funds are made available to agencies.

4. At the start of the fiscal year, and after appropriations bills are passed, pursuant to 31 U.S.C. §§ 1512-13, the President must "apportion" the budget authority to the relevant Federal agencies before each agency may obligate its funds. The President has delegated this apportionment authority to the OMB Director. Executive Order (E.O.)

1

**JA 131**

6166, as amended by E.O. 12608.

5. An apportionment is an OMB-approved plan to use budgetary resources. 31 U.S.C. 1513(b). OMB apportions funds to Executive Branch agencies by time periods, specific activities or projects, or a combination thereof. 31 U.S.C. § 1512(b)(1); OMB Circular A-11 § 120.1. If funds are apportioned by time period, OMB refers to that as a "category A" apportionment. If funds are apportioned by project or activity, OMB refers to that as a "category B" apportionment. If funds are apportioned by both time and purpose, that is referred to as a "category AB" apportionment.

6. Funds are to be apportioned "as the [apportioning] official considers appropriate." 31 U.S.C. § 1512(b)(2). Apportionments involve exercising significant discretion and judgment regarding the budgetary resources a program requires, including when those resources will be needed and for what purpose. Circular A-11 makes clear that officials cannot exceed apportionments. Apportionments, being an exercise of delegated authority from the President, are legally binding upon the Executive Branch officials. The apportionment, however, does not bind OMB, which remains free to change it whenever it so chooses, as Circular A-11 also makes clear. Circular A-11, an Executive Branch guidance document, merely confirms that agencies must follow instructions from the President, acting through OMB.

7. With narrow exceptions, OMB must apportion appropriated funds before an agency may obligate those funds during each fiscal year. The Government Accountability Office (GAO) defines an obligation as "[a] definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States."

2

**JA 132**

U.S. Gov't Accountability Office, A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP, at 70 (2005), available at https://www.gao.gov/assets/gao-05-734sp.pdf. An agency enters an obligation where, for example, it places an order, signs a contract, awards a grant, purchases a service, or takes other actions that require the government to make payments to the public or from one government account to another. OMB Circular A-11 § 20.5(a).

8. An "expenditure" or "outlay" occurs when an agency makes a payment to liquidate an obligation. OMB Circular A-11 § 20.6.

9. Obligations and expenditures that exceed an apportionment are a violation of, and are subject to reporting under, the Antideficiency Act. 31 U.S.C. 1517(a)(1), (b). An apportionment authorizes an agency, but does not require it, to make an obligation of funds. An apportionment does not in any way entitle an outside party to funds. Rather, apportionments are internal directives from OMB, exercising the President's delegated authority, to agencies.

10. OMB communicates apportionment decisions to agencies through Excel sheets that include designated funds for times, periods, projects, or activities. Apportionments reflect a snapshot of time of OMB's best judgment in the moment about how an agency should use its funds during the period when those funds are legally available for obligation. This time period could be one quarter, one fiscal year, many fiscal years, or indefinite. Because apportionments are forward-looking, they are required by statute to be periodically reviewed and often are updated (or "reapportioned") to reflect changes in circumstances or policy goals. 31 U.S.C. 1512(a).

11. OMB routinely also includes informational or legally binding footnotes on apportionments. Footnotes give an agency additional information or instructions beyond

3

**JA 133**

the dollar amounts provided for a time period, project, or activity. Frequently, footnotes will provide additional restrictions on the use of funds, or will condition the availability of funds on further action by the agency, or on other future circumstances. Footnotes can disclose ongoing negotiations between an agency and OMB. An iterative approach to footnotes can assist in gathering information from agencies that are less inclined to provide information to OMB for oversight. They may reflect OMB's current policy deliberations, assumptions about program needs, and even future economic assumptions. As circumstances change, OMB's judgment about such considerations may also change, necessitating a reapportionment.

12.    If, for example, funds for several agency programs are each given a category B apportionment that lists a particular dollar amounts for each program, that reflects the Administration's current view on what those programs may need in the future. But if a significant economic, foreign, or other policy shift occurs, the funds apportioned for those programs may need to change. One program might then have its apportionment reduced, while another program's apportionment would be increased. As long as the agency has not expended the funds for a program, those funds can be reapportioned for other purposes, within the scope of the appropriation.

13.    In 2022, OMB began operating a publicly available automated apportionment reporting system in accordance with section 204 of division E of the Consolidated Appropriations Act, 2022 (Public Law 117-103). The system included each document apportioning an appropriation beginning in fiscal year 2022, including any associated footnotes (in a format that qualified each such document as an Open Government Data Asset) and a written explanation stating the rationale of any footnotes for apportioned amounts. The reporting requirements made OMB's administration of apportionments more difficult.

4

**JA 134**

OMB believed it was prudent to promulgate apportionment documents omitting key information that would assist OMB and agencies in guiding allocations of resources throughout the funding process.

14. To provide a more specific example, OMB has, in the past, apportioned the Department of Energy's funds for the Title 17 loan guarantee program as category B in manner that included estimated credit subsidy amounts for the loans obligated by the agency during that fiscal year. The category B descriptions included identifying references for the individual loan borrowers, and the category B apportionments reflected provisional financial commitments subject to ongoing review and potential re-apportionment. Following the requirement to publish apportionments, OMB had to change its process to protect sensitive information about who would receive Government funding in advance of public announcements, and only included such information after the funds had been obligated and a public announcement had been made. An example of such an apportionment is attached as Exhibit A.

15. In another example, OMB apportioned funds with a footnote that detailed OMB's preliminary understanding of an agency's financial controls, indicating ongoing analysis subject to future verification. Following the publication requirement, OMB was reluctant to include such a footnote due to the deliberative nature of the facts surrounding the apportionment, which has impeded OMB's ability to most efficiently provide direction to and receive information from agencies. The apportionment itself can be part of a larger deliberative process and viewing these as stand-alone documents without additional context could reveal information about the Executive Branch's internal planning and strategy.

16. Apportionments are not fixed in place once signed. They are part of an iterative, internal Executive branch decision-making process that involves ongoing conversations and instructions to the agencies to ensure that apportionments are updated to reflect current

5

**JA 135**

realities and future estimates. Apportionments are an internal Executive branch fiscal control mechanism designed to ensure that funds are being spent in accordance with the law and policy. By their nature, they are estimates of the amounts of budgetary resources that OMB anticipates that programs will likely require in the future. But they must and do change throughout the fiscal year. It is only when the agency, not OMB, takes actions to obligate or expend the funds that any entity outside the Executive branch, is affected. After appropriations Acts are enacted, apportionment of these appropriated funds is one of the first steps in the process before a program or activity can be carried out – it is not the last. Following an apportionment, OMB continues to monitor agency funding, and works with agencies to determine the best use of appropriated funds. It may advise agencies regarding the President's priorities for the use of the funds or on sensitive matters touching on national security or foreign policy.

17. For example, a recent apportionment for the Department of the Interior included a footnote that stated, "Of the amounts apportioned, funding for the Bureau of Reclamation's proposed 'Sustainable Water for Agriculture Program' may be obligated ten days after the Bureau of Reclamation provides a report to OMB on how it will coordinate with USDA on implementation of such program to avoid duplication of programs. [Rationale: An agency spend plan or other documentation is necessary to better understand how the agency intends to obligate some or all of the apportioned funds.]" In another case, an apportionment for the Department of Homeland Security included a footnote that provided, "…these funds are apportioned with the understanding that DHS will submit written reports to OMB on ongoing projects within 10 business days of the close of each quarter, detailing the: DHS component(s) supported; project purpose; desired project outcome; project timeline; number of AI Corps members

6

**JA 136**

working on the project; and data on outcome measures (e.g., number of work hours saved; number/value of contracts reduced). [Rationale: OMB requests additional information on programmatic spending for some or all of the apportioned funds.]" These apportionments demonstrate the iterative nature of OMB's apportionment decisions because additional engagement was necessary with the agencies before the funding could be provided for the purposes in question. These apportionments are included as Exhibit B. Apportionments and footnotes may contain deliberative information that, while not classified, could nevertheless reveal sensitive information about national security, foreign affairs, the industrial base, critical infrastructure, and the like. An apportionment may indicate predecisional details regarding the timing for an infrastructure project, or may indicate the recipient of foreign aid. Apportionments and footnotes can also contain predecisional information that can move markets or create financial disruption, such as apportionments for funding intended to assist an industry.

18.    The requirement in the Consolidated Appropriations Act, 2022, to disclose OMB's apportionments within 48 hours of signing, and to provide a rationale for any footnotes, caused OMB to have to amend the manner in which it apportioned funds that has implications for OMB's ability to use the full scope of its apportionment authority. Even if the OMB apportioning "official considers [it] appropriate" under 31 U.S.C. § 1512(b)(2) to apportion funds with legally binding specific instructions in a Category B apportionment line or a footnote, following the requirement to publish those instructions may mean that in fact, the OMB apportioning official cannot apportion in the manner deemed appropriate. In some instances, it has forced OMB to choose between compromising confidentiality and using its apportionment authority as Congress intended.

7

**JA 137**

17.  On March 29, 2025, OMB Director Russell Vought informed the House and Senate Committees on Appropriations that OMB would no longer operate and maintain the automated apportionment system. Those letters are attached as Exhibit C.

## CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Washington, D.C., on the 30th day of April, 2025.

Kelly Kinneen

**JA 138**

# EXHIBIT A

SF 132 APPORTIONMENT SCHEDULE

FY 2024 Apportionment
Funds provided by PL 117-169

| Line No | Line Split | Line Description | OMB Action | OMB Footnote |
|---|---|---|---|---|
| | | **Department of Energy** | | |
| | | **Bureau: Energy Programs** | | |
| | | **Account: Title 17 Innovative Technology Loan Guarantee Program** | | |
| | | **TAFS: 089-2022-2026-0208** | | |
| IterNo | 9 | Last Approved Apportionment: 2024-07-05 | | |
| RptCat | NO | Reporting Categories | | |
| AdjAut | NO | Adjustment Authority provided | | |
| | | **Budgetary resources** | | |
| 1000 | MA | Mandatory Actual - Unobligated balance brought forward, Oct 1 - Direct | 327,210,687 | |
| 1000 | MA4 | Mandatory Actual - Unobligated balance brought forward, Oct 1 - Other | 8,222,314,951 | B4 |
| 1010 | | Unob Bal: Transferred to other accounts | -17,200,000 | B5 |
| 1021 | | Unob Bal: Recov of prior year unpaid obligations | 121,240 | |
| 1061 | | Unob Bal: Antic recov of prior year unpd/pd obl | 1,878,760 | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **8,534,325,638** | **B2** |
| | | **Application of budgetary resources** | | |
| | | **Category B Projects** | | |
| 6011 | | IRA - Administrative Expenses - Section 50141 (sec. 1703 of EPA) | 82,632,915 | |
| 6012 | | IRA - Administrative Expenses - Section 50144 (sec. 1706 of EPA) | 246,577,772 | |
| 6015 | | Subsidy on Loan 1412 - LongPath Development Company LLC | 10,519,255 | |
| 6016 | | Subsidy on Loan EIR0007 - Holtec Palisades LLC | 18,056,245 | |
| 6017 | | Subsidy on Loan 1365 - Plug Power Energy Loan Borrower LLC | 29,178,402 | |
| 6018 | | Subsidy on Loan 1448 - Bioforge Marshall LLC | 2,063,376 | |
| 6019 | | Subsidy on Loan EIR0029 - Clean Flexible Energy LLC | 74,327,590 | |
| 6020 | | Subsidy on Loan EIR0017 | 43,250,951 | |
| | | **Category C, Apportioned for future fiscal years** | | |
| 6170 | | Apportioned in FY 2025 | 8,027,719,132 | |
| **6190** | | **Total budgetary resources available** | **8,534,325,638** | |

Submitted _____    Date _____

**JA 140**

SF 132 APPORTIONMENT SCHEDULE

**JA 141**

FY 2024 Apportionment
Funds provided by PL 117-169

| Line No | Line Split | Line Description | OMB Action | OMB Footnote |
|---------|-----------|------------------|------------|--------------|
|         |           |                  |            |              |

See Approval_Info sheet for OMB approval information

**JA 141**

FY 2024 Apportionment
OMB Footnotes

**Footnotes for Apportioned Amounts**

**Footnotes for Budgetary Resources**

**B2**  Pursuant to the authority in OMB Circular A-11 section 120.21 one or more lines on the apportionment
(including lines above line 1920) may have been rounded up and as such those rounded lines will not match the
actuals reported on the SF-133. DOE will ensure that its funds control system will only allot actuals.

**B4**  $ 7,200,000.00 Shifting to Admin for OIG 0.2% transfer
$ 10,000,000.00 Shifting to Admin for OIG 0.2% transfer
$3,465,114,950.26 Subsidy for Section 50141
$4,740,000,000.00 Subsidy for Section 50144
$ 0.74 Rounding
----------------------
$8,222,314,951.00

**B5**  Reflects appropriation transfer of two-tenths of one percent to the Office of the Inspector General from
unobligated balances of amounts made available under sections 50141 and 50144 of Public Law 117-169, in
accordance with Public Law 118-42, Division D, Sec. 307(b), as follows:
-$ 7,200,000 Section 50141
-$10,000,000 Section 50144
----------------
$ 17,200,000

End of File

**JA 142**

**OMB Approved this apportionment request using
the web-based apportionment system**



| | |
|---|---|
| **Mark Affixed By:** | Kelly Colyar |
| | Acting Deputy Associate Director for Energy, Science and Water Programs |
| | |
| **Signed On:** | 2024-09-10 03:51 PM |
| **File Name:** | FY24_DOE_089-2226-0208_09ReApp_v1_Updated.xlsx |
| **Sent By:** | John Dick |
| **Sent On:** | 2024-09-10 04:20 PM |
| | |
| **TAF(s) Included:** | 089-2022-2026-0208 (Title 17 Innovative Technology Loan Guarantee Program) |

# EXHIBIT B

**JA 144**

**Exhibit B**

SF 132 APPORTIONMENT SCHEDULE

FY 2025 Apportionment
Funds Provided by N\A - Carryover

| Line No | Line Split | Line Description | OMB Action |
|---|---|---|---|
| | | **Department of the Interior**<br>**Bureau: Bureau of Reclamation**<br>**Account: Water and Related Resources**<br>**TAFS: 014-2022-2026-0680** | |
| IterNo | 2 | Last Approved Apportionment: 2024-09-06 | |
| RptCat | NO | Reporting Categories | |
| AdjAut | YES | Adjustment Authority provided | |
| | | **Budgetary resources** | |
| 1000 | E43 | Estimated - Estimated - Unob Bal: Brought forward, October 1 - Supplemental - Direct (Mand) Inflation Reduction Act, 2022, P. L. 117-169 | 2,957,265,248 |
| 1061 | | Unob Bal: Antic recov of prior year unpd/pd obl | 800,000 |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **2,958,065,248** |
| | | **Application of budgetary resources**<br>**Category B Projects** | |
| 6011 | | All Projects | 800,000 |
| 6012 | | SEC. 50233 Drought Mitigation in the Reclamation States | 2,944,778,679 |
| 6013 | | Sec 80004 Emergency Drought Relief for Tribes | 12,486,569 |
| **6190** | | **Total budgetary resources available** | **2,958,065,248** |

Submitted _____   Date _____


See Approval_Info sheet for OMB approval information

**JA 145**

FY 2025 Apportionment
OMB Footnotes

**Footnotes for Apportioned Amounts**

**A1**  To the extent authorized by law, this estimated amount is apportioned for the current fiscal year. This estimated amount may be increased or decreased without further action by OMB if the actual indefinite appropriations; actual reimbursements earned, including reimbursements and offsetting collections from non-Federal/Federal sources; actual recoveries of prior year obligations; and actual contributions from non-Federal/Federal sources differ from the estimate. If the actual unobligated balance (excluding reimbursable funding) differs by more than 20 percent from the estimate in this apportionment, the agency must request a reapportionment of the account. Transfers of funds authorized by law (except for Section 102 transfers and transfers from the Wildfire Suppression Operations Reserve fund), to or from any of the accounts listed, may be processed without further action by OMB. Any of these funds that are not needed for this purpose may be used for current year obligations without further action by OMB. [Rationale: Footnote signifies that this TAFS has received or may receive an automatic apportionment.]

**A5**  Of the amounts apportioned, funding for the Bureau of Reclamation's proposed "Sustainable Water for Agriculture Program" may be obligated ten days after the Bureau of Reclamation provides a report to OMB on how it will coordinate with USDA on implementation of such program to avoid duplication of programs. [Rationale: An agency spend plan or other documentation is necessary to better understand how the agency intends to obligate some or all of the apportioned funds.]

**Footnotes for Budgetary Resources**

End of File

**JA 146**

**OMB Approved this apportionment request using
the web-based apportionment system**



| | |
|---|---|
| **Mark Affixed By:** | John Pasquantino |
| | Deputy Associate Director for Energy, Science and Water Programs |

| | |
|---|---|
| **Signed On:** | 2025-01-16 12:30 PM |
| **File Name:** | FY2025_DOI_BURREC_TAFS014-2022-2026-0680_IterNo_2_2025-01-15_16.29pm_Updated OMB Edit.xlsx |
| **Sent By:** | Sherron White |
| **Sent On:** | 2025-01-17 09:55 AM |

| | |
|---|---|
| **TAF(s) Included:** | 014-2022-2026-0680 (Water and Related Resources) |

**JA 147**

SF 132 APPORTIONMENT SCHEDULE

FY 2025 Apportionment
Funds Provided by Public Law N/A

| Line No | Line Split | Line Description | OMB Action | OMB Footnote |
|---|---|---|---|---|
| | | **Department of Homeland Security** | | |
| | | **Bureau: Management Directorate** | | |
| | | **Account: Operations and Support, MD** | | |
| | | **Treasury Account: Operations and Support** | | |
| | | **TAFS: 070-2025-2025-0112** | | |
| IterNo | 1 | Last Approved Apportionment: N\A, First Request of Year | | |
| RptCat | NO | Reporting Categories | | |
| AdjAut | NO | Adjustment Authority provided | | |
| | | **Budgetary resources** | | |
| 1100 | | BA: Disc: Appropriation | 1,722,204,000 | |
| 1134 | | BA: Disc: Appropriations precluded from obligation | -1,340,046,932 | |
| 1740 | | BA: Disc: Spending auth:Antic colls, reimbs, other | 390,428,577 | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **772,585,645** | |
| | | **Application of budgetary resources** | | |
| 6001 | | Category A -- 1st quarter | 379,935,384 | |
| 6002 | | Category A -- 2nd quarter | | |
| 6003 | | Category A -- 3rd quarter | | |
| 6004 | | Category A -- 4th quarter | | |
| | | **Category B Projects** | | |
| 6011 | | General Reimbursable Authority | 390,428,577 | |
| 6012 | | AI Corps | 2,221,684 | |
| **6190** | | **Total budgetary resources available** | **772,585,645** | A2 |

Submitted: Ann M.Tipton, Ph.D., PMCEd, CDFM
Budget Director, Office of the Chief Financial Officer
Date:10.28.2024

**JA 148**

FY 2025 Apportionment
OMB Footnotes

**<u>Footnotes for Apportioned Amounts</u>**

**A2**  Of the amounts apportioned, only the amount on line 6012 may be obligated in support of DHS's Artificial Intelligence (AI) Corps or any successor entity, including for no more than 50 positions. Further, these funds are apportioned with the understanding that DHS will submit written reports to OMB on ongoing projects within 10 business days of the close of each quarter, detailing the: DHS component(s) supported; project purpose; desired project outcome; project timeline; number of AI Corps members working on the project; and data on outcome measures (e.g., number of work hours saved; number/value of contracts reduced). [Rationale: OMB requests additional information on programmatic spending for some or all of the apportioned funds.]

**<u>Footnotes for Budgetary Resources</u>**

End of File

**JA 149**

**OMB Approved this apportionment request using
the web-based apportionment system**



**Mark Affixed By:**      Andrew Abrams
                         Deputy Asso Director for Transportation, Homeland, Justice and Service Programs

**Signed On:**           2024-11-01 05:49 PM
**File Name:**           FY_2025_DHS_MGMT_070_25_0112.xlsx
**Sent By:**             Andrew Abrams
**Sent On:**             2024-11-01 05:49 PM

**TAF(s) Included:**     070-2025-2025-0112 (Operations and Support)

**JA 150**

# EXHIBIT C



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

March 29, 2025

The Honorable Susan Collins
Chair
Committee on Appropriations
United States Senate
Washington, D.C. 20510

Dear Chair Collins:

I write to inform you that the Office of Management and Budget will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023.

OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.

Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending. Moreover, apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy.

I value OMB's longstanding relationship with the Committee and I am committed to working with you to provide information on apportionments that may be of interest to the Committee.

Sincerely,

Russell T. Vought
Director

**JA 152**



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

March 29, 2025

The Honorable Rosa DeLauro
Ranking Member
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

Dear Ranking Member DeLauro:

I write to inform you that the Office of Management and Budget will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023.

OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.

Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending.  Moreover, apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy.

I value OMB's longstanding relationship with the Committee and I am committed to working with you to provide information on apportionments that may be of interest to the Committee.

Sincerely,

Russell T. Vought
Director

**JA 153**



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

March 29, 2025

The Honorable Patty Murray
Vice Chair
Committee on Appropriations
United States Senate
Washington, D.C. 20510

Dear Vice Chair Murray:

I write to inform you that the Office of Management and Budget will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023.

OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.

Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending.  Moreover, apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy.

I value OMB's longstanding relationship with the Committee and I am committed to working with you to provide information on apportionments that may be of interest to the Committee.

Sincerely,

Russell T. Vought
Director

**JA 154**



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

March 29, 2025

The Honorable Tom Cole
Chairman
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Cole:

I write to inform you that the Office of Management and Budget will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023.

OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.

Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending. Moreover, apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy.

I value OMB's longstanding relationship with the Committee and I am committed to working with you to provide information on apportionments that may be of interest to the Committee.

Sincerely,

Russell T. Vought
Director

**JA 155**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| | Case No. 1:25-cv-01051-EGS |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## <u>NOTICE OF APPEAL</u>

Defendants—Office of Management and Budget and Russell T. Vought, in his official capacity as director of Office of Management and Budget—provide notice that they hereby appeal to the United States Court of Appeals for the D.C. Circuit the Court's July 21, 2025 Order (ECF No. 32) and Memorandum Opinion (ECF No. 33), which granted in part Plaintiffs' Motion for Partial Summary Judgment (ECF No. 9) and entered a permanent injunction against Defendants.

Dated: July 22, 2025

<div style="text-align: right;">

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Heidy L. Gonzalez*
HEIDY L. GONZALEZ (FL Bar #1025003)
CARMEN M. BANERJEE (D.C. Bar #497678)
Trial Attorneys

</div>

**JA 156**

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*

**JA 157**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

              Plaintiff,

       v.

OFFICE OF MANAGEMENT AND
BUDGET, et al.,

              Defendants.

Civil Action No. 25-1051 (EGS)

## FINAL JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the Memorandum Opinion and Order docketed on July 21, 2025, it is hereby

**ORDERED** that the Clerk shall enter final judgment in favor of Plaintiff and against Defendants. This is a final appealable Order. *See* Fed. R. App. P. 4(a).

**SO ORDERED.**

Signed:    **Emmet G. Sullivan
          United States District Judge
          July 25, 2025**

**JA 158**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 25-cv-1051 |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL DECLARATION OF CHRISTINA L. WENTWORTH**

I, Christina L. Wentworth, declare as follows:

1.    I am Senior Policy Counsel for Citizens for Responsibility and Ethics in Washington (CREW). On April 18, 2025, CREW filed a motion for a preliminary injunction and partial summary judgment, along with my declaration and other exhibits. I make this supplemental declaration based on my personal knowledge, consultation with colleagues at CREW, and review of documents posted by the Office of Management and Budget (OMB) under the Consolidated Appropriations Act, 2022, and Consolidated Appropriations Act, 2023.[1]

2.    On August 15, 2025, OMB restored the Public Apportionments Database to its website, https://apportionment-public.max.gov. On or around August 15–18, 2025, OMB posted to the Public Apportionments Database approximately 1,800 documents that OMB had approved

---

[1] Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257 (2022); Pub. L. No. 117-328, div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (2022).

1

**JA 159**

between March 24, 2025—the date OMB initially removed the Public Apportionments Database—and August 18, 2025.

3.      Hundreds of the apportionments included "A" footnotes, which "have legal effect" and "are subject to the Antideficiency Act."[2]

4.      More than 100 of these footnotes stated that amounts apportioned "are available for obligation consistent with the latest agreed-upon spending plan" or "spend plan" between the agency and OMB.[3] Several of these footnotes included additional language providing:

a.      Specific instructions for what the spend plan must include, such as "the allocations of . . . amounts by program;"[4]

b.      That if OMB "agrees" to a revision to a spend plan, amounts "shall be automatically re-apportioned to the applicable Category B line;"[5]

---

[2] Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget § 120.34 (Aug. 2025).

[3] *See, e.g.*, April 10, 2025 apportionment, TAFS 012-2025-2026-3510 (Department of Agriculture, Food and Nutrition Service, Special Supplemental Nutrition Program for Women, Infants and Children), https://openomb.org/file/11424278 ("Amounts apportioned on this line are available for obligation consistent with the latest agreed-upon spend plan for Fiscal Year 2025 between USDA and the Office of Management and Budget (OMB) as of the date of this apportionment action."); *see About OpenOMB*, OpenOMB, https://openomb.org/about (last visited Sept. 19, 2025) ("All apportionment files on OpenOMB simply reflect the underlying, primary-source data and documents that OMB has made available on apportionment-public.max.gov.").

[4] *See, e.g.*, May 16, 2025 apportionment, for TAFS 091-2025-2025-0301 (Department of Education, Office of Special Education and Rehabilitative Services, Rehabilitation Services), https://openomb.org/file/11430689 ("Such spending plan submitted by ED shall include . . . the allocations of such amounts by program.").

[5] *See, e.g.*, June 4, 2025 apportionment, for TAFS 019-2025-2029-1031 (Department of State, Global Health Programs), https://openomb.org/file/11433699 ("Upon OMB's agreement with a submitted spending plan (or any revision or addition to such a spending plan), amounts apportioned on line 6025 shall be automatically re-apportioned to the applicable Category B line.").

c.      That if OMB "agrees" to a revision to a spend plan, "the latest agreed-upon spend plan shall include" that revision;[6] or

d.      That absent an agreed-upon spend plan, the agency may obligate funds "only as necessary" for certain salary, payroll, or other required payments.[7]

5.      Since August 18, 2025, OMB has continued to post to the Public Apportionments Database documents that incorporate by reference undisclosed spend plans.[8]

6.      As of September 8, 2025, OMB had posted to the Public Apportionments Database 2,245 documents that OMB approved between March 24, 2025 and September 5, 2025. At least 131, or 5.8%, of these documents included an "A" footnote that incorporated by reference an undisclosed spend plan.

7.      This practice of incorporating by reference an undisclosed spend plan in an "A" footnote was particularly prevalent in documents concerning certain agencies. For example, of the 75 documents apportioning funds for the Department of State, at least 33, or 44%, included an "A" footnote that incorporated by reference an undisclosed spend plan. Of the 34 documents apportioning funds for the Department of the Interior, at least 18, or 52.9%, included an "A" footnote that incorporated by reference an undisclosed spend plan. Of the 17 documents

---

[6] *See, e.g.*, April 14, 2025 apportionment, for TAFS 028-X-0406 (Social Security Administration, Supplemental Security Income Program), https://openomb.org/file/11424812 ("If OMB agrees to such revision or addition, the latest agreed-upon spend plan shall include that modification.").

[7] *See, e.g.*, June 27, 2025 apportionment, for TAFS 075-2025-2025-1552 (Department of Health and Human Services, Administration for Children and Families, Temporary Assistance for Needy Families), https://openomb.org/file/11437508 ("In the absence of an agreed-upon spend plan between HHS and OMB, HHS may obligate funds on this line only as necessary for Federal salary and payroll expenses or making payments otherwise required by law.").

[8] *See, e.g.*, September 12, 2025 appropriation, for TAFS 012-2025-2026-3507 (Department of Agriculture, Food and Nutrition Service, Commodity Assistance Program), https://openomb.org/file/11467412.

2

apportioning funds for the Social Security Administration, at least 7, or 41.2%, included an "A" footnote that incorporated by reference an undisclosed spend plan.

8.    The documents posted to the Public Apportionments Database do not include copies of these spend plans, nor do they show whether OMB and any agency subject to these footnotes have agreed to a spend plan, whether—if they have agreed to a spend plan—that plan has been revised, or whether in the latest agreed-upon spend plan OMB has approved amounts by time, activity, function, project, or object, or some combination of both,[9] imposed any additional conditions on the funding, or otherwise specified that funding is unavailable.

9.    Since OMB established the Public Apportionments Database in 2022, OMB has approved many apportionments that, in legally binding footnotes, provided that funds would become available for obligation upon OMB's receipt of a spend plan from the agency.[10] Under such footnotes, once an agency submits the spend plan to OMB, the apportioned funds become available for obligation—regardless of what the spend plan provides or whether OMB "agrees" with the plan.

10.    Before March 24, 2025, however, OMB made funds available for obligation according to the *contents* of spend plans in only a limited number of instances. For example, of the 22,361 apportionments approved between August 15, 2021, and March 21, 2025, I identified less than a quarter of one percent of apportionments that appeared to incorporate by reference the contents of a spend plan.

---

[9] *See* 31 U.S.C. § 1512(b).

[10] *See, e.g.*, December 9, 2021 apportionment, for TAFS 012-2022-2024-0115 (Department of Agriculture, Office of the Secretary, Office of the Secretary), https://openomb.org/file/11205322 ("These funds are available for obligation ten business days after USDA provides OMB a spend plan for how this funding will be distributed to provide support to agricultural producers, growers, and processors.").

3

**JA 162**

11.    Because OMB has not posted to the Public Apportionments Database spend plans incorporated by reference in "A" footnotes, CREW and other members of the public are unable to determine how much funding is available for obligation or monitor these documents for potential misuse of appropriated funds, violations of the Anti-Deficiency Act, or the improper withholding of appropriated funds under the Impoundment Control Act.

12.    To the best of my knowledge, OMB has not posted the incorporated-by-reference spend plans on any other publicly available government website or otherwise made these documents publicly available. Without timely access to these spend plans, CREW is unable to fulfill its mission to inform the public about matters of significant public interest and importance.

13.    Prompt public awareness of any use of the apportionment process to misuse or withhold funds is critical to CREW's role in informing the national debate on government funding and to Congress's and the public's ability to promptly discuss or respond to any possible legal violations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 19, 2025

_____
Christina L. Wentworth

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>                    Plaintiff,<br><br>    v.<br><br>OFFICE OF MANAGEMENT AND BUDGET *et al.,*<br><br>                   Defendant. | Case No. 1:25-cv-01051-EGS |

## DECLARATION OF KELLY KINNEEN

I, Kelly Kinneen, make the following declaration based upon my personal knowledge, upon information provided in my official capacity, and upon conclusions I reached based on that knowledge or information:

1. I am the Assistant Director for Budget of the Office of Management and Budget (OMB) in the Executive Office of the President, in Washington, D.C. I have served in this position since 2017, and have worked at OMB since 2006.

2. I am the senior-most career official responsible for supporting the OMB Director in developing all aspects of the President's Budget. Additionally, I advise OMB leadership and Federal agencies on matters of execution relating to OMB's apportionment authority, 31 U.S.C. § 1512 et seq.

3. In my previous declaration on April 30, 2025, I summarized the OMB's apportionment authority and described the nature of the interagency process by which appropriated funds are made available to agencies. In this declaration, I distinguish an apportionment from a spending plan.

4. The President is required by law to apportion appropriations that are available for a definite period of time in a manner so as to prevent obligation or expenditure at a rate that would indicate a need for a deficiency or supplemental appropriation. 31 U.S.C. §

1

**JA 164**

1512(a). The President is required by law to apportion appropriations that are available for an indefinite period of time to achieve the most effective and economical use. 31 U.S.C. § 1512(a). The President has delegated this apportionment authority to the OMB Director. Executive Order (E.O.) 6166, as amended by E.O. 12608.

5.    OMB Circular A-11 is an OMB product that provides guidance on preparing the annual President's Budget and instructions on budget execution. It is typically updated each calendar year, with the releases generally occurring in the summer.

6.    Section 120.15 of OMB Circular A-11 delineates various kinds of additional information that can be integrated into an apportionment request, including footnotes, additional tabs, and attachments. Per section 120.36 of OMB Circular A-11, footnotes and additional tabs and attachments are part of the apportionment, but they will only be legally binding and subject to the Antideficiency Act if they are specifically referenced in a footnote in the OMB Action column of the Application of Budgetary Resources section of the apportionment.

7.    The 2020 and 2021 versions of section 120.36 contained a paragraph noting that, while not necessary, if an individual wanted to underscore that attachments to the apportionment not cited in the apportionment itself were not subject to the Antideficiency Act, then the individual had the discretion to state as such, with an example statement being: "This attachment is not subject to 31 U.S.C. 1517." This paragraph was removed in the 2022 version of OMB Circular A-11 and replaced with a paragraph noting that such statements are not necessary.

8.    Section 120.34 of OMB Circular A-11 clarifies that footnotes appear as textual descriptions on specific tabs in an apportionment file and typically provide additional information or direction associated with one or more lines on the request. Footnotes are

2

**JA 165**

divided into two basic groups: footnotes for apportioned amounts (in the Application of Budgetary Resources section), and informational footnotes for budgetary resources. OMB routinely includes informational or legally binding footnotes on apportionments. Footnotes give an agency additional information or instructions beyond the dollar amounts provided for a time period, project, or activity. Frequently, footnotes will provide additional restrictions on the use of funds, or will condition the availability of funds on further action by the agency, such as the submission of a spending plan, or on other future circumstances.

9.  Spending plans are not specific to the apportionment process, and are not required by OMB's apportionment authority (31 U.S.C. §§ 1512-13). Spending plans are developed by agencies and serve the purpose of informing the allocation of resources for such agencies. Congress itself often requires agencies to submit spending plans to receive information on how agencies intend to spend appropriated funds. For the purposes of OMB's exercise of its apportionment authority, as a matter of best practices for ensuring appropriated funds are being spent in accordance with the law and Administration policy, OMB may request for an agency to provide OMB with a spending plan. The spending plan is generally at a more granular level than an apportionment and thereby provides greater insight into how an agency intends to utilize its apportioned funds. Thus, spending plan footnotes assist in gathering information from agencies pertaining to how the agency intends to spend their appropriated funds, including how much funding the agency needs to dedicate to particular programs and activities, furthering OMB's financial management and oversight responsibilities.

10.  To the extent an apportionment is approved with a footnote that references an agency's spending plan, the spending plan is not the "document apportioning an appropriation".

3

**JA 166**

The spending plan does not, itself, apportion funds and make them available for obligation. Rather, the apportionment reflecting amounts on certain lines (e.g., category A, category B) with particular conditions is the "document apportioning an appropriation." The reference to the spending plan may often merely memorialize that the spending plan informed the manner in which the appropriation is apportioned. A footnote referencing a spending plan is part of the apportionment and is legally binding and subject to the Antideficiency Act if it is specifically referenced in the OMB Action column of the Application of Budgetary Resources section of the apportionment. Even if a footnote referencing a spending plan is not legally binding, agencies are generally expected to adhere to the spending plan to ensure that the apportioned funds are obligated and expended in a manner consistent with the apportionment.

11.    OMB has always used spend plans as a means to obtain information to inform apportionment decisions. (Compare, for Department of Labor's "Training and Employment Services" apportionment, "Apprenticeship funds may be obligated 15 days after the date of submission by the U.S. Department of Labor to OMB of a spending plan for all apprenticeship investments [Rationale: An agency spend plan or other documentation is necessary to better understand how the agency intends to obligate some or all of the apportioned funds.]", https://openomb.org/file/11349526, with "Amounts apportioned, but not yet obligated as of the date of this apportionment, on this line are available for obligation consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the Department of Labor (DOL) and the Office of Management and Budget (OMB). Such spending plan submitted by DOL shall include specific information on current and anticipated grants and contracts and a detailed description of how such spending plan aligns with Administration priorities. Any

4

**JA 167**

revisions or additions to such spending plan shall be proposed to OMB in writing no later than five business days before the anticipated obligation of funds based on such revisions or additions. If OMB agrees to such revision or addition, OMB will notify DOL in writing, and the latest agreed-upon spend plan shall comprise such revision or addition. [Rationale: An agency spend plan or other documentation is necessary to better understand how the agency intends to obligate some or all of the apportioned funds.]", https://openomb.org/file/11468495).

12.    During fiscal years 2022, 2023, and 2024, OMB approved over 9,000 apportionments containing A footnotes.  During fiscal years 2022, 2023, and 2024, OMB approved footnotes with the phrase "spend plan" or "spending plan" over 500 times.  During fiscal year 2025, OMB has approved over 2,700 apportionments containing A footnotes.  During fiscal year 2025, OMB approved footnotes with the phrase "spend plan" or "spending plan" over 450 times.

13.    Upon enactment of the Consolidated Appropriations Act, 2022, OMB began posting the apportionments within 48 hours of signing the apportionments, and providing a rationale for any footnotes included on those apportionments.  OMB did not post additional documents referenced in those footnotes, including spend plans, on the public website at that time, whether the document implicated the Antideficiency Act or not.  OMB has continued to not post additional documents referenced in footnotes, including spend plans, since enactment of the Consolidated Appropriations Act, 2022, and has not otherwise proactively released such documents, as they routinely contain sensitive and pre-decisional information not intended for public dissemination.

14.    Spending plans routinely contain sensitive and pre-decisional information not intended for public dissemination.  Agencies often prepare spending plans that provide funding

5

**JA 168**

information at the program, project, and activity level that may include sensitive business information and other market-moving, non-public information. At the beginning of a fiscal year or following newly-enactment of appropriations, spending plans often include predecisional information intended to inform OMB of projected costs, possible projects, or other forthcoming decisions that may educate the agencies' apportionment requests. Such spending plans are often not subject to public disclosure for this reason.

CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Washington, D.C., on the 20th day of October, 2025.

Kelly Kinneen

6

**JA 169**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROTECT DEMOCRACY PROJECT,
2020 Pennsylvania Ave., NW, Ste. 163
Washington, D.C. 20006

        Plaintiff,

   v.

U.S. OFFICE OF MANAGEMENT & BUDGET
725 17th Street, NW
Washington, D.C. 20503

and

RUSSELL T. VOUGHT, *Director of the U.S. Office*
*of Management and Budget*
725 17th Street, NW
Washington, D.C. 20503

        Defendants.

Civil Action No. _____

**COMPLAINT**

**INTRODUCTION**

1.     This case raises simple, but fundamental, principles of the rule of law. Under our Constitution, Congress makes the laws, U.S. CONST. art. I, § 1, and the executive branch must faithfully execute those laws, *id.* art. II, § 3. Congress's legislative powers are at their apex on matters of the public fisc, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (citing U.S. CONST. art. I, § 9, cl. 7).

2.     In 2022 and 2023, Congress enacted laws to safeguard its constitutional power of the purse. Congress mandated through these laws that the U.S. Office of Management and

1

**JA 170**

Budget (OMB) make public a critical part of its implementation of appropriations laws: the apportionment of congressionally appropriated funds. Specifically, Congress required OMB to implement an "automated system" for posting apportionment documents and related information on a publicly accessible website in a format that facilitates public use.

3. Congress mandated prompt transparency for apportionments to prevent abuses of power and strengthen Congress's and the public's oversight of the spending process. Absent this transparency, the president and OMB may abuse their authority over the apportionment of federal funds without public or congressional scrutiny or accountability.

4. OMB complied with its statutory mandates from July 2022 through March 24, 2025. Plaintiff Protect Democracy Project was at the forefront of utilizing the information made available for the public's benefit, creating a user-friendly website known as "OpenOMB" that displayed the apportionment information in an interactive format to help the public track and understand the government's spending activities.

5. On March 24, Defendants OMB and Director Russell Vought decided that they no longer wished to comply with the law. The required apportionments website went dark, without explanation. Five days later, Defendant Vought notified Congress that OMB would no longer carry out its statutory duties, citing vague and unsubstantiated concerns about disclosing "deliberative" information and risking "national security."

6. Protect Democracy files this action to require Defendants to comply with their legal duties, and to enable Protect Democracy to resume informing the public about whether its money is being spent in a manner that our elected leaders have required.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States; 28 U.S.C. § 1346(a)(2) because Defendants are a United States agency and official; and 28 U.S.C. § 1361 to the extent that it seeks a remedy in the nature of mandamus.

8. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because OMB is an agency of the United States.

## PARTIES

9. Plaintiff Protect Democracy Project ("Protect Democracy") is a nonpartisan, nonprofit organization whose mission is to prevent American democracy from declining into a more authoritarian form of government. Protect Democracy engages in public education about threats to democratic norms and institutions and how the American people can best confront them. It advances its mission through research, analysis, technology, and litigation to stand up for free and fair elections, the rule of law, fact-based debate, and a better democracy for future generations. *See* Protect Democracy, *About Us,* https://protectdemocracy.org/about/ (last visited Apr. 8, 2025).

10. Part of Protect Democracy's work promoting checks and balances and the constitutional separation of powers includes efforts to support Congress's power of the purse, a critical check against abuses of executive authority. For example, Protect Democracy recently published an extensive report correcting mischaracterizations of the history of presidential impoundments. *See* Protect Democracy, *The Myth of Presidential Impoundment Power* (Mar. 2025), protectdemocracy.org/impoundment-myth; *see also* Protect Democracy, *Checking*

3

**JA 172**

*Presidential Impoundment of Federal Funds* (Jan. 30, 2025), https://tinyurl.com/yc8hcpxw

(collecting more of Protect Democracy's relevant work).

11.    As described in more detail below, in October 2024, Protect Democracy launched

OpenOMB, which—until OMB ceased operating its public apportionment website—drew on

files OMB posted on its website as required by statute. Protect Democracy displayed them in a

user-friendly, interactive format to help Congress, the press, and the public better track and

understand apportionments. *See About OpenOMB*, OpenOMB.org/about (last visited Apr. 10,

2025).

12.    Defendant OMB is a federal agency with responsibility for government-wide

financial management policies for executive agencies and numerous financial management

functions. *See* 31 U.S.C. §§ 503(a), 504. It is part of the Executive Office of the President, *id.* §

501, and maintains a headquarters in Washington, D.C.

13.    Defendant Russel T. Vought is the Director of OMB and is sued in his official

capacity.

## <u>BACKGROUND AND FACTUAL ALLEGATIONS</u>

### The "Apportionment" Process

14.    The Constitution grants the power of the purse to Congress, stating that "[n]o

money shall be drawn from the Treasury, but in consequence of appropriations made by law."

U.S. CONST. art. I, § 9, cl. 7; *see, e.g.*, *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S.

416, 420 (2024) ("Our Constitution gives Congress control over the public fisc.").[1]

15.    To protect and enforce this power, Congress passed two related statutes: the

Antideficiency Act and the Impoundment Control Act. The Antideficiency Act, enacted in 1870,

---

[1] Separating the power of the purse from the executive power is foundational to the
Constitution's separation of powers. *See* 2 The Debates in the Several State Conventions on the

prohibits agencies from obligating funds in excess of the amounts appropriated by Congress. 31 U.S.C. §§ 1341, 1349, 1511-19. On the other side of the equation, the Impoundment Control Act ensures that the president *must* spend funds that Congress appropriated for particular purposes. The Impoundment Control Act permits the president to "defer" (*i.e.*, delay) obligating or expending funds only in limited circumstances pursuant to a process prescribed by Congress. 2 U.S.C. §§ 682, 684. The Act also allows the president to *propose* to Congress that funds be permanently rescinded; the Act does not allow the President to do so unilaterally. *Id.* § 683.

16.     To ensure agencies spend no more than Congress has appropriated, the Antideficiency Act "established a new administrative process"—called "apportionment"—that "requires that budget authority provided to federal agencies in appropriations acts be allocated in installments, rather than all at once." Cong. Rsch. Serv., R46240, *Introduction to the Federal Budget Process* 28 (2023), https://www.congress.gov/crs-product/R46240; *see* 31 U.S.C. §§ 1512-13. Apportioning funds in such installments promotes prudent spending by the executive by "prevent[ing] obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation." 31 U.S.C. § 1512(a).

17.     The Antideficiency Act requires the president to apportion appropriations for federal agencies. *Id*. § 1513(b).

18.     An individual apportionment is a "legally binding" plan that sets the rate of agency expenditure. OMB Circular No. A-11, § 120.1 (2024), https://tinyurl.com/5n8kab4w. "It typically limits the obligations [an agency] may incur for specified time periods, programs,

---

Adoption of the Federal Constitution 349 (Jonathan Elliot ed., 1836), https://tinyurl.com/3tnneueu (Hamilton averring that "[w]here the purse is lodged in one branch, and the sword in another, there can be no danger"); The Federalist No. 58, https://tinyurl.com/5t3kwd6d (Madison describing Congress's power of the purse as "that powerful instrument" for "reducing. . . all the overgrown prerogatives of the other branches of the government").

activities, projects, objects, or any combination thereof." *Id.* Or put simply, apportionments specify what appropriated funds an agency may spend as well as when and on what the agency may spend them.

19.    In requiring the president to apportion appropriations for federal agencies, Congress provided that the president "shall apportion in writing" appropriations "available to" federal agencies and "shall notify" agency heads of the apportionment "action taken" within timelines set forth in statute. 31 U.S.C. § 1513(b).

20.    By statute, federal expenditures that exceed an apportionment are not only prohibited, but also subject the responsible federal officers and employees to administrative discipline and criminal liability. *See id.* §§ 1517(a)(1) (federal officers and employees are prohibited from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding . . . an apportionment"), 1518 (violators of § 1517(a) "shall be subject to appropriate administrative discipline"), 1519 (knowing and willful violators of § 1517(a) "shall be fined not more than $5,000, imprisoned for not more than 2 years, or both"). This liability extends to violations of conditions set forth in certain footnotes provided by OMB in issuing apportionments (known as "A" footnotes), which may describe further legal requirements related to the use of apportioned funds. OMB Circular No. A-11, § 120.34.

21.    The president has delegated his apportionment authority to the OMB Director, and the OMB Director has further delegated the authority to other OMB officials. Prior to the first Trump Administration, such authority was delegated to Deputy Associate Directors, senior career officials within OMB. *See* Project 2025, Heritage Found., *Mandate for Leadership: The Conservative Promise* 45 (2023), https://tinyurl.com/mryu9k4h. In the first Trump Administration, apportionment authority was re-delegated to Program Associate Directors

(PADs), political appointees within OMB. *Id.* During the Biden Administration, the authority was restored to OMB career officials. 87 Fed. Reg. 19138 (Apr. 1, 2022). Most recently, Defendant Vought re-delegated apportionment authority to OMB's political appointees (*i.e.*, the PADs). 90 Fed. Reg. 9737 (Feb. 18, 2025).

22.    In his chapter of Project 2025's *Mandate for Leadership* outlining policy changes for a future Trump Administration's OMB, Defendant Vought described the change in apportionment authority from career to political officials as "open[ing] wide vistas of oversight that had escaped the attention of policy officials." *Mandate for Leadership*, *supra*, at 45. And he recommended that a future Trump Administration avoid choosing an OMB Director "who is unwilling to restore apportionment decision-making to the PADs' personal review, who is not aggressive in wielding the tool on behalf of the President's agenda, or who is unable to defend the power against attacks from Congress." *Id*.

### Apportionment Transparency

23.    Administrations of both parties have been criticized for abusing the apportionment process. By not apportioning funds that the president does not want agencies to spend for policy reasons, the president and OMB can delay or preclude agencies from using funds that Congress appropriated for particular purposes.

24.    President Roosevelt used apportionments during World War II to halt funding for programs that Congress had enacted into law but that the president deemed non-essential to the war effort. These allegedly illegal impoundments drew objections from Congress and the public alike. *See, e.g.*, *First Supplemental National Defense Appropriation Bill for 1944: Hearings on H.R. 3598 Before a Subcomm. of the S. Comm. on Appropriations,* 78th Cong. 336-42 (1943), https://tinyurl.com/3dmav2uk; *Departments of State, Justice, and Commerce Appropriation Bill*

7

**JA 176**

*for 1944: Preliminary Hearings Before the Subcomm. of the S. Comm. on Appropriations*, 78th Cong. 56-61 (1943), https://tinyurl.com/53xnnc32; J.D. Williams, *The Impounding of Funds by the Bureau of the Budget* (1955) (Inter-University Case Program, Case Series No. 28), *in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 378-94 (1971), https://tinyurl.com/5vyd9h8b. President Nixon used apportionments, among other tools, to impound funds for an array of domestic programs, *see, e.g.*, Letter from OMB Director Roy Ash to Sen. Spiro Agnew, President of the Senate (Feb. 5, 1973), *in* 119 Cong. Rec. S3282-86, https://tinyurl.com/m423hnfc, leading to extensive litigation and the passage of the Impoundment Control Act. *See, e.g.*, *Berends v. Butz*, 357 F. Supp. 143 (D. Minn. 1973) (noting OMB apportionment's cap on funds available to the Department of Agriculture); Congressional Budget & Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, § 1002, 88 Stat. 297, 332 (1974) (amending the Antideficiency Act to narrow the circumstances in which apportionments may be used to hold appropriated funds in reserve, and requiring that reserves be reported to Congress); *see also* 31 U.S.C. § 1512. And more recently, in 2019, President Trump used the apportionment process to withhold military aid to Ukraine, an action the Government Accountability Office (GAO) determined violated the Impoundment Control Act. GAO, B-331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance* (Jan. 16, 2020), https://tinyurl.com/nhea99ck.

25. In March 2022, as part of the Fiscal Year 2022 Consolidated Appropriations Act, Congress enacted new legislation requiring OMB to make apportionments public. Congress directed that:

> Not later than 120 days after the date of enactment of this Act, the Office of Management and Budget shall complete implementation of an automated system

to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code), not later than 2 business days after the date of approval of such apportionment, and shall place on such website each document apportioning an appropriation, pursuant to such section 1513(b), including any associated footnotes, already approved the current fiscal year, and shall report the date of completion of such requirements to the Committees on Appropriations and the Budget of the House of Representatives and Senate.

Each document apportioning an appropriation pursuant to section 1513(b) of title 31, United States Code, that is posted on a publicly accessible website pursuant to such section shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts: Provided, That the Office of Management and Budget or the applicable department or agency shall make available classified documentation referenced in any apportionment at the request of the chair or ranking member of any appropriate congressional committee or subcommittee.

Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note) (hereinafter "2022 Appropriations Act").

26.     The "Open Government Data Asset" format required by § 204(b) is defined as "a public data asset that is—(A) machine-readable; (B) available (or could be made available) in an open format; (C) not encumbered by restrictions, other than intellectual property rights, including under titles 17 and 35, that would impede the use or reuse of such asset; and (D) based on an underlying open standard that is maintained by a standards organization." 44 U.S.C. § 3502. This definition was enacted as part of the Open, Public, Electronic, and Necessary Government Data Act or the ''OPEN Government Data Act," Pub. L. No. 115-435, tit. II, 132 Stat. 5529, 5534-35 (2019), which "establishe[d] a default of openness, meaning government data should be available to and usable by the public to the greatest extent possible," H.R. Rep. No. 115-411, at 12 (2017), https://tinyurl.com/4jysd2e6.

27.     Representative Rosa DeLauro, then Chairwoman of the House Appropriations Committee, released a division-by-division summary of the 2022 Appropriations Act that lists

the apportionment transparency provisions among other "Important Policy Changes" that "[s]trengthen[] our democracy" by "mak[ing] apportionments of appropriations publicly available in a timely manner." Chair Rosa DeLauro, H.R. 2471, *Funding for the People: Division-by-Division Summary of Appropriations Provisions* 18, https://tinyurl.com/bdf447pj (last visited Apr. 9, 2025).

28. In December 2022, Congress made the requirements imposed by the 2022 Appropriations Act permanent.

29. Specifically, in the Consolidated Appropriations Act of 2023, Congress directed that,"[i]n fiscal year 2023 and each fiscal year thereafter," OMB "shall operate and maintain the automated system required to be implemented by section 204 of the [2022 Appropriations Act]." Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note) (hereinafter "2023 Appropriations Act"). Congress further directed that OMB "shall continue to post each document apportioning an appropriation" (including "any associated footnotes") in the format and subject to the requirements specified in the 2022 Appropriations Act. *Id.*

30. In July 2022, in compliance with the law, OMB began making apportionments public at https://apportionment-public.max.gov. *See* Press Release, Protect Democracy, *OMB Implements Apportionment Transparency Program, a Key Pro-Democracy Reform* (July 13, 2022), https://tinyurl.com/4e3d8kxd.

**Protect Democracy Launches OpenOMB**

31. After OMB launched its public apportionment website, Protect Democracy organized and led a virtual training for congressional staff in October 2022 on "how to read apportionments, navigate and use OMB's website, and find the apportionments associated with a

particular appropriation or Treasury account." *See* Protect Democracy, *Experts Explain How to Read Apportionments and Navigate OMB's New Apportionment Website*, YouTube (Oct. 17, 2022), https://tinyurl.com/yd6urbxe. Protect Democracy made a recording of the training and other resources for Congress available online. *See Using OMB's Apportionment Website: Resources for Congress*, Protect Democracy (Nov. 3, 2022), https://tinyurl.com/297a79m2.

32.     In May 2024, the Princeton Initiative on Restoring the Constitutional Powers of Congress published recommendations from leading experts to "improv[e] transparency and accountability to Congress." Princeton Initiative, *The Power of the Purse* 1 (May 2024), https://tinyurl.com/3av4dbdx. The group applauded the recently passed apportionment transparency requirement, but described the OMB website as "unnecessarily difficult to navigate" because it provided links to apportionment documents organized by agency and by Treasury Appropriation Fund Symbol, "which may not be easily recognized as programs of interest by members of Congress, staff members, or members of the public." *Id.* at 5. The report also noted that "[r]eviewing information from the website also requires downloading discrete data files rather than allowing users to interact with the information directly online." *Id.* The group's recommendations to improve the website included using titles that reflect program names, identifying apportionment footnotes clearly, and identifying changes in apportionments for the same program or activity over the course of the year. *Id.*

33.     In October 2024, Protect Democracy launched OpenOMB.org ("OpenOMB"). *See* Protect Democracy (@protctdemocracy), X (Oct. 2, 2024, 10:55 PM), https://tinyurl.com/4a7rvzea; William Ford, *et al.*, *Is the president following the law when it comes to spending?*, If You Can Keep It (Oct. 2, 2024), https://tinyurl.com/2j6k4v6e. OpenOMB

11

**JA 180**

aims to make oversight of OMB's apportionments easier for Congress, the press, and the public. *See About OpenOMB*, *supra*.

34. OpenOMB "uses a simple process to provide easier access to apportionment files. Each day, OpenOMB pulls the primary source data from OMB's site and stores the files in a database in a manner that allows them to be searched, filtered, and indexed. OpenOMB's search function then provides a means to query that database, searching for information in and across apportionments. The site is, in short, a user-friendly interface that provides access to a store of primary source data that is updated daily and contains searchable and well-organized files." *See* Ford, *et al.*, *supra*.

35. OpenOMB has a wide range of users beyond Protect Democracy, including Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community. For example:

   a. Congressional appropriators have stated in press releases that they monitor OpenOMB to identify apportionment abuses. *See* Fact Sheet, House Appropriations Committee Democrats, Background on Unlawful Impoundment in President Trump's Executive Orders (Jan. 29, 2025), https://tinyurl.com/5ce9tuhf ("Nevertheless, we will be monitoring OpenOMB.org. . . .").

   b. Litigants have cited OpenOMB's apportionment information. *See, e.g.*, Mem. Of Law in Supp. of Pls.' Renewed Mot. for a TRO at 36, *AFL-CIO, et al. v. Dep't of Labor et al.*, No. 25-cv-00339 (Feb. 12, 2025), ECF No. 29-1, https://tinyurl.com/2s48d7hn (citing OpenOMB); Mem. In Supp. of Pl.'s Mot. For Prelim. Inj. At 2, *Citizens for Responsibility & Ethics in Wash. V. U.S. DOGE*

12

**JA 181**

*Service, et al.*, No. 25-cv-00511 (Feb. 20, 2025), ECF No. 2-1,

https://tinyurl.com/3bt8667p (same).

c. Journalists have used OpenOMB as a source in their news reporting. *See* Aleksandra Wrona, *Exploring DOGE's creation, legality and purpose*, Yahoo News (Mar. 27, 2025), https://tinyurl.com/32czhcpj (same); Paul Krawzak, *White House scraps public spending database*, Roll Call (Mar. 24, 2025), https://tinyurl.com/54zaeye6 (same).

d. Public policy organizations have cited OpenOMB information in issue briefs. *See, e.g.*, Citizens for Responsibility & Ethics in Washington, *Key Concepts Related to the Impoundment Control Act of 1974* (Jan. 2025), https://tinyurl.com/24bn7k6j; Governing for Impact, *Challenging DOGE* (Feb. 2025), https://tinyurl.com/592euzkz.

e. Academics have recognized that the apportionment transparency laws have "enabl[ed] a number of good government groups to better track spending at sites like openomb.org." *See* Matthew B. Lawrence, *Secret Conditions Move from DOGE to OMB*, Yale J. Reg. (Apr. 3, 2025), https://tinyurl.com/278erknm.

f. Libraries have shared OpenOMB as a resource to help the communities they serve understand developments in government. *See* John M. Pfau Library, *U.S. Government Information: Archived and Alternative Sources, Tracking Tools*, Cal. State Univ., San Bernardino, https://tinyurl.com/mwb3ht8m (last visited Apr. 10, 2025) (listing OpenOMB as the resource for tracking apportionments); The Library, *U.S. Government Information: Trump Trackers*, UC San Diego, https://tinyurl.com/2p99bz8n (last visited Apr. 10, 2025) (same).

13
**JA 182**

g. Budget experts have highlighted OpenOMB as a tool to "help track" apportionments and potential spending abuses. *See* Bobby Kogan (@bbkogan.bsky.social), BlueSky (Feb. 21, 2025, 3:20 PM), https://tinyurl.com/knjkvh38.

h. Wikipedia entries cite OpenOMB as an external link. *See, e.g.*, Wikipedia, *Apportionment (OMB)*, https://tinyurl.com/4fp2yjdh (last visited Apr. 10, 2025); Wikipedia, *Centers for Medicare & Medicaid Services*, https://tinyurl.com/327w32ba (last visited Apr. 10, 2025).

**The Trump Administration's Intent to Impound Funds**

36. During the 2024 presidential campaign, then-candidate Trump openly stated that he intended to impound appropriated funds if elected. In a campaign statement, he claimed that: "For 200 years under our system of government, it was undisputed that the President had the Constitutional power to stop unnecessary spending through what is known as Impoundment." Donald J. Trump, *Using Impoundment to Cut Waste, Stop Inflation, and Crush the Deep State*, Agenda47 (June 20, 2023), https://tinyurl.com/2n4nu6mj. He made clear that, if elected, he would "use the president's long-recognized Impoundment Power." *Id.*

37. After the election, Defendant Vought left little doubt that the incoming Administration would follow through on the president's intent to impound funds. At his confirmation hearing, when asked to disclaim any intention to violate the Impoundment Control Act, Vought responded that "the President has run on that issue" and "believes [the Impoundment Control Act is] unconstitutional." Russell Vought Confirmation Hearing, https://tinyurl.com/wreyh37d (last visited Apr. 12, 2025). Vought reiterated the claim that "[f]or

14

**JA 183**

200 years, presidents had the ability to spend less than an appropriation . . ." *Id*; *but see The Myth of Presidential Impoundment Power, supra*.

38.     The laws requiring transparency for apportionments make it more difficult for the executive branch to impound funds unlawfully outside the view of Congress and the public.

<p align="center">**OMB's Failure to Follow the Law**</p>

39.     OMB made apportionments public as required by law until March 24, 2025, when the website began showing a "page not found" error. *See* Cong. Rsch. Serv., *Office of Management and Budget (OMB) Reporting on Apportionments* (Mar. 31, 2025), https://www.congress.gov/crs-product/IN12538?s=1&r=18; Krawzak, *supra*.

40.     On March 29, 2025, Defendant Vought sent a letter to the House and Senate Appropriations Committee's Ranking Members, Representative Rosa DeLauro and Senator Patty Murray, stating that OMB "will no longer operate and maintain" the website mandated by law. *See* Sen. Patty Murray (@PattyMurray), X (Mar. 31, 2025, 5:30 PM), https://tinyurl.com/4xpjy8ur; Cong. Rsch. Serv., *Office of Management and Budget (OMB) Reporting on Apportionments*, *supra*.

41.     Defendant Vought's letter claimed that complying with the law "requires the disclosure of sensitive, predecisional, and deliberative information," and that disclosing the required information "may pose a danger to national security and foreign policy." *Id.* The letter did not point to any specific examples where OMB's compliance with the law has required disclosure of privileged information or would pose a danger to national security or foreign policy.

42.     Without public access to the apportionment documents and information previously made available on the OMB website, Protect Democracy can no longer provide

<p align="center">15</p>
<p align="center">**JA 184**</p>

updated information about apportionments to the public through OpenOMB, or otherwise use the site to monitor the apportionments, footnotes, and written explanations for potential violations of the law.

43. After OMB took its website down, Protect Democracy posted the following header on OpenOMB: "The OMB website that provides the underlying data used by OpenOMB is offline. There will be no new apportionments posted on OpenOMB until that site is back online." OpenOMB.org, https://openomb.org (last visited Apr. 10, 2025).

## CAUSES OF ACTION

### COUNT ONE
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C)
### (Agency Action Not in Accordance with Law, Contrary to Constitutional Right or Power, and in Excess of Statutory Authority)

44. Protect Democracy hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

45. OMB is an agency within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551.

46. Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "contrary to constitutional power [or] right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

47. Federal law provides that OMB "shall operate and maintain [an] automated system" online where it "shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an open Government data asset." 2023 Appropriations Act, div. E, title II, § 204, 136 Stat. at 4667.

16

**JA 185**

48.     Federal law further requires that OMB post each apportionment "not later than 2 business days after the date of approval of such apportionment," and that in posting each apportionment, OMB "shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *See* 2022 Appropriations Act, div. E, tit. II, § 204(b)-(c), 136 Stat. at 256-57.

49.     Defendants have openly admitted that they are not complying with these statutory requirements. Defendants' decision to entirely stop complying with applicable law and their ongoing failure to post apportionments and related required information on a public website violates the 2022 and 2023 Appropriations Acts, as well as the constitutional separation of powers.

50.     Defendants' actions are "not in accordance with law," "contrary to constitutional right [or] power," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

## COUNT TWO
### Administrative Procedure Act, 5 U.S.C. § 706(1)
### (Agency Action Unlawfully Withheld or Unreasonably Delayed)

51.     Protect Democracy hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

52.     OMB is an agency within the meaning of the APA. *See* 5 U.S.C. § 551.

53.     Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

54.     Federal law provides that OMB "shall operate and maintain [an] automated system" online where it "shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in

17
**JA 186**

a format that qualifies each such document as an open Government data asset." 2023 Appropriations Act, div. E, title II, § 204, 136 Stat. at 4667.

55.     Federal law further requires that OMB post each apportionment "not later than 2 business days after the date of approval of such apportionment," and that in posting each apportionment, OMB "shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *See* 2022 Appropriations Act, div. E, tit. II, § 204(b)-(c), 136 Stat. at 256-57.

56.     In no longer fulfilling its statutory obligations to post apportionments and related required information on a public website, Defendants have "unlawfully withheld or unreasonably delayed" taking actions required by law. 5 U.S.C. § 706(1).

## COUNT THREE
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Arbitrary and Capricious Agency Action)

57.     Protect Democracy hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

58.     OMB is an agency within the meaning of the APA. *See* 5 U.S.C. § 551.

59.     Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

60.     Federal law provides that OMB "shall operate and maintain [an] automated system" online where it "shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an open Government data asset." 2023 Appropriations Act, div. E, title II, § 204, 136 Stat. at 4667.

18

**JA 187**

61.    Federal law further requires that OMB post each apportionment "not later than 2 business days after the date of approval of such apportionment," and that in posting each apportionment, OMB "shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *See* 2022 Appropriations Act, div. E, tit. II, § 204(b)-(c), 136 Stat. at 256-57.

62.    OMB's decision to abruptly shut down the apportionments website required by law is arbitrary and capricious. On March 24, 2025, when the OMB website began showing a "page not found" error, Defendants failed to offer *any* explanation, much less a reasonable one, for their actions. And to the extent it was intended as an explanation, Defendant Vought's March 29, 2025 letter is unreasonable because it: ignores the plain requirements of the 2022 and 2023 Appropriations Act; relies on factors which Congress did not intend OMB to consider; entirely fails to consider reliance interests and the ways OMB's breach of legal obligation affects Congress and the public; and runs counter to nearly three years of OMB's compliance with statutory requirements. The letter also relies on spurious claims that the legal requirement for OMB to disclose its *final*, unclassified actions to apportion funds to agencies, which have immediate legal effect in enabling agencies to spend funds, somehow "requires the disclosure of sensitive, predecisional, and deliberative information" or "may pose a danger to national security and foreign policy." Defendants have provided no evidence or other substantiation for these claims.

63.    Thus, Defendants' actions are "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

## COUNT FOUR
### Nonstatutory Claims and *Ultra Vires* Actions

64.    Protect Democracy hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

19
**JA 188**

65.     Federal district courts have jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

66.     Plaintiffs also may bring a nonstatutory action to challenge Defendant Vought's *ultra vires* actions that are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

67.     Defendant Vought's complete abdication of his duties to post apportionment data online violates the separation of powers and represents a "clear departure" from statutory mandates that is "blatantly lawless." *Id.*

68.     Defendants Vought should be enjoined from his ongoing constitutional and statutory violations.

## COUNT FIVE
### Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202

69.     Protect Democracy hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

70.     Protect Democracy is entitled to declaratory relief on the basis of all claims identified.

71.     There is a substantial and ongoing controversy between the parties, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish and affirm that Defendants' decision to stop fulfilling OMB's statutory obligations and their ongoing failure to post apportionments and related required information on a public website violate the 2022 and 2023 Appropriations Acts.

**JA 189**

## COUNT SIX
### Writ of Mandamus

72. Protect Democracy hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

73. If relief is not available on Plaintiff's other counts, Protect Democracy is entitled to a writ of mandamus. The 2022 and 2023 Appropriations Acts impose on OMB clear, mandatory duties to act that are not within OMB's discretion to decline.

74. By law OMB "*shall* operate and maintain [an] automated system" online where it "*shall* continue to post each document apportioning an appropriation." 2023 Appropriations Act, div. E, title II, § 204, 136 Stat. at 4667 (emphasis added). And by law, OMB "*shall* also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." 2022 Appropriations Act, div. E, tit. II, § 204(b)-(c), 136 Stat. at 256-57 (emphasis added).

75. Defendants' refusal to fulfill their statutory obligations and their ongoing failure to post apportionments and related required information on a public website violate the clear duties imposed by the 2022 and 2023 Appropriations Acts.

76. Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials. *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (quotations omitted) (Kavanaugh, J.).

77. Protect Democracy is entitled to a writ of mandamus compelling Defendants to comply with these statutory requirements and, absent this Court granting the relief sought by the counts above, there is no other adequate means of redress.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Protect Democracy Project requests that this Court:

A.  Declare unlawful and set aside Defendants' failure and refusal to operate and maintain the automated system required by the 2022 and 2023 Appropriations Acts, including Defendants' failure and refusal to publish apportionments, associated footnotes, and related information on a public website in an Open Government Data Asset format;

B.  Enter a preliminary and permanent injunction requiring Defendants to publish, on an ongoing basis, all information about apportionments required by the 2022 and 2023 Appropriations Acts (including all information Defendants have unlawfully failed to post since March 24, 2025), either by restoring the previous public website (https://apportionment-public.max.gov) or establishing a similar publicly accessible site;

C.  Enter a preliminary and permanent injunction prohibiting Defendants from ceasing to operate and maintain a public website publishing the information currently required by the 2022 and 2023 Appropriations Acts without statutory authorization;

D.  Grant relief in the nature of mandamus compelling Defendants to perform all nondiscretionary duties required by the 2022 and 2023 Appropriations Acts, including publishing, on an ongoing basis, all information about apportionments required by the 2022 and 2023 Appropriations Acts (including all information Defendants have unlawfully failed to post since March 24, 2025), either by restoring the previous public website (https://apportionment-public.max.gov) or establishing a similar publicly accessible site;

E.  Award Protect Democracy Project its costs and reasonable attorneys' fees; and

**JA 191**

F.  Grant such other and further relief as this Court may deem just and proper.

Dated: April 14, 2025

/s/ Daniel F. Jacobson
Daniel F. Jacobson (D.C. Bar # 1016621)
Kyla M. Snow*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

* Not admitted in the District of Columbia. Practiced limited to matters before U.S. courts. *Pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

23

**JA 192**

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed. R. Civ. P. 4.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson

**JA 193**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PROTECT DEMOCRACY PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>U.S. OFFICE OF MANAGEMENT & BUDGET et al.,<br><br>Defendants. | Case No. 1:25-cv-01111 |

**<u>DECLARATION OF DANIEL F. JACOBSON</u>**

I, Daniel F. Jacobson, declare as follows:

1.      I am the founder of Jacobson Lawyers Group, PLLC, and serve as counsel for Plaintiff Protect Democracy Project in the above-captioned case. I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction or in the Alternative Partial Summary Judgment.

2.      Exhibit 1 is a true and correct declaration of William Ford, policy advocate at Protect Democracy.

3.      Exhibit 2 is a true and correct declaration of Joseph Carlile, managing director of Bluestem Consulting, LLC.

4.      Exhibit 3 is a true and correct copy of Samuel Bagenstos, the Frank G. Millard Professor of Law at the University of Michigan Law School and the Arlene Susan Kohn Professor of Social Policy at the University of Michigan Gerald R. Ford School of Public Policy.

1
**JA 194**

5.      Exhibit 4 is a true and correct copy of Office of Management and Budget Circular No. A-11, Part 4: Instructions on Budget Execution (2024).

6.      Exhibit 5 is a true and correct copy of Project 2025, Heritage Found., *Mandate for Leadership: The Conservative Promise*, 1, 43-45 (2023).

7.       Exhibit 6 is a true and correct copy of GAO, B- 331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance* (Jan. 16, 2020).

8.      Exhibit 7 is a true and correct copy of Chair Rosa DeLauro, H.R. 2471, *Funding for the People: Division-by-Division Summary of Appropriations Provisions*.

9.      Exhibit 8 is a true and correct copy of Protect Democracy, Press Release, *OMB Implements Apportionment Transparency Program, a Key Pro-Democracy Reform* (July 13, 2022), also available at https://tinyurl.com/4e3d8kxd.

10.     Exhibit 9 is a true and correct copy of *Using OMB's Apportionment Website: Resources for Congress*, Protect Democracy (Nov. 3, 2022), also available at https://tinyurl.com/297a79m2.

11.     Exhibit 10 is a true and correct copy of Princeton Initiative, *The Power of the Purse* (May 2024), also available at https://tinyurl.com/3av4dbdx.

12.     Exhibit 11 is a true and correct copy of the homepage of OpenOMB.org.

13.     Exhibit 12 is a true and correct copy of William Ford, et al., *Is the president following the law when it comes to spending?*, If You Can Keep It (Oct. 2, 2024), also available at https://tinyurl.com/2j6k4v6e.

14.     Exhibit 13 is a true and correct copy of Donald J. Trump, *Using Impoundment to Cut Waste, Stop Inflation, and Crush the Deep State*, Agenda47 (June 20, 2023), also available at https://perma.cc/W36M-GA5P.

2

**JA 195**

15.     Exhibit 14 is a true and correct copy of an excerpt of the public transcript of Russell Vought's confirmation hearing, also available at https://tinyurl.com/wreyh37d (last visited Apr. 12, 2025).

16.     Exhibit 15 is a true and correct copy of Paul Krawzak, *White House Scraps Public Spending Database,* ROLL CALL (Mar. 24, 2025), also available at https://tinyurl.com/54zaeye6.

17.     Exhibit 16 is a true and correct copy of Letter from Russell T. Vought to The Hon. Patty Murray (Mar. 29, 2025).

18.     Exhibit 17 is a true and correct copy of DeLauro & Murray, Press Release, *What are They Hiding?* (Mar. 24, 2025), also available at https://perma.cc/93GE-K27U.

19.     Exhibit 18 is a true and correct copy of GAO, *Letter to OMB on Apportionments* (Apr. 8, 2025).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 27, 2025 in Washington, DC.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

3

**JA 196**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PROTECT DEMOCRACY PROJECT,<br><br>       Plaintiff,<br><br>  v.<br><br>U.S. OFFICE OF MANAGEMENT & BUDGET<br>et al.,<br><br>       Defendants. | Case No. 1:25-cv-01111 |

## <u>DECLARATION OF WILLIAM P. FORD</u>

I, William P. Ford, declare as follows:

1.      I am a policy advocate at the Protect Democracy Project (Protect Democracy).

The statements made in this declaration are based on my personal knowledge and my

understanding of information made available to me pursuant to my duties at Protect Democracy.

2.      Plaintiff Protect Democracy is a nonpartisan, nonprofit organization whose

mission is to prevent American democracy from declining into a more authoritarian form of

government. Protect Democracy engages in public education about threats to democratic norms

and institutions and how the American people can best confront them. It advances its mission

through research, analysis, technology, and litigation to stand up for free and fair elections, the

rule of law, fact-based debate, and a better democracy for future generations. *See* Protect

Democracy, *About Us*, https://protectdemocracy.org/about/ (last visited Apr. 20, 2025).

3.      Part of Protect Democracy's work promoting checks and balances and the

constitutional separation of powers includes efforts to defend Congress's power of the purse, a

1

**JA 197**

critical check against abuses of executive authority. For example, Protect Democracy recently published an extensive report correcting mischaracterizations of the history of presidential impoundments. *See* Protect Democracy, *The Myth of Presidential Impoundment Power* (Mar. 2025), protectdemocracy.org/impoundment-myth. Protect Democracy also has advocated for the transparency requirement at issue in this case, which requires Defendant Office of Management and Budget (OMB) to post its apportionments on a public website. *See* Press Release, Protect Democracy, *OMB Implements Apportionment Transparency Program, a Key Pro-Democracy Reform* (July 13, 2022), https://tinyurl.com/4e3d8kxd.

4. In March 2022, Congress enacted new legislation requiring OMB to post its apportionments on a public website. Pub. L. No. 117-103, div. E, tit. II, § 204, 136 Stat. 49, 256-57 (2022). OMB launched its website (https://apportionment-public.max.gov) in July 2022. Press Release, Protect Democracy, *supra*. And in December 2022, Congress made the requirement that OMB "operate and maintain" that public apportionment website permanent. Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022).

5. After OMB launched its public apportionment website, I organized and moderated a virtual training, on Protect Democracy's behalf, for congressional staff in October 2022 on "how to read apportionments, navigate and use OMB's website, and find the apportionments associated with a particular appropriation or Treasury account." *See* Protect Democracy, *Experts Explain How to Read Apportionments and Navigate OMB's New Apportionment Website*, YouTube (Oct. 17, 2022), https://tinyurl.com/yd6urbxe. Three experts on the apportionment process — all former OMB or agency budget officials — led the training. *Id.* To do that, they prepared an 85-page slide deck titled, "Using OMB's Public Apportionment

Website." Lester Cash et al., *Using OMB's Public Apportionment Website* (Oct. 13, 2022), https://tinyurl.com/tz3r954n.

6. In November 2022, Protect Democracy made a recording of the training, a copy of the slide deck, and other resources for Congress publicly available online after the training. *See Using OMB's Apportionment Website: Resources for Congress*, Protect Democracy (Nov. 3, 2022), https://tinyurl.com/297a79m2. As one law professor has written, those additional resources included a detailed explanation of "how to find a relevant apportionment in eleven steps, walking through sequential references to the relevant fiscal year's appropriation act provision, the Treasury Department's Federal Account Symbols and Titles Book, and an excel spreadsheet on OMB's website." Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359, 373-74 (2024), https://tinyurl.com/ycxswdd6 (describing Protect Democracy's training and apportionment educational resources).

7. In January 2024, Protect Democracy began building OpenOMB.org ("OpenOMB") to make it easier for Congress, the press, and the public to use OMB's apportionment information. *See About OpenOMB*, *supra*. As the Princeton Initiative on Restoring the Constitutional Powers of Congress observed in a subsequent report, OMB's website was "unnecessarily difficult to navigate" because it provided links to apportionment documents organized by agency and by Treasury Appropriation Fund Symbol, "which may not be easily recognized as programs of interest by members of Congress, staff members, or members of the public." Princeton Initiative, *The Power of the Purse* 5 (May 2024), https://tinyurl.com/3av4dbdx. "Reviewing information from [OMB's] website," the report continued, "also require[d] downloading discrete data files rather than allowing users to interact

3
**JA 199**

with the information directly online." *Id*. By building OpenOMB, Protect Democracy sought to address these and other hurdles to public engagement with OMB's apportionments.

8.  In October 2024, Protect Democracy launched OpenOMB. *See* Protect Democracy (@protctdemocracy), X (Oct. 2, 2024, 10:55 PM), https://tinyurl.com/4a7rvzea; William Ford, et al., *Is the President following the law when it comes to spending?*, If You Can Keep It (Oct. 2, 2024), https://tinyurl.com/2j6k4v6e. OpenOMB aims to make oversight of OMB's apportionments easier for Congress, the press, and the public. *See About OpenOMB*, *supra*.

9.  I led the development of OpenOMB. *See* Ford, et al., *supra*; *Staff: William Ford*, Protect Democracy, https://tinyurl.com/2vjucdzn. That work began in January 2024, and Protect Democracy has continued to maintain and push out improvements to the site since it launched in October 2024. In total, Protect Democracy has spent hundreds of hours building, designing, operating, and improving OpenOMB. I also have delivered training sessions to nonprofit organizations and journalists on how they can use OpenOMB in their work.

10.  OpenOMB "uses a simple process to provide easier access to apportionment files. Each day, OpenOMB pulls the primary source data from OMB's site and stores the files in a database in a manner that allows them to be searched, filtered, and indexed. OpenOMB's search function then provides a means to query that database, searching for information in and across apportionments. The site is, in short, a user-friendly interface that provides access to a store of primary source data that is updated daily and contains searchable and well-organized files. (All apportionment files displayed on OpenOMB reflect the underlying primary source data and documents that OMB discloses on its site.)" *See* Ford, et al., *supra*.

11.     OpenOMB has a wide range of users beyond Protect Democracy, including Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community. For example:

a.  Congressional appropriators have stated in press releases that they monitor OpenOMB to identify apportionment abuses. *See* Fact Sheet, House Appropriations Committee Democrats, Background on Unlawful Impoundment in President Trump's Executive Orders (Jan. 29, 2025), https://tinyurl.com/5ce9tuhf ("Nevertheless, we will be monitoring OpenOMB.org. . . .").

b.  Litigants have cited OpenOMB's apportionment information. *See, e.g.*, Mem. Of Law in Supp. of Pls.' Renewed Mot. for a TRO at 36, *AFL-CIO, et al. v. Dep't of Labor et al.*, No. 25-cv-00339 (Feb. 12, 2025), ECF No. 29-1, https://tinyurl.com/2s48d7hn (citing OpenOMB); Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. At 2, *Citizens for Responsibility & Ethics in Wash. v. U.S. DOGE Service, et al.*, No. 25-cv-00511 (Feb. 20, 2025), ECF No. 2-1, https://tinyurl.com/3bt8667p (same).

c.  Journalists have used OpenOMB as a source in their news reporting. *See* Aleksandra Wrona, *Exploring DOGE's creation, legality and purpose*, Yahoo News (Mar. 27, 2025), https://tinyurl.com/32czhcpj (same); Paul Krawzak, *White House scraps public spending database*, Roll Call (Mar. 24, 2025), https://tinyurl.com/54zaeye6 (same).

d.  Public policy organizations have cited OpenOMB information in issue briefs. *See, e.g.*, Citizens for Responsibility & Ethics in Washington, *Key Concepts Related to the Impoundment Control Act of 1974* (Jan. 2025), https://tinyurl.com/24bn7k6j;

5

**JA 201**

Governing for Impact, *Challenging DOGE* (Feb. 2025),

https://tinyurl.com/592euzkz.

e.  Academics have recognized that the apportionment transparency laws have

"enabl[ed] a number of good government groups to better track spending at sites

like openomb.org." *See* Matthew B. Lawrence, *Secret Conditions Move from*

*DOGE to OM*B, Yale J. Reg. (Apr. 3, 2025), https://tinyurl.com/278erknm.

f.  Libraries have shared OpenOMB as a resource to help the communities they serve

understand developments in government. *See* John M. Pfau Library, *U.S.*

*Government Information: Archived and Alternative Sources, Tracking Tools*, Cal.

State Univ., San Bernardino, https://tinyurl.com/mwb3ht8m (last visited Apr. 20,

2025) (listing OpenOMB as the resource for tracking apportionments); The

Library, *U.S. Government Information: Trump Trackers*, UC San Diego,

https://tinyurl.com/2p99bz8n (last visited Apr. 20, 2025) (same).

g.  Budget experts have highlighted OpenOMB as a tool to "help track"

apportionments and potential spending abuses. *See* Bobby Kogan

(@bbkogan.bsky.social), BlueSky (Feb. 21, 2025, 3:20 PM),

https://tinyurl.com/knjkvh38.

h.  Wikipedia entries cite OpenOMB as an external link. *See, e.g.*, Wikipedia,

*Apportionment (OMB)*, https://tinyurl.com/4fp2yjdh (last visited Apr. 20, 2025);

Wikipedia, *Centers for Medicare & Medicaid Services*,

https://tinyurl.com/327w32ba (last visited Apr. 20, 2025).

12.  Between OpenOMB's launch on October 2, 2024, and March 24, 2025, Google

Analytics indicates that OpenOMB has had approximately 41,000 page views.

6

**JA 202**

13.    OMB made apportionments public as required by law until March 24, 2025, when its website began displaying a "[p]age not found" error. *See* Krawzak, *supra*.

14.    On March 27, 2025, Protect Democracy posted the following header on OpenOMB: "The OMB website that provides the underlying data used by OpenOMB is offline. There will be no new apportionments posted on OpenOMB until that site is back online." OpenOMB.org, https://openomb.org (last visited Apr. 20, 2025).

15.    This month, OpenOMB's page views have dropped to the lowest level since President Trump took office. According to Google Analytics, after approximately 5,600 page views in January, 20,000 page views in February, and 6,800 page views in March, OpenOMB has received only 3,400 page views so far in April.

16.    Moreover, because OMB took its apportionment website down, Protect Democracy cannot launch a new "notification" feature it has spent months developing for OpenOMB. That notification feature would have allowed OpenOMB users to subscribe to and receive daily or weekly email notifications when a new apportionment is posted for a particular account, agency, or bureau. The notification feature also would have enabled users to subscribe to, and receive daily or weekly email notifications for, particular search results. For instance, if a user wanted to be notified if an apportionment contained the words "are not available for obligation" — the language OMB used in an apportionment footnote during the first Trump administration to withhold funds Congress had appropriated for security assistance to Ukraine[1] — the OpenOMB notification feature would have allowed users to receive daily or weekly email notifications whenever new apportionments included those words.

---

[1] GAO, B331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance* 3-4 (Jan. 16, 2020), https://tinyurl.com/nhea99ck.

17.     Protect Democracy was finishing work on the notification feature when OMB took down its apportionment website. This final stage of work involved testing whether the notification system actually would send an automated email to a user when OpenOMB processed a relevant new apportionment. Without new apportionments uploaded by OMB, Protect Democracy cannot finish this testing and finalize and release the notification feature. Even if Protect Democracy could release the feature without this additional testing, however, it would be of no use to OpenOMB's users since OMB no longer is disclosing new apportionments.

18.     Upon information and belief, since OMB took down its public apportionment site, OpenOMB is the only website (other than the Internet Archive's Wayback Machine) that provides a public archive of the apportionments OMB disclosed from July 13, 2022, to March 24, 2025. *See* Wayback Machine, *https://apportionment-public.max.gov/*, Internet Archive https://tinyurl.com/bdxv2n9w (last visited Apr. 20, 2025); Ford, et al., *supra* ("OpenOMB pulls the primary source data from OMB's site and stores the files in a database.").

19.     Without public access to the up-to-date apportionment documents and information previously made available on the OMB website, Protect Democracy can no longer provide updated information about apportionments to Congress, the press, and the public through OpenOMB, or otherwise use the site to monitor the apportionments, footnotes, and the written explanations accompanying footnotes for potential violations of the law.

20.     Without access to OMB's apportionments, Protect Democracy also cannot update Congress, the press, and the public on whether and how OMB is using its apportionment authority specifically to withhold, or "impound," appropriated funds in ways that potentially unlawfully affect the delivery of federal government services, employment of federal workers, or delivery of federal funding for certain grantees. In October 2024, Protect Democracy assessed that the

apportionment process would be one of the key means by which President Trump would deliver on his vow to impound federal funds if re-elected. *See* Ford, et al., *supra*; Donald J. Trump, *Using Impoundment to Cut Waste, Stop Inflation, and Crush the Deep State*, Agenda47 (June 20, 2023), https://tinyurl.com/2n4nu6mj. As we wrote in October: "[P]residents of both parties have abused [the apportionment] process to advance their agendas in defiance of the law. Former President Trump did so by withholding U.S. military aid to Ukraine through a series of apportionments that put a pause on that funding. The Government Accountability Office found that this hold violated the Impoundment Control Act. *But Trump and his advisers have called for more of the same if he's reelected.* The former President has vowed to impound funds on a massive scale to 'crush the Deep State.' *And Trump's former OMB Director Russell Vought has advocated for the 'aggressive' use of apportionment authority 'on behalf of the President's agenda.'" Id*. (emphases added).

21.     Although Protect Democracy will continue to engage in efforts to educate the public on the administration's impoundment of federal funds, without access to OMB's apportionments, Protect Democracy cannot shine light on whether and how this authority is being used in that effort. *See, e.g.*, *VIRTUAL EVENT: Impoundments*, Soc'y for Rule of Law (Mar. 31, 2025), https://societyfortheruleoflaw.org/impoundments/ (announcing my participation in an April 22 panel event discussing "the past, present, and future of impoundments" in light of "recent actions from the administration"). This is especially burdensome now, as OMB is reportedly preparing to send a rescission package to Congress either this week or next. If OMB had continued to comply with the requirement to post its apportionments on its public website, Protect Democracy might have been able to determine what funds OMB is withholding but declined to include in its rescission package, thereby educating Congress, journalists, and the

9

**JA 205**

public on how the rescissions proposed by the President relate to the potentially larger amount of federal funds that have yet to be apportioned, obligated, or spent.

22.    Protect Democracy recently submitted a Freedom of Information Act request to OMB seeking the apportionments it has issued since it took down its public apportionment website. FOIA Request from Protect Democracy to OMB (Apr. 11, 2025), https://tinyurl.com/3eap6suf. Unfortunately, unless apportionment information responsive to that request is disclosed in the same Open Government Data Act compliant format that OMB used on its apportionment website, Protect Democracy likely would not be able to feed the information into OpenOMB for public dissemination and use without significant manual effort.

23.    By contrast, once OMB's apportionment website is back online, provided OMB continues to disclose apportionments in the same Open Government Data Act compliant format file formats, OpenOMB would automatically update and display the newly posted apportionment files. *See About OpenOMB*, *supra* ("OpenOMB is updated daily."). This would allow Protect Democracy immediately to resume its work of providing the public with urgent, timely, and accessible information about apportionments, including whether OMB is using its apportionment authority to impound appropriated funds. And it would allow Protect Democracy to finish testing and then launch the "notification" feature it has worked to build.

 I declare under penalty of perjury that the foregoing is true and correct.

 Executed on April 22, 2025.

/s/ *William P. Ford*
William P. Ford
Policy Advocate
Protect Democracy

10
**JA 206**

# Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PROTECT DEMOCRACY PROJECT,

Plaintiff,

v.

U.S. OFFICE OF MANAGEMENT & BUDGET
et al.,

Defendants.

Case No. 1:25-cv-01111

### DECLARATION OF JOSEPH CARLILE

I, Joseph Carlile, hereby declare as follows:

1.      I am currently the managing director and founder of Bluestem Consulting, LLC, a consulting firm in Alexandria, Virginia.  In my role as managing director, I lead a specialized consulting practice that provides strategic planning, consulting, advisory, training and education services focused on the Federal budget and appropriations processes.

2.      I served on the staff of the Committee on Appropriations, U.S. House of Representatives from December 2007-January 2021.  During my tenure on the Committee, I served in various roles, including clerk of the Subcommittee on Transportation, Housing and Urban Development and Related Agencies from January 2019-January 2021. In my capacity as clerk, in conjunction with my counterparts from the majority and minority staff of the House and Senate Committees on Appropriations, I drafted and negotiated the annual appropriations acts for the subcommittee, as well as supplemental appropriations acts for COVID-19 funding and funding for recovery from natural disasters.

1

**JA 208**

3.      I served as Senior Advisor for Budget, Policy, and Programs to the Secretary of Housing and Urban Development (HUD) from January 2021-December 2022.  In this role, I served as the Secretary's primary liaison with the Office of Management and Budget (OMB) and coordinated budget formulation and execution between the Secretary's office and the Office of the Chief Financial Officer.

4.      From January 2023—May 2023, I served as Associate Director for Housing, Treasury, Commerce at OMB.  From May 2023-January 2025, I served as the Associate Director for General Government Programs at OMB.  In these roles, I managed the budget execution of the Departments of Housing and Urban Development, Treasury, Commerce, Transportation, Homeland Security and Justice as well as the Small Business Administration, General Services Administration, Executive Office of the President and more than 30 small and independent agencies.

5.      Throughout my career in Federal service, I have interacted with apportionments, which (as defined by OMB Circular A-11, Section 120.1[1]) are OMB-approved plans to use budgetary resources. More specifically, apportionments are OMB-approved plans for making congressionally appropriated funds available for agency spending.  On the Appropriations Committee, I had a vested interest in ensuring that appropriated funds were being used for their statutory purposes.  Before the publicly available apportionment website (which I discuss in paragraph 8 below), this would require inquiring with the relevant agency budget offices to ask if the funds had been apportioned and allotted and were available for obligation.  In my role at HUD, I worked with the Office of the Chief Financial Officer to ensure that funds were apportioned after each enacted appropriations Act, so that the Department could allot funds internally and begin

---

[1] https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

**JA 209**

obligating and expending appropriated funds. At OMB, I supervised two deputy associate directors who had been delegated the OMB Director's authority to approve apportionments. During my tenure at OMB, the approval of apportionments by the deputy associate directors was largely ministerial in nature and aimed at faithfully and responsibly executing the aims of the appropriation.

6.      Apportionment of funding represents a crucial step in the budget execution process. It starts the process through which the executive branch obligates and expends funds, and an approved apportionment is binding on the agency and has the force of law. Without an approved apportionment, the executive branch generally cannot obligate or expend an appropriation. In fact, obligating or expending funds without an approved apportionment violates the Antideficiency Act. (OMB Circular A-11, Section 120.8.)

7.      OMB Circular A-11, Section 120 specified the process under which an agency requested and OMB approved an apportionment during my tenure at OMB. In general, an agency requests an apportionment through OMB's apportionment system, OMB staff reviews the request and confers with the agency with questions about the request, OMB staff drafts an apportionment for the OMB approver, typically a deputy associate director, and then, after consultation with staff, the approver approves the apportionment and the agency is notified of the approval. An apportionment addresses all budgetary resources in an account—including annual discretionary appropriations, mandatory funding, carryover funds from prior fiscal years, recaptures, and transfers. An apportionment often divides the budgetary resources available in a fiscal year into amounts available each fiscal quarter or other time division (Category A) and makes funds available for specific purposes and programs specified within the appropriation (Category B). For multi-year funding or for funding available until expended, an apportionment might reserve funds

3

**JA 210**

for a future fiscal year (Category C). Additionally, an apportionment might include additional direction in a footnote that conditions the availability of funds on a certain agency action, like the submission of a spend plan. If budgetary conditions change throughout the year, the agency may submit a revised request to change the amounts and terms on the apportionment, which would then go through the same review and approval process outlined in this paragraph.

8.      Throughout my tenure at OMB, OMB maintained a publicly available website that provided digital copies of the information contained in apportionments for each Treasury Appropriation Fund Symbol (TAFS),[2] pursuant to 31 U.S.C. § 1513 note, formerly available at https://apportionment-public.max.gov/.  The data posted on the publicly available apportionment website included only the final, OMB approved, legally binding amounts and the accompanying footnotes, which are part of the final, OMB-approved apportionment decisions.

9.      In my current capacity, I rely on the public apportionment website to obtain data about available funding and timelines for certain programs. The data provided on the website is not available from any other government source.  I use the data to track the budget execution of funding that I have a personal interest in.  I also use the data to help formulate strategic advice for colleagues and clients about the status of appropriations and budget execution.  I estimate that, in the time since I left my position at OMB, I refer to the publicly available apportionment data weekly.

10.      For example, the Department of Housing and Urban Development Appropriations Act, 2020 included Section 231 (42 U.S.C. 11364a), which converts "recaptured"[3] funding from

---

[2] "TAFS" is a unique identifier for an appropriation in the Treasury and includes information on the agency responsible for the account and the period of availability.

[3] "Recaptured" funds are funds that were awarded to a grantee in a prior fiscal year and were unexpended at the end of the period of performance for the grant.  The unexpended funds are returned to HUD.

4

**JA 211**

the Department of Housing and Urban Development's (HUD) Homeless Assistance Grants program into no year funding[4] available for specified purposes.  Subsection (a) lists the purposes, which include: subparagraph (1), allowing HUD to use funding for grants under the Continuum of Care program; subparagraph (2), allowing HUD to use funding for grants under the Emergency Solutions Grant program; subparagraph (3), requiring HUD to reserve not less than 10 percent for grants in rural areas; and subparagraph (4), requiring HUD to reserve not less than 10 percent of the recaptured funding for grants in disaster areas.  The funds recaptured pursuant to this section are the only source of budgetary resources available for the grants to disaster areas in subparagraph (4).

11.      The information on the apportionment (TAFS: 086-0192/X) provides details on the amount of funding recaptured and how OMB has allocated the recaptured funds between the specified purposes. Because these funds are not appropriated annually, but instead are recaptured from unspent prior year funds, the apportionment provides the only source of publicly available information on the amount recaptured and the amount of recaptured funds available for each of the specified purposes.

12.      One of the specified purposes for which recaptured funds are available is HUD's Rapid Unsheltered Survivor Housing (RUSH) program, which provides grants to communities affected by natural disasters.[5]  People experiencing homelessness or at risk of homelessness prior to a natural disaster often struggle to obtain assistance in the Federal Emergency Management Agency's Stafford Act programs.  The RUSH program provides resources that do not exist

---

[4] "No year funding" means that the funds are available until expended.  In contrast, funds appropriated annually into the Homeless Assistance Grant account have a limited period of availability, typically two fiscal years.

[5] This funding uses funds recaptured from Section 231 pursuant to subsection (a) subparagraph (4) of the section under the authorities granted in subsection (c).

elsewhere in the Federal government and is funded wholly from recaptures pursuant to Section 231. HUD published a notice of the terms and conditions for the funds in the Federal Register on July 18, 2024 (Docket No. FR-6315-N-01, "Allocation Formula, Applicable Requirements, and Waivers and Suspension of Requirements for Rapid Unsheltered Survivor Housing (RUSH)", 89 FR 58392). As HUD states in the notice: "RUSH is designed to provide immediate funding to States or local governments capable of acting quickly to meet the unmet homeless assistance and homeless prevention needs in declared disaster areas" and "Provided that data is available, HUD plans to notify States or local governments of their eligibility for a RUSH grant within 30 days of a major disaster." Given the quick timeline from a qualifying disaster to funding award, it is critical to know how much funding is available for the year from recaptures, how much was allocated to the RUSH program, how much has been awarded, how much funding has been obligated, and how much remains available for obligation.

13.    SF-133 data (available at: https://portal.max.gov/portal/document/SF133/Budget/ FY%202025%20-%20SF%20133%20Reports%20on%20Budget%20Execution %20and%20Budgetary%20Resources.html) provides information on obligations, by month, and HUD's press releases provide information on funding awards (https://www.hud.gov/news/hud-no-25-035). To the best of my knowledge, however, the only publicly available source of information for the total amount of unobligated funds available for RUSH for the year as well as any relevant footnotes or contingencies on the funding is from the apportionment. Because we cannot know when or where a disaster might strike, it is important that all potential grantees, and the public, know what funding is potentially available to assist people experiencing homelessness after a natural disaster and what conditions must be satisfied before funding could be available.

14.    While the RUSH example provides useful insight, it is far from comprehensive. Without timely access to the publicly available data that was on OMB's public apportionment website, determining the total budgetary resources for a specific appropriation at any given moment—and understanding the terms and conditions governing those funds before an agency may obligate them—becomes nearly impossible. Taking a step back, the removal of this data from public view undermines transparency in how taxpayer dollars are allocated and spent. As mentioned earlier, apportionments have a key role in the function of the Antideficiency Act to prevent overspending (see 31 U.S.C. note prec. § 1341), but they also play a role in the Impoundment Control Act (2 U.S.C. § 681 et seq.) to ensure that the executive prudently obligates appropriations. To track an appropriation through the budget execution lifecycle, one needs to understand the total amount available for obligation from the apportionment, the status of obligations against the apportionment (SF-133 data), and the end recipient of the outlays from the obligation (USAspending.gov). Until last month, data on all three phases were publicly available on government websites. Removing or obscuring data in any phase reduces public transparency into Federal spending and makes oversight more difficult. But the apportion phase is crucial. It sets the amounts available to agencies, the timing of the availability of those funds, and an apportionment might impose conditions before the funding is available for obligation.

15.    I also want to highlight the importance of the statutory requirement to post each apportionment "in a format that qualifies each such document as an Open Government Data Asset" (31 U.S.C. § 1513 note). Users of the OMB apportionment website, formerly available at https://apportionment-public.max.gov/, encountered a series of links to fiscal years, then the agency, then an array of links to the apportionments by TAFS. To seasoned budgeteers like myself, this presentation made sense. To the public, this presentation is likely anything but

7

**JA 214**

intuitive.  OpenOMB.org took the open government data assets available on the apportionment website and improved the user experience and made the data more accessible for a broader audience.   It added search functionality, the ability to compare current and previous apportionments side-by-side, and displayed all source years for a TAFS in one view.  Since my departure from OMB, I estimate that I accessed the OpenOMB website weekly.  If I shared a link to apportionment data, I would share a link to the data on OpenOMB rather than a link to the official data on the OMB apportionment website because the presentation of the data on OpenOMB is easier for the layperson to interpret.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2025

Joseph Carlile

8

**JA 215**

# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PROTECT DEMOCRACY PROJECT,

Plaintiff,

v.

Case No. 1:25-cv-01111

U.S. OFFICE OF MANAGEMENT & BUDGET
et al.,

Defendants.

## DECLARATION OF SAMUEL BAGENSTOS

I, Samuel Bagenstos, declare as follows:

1. I currently hold a joint appointment as the Frank G. Millard Professor of Law at the University of Michigan Law School and the Arlene Susan Kohn Professor of Social Policy at the University of Michigan Gerald R. Ford School of Public Policy. I submit this declaration in my individual capacity only.

2. From January 2021 to June 2022, I served as the General Counsel to the Office of Management and Budget. Among the other duties of that position, I was the principal legal advisor to the White House and the Executive Branch on appropriations and budget law. I advised OMB and the other executive departments and agencies on the apportionment process and compliance with the Antideficiency Act and the Impoundment Control Act, among other matters.

3. I left OMB in June 2022 to serve as the General Counsel to the Department of Health and Human Services, where I remained until December 2024. Among my many duties at HHS, I provided legal advice to the Department on budget and appropriations issues, and engaged with my former colleagues at OMB on those issues as needed.

4. I have also held other legal positions within the federal Executive Branch. From 2009 to 2011, I served as a Deputy Assistant Attorney General at the Department of Justice. From 1994 to 1997, I was a career attorney at the Department of Justice.

### The Apportionment Transparency Statute

5. On March 15, 2022, President Biden signed into law the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103. The Financial Services and General Government title of that

1

**JA 217**

law contained new provisions mandating transparency in the apportionment process. In particular, Section 204(b) required OMB, within 120 days, to "complete implementation of an automated system to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code), not later than 2 business days after the date of approval of such apportionment." In Section 204(c), Congress made clear that the posting of apportionments must occur on a "publicly accessible website" and that the posting "shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." Congress provided that classified information incorporated in an apportionment need not be posted on the website but instead must be "ma[de] available" at "the request of the chair or ranking member of any appropriate congressional committee or subcommittee."

6. Although the apportionment transparency provisions initially applied only to the 2022 fiscal year, Congress adopted them into permanent law in the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328.

7. I served as OMB General Counsel when Congress adopted the apportionment transparency provisions in 2022. I participated in setting up the automated apportionment posting system required by the statute, and I advised OMB's budget staff on compliance with that statute. In my experience at OMB and HHS, compliance with the apportionment transparency law was straightforward, did not interfere with the President's constitutional or statutory responsibilities or OMB's supervision of the Executive Branch, and was fully consistent with effective and efficient governance.

8. Since I left the government, I have consulted the OMB apportionments database to follow the actions of the new administration. I found that database to be an important tool to track whether the new administration is faithfully executing the appropriations laws enacted by Congress.

### The March 29, 2025, Vought Letter

9. I have reviewed the letter OMB Director Russell T. Vought sent to Senator Patty Murray on March 29, 2025. In that letter, Director Vought announces that OMB "will no longer operate and maintain the publicly available automated system to which apportionments are posted" as required by the apportionment transparency law.

10. Director Vought's letter asserts that "[b]y their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change."

2

11. That assertion fundamentally misunderstands both the nature of apportionments and what it means to be "predecisional." Apportionments are not part of the give and take that precedes a binding legal decision; they are the binding legal decisions themselves.

12. In the Antideficiency Act, Congress required the President to apportion appropriations "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation." 31 U.S.C. § 1512(a); see id. § 1513(b). Congress added the apportionment requirement to the Antideficiency Act in 1905 because federal agencies had too often spent more than the amount appropriated to them. Rather than simply enact an annual appropriation and trust agencies to make adjustments throughout the year to remain within the appropriated amount, Congress required the President (in a duty he redelegated to OMB) to parcel out the money periodically (or by project or on another similar basis) to ensure the agencies would not overspend. Each apportionment legally unlocks a certain fraction of the appropriation; the statute bars agencies from making expenditures that exceed the apportionment. See id. § 1517. The apportionment is thus the legally binding decision of the Executive Branch that enables an agency to spend appropriated money.

13. OMB's principal resource on the budget and appropriations process, Circular A-11, makes clear that apportionments are binding decisions, rather than simply part of the give and take that precedes such decisions. In Circular A-11, OMB itself defines an apportionment as "an *OMB-approved* plan to use budgetary resources"—not a proposed plan to use those resources. Circular A-11 § 120.1 (emphasis added). And OMB describes that "approved plan" as itself "legally binding." *Id.*

14. The whole point of the apportionment process is to manage federal funds to ensure that an agency does not overspend its appropriation. Thus, it is typical for an apportionment to release one part of an agency's appropriation and to be followed by one or more subsequent apportionments releasing the remainder of that appropriation. But that does not make any of the apportionments "predecisional." Each apportionment stands on its own as a binding legal decision.

15. My own experience with the apportionments process, both at OMB and at HHS, is consistent with that understanding. Apportionments, and the footnotes that define their conditions and limits, convey the binding determinations made by OMB. They are not "predecisional" in anything but the trivial sense that in a perpetual government virtually any decision that is made today can be superseded or displaced at some subsequent point.

16. Director Vought's letter asserts that "apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy." But the apportionment transparency law already accounts for concerns about national security and foreign policy by permitting OMB to withhold classified information from the public database and provide that information separately to relevant congressional committee chairs. Based on my own experience, it would be a straightforward matter to follow that process

3

**JA 219**

and redact from the public database any information in apportionments or associated footnotes that raises significant national security or foreign policy concerns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2025.

Samuel Bagenstos

4

# Exhibit 4

# CIRCULAR NO. A–11

# PART 4

# INSTRUCTIONS ON BUDGET EXECUTION



**EXECUTIVE OFFICE OF THE PRESIDENT**

**OFFICE OF MANAGEMENT AND BUDGET**

**JULY 2024**

**JA 223**

**SECTION 120—APPORTIONMENT PROCESS**

<div style="border:1px solid">

**Table of Contents**

*Introduction to Apportionments*
120.1    What is an apportionment?
120.2    What terms and concepts should I understand to work with apportionments?
120.3    Are apportionments made at the Treasury appropriation fund symbol (TAFS) level?
120.4    What TAFSs are required to be apportioned?
120.5    What TAFSs are exempt from apportionment?
120.6    Can a portion of my TAFS be exempt from apportionment?
120.7    Do I need to submit an apportionment every fiscal year for TAFSs that are multi-year/no-year?
120.8    Can I incur obligations without an apportionment?
120.9    Can I use an apportionment to resolve legal issues about the availability of funds?

*What is in an Apportionment?*
120.10    How is the apportionment organized?
120.11    Why is the Budgetary Resources section needed?
120.12    After OMB approves an apportionment, can I obligate against all budgetary resources?
120.13    What is the format of the Applications of Budgetary Resources section and what categories does OMB use to apportion funds?
120.14    What is the format of the Guaranteed Loan Levels and Applications section?
120.15    What other kinds of information may an apportionment include?

*Preparing the Apportionment Request*
120.16    How can I submit an apportionment request?
120.17    Is there a standard, set number of lines to show in an apportionment request?
120.18    What header information at the top of the apportionment must I complete?
120.19    What do I put in each column of the apportionment request?
120.20    Do I need to follow special conventions to show the portion of discretionary balances in split accounts (TAFSs with both mandatory and discretionary funds)?
120.21    Can I use amounts that include decimal points or cents in an apportionment?
120.22    Should I use a specific numeric format in the Excel file that holds my request?
120.23    When are apportionments due at OMB for a new fiscal year?
120.24    When is the apportionment system open for a new fiscal year?
120.25    Can I combine TAFSs on a single apportionment?
120.26    Should I assemble apportionment requests for multiple TAFSs in a single package or file?
120.27    Can I cross-check information in the Budgetary Resources section?
120.28    Who can approve the apportionment request for the agency?
120.29    Who is responsible for preparing the apportionment request for allocation (parent/child) accounts?

*Submitting Apportionment Requests*
120.30    How do I submit apportionment requests to OMB?
120.31    What functions will I perform using the apportionment system?
120.32    How do I gain access to the apportionment system?
120.33    Are there situations when I would not use the apportionment system?

</div>

**Table of Contents—Continued**

*Footnotes to Apportionments*

120.34    What are apportionment footnotes (and footnote indicators)?
120.35    Do footnotes starting with the letter A correspond to Category A apportioned amounts while those starting with the letter B relate to Category B apportioned amounts?
120.36    Will footnotes and additional tabs/attachments become part of the apportionment?
120.37    What footnotes are required for agencies to include in their apportionment requests?
120.38    Are there footnotes that are automatically applied to annual and multi-year apportionments?

*Approving Apportionment Requests*

120.39    How will OMB indicate its approval of an apportionment?
120.40    When can I expect OMB to approve my first apportionment request for the fiscal year?
120.41    In the case of newly enacted full-year appropriations, am I under an automatic apportionment until OMB approves my first full-year enacted apportionment request?

*After You Have Received Your Approved Apportionment*

120.42    How should I execute the apportionment?
120.43    What if I think that I may have obligated more than the amounts apportioned?
120.44    Must I control funds below the apportionment level?
120.45    How should I allot once I receive an apportionment?
120.46    How do I treat anticipated budgetary resources that are apportioned in the current fiscal year but not yet realized, and do I need to reapportion them once realized?
120.47    What is the relationship between the apportionment and the Funds Control System?

*Changes to Previously Approved Apportionments for the Current Fiscal Year*

120.48    What types of situations could require me to request a new apportionment?
120.49    What adjustments can I make without submitting a reapportionment request?
120.50    What other types of adjustments can I request OMB to allow me to make without submitting a new apportionment request?
120.51    What is the status of previously approved apportionments when a new apportionment is approved in the same fiscal year?

*Apportionments by Time Period*

120.52    Will OMB apportion funds into future fiscal years?
120.53    How do I present deferrals or proposed rescissions on my request?
120.54    Can OMB reapportion a past period?
120.55    Do unobligated resources apportioned in earlier time periods of the same fiscal year remain available?
120.56    Must I request that funds apportioned in one fiscal year be apportioned in the next fiscal year if the funds were not obligated and remain available?
120.57    What is the status of approved apportionments from a previous fiscal year on apportionments in the current fiscal year?
120.58    How does the last approved apportionment govern the actions a TAFS takes when the TAFS enters the expired phase?

**Table of Contents—Continued**

*Apportionments Affected by a Continuing Resolution (CR)*
120.59    During a CR, what happens to TAFSs that were apportioned before the start of a fiscal year (e.g., no-year TAFSs)?
120.60    After a CR has been replaced by a full-year enacted appropriation, what do I show in the Previous Approved column?'
120.61    After a short-term CR has been replaced by a full-year enacted appropriation, what do I show in the Agency Request column?
120.62    What do I do if the full-year enacted appropriation changes the period of availability of funds apportioned under a short-term CR?

*What Other Important Things Do I Need to Know About Apportionments*
120.63    What types of resources are apportioned by OMB?
120.64    Are all apportionments based on authority to incur obligations?
120.65    How do I treat extensions of the availability of unobligated balances in an apportionment?

*Handling Deficiencies in Apportionments*
120.66    When do I submit requests anticipating the need for the Congress to enact supplemental budget authority?

*Program Reporting Categories*
120.67    What is the purpose of program reporting categories?
120.68    Do my estimates of program reporting category obligations limit the amount I can obligate?
120.69    What do OMB and the agency need to do to start using program reporting categories?
120.70    How do I fill in the program reporting category tab?
120.71    Why does OMB send the names of program reporting categories and Category B projects to Treasury for use in GTAS?

*Exhibits—Sample Formats*
https://community-dc.max.gov/x/N4RNlg


Ex–120A    Program Reporting Categories Format


*When Your Appropriations are Enacted in a Timely Manner*
Ex–120B    One-Year Appropriation—First Apportionment for the Current Fiscal Year
Ex–120C    No-Year Appropriation—First Apportionment for the Current Fiscal Year
Ex–120D    No-Year Appropriation—Reapportionment


*When You Operate Under a Continuing Resolution*
Ex–120E    One-Year Appropriations Under Continuing Resolution
Ex–120F    Appropriations and Unobligated Balances Under a Continuing Resolution
Ex–120G    Apportionment Following a Continuing Resolution (No-Year TAFS)
Ex–120H    Apportionment Following a Continuing Resolution (Annual TAFS, Category A)


*When You Encounter Unusual Circumstances*
Ex–120I    Public Enterprise (Revolving) or Intragovernmental (Revolving) Fund—Reapportionment

---

**Table of Contents—Continued**

Ex–120J    Trust Fund Limitation
Ex–120K    Negative Amount Due to Reduced Unobligated Balance
Ex–120L    Apportionments in Future Fiscal Years for Multi-Year Accounts
Ex–120M    Trust Fund with Contract Authority, Appropriation to Liquidate Contract Authority, and Obligation Limitation
Ex–120N    Trust Fund (or Special Fund) with Collections Precluded from Obligation
Ex–120O    Allocation Transfer Apportionment Format, Apportioning Programs
Ex–120P    Allocation Transfer Apportionment Format, Apportioning Parent and Child
Ex–120Q    Allocation Transfer Apportionment Format, Child Only
Ex–120R    Allocation Transfer Apportionment Format, Parent Only
Ex–120S    Sequester Apportionment
Ex–120T    Appropriations with Different Periods of Availability Executed by Non-Expenditure Transfer
Ex–120U    Rescissions and Reappropriations of Unobligated Balances as of September 30th
Ex–120V    Initial Apportionment of an Appropriation Reduced by Offsetting Collections and Receipts
Ex-120W    Apportionment of an Appropriation Reduced by Offsetting Collections and Receipts during CR period to invoke term and condition of the CR (section 123.10)

**Summary of Changes**

Clarifies guidance on display of the previous approved column for an account specific apportionment made during a CR period for an account that also receives an automatic apportionment (section 120.37).

Allows agencies to reflect 30-day automatically apportioned funds as they would be apportioned normally (either Category A or Category B) without OMB concurrence (section 120.41).

Updates list of situations that could require a reapportionment request to include a scenario where a TAFS needs to increase an indefinite appropriation but the previously approved apportionment did not include an "A" footnote providing automatic apportionment authority (section 120.48).

Provides link (in Table of Contents above) to view Excel versions of section 120 Exhibits on OMB MAX Community (Exhibits 120A-W).

Updates section 120 Exhibits throughout to more consistently follow section 120 guidance (Exhibits 120A-W).

Provides an example of how to  show an account-specific apportionment to account for a term and condition of the CR (Exhibit 120W).

---

**INTRODUCTION TO APPORTIONMENTS**

**120.1    What is an apportionment?**

An *apportionment* is an OMB-approved plan to use budgetary resources (31 U.S.C. 1513(b); Executive Order (E.O.) 6166, as amended by E.O. 12608).  It typically limits the obligations you may incur for specified time periods, programs, activities, projects, objects, or any combination thereof.    An

apportionment is legally binding, and obligations and expenditures (disbursements) that exceed an apportionment are a violation of, and are subject to reporting under, the Antideficiency Act (31 U.S.C. 1517(a)(1), (b)). See section 145 for more on reporting violations of the Antideficiency Act.

**120.2    What terms and concepts should I understand to work with apportionments?**

*Account-specific apportionments* are approved by an OMB Deputy Associate Director (or designee) or an OMB official that has been delegated apportionment authority and typically include specific amounts. They are in contrast to automatic apportionments, described below.

A Treasury Appropriation Fund Symbol (TAFS) has *adjustment authority* if OMB has approved an apportionment with a footnote in the Application of Budgetary Resources section (footnote indicator that starts with A) describing what new or additional resources are automatically apportioned without the need for OMB to approve a new apportionment and a YES is in the Line Split column of the adjustment authority line (AdjAut). For instance, OMB may provide adjustment authority for cases where actual earned reimbursements exceed the estimate on the apportionment. For more on adjustment authority, see sections 120.49 and 120.50.

The *Antideficiency Act* prohibits Federal employees from obligating or disbursing amounts in excess of an appropriation, an apportionment (or in its absence), an allotment, a suballotment or any other subdivisions of funds that are identified in your agency's administrative control of funds. For more on the Antideficiency Act, see section 145.

An amount is *apportioned* for obligation in the current fiscal year when it appears on the Category A, Category B, or Category AB lines. Amounts apportioned for obligation in future fiscal years appear on the Category C lines. The Application of Budgetary Resources section also includes lines for amounts that are exempt from apportionment or not apportioned for either current or future fiscal years.

An *automatic apportionment* is approved by the OMB Director in the form of a Bulletin or provision in Circular A-11, and typically describes a formula that agencies will use to calculate apportioned amounts. An automatic apportionment is in contrast to the account-specific apportionments, described above, which typically include specific amounts, and which are approved by an OMB Deputy Associate Director (or designee) or an OMB official that has been delegated apportionment authority.

*Carryover amounts* are unobligated balances that are available from the prior fiscal year(s) in multi-year and no-year accounts. See section 120.23 regarding the submission, for OMB approval, of requests for the apportionment of carryover amounts. Pursuant to sections 120.7 and 120.56, carryover amounts are automatically apportioned at zero until an account-specific apportionment is issued for such amounts.

*Category A, Category B, Category AB or Category C*—Apportioned amounts appear on different groups of lines in the Application of Budgetary Resources section of an apportionment. Amounts are identified in an apportionment:

- by time (Category A);

- by program, project, or activity (Category B);

- by a combination of program, project, or activity and time period (Category AB); or

- for future years (only for multi-year/no-year accounts) (Category C).

You must report obligations to Treasury with the same categories as used on the apportionment.

*Exception apportionment* is a colloquial term that describes a type of account-specific apportionment that can be issued for operations under a continuing resolution (CR), in lieu of the OMB-issued automatic apportionment. This excludes account-specific written apportionments for an anomaly provided in the CR. OMB approves exception apportionment requests only in extraordinary circumstances. See section 123.9 for additional guidance.

*Footnotes* provide additional information and direction beyond the line stubs and dollar amounts. See section 120.34 for more information.

*Impoundment*—Pursuant to the Impoundment Control Act, apportionments may also set aside all or a portion of the amounts available for obligation.

- Amounts *deferred* through the apportionment process are those portions of the total amounts available for obligation that are specifically set aside as temporarily not available until released by OMB.

- Amounts withheld pending *rescission* are those portions that are set aside pending the enactment of legislation reducing the authority to obligate such funds.

For further information on deferrals and rescissions, including the difference between an impoundment and a cancellation proposed by the President, see section 112.

The *line split* column allows you to provide information about a line or to distinguish between two or more budgetary resource amounts that you would otherwise put on a single line. For more details on line splits, see section 120.19.

*Memo obligations* are amounts obligated during the current fiscal year at the time the apportionment request is prepared. The date of the obligations is at the top of the column.

*Program reporting category*—Agencies and OMB will work together to determine the program reporting categories (if any, section 120.67) under which the agencies will report their obligations in their SF 133 Reports on Budget Execution and Budgetary Resources (see section 130). Program reporting categories should be based on elements that agencies track in their financial systems. Though you are encouraged to use program reporting categories, there are some cases where OMB and agencies will choose not to use any.

The program reporting categories are not used to apportion funds and are not subject to the Antideficiency Act (Appendix G).

*Reapportionments* are made when you need to make changes to the previously approved apportionment for the current year (section 120.48). For example, you should request a reapportionment when approved apportionments are no longer appropriate or applicable because the amounts available for obligation have increased or unforeseen events have occurred.

The *Treasury Appropriation Fund Symbol (TAFS)* combines the Treasury agency or department code, the Federal account symbol, and the period of availability of the resources in the account (section 20.3). The period of availability may be annual, multi-year, or no-year (section 20.4(c)). Annual TAFSs have funds that are available for obligation for no longer than one fiscal year. Multi-year TAFSs have funds that are available for a specified period of time in excess of one fiscal year. No-year TAFSs have funds that are available until expended. See section 20.4 for more details.

The Department of the Treasury's list of account symbols may be found here: http://fiscal.treasury.gov/fsreports/ref/fastbook/fastbook_home.htm.

**120.3   Are apportionments made at the Treasury appropriation fund symbol (TAFS) level?**

Yes, apportionments are only made at the TAFS level.  See section 20.11 for more details on TAFSs.  For cases of allocation transfers, see section 120.29.

**120.4   What TAFSs are required to be apportioned?**

All TAFSs are required to be apportioned, except in the case of a TAFS that is in its entirety exempt from apportionment. See section 120.6 for a TAFS that is partially exempt from apportionment.

OMB is required to post all approved apportionment documents on a public website. Those apportionments can be found here: https://apportionment-public.max.gov/.

**120.5   What TAFSs are exempt from apportionment?**

The following types of TAFSs are exempt from apportionment:

- TAFSs specifically exempted from apportionment by 31 U.S.C. 1511(b) or other laws.

- TAFSs for which budgetary resources:

  - have expired and therefore the expired TAFS cannot be reapportioned in the expired phase (in this case, the last apportionment during the unexpired phase applies);

  - have been fully obligated before the beginning of the fiscal year; or

  - are available only for transfer to other TAFSs (unless OMB determines otherwise), which can include TAFSs where the sole purpose of the TAFSs is to effectuate an expenditure transfer between fund types (e.g., between Federal funds and trust funds) (see below for additional information).

Because transfer-only TAFSs that require expenditure transfers (due to crossing Federal fund group to a trust fund) involve an obligation, you must request a letter from your OMB Deputy Associate Director for proper funds control documentation that the TAFS is exempt from apportionment because the funds are available only for transfer to other TAFSs.

- TAFSs of the following types, which the OMB Director may exempt from apportionment pursuant to 31 U.S.C. 1516:

  - Trust funds or working funds if an expenditure from the fund has no significant effect on the financial operations of the United States Government;

  - Management funds (Treasury TAFSs with the symbols 3900–3999);

  - Payment of claims, judgments, refunds, and drawbacks;

  - Payment under private relief acts and other laws that require payment to a designated payee in the total amount provided in such acts;

- o   Foreign currency fund TAFSs (unless OMB requests), section 120.63;

- o   Interest on, or retirement of, the public debt; and

- o   Items the President has determined to be of a confidential nature for apportionment and budget execution purposes.

In order to request that the OMB Director exempt a TAFS from apportionment pursuant to 31 U.S.C. 1516, you must send in a formal request with the justification.  Your OMB Deputy Associate Director (DAD) or an OMB official that has been delegated apportionment authority will formally notify you in writing about your exemption request.  Memoranda that the DAD or delegated official provides to the agency providing an exemption will also be posted within the apportionment system.

If your exemption request is pursuant to 31 U.S.C. 1516 and specifically for a trust fund or working funds with expenditures that do not have significant effect on the financial operations of the United States Government, your request needs to demonstrate that fact using historical information such as the magnitude of the gifts and donations funding compared to the overall size of the agency's budget, the pattern of obligations in that fund, etc.

To see a list of TAFSs that are exempt from apportionment, a report is available through the apportionment system.

**120.6    Can a portion of my TAFS be exempt from apportionment?**

Yes, in a very limited number of cases, only a portion of the budgetary resources for a TAFS must be apportioned.  In these cases, agencies must show the full amount of budgetary resources—both exempt from apportionment and non-exempt—in the Budgetary Resources section and show the amounts subject to apportionment on apportioned lines, and the amounts not subject to apportionment on Line 6183, Exempt from apportionment in the Application of Budgetary Resources section.

**120.7    Do I need to submit an apportionment every fiscal year for TAFSs that are multi-year/no-year?**

Yes.  Multi-year/no-year TAFSs with unexpired budgetary resources available for obligation MUST be apportioned every fiscal year, unless exempt under section 120.5.  See also section 120.56.

**120.8    Can I incur obligations without an apportionment?**

No, an obligation cannot be incurred without an OMB approved apportionment (account-specific or automatic), except when the relevant account, from which the amounts are being obligated, is exempt from apportionment.  The Antideficiency Act (section 145) prohibits the incurring of obligations that exceed the approved apportionment amount (including, e.g., purchase services or merchandise).  See section 145 for specifics on the Antideficiency Act.

**120.9    Can I use an apportionment to resolve legal issues about the availability of funds?**

No. The apportionment of funds is not a means for resolving any question dealing with the legality of the amounts available by law or the legality of using funds for the purpose for which they are apportioned.  Any question as to the legality of the amounts available by law, or the legality of using funds for a particular purpose, must be resolved through agency legal channels.  Importantly, OMB's approval of an apportionment request does not reflect OMB's concurrence with an agency's legal position.

**WHAT IS IN AN APPORTIONMENT?**

**120.10  How is the apportionment organized?**

The top of the apportionment shows the name and account number of the TAFS being apportioned, and often includes other descriptive information, e.g., agency name, bureau name, budget account name and number.

The apportionment always includes two sections: Budgetary Resources and Application of Budgetary Resources.  The Budgetary Resources section always appears toward the top of the apportionment, and must show all budgetary resources available to the TAFS (e.g., appropriations, reductions, non-expenditure transfers). The Application of Budgetary Resources shows apportioned amounts, which are legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for.

Apportionments for guaranteed loan accounts include a third section, Guaranteed Loan Levels and Applications.

Each section of an apportionment includes line numbers and descriptions of all pertinent amounts. See Appendix F1 for a complete list of line numbers and detail descriptions for each line.

**120.11  Why is the Budgetary Resources section needed?**

The Budgetary Resources section is necessary for several reasons.

- First, it provides sufficient detail for OMB to see what level of funding is coming into the TAFS and therefore available to be apportioned.  In many cases, apportioned amounts tie back to amounts on specific budgetary resource lines.

- Second, budgetary resource lines on apportionments match the lines used in the President's Budget Program and Financing schedule and SF 133 Report on Budget Execution and Budgetary Resources.  The reason that these three presentations use the same line numbers is to facilitate comparisons that provide agencies and OMB with a basis to know they are looking at the right numbers.  In addition, the Budget Enforcement Act (BEA) category (i.e., discretionary or mandatory) information in this section is provided to the Treasury Department to facilitate agency reporting of BEA information in budget execution reports.

- Third, the apportionment is the first step in a fiscal year's budget execution process, and provides the basis for agencies to post information in their funds control and financial systems.

**120.12  After OMB approves an apportionment, can I obligate against all budgetary resources?**

Not necessarily.  You should not obligate until apportioned amounts have been allotted in accordance with your agency's OMB-approved funds control regulations (see section 150, Administrative Control of Funds). There are other circumstances in which you cannot obligate funds following an apportionment.  For example, you cannot obligate against anticipated resources.  You must wait until the resources are realized before incurring obligations.  Additionally, in some cases, a footnote to the apportionment will state that amounts are apportioned, but are only available for obligation when specified events occur (such as an agency taking certain action).

**JA 232**

**120.13  What is the format of the Application of Budgetary Resources section and what categories does OMB use to apportion funds?**

OMB usually uses one of four categories to apportion budgetary resources in a TAFS.

*Category A* apportions budgetary resources by fiscal quarters, e.g., quarter one (October 1 through December 31) and quarter two (January 1 through March 31).  Lines 6001 through 6004 are used for quarters one through four, respectively.

*Category B* apportions budgetary resources by program, project, activities, objects or a combination of these categories.  Lines 6011 through 6110 are used for Category B apportioned amounts.  One TAFS can potentially have dozens of Category B apportionments, each pertaining to specific activities, projects, and so on.  There are also cases when it makes programmatic sense for OMB to use a single, Category B apportionment for a given TAFS.

*Category AB* apportions budgetary resources by a combination of fiscal quarters and projects.  You may use Lines 6111 through 6159 to apportion in this manner. See section 8 of Appendix F for a full list of line numbers and descriptions.

*Category C* apportions budgetary resources in multi-year and no-year TAFSs into future fiscal years.  Lines 6170 thru 6173 are used for Category C apportioned amounts.  (Note: Category C amounts that OMB apportions in one year are not available for you to obligate against in the following year.  For these amounts to be available, OMB must approve a new request in the following year that apportions these amounts on Category A, B, or AB lines.)  See section 120.52 for additional information.

Apportionments may include a combination of categories.

In some cases (uncommon), resources in the Budgetary Resources section are not apportioned. In such cases, the non-apportioned budgetary resources are shown using one of four apportionment lines —

    (1)  6180, Withheld pending rescission (rarely used),

    (2)  6181, Deferred (rarely used),

    (3)  6182, Unapportioned balance of a revolving fund, and

    (4)  6183, Exempt from apportionment (uncommon, and used in TAFSs with both budgetary resources subject to and exempt from apportionment — at the bottom of the section on the Application of Budgetary Resources).

Agencies must report obligations to Treasury (GTAS) using the same level of specificity as appears on the apportioned section of your most recent approved apportionment.  For instance, if OMB uses a single Category B project with five program reporting categories, you must report obligations for each program reporting category.  Likewise, if OMB uses ten Category B projects and you incur obligations for each of these projects, your GTAS submission and SF 133 budget execution report must show obligations for each of these ten Category B projects and continue to report them in the expired phase.

**120.14  What is the format of the Guaranteed Loan Levels and Applications section?**

An apportionment for guaranteed loan financing accounts can have a third section, Guaranteed Loan Levels and Applications section.  This section shows limitations on loan levels by program level either from the current year and/or unused from prior year(s), and the application of the program level by quarter, risk

category, or a combination.  The total of the limitation on loan levels by program level should equal the total of the application of the program levels.

**120.15  What other kinds of information may an apportionment include?**

Many kinds of additional information can be integrated into an apportionment request.  Here are some examples.

*Allocations*.  The allocations tab (if required by your RMO examiner) includes a list of all transfer allocation (or children) accounts that are expected to receive a non-expenditure transfer of funds from the parent TAFS being apportioned.  The allocation accounts are subject to the Antideficiency Act.  Unless OMB separately apportions an allocation account after apportioning the parent account, the allocation account must follow all apportioned amounts, footnotes, and other guidance of the parent account (see section 120.29 for more details).

*Footnotes*.  Footnotes appear on one of three tabs: "Previously Approved Footnotes," "Agency Footnotes," and "OMB Footnotes."  Footnotes on the OMB Action column in the Application of Budgetary Resources section (footnote indicator starts with A) are subject to the Antideficiency Act.  See section 120.34 for additional information on footnotes.

*Program Reporting Categories*.  When used, these identify the level of detail that an agency must use in reporting its obligations on SF 133 budget execution reports.  These appear on the PgmCat tab in the apportionment request. These are not subject to the Antideficiency Act.  See section 120.67 for additional information on program reporting categories.

*System-generated reports*.  When agencies validate requests, the apportionment system sometimes creates reports showing latest SF 133 versus the apportionment request; warrants; and non-expenditure transfers. These reports are not subject to the Antideficiency Act.

*Additional tabs*.  Apportionments are almost always prepared, submitted and approved in Excel files. Certain tabs in the Excel file house the apportionment request or footnotes.  Others are reserved for other specific kinds of information. Agencies may also use additional tabs as attachments to the apportionment. Tabs in the Excel file are only subject to the Antideficiency Act if specifically referenced in a footnote in the OMB Action column of the Application of Budgetary Resources section of the apportionment (see section 120.36).

*Attachments*.  Attachments may include Word, PDF, or Excel files with a wide range of information that pertains to the apportionment request, but that is not included in the Excel file containing the request.  These attachments are subject to the Antideficiency Act only if they are specifically referenced in a footnote in the OMB Action column of the Application of Budgetary Resources section of the apportionment (see section 120.36).

## PREPARING THE APPORTIONMENT REQUEST

**120.16  How can I submit an apportionment request?**

The vast majority of apportionments are submitted by agencies and approved by OMB using OMB's secure, web-based apportionment system.  When questions or issues arise using the system, please send the Excel file you are working with and a brief description of the issue to "apportionment@omb.eop.gov."  Please direct questions of a substantive nature to your OMB representative.

In a limited number of cases necessitated by extenuating circumstances, OMB may approve an apportionment by e-mail or other non-system methods consistent with 31 U.S.C. 1513. Once the extenuating circumstances have passed (or sooner if possible), agencies and OMB should process these same requests using the apportionment system.

**120.17  Is there a standard, set number of lines to show in an apportionment request?**

No. While the format of the request is fixed and uses specific columns to hold certain kinds of information, the number of lines used for a given TAFS varies considerably. The apportionment system allows you to pick from more than 125 different budgetary resource lines, but agencies will only want to show amounts on a few of these lines for any given TAFS. For example, a TAFS with only an annual appropriation may just use one budgetary resource line.

The system provides significant flexibility to allow agencies to put in other lines with zero amounts. For instance, an apportionment for a given TAFS might show all discretionary appropriations lines, but no mandatory appropriations lines. Agencies must work closely with their OMB representatives in determining which budgetary resource lines to show with zero amounts (e.g., post short-term continuing resolution, see section 120.62).

Appendix F1 shows all possible line choices that are available in the apportionment system.

**120.18  What header information at the top of the apportionment must I complete?**

The header must provide the fiscal year for the apportionment and a public law (if no public law is available right after the enactment of the bill, the H.R. number is acceptable). The public law reference may be descriptive if there are multiple public laws covered by the apportionment or if the annual appropriations act is not enacted. Some examples are:

- Funds provided by Public Law N/A – Carryover

- Funds provided by Public Law N/A – Multiple

**120.19  What do I put in each column of the apportionment request?**

*TAFS*. TAFS information appears in columns A through F of apportionment requests. The columns show: Treasury agency; period of availability (FY1 and FY2); and allocation account and sub-account, if applicable. For presentation purposes, these columns are often hidden. You can unhide these columns if necessary. As part of validating requests or sending requests, the system checks that these columns are filled out properly; if they are not, the system provides an error message.

The apportionment system will only accept apportionments that use the three-digit CGAC agency codes (see Appendix C for a listing). For these apportionments, each TAFS code will appear in a single cell, and columns A through F will no longer be dedicated to showing that information.

*Line numbers*. Appendix F1 shows a complete list of line numbers and descriptions.

*Line splits*. You must provide line split in the following cases:

- The IterNo (Iteration Number) line shows the number of times OMB has approved (apportioned) an apportionment for a given TAFS in a fiscal year. No action is necessary if you use the Create Template function in the apportionment system as a starting point for preparing your requests. The

apportionment system automatically puts in the Iteration Number in the line split column, as well as puts the last approval date in the line stub column.

- The RptCat line indicates whether the TAFS uses Program Reporting Categories (section 120.67). Use "YES" or "NO", as appropriate, for the line split column.

- The AdjAut line indicates whether OMB has approved a footnote in the Application of Budgetary Resources section (footnote indicator that starts with A) on the apportionment that allows specific types of adjustments to be made without submitting a reapportionment request. Use "YES" or "NO", as appropriate, for the line split column. (See section 120.50)

- Line 1000 shows unobligated balances. For unobligated balances in no-year and multi-year TAFSs with both mandatory and discretionary funding, you must use a line split that starts with the letter "D" to show the portion of the balances that are discretionary. To distinguish between estimated and actual balances, use line splits of "E" to show estimated balances or "A" to show actual balances. Use "DE" or "DA" to indicate estimated from actual discretionary balances, respectively, and use "ME" and "MA" to indicate estimated from actual mandatory balances (section 120.20).

You may use the line splits to distinguish between two or more amounts that you would otherwise put on a single line. For example, you may use line splits to distinguish between two or more sources of collections, to distinguish between unobligated balances from reimbursable authority versus direct appropriations, or even to distinguish sequestration amounts on an apportionment.

You cannot use line number splits for the Application of Budgetary Resources section.

Previous Approved Column.

- Leave the column blank for the first request you submit for a given fiscal year. See exhibits 120C, and 120D, and 120F for examples of an annual (one-year) appropriation, a no-year appropriation, and appropriations provided by a continuing resolution.

- Include amounts from the "OMB Action" column of the previously approved apportionment within the same fiscal year. This includes any adjustments under sections 120.49 or unless your RMO determines any other adjustment authority granted to you by OMB in writing (section 120.50).

- When appropriations are enacted following one or more CRs, include the amounts from the last CR in this column (see section 120.60) unless otherwise required by your RMO.

- For reapportionment requests add the indicator, e.g., A1, B1\B2, which indicates that a footnote(s) appears on the previous approved footnote worksheet tab. If your earlier apportionment had footnotes, the worksheet tab will be automatically populated by the apportionment system.

Agency Request Column.

- Include the amounts you are requesting in this column.

- Include an indicator, e.g., A1, B1, which indicates that a footnote appears on the agency footnote tab. See section 120.34 for more information on footnotes.

OMB Action Column.

- The apportionment system places formulas in the OMB Action column to set it equal to the Agency Request column. OMB will adjust the OMB Action values as necessary when reviewing and approving your request.

- Include an indicator, e.g., A1, B1, which indicates that a footnote appears on the approved footnote tab. The footnotes in the OMB Footnote column override all other footnotes.

Memo Obligations Column.

- Include memorandum obligations in this column. Also include the date of the obligations using the MM-DD-YYYY format on the RptCat row. The memo obligations support your reapportionment request.

**120.20 Do I need to follow special conventions to show the portion of discretionary balances in split accounts (TAFSs with both mandatory and discretionary funds)?**

Yes. For unobligated balances in no-year and multi-year TAFSs with both mandatory and discretionary funding (split accounts), you must show the discretionary portion of the balances by using a line split that starts with the letter "D" and you must show the mandatory portion of the balances by using a line split that starts with the letter "M". You will do this solely on Line 1000, Unobligated balance, brought forward, Oct. 1. You must also change the Line Stub to start with the word Discretionary, e.g., Discretionary Unobligated balance, brought forward, Oct. 1 or Mandatory Unobligated balance, brought forward, Oct. 1, as appropriate. Many agencies use line splits of "E" or "A" to distinguish Estimated from Actual balances, respectively. In these cases, you would use "DE" or "DA" to indicate estimated from actual discretionary balances, respectively and you would use "ME" or "MA" to indicate estimated from actual mandatory balances, respectively.

**120.21 Can I use amounts that include decimal points or cents in an apportionment?**

No. You must round all amounts up to a dollar in apportionment requests. In addition, you may not round amounts to thousands. When you round up, the delta between the actual cents and the amount apportioned is not available for obligation and your funds control system must reflect that. Additionally, you should add a "B" footnote on line 1920 of the Budgetary Resource section of the apportionment to indicate that rounding has occurred and, therefore, rounded amounts on the apportionment will not match amounts reported on the SF 133 which are reported to the penny. Here is an example of such a footnote:

"Pursuant to section 120.21 of OMB Circular A-11, one or more lines in the Budgetary Resources section may be rounded up. As a result, those rounded lines will not match the actuals reported on the SF 133. Agency will ensure that its funds control system will only allot actuals."

**120.22 Should I use a specific numeric format in the Excel file that holds my request?**

Yes, you must use whole numbers (decimal points are not permitted) or blanks in numeric columns. Numeric columns include the Previous Approved Amount, Agency Request, OMB Action, and Memorandum Obligations columns. Numbers (including zero) must be formatted using the number format with thousands separator (a comma), and with a leading negative sign (-). You cannot use asterisk, special characters, or letters in numeric columns of any apportionment request. Further, you cannot format a number, zero or otherwise, to appear as an asterisk or other special character. There is a single exception: in the memorandum obligations column only, you may use a date format on the RptCat line.

**120.23  When are apportionments due at OMB for a new fiscal year?**

| If ... | Then, submit your first apportionment request by... |
|---|---|
| Any part of the budgetary resources for a TAFS is not determined by current action of the Congress (such as permanent appropriations, public enterprise and other revolving funds subject to apportionment, reimbursements and other income, and balances of prior year budget authority) | August 21, as required by 31 U.S.C. 1513(b) |
| All or any part of the budgetary resources for a TAFS are determined by current action of the Congress | August 21, or within 10 calendar days after the enactment of the appropriation or substantive acts providing new budget authority (i.e., authorization bills), whichever is later |

After August 21, OMB requires an explanation for any delayed initial apportionment requests in accounts with budgetary resources not dependent on current action of the Congress.

We encourage you to begin preparation of apportionments and related materials as soon as the House and Senate have reached agreement on funding levels.  In this way, you can make a timely submission of your request to OMB, and OMB can have adequate time for its review.

**120.24   When is the apportionment system open for a new fiscal year?**

The apportionment system will open to agencies to start preparing requests no later than August 1 (or the following business day).  Agencies can submit their requests starting August 8.

**120.25  Can I combine TAFSs on a single apportionment?**

No.  From time to time, agencies ask whether they can combine (or "roll-up") the amounts from two or more TAFSs, and submit an apportionment for this single "combined" TAFSs (e.g., miscellaneous accounts).  Agencies may not do this because the apportionments must tie back to the statutory authority, which explicitly makes distinctions between accounts and defines the period of availability of the funds in the accounts.  These are generally the same pieces of information that distinguish one TAFS from another.

**120.26  Should I assemble apportionment requests for multiple TAFSs in a single package or file?**

Yes, unless your OMB representative determines otherwise.  To the extent practical, submit apportionment requests for each independent agency, departmental bureau, or similar subdivision together.

**120.27  Can I cross-check information in the Budgetary Resources section?**

Yes.  You can cross-check information in certain cases against the President's Budget or the most recent SF 133 Reports.  In addition, for general fund TAFSs, you should check that appropriations and warrants by Treasury (if any) are consistent and you can check that actual non-expenditure transfers match transfers processed at Treasury.  See https://community-dc.max.gov/x/v5Bwkg.

**120.28  Who can approve the apportionment request for the agency?**

Agencies must use appropriate internal controls in preparing apportionment requests, and specifically ensure that the agency official with authority to review and approve the request has done so.  The approving

official at the agency is not required to sign the request that is sent to OMB, but may do so if required by the agency's internal controls or if requested by the OMB examining division.  OMB's apportionment system does not accommodate electronic signatures of agency officials.

**120.29  Who is responsible for preparing the apportionment request for allocation (parent/child) accounts?**

Allocation accounts involve both a "parent" appropriation and a "child" recipient of budgetary resources via an allocation non-expenditure transfer.  For instance, if an appropriation is enacted to the Funds Appropriated to the President's International Military Education and Training account (11-1081 /X), and a subsequent allocation is made to the Department of the Army (Treasury agency 21), then the allocation non-expenditure transfer from 11-1081 /X to Army would be as follows:  11-1081 /X transfer to 21-11-1081 /X.

Unless OMB determines otherwise, the agency that receives the appropriation to be allocated (the "parent") should submit a single, consolidated apportionment request that encompasses both the parent TAFS and all the allocated recipient "child" agencies and/or bureau TAFSs (see exhibit 120P for an example that uses different lines to distinguish between the parent and children on the apportionment).  Additionally, allocation transfers are normally apportioned at the same category level as the parent account (e.g., Category A, B, AB, or C).  The agency administering the parent TAFS will indicate to the receiving agency what portion of the consolidated apportionment is transferred to the allocation TAFSs.

Allocation account apportionments, however, can be done in different ways.  See exhibit 120R for an example of a parent-only allocation apportionment and exhibit 120Q for an example of a child-only allocation transfer apportionment.

The parent agency must ensure that the recipients are provided the approved apportionment request on a timely basis.  Obligations incurred for the program as a whole are limited by the approved apportionment.  Receiving agencies will be responsible for keeping obligations within the amount so specified in the apportionment or to the amount transferred to it from the parent.

Allocation worksheets are no longer required if you are using allocations on the apportionment.

In order for the transfers to crosswalk correctly in the SF 133 and President's Budget, please ensure that both the parent and child use the appropriate USSGL for allocation transfers (http://www.fms.treas.gov/ussgl/index.html).

## SUBMITTING APPORTIONMENT REQUESTS

**120.30  How do I submit apportionment requests to OMB?**

Agencies will typically use OMB's web-based apportionment system to submit their apportionment requests to OMB (see section 120.32 for getting permission in the system to send).  In those circumstances when you are unable to use the web-based system, e-mail the Excel file containing your request to your OMB representative.  You will almost always be required to send OMB an electronic copy of the apportionment request.  In some cases, the OMB representative may request you to provide a hard copy of the signed request.

**120.31  What functions will I perform using the apportionment system?**

OMB's web-based apportionment system is the primary system agencies will use to prepare, submit, and run reports on their apportionment requests.  Staffers with authority to use the system may use the Support\Links tab to find detailed guidance on using the system.

Below is a brief overview of the major functions.

(a) Create template

Use the Create Template screen to get a starting point for your request.  If you are only creating one TAFS, the data entry screen is the best starting point.  If the TAFS you are working with has already been apportioned in the fiscal year for which you are submitting a request, the system will create a properly formatted Excel file with the most recently approved information in the Previous Approved column.  If the TAFS has not yet been apportioned or has never been apportioned, you can draw source data from a previous fiscal year and/or a different TAFS to provide a starting point for your request.

(b) Validate

After you have created a template and updated it to reflect the proper information for your request, use the Validate Request screen to do two things: check for any math or formatting errors, and if there are no errors, create a new file that is ready to be submitted to OMB.  This file will have several Excel tabs that were not in your original template.  It will have the tab called Appor_Req_to_OMB with the primary apportionment information.  It will have a tab to hold any footnotes that OMB may wish to include with the apportionment. If any of the TAFSs in your file have warrants, transfers, or SF 133 data (excluding parent or child allocation accounts) for the fiscal year of your requests, the validated file will also have tabs to display these items. You will need to download and save this file wherever you keep your apportionment files.

(c) Send

If your agency administrator has given you the ability to send requests, you can use the Send tab to send files to OMB, or in some cases, to send files to a central office in your agency that will approve requests and send them to OMB.

(d) Run reports

At any time, you can go to the Run Reports tab to find information associated with your apportionment request, including the latest approved amounts, the latest submission and approval dates, etc.

**120.32  How do I gain access to the apportionment system?**

The apportionment system can be found here: https://apportionment.max.gov.

In order to use the apportionment system to prepare requests and run reports, you must have a MAX User ID and your agency administrator must add you to one or more apportionment groups.  Your administrator may also choose to give you the ability to submit requests to OMB.

You can register for a MAX User ID here: https://portal.max.gov/portal/main/displayRegistrationForm. You can find your agency administrator here: https://portal.max.gov/home/sa/findAgencyAdminForm.

**120.33  Are there situations when I would not use the apportionment system?**

In limited circumstances, OMB may apportion using a letter apportionment.  Additionally, during a continuing resolution period, OMB will sometimes apportion certain types of budgetary resources, such as spending authority from offsetting collections, using a blanket written letter apportionment in addition to the OMB CR Bulletin.  Consult your OMB representative for more information.

<div align="center"><strong>FOOTNOTES TO APPORTIONMENTS</strong></div>

**120.34  What are apportionment footnotes (and footnote indicators)?**

The request tab of an apportionment includes columns for previous approved amounts, agency request, and OMB action.  Next to each of these columns, in turn, is a column for a footnote indicator.  The use of a footnote indicator on the request tab, e.g., A1, B1, indicates that one or more footnotes are associated with that line.

Footnotes appear as textual descriptions on specific tabs in the apportionment file, and typically provide additional information or direction associated with one or more lines on the request.  A request includes separate footnote tabs associated with amounts in the previously approved request column, agency requests column, and OMB Action column.  Footnotes are divided into two basic groups: footnotes for apportioned amounts (in the Application of Budgetary Resources section), and informational footnotes for budgetary resources.

*Footnotes for Apportioned Amounts (Application of Budgetary Resources section)*.  Each footnote indicator in this section begins with the letter A.  These footnotes are associated with one or more lines in the Application of Budgetary Resources section (the bottom section of the apportionment, OMB action column), have legal effect, and are subject to the Antideficiency Act.  For example, a footnote may allow for an upward adjustment of budgetary resources in excess of amounts prescribed in section 120.49 without the need for further action by OMB.

*Footnotes for Budgetary Resources (Budgetary Resources section)*.  Each footnote indicator in this section begins with the letter B.  These footnotes are informational and are associated with one or more lines in the Budgetary Resources section (the top section of the apportionment).  For example, a footnote may identify the source of offsetting collections or explain the basis for amounts on a recovery line. Because these footnotes are not in the Application of Budgetary Resources section (e.g., apportioned), they have no legal effect.

*Indicators for footnotes*.  Footnotes are designated (indicated) through a letter/number combination.  Each footnote indicator starts with a letter A or B (A for apportioned amounts in the application of budgetary resource section; B for budgetary resource), which is followed by a one- or two-digit number:  e.g., B1.  If a single line has more than one footnote, separate the indicators with commas:  A1, A2, A3.

You can find more detailed implementation guidance in OMB's secure, web-based apportionment system under the "Open Support \ Links" tab in navigation menu.

**120.35  Do footnotes starting with the letter A correspond to Category A apportioned amounts while those starting with the letter B relate to Category B apportioned amounts?**

No.  Footnote indicators associated with lines in the Budgetary Resources section start with the letter B.  Footnote indicators associated with lines in the Application of Budgetary Resources section (apportioned

amounts) start with the letter A (irrespective of whether apportioned amounts are Category A, B, AB, or C).

**120.36  Will footnotes and additional tabs/attachments become part of the apportionment?**

Yes, but they will only be subject to the Antideficiency Act if they are specifically referenced in a footnote in the OMB Action column of the Application of Budgetary Resources section of the apportionment.

It is no longer necessary to include a footnote stating that attachments not referenced in the apportionment are not subject to the Antideficiency Act.

**120.37  What footnotes are required for agencies to include in their apportionment requests?**

There is no universal requirement to include footnotes in an apportionment request, except for those required after a short-term CR (see section 120.60).  Many apportionments are approved without footnotes. Here are examples of cases when you use footnotes:

- If you submit an apportionment request and OMB included footnotes in the OMB Footnotes tab of the last approved apportionment, the previously approved footnote indicators must appear in the Prev Footnote column and the text must appear in the Previously Approved Footnotes tab.

- If a particular TAFS has a standard footnote year after year, retain it in your apportionment request unless you have consulted with OMB.

- Include any footnotes your OMB examining division has specifically directed you to include.

- Unless OMB determines otherwise, when amounts are automatically apportioned (as specified in sections 120.49, 120.50 (if applicable) or section 185.20) and there is a subsequent need for reapportionment, show automatically apportioned amounts in the previously approved column. Include a footnote noting where changes have been previously made as automatic apportionments.

- During a CR period, if you are reapportioning an account that has budgetary resources provided by other Acts (e.g., unobligated balances, spending authority from offsetting collections, etc.) and a CR Bulletin, you do not need to show the automatically apportioned amounts in the previously approved column. However, you must continue the footnote provided in section 123.17. Please see section 120.59 for more details.

**120.38  Are there footnotes that are automatically applied to annual and multi-year apportionments?**

Yes.  The following footnote is automatically apportioned for all annual and/or multi-year TAFS that may need to liquidate obligations that were incurred against canceled appropriations:

"Pursuant to 31 U.S.C. 1553(b), not to exceed one percent of the total appropriations for this account is apportioned for the purpose of paying legitimate obligations related to canceled appropriations."

Written apportionments should no longer include this footnote.

**APPROVING APPORTIONMENT REQUESTS**

**120.39  How will OMB indicate its approval of an apportionment?**

When OMB approves an apportionment through the apportionment system, you will receive an e-mail with the approved Excel file attached.  The e-mail will be from 'apportionment@omb.gov,' and the subject line will include the words 'Approved Apportionment.'

- The Excel file will include a tab called 'Approval Info,' which shows the name, title, and digital signature imprint of the OMB official who approved the apportionment, as well as other pertinent information.

    o  The official who approves the apportionment may affix her or his electronic signature to the request; or

    o  The official approving a request may sign a paper copy in ink and instruct a staffer to put a digitized picture of the official's signature (along with a note saying which staffer affixed the signature) on the apportionment.

In some cases, the 'Approval Info' tab may not be present.  In those cases, OMB will e-mail or fax a hard copy of the apportionment that displays the signature of the approving OMB official.

The Excel file is locked, and should be opened in read-only mode.  OMB maintains a copy of the approved apportionment in its secure, web-based system.  OMB also maintains the signed-in-ink apportionment in those cases when a designated staffer affixes an official's digitized signature to the apportionment.  As OMB continues to transition from using ink signatures to using digital authoritative marks, you may receive apportionments that have been approved using either method.

OMB may also choose to indicate its approval of an apportionment in other ways, including by letter, telephone, hard copy, or other method that is appropriate to the particular circumstance. For instance, in rare circumstances where you need to obligate against a submitted reapportionment as soon as possible, you do not have to wait to receive the signed apportionment in the system before obligating if OMB has notified you that your reapportionment has already been approved.

**120.40 When can I expect OMB to approve my first apportionment request for the fiscal year?**

If a TAFS has any budgetary resources that are not determined by current actions of the Congress (e.g., permanent appropriations, carryover of unobligated balances, anticipated collections), OMB will notify you of the action taken on your first apportionment request for the fiscal year by September 10, as required by law (for requests submitted by the August 21 deadline specified by law).  For TAFSs that have budgetary resources solely as a result of current action by the Congress (e.g., TAFSs where the only budgetary resource is a discretionary appropriation), OMB will notify you of the action taken on your request by September 10 for requests submitted by August 21 or within 30 calendar days after the approval of the act providing new budget authority, whichever is later.

**120.41 In the case of newly enacted full-year appropriations, am I under an automatic apportionment until OMB approves my first full-year enacted apportionment request?**

Yes.  Under this section, newly enacted full-year appropriations, including supplemental appropriations for the current year, are automatically apportioned the pro-rata share (1/365th for each day, 1/366th for a leap-year) of the current year's enacted appropriation level.

Once a full-year appropriations Act is enacted, and if the Act was preceded by a short-term continuing resolution (CR), the automatic apportionment provided by the OMB CR Bulletin is no longer in effect; however, the amounts apportioned remain in effect even if the President enacts the full-year appropriation bill prior to the end of the short-term CR period.

For example, a CR ending November 15th would result in a pro-rata amount of 12.60% (46 days/365 days, non-leap year) apportioned.  If the CR is extended through December 20th an additional 9.59% (35 days/365 days) would be apportioned, bringing the total percentage of the rate of operations apportioned to 22.19% since October 1st.  If full-year appropriations are enacted on December 15th (before the end of the CR period), on December 15th you are automatically apportioned the 30 days' worth of the enacted full year appropriation (30 days/365 days = 8.22%) pursuant to the automatic authority provided by this section.  Therefore, from October 1st through January 15th you have been apportioned a total of 30.41%, 22.19% of the rate for operations provided by the short-term CR from the OMB CR Bulletin plus 8.22% of the final appropriated amount pursuant to this section.

The automatic apportionment does not apply to any budgetary resource provided by authorizing legislation or by reauthorizations that affect appropriated resources, such as the Farm Bill or surface transportation reauthorizations. Additionally, pursuant to sections 120.7 and 120.56, automatic apportionment does not apply to carryover amounts, which are automatically apportioned at zero until an account-specific apportionment is approved for such amounts.

Pending OMB's approval of the first written account-specific apportionment request for full-year enacted appropriations for the current fiscal year, agencies are automatically apportioned 30-calendar days of funds calculated using the above rate. Note that the pro-rata share calculation does not include rescissions and other transactions used to calculate the pro-rata share pursuant to the OMB CR Bulletin. The 30-calendar days begin on the date of enactment of a full-year appropriation, except for after a lapse in appropriations (see below).  If OMB has not approved a request on the 30th calendar day after enactment, agencies are automatically apportioned another 30 calendar days of funds using the above rate. This repeats until an account-specific apportionment is approved.  Once a written account-specific apportionment is approved by OMB, the automatic apportionment ceases to remain in effect.

If an agency has not yet submitted its first written account-specific apportionment request to OMB within the first 30-day automatic apportionment period, the agency must provide an explanation of the delay to its OMB representative.

Under this automatic apportionment, funds are apportioned as "lump-sum". Agencies have the flexibility to record the "lump-sum" as either Category A or Category B, whichever is applicable to the account. If the funds are Category A, the "lump-sum" is automatically apportioned to the quarter in which the full year appropriation is enacted. If the funds are Category B, the "lump-sum" is automatically apportioned as a single Category B line. Additionally, all of the footnotes and conditions placed on prior year apportionments or last-approved apportionments remain in effect. This guidance applies strictly to all budgetary resources provided by annual full-year appropriations bills, including supplemental appropriations for the current year, and not other budgetary resources.

For accounts that have appropriations language with permissive carveouts ("up to" or "not more than" or "not to exceed") for a specific amount with a different period of availability (POA) than the main appropriation, the automatic apportionment applies to the main appropriation and not to the carveout amount. Under this scenario the agency must execute a non-expenditure transfer to move the carveout amount and then process an account-specific apportionment to obligate those specific transferred resources. See Exhibit 120T for further guidance on how to prepare the apportionment in these scenarios.

After a lapse in appropriations, the automatic apportionment of full-year appropriations is in effect the day the lapse occurred, not the date the President enacts the full-year appropriation. This situation only applies when a full-year appropriation follows a lapse in appropriations.

If the full-year enacted appropriations are preceded by a short-term continuing resolution, see sections 120.60 and 120.62 for further guidance on how to reflect the previous approved column on your first written account-specific apportionment request.

## AFTER YOU HAVE RECEIVED YOUR APPROVED APPORTIONMENT

**120.42  How should I execute the apportionment?**

You must execute your programs as apportioned and in accordance with all applicable laws. The authorization and / or appropriation language describes the purpose of the program(s) the TAFS will carry out, and may include guidance for you to follow in executing these programs.

Your apportionment dictates how you must execute programs and control funds. You may only obligate funds within:

- budgetary resources apportioned and realized;

- amounts apportioned by fiscal quarter (Category A);

- amounts apportioned by program, project, or activity (Category B);

- amounts apportioned by fiscal quarters and programs, projects, or activities (Category AB); and

- guidance provided in OMB approved footnotes in the Application of Budgetary Resources section.

**120.43  What if I think that I may have obligated more than the amounts apportioned?**

You may have violated the Antideficiency Act (31 U.S.C. 1517(a)(1)). See section 145.

**120.44  Must I control funds below the apportionment level?**

Yes. Your agency's fund control regulations, as approved by OMB, dictate how you must control funds. See section 150.

**120.45  How should I allot once I receive an apportionment?**

The agency system of administrative control of funds must be designed to keep obligations and expenditures from exceeding apportionments and allotments or from exceeding budgetary resources available for obligation, whichever is smaller, so as to avoid Antideficiency Act violations. See section 150.

**120.46  How do I treat anticipated budgetary resources that are apportioned in the current fiscal year but not yet realized, and do I need to reapportion them once realized?**

Even when anticipated budgetary resources have been apportioned in the current fiscal year, you may not obligate against these resources before the resources have been realized (and, thus, you may not obligate against the resources in an amount that exceeds the amount that has been realized). For example, if OMB has apportioned anticipated budget authority from the agency's collection of user fees, you may not obligate

against those user fees until you have collected them (and, thus, you may not incur obligations that exceed the amounts that have been collected).  This guidance also applies to anticipated non-expenditure transfers of budgetary resources. The transferred resources cannot be obligated against until Treasury Fiscal Service has processed a non-expenditure transfer document and the resources are in the receiving account.

Apportioned anticipated budgetary resources, once realized, do not need to be reapportioned unless the amount realized exceeds the conditions on the total amount apportioned (see section 120.49).  However, this only applies during the current fiscal year.  For instance, if you had anticipated resources apportioned in the prior fiscal year for a reimbursable agreement but it was not realized, you will need to reapportion those anticipated resources in the next fiscal year.

**120.47  What is the relationship between the apportionment and the Funds Control System?**

The agency's system of administrative control of funds (see section 150 and Appendix H) should be designed to keep obligations from exceeding apportioned amounts, allotments, suballotments, and other administrative subdivisions of funds.  This funds-control system also should be designed to keep obligations from exceeding budgetary resources that have been realized, and should be able to track obligations by program reporting categories used in the apportionment.

The funds-control system must track obligations to make sure obligated levels do not exceed:

- budgetary resources apportioned;

- amounts provided by fiscal quarter in Category A;

- amounts provided by program in Category B;

- amounts provided by program in Category AB; and

- other restrictions placed in OMB approved footnotes in the Application of Budgetary Resources section.

If the funds-control system cannot provide this control, the agency must develop other methods to perform this function, e.g., developing monitoring reports.

Since footnotes are not often implemented in an agency's financial system, the agency's budget, finance, and procurement staff need to be aware of and understand the directions and restrictions provided in footnotes.

Your agency's accounting system must fully support the funds-control system (see Appendix H).

### CHANGES TO PREVIOUSLY APPROVED APPORTIONMENTS FOR THE CURRENT FISCAL YEAR

**120.48  What types of situations could require me to request a new apportionment?**

Submit a reapportionment request to OMB when:

- Your budgetary resources have increased since your previous apportionment for the fiscal year (e.g., actual reimbursements differ significantly from estimates, newly enacted legislation provides more resources);

- You want to obligate against the increased resources in the same fiscal year;

- The increase is not covered by the exceptions in sections 120.49 or 120.50 (if applicable);

- Your obligations against an indefinite appropriation for the remainder of the fiscal year are expected to exceed the amount estimated on the latest approved apportionment and the latest approved apportionment does not include an "A" footnote in the OMB Action column that automatically apportions the necessary increase in budgetary resources; or

- Programmatic changes result in a need for an adjustment in the apportionment.

In order to allow time for action by OMB, submit such requests well in advance of the time that the revised amounts, to be apportioned, are needed for obligation (an apportionment for a specific time period, such as for a specific quarter of the current fiscal year, may not be changed after the end of that period).

When emergencies, such as those involving the safety of human life or the protection of property, require immediate action, you may request, and OMB may approve, a reapportionment by e-mail or other non-web-based apportionment system methods (section 120.16).  As soon thereafter as it is practical, submit apportionment requests reflecting such action.

For credit program and financing TAFSs, submit an apportionment request for subsidy reestimates at the beginning of each fiscal year (starting with the fiscal year following the year in which a disbursement is made) as long as the loans are outstanding (see sections 185.17 and 185.18).  Also submit an apportionment request for subsidy modifications when the modification is approved by OMB (see section 185.21).  Credit program and financing TAFSs are also subject to the standard reapportionment requirements described above (see sections 185.14 through 185.21 for further guidance on apportioning credit accounts).

Submit an apportionment request within *10 calendar days* after enactment of an appropriation, substantive act providing budget authority, where such authority is enacted after the first apportionment for the year has been made (except as specified in section 120.49).  We encourage you to begin preparation of apportionments and related materials as soon as the House and Senate have reached agreement on funding levels.

In some cases, you will need to submit your first apportionment request before the unobligated balance brought forward has been precisely determined.  If the unobligated balance brought forward, as shown on the latest approved apportionment schedule, is larger than the unobligated balance at the end of the preceding year, as reported on the final SF 133 for that year, and the difference is larger than the amount specified in section 120.49, OMB must approve the apportionment request before you can obligate the additional funds.

**120.49  What adjustments can I make without submitting a reapportionment request?**

After the first apportionment for the fiscal year, downward adjustments of any amount to budgetary resources, including anticipated amounts, do not need to be reapportioned, unless specifically required by OMB or, at the agency's discretion, for funds control purposes.  However, if the decrease applies to amounts apportioned in Category C, and as a result you need to increase the amounts apportioned to Category B(s) or current Cat A or A/B(s) lines,  you will have to submit a reapportionment to reflect the reallocation from Category C. Apportioned anticipated budgetary resources, once realized in the current fiscal year of the apportionment, do not need to be reapportioned unless the amount realized exceeds the conditions on the total amount apportioned, as noted below.

Although an apportionment is not required to execute a non-expenditure transfer out of a TAFS, for funds control purposes a reapportionment should follow shortly after such a transfer is executed to reflect the non-expenditure transfer and reduce the budgetary resources of the giving account accordingly.

After the first apportionment for the fiscal year, unless OMB determines otherwise, you may adjust apportioned amounts upwards without submitting a reapportionment request by up to $400,000 or two percent of the amount of total budgetary resources, whichever is lower, to reflect:

- Upward adjustments in the amount of unobligated balances brought forward;

- Increases in amounts of budget authority transfers or balance transfers; or

- Increases in amounts of actual budgetary resources that are realized above anticipated amounts.

You may only adjust apportioned amounts when OMB apportions either a single program, project, or activity (Category B) or, if the total amount is apportioned, by quarter (Category A or Category AB). When amounts are apportioned by quarter, you must adjust the apportioned amounts in the quarter that is current when you record the resource. For example, if anticipated collections were apportioned in the third quarter but the increased amount above the anticipated collections (still within the lower of $400,000 or two percent) were not realized until the fourth quarter; record the resource in the fourth quarter, not the third. This guidance is not applicable when your resources are apportioned pursuant to an automatic apportionment. In those cases, you record the automatic apportionment of those resources in the quarter in which they are realized.

If only the name of your apportioned account and/or bureau has changed, you do not need to submit a reapportionment to OMB.

In credit financing TAFSs, additional amounts for the payment of interest to Treasury are automatically apportioned (section 185.19) if the amounts needed exceed your estimate on the most recent approved apportionment.

You cannot make any upward adjustments under this section (downward adjustments are not affected) when OMB apportions funds for two or more categories on the same apportionment, such as Category A and Category B, or Category A and Category AB, or two or more Category Bs, etc. In these types of apportioned TAFSs, you must submit a reapportionment request to OMB or otherwise have prior OMB approval (e.g., through an OMB footnote in the Application of Budgetary Resources section that starts with the indicator of A) to adjust apportioned amounts upward.

Apportionments are not required for transactions to send funds back to the Treasury, such as closing an account.

**120.50  What other types of adjustments can I request OMB to allow me to make without submitting a new apportionment request?**

You may make other specific types of adjustments to apportionments without submitting a reapportionment request if specified in a footnote in the Application of Budgetary Resources section (footnote indicator starts with letter A) on the most recently approved apportionment or otherwise approved in writing by OMB. For example, OMB may include on an approved apportionment a footnote (with a corresponding YES in the Line Split column of the Adjustment Authority Provided row) which states that, to the extent provided in law, actual earned reimbursements are automatically apportioned without further OMB action.

In order to facilitate OMB approval of your apportionment request, your apportionment request must indicate that you have previously received, or are requesting, OMB approval to use this authority.

**120.51  What is the status of previously approved apportionments when a new apportionment is approved in the same fiscal year?**

Each new apportionment in a fiscal year supersedes previous apportionment actions taken earlier that year.

**APPORTIONMENTS BY TIME PERIOD**

**120.52  Will OMB apportion funds into future fiscal years?**

Yes.  OMB will sometimes apportion multi-year/no-year funds into future fiscal years using a Category C. OMB cannot apportion annual funds into a future fiscal year.

The Congress appropriates funds on a multi-year and no-year basis with the expectation that the funds will be obligated over more than one fiscal year.  OMB will apportion these TAFSs beyond the current fiscal year where financial requirements are known in advance and it makes programmatic sense to do so.

When you plan to obligate amounts appropriated in a no-year or multi-year TAFSs over more than one fiscal year, make sure that the apportionment request shows the full amount appropriated and available for obligation in the current fiscal year.  The request must also include planned obligations for the current year and amounts planned for obligation in future fiscal years.

Note: apportionments last no longer than one fiscal year.  Funds must be apportioned at the beginning of each fiscal year in accordance with sections 120.7 and 120.56.

**120.53  When do I use lines 6180 (withheld pending rescission) or 6181 (deferred)?**

Do not use these lines on your apportionment without first consulting with your OMB representative.  These lines are used to reflect a proposed rescission or deferral under the authority of the Impoundment Control Act of 1974.  If these lines are used on your apportionment, you must submit a rescission or deferral report that outlines the reasons for and the effects of the proposed action.  See section 112 for further information on the use of these lines and preparing rescission and deferral reports.

**120.54  Can OMB reapportion a past period?**

No.  Apportionments are never subject to change after the period for which the apportionment was made (e.g., a prior fiscal year or a past quarter time period in the current fiscal year).

For apportionments with Category A amounts, once funds are apportioned, the apportionment cannot be retroactively changed to show a different apportioned amount if that quarter has passed.  For instance, if your first quarter apportioned amount was overestimated but in a subsequent quarter the realized actuals were much lower than the estimated amount, you would do the following on the reapportionment:

- First quarter apportioned amount remains as previously apportioned;

- Current quarter (i.e., second, third or fourth) reflect a negative amount so as to net to the correct total amount that needs to be reapportioned.

See exhibit 120K for an example.

**JA 249**

Here are examples of where OMB is not reapportioning a past period: apportionments that simply reflect a past automatic apportionment on a subsequent account-specific apportionment, such as the initial account-specific apportionment following a continuing resolution (because the apportionment was in fact in effect during the past quarter time period); or where budget authority has been expressly appropriated to cover prior obligations.

See section 120.41 for additional guidance about the automatic apportionment of budgetary resources when a full-year appropriations Act follows a lapse in appropriations.

**120.55 Do unobligated resources apportioned in earlier time periods of the same fiscal year remain available?**

Yes. When budgetary resources are apportioned for time periods of less than a fiscal year (e.g., fiscal quarters), any apportioned amounts that have not been obligated at the end of any period will remain available for obligation through the remainder of the current fiscal year without being reapportioned, unless otherwise specified on the apportionment. However, this rule does not apply to unobligated balances apportioned during a short-term continuing resolution that is followed immediately by a lapse in appropriations (see section 123.16).

**120.56 Must I request that funds apportioned in one fiscal year be apportioned in the next fiscal year if the funds were not obligated and remain available?**

Yes. When budgetary resources remain available (unexpired) beyond the end of a fiscal year, you must submit a new apportionment request for the upcoming fiscal year. You cannot incur obligations in any year absent an approved apportionment for that year. For instance, if OMB apportioned $1 million for a no-year TAFSs in FY 2018 and you obligated no funds, you must still submit an FY 2019 request and receive OMB approval of that request before incurring obligations in FY 2019. Until you receive an account-specific apportionment from OMB, the amount of carryover apportioned is zero dollars. In addition, apportioned anticipated or estimated resources are not available for obligation until the resources are realized.

**120.57 What is the status of approved apportionments from a previous fiscal year on apportionments in the current fiscal year?**

New apportionment action for a fiscal year is independent of all apportionment actions of the previous year, including the apportionment of amounts under Category C in the previous fiscal year.

**120.58 How does the last approved apportionment govern the actions a TAFS takes when the TAFS enters the expired phase?**

Every annual and multi-year TAFSs, as well as some no-year TAFSs, has a finite period of time to incur an obligation; this is called the unexpired phase. OMB only apportions TAFSs in the unexpired phase.

When shifting to the expired phase, a TAFS can only make adjustments to obligations made in the unexpired phase. Activity in the expired phase of a TAFS is governed by the last approved apportionment, including apportioned footnotes in the OMB Action column of the Application of Budgetary Resources section.

In some instances, there may be a subset of resources in a no-year TAFS that are no longer available for new obligations. This does not impact the phase (e.g.., expired or unexpired) of the entire TAFS.

**JA 250**

## APPORTIONMENTS AFFECTED BY A CONTINUING RESOLUTION (CR)

**120.59  During a CR, what happens to TAFSs that were apportioned before the start of a fiscal year (e.g., no-year TAFSs)?**

When budgetary resources (e.g., unobligated balances, spending authority from offsetting collections, anticipated transfers) are apportioned prior to the start of a fiscal year, those apportionments remain in effect even if a CR is enacted, unless otherwise directed by OMB.

However, you must submit a new apportionment request to OMB if:

- The CR changes the funding level or alters the program mix that OMB apportioned (e.g., the Congress rescinds unobligated balances during the CR period or zero-funds a program that OMB previously apportioned); or

- Changes occur that affect the budgetary resources apportioned as described in sections 120.48 through 120.50 (e.g., actual reimbursements differ significantly from estimates).

The automatic apportionment approved by OMB after enactment of a short-term CR (OMB CR Bulletin) covers only the budgetary resources provided by the short-term CR.  Some TAFSs may receive funds provided by the CR in addition to budgetary resources provided by other acts.  These TAFSs receive both the automatic apportionment for the CR funds and any budgetary resources apportioned before the start of the fiscal year (e.g., unobligated balance carried forward).

If you chose to seek reapportionment of the TAFS during the CR period and you and the RMO agree not to reflect the amounts from the CR in the reapportionment, then you must include a footnote in the reapportionment to indicate that the account is also receiving apportioned resources from the CR.  See section 123.17 for the footnote language.

**120.60  After a CR has been replaced by a full-year enacted appropriation, what do I show in the Previous Approved column?**

Unless otherwise requested by your RMO, in the Previous Approved column, show all budgetary resources and apportioned amounts since the start of the fiscal year through the last day of the CR (in accordance with the most recent OMB CR Bulletin on the "Apportionment of the Continuing Resolution(s) for Fiscal Year 20XX") plus the amounts automatically apportioned pursuant to section 120.41.  For example, amounts on line 1100, discretionary appropriations, should show the short-term CR's calculated rate for operations.  Additionally, a footnote on line 1134 Appropriations precluded from obligation (or line 1135 for a special or trust fund TAFS), should state the following: "Amount on line 1134 (or line 1135) has been adjusted pursuant to OMB CR Bulletin XX-XX and Circular A-11 section 120.41." (see exhibit 120G).  For instance, if budgetary resources such as unobligated balances were apportioned by OMB and the TAFS also received automatically apportioned CR funds via the OMB CR Bulletin(s) and section 120.41, you must show both types of budgetary resources on your apportionment request.

If you were apportioned under the CR with a POA that was changed in the full-year enacted appropriations, see section 120.62 for further apportionment guidance.

**120.61  After a short-term CR has been replaced by a full-year enacted appropriation, what do I show in the agency request column?**

In the agency request column, show all budgetary resources and application of budgetary resources for the entire fiscal year, beginning from the start of the fiscal year.  See section 120.54 and exhibit 120G. See

Exhibit 120H if you received OMB concurrence during the short-term CR period to record your lump-sum automatic apportionment as Category A.

Note that while an account is under the automatic apportionment authority in section 120.41, GTAS reporting will not show any amounts on line 1134 unlike the previously approved column of the first apportionment post-CR.  Instead, GTAS will report those amounts on line 2403 in the Status of Budgetary Resources section of a SF 133.

**120.62  What do I do if the full-year enacted appropriation changes the period of availability of funds apportioned under a short-term CR?**

If the POA of funds under a short-term CR was changed by the full-year enacted appropriations, you must submit two account-specific apportionments.  Under the short-term CR, you were apportioned for that specific POA and all obligations were valid; however, the CR states that expenditures made pursuant to the CR shall be charged to the applicable appropriation, fund, or authorization whenever a bill in which such applicable appropriation, fund, or authorization is contained is enacted into law.

In the situation where the entire POA of the TAFS changed in the final bill, you must prepare the following apportionments.  In this scenario the CR POA was annual and the final enacted appropriation POA was multi-year.

- For the POA that was under the CR, you will reflect "0" on lines 1100 discretionary appropriation and 1134 appropriation excluded from obligation (or 1135 for special and trust funds) and place the following "A" footnote on line 6190 total budgetary resources available in the previously approved column only:

  o "Under the FY 2020 short-term continuing resolution (CR) (P.L. XXX-XXX, as amended) this account was appropriated as an annual TAFS (put TAFS number here) and was apportioned by OMB Bulletin 19-XX.  The full-year FY 2020 appropriation (P.L. XXX-XXX) enacted the funding within a multi-year TAFS (put TAFS number here) and was automatically apportioned via OMB Circular A-11 section 120.41. Pursuant to section XXX (check CR for actual section number, e.g., 105) of the FY 2020 CR, any obligations/outlays made with the previous annual appropriation shall now be redistributed (or recast) to the new multi-year TAFS (put TAFS number here)."

- For the POA that is enacted in the full-year bill, you will reflect the CR (lines 1100 discretionary appropriations and 1134 appropriation excluded from obligation or 1135 for special or trust funds) in the previous approved column (see section 120.60 for "B" footnote on line 1134 or 1135) and place the following "A" footnote on line 6190 total budgetary resources available:

  o "Under the FY 2020 short-term continuing resolution (CR) (P.L. XXX-XXX, as amended) this account was appropriated as an annual TAFS (put TAFS number here) and was apportioned by OMB Bulletin 19-XX.  The full-year 2020 appropriation (P.L. XXX-XXX) enacted the funding within this multi-year TAFS (put TAFS number here) and was automatically apportioned via OMB Circular A-11 section 120.41.  Pursuant to section XXX (check CR for actual section number, e.g., 105) of the FY 2020 CR, any obligations/outlays made with the previous annual appropriation shall now be redistributed (or recast) to this new multi-year TAFS (put TAFS number here)."

There may be cases where the POA is only changed partially by the full-year enacted appropriations bill.  If this occurs, please contact your OMB representative for guidance.

## WHAT OTHER IMPORTANT THINGS DO I NEED TO KNOW ABOUT APPORTIONMENTS?

**120.63  What types of resources are apportioned by OMB?**

The following resources are apportioned by OMB:

- Budgetary resources;

- Non-budgetary resources (such as foreign currency, quotas, etc.); and

- An agency's other authority (pursuant to statutory authority) in whatever form it may take.

**120.64  Are all apportionments based on authority to incur obligations?**

OMB usually apportions the budgetary resources of a TAFS with respect to the authority to incur new obligations.

However, OMB may apportion budgetary resources on a pre-obligation basis, such as "commitments," which, if used, are made before obligations are incurred.  If OMB apportions on a basis other than obligations, you should continue to include your usual obligations in the GTAS system, but in addition, you must report a GTAS footnote regarding the status of the non-obligation apportioned items, i.e., footnote the amount of "commitments" incurred against the amount shown on the apportionment.

**120.65  How do I treat extensions of the availability of unobligated balances in an apportionment?**

Reappropriations (see section 20.4(h)) are recorded on lines 1105 Discretionary Reappropriation or 1204 Mandatory Reappropriation.  For example, an apportionment for FY 2019 should reflect an estimate of the amount to be reappropriated from the estimated expiring FY 2018 balances.  A reapportionment may be required after the actual amount of the expiring balances is known.  You may wish to reflect these amounts on either lines 1134 Discretionary appropriations precluded from obligation (use for only general fund TAFS; use line 1135 for special or trust fund TAFS) or 1235 Mandatory appropriations precluded from obligation, until an appropriate time after the required reprogramming notice has been transmitted to the Congress.

Balance transfer amounts from expired to unexpired funds, are reflected on line 1012 Unobligated balance transfers between expired and unexpired accounts.

## HANDLING DEFICIENCIES IN APPORTIONMENTS

**120.66  When and how do I submit apportionments anticipating the need for the Congress to enact supplemental budget authority?**

Submit requests anticipating the need for the Congress to enact supplemental budget authority only under exceptional circumstances as authorized by law.  The Antideficiency Act (31 U.S.C. 1515) permits apportionments to be made on such a deficient-rate basis that indicates the need for the Congress to enact supplemental budget authority only when:

- Laws enacted after submission to the Congress of the estimates for an appropriation require an expenditure beyond administrative control.

- Emergencies arise involving:

  - (1)  the safety of human life;

  - (2)  the protection of property; or

  - (3) the immediate welfare of individuals in cases where an appropriation that would allow the United States to pay, or contribute to, amounts required to be paid to individuals in specific amounts fixed by law or under formulas prescribed by law, is insufficient.

When you submit a requested apportionment that indicates a necessity for the enactment of supplemental appropriations, include the following notation on the apportionment request:

"This apportionment request indicates a necessity for a supplemental appropriation now estimated at $_____."

Submit the apportionment request to OMB along with your agency head's determination of the reasons for a deficiency apportionment, as required by law (31 U.S.C. 1515).  The statement of necessity will read as follows:

"I hereby determine that it is necessary to request apportionment of the appropriation '(appropriation title)' on a basis that indicates the necessity for a supplemental estimate of appropriations, because .... [cite one of the allowable reasons mentioned above]."

Usually, you will reflect the need for a supplemental appropriation in quarterly apportionments by making the request for the fourth quarter less than the amount that will be required.  For apportionments by activities, verify that the amount requested for each activity provides for continuing that activity until the supplemental appropriation is expected to be enacted and become available.  OMB approval of requests for a deficiency apportionment allows the agency to operate at a deficient rate of operations, but does *not* authorize the agency to exceed the total amount of the existing appropriation and of the resources that OMB has apportioned within a TAFS.

Fully justify the amount of any anticipated supplemental appropriation.  Action on the apportionment request does not commit OMB to the amount of the supplemental appropriation that will be recommended subsequently to the President or transmitted to the Congress.

A deficiency apportionment cannot be requested to provide obligational authority in the event of a lapse of appropriations.  The obligational authority for such a circumstance is provided by 31 U.S.C. 1342, and is automatically apportioned via section 124.5.

## PROGRAM REPORTING CATEGORIES

### 120.67  What is the purpose of program reporting categories?

Program reporting categories show how agencies will report obligations on their SF 133 Reports on Budget Execution and Budgetary Resources (see section 130).  Absent program reporting categories, agencies report obligations on their SF 133 reports in accordance with their approved apportionments.  For instance, if OMB uses a single Category B project on the apportionment and does not use program reporting categories, the SF 133 report will show obligations on a single line.

**SECTION 120—APPORTIONMENT PROCESS**

You should use program reporting categories when you want obligations reported at a more detailed and programmatically meaningful manner than the apportioned lines would otherwise result in. If program reporting categories were used in the case above, the SF 133 report would show obligations on two or (most likely) more lines. For instance, if a Department of the Interior account had a single Category B project but program categories for maintaining land resources and protecting endangered species, the SF 133 report would distinguish obligations by these categories. While program reporting categories result in more detailed reporting on obligations, they do not control what the agency can obligate for these categories.

Most TAFSs do not use program reporting categories.

**120.68  Do my estimates of program reporting category obligations limit the amount I can obligate?**

No. Program reporting categories are not used to apportion funds, and are not subject to the Antideficiency Act.

**120.69  What do OMB and the agency need to do to start using program reporting categories?**

OMB and agencies work together to determine what program reporting categories agencies will report upon. Program reporting categories should be based on elements that agencies track in their financial systems. In some cases, you may choose to report upon the same programs that appear in the Program and Financing Schedule of the President's Budget.

Because the level of reporting is lower level than the apportionment categories, program reporting categories should be identified in advance of the beginning of a fiscal year if at all possible, and in advance of the time that agencies produce their first apportionment requests for the year. The reason is that agencies need time to place entries in their financial systems to allow them to track these program categories throughout the year. One reason is that large numbers of staff including timekeepers, procurement staff, administrative officers, and others need to document the new program reporting categories, and train program office staff on how to use the new categories. In addition, agencies may need time to update their systems to extract the data.

**120.70  How do I fill in the program reporting category tab?**

The apportionment user's guide that appears on the support\links tab of the apportionment system describes how to fill in the program reporting category tab. The URL for the apportionment system is: https://apportionment.max.gov.

**120.71  Why does OMB send the names of program reporting categories and Category B projects to Treasury for use in GTAS?**

OMB sends program reporting categories from approved apportionments to the Treasury Department's Bureau of the Fiscal Service, which operates the GTAS system that agencies use to report their SF 133 budget execution information. When reporting their obligations, GTAS provides agencies with the list of program reporting categories to report upon; these are the same program reporting categories that OMB provides from the apportionment attachments.

For those TAFSs that use Category B projects but do not use program reporting categories, OMB sends Fiscal Service the list of Category B projects for use in GTAS reporting.

OMB sends this information to Fiscal Service so OMB can use automated tools to align program reporting categories and Category B projects on the apportionments to the budget execution reports.

**JA 255**

**APPORTIONMENT PROCESS**                                              **EXHIBIT 120A**

PROGRAM REPORTING CATEGORIES FORMAT

Program Reporting Categories

| Agency Identifier | Beginning POA | Ending POA | Availability Type | Main Account | SF 132 Line | Report Cat No. | Program Reporting Category | Projected, Annual Obligations |
|---|---|---|---|---|---|---|---|---|
| 080 | | | X | 1309 | 6001 | 1 | Salaries | 400,000 |
| 080 | | | X | 1309 | 6001 | 2 | All Other | 80,000 |
| 080 | | | | | | | Cat A, Sub-total | 480,000 |
| 080 | | | X | 1309 | 6011 | 3 | Research -- Air | 8,880,000 |
| 080 | | | X | 1309 | 6011 | 4 | Research -- Water | 4,000,000 |
| 080 | | | X | 1309 | 6011 | 5 | Research -- All Other | N/A |
| 080 | | | | | | | Research, Sub-total | 12,880,000 |
| 080 | | | X | 1309 | 6012 | 6 | Development -- Air | 5,450,000 |
| 080 | | | X | 1309 | 6012 | 7 | Development -- Water | 4,000,000 |
| 080 | | | X | 1309 | 6012 | 8 | Development -- All Other | N/A |
| | | | | | | | Development, Sub-total | 9,450,000 |

Note: Program reporting categories are not used to apportion funds, and are not subject to 31 USC 1517.

When the Report Cat No has a number between 1 - 100, the stub will be sent to the GTAS system for use in budget execution reporting.

You may also include additional rows where the Report Cat No is blank. In this example, these rows serve as sub-totals.

Note how the program reporting categories relate to apportioned amounts in Exhibit 120D's Office of the Secretary apportionment.

Do not use program reporting categories that are identical to Category B projects. The simple rule is that you use two or more reporting categories for each Cat B project.

Check with OMB on whether you need to put in projected, annual obligations.

Note also that the amounts in this column do not need to add to the total amount on the apportioned lines.

**EXHIBIT 120B**                                                                      **APPORTIONMENT PROCESS**

### One-Year Appropriation—First Apportionment for the Current Fiscal Year



Exhibit Notes:

　1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

　2) Per section 120.41, newly enacted appropriations are automatically apportioned for a temporary period.  If you choose to leave the previous approved column blank and were under an automatic apportionment(s), then state so in an "A" footnote on line 6190 in in that column.

**No-Year Appropriation—First Apportionment for the Current Fiscal Year**



Exhibit Notes:

1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

2) Per section 120.41, newly enacted appropriations are automatically apportioned for a temporary period.  If you choose to leave the previous approved column blank and were under an automatic apportionment(s), then state so in an "A" footnote on line 6190 in in that column.

**EXHIBIT 120D**
APPORTIONMENT PROCESS

**No-Year Appropriation—Reapportionment**

FY 20xx Apportionment
Funds provided by Public Law XXX-XXX ←

> Identify in the header the law(s) providing the budget authority.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-X-1309** | | | | | | | |
| IterNo | 2 | Last Approved Apportionment: 9/10/CY | | | | | | | |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | YES | Adjustment Authority provided | | | | | | | |
| 1000 | DE<br>DA | Unob Bal: Brought forward, Oct 1<br>[line split = DE for estimated balances of discretionary]<br>[line split = DA for actual balance of discretionary] | 1,298,000 | | 1,610,000 | | 1,610,000 | | |
| 1061 | | Unob Bal: Antic recov of prior year unpd/pd obl | 150,000 | | 150,000 | | 150,000 | | |
| 1100 | | BA: Disc: Appropriation | 25,000,000 | | 25,000,000 | | 25,000,000 | | |
| 1130 | | BA: Disc: Appropriations permanently reduced | | | -200,000 | | -200,000 | | |
| 1700 | | BA: Disc: Spending auth: Collected | | | 95,000 | | 95,000 | | |
| 1740 | 1 | BA: Disc: Spending auth:Antic colls, reimbs, other | 300,000 | | 205,000 | | 205,000 | | |
| 1740 | 2 | BA: Disc: Spending auth:Antic colls, reimbs, other | 100,000 | | 100,000 | | 100,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **26,848,000** | | **26,960,000** | | **26,960,000** | | |
| 6001 | | 1st quarter | 120,000 | | 120,000 | | 120,000 | | 36,000 |
| 6002 | | 2nd quarter | 120,000 | | 120,000 | | 120,000 | | |
| 6003 | | 3rd quarter | 120,000 | | 120,000 | | 120,000 | | |
| 6004 | | 4th quarter | 120,000 | | 120,000 | | 120,000 | | |
| 6011 | | Research | 16,800,000 | | 12,880,000 | | 12,880,000 | | |
| 6012 | | Development of Products | 9,568,000 | | 9,600,000 | | 9,600,000 | | 1,348,250 |
| 6170 | | CY +1 | | | 4,000,000 | | 4,000,000 | | |
| **6190** | | **Total budgetary resources available** | **26,848,000** | | **26,960,000** | A1 | **26,960,000** | A1 | |

> If you need to reapportion after final unobligated balances are determined, change the line split from E to A. For more information about when a reapportionment is necessary, please see section 120.49.

> On a reapportionment, this entry will include enacted appropriations, amounts certified by Treasury warrant of indefinite appropriations, any enacted supplemental appropriation, and any appropriated receipts in special and trust funds. See Appendix F for applicable line numbers.

> Anticipated resources should be adjusted to actual resources on subsequent apportionments.

> No-year and multi-year TAFS can have apportioned amounts in future fiscal years (Category C). When using line 6170, provide the future fiscal years.

> Display the text of any footnotes in a separate tab in your Excel file.

Exhibit Notes:

1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.

2) Unless OMB determines otherwise, when amounts are automatically apportioned (see section 120.50), and there is a subsequent need for reapportionment, reflect adjustments previously made as automatic apportionments in the "Previous Approved" column. In such cases, footnote what changes were automatically apportioned.

3) Exhibit 130C illustrates the SF 133 for this account.

**JA 259**

### One-Year Appropriations Under Continuing Resolution (CR)

FY 20xx Apportionment
Funds provided by Public Law XXX-XXX

Identify in the header the law(s) providing the budget authority. If a CR is extended multiple times, include the citation of first CR "as amended" (not the subsequent amendments). However, if a new, separate CR is passed (e.g. after a lapse in appropriations), cite the new CR as well as the first CR.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government** **Bureau: Office of the Secretary** **Account: Salaries and Expenses (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)** **TAFS: 080-20xx-20xx-0137** | | | | | | | |
| IterNo | 1 | Last Approved Apportionment: N/A, First Request of year | | | | | | | |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | NO | Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation | | | 24,000,000 | B1 | 24,000,000 | | |
| 1134 | | BA: Disc: Appropriations precluded from obligation | | | -22,030,000 | B2 | -22,030,000 | | |
| 1740 | | BA: Disc: Spending auth:Antic colls, reimbs, other | | | 1,348,260 | | 1,348,260 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **0** | | **3,318,260** | | **3,318,260** | | |
| 6001 | | 1st quarter | | | 1,348,260 | A3 | 1,348,260 | A3 | |
| 6002 | | 2nd quarter | | | 0 | | 0 | | |
| 6003 | | 3rd quarter | | | 0 | | 0 | | |
| 6004 | | 4th quarter | | | 0 | | 0 | | |
| 6011 | | Lump Sum | | | 1,970,000 | | 1,970,000 | | |
| **6190** | | **Total budgetary resources available** | **0** | | **3,318,260** | | **3,318,260** | | |

Even though a short-term CR is for part of a fiscal year, you still show the total annualized level (i.e., rate for operations) provided by the CR on line 1100 (not the pro-rata share apportioned for the time period of the CR).

For a short-term CR, show the amount of BA that is currently not provided under the given time period of the CR as a negative on line 1134 (for special or trust fund TAFS, you must use line 1135). (See section 123.2 for guidance.)

Note that funds made available by the continuing resolution ($24,000,000 - $22,030,000) are all apportioned as lump sum by the OMB short-term CR apportionment bulletin.

You can either show the lump-sum amount in Cat B (as shown on line 6011) OR if you typically apportion Cat A, the entire lump-sum amount in the first quarter (line 6001). If the short-term CR gets extended and enacted in a subsequent quarter, you would reflect the additive amount as lump-sum in the quarter current at that time.

Display the text of any footnotes in a separate tab in your Excel file.

Exhibit Notes:

1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.

2) Generally, the OMB CR Bulletin will automatically apportion funds made available by a CR without requiring you to submit an account-specitic apportionment request (see section 123.3, 120.59). However, you may submit, or OMB may require you to submit a request.

**EXHIBIT 120F**                                                                                 **APPORTIONMENT PROCESS**

Appropriations and Unobligated Balances Under a Continuing Resolution (CR)



Footnote A1: In addition to the amounts apportioned above, this account also received funds pursuant to Public Law XXX-XXX as automatically apportioned via OMB Bulletin XX-XX.

Exhibit Notes:

1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.

2) Generally, the OMB CR Bulletin will automatically apportion funds made available by a CR without requiring you to submit an account-specific apportionment request (see section 123.3, 120.59). However, you may submit, or OMB may require you to submit a request.

3) You must submit a reapportionment request showing the final determination of unobligated balances to OMB as soon as it becomes known unless the amount is automatically apportioned by section 120.49. If you need to submit a reapportionment post October 1 and you do not reflect the amounts automatically apportioned by the OMB CR Bulletin, then you must footnote the apportionment accordingly (see section 123.18).

**JA 261**

### Apportionment Following a Continuing Resolution (CR) (No-Year TAFS)



FY 20xx Apportionment
Funds provided by Public Law XXX-XXX

Identify in the header the law(s) providing the budget authority. Note: you can choose to reference Public Law number of the CR or both the CR and any appropriation laws.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-X-1200** | | | | | | | |
| IterNo<br>RptCat<br>AdjAut | 2<br>NO<br>NO | Last Approved Apportionment: 9/10/CY<br>Reporting Categories<br>Adjustment Authority provided | | | | | | | |
| 1000 | DE<br>DA | Unob Bal: Brought forward, Oct 1<br>[line split = DE for estimates of discretionary balances]<br>[line split = DA for actual discretionary balances] | 60,000,000 | | 46,000,000 | | 46,000,000 | | |
| 1100 | | BA: Disc: Appropriation | 24,000,000 | | 25,000,000 | | 25,000,000 | | |
| 1134 | | BA: Disc: Appropriations precluded from obligation | -22,030,000 | B1 | 0 | | 0 | | |
| 1700 | | BA: Disc: Spending auth: Collected | 1,500 | | 2,000 | | 2,000 | | |
| 1740 | 1 | BA: Disc: Spending auth:Antic colls, reimbs, other | 1,000,260 | | 1,000,260 | | 1,000,260 | | |
| 1740 | 2 | BA: Disc: Spending auth:Antic colls, reimbs, other | 348,000 | | 178,000 | | 178,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **63,319,760** | | **72,180,260** | | **72,180,260** | | |
| 6001 | 1st quarter | | 22,320,447 | | 22,320,447 | | 22,320,447 | | |
| 6002 | 2nd quarter | | 13,009,771 | | 6,009,771 | | 6,009,771 | | |
| 6003 | 3rd quarter | | 13,009,771 | | 6,009,771 | | 6,009,771 | | |
| 6004 | 4th quarter | | 13,009,771 | | 13,009,771 | | 13,009,771 | | |
| 6011 | Lump Sum | | 1,970,000 | | 24,830,500 | | 24,830,500 | | |
| **6190** | | **Total budgetary resources available** | **63,319,760** | | **72,180,260** | | **72,180,260** | | |

NOTE:
This exhibit reflects the cumulative amounts from the initial apportionment (budgetary resources not determined by the current action of the Congress, section 120.23) approved prior to October 1 and the automatic apportionments provided by the OMB CR Bulletin and section 120.41.

In the previous approved column, line 1100 is equal to the rate for operations from the short-term CR, not the

Requirement for line 1134 (or line 1135 for special or trust fund TAFS)--see footnote language below.

**Scenario 1 (Category B lump-sum):**
If you choose to lump-sum Cat B amounts automatically apportioned pursuant to the OMB CR Bulletin and A-11 section 120.41, it will all show on line 6011.

**Scenario 2 (Category A lump-sum):**
If you choose to record amounts automatically apportioned pursuant to the OMB CR Bulletin as Cat A, you show the amounts from the Bulletin all in 1st quarter, line 6001.

**Scenario 3**
If the short-term CR is extended, the lump-sum from the Bulletin will be shown as follows:
Cat B: additive to line 6011
Cat A: in the quarter current at the time of the enactment of the CR extension(s) (e.g., if extended in the second quarter, automatically apportioned amounts are shown in the second quarter, line 6002). See section 120.55

Post short-term CR: adjust line 1134 in the previous approved column to reflect the automatically apportioned amounts from both the Bulletin and A-11 section 120.41 and reflect it in the manner described in scenario 3.

Footnote B1: Amount on line 1134 has been adjusted pursuant to OMB Bulletin XX-XX and A-11 section 120.41.

Exhibit Notes:

1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.

2) Consult your RMO for B1 footnote language if you received an account-specific apportionment during the short-term CR.

3) See section 120.60 for additional detail on what to show in the "Previous Approved" column post CR.

## Apportionment Following a Continuing Resolution (CR) (Annual TAFS, Category A)



**JA 263**

## Public Enterprise (Revolving) or Intragovernmental (Revolving) Fund - Reapportionment

FY 20xx Apportionment
Funds provided by Public Law XXX-XXX

Identify in the header the law(s) providing the budget authority.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-X-4321** | | | | | | | |
| IterNo<br>RptCat<br>AdjAut | 2<br>NO<br>NO | Last Approved Apportionment: 9/10/CY<br>Reporting Categories<br>Adjustment Authority provided | | | | | | | |
| 1000 | DE<br>DA | Unob Bal: Brought forward, Oct 1<br>[line split = DE for estimate of discretionary balances]<br>[line split = DA for actual discretionary balances] | 83,584,884 | | 83,583,738 | | 83,583,738 | | |
| 1023 | | Unob Bal: Applied to repay debt | -20,756,800 | | -20,756,800 | | -20,756,800 | | |
| 1100 | | BA: Disc: Appropriation | 4,100,000 | | 4,100,000 | | 4,100,000 | | |
| 1700 | 1 | BA: Disc: Spending auth: Collected | | | 8,000,000 | | 8,000,000 | | |
| 1700 | 2 | BA: Disc: Spending auth: Collected | | | 8,189,500 | | 8,189,500 | | |
| 1740 | | BA: Disc: Spending auth:Antic colls, reimbs, other | 69,806,300 | | 54,616,800 | | 54,616,800 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **136,734,384** | | **137,733,238** | | **137,733,238** | | |
| 6001 | | 1st quarter | 550,000 | | 550,000 | | 550,000 | | 1,965,425 |
| 6002 | | 2nd quarter | 650,000 | | 650,000 | | 650,000 | | |
| 6003 | | 3rd quarter | 625,000 | | 625,000 | | 625,000 | | |
| 6004 | | 4th quarter | 609,600 | | 609,600 | | 609,600 | | |
| 6011 | | Management services | 23,202,000 | | 23,202,000 | | 23,202,000 | | 6,190,625 |
| 6012 | | Sales program | 11,834,000 | | 11,834,000 | | 11,834,000 | | 2,012,790 |
| 6013 | | Power program | 20,980,600 | | 20,980,600 | | 20,980,600 | | 5,125,630 |
| 6182 | | Unapportioned balance of revolving fund | 78283184 | | 79,282,038 | A1 | 79,282,038 | A1 | |
| **6190** | | **Total budgetary resources available** | **136,734,384** | | **137,733,238** | | **137,733,238** | | |

Change the line split from DE to DA whenever you reapportion after the final determination of unobligated balance.

Note: For Cat A you fill in the memo obligations in the quarter in which the obligations were incurred

Display the text of any footnotes in a separate tab in your Excel file.

Exhibit Notes:

1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

2) If you don't know the amount of the unobligated balance brought forward at the time you must submit an apportionment request for an account, show an estimated amount on line 1000, and submit a reapportionment form if adjustments are required, except as specified in section 120.49.

3) For revolving funds with indefinite  borrowing authority :
   • Line 1023 includes estimates for the year of repayments of principal.
   • Line 1740 includes any credits or payments anticipated to be received.

4) Exhibit 130E illustrates the SF 133 for this account.

## Trust Fund Limitation

| | | FY 20xx Apportionment<br>Funds provided by Public Law N/A | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-20xx-20xx-8004** | | | | | | | |
| IterNo<br>RptCat<br>AdjAut | 2<br>NO<br>NO | Last Approved Apportionment: 9/10/CY<br>Reporting Categories<br>Adjustment Authority provided | | | Include reference to law(s) that establish the limitation authority in a footnote. Display the text of any footnotes in a separate tab in your Excel file. | | | | |
| 1201 | | BA: Mand:  Appropriation (special or trust Fund) | 9,000,000 | | 9,000,000 | B1 | 9,000,000 | B1 | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **9,000,000** | | **9,000,000** | | **9,000,000** | | |
| 6011 | | Management services | 1,500,000 | | 1,500,000 | | 1,500,000 | | 500,000 |
| 6012 | | Sales program | 7,500,000 | | 7,500,000 | | 7,500,000 | | 2,003,456 |
| **6190** | | **Total budgetary resources available** | **9,000,000** | | **9,000,000** | | **9,000,000** | | |

Exhibit Notes:

    1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

**APPORTIONMENT PROCESS**                                              **EXHIBIT 120K**

## Negative Amount Due to Reduced Unobligated Balance

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | FY 20xx Apportionment Funds provided by Public Law N/A | | | | | | | |
| | | **Agency: Department of Government** **Bureau: Office of the Secretary** **Account: R & D (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)** **TAFS: 080-X-4321** | | | | | | | |
| IterNo | 2 | Last Approved Apportionment: 9/10/CY | | | | | | | |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | NO | Adjustment Authority provided | | | | | | | |
| 1000 | DE | Unob Bal: Brought forward, Oct 1 | 1,180,000 | | | | | | |
| | DA | Unob Bal: Brought forward, Oct 1 [line split = DE for estimate of discretionary balances] [line split = DA for actual discretionary balances] | | | 410,000 | | 410,000 | | |
| 1021 | | Unob Bal: Recov of prior year unpd obl | 150,000 | | 150,000 | | 150,000 | | |
| 1700 | | BA: Disc: Spending auth: Collected | | | 86,000 | | 86,000 | | |
| 1701 | | BA: Disc: Spending auth: Chng uncoll pymts Fed src | | | 9,000 | | 9,000 | | |
| 1740 | | BA: Disc: Spending auth:Antic colls, reimbs, other | 400,000 | | 145,000 | B1 | 145,000 | B1 | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **1,730,000** | | **800,000** | | **800,000** | | |
| 6001 | | 1st quarter | 432,500 | | 432,500 | | 432,500 | | 250,000 |
| 6002 | | 2nd quarter | 432,500 | | -32,500 | | -32,500 | | |
| 6003 | | 3rd quarter | 432,500 | | 200,000 | | 200,000 | | |
| 6004 | | 4th quarter | 432,500 | | 200,000 | | 200,000 | | |
| **6190** | | **Total budgetary resources available** | **1,730,000** | | **800,000** | | **800,000** | | |

Assuming that 1st quarter obligations were $250,000 in this example, then the 2nd quarter apportioned amount would be $150,000 (432,500 apportioned less 250,000 obligated plus -32,500 apportioned).

When you need to reduce the cumulative amount apportioned through the current period, revise the amount apportioned for the current period to a negative amount.

Exhibit Notes:
   1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.
   2) Apportionments previously established are not subject to change after the close of the period for which the apportionment is made (section 120.54).

**JA 266**

**Apportionments in Future Fiscal Years for Multi-Year Accounts (Category C)**

**Current year's Apportionment:**

FY 20xx Apportionment
Funds provided by Public Law N/A

*Identify in the header the law(s) providing the budget authority.*

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 80-20xx-20xx+1-4321** | | | | | | | |
| IterNo | 1 | Last Approved Apportionment: N/A, First Request of year | | | | | | | |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | NO | Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation | | | 100,000 | | 100,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **0** | | **100,000** | | **100,000** | | |
| 6001 | | 1st quarter | | | 12,500 | | 12,500 | | |
| 6002 | | 2nd quarter | | | 12,500 | | 12,500 | | |
| 6003 | | 3rd quarter | | | 12,500 | | 12,500 | | |
| 6004 | | 4th quarter | | | 12,500 | | 12,500 | | |
| 6170 | | FY 20xx+1 | | | 50,000 | | 50,000 | | |
| **6190** | | **Total budgetary resources available** | **0** | | **100,000** | | **100,000** | | |

*Includes the full amount appropriated*

*The planned use of appropriations in year 1.*

*The planned use of appropriations in year 2 assuming there's no programmatic need in first year.*

**Next year's apportionment:**

FY 20xx+1 Apportionment
Funds provided by Public Law N/A

| Line No | Line Split | Bureau/ Account Title / Cat B Stub / Line Split | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 80-4321 20xx/20xx+1** | | | | | | | |
| IterNo | 1 | Last Approved Apportionment: N/A, First Request of year | | | | | | | |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | NO | Adjustment Authority provided | | | | | | | |
| 1000 | DA | Unob Bal: Brought forward, Oct 1<br>[line split = DE for estimate of discretionary balances]<br>[line split = DA for actual discretionary balances] | | | 52,000 | | 52,000 | | |
| 1061 | | Anticipated recoveries of prior year unpaid and paid obligations | | | 5,000 | | 5,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **0** | | **57,000** | | **57,000** | | |
| 6001 | | 1st quarter | | | 13,000 | | 13,000 | | |
| 6002 | | 2nd quarter | | | 13,000 | | 13,000 | | |
| 6003 | | 3rd quarter | | | 13,000 | | 13,000 | | |
| 6004 | | 4th quarter | | | 18,000 | | 18,000 | | |
| **6190** | | **Total budgetary resources available** | **0** | | **57,000** | | **57,000** | | |

*Includes the $50,000 planned to be obligated in year 2 plus $2,000 not obligated in year 1.*

*The planned use of appropriations in year 2.*

Exhibit Notes:

1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

2) Apportionments previously established are not subject to change after the close of the period for which the apportionment is made (section 120.54).

**APPORTIONMENT PROCESS**                                              **EXHIBIT 120M**

**Trust Fund with Contract Authority, Appropriation to Liquidate Contract Authority, and Obligation Limitation**

FY 2011 Apportionment
Funds provided by Public Law N/A

Identify in the header the law(s) providing the budget authority.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government** **Bureau: Office of the Secretary** **Account: R & D (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)** **TAFS: 080-X-8004** | | | | | | | |
| IterNo RptCat AdjAut | 2 NO NO | Last Approved Apportionment: 9/10/CY Reporting Categories Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation | | | 90,000 | | 90,000 | | |
| 1138 | | BA: Disc: Approps applied to liq contract auth | | | -90,000 | | -90,000 | | |
| 1600 | | BA: Mand: Contract authority | 100,000 | | 100,000 | | 100,000 | | |
| 1622 | | BA: Mand: Contract auth: Precluded from ob (lim) | | | -10,000 | | -10,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **100,000** | | **90,000** | | **90,000** | | |
| 6001 | | 1st quarter | 25,000 | | 25,000 | | 25,000 | | |
| 6002 | | 2nd quarter | 25,000 | | 20,000 | | 20,000 | | |
| 6003 | | 3rd quarter | 25,000 | | 25,000 | | 25,000 | | |
| 6004 | | 4th quarter | 25,000 | | 20,000 | A1 | 20,000 | | |
| **6190** | | **Total budgetary resources available** | **100,000** | | **90,000** | | **90,000** | | |

The appropriation to liquidate contract authority is included on line 1100 and is subtracted on line 1138 because it cannot be used to make new obligations.

Display the text of any footnotes in a separate tab in your Excel file.

Exhibit Notes:

1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

2) This example assumes that the authorizing legislation provides $100,000 in contract authority that was apportioned in the initial apportionment for the year.  Subsequently, the appropriation act provided $90,000 in an appropriation to liquidate contract authority and limited obligations from the contract authority to $90,000.

3) This example assumes that the contract authority that cannot be obligated is available to be obligated in the succeeding fiscal year. This is an obligation limitation.

**Trust Fund (or Special Fund) with Collections Precluded from Obligation**

FY 20xx Apportionment
Funds provided by Public Law N/A ← Identify in the header the law(s) providing the budget authority.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---------|-----------|------------------|-------------------|---------------|----------------|-----------------|------------|--------------|------------------|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-X-8004** | | | In this example, the amount on line 1201 equals one-quarter of the estimated annual obligations. This amount is derived from prior year collections and is used to fund obligations and outlays until current year collections are received. | | | | |
| IterNo<br>RptCat<br>AdjAut | 1<br>NO<br>NO | Last Approved Apportionment: N/A, First Request of year<br>Reporting Categories<br>Adjustment Authority provided | | | The amount on line 1234 equals the excess of current year receipts over the anticipated obligations ($40 thousand) plus the amount on line 1201 ($30 thousand). | | | | |
| 1201 | | BA: Mand: Appropriation (special or trust fund) | | | 30,000 | | 30,000 | | |
| 1234 | | BA: Mand: Appropriations precluded from obligation | | | -70,000 | | -70,000 | | |
| 1250 | | BA: Mand: Anticipated appropriation | | | 160,000 | | 160,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | | | **120,000** | | **120,000** | | |
| 6011 | | Payment of Benefits | | | 120,000 | A1 | 120,000 | | |
| **6190** | | **Total budgetary resources available** | | | **120,000** | | **120,000** | | |

Display the text of any footnotes in a separate tab in your Excel file.

Exhibit Notes:

1) This exhibit only reflects lines that contain values. For a full listing of all lines, please Appendix F1.

2) This example assumes that the authorizing legislation makes all receipts available until expended. However, the same law permits obligations only for benefits. The estimate of benefits to be paid is less than the current receipts. In this case, include all estimated current receipts on line 1250 (include actual collections on line 1201). Include, as a negative, the amount not needed to cover current obligations on line 1234. Do not include prior year collections that are not needed to incur current obligations on the apportionment or the SF 133.

3) See exhibit 130J for a display of the treatment of this account on the SF 133 during the year and on September 30.

**APPORTIONMENT PROCESS**                                          **EXHIBIT 120O**

---

**Allocation Transfer Apportionment Format, Apportioning Programs**

FY 20xx Apportionment
Funds provided by Public Law N/A

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| IterNo RptCat AdjAut | 1 NO NO | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-X-1309**<br><br>Last Approved Apportionment: N/A, First Request of year<br>Reporting Categories<br>Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation | | | 10,000,000 | | 10,000,000 | | |
| 1151 | C1 | BA: Disc: Anticipated nonexpenditure transfers of Approps to 019-080X1309 | | | -1,000,000 | | -1,000,000 | | |
| 1151 | C2 | BA: Disc: Anticipated nonexpenditure transfers of Approps to 020-080X1309 | | | -2,000,000 | | -2,000,000 | | |
| 1151 | C1 | BA: Disc: Anticipated nonexpenditure transfers of Approps from 080X1309 | | | 1,000,000 | | 1,000,000 | | |
| 1151 | C2 | BA: Disc: Anticipated nonexpenditure transfers of Approps from0 80X1309 | | | 2,000,000 | | 2,000,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | | | **10,000,000** | | **10,000,000** | | |
| 6011 | | Program A | | | 5,500,000 | | 5,500,000 | | |
| 6012 | | Program B | | | 2,000,000 | | 2,000,000 | | |
| 6013 | | Program C | | | 2,500,000 | | 2,500,000 | | |
| **6190** | | **Total budgetary resources available** | | | **10,000,000** | | **10,000,000** | | |

The Budgetary Resources section reflects the accounting steps of both the parent an the children. The net effect is to show the resources available for obligation for the entire TAFS.
Note: In order for the transfers to crosswalk correctly in the SF 133 and President's Budget, please ensure that both the parent and child use the appropriate USSGL for allocation transfers https://tfm.fiscal.treasury.gov/v1/supplements/ussgl.html.

Exhibit Notes:
1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.

---

**OMB Circular No. A–11 (2024)**                          **Page 47 of Section 120**

**EXHIBIT 120P**                                                    **APPORTIONMENT PROCESS**

### Allocation Transfer Apportionment Format, Apportioning Parent and Child

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|

> Identify in the header the law(s) providing the budget authority.

FY 20xx Apportionment
Funds provided by Public Law N/A

> The Budgetary Resources section reflects the accounting steps of both the parent an the children. The net effect is to show the resources available for obligation for the entre TAFS.
>
> Note: In order for the transfers to crosswalk correctly in the SF 133 and President's Budget, please ensure that both the parent and child use the appropriate USSGL for allocation transfers https://tfm.fiscal.treasury.gov/v1/supplements/ussgl.html.

| Line No | Line Split | Line Description | Previous Approved | | Agency Request | | OMB Action | | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| IterNo RptCat AdjAut | 1 NO NO | **Agency: Department of Government** **Bureau: Office of the Secretary** **Account: R & D (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)** **TAFS: 080-X-1309** <br><br> Last Approved Apportionment: N/A, First Request of year <br> Reporting Categories <br> Adjustment Authority provided | | | | | | | |
| 1000 | P | Unob Bal: Brought forward, Oct 1 (parent, 080X1309) | | | 750,000 | | 750,000 | | |
| 1000 | C1 | Unob Bal: Brought forward, Oct 1 (child, 019-080X1309) | | | 500,000 | | 500,000 | | |
| 1100 | | BA: Disc: Appropriation | | | 10,000,000 | | 10,000,000 | | |
| 1151 | C1 | BA: Disc: Anticipated nonexpenditure transfers of Approps to 019-080X1309 | | | -1,000,000 | | -1,000,000 | | |
| 1151 | C2 | BA: Disc: Anticipated nonexpenditure transfers of Approps to 012-080X1309 | | | -2,000,000 | | -2,000,000 | | |
| 1151 | P | BA: Disc: Anticipated nonexpenditure transfers of Approps from 080X1309 | | | 1,000,000 | | 1,000,000 | | |
| 1151 | P | BA: Disc: Anticipated nonexpenditure transfers of Approps from 080X1309 | | | 2,000,000 | | 2,000,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | | | **11,250,000** | | **11,250,000** | | |
| 6111 | | Parent - 1st quarter | | | 3,750,000 | | 3,750,000 | | |
| 6112 | | State FA  (019-080X1309) - 1st quarter | | | 1,000,000 | | 1,000,000 | | |
| 6113 | | Agric. (012-080X1309) - 1st quarter | | | 500,000 | | 500,000 | | |
| 6124 | | Parent - 2nd quarter | | | 4,000,000 | | 4,000,000 | | |
| 6125 | | State FA  (019-080X1309) - 2nd quarter | | | 500,000 | | 500,000 | | |
| 6126 | | Agric. (012-080X1309) - 2nd quarter | | | 1,500,000 | | 1,500,000 | | |
| **6190** | | **Total budgetary resources available** | | | **11,250,000** | | **11,250,000** | | |

> In the application of budgetary resources section of the apportionment only Cat AB is shown.
>
> Same concept applies to using separate Cat B lines to reflect parent and child apportioned amounts separately.

> Please note that in this scenario the parent apportions both the parent and the children (019-080X1309, 012-080X1309) and separately identifies the children in the application of budgetary resources section.
>
> An apportionment for a parent/child does NOT have to separately identify the children in the application of budgetary resources section of the apportionment (e.g., PPA could be apportioned as separate category B lines).

Exhibit Notes:
   1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

**JA 271**

**APPORTIONMENT PROCESS**                                          **EXHIBIT 120Q**

---

**Allocation Transfer Apportionment Format, Child Only**

Identify in the header the law(s) providing the budget authority. →

FY 20xx Apportionment
Funds provided by Public Law N/A

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of State Affairs** **Bureau: Office of the Comptroller** **Account: R & D (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)** **TAFS: 019-080-1309 /X** | | | | | For a few allocation arrangements, the Parent has delegated the apportionment responsibility to its children. Note: In order for the transfers to crosswalk correctly in the SF 133 and President's Budget, please ensure that both the parent and child use the appropriate USSGL for allocation transfers https://tfm.fiscal.treasury.gov/v1/supplements/ussgl.html. | | |
| IterNo RptCat AdjAut | 1 NO NO | Last Approved Apportionment: N/A, First Request of year Reporting Categories Adjustment Authority provided | | | | | | | |
| 1000 | | Unob Bal: Brought forward, Oct 1 | | | 500,000 | | 500,000 | | |
| 1151 | | BA: Disc: Anticipated nonexpenditure transfers of Approps from 080X1309 | | | 12,000,000 | B1 | 12,000,000 | B1 | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | | | **12,500,000** | | **12,500,000** | | |
| 6011 | | Country A activities | | | 3,000,000 | | 3,000,000 | | |
| 6012 | | Country B activities | | | 1,500,000 | | 1,500,000 | | |
| 6014 | | Country C activities | | | 3,500,000 | | 3,500,000 | | |
| 6170 | | Unallocated activities - available CY+1 | | | 4,500,000 | A1 | 4,500,000 | A1 | |
| **6190** | | **Total budgetary resources available** | | | **12,500,000** | | **12,500,000** | | |

B1 footnote: Allocation transfer from parent agency, Department of Government.

Exhibit Notes:
   1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.

---

**EXHIBIT 120R**                                                                                                   **APPORTIONMENT PROCESS**

### Allocation Transfer Apportionment Format, Parent Only

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Identify in the header the law(s) providing the budget authority. → | FY 20xx Apportionment<br>Funds provided by Public Law N/A | | | | | | |
| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
| IterNo<br>RptCat<br>AdjAut | 1<br>NO<br>NO | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-X-1309**<br><br>Last Approved Apportionment: N/A, First Request of year<br>Reporting Categories<br>Adjustment Authority provided | | | | | The Budgetary presentation reflects the accounting steps for the parent only so the net effect is to show the resources available for obligation for the parent.<br><br>Note: In order for the transfers to crosswalk correctly in the SF 133 and President's Budget, please ensure that both the parent and child use the appropriate USSGL for allocation transfers https://tfm.fiscal.treasury.gov/v1/supplements/ussg1.html. | | |
| 1000 | | Unob Bal: Brought forward, Oct 1 | | | 750,000 | | 750,000 | | |
| 1100 | | BA: Disc: Appropriation | | | 10,000,000 | | 10,000,000 | | |
| 1151 | | BA: Disc: Anticipated nonexpenditure transfers of Approps to other accounts | | | -3,000,000 | | -3,000,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | | | **7,750,000** | | **7,750,000** | | |
| 6001 | | 1st quarter | | | 3,750,000 | | 3,750,000 | | |
| 6002 | | 2nd quarter | | | 4,000,000 | | 4,000,000 | | |
| **6190** | | **Total budgetary resources available** | | | **7,750,000** | | **7,750,000** | | |

Exhibit Notes:
   1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

**JA 273**

**Sequester Apportionment**

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government** <br> **Bureau: Office of the Secretary** <br> **Account: Research and Development (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)** <br> **Treas Account: Research and Development** <br> **TAFS: 099-X-0001** | | | | | | | |
| IterNo | 2 | Last Approved Apportionment: 20xx-09-10 | | | | | | | Amounts sequestered in the previous year that have been determined to be available in the current year ("pop-up") |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | NO | Adjustment Authority provided | | | | | | | |
| | | **Budgetary resources** | | | | | | | |
| 1000 | DE | Discretionary Estimated - Unob Bal: Brought forward, Oct 1 | 3,000,000 | | | | | | |
| 1000 | DA | Discretionary Actual - Unob Bal: Brought forward, Oct 1 | | | 3,100,000 | | 3,100,000 | | |
| 1000 | ME | Mandatory Estimated - Unob Bal: Brought forward, Oct 1 | 2,400,000 | | | | | | |
| 1000 | MA | Mandatory Actual - Unob Bal: Brought forward, Oct 1 | | | 2,500,000 | | 2,500,000 | | |
| 1700 | | BA: Disc: Spending auth: Collected | | | 700,000 | | 700,000 | | |
| 1740 | | BA: Disc: Spending auth:Antic colls, reimbs, other | 2,700,000 | | 2,000,000 | | 2,000,000 | | |
| 1800 | | BA: Mand: Spending auth: Collected | | | 500,000 | | 500,000 | | |
| 1802 | SEQ | BA: Mand: Spending auth: Previously unavailable | 140,000 | B1 | 140,000 | B1 | 140,000 | B1 | |
| 1823 | SEQ | BA: Mand: Spending auth: New\Unob bal temp reduced | -210,000 | | -210,000 | | -210,000 | | |
| 1840 | | BA: Mand: Spending auth:Antic colls, reimbs, other | 3,000,000 | | 2,500,000 | | 2,500,000 | | Amounts sequestered in the current year |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **11,030,000** | | **11,230,000** | | **11,230,000** | | |
| | | **Application of Budgetary Resources** | | | | | | | |
| 6011 | | Development | 6,066,500 | | 6,176,500 | | 6,176,500 | | |
| 6011 | | Research | 4,963,500 | | 5,053,500 | | 5,053,500 | | |
| **6190** | | **Total budgetary resources available** | **11,030,000** | | **11,230,000** | | **11,230,000** | | |

Exhibit Notes:

1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

**JA 274**

**Appropriations with Different Periods of Availability Executed by Non-Expenditure Transfer**

**Initial Apportionment for Total Appropriation:**

FY 20xx Apportionment
Funds provided by Public Law N/A

> Identify in the header the law(s) providing the budget authority.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | This scenario reflects how to apportion accounts where the appropriation is available for one year (or for a fixed amount of time) and the law permits "not to exceed", "up to", or "no more than" a specific amount to be available for a longer period of time or until expended. Example: "For necessary expenses of XXX, $100 million, _of which not to exceed_ $10 million may be available until expended for the acquisition of XXX...." | | | | | | | |
| | | **Agency: Department of Government** **Bureau: Office of the Secretary** **Account: R & D (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)** **TAFS: 080-20xx-20xx-4321** | | | | | | | |
| IterNo RptCat AdjAut | 1 NO NO | Last Approved Apportionment: N/A, First Request of year Reporting Categories Adjustment Authority provided | | | | | | | |
| 1100 1151 | | BA: Disc: Appropriation BA: Disc: Anticipated non-expenditure transfers of appropriations | | | 100,000,000 -10,000,000 | | 100,000,000 -10,000,000 | | |
| 1920 | | **Total budgetary resources avail (disc. and mand.)** | 0 | | 90,000,000 | | 90,000,000 | | |
| 6001 | | 1st quarter | | | 25,000,000 | | 25,000,000 | | |
| 6002 | | 2nd quarter | | | 15,000,000 | | 15,000,000 | | |
| 6003 | | 3rd quarter | | | 25,000,000 | | 25,000,000 | | |
| 6004 | | 4th quarter | | | 25,000,000 | | 25,000,000 | | |
| 6190 | | **Total budgetary resources available** | 0 | | 90,000,000 | | 90,000,000 | | |

> Line 1100 should match the total appropriation, including the amount provided for the different TAFS.

> A non-expenditure transfer document must be processed to move funds to the different TAFS specified in the language.

**Initial Apportionment for Different Period of Availability:**

FY 20xx Apportionment
Funds provided by Public Law N/A

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government** **Bureau: Office of the Secretary** **Account: R & D (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)** **TAFS: 080-X-4321** | | | | | | | |
| IterNo RptCat AdjAut | 1 NO NO | Last Approved Apportionment: N/A, First Request of year Reporting Categories Adjustment Authority provided | | | | | | | |
| 1151 | | BA: Disc: Anticipated non-expenditure transfers of appropriations | | | 10,000,000 | | 10,000,000 | | |
| 1920 | | **Total budgetary resources avail (disc. and mand.)** | 0 | | 10,000,000 | | 10,000,000 | | |
| 6002 | | 2nd quarter | | | 5,000,000 | | 5,000,000 | | |
| 6003 | | 3rd quarter | | | 5,000,000 | | 5,000,000 | | |
| 6190 | | **Total budgetary resources available** | 0 | | 10,000,000 | | 10,000,000 | | |

> If $10m is not needed in the extended/different TAFS, submit a reapportionment request to transfer the funds back to the original TAFS using lines 1151/1120. A reapportionment will also be needed for the original TAFS.

Exhibit Notes:
1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.
2) See Section 3 of Appendix F for additional guidance.

**APPORTIONMENT PROCESS**                                                                 **EXHIBIT 120U**

### Rescissions and Reappropriations of Unobligated Balances as of September 30th

**Apportionment of Rescinded Amounts as of September 30th**

FY 20xx Apportionment
Funds provided by Public Law N/A ← Identify in the header the law(s) providing the budget authority.

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-20xx-20xx-4321** | | | | | | | |
| IterNo<br>RptCat<br>AdjAut | 1<br>NO<br>NO | Last Approved Apportionment: N/A, First Request of year<br>Reporting Categories<br>Adjustment Authority provided | | | | | | | |
| 1100<br>1130 | | BA: Disc: Appropriation [Amount of unobligated balances as of September 30th]<br>BA: Disc: Appropriations permanently reduced | | | 900,000<br>-100,000 | | 900,000<br>-100,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **0** | | **800,000** | | **800,000** | | |
| 6001 | | 1st quarter | | | 225,000 | | 225,000 | | |
| 6002 | | 2nd quarter | | | 225,000 | | 225,000 | | |
| 6003 | | 3rd quarter | | | 225,000 | | 225,000 | | |
| 6004 | | 4th quarter | | | 125,000 | | 125,000 | | |
| **6190** | | **Total budgetary resources available** | **0** | | **800,000** | | **800,000** | | |

This scenario reflects how to apportion TAFS with language that rescinds unobligated balances as of September 30th and reappropriates them to be available for an additional fiscal year. This language may also have a provision that if enacted after September 30th the language shall apply as if it were in effect on September 30th.

Example:
"The remaining unobligated balances as of September 30 XXXX, from amounts made available for the Office of the Secretary, R&D account, are hereby permanently rescinded and an amount of additional new budget authority equivalent to the amount rescinded is hereby appropriated on September 30 XXXX to remain available until September 30 XXXX+1,......"

**Apportionment of the Rescinded Amount that is Reappropriated as of September 30th**

FY 20xx+1 Apportionment
Funds provided by Public Law N/A

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | **Agency: Department of Government**<br>**Bureau: Office of the Secretary**<br>**Account: R & D (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)**<br>**TAFS: 080-20xx-20xx-4321** | | | | | | | |
| IterNo<br>RptCat<br>AdjAut | 1<br>NO<br>NO | Last Approved Apportionment: N/A, First Request of year<br>Reporting Categories<br>Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation [Amount of the rescinded unobligated balances that is reappropriated] | | | 100,000 | | 100,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **0** | | **100,000** | | **100,000** | | |
| 6001 | | 1st quarter | | | 100,000 | | 100,000 | | |
| **6190** | | **Total budgetary resources available** | **0** | | **100,000** | | **100,000** | | |

Exhibit Notes:
   1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.

**OMB Circular No. A–11 (2024)**                                                         **Page 53 of Section 120**

**EXHIBIT 120V**                                                                **APPORTIONMENT PROCESS**

---

Initial Apportionment of an Appropriation Reduced by Offsetting Collections and Receipts

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| | | *Identify in the header the law(s) providing the budget authority.* → | FY 20xx Apportionment Funds provided by Public Law N/A | | | | | | |
| | | **Agency: Department of State Affairs** **Bureau: Office of the Comptroller** **Account: R & D (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)** **TAFS: 019-080-X-1309** | | | Sample appropriations language: For expenses necessary for the ... , $65,000,000, to remain available until expended: Provided, That the sum herein appropriated from the general fund shall be reduced as such offsetting collections are received during fiscal year 20XX, so as to result in a final fiscal year 20XX appropriation from the general fund estimated at $4,000,000. | | | | |
| IterNo RptCat AdjAut | 1 NO NO | Last Approved Apportionment: N/A, First Request of year Reporting Categories Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation | 65,000,000 | | 65,000,000 | | 65,000,000 0 | | |
| 1134 | | BA: Disc: Appropriations precluded from obligation | -43,452,500 | | | | 0 0 | | |
| 1153 | | BA: Disc: Antic redc to apprp by offst coll/recpt | | | -61,000,000 | | -61,000,000 0 | | |
| 1740 | | BA: Disc: Spending auth: Antic colls, reimbs, other | | | 61,000,000 | | 61,000,000 0 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **21,547,500** | | **65,000,000** | | **65,000,000** | | |
| 6001 | 1st quarter | For the previously approved column, assume the account received an automatic apportionment during a CR that was in effect through December 30 and the account also received an automatic 30-day apportionment pursuant to section 120.41 of A-11 on December 30, and both current and prior year enacted language is the same. The pro-rata share of the up-front appropriation is $16,204,500 (91 days / 365 days = 24.93%, 24.93% of $65,000,000 = $16,204,500) and the automatic 30-day apportionment is $5,343,000 (30 days / 365 days = 8.22%, 8.22% of $65,000,000 = $5,343,000). | 21,547,500 | | 21,547,500 | | 21,547,500 | | On the reapportionment after enactment of a full year appropriation, the amount appropriated ($65m) is reduced on line 1153 by the amount of estimated offsetting collections on line 1740 so as to result in an estimated general fund appropriation of $4m. Reapportionments should reflect amounts on lines 1100, 1137, 1153, 1700, and 1740 of the latest SF 133. |
| 6002 | 2nd quarter | | | | 10,952,500 | | 10,952,500 | | |
| 6003 | 3rd quarter | | | | 16,250,000 | | 16,250,000 | | |
| 6004 | 4th quarter | | | | 16,250,000 | | 16,250,000 | | |
| **6190** | | **Total budgetary resources available** | **21,547,500** | | **65,000,000** | | **65,000,000** | | |

Exhibit Notes:
1) This exhibit only reflects lines that contain values. For a full listing of all lines, please see Appendix F1.
2) For additional guidance on how to capture the latest budget execution data, see A-11 exhibit 130J.

**APPORTIONMENT PROCESS**  **EXHIBIT 120W**

**Apportionment of an Appropriation Reduced by Offsetting Collections and Receipts during CR period to invoke term and condition of the CR (section 123.10)**

FY 20xx Apportionment
Funds provided by Public Law N/A

Identify in the header the law(s) providing the budget authority.

Sample appropriations language:
For expenses necessary expenses to carry out..... , $8,000,000, to remain available until expended: Provided, That the sum herein appropriated from the general fund shall be reduced as such offsetting collections under such section XXX are received during fiscal year 20XX, ....so as to result in a final fiscal year 20XX appropriation from the general fund estimated at not more than $0: Provided further, That to the extent such offsetting collectionss received in fiscal year XXXX exceed $8,000,000, those execess amounts shall remain available until expended.....

| Line No | Line Split | Line Description | Previous Approved | Prev Footnote | Agency Request | Agency Footnote | OMB Action | OMB Footnote | Memo Obligations |
|---|---|---|---|---|---|---|---|---|---|
| IterNo | 1 | Last Approved Apportionment: N/A, First Request of year | | | | | | | |
| RptCat | NO | Reporting Categories | | | | | | | |
| AdjAut | NO | Adjustment Authority provided | | | | | | | |
| 1100 | | BA: Disc: Appropriation | 8,000,000 | | 8,000,000 | | 8,000,000 | | |
| 1134 | | BA: Disc: Appropriations precluded from obligation | -5,282,400 | | -5,282,400 | | -5,282,400 | | |
| 1153 | | BA: Disc: Antic redc to apprp by offst coll/recpt | | | 0 | | 0 | | |
| 1740 | | BA: Disc: Spending auth: Antic colls, reimbs, other | | | 1,000,000 | | 1,000,000 | | |
| **1920** | | **Total budgetary resources avail (disc. and mand.)** | **2,717,600** | | **3,717,600** | | **3,717,600** | | |
| 6001 | 1st quarter | For the previously approved column, assume the account received an automatic apportionment during a CR lasting through February 1st (124 days / 365 days = 33.97%). Pursuant to the guidance in A-11 section 123.10, agency came in for an account-specific apportionment in January for an expected $1 million to be collected above the $8 million in statutue. | 2,717,600 | | 2,717,600 | | 2,717,600 | | |
| 6002 | 2nd quarter | | | | 1,000,000 | | 1,000,000 | | |
| 6003 | 3rd quarter | | | | | | 0 | | |
| 6004 | 4th quarter | | | | | | 0 | | |
| **6190** | | **Total budgetary resources available** | **2,717,600** | | **3,717,600** | | **3,717,600** | | |

Exhibit Notes:
  1) This exhibit only reflects lines that contain values.  For a full listing of all lines, please see Appendix F1.
  2) For additional guidance on how to capture the latest budget execution data, see A-11 exhibit 130J.
  3) The previous approved column reflects an automatic apportionment of 25% of the pro-rata share plus an estimated $2 million in excess fees collected during the CR period.
  4) The full-year bill was enacted after the first quarter and language did not change.

## SECTION 123—APPORTIONMENTS UNDER CONTINUING RESOLUTIONS

**Table of Contents**

123.1      What is a continuing resolution (CR) and how does OMB collect information on proposed CR anomalies from agencies?
123.2      How do I determine the rate for operations under a short-term CR?
123.3      How do I determine the automatically apportioned amount during a short-term CR by the Bulletin?
123.4      How does the Bulletin automatically apportion funding during a short-term CR?
123.5      How can anomalies impact funding for a TAFS during a short-term CR?
123.6      Am I required to submit an account-specific apportionment request while I am funded by a short-term CR?
123.7      How do recurring rescissions impact the rate for operations of a TAFS under a short-term CR?
123.8      Do recurring changes in mandatory programs impact the rate for operations under a short-term CR?
123.9      How is transfer authority applied during a short-term CR?
123.10     How is spending authority from offsetting collections or offsetting receipts that is provided in annual appropriation Acts apportioned during a short-term CR?
123.11     How are appropriated entitlement or other mandatory payments and activities under the Food and Nutrition Act of 2008 apportioned during a short-term CR?
123.12     Are earmarks or programs, projects, and activities (PPAs) in a TAFS apportioned on a pro-rata basis by the Bulletin during a short-term CR?
123.13     What is apportioned during a short-term CR to a TAFS that receives no funding in the House or Senate bill?
123.14     Do the amounts provided as a rate for operations remain available after a short-term CR expires?
123.15     Do short-term CRs limit the purposes for which funds may be obligated?
123.16     When may I request that OMB issue an exception apportionment during a short-term CR?
123.17     If I am funded by a short-term CR and have received an account-specific apportionment, will I have to submit account-specific reapportionment requests for each extension of the CR?
123.18     Are my credit programs funded under a short-term CR?
123.19     Do I have to request a warrant from Treasury for funds provided by a short-term CR?
123.20     Do I need to request a reapportionment after my full-year appropriation is enacted?
123.21     Will my full-year enacted appropriations cover obligations made during the CR?
123.22     What if the full-year enacted appropriations subsequently provided less budget authority than obligations incurred under the short-term CR?
123.23     What happens to my apportioned, unobligated short-term CR funding if the short-term CR is followed by a lapse in appropriations?

**Summary of Changes**

Includes a timeline for collecting information from agencies on anomalies needed in short-term CRs (section 123.1).

---

**Summary of Changes—Continued**

Updates the definition for "rate for operations" to further clarify the difference between the rate of operations and the pro-rata share that is automatically apportioned by a OMB CR Bulletin (section 123.2).

Allows agencies to reflect the pro-rata share of CR funds as either Category A or a single Category B without OMB concurrence (sections 123.4).

Updates guidance on mandated transfer authority that factors into the rate for operations calculation (section 123.9).

Updates guidance to add an example of a "floor" for permissive transfers (section 123.9).

Provides a link to a section 120 exhibit of how to show an upfront general fund appropriation reduced by collections during a short-term CR on an account-specific apportionment when such apportionment is required to invoke a term and condition of the CR (section 123.10).

Clarifies that the standard CR language regarding appropriated mandatory payment means that such programs can continue normal obligational activity during the 30-day extension period (section 123.11).

---

**123.1   What is a continuing resolution (CR) and how does OMB collect information on proposed CR anomalies from agencies?**

Continuing resolutions (CRs) are joint resolutions that provide continuing appropriations for part of a fiscal year or a full fiscal year.  A CR that covers only a part of a fiscal year is referred to as a "short-term" CR, and a CR that covers a full fiscal year is referred to as a "full-year" CR.  A CR is often enacted when the Congress has not yet passed new appropriations bills by October 1 or when the President has vetoed congressionally passed appropriations bills.  Because of the nature of a short-term CR, each agency should operate at a minimal level until after its regular fiscal year appropriations are enacted.

Short-term CRs sometimes include separate legislative provisions providing funding or authorities for a specific TAFS or program (known as "anomalies"). OMB solicits information from agencies on anomalies needed for potential short-term CRs under the following timeframes:

- No later than three months prior to the start of the upcoming fiscal year, OMB will issue a budget data request (BDR) for anomalies that would be necessary for a CR lasting through at least December 30. Your OMB representative will communicate a specific due date, which may be as early as one week after the BDR is released.

- For agencies that are operating under a short-term CR that expires on January 31 or earlier:  no later than November 1 or one month prior to the expiration of the current CR, whichever is later, OMB will solicit information on anomalies that would be necessary during a short-term CR lasting through at least January 31 or one month after the expiration of the current CR, whichever is later. Your OMB representative will communicate a specific due date, which may be as early as 24 hours after the solicitation.

- For agencies that are operating under a short-term CR that expires after January 31: OMB will determine on an ad hoc basis whether to solicit information on anomalies needed in further short-term CR extensions.

CRs provide funds for projects and activities.  The phrase projects and activities may have two meanings:

- In section 101 of a CR, the phrase usually refers to the total appropriation for the account (i.e., the amount calculated by the formula) rather than to specific activities (when determining which Government programs are covered by the CR and the rate for operations limit).

- The phrase *also* refers to the specific activity (e.g., programs, projects, or activities) in order to determine whether the activity is a prohibited new start or not.  In other words, a new start is not when an activity was authorized to be carried out but was not executed in the prior fiscal year.

Usually, CRs do not provide specific dollar amounts in the legislative language applicable to each Treasury Appropriation Fund Symbol (TAFS).  Rather, CRs provide formulas for calculating the amounts appropriated for continuing projects and activities during the period of the CR.  For more information on calculating these amounts, see section 123.2.

For short-term CRs, an annual OMB CR Bulletin ("Bulletin") automatically apportions a pro-rata share of funding available for most TAFSs.  For more information on how the Bulletin apportions funding and how much is apportioned, see sections 123.3 and 123.4.  There are some instances where TAFSs will not receive an automatic apportionment pursuant to the Bulletin and an account-specific apportionment is required during the short-term CR.  Some of those instances are mentioned throughout this section and will be specifically addressed in the Bulletin.

The Bulletin is generally released after the enactment of an initial short-term CR and will contain any specific information regarding the execution of that year's CR.  This section of the Circular provides general conceptual information on the apportionment and execution of short-term CRs.  The Bulletin should be regarded as the official apportionment of CR funds and will refer to this section and section 120 of this Circular as necessary.

Amounts appropriated in a full-year CR are apportioned using the same processes that are used for full-year appropriations Acts.  OMB does not typically issue a Bulletin for full-year CRs.  Occasionally, short-term CRs will include provisions that provide a full-year appropriation for a specific TAFS.  Such full-year appropriations are not automatically apportioned by the Bulletin and are not subject to the calculations discussed below.

**123.2    How do I determine the rate for operations under a short-term CR?**

Short-term CRs routinely provide a formula for determining the rate for operations either in section 101 or in subsequent sections of the bill that may provide a particular rate for a program or account (anomaly). For over a decade, section 101 of short-term CRs has provided the same process for calculating the rate for operations formula and lists the previous fiscal year's appropriations Acts that are continued under the CR. In addition, section 101 sometimes includes an across-the-board (ATB) increase or reduction to the rate for operations. This section of the Circular provides guidance that assumes that future short-term CRs will continue with this structure; however, the annual Bulletin will specify the official formula based on each CR's legislative text.

"Rate for operations" is defined as the annualized level of resources provided by the appropriations Acts referenced in section 101 of a short-term CR.  It is often used interchangeably with "annualized level".  For consistency purposes, this section of the Circular uses "rate for operations."  The rate for operations is only

available for obligation during the period specified in a short-term CR. See section 123.3 to determine the amount that is automatically apportioned during a short-term CR.

The rate for operations must be calculated at the TAFS level.  The rate for operations is provided to the TAFS with the period of availability in the appropriations Acts referenced in section 101, but updated to start in the fiscal year for which the CR applies.  For example, annual funds appropriated in the FY 2020 appropriations Act for TAFS 012-3456/2020 result in a rate for operations in an annual TAFS for FY 2021 in a FY 2021 CR (i.e., 012-3456/2021).  Follow the steps below to calculate the rate for operations for each applicable TAFS under section 101 of the CR:

a)  Take the full-year amount enacted in the appropriations Acts specified in section 101, including obligation limitations.

b)  Subtract any recurring account-specific rescissions, followed by agency-specific and then bill-wide reductions, if any, enacted in the appropriations Acts specified in section 101.

c)  Add or subtract non-expenditure transfers mandated by the appropriations Acts referenced in section 101.  See section 123.9 for the definition of mandated transfers.

d)  Add or subtract any ATB increase or reduction specified in section 101 (if any).

For example, TAFS 012-3456/2020 was appropriated $100 million in the FY 2020 appropriations Act referenced in section 101 of the 2021 CR.  The appropriations Act referenced in section 101 also included a recurring rescission of $50 million and directed that $30 million shall be transferred to TAFS 012-1234/2020.  Assuming section 101 does not include an ATB increase or reduction, here's how the 2021 CR rate for operations for TAFS 012-3456/2021 would be calculated following the steps above.

a)  $100 million (FY 2020 amount provided in Act referenced in section 101 of the CR)

b)  Subtract $50 million (recurring rescission) = $50 million

c)  Subtract $30 million (mandated transfer to other TAFS) = $20 million

Using this example, the rate for operations would be $20 million, which would be reflected on line 1100 of the apportionment and/or any Treasury reporting (SF 133, etc.) for TAFS 012-3456/2021.  For Treasury reporting and apportionment purposes, the rate for operations as provided by section 101 is reflected as a single number on line 1100, and any rescissions, mandated transfers, or ATB increases or decreases that are factored into the rate for operations as specified above are not identified on lines separate from 1100.

See section 123.5 for the rate for operations for enacted CR anomalies.

See section 123.7 for more information on recurring account-specific rescissions.

**123.3   How do I determine the automatically apportioned amount during a short-term CR by the Bulletin?**

For a short-term CR, OMB usually issues a Bulletin to automatically apportion funds. This automatic apportionment applies to most TAFSs, but not all.  For particular TAFSs, OMB may require a separate account-specific apportionment.

Note that an agency may not obligate funds under a short-term CR that would impinge on final funding prerogatives of Congress.  CRs usually include provisions directing agencies to execute programs using the

most limited funding actions permitted in order to provide for continuing projects and activities. Agencies are also directed by the CR to not execute programs that would otherwise have high initial rates of operation or complete distribution of appropriations at the beginning of the year because of distribution of funds to States, foreign countries, grantees, or others.

The last Bulletin that provided detailed guidance on how to execute the FY 2023 short-term CR can be found here:

OMB Bulletin No. 23-02

Typically, the Bulletin will not automatically apportion the full rate for operations for a TAFS. For instance, the Bulletin usually apportions the "pro-rata share" of the rate for operations through the period of the CR or any extension thereof. The pro-rata share is usually calculated by multiplying the rate for operations by the percentage of the year covered by the CR.

Using the example in section 123.2, the pro-rata share automatically apportioned to TAFS 012-3456/2021 for a CR ending December 15 would be calculated as follows:

$20 million (rate for operations) x 20.82 percent (76 days/365 days (use 366 for a leap year))
= $4.164 million

If a full-year appropriations Act (including a full-year CR) is enacted before the CR period is over (e.g., December 10), the amounts automatically apportioned by the Bulletin are unaffected (see section 120.41).

The pro-rata percentage used for the automatic apportionment is calculated and rounded to the hundredths for each short-term CR extension when enacted. For instance, a CR is enacted from October 1st to November 3rd (34/365=9.32%). The CR then gets extended until November 27th (24/365=6.58%). The CR is then further extended until December 15th (18 days/365=4.93%). The total amount automatically apportioned (even if, like stated above, the President enacts the full-year bill on December 10th) cumulatively is 20.83% of the agency's rate for operations. This method results in a different percentage if the agency tried to calculate from October 1st to December 15th (76/365=20.82%).

It may be determined that a TAFS should be apportioned less than the amount automatically apportioned by the Bulletin to ensure that an agency does not impinge upon the final funding prerogatives of Congress. In these cases, an account-specific apportionment (section 120.2) approved by OMB is required.

**123.4 How does the Bulletin automatically apportion funding during a short-term CR?**

The Bulletin automatically apportions the pro-rata share as a lump-sum amount using either Category A or Category B – depending upon how the agency chooses to record the funding. In other words, if the funds are Category A, the pro-rata share automatically apportioned is reflected in the quarter in which the CR is enacted and/or extended and is not spread over quarters. Additionally, if the funds are Category B, the pro-rata share is automatically apportioned as a single Category B line. If an agency would prefer to spread the automatically apportioned amount among more than one Category B line, the agency must request an account-specific apportionment from its OMB representative as soon as possible.

**123.5 How can anomalies impact funding for a TAFS during a short-term CR?**

Because a CR usually provides the funding levels and authorities enacted in the previous fiscal year, there may be cases where a program requires additional funding or different authorities to maintain operations during the CR. In these cases, a short-term CR may include a separate legislative provision (an "anomaly") providing funding or authorities for a specific TAFS or program. CR anomalies can impact a program in a number of different ways including, but not limited to, changing the rate for operations to provide additional

funding, allowing more than the pro-rata share to be apportioned during the period of the CR ("spend-faster" anomalies), adding an authority not carried forward in section 101 of the CR, or removing or modifying an authority carried forward in section 101 of the CR. This section will focus on anomalies that change the rate for operations and spend-faster anomalies.

a) *Anomalies that change the rate for operations.* This type of an anomaly may be required if the rate for operations provided by section 101 for a TAFS is not sustainable for the period of the CR. In order to increase the rate for operations of the TAFS above what is provided by section 101, additional authority is required. Using the example in section 123.2, an anomaly that would provide a higher than $20 million rate for operations is below.

> Sec. XXX. Notwithstanding section 101, amounts are provided for "Account 1234" at a rate for operations of $150,000,000.

The example language replaces the $100 million that is provided by section 101 of the CR with $150 million. Based on the anomaly language, the new rate for operations would be calculated using the steps below. Note that all provisos and other authorities that applied to that funding under section 101, including recurring rescissions and transfers, continue to apply to the rate for operations provided by the anomaly unless specific legislative language is included in the anomaly to alter that authority.

   a) Take the full-year amount specified in the anomaly.

   b) Subtract any recurring account-specific rescissions followed by agency-specific rescission and then bill-wide reductions, if any, as included in appropriations Acts referenced in section 101.

   c) Add or subtract transfers mandated by the appropriations Acts referenced in section 101.

As an example, here's how the rate for operations for TAFS 12-3456/XXXX with the enacted anomaly would be calculated following the steps above:

   a) $150 million (enacted amount in anomaly).

   b) Subtract $50 million (recurring rescission) = $100 million.

   c) Subtract $30 million (mandated transfer to other TAFS) = $70 million.

The rate for operations would be $70 million under the CR, which would be reflected on line 1100 of the apportionment and/or any Treasury reporting (e.g., SF 133). The pro-rata share automatically apportioned by the Bulletin would be calculated using the $70 million.

b) *Spend-faster anomalies.* Sometimes it may not be necessary for a TAFS to receive a higher rate for operations, but the TAFS may need more funding apportioned than the pro-rata share automatically apportioned by the Bulletin. This could be for a number of reasons, including, but not limited to, higher obligations anticipated during the expected period of the CR. Below is example anomaly language that would allow TAFS 012-3456/XXXX to be apportioned more than the pro-rata share automatically apportioned.

> Sec. XXX. Amounts made available by section 101 for "Account 1234" may be apportioned up to the rate for operations necessary to maintain activities x, y, and z.

With this language enacted, TAFS 012-3456/XXXX would still receive a rate for operations of $20 million (see section 123.2), but the TAFS may receive an account-specific apportionment during the

period of the CR for an amount greater than the automatically apportioned amount ($4.164 million) as long as the rate for operations is not exceeded.

For example, instead of basing the pro-rata share calculation on 76 days for a CR starting October 1 and ending December 15, this type of anomaly could allow the TAFS to be apportioned a pro-rata share based on 90 days for a CR of the same duration. Accordingly, the amount apportioned for TAFS 012-3456/2021 pursuant to the spend-faster anomaly for a CR starting October 1 and ending December 15 could be calculated as follows:

$20 million (rate for operations) x **24.66** percent (**90** days/365 days (use 366 for a leap year)) = **$4.932** million

An account-specific apportionment must be approved by OMB before the agency may obligate at a rate higher than the pro-rata share automatically apportioned by the Bulletin pursuant to the authority provided by a spend-faster anomaly. Using the example above, the Bulletin would apportion TAFS 12-3456/XXXX $4.164 million unless and until an account-specific apportionment is approved by OMB.

Absent an enacted spend-faster anomaly, if a TAFS requires an amount that exceeds the amount automatically apportioned by the Bulletin, an exception apportionment must be requested by the agency and approved by OMB. For more information on exception apportionments, see section 123.16.

### 123.6    Am I required to submit an account-specific apportionment request while I am funded by a short-term CR?

Generally, no. OMB will typically issue a Bulletin to automatically apportion amounts made available by a CR and may provide additional guidance on the types of account-specific apportionments that may be required and other specific CR execution issues.

### 123.7    How do recurring rescissions impact the rate for operations of a TAFS under a short-term CR?

Rescissions or cancellations of discretionary prior-year balances that were included in the prior-year appropriation Acts specified in section 101 of a short-term CR continue during the CR period and are factored into the rate for operations calculation as shown in section 123.2. OMB typically includes an attachment to the Bulletin that lists rescissions or cancellations enacted in the previous fiscal year that impact the current CR. The attachment also usually includes the level at which such rescissions recur to provide the amount to use when calculating the rate for operations. For example, Attachment B of the OMB CR Bulletin lists rescissions by TAFS, categorizes each recurring rescission by how it should be applied during the CR, and also indicates which rescissions do not recur and should not be factored into the rate for operations.

As indicated in the Attachment B of the OMB CR Bulletin, some recurring rescissions will be applied to new budget authority provided by section 101 of the CR based on the way the appropriations language directing the rescission is written. If the rescission language is broad enough to be applied to the budget authority provided by section 101 of the CR, it will be factored into the rate for operations. If the rescission language is more restrictive and can only apply to prior-year discretionary balances in a TAFS that does not receive a rate for operations under section 101 of the CR, an account-specific apportionment by OMB is required to preclude these balances from obligation during the period of the CR.

The only exception to this account-specific apportionment rule for recurring rescissions of prior-year balances is if language is enacted in the CR to allow Treasury Account Symbols (TASs) that have this type of rescission to effectuate it as a reduction in the rate for operations of the current applicable TAFS.

"Current applicable TAFS" refers to any of the TAFSs within a TAS for which a rate for operations is provided by section 101 of the CR. This authority was provided in section 115 of the first CR. With this authority, recurring rescissions of prior-year balances can be factored into the rate for operations calculation of the current applicable TAFS and will be automatically apportioned by the Bulletin, unless otherwise directed. Additional details and specific instructions on recurring rescissions will be included in the Bulletin.

**123.8 Do recurring changes in mandatory programs impact the rate for operations under a short-term CR?**

Changes in mandatory programs (CHIMPs) that continue as terms and conditions under section 101 of the CR and result in the reduction of mandatory funding (rescissions/cancellations, mandated transfers to other TAFSs, obligation delays, etc.) are not factored into the rate for operations. An account-specific apportionment is required during the period of the CR to preclude applicable resources from obligation. Reductions of this kind are typically included in an attachment to the Bulletin. For example, the reductions were included in Attachment C of the OMB CR Bulletin.

CHIMPs that continue as terms and conditions under section 101 of the CR and do not result in a reduction of mandatory funding (e.g., appropriations for or mandated transfers to mandatory programs) are factored into the rate for operations calculation for those TAFS and are automatically apportioned by the Bulletin.

For more information on CHIMPs, see section 20.3.

**123.9    How is transfer authority applied during a short-term CR?**

Non-expenditure mandated transfers in the appropriations Acts referenced in section 101 are factored into the rate for operations of both the giving and receiving TAFSs. Therefore, agencies do not have to execute the non-expenditure transfer, report transfers in GTAS, or reflect these transfers separately in account-specific apportionments, except as a preclusion for items discussed below.

For the purposes of calculating a rate for operations under a short-term CR, a mandated transfer is defined as one in which the legislative transfer authority provided in the prior fiscal year appropriations Acts referenced in section 101 provides a specific dollar amount to be transferred and does not provide any flexibility for the agency to change that dollar amount or to choose the giving and receiving TAFSs involved in the transfer. Only mandated transfers that were executed as non-expenditure transfers in the previous fiscal year factor into the rate for operations calculation.

If the giving TAFS does not have a rate for operations under section 101, an account-specific apportionment is required during the period of the CR to preclude the applicable resources from obligation. Section 123.8 discussed the account-specific apportionment required if the giving TAFS is mandatory. If the giving TAFS is discretionary and does not have a rate for operations, a similar account-specific apportionment is required.

Not all mandated transfers in the previous fiscal year's appropriations Act use the language "shall transfer". For instance, the appropriations language could instead call for funds to be derived from a specific source other than the general fund of the Treasury. If such authority was executed as a non-expenditure transfer the previous fiscal year, then it is considered a mandated transfer for purposes of calculating the rate for operations. Two such examples are listed below:

> "For necessary expenses of the Inspector General in carrying out the provisions of the Inspector General Act of 1978, $250,000,000, to be derived by transfer from the Postal Service Fund and expended as authorized by section 603(b)(3) of the Postal Accountability and Enhancement Act (Public Law 109-535)."

"For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, $42,982,000, to be derived from the Deposit Insurance Fund, or, only when appropriate, the FSLIC Resolution Fund."

If the mandated transfer is from an account that has either a zero balance or insufficient funds to cover the mandated transfer amount during the CR period, then the amount derived by transfer for purposes of calculating the rate for operations is zero or the lower amount, and the total rate for operations of the receiving TAFS would be reduced accordingly. An example of this type of language is provided below:

"For procurement, acquisition and construction of capital assets, including alteration and modification costs, of the National Oceanic and Atmospheric Administration, $1,719,866,000, to remain available until September 30, 2026: … Provided further, That in addition, $44,000,000 shall be derived by transfer for the purposes provided under this heading from the unobligated balances in the Fund established in section 111(a) of division B of Public Law 116–93."

In this example, if the unobligated balances of the Fund established in section 111(a) of division B of Public Law 116-93 were only $1,000,000, then the rate for operations would be $1,720,866,000. If the unobligated balances were zero, then the rate for operations would be $1,719,866,000.

Mandated transfers that were executed as expenditure transfers in the previous fiscal years are not used to calculate the rate for operations of the giving and receiving TAFSs. Instead, the giving TAFS retains the rate for operations and should execute the expenditure transfer from amounts apportioned to them during the period of the CR.

Permissive transfer authority does not factor into a rate for operations. For purposes of calculating a rate for operations under a short-term CR, permissive transfer authority is defined as legislative transfer authority that provides flexibility in the amount transferred and/or the giving and receiving TAFS involved in the transfer. Below are some examples of transfer authority that is considered permissive for purposes of calculating the rate for operations:

"of which not to exceed $9,000,000 may be transferred to the Working Capital Fund:"

"up to 2 percent of funds made available for grant or reimbursement programs under such headings shall be transferred…"

"Provided further, That any such amounts from the fund that the Attorney General determines are necessary to pay, first, for the costs of processing and tracking civil and criminal debt collection litigation activities, and thereafter for financial systems and for debt-collection-related personnel, administrative, and litigation expenses, in fiscal year 2020 and thereafter, shall be transferred to other appropriations accounts in the Department of Justice for paying the costs of such activities, and shall be in addition to any amounts otherwise made available for such purposes in those appropriations accounts:"

In contrast, if the previous fiscal year's appropriations Act contains language requiring that a minimum amount be transferred to a separate TAFS (a.k.a. "floor"), then that minimum amount is considered the appropriated amount for purposes of calculating the rate for operations. Amounts above the minimum amount specified in law are considered permissive and would not factor into the rate for operations. An account-specific apportionment would be required for both the giving and receiving TAFS to reflect the transferred amount above the minimum. Below is an example of this kind of language:

"of which not less than $6,000,000 shall remain available until expended for efforts to enforce laws against forced child labor; "

In addition, any transfer authority provided in legislation outside of the appropriations Acts referenced in section 101 (i.e., authorized transfer authority) does not factor into the rate for operations.

An agency may utilize permissive or authorized transfer authority from within the amounts apportioned to it during the CR. The agency would need to request an account-specific apportionment for both the giving and receiving TAFSs in order to obligate against the transferred resources.

If an agency is executing general transfer authority that has a percentage limit on the amount that can be given or received (e.g., not more than five percent may be transferred or not more than ten percent may be received), that percentage limitation is calculated against the rate for operations of the applicable TAFS. However, as stated above, the actual amounts that may be transferred are limited to the amounts apportioned to the giving TAFS.

In some cases, permissive transfer authority is provided to move funding between TAFSs within the same TAS. For example, for a TAS that has a $10 million appropriation with a one-year period of availability (POA) and a permissive carve-out ("up to," "not more than," or "not to exceed") of $2 million with a multi-year POA, the rate for operations for the account would be $10 million in the one-year TAFS. The agency would then have to execute a non-expenditure transfer to the multi-year POA to move amounts from within the amounts apportioned in the one-year TAFS for the period of the CR. The agency may transfer up to the $2 million statutory cap, as long as that amount is within the amounts apportioned. The agency would need to request an account-specific apportionment for both the giving and receiving TAFSs in order to obligate against the transferred resources. See section 120.41 for similar guidance for automatic apportionment authority for the full-year enacted appropriation.

**123.10  How is spending authority from offsetting collections or offsetting receipts that is provided in annual appropriation Acts apportioned during a short-term CR?**

In order to determine how apportionment of spending authority from offsetting collections or offsetting receipts that is provided in annual appropriations Acts is effectuated under a CR, it is imperative to first determine if the authority is under the rate for operations formula or is a term and condition of the CR and therefore not funded within the rate for operations. In general, if the previous fiscal year's appropriations Act appropriated a specific dollar amount to an account – all or some of which would be derived from offsetting collections or offsetting receipts – then that dollar amount is a rate for operations. If the CR provides additional authority to spend what is collected (i.e., not a specific dollar amount), then such authority is a term and condition and not a rate for operation, so it requires a separate account-specific apportionment. In some cases, an agency may have a blanket apportionment to cover all spending authority provided as a term and condition of a short-term CR.

For example, in the following language below, the $8.0 million is the rate for operations and therefore is pro-rated under the automatic apportionment provided by the Bulletin. However, the authority in the second proviso to spend additional funds collected above $8.0 million is a term and condition. A separate account-specific apportionment is required to obligate pursuant to the authority provided in the second proviso. For a visual display of how this would look on an account-specific apportionment, please see the previously approved column of Exhibit 120W.

> "For necessary expenses to carry out section 3024 of the Solid Waste Disposal Act (42 U.S.C. 6939g), including the development, operation, maintenance, and upgrading of the hazardous waste electronic manifest system established by such section, $8,000,000, to remain available until expended: Provided, That the sum herein appropriated from the general fund shall be reduced as offsetting collections under such section 3024 are received during fiscal year 2019, which shall remain available until expended and be used for necessary expenses in this appropriation, so as to

result in a final fiscal year 2019 appropriation from the general fund estimated at not more than $0: Provided further, That to the extent such offsetting collections received in fiscal year 2019 exceed $8,000,000, those excess amounts shall remain available until expended and be used for necessary expenses in this appropriation."

In the second example below, the authority to collect and spend fees does not specify a dollar amount and therefore not part of the rate for operations. This spending authority is not automatically apportioned by the Bulletin and therefore requires a separate account-specific apportionment.

"The Administrator of the Environmental Protection Agency is authorized to collect and obligate pesticide registration service fees in accordance with section 33 of the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by Public Law 112-177, the Pesticide Registration Improvement Extension Act of 2012."

**123.11  How are appropriated entitlement or other mandatory payments and activities under the Food and Nutrition Act of 2008 apportioned during a short-term CR?**

Typically, the short-term CR contains a provision that states that for appropriated entitlements and other mandatory payments whose budget authority was provided in the previous fiscal year's appropriations Acts referenced in section 101, and for mandatory payments and activities under the Food and Nutrition Act of 2008, activities shall continue at the rate necessary to maintain program levels under current law and under the authority and conditions of the previous fiscal year's appropriations Act. In other words, these programs operate as normal and are appropriated such sums as are necessary to do so.

Additionally, this provision of the CR typically provides that "obligations for mandatory payments" may continue to be made for an additional 30 days beyond the end date of the short-term CR, including during any government shutdowns. In other words, mandatory payment programs may make obligations they would normally make during the additional 30 days of obligational authority and funding.

The Bulletin typically apportions such sums as are necessary to maintain program levels as specified above. These programs are not limited to a pro-rata share or to a funding total provided in the previous fiscal year's fiscal appropriations Acts referenced in section 101.

The programs provided this authority are within the accounts identified in the joint explanatory statement of managers accompanying the conference report on the Balanced Budget Act of 1977 (House Report 105-217, see page 1014), or accounts with legislatively enacted directed scoring making otherwise discretionary appropriations mandatory.

**123.12  Are earmarks or programs, projects, and activities (PPAs) in a TAFS apportioned on a pro-rata basis by the Bulletin during a short-term CR?**

No. The Bulletin automatically apportions the pro-rata share for each TAFS based on the rate for operations for the entire TAFS without regard to any earmarks or PPAs within the TAFS, and without a requirement that such earmarked amounts or PPAs also be pro-rated. Legislative earmark provisions continue as terms and conditions of the CR, and as such, they continue to remain in effect during the period of the CR. As in the case with other terms and conditions continuing in effect under a CR, agencies must comply with and not breach earmark provisions over the course of the fiscal year, including during the period of a CR.

**123.13  What is apportioned during a short-term CR to a TAFS that receives no funding in the House or Senate bill?**

If either the House or Senate has reported out of committee or passed an appropriations bill that provides no funding for a whole TAFS (as opposed to merely providing no funding for a project, program or activity

within a TAFS) at the time the CR is enacted, that TAFS is automatically apportioned zero, even if that TAFS receives a rate for operations under section 101. An agency must submit an account-specific apportionment request to OMB if the agency want funds apportioned for that TAFS during the period of the CR, including any extensions of the CR. Agencies must also submit a written justification for any such request. This restrictive funding action is to ensure that an agency does not impinge on final funding prerogatives of the Congress.

However, if subsequently either the House or Senate does take action during the short-term CR to either report out of committee or pass an appropriations bill that provides funding for a TAFS, then the TAFS would be under the automatic apportionment as provided by the Bulletin.

### 123.14 Do the amounts provided as a rate for operations remain available after a short-term CR expires?

It depends on the legislative action that follows the short-term CR or the absence of legislation that follows the CR (e.g., a lapse in appropriations). Generally, CRs make amounts available for obligation only until a time specified by the CR or until the enactment of regular fiscal year appropriations, whichever occurs first. A CR normally provides temporary funding and may specify any period of time (e.g., one day, a few days, a few weeks, or a month). It is generally understood that the normal appropriations process will eventually produce appropriation Acts to replace or terminate the CR, and it is also generally assumed that the full-year enacted level will be close to the level provided by the CR's rate for operations. An agency must consult its RMO if its full-year enacted level is much lower than the amounts apportioned against the CR's rate for operations. If a full-year CR follows a short-term CR, agencies must submit a reapportionment request for the full-year appropriations (see section 123.20).

This rule does not apply to unobligated funds from a rate for operations provided by a short-term CR if that CR is followed immediately by a lapse in appropriations (see sections 120.56, 123.23).

### 123.15 Do short-term CRs limit the purposes for which funds may be obligated?

Generally, yes. A CR makes amounts available subject to the same terms and conditions specified in the enacted appropriations acts from the prior fiscal year unless otherwise stated in the statutory text. Normally, an agency is **not** permitted to start new PPAs for which authority did not exist in the previous fiscal year.

### 123.16 When may I request that OMB issue an exception apportionment during a short-term CR?

If an agency seeks an amount for a TAFS that is more than the pro-rata share automatically apportioned by the Bulletin, and the short-term CR does not provide a spend-faster anomaly that applies to that TAFS, then the agency may request an exception apportionment from OMB. Each request for an exception apportionment must be accompanied by a written justification that includes the legal basis for the request. OMB grants exception apportionment requests only in extraordinary circumstances. This is different from an account-specific apportionment for a spend-faster anomaly provided in the CR itself.

An exception apportionment may be requested on the following bases:

- *Seasonality*. This basis will be considered only if the program experiences regular and predictable changes in the rate of obligations throughout the year due to programmatic requirements, using historical data from SF 133s or OMB approved account-specific apportionments. For example, a history of apportionment shows that the Low-Income Home Energy Assistance Program has an established pattern of a higher rate of obligations in the first and second quarters of the fiscal year, when the temperatures are colder. Another example is funding for the protection of Presidential candidates and increased security at inaugurations every four years. Seasonality apportionment

requests will not be approved simply because an agency prefers to sign full-year contracts at the beginning of the fiscal year, or if doing so would be business as usual under a full-year enacted appropriation.

- *Annualizing a new program.*  This basis involves situations where a new program began late in the previous fiscal year and the partial year funding level for the previous fiscal year would not be sufficient to fund a full year's rate for operations this year.

- *Safety of human life or protection of Federal property.*  This basis involves situations where the obligations could legally be incurred under the Antideficiency Act during a Government-wide lapse of appropriations.

**123.17 If I am funded by a short-term CR and have received an account-specific apportionment, will I have to submit account-specific reapportionment requests for each extension of the CR?**

No.  In the case of TAFS that receive an account-specific apportionment at any time during a short-term CR period (exclusions noted below), the automatic apportionment provided by the Bulletin will apply to such TAFSs under any subsequent extensions of the CR, provided that the total amount apportioned during the short-term CR period does not exceed the rate for operations provided by the CR.  However, any footnotes on the account-specific apportionment continue to apply to the TAFS when subsequently operating under the automatic apportionment.

Agencies must, however, submit account-specific apportionments for each extension of the CR for TAFS with zero-funding or utilizing a spend-faster anomaly.  For TAFS with zero funding, account-specific apportionments must be submitted for each CR extension—there is no automatic apportionment.  If an agency has already been apportioned a spend-faster anomaly or account-specific apportionment, then for subsequent extensions of the CR an agency will be only automatically apportioned an additional pro-rata share of the rate for operations.  If an agency seeks to utilize the spend-faster CR anomaly for any CR extension, the agency must once again submit an account-specific apportionment.

A full-year CR is not considered an extension of a short-term CR. The Bulletin typically does not apportion additional funding for a full-year CR. If a full-year CR is enacted, an agency must request a reapportionment **within 10 calendar days** of the enactment of the full-year CR (see section 123.20).

If an agency needs a reapportionment of carryover balances or any other budgetary resource not provided by the CR, after the Bulletin is in effect, and the agency's RMO does not require the agency to show the CR budgetary resources on the reapportionment, then the agency must footnote the reapportionment as follows ("A" footnote on line 6190 total budgetary resources):

> "In addition to the amounts apportioned above, this account is also receiving funds pursuant to Public Law XXX-XXX as automatically apportioned via OMB Bulletin XX-XX."

If the CR is extended (e.g., a subsequent law amends the CR to extend the date of its applicability), then add "as amended" after "Public Law XXX-XXX" in the above footnote.

**123.18  Are my credit programs funded under a short-term CR?**

Yes.  Appropriations for subsidy cost amounts associated with direct and guaranteed loan activities that were conducted in the prior fiscal year are provided as a rate for operations in the same manner as other appropriations.  Normally, the CR allows agencies to make new direct loans and new commitments to guarantee loans within the limitations on credit activity levels and subject to the terms and conditions specified in the prior fiscal year appropriations Act(s).  If there is an enacted credit limitation (i.e., a

limitation on loan principal or commitment level) in the previous fiscal year, the automatic apportionment is the pro-rata share of the credit limitation or rate for operations, whichever is more restrictive.

In the two examples below, the appropriations Act specified in section 101 appropriates $5 million for subsidy costs and $200 million in loan limitation for direct loans. Assume the CR covers the first quarter of the fiscal year (92 days), which results in a pro-rata share of roughly 25%, and that the prior fiscal year's subsidy rate was 5.00%. The current subsidy rate differs in each example. The examples show that along with other factors, the current subsidy rate impacts the amounts apportioned by the Bulletin for credit programs.

To determine the amounts apportioned during a CR for Example 1, with a current subsidy rate of 8.00%:

Step 1 – Calculate the pro-rata share of last year's enacted credit limitation: 25% x $200 million = $50 million. The pro-rata share of the credit limitation would support a loan level of $50 million.

Step 2 – Calculate the pro-rata share of the subsidy appropriation: 25% x $5 million = $1.25 million.

Step 2A – Calculate the loan level that $1.25 million would support:

- To calculate the loan level, take budget authority and divide by the <u>current</u> subsidy rate (pro-rata share/subsidy rate = loan level).

- $1.25 million /.0800 = $15.625 million. The pro-rata share would support a loan level of $15.625 million.

Step 3 – Determine the lesser of the pro-rata share of the credit limitation or the budget authority:

- Compare the results of steps 1 and 2A.

- Since the pro-rata share of the subsidy provides for a lower loan level ($15.625 million < $50 million), the pro-rata share of the subsidy is the amount automatically apportioned by the Bulletin.

- Under the CR, this direct loan program may obligate up to $1.25 million for subsidy costs, which may support a loan level of $15.625 million.

| Example 1: | Current subsidy rate = | 8.00% | | |
|---|---|---|---|---|
| | | Pro-rata share (25%) | Pro-rata loan level | Amounts available under CR |
| Credit limitation | 200,000,000 | 50,000,000 | 50,000,000 | 1,250,000 in subsidy to support a loan level of 15,625,000 |
| BA | 5,000,000 | 1,250,000 | 15,625,000 | |

| Example 2: | Current subsidy rate = | 1.00% | | |
|---|---|---|---|---|
| | | Pro-rata share (25%) | Pro-rata loan level | Amounts available under CR |
| Credit limitation | 200,000,000 | 50,000,000 | 50,000,000 | 50,000,000 loan level which requires |
| BA | 5,000,000 | 1,250,000 | 125,000,000 | 500,000 in BA for subsidy cost |

See section 185.24 for further information regarding the subsidy rates to be used for loans or loan guarantees at execution.

**123.19  Do I have to request a warrant from Treasury for funds provided by a short-term CR?**

Generally, no.  Treasury will not issue a warrant under a short-term CR unless an agency explicitly requests one (see Treasury Financial Manual I TFM2–2000, section 2025.30).  Exceptions may be made on a case-by-case basis if the short-term CR extends beyond the second quarter of the fiscal year. Further Fiscal Service Treasury guidance may be found on the USSGL website (https://www.fiscal.treasury.gov/ussgl/resources-implementation.html#budgetary).

**123.20  Do I need to request a reapportionment after my full-year appropriation is enacted?**

Yes.  Agencies must request a reapportionment **within 10 calendar days** of the enactment of an agency's full-year appropriations Act (including a full-year CR), even if the period covered by the CR has not expired.  In the Previous Approved column, include the amounts apportioned under the short-term CR (including automatic apportionment amounts as provided by the Bulletin and section 120.41.  See exhibit 120H and section 120.61).  The total amount subject to reapportionment will equal the total amount made available for the fiscal year in the regular appropriation.  See below for further information on the following:

- Instructions on the apportionment process/format (see section 120)

- Detailed instructions for each line on the apportionment (see Appendix F)

Until OMB approves an agency's first apportionment request for the fiscal year, and unless otherwise determined by the agency's OMB representative, the agency will be under an automatic apportionment as specified in section 120.41.

**123.21  Will my full-year enacted appropriations cover obligations made during the CR?**

Yes. Normally, an agency's full-year enacted appropriations will cover all obligations made during the CR. However, there could be exceptions.  See section 123.14 for an example of an exception.

Additionally, if the enacted full-year appropriations provides funds in a TAS that is a different period of availability (i.e., a different TAFS) than was provided under the short-term CR, see section 120.63.

**123.22  What if the full-year enacted appropriations subsequently provided less budget authority than obligations incurred under the short-term CR?**

Any agency must do everything possible to reduce the amount of its existing obligations so that the agency's obligations do not exceed the amounts provided in the full-year enacted appropriations.  The agency must reduce obligations to the maximum extent possible—returning purchases received for a refund, canceling purchases of goods and services ordered but not yet received, and canceling grants.

For example, consider the following situation:

(1) There was no indication that the Congress would enact a regular annual appropriation less than the amount available under the CR;

(2) The amount obligated was available under the CR;

(3) The full-year enacted appropriation was subsequently less than the obligations incurred under the CR; and

(4) The agency reduced obligations to the maximum extent possible (e.g., returned purchases received for a refund, cancelled purchases of goods and services ordered but not yet received, canceled grants, and transferred funds to the extent possible to cover obligations made during the period of the CR).

In this circumstance, it is expected that an agency will normally be able to reduce its CR-incurred obligations by a sufficient amount so that the agency's obligations during that fiscal year will not exceed the level of the full-year enacted appropriation (and, thus, all of these obligations will be charged to the full-year enacted appropriation).  However, in a case in which an agency is not able (after having de-obligated funds to the maximum extent possible or used existing transfer authority to cover obligations made during the period of the CR) to reduce its CR-period obligations to the level of the full-year enacted appropriation, then the amount by which the full-year enacted appropriation has been exceeded will be charged to the CR.

If an agency's full-year enacted appropriations provided less budget authority than the obligations the agency incurred under the CR, the agency must contact its OMB examiner and request an apportionment (if the agency is subject to apportionment) that specifically footnotes that all of the requirements of this section have been met.  For any supplemental warrant, the agency must also provide to its Treasury Bureau of the Fiscal Service contact an OMB-approved apportionment stating that the conditions of this section have been met.

**123.23  What happens to my apportioned, unobligated short-term CR funding if the short-term CR is followed by a lapse in appropriations?**

During a lapse in appropriations, any unobligated funding from a rate for operations that was provided by the CR and apportioned by OMB is not available for obligation.  This includes unobligated funds from rate for operations for multi-year and no-year TAFSs by the CR.  This also includes any apportionments related to the authority provided as term and condition of the CR to be able to retain and spend collections.

If the short-term CR includes a provision that provides a full-year appropriation to a specific TAFS, amounts apportioned from that specific appropriation remain available during a lapse in appropriations.

**SECTION 124—AGENCY OPERATIONS IN THE ABSENCE OF APPROPRIATIONS**

<div style="border:1px solid">

**Table of Contents**

124.1    What types of actions may my agency conduct during a lapse in appropriations?
   (a)    Background
   (b)    Policies
124.2    What plans should my agency make in anticipation of a lapse in appropriations?
124.3    When should my agency's shutdown plans be implemented?
124.4    How may my agency receive lapse communications updates from OMB?
124.5    Am I automatically apportioned obligational authority for agency operations that are authorized by law to continue in the absence of appropriations?

**Summary of Changes**

Clarifies and expands background information and policies (section 124.1).

Reiterates what agencies should include in lapse plans, clarifies when and how agencies should submit changes, and asks agencies to use a specified landing page to link to the OMB website (section 124.2).

</div>

**124.1    What types of actions may my agency conduct during a lapse in appropriations?**

(a)  *Background.*

The Antideficiency Act (ADA) prohibits agencies from incurring obligations in advance of, or in excess of, an appropriation, except in certain limited circumstances.  The Attorney General issued two opinions in the early 1980s ("Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriations" (1980) and "Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations" (1981)) finding that the language and legislative history of the ADA prohibits agency officials from incurring obligations in the absence of appropriations.   The Department of Justice's Office of Legal Counsel issued another opinion in 1995 ("Government Operations in the Event of a Lapse in Appropriations" (1995)) reaffirming and updating its 1981 opinion.

An agency may still incur an obligation in the absence of an appropriation for certain "excepted" functions, including when:

- A statute or court order expressly authorizes or requires an agency to obligate funds in advance of appropriations for the subject function;

- The lawful continuation of funded or unfunded functions necessarily implies that the subject function must also continue because suspension of that subject function would prevent or significantly damage the execution of the other lawfully continuing functions;

- The subject function addresses emergency circumstances such that the suspension of the function would imminently threaten the safety of human life or the protection of property; or

- The subject function is necessary to discharge the President's Constitutional duties and powers.

SECTION 124—AGENCY OPERATIONS IN THE ABSENCE OF APPROPRIATIONS

As discussed in section 124.2, an agency may retain employees who otherwise would be subject to furlough so that those employees may continue to perform "excepted" functions during a lapse in appropriations.

Agency functions that are financed with appropriations that have not lapsed may continue and are "exempt" from any shutdown procedures, even while a lapse has occurred in other appropriations.

(b)  *Policies*.

This section provides policy guidance and instructions for actions to be taken by Executive Branch agencies when the Congress fails to enact regular appropriations, a continuing resolution, or needed supplemental appropriations, resulting in a lapse of appropriations.

This section does not apply to specific appropriations action by the Congress to deny program funding.

When the Congress fails to act on program supplementals and the result is partial funding interruptions, special procedures beyond those outlined in this section may be warranted.   In such cases, you should consult your OMB representative.

Within the guidance established by the opinions issued by the Department of Justice and this Circular, agency heads, in consultation with their general counsels, must decide what agency activities are excepted or otherwise legally authorized to continue during a lapse in appropriations.   Agencies should address questions to OMB, including questions about the interpretation of the Antideficiency Act.   OMB will engage with the agency and the Department of Justice's Office of Legal Counsel, as necessary and appropriate.

## 124.2    What plans should my agency make in anticipation of a lapse in appropriations?

Agency heads, in consultation with their general counsels, must develop and maintain plans for an orderly shutdown in the event of a lapse in appropriations.  Each agency must have an up-to-date lapse plan on file with OMB.

Agencies must submit an updated lapse plan to OMB for review, at minimum, every two years, in the odd-numbered years, on August 1.  Plans should be updated in 2025.  Agencies must also submit an updated lapse plan to OMB for review whenever there is a change in the source of funding for an agency program or any significant modification, expansion, or reduction in agency program activities.  Additional guidance on lapse plan submission and review for each potential lapse will be communicated with agencies, as needed.

When submitting updated lapse plans for review, agencies must specifically identify any changes made based on the most recent lapse plan on file with OMB.  A document containing tracked changes and/or annotated comments is required.  Plans should be submitted to your OMB examiner and with a copy to the following email address: Section124Plans@omb.eop.gov.   Agencies may also contact this email address with questions related to their lapse plans.

Once the updated lapse plan is reviewed by OMB, the agency will publish the final lapse plan using a specified landing page on their agency website.  This landing page will be linked to each respective agency on the OMB website's Agency Contingency Plans page.

*Below are the requirements for each lapse plan.*

Given that the duration of a lapse in appropriations is inherently uncertain, your plan should describe agency actions to be taken during a short-term lapse (1-5 days).   It also should identify anticipated changes if the

lapse extends beyond that time period.    Your plan should also designate personnel responsible for implementing and adjusting the plan to respond to the length of the lapse in appropriations and changes in external circumstances.

You must include the following template at the beginning of your plan:

| **Lapse Plan Summary Overview** | |
|---|---|
| Estimated time (to nearest half day) required to complete shutdown activities: | *# days* |
| Total number of agency employees expected to be on board before implementation of the plan: | *# employees* |
| Total number of agency employees expected to be furloughed under the plan (unduplicated count): | *# employees* |
| **Total number of employees to be retained under the plan for each of the following categories** (may include duplicated counts)**:** | |
| Compensation is financed by a resource other than annual appropriations: | *# employees* |
| Necessary to perform activities expressly authorized by law: | *# employees* |
| Necessary to perform activities necessarily implied by law: | *# employees* |
| Necessary to the discharge of the President's constitutional duties and powers: | *# employees* |
| Necessary to protect life and property: | *# employees* |

| **Brief summary of significant agency activities that will continue during a lapse:** |
|---|
| |

| **Brief summary of significant agency activities that will cease during a lapse:** |
|---|
| |

The plan should then proceed to describe in detail, for each component within your agency, the following:

- To the extent that specific shutdown activities will not be completed within one-half day, specify the nature of each such activity, together with the time and the number of employees necessary to complete the activity;

- The total number of employees in the component to be on-board before implementation of the plan;

- The total number of employees in the component expected to be furloughed under the plan;

- The total number of employees to be retained in the component under the plan for each of the categories listed in the table above (i.e., the employees' compensation is financed by carryover funds or an appropriation provided by permanent law, they are necessary to perform activities expressly authorized by law, they are necessary to perform activities necessarily implied by law, they are necessary to the discharge of the President's constitutional duties and powers, or they

are necessary to protect life and property).   If an employee fits in more than one category, they may be reflected in the count for all applicable categories (i.e., count may be duplicated), in order to ensure the best estimate of the number of employees within each category; and

- The agency's legal basis for each of its determinations to retain categories of employees, including a description of the nature of the agency activities in which these employees will be engaged.

To the extent that any of the information described above is expected to change should a lapse in appropriations extend for a prolonged period of time (i.e., longer than 5 days), the plan should explicitly describe these changes.   In particular, the plan should indicate any points in time when the furlough status of employees may change, how many employees would be affected, and the legal basis for such changes. Agencies should consult with an OMB representative at such points in time during a lapse in appropriations to make OMB aware of any such changes.   In addition, during a lapse in appropriations agencies should make an OMB representative aware of any instances where actions deviate from what is set forth in the plan.

Agency plans should also describe the actions that will be necessary to resume orderly operations once appropriations are restored, including:

- Methods for notifying employees that the shutdown furlough has ended and that they are to return to work on a specified day (normally the employee's next scheduled workday after the furlough has ended);

- Flexibilities available to supervisors if employees have problems returning to work on the day specified by the agency, including the use of accrued annual leave, compensatory time off, or credit hours;

- Procedures for resuming program activities, including steps to ensure appropriate oversight and disbursement of funds.

At the time employees are given furlough notices, agencies should provide them as much information as possible regarding how the agency will go about resuming operations after the furlough has ended.

### 124.3   When should my agency's shutdown plans be implemented?

OMB will monitor the status of congressional actions on appropriations bills and will notify agencies if shutdown plans are to be implemented.   Whenever it appears that a lapse in appropriations might occur, you should review your shutdown plans, and, if revisions are required, promptly submit the revised plan to OMB and post the revised plan on your agency website.   When agencies submit their plans to OMB, they should provide OMB with information on the agency personnel that would serve as a point of contact in the event of a lapse.   While agencies are ultimately responsible for preparing and implementing orderly shutdown plans, all changes to the plans must be submitted to OMB for review in advance of implementing the plan.  See section 124.2.

One week prior to the expiration of appropriations bills, regardless of whether the enactment of appropriations appears imminent, OMB will communicate with agency senior officials to remind agencies of their responsibilities to review and update orderly shutdown plans, and will share a draft communication template to notify employees of the status of appropriations.   OMB will hold follow-up communications on a periodic basis until such time as appropriations are enacted or a lapse in appropriations occurs. Approximately two business days before a potential lapse in appropriations, in coordination with OMB, agencies should notify employees of the status of funding using the OMB-provided employee notification.

OMB will notify agencies when they should begin to inform employees of their individual status (e.g., furloughed or not) under a lapse.

After OMB has communicated that a lapse in appropriations has occurred, OMB will provide guidance to agencies directing the initiation of orderly shutdown activities. Each agency head must determine the specific actions that will be taken; however, all actions must contribute to an orderly shutdown of the agency. All individual employees should have been notified of their status under a lapse by this time. Agency heads will notify OMB immediately once shutdown activities are initiated.

During a lapse in appropriations, agencies should only engage in activities consistent with their shutdown plan.

Agencies must take necessary personnel actions to release employees in accordance with applicable law and regulations of the Office of Personnel Management. You must prepare employee furlough notices and process personnel and pay records in connection with shutdown furlough actions. You should plan for these functions to be performed by employees who are retained for orderly termination of agency activities as long as those employees are available. Agencies should also establish clear protocols for how employees will be provided with furlough notices, contacted to be recalled to work following the end of the lapse in appropriations or should their furlough status change in accordance with their agency's plan, and informed of pertinent pay and leave information during the lapse. Where appropriate, agencies should seek to utilize available technology to allow employees maximum flexibility in returning to work.

OMB will notify you once the lapse in appropriations has ended so that you can begin implementing your plan to orderly resume agency activities.

### 124.4    How may my agency receive lapse communications updates from OMB?

Executive Branch agencies may receive updates on the status of appropriations at the OMB Communications Regarding a Lapse in Appropriations page. Additional resources are provided on this page and all agencies are encouraged to visit the page one week prior to the expiration of annual appropriations Acts, regardless of whether the enactment of appropriations appears imminent.

To receive lapse updates via email, agency employees must join the group by following instructions on the page. Receiving email updates is optional; all updates will be provided on the OMB Communications Regarding a Lapse in Appropriations page.

### 124.5    Am I automatically apportioned obligational authority for agency operations that are authorized by law to continue in the absence of appropriations?

Yes. You are automatically apportioned the amounts necessary to carry out your agency's shutdown plan as required by this section. This automatic apportionment provides authority to incur obligations, but does not provide any authority to liquidate such obligations.

This automatic apportionment does not affect previously approved current-year apportionments for non-continuing resolution (CR) funds, such as multi-year and permanent law appropriations. See sections 120.55 and 123.23 for what happens to apportioned CR funds if the lapse in appropriations follows a CR.

# Exhibit 5

JA 301

# Mandate *for* Leadership

## The Conservative Promise

## Project 2025

PRESIDENTIAL TRANSITION PROJECT

JA 302

**2**

# EXECUTIVE OFFICE OF THE PRESIDENT OF THE UNITED STATES
### Russ Vought

In its opening words, Article II of the U.S. Constitution makes it abundantly clear that "[t]he executive power shall be vested in a President of the United States of America."[1] That enormous power is not vested in departments or agencies, in staff or administrative bodies, in nongovernmental organizations or other equities and interests close to the government. The *President* must set and enforce a plan for the executive branch. Sadly, however, a President today assumes office to find a sprawling federal bureaucracy that all too often is carrying out its own policy plans and preferences—or, worse yet, the policy plans and preferences of a radical, supposedly "woke" faction of the country.

The modern conservative President's task is to limit, control, and direct the executive branch on behalf of the American people. This challenge is created and exacerbated by factors like Congress's decades-long tendency to delegate its lawmaking power to agency bureaucracies, the pervasive notion of expert "inde-pendence" that protects so-called expert authorities from scrutiny, the presumed inability to hold career civil servants accountable for their performance, and the increasing reality that many agencies are not only too big and powerful, but also increasingly weaponized against the public and a President who is elected by the people and empowered by the Constitution to govern.

In *Federalist* No. 47, James Madison warned that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."[2] Regrettably, that wise and cautionary note describes to a significant degree the modern executive branch, which—whether controlled

by the bureaucracy or by the President—writes federal policy, enforces that policy, and often adjudicates whether that policy was properly drafted and enforced. The overall situation is constitutionally dire, unsustainably expensive, and in urgent need of repair. Nothing less than the survival of self-governance in America is at stake.

The great challenge confronting a conservative President is the existential need for aggressive use of the vast powers of the executive branch to return power—including power currently held by the executive branch—to the American people. Success in meeting that challenge will require a rare combination of boldness and self-denial: boldness to bend or break the bureaucracy to the presidential will and self-denial to use the bureaucratic machine to send power away from Washington and back to America's families, faith communities, local governments, and states.

Fortunately, a President who is willing to lead will find in the Executive Office of the President (EOP) the levers necessary to reverse this trend and impose a sound direction for the nation on the federal bureaucracy. The effectiveness of those EOP levers depends on the fundamental premise that it is *the President's agenda* that should matter to the departments and agencies that operate under his constitutional authority and that, as a general matter, it is the President's chosen advisers who have the best sense of the President's aims and intentions, both with respect to the policies he intends to enact and with respect to the interests that must be secured to govern successfully on behalf of the American people. This chapter focuses on key features of and recommendations for several of the EOP's important components.

## U.S. OFFICE OF MANAGEMENT AND BUDGET (OMB)

OMB assists the President in the execution of his policy agenda across the government by employing many statutory and executive procedural levers to bring the bureaucracy in line with all budgetary, regulatory, and management decisions. Properly understood, it is a President's air-traffic control system with the ability and charge to ensure that all policy initiatives are flying in sync and with the authority to let planes take off and, at times, ground planes that are flying off course. OMB's key roles include:

- **Developing and enforcing** the President's budget and executing the appropriations laws that fund the government;

- **Managing** agency and personnel performance, procurement policy, financial management, and information technology;

- **Developing** the President's regulatory agenda, reviewing new regulatory actions, reviewing federal information collections, and setting and enforcing federal information policy; and

- **Coordinating and clearing** agency communications with Congress, including testimonies and views on draft legislation.

OMB cannot perform its role on behalf of the President effectively if it is not intimately involved in all aspects of the White House policy process and lacks knowledge of what the agencies are doing. Internally to the EOP, ensuring that the policy-formulation procedures developed by the White House to serve the President include OMB is one of any OMB Director's major responsibilities. A common meme of those who intend to evade OMB review is to argue that where "resources" are not being discussed, OMB's participation is optional. This ignores both OMB's role in all downstream execution and the reality that it has the only statutory tools in the White House that are powerful enough to override implementing agencies' bureaucracies.

The Director must view his job as the best, most comprehensive approximation of the President's mind as it pertains to the policy agenda while always being ready with actual options to effect that agenda within existing legal authorities and resources. This role cannot be performed adequately if the Director acts instead as the ambassador of the institutional interests of OMB and the wider bureaucracy to the White House. Once its reputation as the keeper of "commander's intent" is established, then and only then does OMB have the ability to shape the most efficient way to pursue an objective.

Externally, the Director must ensure that OMB has sufficient visibility into the deep caverns of agency decision-making. One indispensable statutory tool to that end is to ensure that policy officials—the Program Associate Directors (PADs) managing the vast Resource Management Offices (RMOs)—personally sign what are known as the apportionments. In 1870, Congress passed the Anti-Deficiency Act[3] to prevent the common agency practice of spending down all appropriated funding, creating artificial funding shortfalls that Congress would have to fill. The law mandated that all funding be allotted or "apportioned" in installments. This process, whereby agencies come to OMB for allotments of appropriated funding, is essential to the effective financial stewardship of taxpayer dollars. OMB can then direct on behalf of a President the amount, duration, and purpose of any apportioned funding to ensure against waste, fraud, and abuse *and* ensure consistency with the President's agenda and applicable laws.

The vast majority of these apportionments were signed by career officials—the Deputy Associate Directors (DADs)—until the Trump Administration placed this responsibility in the hands of the PADs and thereby opened wide vistas of oversight that had escaped the attention of policy officials. The Biden Administration subsequently reversed this decision. No Director should be chosen who is unwilling to restore apportionment decision-making to the PADs' personal review, who is not aggressive in wielding the tool on behalf of the President's agenda, or who is unable to defend the power against attacks from Congress.

# Exhibit 6



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC  20548**

# Decision

**Matter of:**    Office of Management and Budget—Withholding of Ukraine Security
                  Assistance

**File:**    B-331564

**Date:**    January 16, 2020

## DIGEST

In the summer of 2019, the Office of Management and Budget (OMB) withheld from
obligation funds appropriated to the Department of Defense (DOD) for security
assistance to Ukraine.  In order to withhold the funds, OMB issued a series of nine
apportionment schedules with footnotes that made all unobligated balances
unavailable for obligation.

Faithful execution of the law does not permit the President to substitute his own
policy priorities for those that Congress has enacted into law.  OMB withheld funds
for a policy reason, which is not permitted under the Impoundment Control Act (ICA).
The withholding was not a programmatic delay.  Therefore, we conclude that OMB
violated the ICA.

## DECISION

In the summer of 2019, OMB withheld from obligation approximately $214 million
appropriated to DOD for security assistance to Ukraine.  *See* Department of Defense
Appropriations Act, 2019, Pub. L. No. 115-245, div. A, title IX, § 9013, 132 Stat.
2981, 3044–45 (Sept. 28, 2018).  OMB withheld amounts by issuing a series of nine
apportionment schedules with footnotes that made all unobligated balances for the
Ukraine Security Assistance Initiative (USAI) unavailable for obligation.  *See* Letter
from General Counsel, OMB, to General Counsel, GAO (Dec. 11, 2019) (OMB
Response), at 1–2.  Pursuant to our role under the ICA, we are issuing this decision.
Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344,
title X, § 1015, 88 Stat. 297, 336 (July 12, 1974), *codified at* 2 U.S.C. § 686.  As
explained below, we conclude that OMB withheld the funds from obligation for an

**JA 307**

unauthorized reason in violation of the ICA.[1]  *See* 2 U.S.C. § 684.   We also question actions regarding funds appropriated to the Department of State (State) for security assistance to Ukraine.

OMB removed the footnote from the apportionment for the USAI funds on September 12, 2019.  OMB Response, at 2.  Prior to their expiration, Congress then rescinded and reappropriated the funds.  Continuing Appropriations Act, 2020, Pub. L. No. 116-59, div. A, § 124(b), 133 Stat. 1093, 1098 (Sept. 27, 2019).

In accordance with our regular practice, we contacted OMB, the Executive Office of the President, and DOD to seek factual information and their legal views on this matter.  GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/products/GAO-06-1064SP; Letter from General Counsel, GAO, to Acting Director and General Counsel, OMB (Nov. 25, 2019); Letter from General Counsel, GAO, to Acting Chief of Staff and Counsel to the President, Executive Office of the President (Nov. 25, 2019); Letter from General Counsel, GAO, to Secretary of Defense and General Counsel, DOD (Nov. 25, 2019).

OMB provided a written response letter and certain apportionment schedules for security assistance funding for Ukraine.  OMB Response (written letter); OMB Response, Attachment (apportionment schedule).  The Executive Office of the President responded to our request by referring to the letter we had received from OMB and providing that the White House did not plan to send a separate response.  Letter from Senior Associate Counsel to the President, Executive Office of the President, to General Counsel, GAO (Dec. 20, 2019).  We have contacted DOD regarding its response several times.  Letter from General Counsel, GAO, to Secretary of Defense and General Counsel, DOD (Dec. 10, 2019); Telephone Conversation with Deputy General Counsel for Legislation, DOD (Dec. 12, 2019); Telephone Conversation with Office of General Counsel Official, DOD (Dec. 19, 2019).  Thus far, DOD officials have not provided a response or a timeline for when we will receive one.

---

[1] On October 30, 2019, Senator Chris Van Hollen asked the Comptroller General about this matter during a hearing before the Senate Committee on the Budget. *Chief Financial Officers Act of 1990: Achieving the Vision: Hearing Before the Senate Committee on the Budget,* 116th Cong. (2019), (statement of Sen. Van Hollen), *available at* https://www.budget.senate.gov/chief-financial-officers-act-of-1990-achieving-the-vision (last visited Jan. 13, 2020).  We also received a letter from Senator Van Hollen regarding this matter.  Letter from Senator Chris Van Hollen to Comptroller General (Dec. 23, 2019).

BACKGROUND

For fiscal year 2019, Congress appropriated $250 million for the Ukraine Security Assistance Initiative (USAI).  Pub. L. No. 115-245, § 9013, 132 Stat. at 3044–45.  The funds were available "to provide assistance, including training; equipment; lethal assistance; logistics support, supplies and services; sustainment; and intelligence support to the military and national security forces of Ukraine."  *Id.* § 9013, 132 Stat. at 3044.  The appropriation made the funds available for obligation through September 30, 2019.  *Id.*

DOD was required to notify Congress 15 days in advance of any obligation of the USAI funds.  *Id.* § 9013, 132 Stat. at 3045.  In order to obligate more than fifty percent of the amount appropriated, DOD was also required to certify to Congress that Ukraine had taken "substantial actions" on "defense institutional reforms."  John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, div., A, title XII, § 1246, 132 Stat. 1636, 2049 (Aug. 13, 2018) (amending National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, div. A, title XII, § 1250, 129 Stat. 726, 1068 (Nov. 25, 2015)).  On May 23, 2019, DOD provided this certification to Congress.  Letter from Under Secretary of Defense for Policy, to Chairman, Senate Committee on Foreign Relations (May 23, 2019) (DOD Certification) (noting that similar copies had been provided to the congressional defense committees and the House Committee on Foreign Affairs).  In its certification, DOD included descriptions of its planned expenditures, totaling $125 million.  *Id.*

On July 25, 2019, OMB issued the first of nine apportionment schedules with footnotes withholding USAI funds from obligation.  OMB Response, 1–2.  This footnote read:

> "Amounts apportioned, but not yet obligated as of the date of this reapportionment, for the Ukraine Security Assistance Initiative (Initiative) are not available for obligation until August 5, 2019, to allow for an interagency process to determine the best use of such funds. Based on OMB's communication with DOD on July 25, 2019, OMB understands from the Department that this brief pause in obligations will not preclude DOD's timely execution of the final policy direction. DOD may continue its planning and casework for the Initiative during this period."

*Id.*; *see id.*, Attachment.  On both August 6 and 15, 2019, OMB approved additional apportionment actions to extend this "pause in obligations," with footnotes that, except for the dates, were identical to the July 25, 2019 apportionment action.[2]  *Id.*,

---

[2] The initial apportionment footnote made USAI funds unavailable for obligation until August 5, 2019.  OMB Response, Attachment.  OMB did not sign the next

at 2 n. 2.  OMB approved additional apportionment actions on August 20, 27, and 31, 2019; and on September 5, 6, and 10, 2019.[3]  *Id.*  The footnotes from these additional apportionment actions were, except for the dates, otherwise identical to one another.  *Id.*, Attachment.  They nevertheless differed from those of July 25 and August 6 and 15, 2019, in that they omitted the second sentence that appeared in the earlier apportionment actions regarding OMB's understanding that the pause in obligation would not preclude timely obligation.  *Id.*  The apportionment schedule issued on August 20 read as follows:

> "Amounts apportioned, but not yet obligated as to the date of this reapportionment, for the Ukraine Security Assistance Initiative (Initiative) are not available for obligation until August 26, 2019, to allow for an interagency process to determine the best use of such funds.  DOD may continue its planning and casework for the Initiative during this period."

*Id.*, Attachment.  The apportionment schedules issued on August 27 and 31, 2019; and on September 5, 6, and 10, 2019 were identical except for the dates.  *Id.*  On September 12, 2019, OMB issued an apportionment that removed the footnote that previously made the USAI funds unavailable for obligation.  OMB Response, at 2; *id.,* Attachment.  According to OMB, approximately $214 million of the USAI appropriation was withheld as a result of these footnotes.  OMB Response, at 2.  OMB did not transmit a special message proposing to defer or rescind the funds.

DISCUSSION

At issue in this decision is whether OMB had authority to withhold the USAI funds from obligation.

apportionment until August 6, 2019.  *See id.*  On August 6, 2019, the amounts were made unavailable for obligation until August 12, 2019.  *Id.*  While the next footnote was issued on August 15, 2019 it stated that funds were unavailable for obligation "until August 12, 2019."  *Id.*  Despite the dates listed in each apportionment footnote, OMB provided that the "pause in obligations was *extended*" on both August 6, 2019 and August 15, 2019.  *See* OMB Response, at 2, fn. 2 (emphasis added).

[3] The apportionment footnote issued on August 20, 2019 made USAI funds unavailable for obligation until August 26, 2019.  OMB Response, Attachment.  OMB did not sign the next apportionment until August 27, 2019.  *See id.*  Despite the date listed in the apportionment footnote, OMB provided that the "pause in obligations was *extended*" on August 20, 2019.  *See* OMB Response, at 2, fn. 2 (emphasis added).

The Constitution specifically vests Congress with the power of the purse, providing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  The Constitution also vests all legislative powers in Congress and sets forth the procedures of bicameralism and presentment, through which the President may accept or veto a bill passed by both Houses of Congress, and Congress may subsequently override a presidential veto.  *Id.*, art. I, § 7, cl. 2, 3.  The President is not vested with the power to ignore or amend any such duly enacted law.  *See Clinton v. City of New York,* 524 U.S. 417, 438 (1998) (the Constitution does not authorize the President "to enact, to amend, or to repeal statutes").  Instead, he must "faithfully execute" the law as Congress enacts it.  U.S. Const., art. II, § 3.

An appropriations act is a law like any other; therefore, unless Congress has enacted a law providing otherwise, the President must take care to ensure that appropriations are prudently obligated during their period of availability.  *See* B-329092, Dec. 12, 2017 (the ICA operates on the premise that the President is required to obligate funds appropriated by Congress, unless otherwise authorized to withhold).  In fact, Congress was concerned about the failure to prudently obligate according to its Congressional prerogatives when it enacted and later amended the ICA.  *See generally,* H.R. Rep. No. 100-313, at 66–67 (1987); *see also*  S. Rep. No. 93-688, at 75 (1974) (explaining that the objective was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").

The Constitution grants the President no unilateral authority to withhold funds from obligation.  *See* B-135564, July 26, 1973.  Instead, Congress has vested the President with strictly circumscribed authority to impound, or withhold, budget authority only in limited circumstances as expressly provided in the ICA.  *See* 2 U.S.C. §§ 681–688.  The ICA separates impoundments into two exclusive categories—deferrals and rescissions.  The President may temporarily withhold funds from obligation—but not beyond the end of the fiscal year in which the President transmits the special message—by proposing a "deferral."[4]  2 U.S.C. § 684.  The President may also seek the permanent cancellation of funds for fiscal policy or other reasons, including the termination of programs for which Congress has provided budget authority, by proposing a "rescission."[5]  2 U.S.C. § 683.

In either case, the ICA requires that the President transmit a special message to Congress that includes the amount of budget authority proposed for deferral or

---

[4] Budget authority proposed for deferral must be prudently obligated before the end of its period of availability.  2 U.S.C. § 684; B-329092, Dec. 12, 2017.

[5] Budget authority proposed for rescission must be made available for obligation unless, within 45 calendar days of continuous congressional session, Congress has completed action on a rescission bill rescinding all or part of the amount proposed for rescission.  2 U.S.C. § 683.

rescission and the reason for the proposal.  2 U.S.C. §§ 683–684.  These special messages must provide detailed and specific reasoning to justify the withholding, as set out in the ICA.  *See* 2 U.S.C. §§ 683–684; B-237297.4, Feb. 20, 1990 (vague or general assertions are insufficient to justify the withholding of budget authority).  The burden to justify a withholding of budget authority rests with the executive branch.

There is no assertion or other indication here that OMB intended to propose a rescission.  Not only did OMB not submit a special message with such a proposal, the footnotes in the apportionment schedules, by their very terms, established dates for the release of amounts withheld.  The only other authority, then, for withholding amounts would have been a deferral.

The ICA authorizes the deferral of budget authority in a limited range of circumstances:  to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law.  2 U.S.C. § 684(b).  No officer or employee of the United States may defer budget authority for any other purpose.  *Id.*

Here, OMB did not identify—in either the apportionment schedules themselves or in its response to us—any contingencies as recognized by the ICA, savings or efficiencies that would result from a withholding, or any law specifically authorizing the withholding.  Instead, the footnote in the apportionment schedules described the withholding as necessary "to determine the best use of such funds."  *See* OMB Response, at 2; Attachment.  In its response to us, OMB described the withholding as necessary to ensure that the funds were not spent "in a manner that could conflict with the President's foreign policy."  OMB Response, at 9.

The ICA does not permit deferrals for policy reasons.  *See* B-237297.3, Mar. 6, 1990; B-224882, Apr. 1, 1987.  OMB's justification for the withholding falls squarely within the scope of an impermissible policy deferral.  Thus, the deferral of USAI funds was improper under the ICA.

When Congress enacts appropriations, it has provided budget authority that agencies must obligate in a manner consistent with law.  The Constitution vests lawmaking power with the Congress.  U.S. Const., art. I, § 8, cl. 18.  The President and officers in an Administration of course may consider their own policy objectives as they craft policy proposals for inclusion in the President's budget submission.  *See* B-319488, May 21, 2010, at 5 ("Planning activities are an essential element of the budget process.").  However, once enacted, the President must "take care that the laws be faithfully executed."  *See* U.S. Const., art. II, § 3.  Enacted statutes, and not the President's policy priorities, necessarily provide the animating framework for all actions agencies take to carry out government programs.  *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (a federal agency is "a creature of

**JA 312**

statute" and "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress").

Faithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law. In fact, Congress was concerned about exactly these types of withholdings when it enacted and later amended the ICA. *See* H.R. Rep. No. 100-313, at 66–67 (1987); *see also* S. Rep. No. 93-688, at 75 (1974) (explaining that the objective was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").

OMB asserts that its actions are not subject to the ICA because they constitute a programmatic delay. OMB Response, at 7, 9. It argues that a "policy development process is a fundamental part of program implementation," so its impoundment of funds for the sake of a policy process is programmatic. *Id.*, at 7. OMB further argues that because reviews for compliance with statutory conditions and congressional mandates are considered programmatic, so too should be reviews undertaken to ensure compliance with presidential policy prerogatives. *Id.*, at 9.

OMB's assertions have no basis in law. We recognize that, even where the President does not transmit a special message pursuant to the procedures established by the ICA, it is possible that a delay in obligation may not constitute a reportable impoundment. *See* B-329092, Dec. 12, 2017; B-222215, Mar. 28, 1986. However, programmatic delays occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated. B-329739, Dec. 19, 2018; B-291241, Oct. 8, 2002; B-241514.5, May 7, 1991. This presumes, of course, that the agency is making reasonable efforts to obligate. B-241514.5, May 7, 1991. Here, there was no external factor causing an unavoidable delay. Rather, OMB on its own volition explicitly barred DOD from obligating amounts.

Furthermore, at the time OMB issued the first apportionment footnote withholding the USAI funds, DOD had already produced a plan for expending the funds. *See* DOD Certification, at 4–14. DOD had decided on the items it planned to purchase and had provided this information to Congress on May 23, 2019. *Id.* Program execution was therefore well underway when OMB issued the apportionment footnotes. As a result, we cannot accept OMB's assertion that its actions are programmatic.

The burden to justify a withholding of budget authority rests with the executive branch. Here, OMB has failed to meet this burden. We conclude that OMB violated the ICA when it withheld USAI funds for a policy reason.

**JA 313**

Foreign Military Financing

We also question actions regarding funds appropriated to State for security assistance to Ukraine.  In a series of apportionments in August of 2019, OMB withheld from obligation some foreign military financing (FMF) funds for a period of six days.  These actions may have delayed the obligation of $26.5 million in FMF funds.  *See* OMB Response, at 3.  An additional $141.5 million in FMF funds may have been withheld while a congressional notification was considered by OMB.  *See* E-mail from GAO Liaison Director, State, to Staff Attorney, GAO, *Subject:  Response to GAO on Timeliness of Ukraine Military Assistance* (Jan. 10, 2020) (State's Additional Response).  We have asked both State and OMB about the availability of these funds during the relevant period.  Letter from General Counsel, GAO, to Acting Director and General Counsel, OMB (Nov. 25, 2019); Letter from General Counsel, GAO, to Secretary of State and Acting Legal Adviser, State (Nov. 25, 2019).  State provided us with limited information.  E-mail from Staff Attorney, GAO, to Office of General Counsel, State, *Subject: RE: Response to GAO on Timeliness of Ukraine Military Assistance* (Dec. 18, 2019) (GAO's request for additional information); E-mail from GAO Liaison Director, State, to Assistant General Counsel for Appropriations Law, GAO, *Subject: Response to GAO on Timeliness of Ukraine Military Assistance* (Dec. 12, 2019) (State's response to GAO's November 25, 2019 letter); State's Additional Response.  OMB's response to us contained very little information regarding the FMF funds.  *See generally* OMB Response, at 2–3.

As a result, we will renew our request for specific information from State and OMB regarding the potential impoundment of FMF funds in order to determine whether the Administration's actions amount to a withholding subject to the ICA, and if so, whether that withholding was proper.  We will continue to pursue this matter.

CONCLUSION

OMB violated the ICA when it withheld DOD's USAI funds from obligation for policy reasons.  This impoundment of budget authority was not a programmatic delay.

**JA 314**

OMB and State have failed, as of yet, to provide the information we need to fulfill our duties under the ICA regarding potential impoundments of FMF funds.  We will continue to pursue this matter and will provide our decision to the Congress after we have received the necessary information.

We consider a reluctance to provide a fulsome response to have constitutional significance.  GAO's role under the ICA—to provide information and legal analysis to Congress as it performs oversight of executive activity—is essential to ensuring respect for and allegiance to Congress' constitutional power of the purse.  All federal officials and employees take an oath to uphold and protect the Constitution and its core tenets, including the congressional power of the purse.  We trust that State and OMB will provide the information needed.

Thomas H. Armstrong
General Counsel

# Exhibit 7

## H.R. 2471, Funding For The People
### *DIVISION-BY-DIVISION SUMMARY OF APPROPRIATIONS PROVISIONS*

H.R. 2471 totals $1.5 trillion in discretionary resources and reflects conference agreements for the fiscal year 2022 appropriations bills. It furthers House Democrats' commitment to investing For The People with substantial increases to non-defense spending alongside responsible increases for defense-related programs.

In total, the 12 annual bills provide:

- $730 billion in nondefense funding, a $46 billion – 6.7 percent – increase over fiscal year 2021; and
- $782 billion in defense funding, a $42 billion – 5.6 percent – increase over fiscal year 2021.

## Division A – Agriculture-Rural Development-FDA

### <u>Overview:</u>

The 2022 Agriculture, Rural Development, Food and Drug Administration, and Related Agencies funding bill provides discretionary funding of $25.125 billion – an increase of $1.426 billion, 6 percent – above 2021. In total, the bill includes $234.2 billion for both discretionary programs funded on an annual basis and mandatory programs such as the Supplemental Nutrition Assistance Program. The legislation:

- Tackles hunger and nutrition insecurity by expanding access to fruits and vegetables to 6.2 million women, infants and children through WIC and by ensuring 42 million people in SNAP-eligible families get the benefits they need. The bill also invests in the health of America's kids through Child Nutrition programs, like school meals - which are now the healthiest source of food consumed in the United States.
- Grows opportunity and lifts up rural communities by increasing funding for rural broadband, connecting more communities to the internet through a program that last year got more than 100,000 people connected to the 21st century economy.
- Rebuilds our public health and consumer safety infrastructure with increased funding to address maternal and infant nutrition, including resources for the 'Closer to Zero' initiative to reduce exposure to toxic elements in babies' and young children's food, emerging food-related chemical and toxicological issues, drug safety oversight, as well as providing additional resources for in-person inspections in large foreign drug manufacturing countries, and drug and device supply chain monitoring and surveillance. The bill also invests in our public health infrastructure by modernizing FDA's data infrastructure to better ensure the safety and security of the food and medical supply chain.
- Provides important investments to ensure equitable participation in USDA programs. In total, the bill provides more funding than the request to advance racial justice, including increases for extension, research, and capacity grants at 1890 land grants, 1994 land grants, and Hispanic serving institutions to help strengthen the pipeline for the future of agriculture. It also provides funding to improve outreach and program access to historically underserved communities and provides a healthy increase for USDA's Office of Civil Rights above the request.
- Confronts the climate crisis with $78.3 million across USDA to address the impacts of climate change. These investments are aimed to tackle the climate crisis in farming and rural communities and include research to monitor, measure, and mitigate climate change, accelerate climate smart agriculture practices, reduce greenhouse gases, and advance clean energy technologies.

**JA 317**

**Bill Summary:**

**Rural Development and Infrastructure** – The bill provides a total of nearly $4 billion for rural development programs. These programs help create an environment for economic growth by providing business and housing opportunities and building sustainable rural infrastructure for the modern economy.

- **Rural Broadband** – The legislation invests over $550 million in the expansion of broadband service to provide economic development opportunities and improved education and healthcare services, including an additional $450 million for the ReConnect program. This is in addition to the $2 billion provided in Infrastructure Investment and Jobs Act. These significant investments in broadband reflect a commitment to enabling Americans in rural communities to access digital tools necessary to improve health, educational, and economic outcomes. Since 2019, more than 200,000 rural residents have gained access to broadband through these programs.
- **Critical Infrastructure** – The legislation includes responsible investments in infrastructure to help rural areas of the country access basic utilities. This includes $1.45 billion for rural water and waste program loans, and over $653 million in water and waste grants for clean and reliable drinking water systems and sanitary waste disposal systems, which will provide safe drinking water to millions of rural residents. An additional $7.9 billion in loan authority is provided for rural electric and telephone infrastructure loans.
- **Rural Housing Loans and Rental Assistance** – The bill provides a total of $30 billion in loan authority for the Single Family Housing Guaranteed Loan Program. The bill includes $1.25 billion in direct single family housing loans, meeting the estimated need for these loans, which provide home loan assistance to low-income rural families, many of whom would have few loan options for purchasing a home because of their geographical location. In addition, a total of $1.495 billion is provided for rental assistance and rental vouchers for affordable rental housing for low-income families and the elderly in rural communities to renew all existing rental assistance contracts. In FY 2020, Rural Development housing programs provided affordable housing to 138,331 rural homeowners and over 250,000 rental units.
- **Business and Industry Loan Program** – The bill includes $1.250 billion for the Business and Industry loan program, a 25% increase over fiscal year 2021. This will enable additional lending opportunities to business and non-profits in rural areas.

**Food and Nutrition Programs** – The legislation contains discretionary funding, as well as mandatory funding required by law, for food and nutrition programs within the Department of Agriculture. This includes funding for the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), the Supplemental Nutrition Assistance Program (SNAP), and child nutrition programs.

- **Women, Infants, and Children (WIC)** – The bill provides $6 billion in discretionary funding for WIC, including $834 million to increase the amounts of fruits and vegetables in the WIC Food Package. In FY 2022, WIC will serve an estimated 6.2 million women, infants, and children.
- **Supplemental Nutrition Assistance Program (SNAP)** – The bill provides $140.4 billion in required mandatory spending for SNAP, including $3 billion for the SNAP reserve fund, which will serve more than 42 million people. This fully funds participation, as well as the SNAP enhanced allotments authorized by the Families First Coronavirus Response Act.
- **Child nutrition programs** – The bill provides $26.9 billion in funding for child nutrition programs. This is an increase of $1.77 billion above the FY 2021 enacted level. As kids return to the classroom, this funding will support more than 5.2 billion school lunches and snacks. In addition, the bill provides $45 million for the Summer EBT program, $30 million for school kitchen equipment grants, and $6 million for school breakfast expansion grants.

**International Food Assistance Programs** – The legislation contains $2.2 billion for international food aid and to promote U.S. agricultural exports overseas. This includes $1.74 billion for Food for Peace grants and $237

**JA 318**

million for the McGovern-Dole International Food for Education and Child Nutrition program. In 2021, these programs, which work to reduce famine and increase food security overseas, provided food assistance across six continents.

**Marketing Programs** – The bill provides $228 million, $39 million above the FY 2021 enacted level and $14 million above the request, to facilitate the movement of agriculture products and open market opportunities. This includes $20.3 million for the National Organic Program to protect the integrity of the USDA Organic label and $25.6 million for the oversight and enforcement of the Packers and Stockyards Act. The bill also provides $20.4 million in discretionary funds to the Agricultural Marketing Service and Rural Development for the Local Agriculture Market Program to continue supporting local food and value-added agriculture. In addition, the bill provides $25 million to support dairy business innovation initiatives.

**Agricultural Research** – The bill provides $3.5 billion – $217 million above the FY 2021 enacted level – for agriculture research programs, including the Agricultural Research Service (ARS) and the National Institute of Food and Agriculture (NIFA). This funding will support research at all ARS facilities to help mitigate and stop devastating livestock and crop diseases, improve food safety and water quality, increase production, and combat antimicrobial resistance. This funding also includes important research investments in U.S. land-grant colleges and universities, including a significant increase for the 1890 institutions, and for the Agriculture and Food Research Initiative, the U.S. Department of Agriculture's premier competitive research program.

**Farm Programs** – The legislation provides $1.87 billion for farm programs, which is $44 million above the FY 2021 enacted level. This includes $61 million to resolve ownership and succession of farmland issues, also known as heirs' property issues. This funding will continue support for various farm, conservation, and emergency loan programs, and help American farmers and ranchers. It will also meet estimates of demand for farm loan programs.

**Animal and Plant Health** – The legislation includes $1.113 billion – $46 million above the FY 2021 enacted level – for the Animal and Plant Health Inspection Service. This funding will support programs to help control or eradicate plant and animal pests and diseases that can be crippling to U.S. producers. The funding level provides increases that will help address harmful pests and diseases such as cotton pests, spotted lanternfly, and chronic wasting disease, and support the growing needs of veterinary biological products such as vaccines and diagnostic tests while maintaining increases from past years for citrus greening. The bill also provides $250 million for the Agriculture Quarantine and Inspection Services Program to continue activities at the U.S. borders and ports of entry to intercept any foreign agricultural pests and diseases that could affect U.S. agriculture, trade and commerce.

**Conservation Programs** – The bill provides $1.005 billion to help farmers, ranchers, and other private landowners conserve and protect their land. This includes $101 million for infrastructure for watershed and flood prevention and watershed rehabilitation projects, $8.5 million for the Urban Agriculture and Innovative Production Program, and $7 million for the Healthy Forests Reserve Program.

**Food Safety and Inspection Service** – The legislation includes $1.109 billion for food safety and inspection programs. These mandatory inspection activities help ensure the safety and productivity of the country's meat and poultry industry, and keep safe, healthy food on American tables. The funding provided will maintain more than 8,700 frontline inspection personnel for meat, poultry, and egg products at more than 6,500 facilities across the country.

**Food and Drug Administration (FDA)** – FDA receives a total of $3.3 billion in discretionary funding in the bill, an increase of $102 million above the FY 2021 enacted level. Total funding for FDA, including revenue from user fees, is $6.2 billion. Within this total, the Committee provides a targeted increase of $29 million to address the opioid crisis, medical supply chain surveillance, rare cancers, and increasing and strengthening in

person inspections of foreign drug manufacturers. It also includes a $29.5 million increase to better avoid or more quickly respond to food outbreaks, improve the animal food inspection system, and addresses heavy metals in baby food. The bill also appropriates $50 million to accelerate medical product development as authorized in the 21st Century Cures Act.

**Commodity Futures Trading Commission (CFTC)** – The bill provides $382 million for the CFTC – $78 million above the FY 2021 enacted level.

# Division B – Commerce-Justice-Science

## Overview:

The 2022 Commerce, Justice, Science, and Related Agencies funding bill provides $75.8 billion.  The legislation:

- Creates good-paying American jobs with investments in economic development in distressed communities with support for small businesses, including small and medium sized American manufacturers
- Strengthens communities by supporting local law enforcement while bolstering police and criminal justice reform and expanding gun violence prevention efforts
- Addresses gender-based violence with strong increases for Violence Against Women Act prevention and prosecution programs, as well as efforts to reduce the backlog of unprocessed rape kits
- Confronts the climate crisis with strong funding for climate resilience and research at NASA, the National Oceanic and Atmospheric Administration, and the National Science Foundation

## Bill Summary:

**U.S. Department of Commerce –** $9.9 billion in net discretionary funding for the Department of Commerce, an increase of $989 million above the FY 2021 enacted level.

- **International Trade Administration (ITA) –** $570 million, $29 million above the FY 2021 enacted level.  The total includes no less than the fiscal year 2021 level for ITA Global Markets to help create jobs here at home by increasing U.S. exports and no less than $105.5 million for ITA Enforcement and Compliance to protect U.S. industries against unfair foreign trade practices.

- **Bureau of Industry and Security (BIS) –** $141 million, an increase of $8 million above FY 2021 to advance U.S. national security through effective export control.

- **Economic Development Administration (EDA) –** $373.5 million, an increase of $27.5 million above FY2021.  This includes $120.5 million for EDA's Public Works program, which supports brick-and-mortar projects in distressed communities across the nation, $41.5 million for Assistance to Coal Communities, an increase of $8 million and $45 million for the Regional Innovation Program, an increase of $7 million, to help create jobs by establishing and expanding region-focused innovative technology business endeavors.  Additionally, $2 million is provided for STEM Apprenticeships to help align the skills of workers and the needs of employers.

- **Minority Business Development Agency (MBDA) –** $55 million, an increase of $7 million above FY 2021, is provided for MBDA to support minority businesses around the country.

**JA 320**

- **U.S. Patent and Trademark Office (PTO)** – $4.1 billion, an increase of $363.1 million above FY 2021, to help protect new ideas and investments in American innovation and creativity, and to promote technological progress and achievement.

- **Manufacturing Extension Partnership (MEP) Program** – $158 million, $8 million above FY 2021 to help small and medium sized American manufacturers create and preserve jobs.

- **National Oceanic and Atmospheric Administration (NOAA)** – $5.88 billion, an increase of $447 million above FY 2021, including:

  - **Climate Research** – $200 million, an increase of $18 million above FY 2021, including an increase of $10 million to provide actionable climate information to inform Americans' decisions about how to adapt to the changing climate.

  - **NOAA's National Marine Fisheries Service (NMFS)** – $1.02 billion for NMFS operations, an increase of $51 million above FY 2021, including a $6 million increase to support the President's initiative to build more offshore wind farms and an increase of $16 million to support efforts to protect the critically endangered North Atlantic right whale.

  - **National Weather Service** – $1.17 billion for operating expenses, an increase of $74 million above FY 2021. In addition, this Act provides an increase of $70 million over FY 2021 to procure future weather satellites, which are essential for accurate weather forecasting.

**U.S. Department of Justice (DOJ)** – $35.2 billion overall for the Department of Justice, which is $1.4 billion above the FY2021 enacted level.

- **Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016** – $14.5 million is provided, as authorized, including: $5 million within the Civil Rights Division; $5 million within the Federal Bureau of Investigation; $1.5 million within the Community Relations Service; and $3 million within State and Local Law Enforcement Assistance.

- **Executive Office for Immigration Review --** $760 million, an increase of $26 million above FY 2021, including $24 million for the Legal Orientation Program.

- **Federal Bureau of Investigation** – $10.77 billion, an increase of $454 million above the FY 2021 enacted level and $492.5 million above the President's budget request.

- **Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)** – $1.53 billion, an increase of $47.2 million above the FY 2021 enacted level.

- **Federal Bureau of Prisons (BOP)** – $8.1 billion, an increase of $265 million above the FY 2021 enacted level and $251 million above the President's budget request.

- **First Step Act** – The agreement fully funds the requested $409.5 million for programs and activities authorized by the First Step Act of 2018, including medication-assisted treatment.

- **Task Force on Law Enforcement Oversight**– The agreement reminds the Attorney General to comply with congressional direction and use the $5 million provided in fiscal year 2021 to establish a Task Force on Law Enforcement Oversight, comprised of representatives from multiple Justice Department components, in consultation with law enforcement, labor, and community-based organizations to coordinate the detection and referral of complaints regarding incidents of alleged law enforcement

**JA 321**

misconduct.

- **Database on Use of Force and Officer Misconduct** – The agreement reminds the Attorney General to comply with congressional direction and use the $5 million appropriated in fiscal year 2021 for the development and deployment of databases to track excessive use of force and officer misconduct, to be developed in consultation with State and local law enforcement agencies, community organizations, and advocacy groups, including those that advocate for the preservation of civil liberties and civil rights.

- **Grants to State and Local Law Enforcement** – $3.9 billion is provided, an increase of $506.4 million above FY 2021. This includes: $674.5 million for Byrne JAG; $512 million for Community Oriented Policing Services (COPS) programs; $201 million to address sexual assault kit and other DNA evidence backlogs; $115 million for Second Chance Act programs; $572.5 million for grant programs to address substance use disorders; $135 million for the STOP School Violence Act; $575 million for Violence Against Women Act (VAWA) prevention and prosecution programs; $95 million for grants to improve the NICS firearms background check system; $50 million for a new Community Violence Intervention and Prevention initiative; and nearly $300 million in community projects to fight crime and improve public safety in communities across the country.

**National Aeronautics and Space Administration (NASA)** – $24 billion is provided, an increase of $770 million above the FY 2021 enacted level, including:

- $7.6 billion for NASA's **Science Mission Directorate**, an increase of $313.4 million above the FY2021 enacted level, to enable better scientific information about the Earth and its changing climate, as well as to further our understanding of our solar system and beyond. These funds include support for the James Webb Space Telescope, which launched in December and will soon begin taking pictures of parts of the universe never previously observed.

- $880.7 million for **Aeronautics research**, an increase of $52 million above FY 2021, to continue efforts to improve environmental sustainability of air travel through increased fuel efficiency and electric flight, as well to improve passenger safety.

- $137 million for **NASA's STEM Engagement education initiatives**, an increase of $10 million above FY 2021, to enable NASA to inspire young people to pursue future careers in science and engineering. This amount includes funding significant increases for the Space Grant consortium, which benefits all 50 states, and the Minority University Research and Education Project.

- Funding to jumpstart development of commercial low-Earth orbit **space station design and development**. Funding will help NASA promote new, private space stations to replace the International Space Station, which is scheduled for retirement in 2031.

**National Science Foundation (NSF)** – $8.84 billion, an increase of $351 million above the FY 2021 enacted level to support cutting edge research including:

- **NSF Research and Related Activities** – $7.2 billion is provided, an increase of $250 million above FY 2021.

- **Education and Human Resources** -- $1.01 billion is provided, an increase of $38 million above FY 2021.

**Legal Services Corporation** – $489 million, $24 million above the FY 2021 enacted level to provide legal assistance to underserved communities.

**JA 322**

**Equal Employment Opportunity Commission** – $420 million, $15.5 million above the FY 2021 enacted level.

**International Trade Commission (ITC)** – $110 million, $7 million above the FY 2021 enacted level.

# Division C – Defense

## Overview:

For 2022, the bill provides $728.5 billion in discretionary spending, an increase of $32.5 billion above 2021. The legislation:

- Protects our national security, preserves our domestic advanced manufacturing base to support jobs and economic growth, and invests heavily in research and development.
- Eliminates the Overseas Contingency Operations budget gimmick.
- Promotes democracy by countering China with strong funding to protect a free and open Indo-Pacific.
- Supports working families by funding the President's executive order of a $15 minimum wage for Department of Defense personnel.
- Confronts the climate crisis with historic investments for clean energy and climate adaptation to protect facilities, readiness, and global security.
- Addresses gender-based violence with funding to tackle sexual assault in the military and directs DoD to report on extremist activities.

To respond to Russian aggression in Ukraine, the bill includes $300 million for the Ukraine Security Assistance Initiative and $300 million for allies and partners in the region, including $180 million for the Baltic Security Initiative, $30 million for Poland, $30 million for Romania, $20 million for Bulgaria, and $40 million for Georgia.

## Bill Summary:

**Military Personnel**
Total: $166.8 billion

The FY 2022 Military Personnel recommendation is $166.8 billion in funding for active, reserve and National Guard military personnel, a decrease of $569 million below the budget request and an increase of $8.9 billion above the FY 2021 enacted level.

- Provides full funding necessary to support the proposed 2.7 percent military pay raise.
- Increases funding by $151.5 million above the President's request for the Department and Services' Sexual Assault Prevention and Response programs, for a total of $539.7 million. This includes $97 million for implementation of the Independent Review Commission on Sexual Assault in the Military, $47 million for the Special Victims' Counsel, and an increase of $7.5 million above the request for the Department's Sexual Assault Prevention and Response Office.
- Funds active duty end strength of 1,348,040, a decrease of 335 below current year and equal to the authorized level. Funds reserve component end strength of 799,500, a decrease of 2,500 below current year and equal to the request and the authorized level.
  - Army totals: 485,000 active duty, a decrease of 900 below current year and equal to the request; 189,500 reserve, a decrease of 300 below current year and equal to the request; and 336,000 Guard, a decrease of 500 below current year and equal to the request.

**JA 323**

- o Navy totals: 346,920 active duty, a decrease of 880 below current year and equal to the authorized level; and 58,600 reserve, a decrease of 200 below current year and equal to the request.
- o Marine Corps totals: 178,500 active duty, a decrease of 2,700 below current year and equal to the request; and 36,800 reserve, a decrease of 1,700 below current year and equal to the request.
- o Air Force totals: 329,220 active duty, a decrease of 4,255 below current year and equal to the authorized level; 70,300 reserve, equal to current year and the request; and 108,300 Guard, an increase of 200 above current year and equal to the request.
- o Space Force totals: 8,400 active duty, equal to the authorized level and to the request.

**Operation and Maintenance**
Total: $256.3 billion

The FY 2022 Operation and Maintenance recommendation is $256.3 billion, an increase of $2.6 billion above the budget request and an increase of $64 billion above the FY 2021 base enacted level.

- Provides $30.7 billion to the Departments of the Army, Navy, Marine Corps, and Air Force for depot maintenance.
- Provides $1.5 billion for Environmental Restoration activities, $486.5 million above the request and of which $210 million are for costs associated with PFOS/PFOA cleanup. In addition, provides $15 million for study and assessment of health implications of PFOS/PFOA contamination in drinking water.
- Provides an increase of $1.6 billion in Facilities Sustainment, Repair and Modernization programs across Active, Reserve and Guard components.
- Provides an additional $120 million for climate infrastructure programs.
- Provides $264 million in added funds for the Navy's Shipyard Infrastructure Optimization Program (SIOP).
- Provides $9.4 billion to fund SOCOM's operation and maintenance requirements.
- Provides $1 million to the Army for the renaming of installations, facilities, roads and streets that bear the name of confederate leaders and officers.
- Provides increases for National Guard Youth Challenge ($210m); and Starbase ($42 million).
- Provides an additional $40 million for the Office of Defense Local Community Cooperation for the Defense Community Infrastructure Program.
- Provides $50 million for Impact Aid and $20 million for Impact Aid for those with disabilities.
- Provides $8.6 million for gender advisor programs.
- Provides $50 million for the Procurement Technical Assistance Program.
- Provides $345 million for the Cooperative Threat Reduction Program.
- Provides $75 million for noise mitigation tools for communities.
- Provides $5 million for ex-gratia payments, including for families of the victims of the August 29, 2021, air strike in Kabul, Afghanistan.

*Security Cooperation Programs*
- $300 million for the Ukraine Security Assistance Initiative.
- $1.3 billion for International Security Cooperation Programs, including:
  - o $300 million to shore up the defenses of U.S. allies and partners facing of Russian aggression, including $180 million for Estonia, Latvia, and Lithuania through the Baltic Security Initiative; $30 million for Poland; $30 million for Romania; $20 million for Bulgaria; and $40 million for Georgia.
  - o $165 million for programs with countries in the Africa Command area of responsibility, $60 million above the request.
  - o $90 million for programs with Jordan.

**JA 324**

- o Supports international security cooperation programs with countries in Indo-Pacific Command, including Maritime Security Programs.
- Requires the Secretary of Defense, in coordination with the Secretary of State, to provide integrated security cooperation strategies for key U.S. partner nations.
- Up to $500 million for Jordan, including not less than less than $150 million for reimbursements for enhanced border security.
- $50 million for Coalition Support Funds, including support for U.S. allies and partners who fought in Afghanistan.

*Counter-ISIS Train and Equip Fund*
- $500 million to support the Iraqi Security Forces, Kurdish Peshmerga, and the Syrian Democratic Forces counter ISIS.
- Requires the Secretary of Defense to ensure elements are appropriately vetted and receiving commitments to promote respect for human rights and the rule of law.
- No funds may be used with respect to Iraq or Syria in contravention of the War Powers Resolution.
- No funds to establish any military base for the purpose of providing for the permanent stationing of U.S. Armed Forces in Iraq.
- No funds to exercise U.S. control over any oil resource of Iraq or Syria.

*Overseas Humanitarian, Disaster, and Civic Aid*
- Provides $160 million for foreign disaster relief, humanitarian assistance, and the humanitarian mine action program, $50 million above the budget request.

**Procurement**
Total: $144.9 billion

For FY 2022, the bill provides $144.9 billion, an increase of $12.4 billion above the budget request and an increase of $8.4 billion above the FY 2021 base enacted level.
- Provides $12.4 billion above the total funding request for increased investments in ground vehicles, aircraft, ships, munitions, and other equipment.

*Aircraft*
- Funds 12 F/A-18E/F Super Hornet aircraft ($977 million).
- Funds the request of 85 F-35 aircraft ($8.5 billion).
- Funds 12 F-15EX aircraft to recapitalize the F-15C/D fleet ($1.1 billion).
- Funds the request of 14 KC-46 tankers ($2.3 billion).
- Funds the request of 14 HH-60W combat rescue helicopters ($744 million).
- Funds 29 C/KC/MC-130J aircraft, 20 more than the request ($3.1 billion), including 16 C-130J aircraft for the Air National Guard and 4 C-130J aircraft for the Air Force Reserve.
- Funds 12 MQ-9 Reaper air vehicles for the Marine Corps and Air Force, six more than the request ($365 million).
- Funds the second lot of CH-47F Block II Chinook aircraft and long-lead funding for the third lot to ensure that the Army stays on schedule with the program of record ($170 million).
- Provides $211.5 million above the request to fund a total of 33 UH/HH-60M Blackhawk helicopters ($842 million).
- Funds the requested 30 remanufactured AH-64 Apache helicopters ($469 million).
- Funds the request of five E-2D Advanced Hawkeye aircraft ($749.6 million).
- Funds 11 CH-53K helicopters, two more than the request ($1.5 billion).
- Funds 12 V-22 helicopters, four more than the request (1.1 billion).

**JA 325**

- Provides $166 million for SOCOM's Armed Overwatch Program.
- Provides $29 million for a SOCOM MH-60 resulting from a battle loss.

*Shipbuilding*
- Provides $26.7 billion to procure 13 Navy ships, $4.1 billion above the request.
- Funds are provided for two DDG-51 guided missile destroyers, two SSN-774 attack submarines, one Frigate, two TAO Fleet Oiler, two towing, salvage, and rescue ships, one T-AGOS(X) auxiliary general ocean surveillance ship, one expeditionary sea base, one expeditionary medical ship, and one expeditionary fast transport.

*Vehicles/Force Protection*
- Provides $139 million above the request to procure an additional 41 Stryker A1 combat vehicles for a total of 228 vehicles ($1.08 billion).
- Provides $175 million above the request to upgrade a total of 90 Abrams tanks to the M1A2 SEPv3 tank variant ($1.15 billion).
- Provides $227 million above the request for an additional 23 Paladin Integrated Management self-propelled howitzers ($663 million).
- Provides an additional $100 million for Army National Guard HMMWV modernization.
- Provides $183 million above the request to install Anti-lock Brake System/Electronic Stability Control (ABS/ESC) kits on existing Army HMMWV vehicles for improved safety.
- Provides $374 million above the request to accelerate fielding of Counter-Small Unmanned Aerial System equipment ($434 million).
- Fully funds the Army's request for production of 23 Mobile Protected Firepower systems ($287 million).
- Fully funds the Army's request for 2,744 Joint Light Tactical Vehicle trucks and trailers ($574 million).
- Provides $78 million above the request for autonomous, lightweight Counter Unmanned Aerial Systems for Special Operations Forces.

*Other*
- Provides $47 million above the request for Defense Production Act Purchases to ensure the timely availability of domestic industrial base capabilities essential for the national defense ($388 million).
- Provides $1,327 million to procure five National Security Space Launch services.
- Provides $853 million to procure three GPS IIIF spacecraft.
- Provides $200 million to fully support Israeli Cooperative procurement programs (Iron Dome, David's Sling, and Arrow).
- Includes $950 million for the National Guard and Reserve Equipment Account (NGREA).

**Research, Development, Test and Evaluation (RDT&E)**
Total: $119.2 billion

For FY 2022, the bill provides $119.2 billion, an increase of $7.2 billion above the budget request and an increase of $12.1 billion above the FY 2021 base enacted level.
- Invests in basic and applied scientific research, development, test and evaluation of new technologies and equipment, and supports the research community so forces will have the systems and equipment for tomorrow's challenges.

*Aircraft*
- Fully funds the continued development and modernization of the F-35 Joint Strike Fighter ($2.1 billion).
- Fully funds the continued development of the Air Force's B-21 bomber ($2.9 billion).

**JA 326**

- Fully funds the Air Force's Next Generation Air Dominance program ($1.5 billion).
- Provides $77.5 million above the request for the Army's Future Long Range Assault Aircraft ($521 million).
- Fully funds the continued development and testing of the CH-53K helicopter ($257 million).

*Vehicles and Ground Forces*
- Provides $15 million above the request to support the Army's Long Range Hypersonic Weapon ($315 million).
- Fully funds the Army's Mobile Medium Range Missile ($286 million).
- Fully funds the Army's Precision Strike Missile ($188 million).

*Defense Advanced Research Project Agency (DARPA)*
- Provides $3.87 billion for DARPA research programs.

*Other*
- Provides an additional $30 million for PFAS remediation and disposal technology.
- Provides an additional $28.7 million for PFAS destruction technologies.
- Provides an additional $20 million for AFFF replacement, disposal, and cleanup technology.
- Provides $300 million for the Israeli cooperative research and development programs, including David's Sling and Arrow-3.
- Provides $246million for the Global Positioning System IIIF program.
- Provides $402 million for the Global Positioning System III Operational Control Segment.
- Provides $434 million for Global Positioning System user equipment.
- Provides $202 million for National Security Space Launch.
- Provides $2.34 billion for Next Generation Overhead Persistent Infrared.
- Provides $2.5 billion for the Ground Based Strategic Deterrent and $599 million for the Long Range Standoff Weapon.
- Provides $1.3 billion for the Navy's Conventional Prompt Strike program.

**Revolving and Management Funds**
Total: $2.017 billion

The FY 2022 Revolving and Management Funds recommendation is $2.017 billion in base funding, which is $115 million above the budget request and an increase of $544 million above the FY 2021 enacted level.
- Fully funds the Defense Commissary Agency to ensure servicemembers and their families receive continued savings for food and household goods as part of the military pay and benefits package.

**Other Department of Defense Programs**

*Defense Health Programs*
- $37.35 billion for medical and health care programs of the Department of Defense. Within this total, adds $577.5 million for cancer research. The total amount is distributed as follows:
  - $150 million for the breast cancer research program;
  - $110 million for the prostate cancer research program;
  - $50 million for the kidney cancer research program;
  - $45 million for the ovarian cancer research program;
  - $20 million for the lung cancer research program;
  - $40 million for the melanoma research program;
  - $15 million for the pancreatic cancer research program;

**JA 327**

- o   $17.5 million for the rare cancer research program; and
- o   $130 million for the cancer research program.
- o   Adds $175 million for the peer-reviewed traumatic brain injury and psychological health research program.
- o   Adds $40 million for spinal cord research.
- o   Adds $40 million for the joint warfighter medical research program.
- o   Adds $30 million for a new toxic exposures research line.

*Chemical Agents and Munitions Destruction*
- $1.09 billion, as requested.

*Drug Interdiction and Counter-Drug Activities*
- $926 million, including $194 million for the National Guard Counter-Drug Program.

*Office of the Inspector General*
- $438.4 million, as requested.

*General Provisions*
- $200 million for an Artificial Intelligence Development Fund.
- $50 million to build a workforce to tackle Artificial Intelligence-specific challenges.

**Oversight and Reform Provisions**
- No funds may be used in contravention of the War Powers Resolution.
- No funds for the Taliban.
- No funds for the Russian state-owned arms export agency Rosoboronexport.
- Provides that nothing in this Act may be construed as authorizing the use of force against Iran or North Korea.
- Requires the Secretary of Defense to notify Congress not later than 15 days after a foreign base is opened or closed.
- Directs the Secretary of Defense to provide all remaining documents to judicial authorities in El Salvador investigating the El Mozote massacre.
- Provides $1 million to the Army for the renaming of installations, facilities, roads and streets that bear the name of confederate leaders and officers since the Army has the preponderance of the entities to change.
- Includes over $500 million to construct, renovate, repair, or expand public schools on military installations and requires laborers and mechanics to be paid prevailing wages.
- Includes $3.3 billion in prior year rescissions.

**Support to Israel**
- In addition to the amount covered in the MOU, the bill provides an additional $1 billion for the Iron Dome defense system to counter short-range rocket threats and to replace missile interceptors from the May 2021 conflict.

# Division D – Energy & Water Development

## Overview:

The 2022 Energy and Water Development and Related Agencies funding bill provides $54.97 billion, an increase of $3.2 billion above the fiscal year 2021 enacted level. The legislation:

**JA 328**

- Creates tens of thousands of good-paying jobs with a focus on deploying clean energy technologies and the green jobs of tomorrow in communities across the country
- Confronts the climate crisis with more than $14 billion of transformative investments in clean energy and science, which will help develop clean, affordable, and secure American energy
- Rebuilds our nation's water infrastructure, critical to protecting communities from more frequent and severe storms and addressing the worsening drought

## Bill Summary:

**Army Corps of Engineers** – For fiscal year 2022, the bill provides a total of $8.3 billion, an increase of $548 million above the fiscal year 2021 level and an increase of $1.6 billion above the budget request.

- **Investigations** – The bill provides $143 million, an increase of $37.2 million above the request.
- **Construction** – The bill provides $2.49 billion, an increase of $700 million above the request.
- **Operation and Maintenance** – The bill provides $4.57 billion, an increase of $720 million above the fiscal year 2021 level and $2.07 billion above the request.
- **Harbor Maintenance Trust Fund projects** receive an estimated $2.05 billion, an increase of $370 million above fiscal year 2021 and $424.1 million above the request. The bill provides these funds in accordance with the budgetary adjustments made by the CARES Act and the Water Resources Development Act of 2020.
- Funds the **Water Infrastructure Finance and Innovation Program** to provide $500 million in loans for non-federal water infrastructure.

**Department of the Interior and Bureau of Reclamation** – For fiscal year 2022, the bill provides a total of $1.92 billion, an increase of $233 million above the fiscal year 2021 level and $371 million above the budget request.

- **Central Utah Project** – The bill provides $23 million, an increase of $2 million above the fiscal year 2021 level and $3 million above the request.
- **Bureau of Reclamation** – The bill provides $1.9 billion, an increase of $231 million above the fiscal year 2021 level and $368 million above the request.

**Department of Energy** – For fiscal year 2022, the bill provides a total of $44.9 billion for the Department, an effective increase of $2.9 billion above the fiscal year 2021 level after accounting for one-time rescissions of emergency funds in fiscal year 2021.

- **Energy Efficiency and Renewable Energy** – The bill provides a record-level $3.2 billion, an increase of $338 million above the fiscal year 2021 level. This funding provides for clean, affordable, and secure energy and ensures American leadership in the transition to a global clean energy economy.
- **Cybersecurity, Energy Security, and Emergency Response** – The bill provides $185.8 million, an increase of $29.8 million above the fiscal year 2021 level. This funding provides for efforts to secure the nation's energy infrastructure against all hazards, reduce the risks of and impacts from cybersecurity events, and assist with restoration activities.
- **Electricity** – The bill provides $277 million, an increase of $65.3 million above the fiscal year 2021 level. This funding will advance technologies to increase the resiliency and efficiency of the nation's electricity delivery system with capabilities to incorporate growing amounts of clean energy technologies.
- **Nuclear Energy** – The bill provides $1.65 billion, an increase of $147 million above the fiscal year 2021 level. The funding invests in research, development, and demonstration activities that develop the next generation of clean and safe reactors, further improve the safety and economic viability of our

**JA 329**

current reactor fleet, and contribute to the nation's long-term leadership in the global nuclear power industry.

- **Fossil Energy and Carbon Management** – The bill provides $825 million, an increase of $75 million above the fiscal year 2021 level. This funding advances carbon reduction and mitigation in sectors and applications that are difficult to decarbonize, including the industrial sector, with technologies and methods such as carbon capture and storage, hydrogen, and direct air capture, while assisting in facilitating the transition toward a net-zero carbon economy and rebuilding a U.S. critical minerals supply chain.
- **Science** – The bill provides $7.475 billion, an increase of $449 million above the fiscal year 2021 level and $35 million above the request. The Office of Science funds basic science research in physics, biology, chemistry, and other science disciplines to expand scientific understanding and secure the nation's global leadership in energy innovation. The supported research supports nearly 28,000 researchers located at over 300 institutions, spanning all 50 states. The supported scientific user facilities serve over 36,000 users.
- **Nuclear Waste Disposal** – The bill provides $27.5 million for interim storage of nuclear waste and oversight of the Nuclear Waste Fund.
- **Advanced Research Projects Agency—Energy** – The bill provides $450 million, an increase of $23 million above the fiscal year 2021 level. This funding supports research aimed at rapidly developing energy technologies that are capable of significantly changing the energy sector to address the nation's critical economic, environmental, and energy security challenges.
- **Indian Energy Policy and Programs** – The bill provides $58 million, an increase of $36 million above the fiscal year 2021 level. This funding will provide technical assistance, direct and remote education, policy research and analysis, and financial assistance to Indian tribes, Alaska Native Village and Regional corporations, and Tribal Energy Resource Development Organizations.
- **National Nuclear Security Administration** – The bill provides $20.7 billion for DOE's nuclear security programs. This funding will maintain a safe, secure, and credible nuclear deterrent while addressing the threat of nuclear proliferation and terrorism. This includes:
  - **Weapons Activities** – $15.92 billion to maintain a safe and reliable nuclear deterrent.
  - **Defense Nuclear Nonproliferation** – $2.35 billion, an increase of $94 million above the fiscal year 2021 level. This funding secures nuclear material at home and abroad, combats the threat of nuclear terrorism, and provides emergency response capabilities.
  - **Naval Reactors** – $1.9 billion, an increase of $234 million above the fiscal year 2021 level, to continue safe and reliable operation of the Navy's nuclear-powered fleet.
- **Environmental Management** – The bill provides $7.9 billion, an increase of $318 million above the fiscal year 2021 level. This funding is used for nuclear cleanup work at 16 sites across the country. This includes:
  - **Non-Defense Environmental Cleanup** – $333.9 million, an increase of $14.7 million above the fiscal year 2021 level.
  - **Uranium Enrichment Decontamination and Decommissioning** – $860 million, an increase of $19 million above the fiscal year 2021 level and $28.7 million above the request.
  - **Defense Environmental Cleanup** – $6.71 billion, an increase of $284 million above the fiscal year 2021 level.
- **Loan Guarantee Programs** – Maintains funding consistent with the fiscal year 2021 levels.
- **Power Marketing Administrations** – The bill provides the net budget request levels for the Southeastern Power Administration, Southwestern Power Administration, and Western Area Power Administration.

**Independent Agencies**

**JA 330**

- **Nuclear Regulatory Commission** – The bill provides a total net appropriation of $131 million, equal to the request. This funds regulatory activities to ensure the safe use of nuclear reactors and radioactive materials while protecting people and the environment.
- **Defense Nuclear Facilities Safety Board** – The bill provides $36 million, an increase of $5 million above the fiscal year 2021 level. The Board provides recommendations regarding public health and safety matters at Department of Energy defense nuclear facilities.
- **Appalachian Regional Commission** – The bill provides $195 million, an increase of $15 million above the fiscal year 2021 level. The Commission funds efforts in the Appalachian Region to promote economic and community development, education and job training, and critical infrastructure.
- **Delta Regional Authority** – The bill provides $30.1 million, equal to the request. This funding targets the economic development needs of distressed portions of the Mississippi River Delta Region.
- **Denali Commission** – The bill provides $15.1 million, equal to the request. This funding provides critical utilities, infrastructure, health services, and economic support throughout Alaska.
- **Northern Border Regional Commission** – The bill provides $35 million, an increase of $5 million above the fiscal year 2021 level and $4.9 million above the request. This funding targets the economic development needs of distressed portions of Maine, New Hampshire, Vermont, and New York.
- **Southeast Crescent Regional Commission** – The bill provides $5 million, an increase of $4 million above the fiscal year 2021 level and $2.5 million above the request. This funding targets the economic development needs of distressed portions of Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, and Virginia.
- **Southwest Border Regional Commission** – The bill provides $2.5 million, equal to the request and $2.25 million above the fiscal year 2021 level. This funding targets the economic development needs of distressed portions of Arizona, California, New Mexico, and Texas.
- **Nuclear Waste Technical Review Board** – The bill provides $3.8 million, equal to the request. The Board provides independent technical oversight of the Department of Energy's nuclear waste disposal program.

## Division E – Financial Services & General Government

**Overview:**

The 2022 Financial Services and General Government funding bill includes $25.5 billion, an increase of $1.1 billion over 2021. The legislation:

- Assists small businesses and entrepreneurs through the Small Business Administration and Community Development Financial Institutions
- Protects our democracy with Election Security Grants that ensure the integrity and safety of our elections
- Rebuilds the Internal Revenue Service to finally crack down on big corporations and the wealthy who aren't paying their fair share and to provide better customer service to working families navigating the tax system
- Supports working and middle-class families by increasing funding for consumer protection activities at the Consumer Product Safety Commission and the Federal Trade Commission

**Bill Summary:**

**Department of the Treasury** – For fiscal year 2022, the bill provides a total of $14.3 billion in discretionary appropriations for the Department, an increase of $811 million above the FY 2021 enacted level. Of the total provided for the Department of the Treasury, the bill includes:

- $295 million for **Community Development Financial Institutions**, an increase of $25 million above the FY 2021 enacted level. The total amount includes $173 million for financial and technical assistance grants and $35 million for the Bank Enterprise Award Program to help struggling businesses in underserved communities.
- $240.5 million for **Inspectors General** offices within the Treasury Department, an increase of $10 million above the FY 2021 enacted level, to ensure robust oversight of Departmental policies and practices.
- $161 million for the **Financial Crimes Enforcement Network**, an increase of $34 million above the FY 2021 enacted level, to boost efforts to combat terrorist financing and money laundering.
- $195 million for the **Office of Terrorism and Financial Intelligence**, an increase of $20 million above the FY 2021 enacted level, to continue investments to protect the integrity of the financial system.
- $80 million for the Department's **Cybersecurity Enhancement Account,** an increase of $62 million above the FY 2021 enacted level, to address the impacts of the SolarWinds attack and minimize the impact of future attacks.
- $128 million for the **Alcohol and Tobacco Tax and Trade Bureau**, an increase of $4 million above the FY 2021 enacted level.
- **Internal Revenue Service (IRS)** – The bill includes $12.6 billion for the IRS, an increase of $675 million above the FY 2021 enacted level.  The largest increase since 2001.  Additionally, the bill provides special funding transfer authority and direct hire authority to address the backlog of returns and correspondence. Of this amount, the bill includes:
  - $2.8 billion, an increase of $225 million above the FY 2021 enacted level, for **Taxpayer Services**. This total includes support for the Volunteer Income Tax Assistance Matching Grants Program, Low Income Taxpayer Clinic, the Taxpayer Advocate, Tax Counseling for the Elderly, and increased personnel to improve IRS customer service.
  - $5.4 billion, an increase of $225 million above the FY 2021 enacted level, for **Enforcement**. These funds support increased enforcement efforts and additional essential personnel.
  - $4.1 billion, an increase of $173 million, including the program integrity allocation adjustment, above the FY 2021 enacted level, for **Operations Support**.
  - $275 million, an increase of $52 million above the FY 2021 enacted level, for **Business Systems Modernization** to modernize IRS legacy systems and improve IRS Web applications.

**Executive Office of the President** – The bill includes a total of $786 million, an increase of $27 million above the FY 2021 enacted level.

- **Office of Administration** – The bill provides $106.5 million, an increase of $6.5 million above the FY 2021 enacted level. The bill also includes language allowing the Office to pay White House and other Executive Office of the President interns, in line with recent actions by Congress to pay its interns.
- **Office of Management and Budget (OMB)** – The bill provides $116 million for OMB, an increase of $9.4 million above the FY 2021 enacted level.
- **Office of National Drug Control Policy (ONDCP)** – The bill includes a total of $449 million for ONDCP, including:
  - $297 million for the **High Intensity Drug Trafficking Areas Program**, an increase of $7 million above the FY 2021 enacted level; and
  - $106 million for the **Drug-Free Communities Program**, an increase of $4 million above the FY 2021 enacted level.

**The Judiciary** – The bill includes a total of $8 billion in discretionary appropriations, an increase of $267 million above the FY 2021 enacted level.

- **Courts of Appeals, District Courts, and Other Judicial Services** – $5.6 billion, an increase of $186 million above the FY 2021 enacted level, to support court operations and increased services in Probation and Pretrial.
- **Defender Services** – $1.3 billion, an increase of $27 million above the FY 2021 enacted level, to support the right to the assistance of counsel.
- **Court Security** – $705 million, an increase of $41 million above the FY 2021 enacted level, to support security needs and protective services in courthouses, as identified by the U.S. Marshals Service.

Additionally, the bill extends temporary judgeships in several districts.

**District of Columbia** – The bill includes a total of $775.5 million, an increase of $28 million above the FY 2021 enacted..

- $40 million **for D.C. Resident Tuition Support**, equal to the FY 2021 enacted level.
- $25 million for **Emergency Planning and Security Costs** in DC equal to the President's request.
- $4 million for **HIV/AIDS Testing and Treatment** to help prevent the spread of HIV/AIDS in the District of Columbia.
- $8 million, equal to the FY 2021 enacted level, to fund infrastructure improvements for the **D.C. Water and Sewer Authority**.

**Independent Agencies:**

- **Consumer Product Safety Commission (CPSC)** – The bill funds the CPSC at $139 million, an increase of $4 million above the FY 2021 enacted level. Within the total, $2 million is provided for Virginia Graeme Baker Pool Safety grants.
- **Election Assistance Commission (EAC)** – The bill provides $75 million for **Election Security Grants** to augment State efforts to improve the security and integrity of elections for Federal office. In addition, $20 million is included for EAC operating expenses, an increase of $3 million above the FY 2021 enacted level.
- **Federal Communications Commission (FCC)** – The bill includes $382 million for the FCC, an increase of $8 million above the FY 2021 enacted level, to support efforts to expand broadband access, improve the security of U.S. telecommunications networks, and administer billions in COVID relief programs.
- **Federal Trade Commission (FTC)** – The bill includes $376.5 million for the FTC, an increase of $25.5 million above the FY 2021 enacted level, to bolster antitrust, privacy, and consumer protection work.
- **General Services Administration (GSA) Federal Buildings Fund (FBF)** – The bill includes $9.3 billion in spending authority for the FBF. The total funding level includes:
  - $246 million for construction of U.S. Courthouses in Hartford, CT, Chattanooga, TN and San Juan, PR;
  - $581 million for **Repairs and Alterations**; and
  - $53 million for Special emphasis projects including $15 million for to improve security at federal childcare facilities and $20 million to increase security at U.S. courthouses.
- **National Archives and Records Administration (NARA)** – The bill provides a total of $477 million for NARA, an increase of $79 million above the FY 2021 enacted level and $51 million above the President's request. This amount includes $2 million for implementation of the Civil Rights Cold Case Record Collections Act of 2018, $12.3 million for the National Historical Publications & Records Commission Grants Program, $30 million to help prepare for the 250th anniversary of the founding of the United States, and $41 million for other repairs and restorations.

**JA 333**

- **Office of Personnel Management (OPM)** – The bill includes $373 million, an increase of $11 million above the FY 2021 enacted level, for OPM to manage and provide guidance on Federal human resources and administer Federal retirement and health benefit programs.
- **Securities and Exchange Commission (SEC)** – The bill includes $2 billion, an increase of $73.5 million above the FY 2021 enacted level, for the SEC to monitor the capital and securities markets, ensure full disclosure of appropriate financial information, and combat financial fraud and malpractice. This amount also includes funding for move costs related to the SEC's Fort Worth and San Francisco regional offices.
- **Small Business Administration (SBA)** – The bill provides a total of $1 billion for SBA, an increase of $109 million above the FY 2021 enacted level, to support investments in programs to help underserved entrepreneurs access capital and contracting opportunities. The bill includes $290 million, an increase of $18 million above the FY 2021 enacted level, for **Entrepreneurial Development Programs**, including:
  - $138 million for **Small Business Development Centers**;
  - $37 million for **Microloan Technical Assistance**;
  - $17 million for the **Federal and State Technology Partnership Program, Growth Accelerators,** and **Regional Innovation Clusters**; and
  - $24 million for **Women's Business Centers**.

**Important Policy Changes:**
- **Strengthens our democracy:**
  - *Apportionment Transparency* – Includes a new provision requiring OMB to make apportionments of appropriations publicly available in a timely manner.
  - *Budget Landing Page* – Includes new language requiring OMB to create a single landing page that links to all Federal agency budget submissions to Congress.
  - *Improvements in Budget Execution* – Includes new provisions that require budget authority be made available prudently for obligation**,** executive agencies to provide budget and appropriations information to the Government Accountability Office (GAO) promptly, and agencies to notify Congress of certain delays or restrictions in apportionment of appropriations.
  - *Recordkeeping* – Includes a new provision related to recordkeeping requirements for certain GAO audits.

# Division F – Homeland Security

## Overview:

The 2022 Homeland Security funding bill provides $81.1 billion in discretionary resources, including $77.9 billion for non-defense programs; $3.2 billion for defense-related programs; and $18.8 billion for major disaster response and recovery activities. When excluding offsetting collections and major disaster funding, the total provided in the bill is $57.5 billion, which is $5 billion above the budget request and $5.6 billion above the FY2021 enacted level. The legislation:

- Dramatically increases funding to protect our critical physical infrastructure, prevent cyber-attacks and root out cyber intrusions
- Invests strongly in maritime security through operational funding and investment in new fleet assets for the Coast Guard
- Makes responsible investments in border security and respects the dignity of immigrants with new funding to improve migrant processing and reduce backlogs in refugee, asylum, and immigration benefit applications

## Bill Summary:

**JA 334**

**Office of the Secretary** – The bill provides $271.1 million for the Office of the Secretary and Executive Management, an increase of $65.2 million above the FY2021 enacted level and an increase of $21.3 million above the President's budget request, including:

- $23.2 million for the Office of Immigration Detention Ombudsman to investigate and resolve complaints regarding misconduct by DHS personnel and violations of the rights of individuals in DHS custody, including through unannounced inspections of detention facilities; and
- $35 million to be transferred to FEMA, including:
    - $20 million for Targeted Violence and Terrorism Prevention grants; and
    - $15 million for an Alternatives to Detention case management grant pilot program.

**Management Directorate** – The bill provides $1.637 billion for the Management Directorate, an increase of $238.5 million above the FY2021 enacted level and $16.5 million below the President's budget request.

- $209.7 million for the continued development of the **DHS headquarters campus** at St. Elizabeths.
- $200 million for joint migrant processing centers, including funds provided in title V of the bill.

**Office of Inspector General** – The bill provides $205.4 million for the Office of Inspector General, an increase of $15.2 million above the FY2021 enacted level and equal to the request.

**U.S. Customs and Border Protection (CBP)** – The bill provides $14.8 billion for CBP, $428.2 million below the FY2021 enacted level and $25.7 million above the President's budget request, including:

- $30 million for new body worn cameras and video recording equipment for Border Patrol Stations.
- $27.5 million for the implantation of the Uyghur Forced Labor Prevention Act.
- $23 million for onsite mental health clinicians and resiliency efforts.
- $5 million for tuition assistance and $6 million for caregivers and childcare services for CBP employees.
- $20 million for the increased efforts in the Office of Trade.
- $30 million for processing improvements.
- $10 million for Port of Entry Technology.
- $72.4 million for new aircraft and aircraft sensors.
- $256 million for border technology.
- $87 million for non-intrusive inspection systems.
- $650 million to compensate for the pandemic related reduction in customs and immigration user fee revenue.
- $1.0 billion for increased border management requirements.

**U.S. Immigration and Customs Enforcement (ICE)** – Provides $8.26 billion for ICE, $284.7 million above the FY2021 enacted level and $266.7 million above the President's budget request, including:

- $2.27 billion for Homeland Security Investigations, an increase of $128.7 million above the FY2021 enacted level and $99.7 above the request.
- $4.18 billion for Enforcement and Removal Operations, $56.9 million above the FY2021 enacted level and $109.4 million above the President's budget request, including:
    - $3.3 billion for Custody Operations and Transportation and Removal, $39.9 million above the FY2021 enacted level and $100 million above the President's budget request; and
    - $442.7 million for Alternatives to Detention, $2.5 million above the FY2021 enacted level and $2.2 million above the President's budget request.

**JA 335**

Provides *no* funding for additional immigration enforcement personnel.

Provides *no* additional funding for Immigration Hearing Facilities to support the illegal and inhumane Remain in Mexico program.

Provides $25 million above the request for ICE's fleet replacement program to improve the safety of ICE officers and agents.

Provides $6 million above the request to support data modernization efforts.

Provides $8.5 million above the request to accelerate overdue efforts for ICE's body-worn cameras pilot program.

Provides $2.5 million above the request to address gaps in the design and plans for inspections and oversight at ICE's civil detention facilities.

**Transportation Security Administration (TSA)** – Provides $**8.49** billion for TSA, $ 176 million above the FY2021 enacted level and $23 million above the President's budget request, including:

- Provides $131 million for computed tomography screening equipment and credential authentication and standoff detection technology.
- Fully funds the Visible Intermodal Prevention and Response teams (VIPR); staffing at exit lanes; and the Law Enforcement Officer reimbursement program.
- $30 million for reimbursements to airports for legacy purchases of in-line explosive detection systems.

**Coast Guard** – Provides $11.5 billion for the Coast Guard, $515.0 million above the FY2021 enacted level and $582.4 million above the President's budget request, including:

- $2.0 billion for significant new investments in the Coast Guard's air and marine fleet, and facilities, including:
  - Continued support for the Offshore Patrol Cutter program, Fast Response Cutters, MH-60 helicopters, Polar Security Cutter and C-130 J aircraft.
  - $354.650 million, which is $75.0 million above the request for shore facilities and other infrastructure, including housing for Coast Guard families.
- $141.4 million above the request to invest further in Coast Guard operational readiness, personnel and their families, including additional investment in cybersecurity, communications, workforce readiness, tuition assistance and childcare subsidy.

**United States Secret Service (USSS)** – Provides $2.6 billion for the USSS, $173 million above the FY2021 enacted level and $39.9 million above the President's budget request, including:

- $6 million for grants related to investigations of missing and exploited children; and
- $6 million for additional overtime and retention incentives
- $2.3 million for IT support
- $5.7 million for basic and advanced computer forensics training for state and local law enforcement officers, judges, and prosecutors in support of the Secret Service mission

**Cybersecurity and Infrastructure Security Agency (CISA)** – Provides $2.6 billion for CISA, $568.7 million above the FY2021 enacted level and $460 million above the President's budget request, including:

- $271.9 million to further advance CISA's Cybersecurity Operations, including
  - a $119.5 million increase for threat hunting, including $95.5 million for the CyberSentry program;
  - a $64.1 million increase for vulnerability management;
  - an $11 million increase for the Multi-State Information and Analysis Center, for a total of $38 million for the center; and
  - a $32.4 million increase for the Continuous Diagnostics and Mitigation program for a total of $357.8 million for the program;
- $47.7 million for Infrastructure Security and Integrated Operations, including
  - a $17.1 million increase for additional cyber- and protective security advisors and other regional support;
  - an $8 million increase for increased public gathering security-related activities; and
  - a $7.5 million increase for bombing prevention activities;
- $78.6 million for Emergency Communications, including
  - a $47.6 million increase for Next Generation Networks Priority Services; and
  - a $20 million increase to begin efforts for a Next Generation 911 Ecosystem Program;
- $45.7 million for Risk Management Operations; and
- $19 million for Stakeholder Engagements and Requirements, including a $10.5 million increase for Sector Risk Management Agency Management.

**Federal Emergency Management Agency (FEMA)** – Provides $23.9 billion for FEMA, $2.19 billion above the FY2021 enacted level and $159 million below the President's budget request, including:

- $18.8 billion for disaster response and recovery efforts; and
- $3.6 billion for Federal Assistance, including:
  - $633 million for the State Homeland Security Grant Program (SHSGP), including $113 million for the SHSGP Nonprofit Security Grants Program;
  - $728 million for the Urban Areas Security Initiative (UASI), including $113 million for the UASI Nonprofit Security Grant Program;
  - $720 million for firefighter grant programs;
  - $130 million for the Emergency Food and Shelter program.
  - $40 million for the Next Generation Warning System to improve the capabilities of public broadcasters to send critical emergency and civil defense warnings;
  - $20 million transferred from the Office of the Secretary for Targeted Violence and Terrorism Prevention grants; and
  - $15 million transferred from the Office of the Secretary for an Alternatives to Detention case management grant pilot program.

**U.S. Citizenship and Immigration Services (USCIS)** – Provides $409.5 million for USCIS, $281.7 million above the FY2021 enacted level and $60 million below the President's budget request, including:

- $275 million for application processing to address USCIS backlogs and delays; and
- $20 million for the Citizenship and Integration Grant program.

**Other**

- $1.45 billion in additional support for CBP, ICE, and FEMA to help manage the high volume of migrants arriving at the southern border, including:
  - $1.06 billion for CBP for processing facilities; migrant medical care, transportation, personnel overtime and other costs;

**JA 337**

- $239.7 million for ICE for processing capacity, personnel overtime; transportation; and other costs; and
- $150 million for FEMA's Emergency Food and Shelter Program for nonprofit organizations sheltering migrants.
- $355.6 million for the Federal Law Enforcement Training Centers, $15.3 million above the FY2021 enacted level and equal to the President's budget request.
- $886.3 million for the Science and Technology Directorate, $ 120.8 million above the FY2021 enacted level and $63.5 million above the President's budget request.
- $50 million for the National Coast Guard Museum.
- $452 million for the Countering Weapons of Mass Destruction Office, $49.7 million above the FY2021 enacted level and $24.6 million above the request, to include $14.5 million for child welfare professionals and $13 million for electron health records.

**Policy Provisions**

- Increases the federal share of the cost for response and recovery from 75 percent to at least 90 percent for disasters and emergencies that were declared or occurred in 2020 and 2021.

- Requires ICE to make information about the 287(g) program publicly available.

- Requires ICE to terminate any 287(g) agreement if the DHS Office of Inspector General determines that such terms have been materially violated.

- Requires ICE to sever contracts with detention facilities that fail two consecutive inspections and requires more frequent inspections by ICE's Office of Professional Responsibility.

- Ensures access by Members of Congress to detention facilities.

- Prohibits DHS from destroying records related to the death of, potential sexual assault against, or abuse of individuals in its custody.

- Ensures that information shared with ICE by the Department of Health and Human on potential sponsors of unaccompanied children cannot be used by ICE for detention or removal purposes unless the sponsor has a dangerous criminal background.

- Prohibits DHS from placing pregnant women in restraints except in extraordinary circumstances.

- Requires public reporting on requests to DHS by non-DHS law enforcement agencies for law enforcement support and requires approval by the Secretary or his designee for support related to a mass gathering or protest event.

- Requires ICE to publish information on a publicly available website with the numbers and types of people in its custody, such as:
  - families and transgender detainees;
  - border apprehension detainees;
  - interior enforcement detainees; and
  - those who are in custody who have a positive credible fear claim.

- Provides an exception to a limitation on reorganization authority that allows the Secretary to establish an office of the Chief Medical Officer.

**JA 338**

# Division G – Interior-Environment

## Overview:

The 2022 Interior, Environment, and Related Agencies Appropriations bill, includes $38 billion, an increase of $1.893 billion over the 2021 enacted level. There is also an additional $2.45 billion of funding provided under the fire suppression cap adjustment The legislation:

- Creates good-paying American jobs through investments in renewable energy development, including offshore wind, and a national initiative to reclaim abandoned mines and cap orphan oil and gas wells
- Confronts the climate crisis by expanding environmental enforcement efforts and launching a renewed focus on land and water conservation
- Supports Native American families by investing in a strong and resilient Indian Country, including through education and health care programs
- Dramatically expands environmental justice efforts to address unacceptable pollution in communities of color
- Honors the federal government's responsibilities to Native Americans

## Bill Summary:

**Department of the Interior (DOI)** – The bill provides a total of $14.1 billion in discretionary appropriations for DOI – $776 million above the 2021 enacted level. Of this amount, the bill includes:

- $1.41 billion for the **Bureau of Land Management**, $101 million above the fiscal year 2021 enacted level. Within this amount, the bill includes:
  - No less than $78 million for **sage-grouse conservation.**
  - $31 million for **threatened and endangered species**
  - $137 million for the **wild horse and burro program**, $21 million above the fiscal year 2021 enacted level.
- $1.65 billion for the **U.S. Fish and Wildlife Service**, $62 million above the fiscal year 2021 enacted level. Within this amount, the bill includes:
  - $277 million for **Ecological Services**, $8 million above the fiscal year 2021 enacted level.
  - $519 million for **National Wildlife Refuge System**, $15 million above the fiscal year 2021 enacted level.
  - $23 million for **Science Support**, $6 million above the fiscal year 2021 enacted level.
- **$3.26 billion for National Park Service**, $142 million above the fiscal year 2022 enacted level. Within this amount, the bill includes:
  - $2.77 billion for **Operation of the National Park System**, $79 million above the fiscal year 2021 enacted level.
  - $84 million for **National Recreation and Preservation**, $10 million above the fiscal year 2021 enacted level.
  - $173 million for the **Historic Preservation Fund**, $29 million above the fiscal year 2021 enacted level. Within this amount, the bill includes $74 million for State and Tribal Historic Preservation Offices, $26.5 million for Save America's Treasures grants, $28 million for competitive grants to preserve the sites and stories of underrepresented community civil rights, and $10 million for grants to Historically Black Colleges and Universities.
- $1.39 billion for the **U.S. Geological Survey**, $79 million above the fiscal year 2021 enacted level.
- $164 million for the **Bureau of Ocean Energy Management**, $36 million above the fiscal year 2021 enacted level. Within this amount, the bill includes:

**JA 339**

- o $37 million for **renewable energy an increase of $8 above the fiscal year 2021 enacted level.**
- o $80 million for **environmental assessment an increase of $4 million above the fiscal year 2021 enacted level.**
- $268 million for the **Office of Surface Mining Reclamation and Enforcement,** $46 million above the fiscal year 2021 enacted level. Within this amount, the bill includes:
  - o $118 million for **Regulation and Technology,** an increase of $25 million above the fiscal year 2021 enacted level.
  - o $149 million the **Abandoned Mine Land Reclamation Fund,** an increase of $20 million above the fiscal year 2021 enacted level.
- $3.66 billion for **Bureau of Indian Affairs**, **Bureau of Indian Education**, and the **Office of the Special Trustee,** $150 million above the fiscal year 2021 enacted level. Within this amount, the bill includes:
  - o $1.8 billion for operation of **Bureau of Indian Affairs Operation of Indian Programs**, $204 million above the fiscal year 2021 enacted level.
  - o Establishes and provides $1 million for a new **Indian Land Consolidation** account.
  - o $147 million for **Bureau of Indian Affairs Construction**, $18 million above the fiscal year 2021 enacted level.
  - o $11.8 million for the **Indian Guaranteed Loan Program**, equal to the fiscal year 2021 enacted level.
  - o $1 billion for **Bureau of Indian Education Operation of Indian Programs**, $50 million above the fiscal year 2021 enacted level.
  - o $264 million to **Bureau of Indian Education Construction**, equal to the fiscal year 2021 enacted level.
  - o Fully funds **Contract Support Costs** and **Payments for Tribal Leases**.
  - o $109.6 million for the **Office of the Special Trustee,** $1.2 million above the fiscal year 2021 enacted level.
- $122 million for Office of Insular Affairs, $7 million above the fiscal year 2021 enacted level.
- $62 million for Office of Inspector General, $3.6 million above the fiscal year 2021 enacted level.
- $95 million for the Office of the Solicitor, $8 million above the fiscal year 2021 enacted level.
- $5 million for the new Energy Community Revitalization Program that will be supplemented by funding provided in Public Law 117-58.

**Environmental Protection Agency (EPA) –** The bill provides a total of $9.56 billion in for EPA – $323 million above the 2021 enacted level. Of this amount, the bill includes:

- $3.566 billion for EPA's core **science and environmental program work**, an increase of $224 million above the 2021 enacted level. Within these amounts, the bill includes:
  - o $587 million for **Geographic Programs** which help with restoration of nationally significant bodies of water like the Great Lakes, Chesapeake Bay, and Long Island Sound. This is an increase of $45 million above the 2021 enacted level.
  - o $539 million for **environmental compliance monitoring and enforcement activities and grants**, a $13 million increase above the 2021 enacted level.
- $4.352 billion for **State and Tribal Assistance Grants,** a $38 million increase above the 2021 enacted level. Within this amount, the bill includes:
  - o $2.77 billion for **Clean Water and Drinking Water State Revolving Funds**, equal to the 2021 enacted level.
  - o $43 million for **Combined Sewer Overflow grants**, a $3 million increase above the enacted level.
  - o $92 million for **Brownfields cleanups**, a $1 million increase above the 2021 enacted level.

**JA 340**

- $92 million for **Diesel Emissions Reductions grants**, a $2 million increase above the enacted level.
- $1.233 billion for **Superfund**, a $27 million increase above the 2021 enacted level.
- $100 million for **Environmental Justice activities**, an $83 million increase above the 2021 enacted level.

**Wildland Fire Management (WFM) -** The bill provides $5.48 billion for WFM, which includes, $2.45 billion in cap adjusted fire suppression funding. The bill provides an increase of $211 million for WFM.

**Related Agencies –**
- $3.7 billion for the **Forest Service (non-fire)**, an increase of $239 million above the 2021 enacted level.
- $6.6 billion for the **Indian Health Service for fiscal year 2022**, an increase of $395 million above the fiscal year 2021 enacted level.
  - $4.7 billion for health services, $359 million above the fiscal year 2021 enacted level.
  - $940 million for health facilities construction, $22 million above the fiscal year 2021 enacted level. This continues $5 million to invest in green infrastructure.
  - Fully funds Contract Support Costs and Payments for Tribal Leases.
- $180 million each for the **National Endowment for the Arts** and the **National Endowment for the Humanities**, which is $12.5 million more than the 2021 enacted levels.
- $1.06 billion for the **Smithsonian Institution**, $29 million above the fiscal year 2021 enacted level.
- $15 million for the **Woodrow Wilson International Center for Scholars**, $1 million above the fiscal year 2021 enacted level.
- $40.4 million for the **John F. Kennedy Center for the Performing Arts**, equal to the 2021 enacted level and equal to the President's budget request.
- $62.6 million for the **United States Holocaust Memorial Museum**, $1 million above the fiscal year 2021 enacted level. The NEVER AGAIN EDUCATION ACT (Public Law 116-141) is fully funded at $2 million to enhance the U. S. Holocaust Memorial Museum's education programming on the Holocaust and genocide prevention.

**Land and Water Conservation Fund (LWCF)** – The bill provides for the allocation of the full $900 million now permanently available from the Land and Water Conservation Fund as a result of enactment of the Great American Outdoors Act.  These allocations include $418 million for the federal program, $330 million for the state grants program, and $152 million for other non-federal grant programs.

**Outcome of Policy Provisions:**
The bill includes the following policy provisions that were previously enacted:
- Sec. 123 retains restrictions on the issuance of rules for sage grouse.
- Sec. 428 continues a provision limiting oil and gas development near Chaco Culture National Historical Park.
- Sec. 432 addresses carbon emissions from forest biomass.
- Sec. 433 addresses the use of small remote incinerators in the State of Alaska.
- Sec. 436 continues a provision prohibiting the use of funds to promulgate or implement permitting requirements under Title V of the Clean Air Act for certain livestock emissions.
- Sec. 437 continues a provision prohibiting funds to implement any provision that requires reporting mandatory greenhouse gas emissions from manure management operations.
- Sec. 438 retains provision prohibiting funds to regulate the lead content of ammunition or fishing tackle.

# Division H – Labor-HHS-Education

**JA 341**

**Overview:**

The 2022 Labor, Health and Human Services, Education, and Related Agencies funding bill provides $213.6 billion, an increase of $15.3 billion – 7.7 percent – above 2021. The legislation:

- Grows opportunity with transformative investments in education, including strong funding increases for high-poverty schools and students with disabilities, as well as programs that expand access to post-secondary education
- Strengthens lifesaving biomedical research with increased funding for the National Institutes of Health, and includes funding to establish the Advanced Research Projects Agency for Health
- Bolsters our public health infrastructure with more resources for the Centers for Disease Control and Prevention and for states and local governments to strengthen infrastructure and capacity
- Addresses our nation's most urgent health crises, including maternal health, mental health, gun violence, and substance misuse, while making strides to reduce persistent and unacceptable health disparities
- Supports middle class and working families with increased funding for child care and development programs, Head Start, and preschool development grants
- Creates and sustains good-paying American jobs through investments in job training, apprenticeship programs, and worker protection

**Bill Summary:**

**Department of Labor (DOL) –** The bill provides a total of $13.2 billion in discretionary appropriations for DOL, an increase of $653 million above the FY 2021 enacted level.  Of this amount, the bill includes:

- $9.8 billion for the **Employment and Training Administration,** an increase of $412 million above the FY 2021 enacted level. Within this amount, the bill includes:
    - $2.9 billion for **Workforce Innovation and Opportunity Act State Grants,** an increase of $34 million above the FY 2021 enacted level.
    - $95.4 million for **Migrant and Seasonal Farmworkers**, an increase of $1.5 million above the FY 2021 enacted level.
    - $102.1 million for the **Reintegration of Ex-Offenders**, an increase of $2 million above the FY 2021 enacted level.
    - $235 million for **Registered Apprenticeships**, an increase of $50 million above the FY 2021 enacted level.
    - $99 million for **YouthBuild**, an increase of $2.5 million above the FY 2021 enacted level.
    - $50 million, an increase of $5 million over the FY 2021 enacted level, to continue and expand **Strengthening Community College Training Grants** to help meet local and regional labor market demand for a skilled workforce by providing training to workers in in-demand industries at community colleges and four-year partners.
    - $1.7583 billion for **Job Corps**.
    - $405 million for the **Senior Community Service Employment for Older Americans Program**.
    - $2.9 billion for operation of the **Unemployment Insurance** program, an increase of $285 million above the FY 2021 enacted level. The bill also includes contingency funding to help States if there is a spike in unemployment claims.
    - $80 million for **Foreign Labor Certification**, an increase of $2 million above the FY 2021 enacted level. Funds will help support Federal oversight and enforcement of regulations and assist States in reviewing and conducting oversight of processing applications.

- $1.8 billion for **Worker Protection Agencies**, an increase of $42 million above the FY 2021 enacted level. Within this amount, the bill includes:

**JA 342**

- o $251 million for the **Wage and Hour Division**, an increase of $5 million above the FY 2021 enacted level.
- o $612 million for the **Occupational Safety and Health Administration**, an increase of $20 million above the FY 2021 enacted level
- o $186 million for the **Employee Benefits Security Administration**, an increase of $5 million above the FY 2021 enacted level

- $106 million for the **Bureau of International Labor Affairs**, an increase of $10 million above the FY 2021 enacted level.

- $18 million for the **Women's Bureau**, an increase of $3 million above the FY 2021 enacted level.

- $60.5 million for the **Homeless Veterans Reintegration Program**, an increase of $3 million above the FY 2021 enacted level.

**Department of Health and Human Services (HHS)** – The bill provides a total of $108.3 billion for HHS, an increase of $11.3 billion above the FY 2021 enacted level. Of this amount, the bill includes:

- **Advanced Research Projects Agency for Health (ARPA-H)** – The bill includes $1 billion to establish ARPA-H within the HHS Office of the Secretary to accelerate the pace of scientific breakthroughs for diseases such as ALS, Alzheimer's disease, diabetes, and cancer.

- **National Institutes of Health (NIH)** – The bill provides a total of $45 billion for NIH, an increase of $2.25 billion above the FY 2021 enacted level. The bill includes an increase of no less than 3.4 percent for each Institute and Center to support a wide range of biomedical and behavioral research, as well as targeted investments in several high-priority areas, including:
  - o $6.9 billion, an increase of $353 million above the FY 2021 enacted level, for the **National Cancer Institute,** including $194 million for the **Cancer Moonshot**;
  - o $3.2 billion, an increase of $289 million above the FY 2021 enacted level for **Alzheimer's disease and related dementias research**;
  - o $3.2 billion, an increase of $104 million above the FY 2021 enacted level, for **HIV/AIDS research**, including an increase of $10 million for the Centers for AIDS Research as part of the **Ending the HIV Epidemic Initiative**;
  - o $25 million to implement the **Accelerating Access to Critical Therapies for ALS** Act;
  - o An increase of $30 million to support research on maternal morbidity and mortality through the **Implementing a Maternal Health and Pregnancy Outcomes Vision for Everyone (IMPROVE) initiative**;
  - o An increase of $50 million for research related to **opioids, stimulants, and pain/pain management**;
  - o An increase of $50 million for **health disparities research**;
  - o $12.5 million to continue **firearm injury and mortality prevention research**;
  - o $xxx million, an increase of $xx million above the FY 2021 enacted level, for **Universal Flu Vaccine Research**;
  - o $75 million, an increase of $10 million above the FY 2021 enacted level, for the **INCLUDE Down syndrome research initiative**;
  - o $59 million, an increase of $8 million above the FY 2021 enacted level, for the **Office of Research on Women's Health**; and
  - o Increased investments in increasing diversity in the biomedical research workforce, including $5 million above the FY 2021 enacted level for **Research Centers in Minority Institutions**, an increase of $6 million for research workforce programs, and an increase of $10 million to

**JA 343**

strengthen the **Office of the CIO for Scientific Workforce Diversity**;

- **Centers for Disease Control and Prevention (CDC)** – The bill includes a total of $8.5 billion for CDC, an increase of $582 million above the FY 2021 enacted level. This includes $903 million in transfers from the Prevention and Public Health Fund.

- The bill includes significant investments in our nation's public health infrastructure including:
  - $200 million in a new, flexible funding stream for **public health infrastructure and capacity nationwide**.
  - $100 million, an increase of $50 million above the FY 2021 enacted level, to **modernize public health data surveillance and analytics** at CDC and State and local health departments.
  - $61 million, an increase of $5 million above the FY 2021 enacted level, in **public health workforce** initiatives.
  - $180 million, an increase of $5 million above the FY 2021 enacted level, for the **National Center for Health Statistics**.
  - $715 million, an increase of $20 million above the FY 2021 enacted level, for **public health emergency preparedness cooperative agreements**.

- The bill provides increases for numerous public health efforts, including:
  - $83 million, an increase $20 million above the FY 2021 enacted level, for **safe motherhood and infant health.**
  - $195 million, an increase of $20 million above the FY 2021 enacted level, for the **Ending the HIV Epidemic Initiative**.
  - $491 million, an increase of $15 million above the FY 2021 enacted level, for **opioid overdose prevention and surveillance**.
  - $182 million, an increase of $10 million above the FY 2021 enacted level, for the **antibiotic resistance initiative**.
  - $647 million, an increase of $54 million above the FY 2021 enacted level, for **global health**.

- **Substance Abuse and Mental Health Services Administration (SAMHSA)** – The bill funds SAMHSA at $6.5 billion – an increase of $530 million above the FY 2021 enacted level. SAMHSA funding includes:

  - **Mental Health:** $2 billion, an increase of $288.8 million over the FY 2021 enacted level, including an $100 million increase to the **Mental Health Block Grant** (MHBG), making investments across the behavioral health continuum to support prevention, screening, treatment, and other services.
  - **Mental health resources for children and youth**: $120 million for **Project AWARE**, an increase of $13 million above the FY 2021 enacted level; $81.8 million for the **National Child Traumatic Stress Initiative**, an increase of $10 million above the FY 2021 enacted level; and $10 million for **Infant and Early Childhood Mental Health**, an increase of $2 million above the FY 2021 enacted level.
  - **Suicide prevention**: $101.6 million for the **Suicide Lifeline**, an increase of $77.6 million above the FY 2021 enacted level to support the implementation of the Lifeline's new 988 number; $5 million to create a new **Behavioral Health Crisis and 988 Coordinating Office**; and $38.8 million for **Garrett Lee Smith Youth Suicide Prevention** grants, an increase of $2.3 million above the FY 2021 enacted level.
  - Increases the **mental health crisis systems** set-aside in the MHBG to 5 percent of the total.
  - Creates a new **Mental Health Crisis Response Partnership Pilot Program**, which will provide $10 million to help communities create mobile behavioral health crisis response teams.

**JA 344**

- o **Substance use treatment**: $3.9 billion, an increase of $99.8 million above the FY 2021 enacted level, including continued funding for opioid prevention and treatment, recovery, and tribal-focused treatment efforts. This includes $1.85 billion, an increase of $50 million above the FY 2021 enacted level, for the **Substance Abuse Prevention and Treatment Block Grant** (SABG); $1.525 billion for **State Opioid Response Grants**, an increase of $25 million over the FY 2021 enacted level; $34.9 million for **Pregnant & Postpartum Women**, an increase of $2 million above the FY 2021 enacted level; $13 million for **Building Communities of Recovery**, an increase of $3 million above the FY 2021 enacted level; and $101 million, an increase of $10 million, for **Medication Assisted Treatment**.
  - o **Substance abuse prevention**: $218.2 million, an increase of $10 million above the FY 2021 enacted level. This includes $127.4 million for the **Strategic Prevention Framework**, an increase of $8 million above the FY 2021 enacted level; and $12 million for the **Sober Truth on Preventing Underage Drinking** (STOP Act), an increase of $2 million.

- **Health Resources and Services Administration (HRSA)** – The bill includes $8.9 billion for HRSA, an increase of $1.4 billion above the 2021 enacted level. The amount includes:

  - o $1.7 billion, an increase of $65 million above the FY 2021 enacted level, for the **Health Centers** program, including $30 million, an increase of $25 million, to support **school-based health centers**, and $5 million to establish the **Alcee L. Hastings Program for Advanced Cancer Screening in Underserved Communities**;
  - o $2.5 billion, an increase of $71 million above the FY 2021 enacted level, for the **Ryan White HIV/AIDS** program;
  - o $122 million, an increase of $20 million, in **Health Centers** and $125 million, an increase of $20 million, in the **Ryan White HIV/AIDS program** for the **Ending the HIV Epidemic Initiative**;
  - o $1.3 billion, an increase of $72 million above the FY 2021 enacted level, for HRSA's Bureau of **Health Professions** programs to support health workforce development, including:
    - ▪ $5 million to establish the **Pediatric Subspecialty Loan Repayment Program**;
    - ▪ $24 million, an increase of $8 million above the FY 2021 enacted level, for the **Substance Use Disorder Treatment and Recovery Loan Repayment Program**; and
    - ▪ $375 million, an increase of $25 million above the FY 2021 enacted level, for **Children's Hospitals Graduate Medical Education**;
  - o $1 billion, an increase of $43 million above the FY 2021 enacted level, for programs to improve **maternal and child health**, including:
    - ▪ $748 million, an increase of $35 million above the FY 2021 enacted level, for the **Maternal and Child Health Block Grant**;
    - ▪ $12 million, an increase of $3 million above the FY 2021 enacted level, for **Alliance for Maternal Health Safety Bundles**;
    - ▪ $29 million, an increase of $6 million above the FY 2021 enacted level, for **State Maternal Health Innovation Grants**;
    - ▪ $4 million, an increase of $1 million above the FY 2021 enacted level, for the **Maternal Mental Health Hotline**;
    - ▪ $132 million, an increase of $4 million above the FY 2021 enacted level, for **Healthy Start**;
    - ▪ $6.5 million, an increase of $1.5 million above the FY 2021 enacted level, for **Screening and Treatment for Maternal Depression and Related Disorders**.
  - o $366 million, an increase of $37 million above the FY 2021 enacted level, for **Rural Health Programs**, including $5 million to establish the **Rural Emergency Hospitals Technical Assistance Program** and $6 million, an increase of $1 million, for the **Rural Maternity and Obstetrics Management Strategies (RMOMS)** program.

**JA 345**

- **Agency for Healthcare Research and Quality (AHRQ)** – The bill provides $350 million for AHRQ, an increase of $12 million above the FY 2021 enacted level.

- **Centers for Medicare & Medicaid Services (CMS)** – The bill provides a total of $4 billion for CMS administrative expenses, an increase of $50 million above the FY 2021 enacted level.

- **Administration for Children and Families (ACF)** – The bill provides $29.9 billion in discretionary funding for ACF, an increase of $5.2 billion above the FY 2021 enacted level.
  - **Early childhood education** programs receive an increase of $558 million above the FY 2021 enacted level:
    - $6.2 billion for the **Child Care and Development Block Grant**, an increase of $254 million above the FY 2021 enacted level;
    - $11 billion for **Head Start**, an increase of $289 million above the FY 2021 enacted level; and
    - $290 million for **Preschool Development Grants**, an increase of $15 million above the FY 2021 enacted level.
  - $3.8 billion for the **Low Income Home Energy Assistance Program,** an increase of $50 million above the FY 2021 enacted level.
  - $755 million for the **Community Services Block Grant,** an increase of $10 million above the FY 2021 enacted level.
  - $161 million for **Child Abuse Prevention and Treatment Act (CAPTA) State Grants** and **Community Based Child Abuse Prevention (CBCAP)** programs, an increase of $10 million above the FY 2021 enacted level.
  - $200 million for **Family Violence and Prevention Services Act (FVPSA)** programs**,** an increase of $17.5 million above the FY 2021 enacted level.
  - $15.5 million for the **Domestic Violence Hotline**, an increase of $2.5 million above the FY 2021 enacted level.

- **Administration for Community Living (ACL)** – The bill funds ACL at $2.3 billion, an increase of $60 million above the FY 2021 enacted level. This amount includes:

  - $967 million for **Senior Nutrition** programs, an increase of $15 million above the FY 2021 enacted level;
  - $399 million for **Home and Community-based Supportive Services,** an increase of $6 million above the FY 2021 enacted level;
  - $205 million for **Family and Native American Caregivers** Services, an increase of $6 million above the FY 2021 enacted level;
  - $36 million for **Grants for Native Americans**, an increase of $1 million above the FY 2021 enacted level; and
  - $8.1 million for the **Lifespan Respite Program**, an increase of $1 million above the FY 2021 enacted level.

- **Office of the Secretary—General Departmental Management** – The bill provides $571 million, an increase of $20.5 million above the FY 2021 enacted level. The amount includes:

  - $64.8 million for the **Office of Minority Health**, an increase of $3 million above the FY 2021 enacted level.
  - $56.9 million for the **Minority HIV/AIDS Initiative**, an increase of $1.5 million above the FY 2021 enacted level.

**JA 346**

- $38.1 million for the **Office on Women's Health**, an increase of $3 million above the FY 2021 enacted level.
- $5 million for **KidneyX**, equal to the FY 2021 enacted level, for a public-private partnership to accelerate the development and adoption of novel therapies and technologies to improve the diagnosis and treatment of kidney diseases.

- **Office of the Secretary—Public Health and Social Services Emergency Fund (PHSSEF) –** The bill provides $3.2 billion for PHSSEF, an increase of $352 million above the FY 2021 level.

- The bill provides funding to improve the nation's preparedness for public health emergencies, including:
    - $300 million, an increase of $13 million above the FY 2021 enacted level, for **pandemic influenza.**
    - $745 million, an increase of $148 million above the FY 2021 enacted level, for the **Biomedical Advanced Research and Development Authority (BARDA)**.
    - $780 million, an increase of $10 million above the FY 2021 enacted level, for **Project BioShield**.
    - $845 million, an increase of $140 million above the FY 2021 enacted level, for the **Strategic National Stockpile**.
    - $21 million, an increase of $15 million above the FY 2021 enacted level, to expand the number of **Regional Ebola and Other Special Pathogen Treatment Centers**.

**Department of Education (ED) –** The bill provides a total of $76.4 billion in discretionary appropriations for ED, an increase of $2.9 billion above the FY 2021 enacted level. Of this amount, the bill includes:

- **K-12 Education, including Individuals with Disabilities Education Act programs**—The bill provides $42.6 billion, an increase of $2 billion over the fiscal year 2021 enacted level. Within this amount, the bill provides:
    - $17.5 billion for **Title I Grants to Local Educational Agencies,** an increase of $1 billion above the FY 2021 enacted level. This is the largest increase in the program in more than a decade.
    - $14.5 billion for **Special Education**, an increase of $448 million above the FY 2021 enacted level. The amount includes:
        - $13.3 billion **for Part B Grants to States**, an increase of $406 million above the FY 2020 enacted level, and
        - $31 million for **Special Olympics** education programs, an increase of $7 million above the FY 2021 enacted level.
    - $831 million for **English Language Acquisition**, an increase of $34 million above the FY 2021 enacted level.
    - $2.2 billion for **Supporting Effective Instruction State Grants (Title II-A)**, an increase of $27 million above the FY 2021 enacted level.
    - $1.3 billion for **Student Support and Academic Enrichment State Grants**, an increase of $60 million above the FY 2021 enacted level.
    - $1.3 billion for **Nita M. Lowey 21st Century Community Learning Centers**, an increase of $30 million above the FY 2021 enacted level.
    - $1.6 billion for **Impact Aid**, an increase of $56 million above the FY 2021 enacted level.
    - $124 million for **Magnet Schools Assistance**, an increase of $15 million above the FY 2021 enacted level.
    - Continued support for a **Social and Emotional Learning (SEL) Initiative** to support SEL and "whole child" approaches to education. Within this amount, the bill provides:
        - $82 million, an increase of $15 million over the FY 2021 enacted level, for grants for evidence-based, field-initiated innovations that address student social, emotional, and cognitive needs within the **Education Innovation and Research** program;

**JA 347**

- $85 million, an increase of $5 million over the FY21 enacted level, for the **Supporting Effective Educator Development (SEED)** program with a priority for teacher professional development and pathways into teaching that provide a strong foundation in implementing SEL and "whole child" strategies;
- $111 million within **School Safety National Activities** for Mental Health Services Professional Demonstration Grants and School-Based Mental Health Services Grants, an increase of $95 million over the FY 2021 enacted level, to help LEAs directly increase the number of mental health and child development experts in schools; and
- $75 million, an increase of $45 million over the FY 2021 enacted level, for **Full-Service Community Schools** to provide comprehensive services and expand evidence-based models that meet the holistic needs of children, families, and communities.

- **Career, Technical and Adult Education**—The bill provides $2.1 billion for Career, Technical and Adult Education, an increase of $61 million above the FY 2021 enacted level. This amount includes:

  - $1.38 billion for **CTE State Grants**, an increase of $45 million above the FY 2021 enacted level, and
  - $690 million for **Adult Education State Grants**, an increase of $16 million above the FY 2021 enacted level.

- **Student Financial Assistance—** The bill provides $24.6 billion for Federal student aid programs, an increase of $35 million above the FY 2021 enacted level.  Within this amount, the bill provides:

  - $6,895 for the maximum **Pell Grant**, an increase of $400 above the FY 2021 enacted level. This is the largest increase in the maximum award in more than a decade.
  - $895 million for the **Federal Supplemental Educational Opportunity Grant program**, an increase of $15 million above the FY 2021 enacted level.
  - $1.21 billion for **Federal Work Study**, an increase of $20 million above the FY 2021 enacted level.

- **Higher Education—** The bill provides $3 billion for higher education programs, an increase of $452 million above the FY 2021 enacted level.
  - Within this amount, the bill provides $885 million, an increase of $96 million over the FY 2021 enacted level, to assist primarily **Minority Serving Institutions (MSIs)** in the Aid for Institutional Development account, including:
    - $363 million for **Historically Black Colleges and Universities**, an increase of $25 million above the FY 2021 enacted level.
    - $183 million for **Hispanic Serving Institutions**, an increase of $34 million above the FY 2021 enacted level.
    - $44 million for **Tribally Controlled Colleges and Universities**, an increase of $6 million above the FY 2021 enacted level.
  - The bill also provides investments in the following higher education programs:
    - $1.14 billion for **Federal TRIO programs**, an increase of $40 million above the FY 2021 enacted level.
    - $378 million for **GEAR UP**, an increase of $10 million above the FY 2021 enacted level.
    - $59 million for **Teacher Quality Partnerships**, an increase of $7 million above the FY 2021 enacted level.
    - $65 million for the **Child Care Access Means Parents in School**, an increase of $10 million above the FY 2021 enacted level.

- **Howard University—** The bill provides $344 million for Federal student aid programs, an increase of $93 million above the FY 2021 enacted level.  Within this amount, the bill provides $100 million to support new construction for **Howard University Hospital**.

**Related Agencies –**

- $1.2 billion for the **Corporation for National and Community Service (CNCS)**, an increase of $30 million above the FY 2021 enacted level.
  - o  Within the total amount, the bill includes:
    - ▪ $467 million for **AmeriCorps State and National Grants**, an increase of $12 million over the FY 2021 enacted level.
    - ▪ $231 million for **SeniorCorps programs**, an increase of $6 million over the FY 2021 enacted level.

- $525 million for the **Corporation for Public Broadcasting (CPB),** in 2024 advance funding, an increase of $50 million above the FY 2023 enacted level.  In addition, the bill includes $20 million for the interconnection system and system wide infrastructure, equal to the FY 2021 enacted level.

- $268 million for the **Institute of Museum and Library Services**, an increase of $11 million above the FY 2021 enacted level.
  - o  Within the total amount, the bill includes $4 million for the **National Museum of the American Latino Act.**

- $13.3 billion for the **Social Security Administration's (SSA)** operating expenses, an increase of $411 million above the FY 2021 enacted level.

# Division I – Legislative Branch

## Overview:

The 2022 Legislative Branch funding bill appropriates a total of $5.925 billion, an increase of $625 million or 11.8 percent, over 2021. The legislation:

- Strengthens Legislative Branch capacity by increasing funding for Congressional offices by 21 percent so they can recruit and retain a talented and diverse workforce
- Protects our democracy with funding, building on the emergency supplemental passed in July, to secure the United States Capitol
- Improves training and bolsters wellness support for the Capitol Police, who were attacked on January 6
- Grows opportunity by increasing funding for internships to support more interns from working and middle-class families

## Bill Summary:

**House of Representatives** – The bill provides a total of $1.715 billion in discretionary appropriations for the House of Representatives, an increase of $238 million above the FY 2021 enacted level.

- $774.4 million for the **Members Representational Allowance (MRA),** the basic office budgets of House Members, an increase of $134.4 million (21%) above the FY 2021 level. This is the largest increase in the MRA appropriation since its authorization in 1996.

**JA 349**

- $34.95 million for the offices of the **Majority and Minority Leadership**, an increase of $6 million (21%) above the FY 2021 level.
- $18.2 million in **funding for paid interns** for Member and Leadership offices including $2.3 million in new funding for interns within Committee offices.  This allowance helps extend internship opportunities to people who may not be financially able to take an unpaid position.
- $197 million for the operations of **House committees**, an increase of $34.2 million (21%) above the FY 2021 level.  This appropriation will cover the funding allocated to committees for 2021 by the biennial funding resolution adopted by the House in the 1st session of the 117th Congress (H. Res. 316).
- $288.5 million for the salaries and expenses of **House officers and employees**, including the offices of the Clerk of the House, Sergeant at Arms, Chief Administrative Officer (CAO), Parliamentarian, and Legislative Counsel, among others. This in an increase of $27.7 million above the FY 2021 level.
    - Within this funding, $27.7 million is provided for the Sergeant at Arms, $4.4 million above the FY 2021 level; $12.6 million for the Office of Legislative Counsel, $688,000 above the FY 2021 level; and $3 million for the Office of Diversity and Inclusion, $1.5 million above the FY 2021 level.
- $2 million for the **House Modernization Initiatives Account** to make Congress more effective, efficient, and transparent on behalf of the American people.
- $9.294 million the **Congressional Green and Gold Congressional Aide Program** (formerly Wounded Warrior Program/Gold Star Families), an increase of $5.3 million above the FY 2021 level.

**Other Agencies**

- $60.9 million for the **Congressional Budget Office (CBO)**, an increase of $3.7 million above the FY 2021 level. This funding level will allow CBO to be responsive to Committees, Leadership and Members to the greatest extent practicable and to modestly increase its efforts to improve modeling and analytical capability in key areas and to make its work as transparent and accessible as possible.
- $124.2 million for the **Government Publishing Office**, an increase of $7.2 million above the FY 2021 level.  This funding allows for the publishing of Congressional information in both digital and print formats.
- $719.2 million for the **Government Accountability Office (GAO)**, an increase of $58.1 million above the FY 2021 level.  This funding should allow the GAO to bring on 190 additional staff, including for the Science, Technology Assessment and Analytics Team, to handle its large workload, and to begin to address its information technology and building renovation needs.
- $794.0 million, an increase of $37 million above the FY 2021 level, for the **Library of Congress**, including the Copyright Office, Congressional Research Service, and National Library Service for the Blind and Print Disabled.  This funding level will allow continued progress on urgent information technology needs and on modernization of systems for copyright registration and recordation and support ongoing Library initiatives such as the Veterans' History Project.
    - Of the amount for the Library, the bill includes $129.1 million for **Congressional Research Service**, an increase of $3.6 million above FY 2021 level.
    - The Library's total includes $10 million for the third, and final installment of funding for the Library's Visitor Experience initiative, subject to the Appropriations Committees' review of the specific plans, cost estimates, and schedules for the initiative. It also includes $5 million for modernizing the infrastructure that handles distribution of audio and Braille reading materials at the National Library Service for the Blind and for purchase of braille e-readers.
- $773.9 million for the **Architect of the Capitol**, an increase of $98.8 million above the FY 2021 level. Funding includes $128 million to continue restoration of the Cannon House Office Building.
- $602.5 million for the **Capitol Police**, an increase of $87 million above the FY 2021 level. Funding will allow for the hiring of up to 2,112 sworn officers and 450 civilian members of the Capitol Police. The Committee report includes several significant measures to help bring more transparency, diversity, and

**JA 350**

leadership training, and standardize vetting and routinely review staff for employment suitability with the Capitol Police.

**Noteworthy Actions:**

- **Honoring Heroes -**The bill directs the AOC to affix a honorific plaque on the Western front of the Capitol honoring the law enforcement officers and agencies that responded to the attack on the United States Capitol on January 6

## Division J – Military Construction & Veterans Affairs

**Overview:**

The 2022 Military Construction, Veterans Affairs, and Related Agencies Appropriations bill provides $284.6 billion, an increase of $32.7 billion – more than 13 percent – above 2021. Of this amount, discretionary funding for programs such as Veterans' health care and military construction totals $127.6 billion, an increase of $14.4 billion above 2021. The legislation:

- Supports our Veterans with investments in health care, including targeted investments that advance women's health, mental health, and homelessness assistance
- Rebuilds our infrastructure with strong investments to construct critical facilities on military installations including family housing and child development centers, and build, repair, and retrofit Veterans Affairs facilities
- Protects our national security with investments to respond to the challenges posed by Russian and Chinese aggression
- Confronts the climate crisis with increased climate change and resiliency funding to help military installations adapt to rising sea levels and worsening natural disasters
- Responds to natural disasters by providing funding for recovery and rebuilding of damaged installations
- Remediates harmful substances and chemicals leaked into the land and water sources

**Bill Summary:**

**Military Construction –** The bill provides a total of $14.9 billion for military construction – $6.8 billion above the 2021 enacted level and $5 billion above the President's budget request. Of this amount, the bill includes:

- $224 million for **Child Development Centers**, of which $33 million is for planning and design for future facilities, and in total is $204 million above the FY 2022 budget request. The funds will support increased capacity and better facilities for the 1.2 million children of active duty servicemembers worldwide.
- $1.4 billion for **Family Housing,** an increase of $87 million above the 2021 enacted level and the same as the budget request. Within this amount, Family Housing Support and Management is funded at $116.2 million to address issues such as mold, vermin, and lead in military family housing.
- $928.9 million for construction or alteration of **Guard and Reserve** facilities in states and territories, an increase of $332.8 million above the 2021 enacted level and $259 million above the FY 2022 budget request.
- $215.9 million for the **NATO Security Investment Program**, an increase of $42.8 million above the 2021 enacted level and $10 million above the FY 2022 budget request, for infrastructure necessary for wartime, crisis, and peace support and deterrence operations, and training requirements. The funds will support responses to the challenges posed by Russian aggression as well as the risks and threats emanating from the Middle East and North Africa.

**JA 351**

- $529.6 million for **Base Realignment and Closure**, an increase of $49.2 million above the 2021 enacted level and $245 million above the FY 2022 budget request. Within this amount, cleanup of Perfluorooctane Sulfanate and Perfluorooctanoic Acid (PFOS/PFOA) contamination is funded at $150 million.
- $4.3 billion for all eligible, authorized **Unfunded Requirement (UFR) projects**.
- $150 million for **Natural Disaster Recovery Construction**, to be distributed between the Air Force and Navy & Marine Corps.
- $20 million for the **Army National Guard transformation plan** project planning and design towards future facilities.
- $1.1 billion for **Barracks for Unaccompanied Soldiers** at various locations, $787 million above the FY 2022 budget request.
- $120 million for **Climate Change and Resiliency projects**, which is $106 million above the FY 2021 enacted level, and $120 million above the FY 2022 budget request.
- $625 million for **Shipyard Infrastructure Optimization Plan (SIOP)** projects, which is $465 million above the FY 2021 enacted level, and $219 million above the FY 2022 budget request.
- $125 million for planning and design, unspecified minor construction, and authorized major construction projects to address priority **Defense laboratory requirements**.
- $58.6 million for **INDOPACOM** planning and design to advance future projects.

**Department of Veterans Affairs (VA) –** The bill provides a total of $112.2 billion in discretionary appropriations for VA, an increase of $7.8 billion above the 2021 enacted level and $755 million below the President's budget request. These resources will serve to expand access to services for Veterans and will boost oversight and accountability across the department. Of this amount, the bill includes:

- $97.5 billion for **Veterans Medical Care,** an increase of $7.5 billion above the 2021 enacted level and equal to the President's budget request. This will provide care for 7.1 million patients expected to be treated by VA in FY 2022. This amount includes:
  - $13.2 billion for **Mental Healthcare**, an increase of $2.9 billion above the 2021 enacted level and equal to the President's budget request, including $598 million for suicide prevention outreach. This will support the nearly 2 million Veterans who receive mental health services in a VA specialty mental health setting, as well as support suicide prevention services like the Veterans Crisis Line, which saw an increase in demand by over 59 percent in the last year.
  - $840.4 million for **Gender-specific Care and Programmatic Efforts for Women**, an increase of $111 million above the comparable 2021 enacted level and $30 million above the President's budget request. Women are the fastest growing cohort within the Veteran community, with nearly 561,000 women Veterans using VA health services.
  - $2.2 billion for **Homeless Assistance Programs**, an increase of $246 million above the 2021 enacted level and equal to the President's budget request. This funding will enhance VA's ability to reach homeless Veterans, which is particularly crucial as the most recent homelessness survey showed that on a given night in January 2021, an estimated 19,750 Veterans were experiencing homelessness.
  - $621 million for **Opioid Abuse Prevention**, an increase of $149 million above the 2021 enacted level and equal to the President's budget request. This funding will allow for more targeted funding of pain management and opioid safety programs primarily at the facility level.
  - $327.5 million for **Rural Health Initiatives**, an increase of $27.5 million above the 2021 enacted level and $20 million above the President's budget request. This will build upon VA's success in having served 2.9 million Veterans at 600 rural serving sites.
  - $84 million for **Whole Health Initiatives**, an increase of $10 million above the 2021 enacted level and $10 million above the President's budget request. This will enable VA to build upon

**JA 352**

the success of this program that focuses on Veterans' overall health and well-being, which has already reached 346,629 Veterans, or 7.41 percent of active VA users.

- Additionally, the bill includes $111.3 billion in advance fiscal year 2023 funding for **Veterans' medical care** – equal to the President's budget request. This funding will provide for medical services, medical community care, medical support and compliance, and medical facilities, and ensure that our Veterans have continued, full access to their medical care needs.

- $882 million for **Medical and Prosthetic Research**, an increase of $67 million above the 2021 enacted level and equal to the President's budget request. This funding will allow VA to fund approximately 2,563 total projects, support more than 1,700 researchers, and partner with more than 200 medical schools and other academic institutions.

- $2.5 billion to continue implementation of the **VA Electronic Health Record Modernization** initiative, $127 million below the 2021 enacted level and $163 million below the President's budget request. These funds will allow VA to support continued deployment of the new electronic health record (EHR) system at VA medical centers and allow for intensive staff training, critical to the success of the effort. The bill also continues robust oversight of this program, including by the Government Accountability Office, to ensure that the EHR system is implemented in a timely and efficient manner.

- $2.2 billion for **VA Construction**, an increase of $458 million above the 2021 enacted level and equal to the President's budget request. Within this amount, $1.6 billion is for Major Construction and $553 million is for Minor Construction. This increase will support VA's highest priority projects and correct critical seismic and safety deficiencies and address other performance gaps at VA facilities to ensure that Veterans can access care in modern facilities that are safe, secure, sustainable, and accessible.

- $3.5 billion for operating expenses of the **Veterans Benefits Administration**, an increase of $274 million above the 2021 enacted level and $31 million above the President's budget request, to ensure the prompt processing of disability claims and efforts to continue reducing the disability claims backlog. These funds will allow VA to complete an estimated 1.7 million disability compensation claims in 2022 and support service-connected compensation payments to an estimated 5.5 million Veterans, 500,000 survivors and dependents. In addition, pension payments will be funded for more than 350,000 Veterans and survivors. The bill also continues rigorous reporting requirements to track each regional office's performance on claims processing and appeals backlogs.
    - The funding provided above the budget request will help VA address claims for benefits due to newly identified service-connected health conditions related to toxic exposures.
    - Additionally, the bill includes $161 billion in advance mandatory funding for VA benefit programs.

**Related Agencies** – The bill provides a total of $434.2 million in discretionary appropriations for related agencies, an increase of $155.9 million above the 2021 enacted level and $4.4 million above the President's budget request. Of this amount, the bill includes:

- $228 million for **Arlington National Cemetery**, including $141 million to continue the urgently needed Southern Expansion project that will create 80,000 additional burial spaces. This is an increase of $146.2 million above the 2021 enacted level and equal to the President's budget request.

- $87.5 million for the **American Battle Monuments Commission**, $3.4 million above the fiscal year 2021 enacted level and $2.7 million more than the President's budget request. This will support continued maintenance of the graves of 124,000 American war dead in overseas cemeteries, as well as visitor and education services for the more than 3 million visitors expected to visit these sites in FY 2022.

- $77 million for the **Armed Forces Retirement Home**, $1.7 million above the 2021 enacted level and $1.7 million above the President's budget request. This will support the needs of the over 800 residents at the two retirement home campuses and invest in critical life and safety infrastructure improvements.

# Division K – State and Foreign Operations

## Overview:

The 2022 State, Foreign Operations, and Related Programs Appropriations bill provides $56.1 billion, which is $595 million above 2021. In addition, the legislation includes $6.8 billion in humanitarian, economic, and security assistance for Ukraine, the countries affected by the situation in Ukraine, and other assistance to vulnerable populations and communities, and $5 billion to enhance the global COVID response. This legislation:

- Invests in Global Health and the Prevention of Future Pandemics by including $9.83 billion to support the health of families and communities around the world, a $634 million increase over FY2021 enacted. Included is a substantial investment in global health security to prevent future pandemics through both bilateral and multilateral mechanisms. The legislation also includes an additional $5 billion to enhance the global COVID response.
- Provides $6.8 billion in humanitarian assistance to address the historic levels of global displacement and humanitarian need resulting from natural disasters, conflict, and the pandemic, and to rebuild the U.S. Refugee Admissions program.
- Recommends over $1.5 billion to address the Climate Crisis and other environmental issues.
- Supports women's health globally by preserving funding for bilateral family planning and reproductive health at $575 million and the U.S. contribution to the United Nations Population Fund (UNFPA) at $32.5 million.
- Provides over $1.6 billion to promote a free and open Indo-Pacific and help counter the growing influence of the government of the People's Republic of China in developing countries.
- Increases resources to the Department of the Treasury in order to provide economic relief to vulnerable low-income countries recovering from the impacts of the COVID-19 pandemic through both bilateral and multilateral programs.

## Bill Summary:

**State Department Operations and Related Agencies** – The bill provides a total of $17.2 billion for the operational costs of the State Department and related agencies, as well as diplomatic efforts to enhance peace and stability around the globe.

Within this amount, the legislation provides $5.8 billion for embassy security, the same as the fiscal year 2021 enacted level after adjusting for reduced costs related to Afghanistan. These funds will address needs at more than 275 diplomatic facilities overseas, including facility upgrades and security personnel.

**United States Agency for International Development (USAID) Operations** – The bill provides a total of $1.97 billion for USAID and the USAID Office of Inspector General – an increase of $263 million above the fiscal year 2021 enacted level. The legislation increases diversity, equity, inclusion, and accessibility initiatives in addition to supporting increased foreign service and civil service personnel, including for global health security and climate programs.

**Bilateral Economic and Global Health Assistance** – The bill contains a total of $19.05 billion for bilateral economic assistance to foreign countries – an increase of $2.34 billion from the fiscal year 2021 enacted

**JA 354**

level.   Within this amount, programs that support development assistance, global health, and humanitarian assistance are prioritized.  In addition, the bill includes $5.95 billion to fight HIV/AIDS around the globe.

**International Security Assistance –** The bill provides a total of $8.9 billion for international security assistance.  Funds are included for international narcotics control and law enforcement activities, antiterrorism programs, nonproliferation programs, peacekeeping operations, and other critical international security efforts. The bill also provides funding to fight terrorist financing networks and bolsters border and airport security.

In addition, the legislation provides security assistance to key allies and partners.  The bill fully funds the $3.3 billion commitment to Israel's security, and it maintains strong support for Foreign Military Financing Program (FMF) assistance for Egypt, Georgia and Jordan.

The legislation also provides $650 million in FMF funding under division N for Ukraine and Eastern European allies and security partners facing threats from Russia.

**Multilateral Assistance –** The bill provides $2.37 billion for assistance to foreign countries through international organizations and banks – an increase of $334 million above the fiscal year 2021 enacted level. The bill fully provides for our assessed Contributions to International Organizations and continues our contributions to international financial institutions such as the World Bank's International Development Association as well as to other multilateral institutions, including the Global Environment Facility and the International Fund for Agricultural Development.

The bill supports increased partnership with multilateral institutions on providing additional COVID-19 assistance to combating the climate crisis.  In continuation of supporting countries through the pandemic, the bill provides a new contribution of $102 million to the International Monetary Fund for the Poverty Reduction and Growth Trust to help low-income countries respond to the economic impacts from the COVID-19 pandemic. The bill provides a new contribution of $125 million to the Clean Technology Fund to combat the climate crisis and help countries scale up low carbon technologies. The bill also includes a $5 million contribution to the Global Agriculture and Food Security Program to advance the UN Sustainable Development Goals on eliminating poverty and hunger.

**Export and Investment Assistance** – The bill provides $891.5 million for the Export-Import Bank (EXIM), the United States International Development Finance Corporation (DFC), and the Trade and Development Agency (TDA).   The bill provides $114 million for administrative expenses for EXIM, an increase of $4 million above the fiscal year 2021 enacted level, and provides funds to support EXIM's China and Transformational Exports Program to help American exporters compete fairly against PRC-backed competition.

The bill also provides $698 million for the DFC, an increase of $129 million above the fiscal year 2021 enacted level, to support administrative expenses for increased personnel to manage the DFC's expanding portfolio, including its monitoring and evaluation requirements. In addition, $2.8 million is provided for the DFC Office of Inspector General, an increase of $800,000 above the fiscal year 2021 enacted level, in order to have sufficient personnel and resources to conduct oversight on the DFC's portfolio. The bill also provides $79.5 million for the United States Trade and Development Agency, same as the fiscal year 2021 enacted level.

*Funding for critical programs and organizations:*

**President's Emergency Plan for AIDS** Relief **(PEPFAR), including the Global Fund:**
- $5.95 billion for PEPFAR, including $1.56 billion for the Global Fund – $20 million more than the fiscal year 2021 enacted level and the President's budget request.

**Family Planning & UNFPA:**

**JA 355**

- $575 million for family planning – same as fiscal year 2021 enacted level.
- $32.5 million for UNFPA – same as fiscal year 2021 enacted level.

**Other Global Health Programs:**
- $3.88 billion for programs to improve maternal and child health and fight infectious diseases, $614 million above the fiscal year 2021 enacted level and $241 million below the President's budget request.  Includes $700 million for Global Health Security, an $510 million increase above the fiscal year 2021 enacted level.

**Human Rights of All People including LGBTQI+ Communities:**
- $15 million for the Global Equality Fund – $5 million above the fiscal year 2021 enacted level.
- $10 million for the Protection of LGBTQI+ Persons, USAID – $4 million above the fiscal year 2021 enacted level.
- $500,000 for the Special Envoy for the Human Rights of LGBTI Persons – same as the fiscal year 2021 enacted level.
- $4 million for disability rights – $1 million above the fiscal year 2021 enacted level.

**International Basic Education:**
- $950 million for basic education – the same as the fiscal year 2021 enacted level and $267.5 million above the President's budget request. This includes $150 million for multilateral partnerships in education and requires not less than $150 million be spent on girl's education in areas of conflict.

**Humanitarian Assistance:**
- $6.8 billion for humanitarian assistance under the accounts Migration & Refugee Assistance (MRA), U.S. Emergency Refugee & Migration Assistance (ERMA), and International Disaster Assistance (IDA).  In addition, $4 billion under IDA and MRA are included in division N to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine and for additional support for other vulnerable populations. Division M also includes $500 million in additional funding under IDA and MRA to enhance the Global COVID Response.

**Educational and Cultural Exchange (ECE) Programs:**
- $753 million for exchange programs - $12.7 million above the fiscal year 2021 enacted level and $11.7 million above the President's budget request.

**Biodiversity, Wildlife Trafficking, & Climate Initiatives:**
- $385 million for biodiversity - $65 million above the fiscal year 2021 enacted level and $167.3 million above the President's budget request.
- $125 million for wildlife trafficking - same as the fiscal year 2021 enacted level and $32.3 million above the President's budget request.
- $149.3 million for the Global Environment Facility, of which $12.7 million is for unmet commitments - $9.7 million above the fiscal year 2021 enacted level and the same as the President's budget request.
- $125 million for the Clean Technology Fund - $125 million above the fiscal year 2021 enacted level and $175 million below the President's budget request.

**Other Environment Programs:**
- $185 million for sustainable landscapes, $50 million above the fiscal year 2021 enacted level and $47.3 million below the President's budget request.
- $270 million for adaptation programs, $93 million above the fiscal year 2021 enacted level and $24 million below the President's budget request.

**JA 356**

- $260 million for clean energy programs, $77 million above the fiscal year 2021 enacted level and $158 million less than the President's budget request.
- Provides authority for a contribution to the Adaptation Fund and the Least Developed Countries Fund to help countries adapt to new climate realties caused by climate change.

**Democracy Programs & National Endowment for Democracy (NED):**
- $2.6 billion for democracy programs - $183 million above the fiscal year 2021 enacted level
- $315 million for the National Endowment for Democracy - $15 million above the fiscal year 2021 enacted level and the President's budget.
- $340.7 million for Democracy Fund, of which $215.5 million is for the State Department and $125.2 million for USAID, and increase of $50 million above the fiscal year 2021 enacted level and the President's budget request

**Assessed & voluntary contributions for U.N. peacekeeping activities:**
- $1.5 billion for Contributions for International Peacekeeping Activities (CIPA).
- $455 million for Peacekeeping Operations (PKO), $14.2 million above the fiscal year 2021 enacted level and $14.5 million below the President's budget request.

**Assessed & voluntary contributions to international organizations:**
- $1.663 billion to fully fund our assessed Contributions to International Organizations (CIO), including for human rights-related arrears.
- $423 million for International Organizations & Programs (IO&P) – $35.5 million above the fiscal year 2022 enacted level and $34.1 million below the President's budget request.
  - Includes significant increases for two critical partners in the global response to climate change – the Montreal Protocol Multilateral Fund and the UN Intergovernmental Panel on Climate Change/UN Framework Convention on Climate Change.

**U.S. Agency for Global Media (USAGM):**
- $860 million for USAGM, which is $57 million above the fiscal year 2021 enacted level and $46.6 million above the President's budget request.

**Peace Corps:**
- $410.5 million for Peace Corps – same as the fiscal year 2021 enacted level and the President's budget request.

**The Asia Foundation:**
- $21.5 million for the Asia Foundation – $1.5 million above the fiscal year 2021 enacted level and President's budget request.

**East-West Center:**
- $19.7 million for the East-West Center - same as the fiscal year 2021 enacted level and President's budget request.

**Millennium Challenge Corporation (MCC):**
- $912 million for MCC – same as the fiscal year 2021 enacted level and the President's budget request and provides MCC new transfer authority to the DFC for private sector development.

**The U.S. Institute of Peace (USIP):**
- $54 million for USIP, which is $9 million above the fiscal year 2021 enacted level.

**JA 357**

**The Inter-American Foundation:**
- $42 million for the IAF, which is $4 million above the fiscal year 2021 enacted level.

**U.S. African Development Foundation:**
- $40 million for the USADF, which is $7 million above the fiscal year 2021 enacted level.

*Support for U.S. allies, partners, and programs including:*
*(amounts are included in account totals above)*

- **Assistance for programs in the West Bank and Gaza:** Not less than $219 million under Economic Support Fund for programs in the West Bank and Gaza serving the Palestinian people, which is $150 million above the fiscal year 2021 enacted level and $40 million above the President's budget request.
- **Assistance for Europe, Eurasia and Central Asia (AEECA):** $500 million for the countries of Eastern Europe, Eurasia and Central Asia. In addition, $1.12 billion for AEECA is included in division N for assistance and related programs for Ukraine and countries impacted by the situation in Ukraine.
- **Central America:** Provides funding to support the U.S. Strategy to Address the Root Causes of Migration in Central America, including $61.5 million to combat corruption, strengthen rule of law, and advance human rights; $70 million to address violence against women and girls; $100 million to promote locally-led development in El Salvador, Guatemala, and Honduras; and $50 million to support a new Central America Youth Empowerment Program to engage youth in the region to measurably reduce migration. Maintains strong prior year conditions on assistance to the central governments of El Salvador, Guatemala, and Honduras.
- **The Caribbean:** Not less than $80 million for the Caribbean Basin Security Initiative, $10 million for a new initiative to promote inclusive economic growth, $12 million to strengthen resilience to natural disasters, and $6.5 million for the Caribbean Energy Initiative.
- **Colombia:** Not less than $471 million, including $50 million for rule of law and human rights activities and $40 million to enhance security in rural municipalities with high coca production or levels of illicit activities. Strengthens conditions on assistance to ensure the Government of Colombia is holding accountable all those who committed illegal acts against protesters in 2020 and 2021.
- **Venezuela:** Not less than $40 million for democracy programs, as well as funding to support Venezuelan migrants in third countries.
- **Countering Russian Influence Fund:** $295 million.
- **Countering PRC Fund:** $300 million
- **Tibetan Communities:** $21 million for Tibetan communities, an increase of $4 million above the fiscal year 2021 enacted level; and $1 million for the U.S. Special Coordinator for Tibetan Issues.
- **The Nita M. Lowey Middle East Partnership for Peace Act**: $50 million to support the 2nd year of implementation, as authorized.
- **Israel:** $3.3 billion for assistance for Israel, fulfilling the MOU.
- **Jordan:** $1.65 billion for assistance for Jordan.
- **Egypt:** $1.3 billion for security assistance to Egypt, while increasing the amount of assistance subject to human rights and democratic governance conditions, including the amount excluded from the President's waiver authority, which also includes new human rights priorities.

*Important policy provisions:*

**Promotes Diversity and Inclusion**
- The bill includes increased funding, authority, and guidance to equip the Secretary of State and USAID Administrator to increase diversity, equity, inclusion, and accessibility (DEIA) within the nation's diplomatic and development workforce. The bill includes $8 million for paid internships at the Department of State and increases funding for other workforce diversity initiatives at both the

**JA 358**

Department of State and USAID, including a total of $12 million for the Pickering and Rangel Fellowships.
- The bill includes not less than $9.5 million for USAID's DEIA initiatives, including to support the new office of the Chief DEIA Officer and to implement USAID's DEIA strategic plan.

**Combatting the Impacts of COVID-19 Pandemic**
- The bill includes $52 million under Debt Restructuring for the Debt Service Suspension Initiative and the Common Framework to support low-income countries struggling under debt burdens exacerbated during the pandemic.
- The bill includes $102 million for a contribution to the IMF's Poverty Reduction Growth Trust that helps low-income countries by offering concessional loans.

**Emphasizes gender equality:**
- The bill includes $200 million for the Gender Equity and Equality Action Fund, $50 million to support women's leadership, $175 million to prevent and respond to gender-based violence, and $130 million to support the Women, Peace and Security Strategy.

**Afghan Special Immigrant Visa (SIV) Program:**
- The bill includes authority and direction for the Secretary of State to use the funding in this legislation to eliminate processing backlogs and expedite the adjudication of Afghan Special Immigrant (SIV) cases.

## Division L – Transportation-Housing & Urban Development

**Overview:**

The 2022 Transportation, and Housing and Urban Development, and Related Agencies funding bill provides funding of $81 billion, an increase of $6.4 billion – more than 8 percent – above 2021. This includes a discretionary increase of $4 billion for the Department of Housing and Urban Development and $1.6 billion for the Department of Transportation. In total, the bill provides $157 billion in budgetary resources, an increase of $20.3 billion above 2021. The legislation:

- Creates tens of thousands of good-paying American jobs by rebuilding our crumbling infrastructure with significant investments in airports, highways, transit, passenger rail, and port systems.
- Fully implements the historic investments in the Infrastructure Investment and Jobs Act.
- Grows opportunity through homeownership and rental assistance, including up to 25,000 new housing choice vouchers targeted to individuals and families experiencing or at risk of homelessness and over 4,000 new units for seniors and persons with disabilities.
- Supports the vulnerable with public housing safety, maintenance and improvement investments, such as the remediation of lead paint and radon.
- Promotes safe transportation and housing with a skilled and growing workforce to conduct inspections, mitigate hazards, and study emerging threats and innovative solutions.
- Reduces emissions, increases resiliency, and addresses historical inequities in transportation and housing programs through targeted grants and investments.

**Bill Summary:**

**Department of Transportation (DOT)**—For fiscal year 2022, the bill provides a total of $102.9 billion in budgetary resources for DOT – an increase of $16.2 billion above the fiscal year 2021 enacted level and $15.9 billion above the President's 2022 budget request. The legislation:

**JA 359**

- Creates and leverages tens of thousands of additional jobs in construction and related industries.
- Improves the safety of our highways, aviation, transit, rail, and port systems.
- Fixes roads and highways, expands bicycle and pedestrian infrastructure, supports Federal auto safety programs, and invests in the transit state of good repair, consistent with the Infrastructure Investment and Jobs Act.

The bill includes:
- $775 million for **National Infrastructure Investments (RAISE/TIGER/BUILD)**, including not less than $20 million for grants to assist areas of persistent poverty and historically disadvantaged communities. An additional $25 million is included for a new technical assistance and capacity building program to spur **Thriving Communities** nationwide.
- Robust increases for **Research and Technology** to expand research on ways to create more equitable access to transportation systems, combat climate change, and reduce greenhouse gas emissions, as well as a 79 percent increase in **cybersecurity initiatives** to safeguard our transportation systems. An additional $5 million to support the **Highly Automated Systems Safety Center of Excellence** to coordinate DOT's technical expertise around automated systems.
- Improvements to our aviation system by providing $18.1 billion for the **Federal Aviation Administration (FAA)**, $495 million above fiscal year 2021, including $1.5 billion for **Aviation Safety** and $554 million for discretionary **Airport Improvement Grants and projects**.
- $57.5 billion for the **Federal Highway Administration** for formula programs funded from the Highway Trust Fund that improve the safety and long-term viability of our nation's highway systems, consistent with the Infrastructure Investment and Jobs Act, and $2.4 billion for **Highway Infrastructure Programs and projects**.
- $856 million for the **Federal Motor Carrier Safety Administration** and $1.2 billion for the **National Highway Traffic Safety Administration** to make trucks, cars, and the nation's roads safer, consistent with the Infrastructure Investment and Jobs Act.
- Advances the safety and reliability of our passenger and freight rail systems by providing $3.3 billion for the **Federal Railroad Administration**, an increase of $504 million above fiscal year 2021. This includes $625 million for the **Consolidated Rail Infrastructure and Safety Improvements** grant program, $250 million above fiscal year 2021. It also provides $2.3 billion for **Amtrak**, $331 million above fiscal year 2021, including $874.5 million for **Northeast Corridor Grants** and $1.45 billion for **National Network Grants**.
- $16.3 billion for the **Federal Transit Administration**, including $13.4 billion for **Transit Formula Grants** to expand bus fleets and increase the transit state of good repair, consistent with the Infrastructure Investment and Jobs Act; $2.3 billion for **Capital Investment Grants**, $234 million above fiscal year 2021; and $504.3 million for **Transit Infrastructure Grants and projects**.
- $1.3 billion for the **Maritime Administration**, $81 million above fiscal year 2021, including $318 million for the **Maritime Security Program**, $60 million to establish the **Tanker Security Program**, $234 million for the **Port Infrastructure Development Program**, and $380.6 million for **schoolship construction** and related shore-side infrastructure, which fully funds the fifth and final schoolship.
- Community projects identified by more than 145 Members of Congress and 62 Senators on both sides of the aisle that increase the safety and viability of our airports, highways, rails, and transit systems.

**Department of Housing and Urban Development (HUD)**—For fiscal year 2022, the bill provides a total of $53.7 billion for HUD – an increase of $4 billion above fiscal year 2021. The legislation:

- Expands housing choice vouchers to up to 25,000 low-income individuals and families experiencing or at risk of homelessness, including survivors of domestic violence and veterans.
- Protects housing assistance for more than 4.8 million individuals and families to ensure they continue to remain in safe, stable, and affordable housing.

**JA 360**

- Includes $11 billion in funding for new affordable housing, critical health, safety, and maintenance improvements to ensure the safety and quality of public and low-income housing, and community development activities, including $360 million to construct over 4,000 new affordable housing units for seniors and persons with disabilities, $1.5 billion in direct funding to states and local governments through the HOME Investment Partnerships Program, and significantly increases investments in distressed neighborhoods through the Choice Neighborhoods Initiative program.

The bill includes:
- $27.4 billion for **Tenant-based Rental Assistance** to continue to serve more than 2.3 million very low- and extremely low-income households nationwide. This level of funding also includes $200 million to expand housing assistance to up to 25,000 low-income families, including individuals and families experiencing or at risk of homelessness, including survivors of domestic violence and veterans. A combined $55 million is provided for the **HUD/VA Supportive Housing for Homeless Veterans** and **Native American Veterans** programs.
- $8.45 billion for **Public Housing**, $645.5 million above fiscal year 2021, including $3.2 billion to meet the full annual capital accrual need in order to improve the quality and safety of public housing for more than 2 million residents.
- $450 million for **Housing Opportunities for Persons with AIDS**, to protect housing and services for more than 75,000 low-income people living with HIV, an increase of $20 million above fiscal year 2021 and equal to the President's budget request.
- A 75 percent increase in investments to revitalize low-income housing and distressed communities through the **Choice Neighborhoods Initiative**, providing $350 million, an increase of $150 million above fiscal year 2021.
- An increase in supportive services for HUD-assisted households to improve their connections to jobs, healthcare, and educational opportunities by providing $159 million for **Self-Sufficiency Programs**.
- Expanded housing options and improved living conditions for tribal communities by providing $1 billion for **Native American Programs**, an increase of $177 million above fiscal year 2021 and an additional $22.3 million for the **Native Hawaiian Housing Block Grant** program.
- $10 billion for **Community Planning and Development**, an increase of $1.75 billion above fiscal year 2021, including $3.3 billion for **Community Development Block Grants**. This also includes $1.5 billion for the **HOME Investment Partnerships Program** which has helped preserve approximately 1.33 million affordable homes, an increase of $150 million above fiscal year 2021.
- More than 18,000 new housing options for people at risk of or experiencing homelessness while also continuing assistance to over 750,000 people experiencing homelessness and more than 350,000 individuals in emergency shelters, by including $3.2 billion for **Homeless Assistance Grants**, an increase of $213 million above fiscal year 2021.
- $13.9 billion for **Project-based Rental Assistance** to continue to house more than 1.2 million very low- and low-income households nationwide, an increase of $475 million above fiscal year 2021. An additional $1 billion is provided for **Housing for the Elderly** to build approximately 2,200 new affordable housing units for low-income seniors and $352 million for **Housing for Persons with Disabilities** to construct approximately 1,800 new affordable housing units for persons with disabilities.
- $57.5 million for **Housing Counseling** assistance for renters, homeowners, and those considering homeownership and $145.4 million for **Policy Development and Research**, including $20 million to continue legal aid assistance for eviction prevention, a combined increase of $40.4 million above fiscal year 2021.
- Increased enforcement in fair housing by providing $85 million for **Fair Housing and Equal Opportunity**, an increase of $12 million above fiscal year 2021 and equal to the President's budget request.
- $415 million for the **Office of Lead Hazard Control and Healthy Homes**, an increase of $55 million above fiscal year 2021, including $5 million to continue a radon testing and mitigation demonstration

**JA 361**

program for public housing and $25 million to initiate a new demonstration program to conduct inspections for lead in housing choice voucher units.

- Community projects identified by more than 265 Members of Congress and 60 Senators on both sides of the aisle to support a variety of targeted housing, economic, and community development investments.

**Related Agencies**—The bill provides $398 million for the related agencies in the bill, including $166 million for **NeighborWorks** to support unique solutions to expand affordable housing options, increase housing counseling assistance, and strengthen economic development. To strengthen the Federal coordination of assistance to people experiencing or at risk of homelessness, the bill includes $3.8 million for the **U.S. Interagency Council on Homelessness**.

# Exhibit 8



DEFENDING THE RULE OF LAW    LEGISLATION & POLICY    STATEMENTS

# OMB Implements Apportionment Transparency Program, a Key Pro-Democracy Reform

JULY 13, 2022    SHARE

The Office of Management and Budget (OMB) has released a new public website that for the first time makes available to the Congress and the public all documents apportioning an appropriation. Apportionments are legally binding documents that spell out how much funding an agency can spend and the conditions an agency must meet to spend it. They are one of the ways that presidents, through OMB, exercise day-to-day control over federal agencies.

The new website is available at https://apportionment-public.max.gov.

Congress passed the requirement for OMB to implement this apportionment transparency website on a bipartisan basis as part of H.R.2471, the Fiscal Year 2022 omnibus spending bill. This new apportionment transparency system will help ensure Congress has the information it needs to oversee the executive branch. A similar provision previously passed the House of Representatives as part of the Protecting Our Democracy Act.

In support of this important step forward by OMB, Cerin Lindgrensavage, counsel at Protect Democracy, released the following statement:

"Apportionment transparency is a long overdue reform crucial to ensuring the president is implementing the appropriations laws that Congress has passed. By showing everyone these apportionment documents, this website will support better congressional and public oversight of how the executive branch manages federal spending."

Protect Democracy joined the Power of the Purse coalition in advocating for the inclusion of this transparency requirement in Fiscal Year 2022 appropriations legislation and has urged Congress to make the requirement permanent in Fiscal Year 2023 appropriations legislation.

For more resources on these and other institutional reforms to improve government accountability and transparency, click here.

RELATED CONTENT



### Restoring Transparency to OMB Apportionment Decisions

DEFENDING THE RULE OF LAW    LITIGATION
CASE DOCUMENTS



### Challen and me

DEFENDIN
CASE DC



# It can happen here.
# We can stop it.

Defeating authoritarianism is going to take all of us. Everyone and every institution has a role to play. Together, we can protect democracy.

**Donate**

<div align="center">JA 364</div>



f  in

Protect Democracy United is a registered 501(c)(4) social welfare organization. Protect Democracy Project is a registered 501(c)(3) charitable organization. Learn about the difference here.

Privacy Policy / Terms of Use

© PROTECT DEMOCRACY UNITED. ALL RIGHTS RESERVED. 2025

JA 365

# Exhibit 9

Case 1:25-cv-01111-EGS   Document 18-12   Filed 04/27/25   Page 2 of 7



DEFENDING THE RULE OF LAW     LEGISLATION & POLICY     ISSUE

# Using OMB's Apportionment Website: Resources for Congress

NOVEMBER 3, 2022     SHARE



Apportionments are legally binding plans that the Office of Management and Budget (OMB) uses to make appropriated funds available to federal agencies.

Apportionments set limits—beyond those in appropriations and authorization legislation—on how and when an agency may spend funds, what an agency may spend funds on, and any conditions an agency must meet before spending funds. In short, these documents help explain when and where money goes after Congress appropriates it.

In the FY2022 omnibus, for the first time, lawmakers required OMB to disclose apportionments to Congress and the public. In July 2022, OMB met that requirement, unveiling a public apportionment website: https://apportionment-public.max.gov/.

This page provides a suite of resources to ensure members of Congress and staff have the information they need to take full advantage of their access to this website—from a recorded training on how to read apportionments and use OMB's website and the associated slide deck to an overview of relevant statutory requirements and a compilation of related educational resources.

## Apportionment Resources for Congress

### How to Read Apportionments and Use OMB's Website: A Video Training

In October 2022, three experts in budget and appropriations law led a training for congressional staff on how to read apportionments, navigate and use OMB's website, and find the apportionments associated with a particular appropriation or Treasury account.

You can find a recording of their presentation here and below:

**JA 367**

Case 1:25-cv-01111-EGS    Document 18-12    Filed 04/27/25    Page 3 of 7



Experts Explain How to Read Apportionments and Navigate OMB's New Apportionment Website

And you can find their slide deck here. (In light of the animations on the slides, it's best to view them in "Slideshow" mode in Google Slides or to download them and view them as a slideshow in Microsoft PowerPoint.)

The following experts led the training:

- **Lester Cash** recently retired after serving as the deputy director of the Department of Health and Human Services's (HHS) Office of Budget for 15 years. He was responsible for HHS's apportionment requests from 2009 to 2021. Mr. Cash served in HHS's Office of Budget for 25 years, at OMB for 10 years, and at the Census Bureau for 3 years.
- **Ed Martin** worked for over 30 years on the budget execution of HHS programs. He spent an additional 10 years as an independent contractor developing and providing training on budget execution and appropriations law for HHS. Mr. Martin retired in 2018.
- **Charlotte (Charlie) McKiver** is an Assistant General Counsel in GAO's Appropriations Law Group. Before joining GAO, she served as an Assistant General Counsel in OMB's Office of General Counsel and as a fiscal law analyst in HHS's Office of Budget.

The training was sponsored by Protect Democracy, American Action Forum, Demand Progress, FreedomWorks, National Taxpayers Union, Project on Government Oversight, R Street Institute, and Taxpayers for Common Sense.

## Key Terms Defined



In 2005, the Government Accountability Office published *A Glossary of Terms Used in the Federal Budget Process*. Please consult the *Glossary* for a comprehensive list of key terms and definitions in budget and appropriations law. A handful of terms and definitions relevant to apportionments are highlighted below. These definitions are taken from the *Glossary*, OMB Circular No. A-11, the Treasury Department's FAST Book, and the Oct. 13 apportionment training. Each entry is hyperlinked to the source providing the definition.

**Antideficiency Act –** the federal law that:

- prohibits the making of expenditures or the incurring of obligations in advance of an appropriation;
- prohibits the incurring of obligations or the making of expenditures in excess of amounts available in appropriation or fund accounts unless specifically authorized by law (31 U.S.C. § 1341(a));
- requires the Office of Management and Budget (OMB), via delegation from the President, to apportion appropriated funds and other budgetary resources for all executive branch agencies (31 U.S.C. § 1512);
- requires a system of administrative controls within each agency (see 31 U.S.C. § 1514 for the administrative divisions established);
- prohibits incurring any obligation or making any expenditure in excess of an apportionment or reapportionment or in excess of other subdivisions established pursuant to sections 1513 and 1514 of title 31 of the United States Code (31 U.S.C. § 1517); and
- specifies penalties for deficiencies.

**JA 368**

Case 1:25-cv-01111-EGS Document 18-12 Filed 04/27/25 Page 4 of 7

**Apportionment –** a legally binding plan approved by OMB that makes budgetary resources available to a federal agency. Apportionments set limits—beyond those in appropriations and authorization legislation—on how and when an agency may spend funds, what an agency may spend funds on, and any conditions an agency must meet before spending funds.

- **Reapportionment** – a revision of a previous apportionment of budgetary resources for an appropriation or fund account. OMB reapportions just as it apportions. Agencies usually submit requests for reapportionment to OMB as soon as a change becomes necessary due to changes in amounts available, program requirements, or cost factors.

**Appropriation –** a provision of law authorizing the expenditure of funds for a given purpose.

**Appropriation Account –** The basic unit of an appropriation generally reflecting each unnumbered paragraph in an appropriation act.

**A-11 (OMB Circular No. A-11) –** the OMB manual that offers detailed guidance to federal agencies on budget preparation, submission, and execution.

**Budgetary Resources –** amounts available to enter into new obligations and liquidate them. Budgetary resources are made up of unobligated balances provided in previous years and new budget authority.

**New Budget Authority –** New budget authority is made up of:

- *Appropriations*
- *Borrowing authority* – a type of budget authority that permits obligations and outlays to be financed by borrowing.
- *Contract authority* – a type of budget authority that permits you to incur obligations in advance of an appropriation, offsetting collections, or receipts to make outlays to liquidate the obligations.
- *Spending authority from offsetting collections* – collections authorized by law to be credited to appropriation or fund expenditure accounts.

**Deferral of Budget Authority –** temporary withholding or delaying of the obligation or expenditure of budget authority or any other type of executive action, which effectively precludes the obligation or expenditure of budget authority. A deferral is one type of impoundment. Under the Impoundment Control Act of 1974 (2 U.S.C. § 684), budget authority may only be deferred to provide for contingencies, to achieve savings or greater efficiency in the operations of the government, or as otherwise specifically provided by law. Budget authority may not be deferred for policy or any other reason.

**The Federal Account Symbols and Titles (FAST) Book –** the Treasury Department manual listing appropriation and other fund account symbols and titles. Identifying the Treasury Appropriation Fund Symbol (or TAFS)—a numerical identifier—associated with an appropriation account is the first step in the process of finding the corresponding apportionment. On OMB's apportionment website, the TAFS is an essential component of the file name identifying an apportionment.

**Obligation –** a definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States. Payment may be made immediately or in the future. An agency incurs an obligation, for example, when it places an order, signs a contract, awards a grant, purchases a service, or takes other actions that require the government to make payments to the public or from one government account to another.

**Outlay –** the issuance of checks, disbursement of cash, or electronic transfer of funds made to liquidate a federal obligation. Outlays also occur when interest on the Treasury debt held by the public accrues and when the government issues bonds, notes, debentures, monetary credits, or other cash-equivalent instruments in order to liquidate obligations.

**Reprogramming –** shifting funds within an appropriation or fund account to use them for purposes other than those contemplated at the time of appropriation; it is the shifting of funds from one object class to another within an appropriation or from one program activity to another. While a transfer of funds involves shifting funds from one account to another, reprogramming involves shifting funds within an account.

**Rescission –** Legislation enacted by Congress that cancels the availability of budget authority previously enacted before the authority would otherwise expire. The Impoundment Control Act of 1974 (2 U.S.C. § 683) provides for the President to propose rescissions whenever the President determines that all or part of any budget authority will not be needed to carry out the full objectives or scope of programs for which the authority was provided. Rescissions of budget authority may be proposed for fiscal policy or other reasons. All funds proposed for rescission must be reported to Congress in a special message.

**SF (Standard Form) 132 –** the standard apportionment form.

**SF133 –** the report on budget execution and budgetary resources. SF133 reports can be accessed here.

**JA 369**

Case 1:25-cv-01111-EGS   Document 18-12   Filed 04/27/25   Page 5 of 7

<u>Treasury Appropriation Fund Symbol (TAFS)</u> – the numerical identifier associated with an appropriation account. A TAFS has three elements: a three-digit federal agency ID, a four-digit appropriation account ID, and an availability code. An availability code specifies whether the appropriation is available for one year, multiple years, or has no time limit, known as a "no-year" account.

- <u>For example</u>, the TAFS for the Health Care Systems appropriation account is 075 0357. "075" identifies the agency—in this case, the Department of Health and Human Services. "0357" identifies Health Care Systems as an account in the Health Resources and Services Administration.
- On OMB's apportionment website, one <u>sees</u> several entries for account 0357 (the availability code is bolded):
    - An annual account (075-**2022-2022**-0357)
    - A multi-year account (075-**2020-2022**-0357)
    - A no-year account (075-**X**-0357)

## Finding the Right Apportionment: Instructions from Start to Finish



To use OMB's public apportionment website, you must know how to find the apportionment associated with a particular appropriation or Treasury account. For a step-by-step guide to finding the right apportionment, consult <u>slides 16-30</u> from the Oct. 13 apportionment training presentation (which feature relevant screenshots and other visual aids) or follow the identical written guidance below.

- Apportionments are done at the account level. Thus, to find the apportionment(s) you're looking for, begin by identifying the Treasury Appropriation Fund Symbol (or TAFS) associated with the relevant appropriation account.

- Suppose we want to find the apportionments associated with the <u>"Health Care Systems" appropriation</u> in the Consolidated Appropriations Act of 2022. (Click the hyperlinked text to follow along.) That appropriation is for the Department of Health and Human Services (HHS).

- <u>Read</u> the appropriations language closely: "For carrying out titles III and XII of the PHS Act with respect to health care systems, and the Stem Cell Therapeutic and Research Act of 2005, $133,093,000, of which $122,000 shall be available until expended for facilities-related expenses of the National Hansen's Disease Program."

- The "Health Care Systems" appropriation is an unnumbered paragraph heading in the Consolidated Appropriations Act of 2022. It denotes an account set up in the Treasury called "Health Care Systems." To find the TAFS associated with the "Health Care Systems Account," consult the Treasury Department's <u>Federal Account Symbols and Titles (FAST) Book</u>.

- Search for the "Health Care Systems" account. This <u>takes us to a line</u> in the FAST Book (click the link to follow along) with a numerical identifier code: 075 0357. "075" identifies HHS as the agency. "0357" identifies Health Care Systems as an account in the Health Resources and Services Administration (HRSA).

- Now that we have the TAFS 075 0357, go to OMB's public apportionment website: <u>https://apportionment-public.max.gov/</u>.

- Select the appropriate fiscal year. In this case, it is Fiscal Year 2022.

- Select the appropriate department. In this case, it is HHS.

- Select "Excel" as the file format you would like to peruse. This will bring you to a dropdown list of numerous apportionments. Note the components of an apportionment file name (e.g. FY2022_Agency=HHS_Bureau=HRSA_TAFS=075-2020-2022-0357_Iteration=1_2021-08-25-18.17.xlsx):
    1. Fiscal year (an apportionment lasts only one year regardless of the period of availability)
    2. Federal agency and bureau
    3. TAFS
    4. Iteration
    5. Approval date and time

- Search (Control+F or Command+F) for the four-digit account ID part of the TAFS. In this case, that is 0357. That search will result in four hits:
    1. A multi-year account (075-2020-2022-0357)
    2. Two no-year accounts (075-X-0357); iterations 1 and 2
    3. An annual account (75-2022-2022-0357)

- Examine the apportionments you have found that are associated with the appropriation account relevant to your work.

## JA 370

## The Antideficiency Act and Apportionments: A Compilation of Relevant Sections



Congress created the apportionment power in the Antideficiency Act to ensure federal agencies spend within the limits of the law. Authorizing an obligation or expenditure in excess of the apportioned amount is a violation of the Antideficiency Act and may result in administrative or criminal penalties. The Antideficiency Act sections relevant to apportionments are copied below and can be found here.

**31 U.S.C. § 1511:** What is apportioned?

**31 U.S.C. § 1512:** How should amounts be apportioned?

**31 U.S.C. § 1513:** Who controls apportionments? When must apportionments be approved?

**31 U.S.C. § 1514:** What are the requirements for a funds control system?

**31 U.S.C. § 1515:** When can deficiency apportionments be requested? When can they be approved?

**31 U.S.C. § 1516:** Which appropriations are exempt from apportionment?

**31 U.S.C. § 1517:** What happens if an agency obligates or expends in excess of an apportionment?

**31 U.S.C. § 1518:** What are the administrative penalties for exceeding an apportionment or administrative subdivision of funds?

**31 U.S.C. § 1519:** What are the criminal penalties for exceeding an apportionment or administrative subdivision of funds?

## OMB Resources on Apportionments



OMB Circular No. A-11 is the manual behind the federal budget, offering guidance to agencies on budget preparation, submission, and execution. Sections 120, 123, 124 of A-11 concern apportionments.

- Section 120 covers the apportionment process.
- Section 123 covers apportionments under continuing resolutions.
- Section 124 covers agency operations in the absence of appropriations.
- Appendix F covers the format of the Standard Form (SF) 132 (the apportionment form) and SF 133 (the report on budget execution and budgetary resources).

OMB updates the Circular annually, and one may find the most up-to-date version here: https://www.whitehouse.gov/omb/information-for-agencies/circulars/.

OMB publicly posts apportionments here: https://apportionment-public.max.gov/.

OMB also publishes SF133 reports—that is, reports on budget execution and budgetary resources—here.

## Additional Video Explainers



While working as an independent contractor for the Department of Health and Human Services after a lengthy career in government service, Ed Martin created an array of videos explaining the ins and outs of budget execution and appropriations law. These videos provide an accessible and detailed overview of key topics in those areas. We highlight and have embedded some of these videos below, but the full video library can be accessed here. Please note that, since Mr. Martin retired in 2018, the content of some of the videos may be out of date.

**Understanding Apportionments**

- Module 1—defines an apportionment, explains why we apportion, and lays out the basic rules of apportionment.
- Module 2—covers the apportionment form, the Standard Form (SF) 132.
- Module 3—examines the rest of the apportionment and the circumstances in which an apportionment is not necessary.

**Reading the SF133**—breaks down the information provided on the SF 133, the report on budget execution and budgetary resources. Among other things, the SF 133 allows one to track the status of funds that have been apportioned—to see how an agency obligates funds once it is authorized by OMB to do so.

**JA 371**

**Reading Appropriations Language**

- Module 1—covers reading appropriations language in annual and supplemental appropriations.
- Module 2—covers reading appropriations language in continuing appropriations (CRs).
- Module 3—covers reading appropriations language in permanent appropriations.

**The Antideficiency Act: What You Need to Know**—covers the content and history of the Antideficiency Act and why it is important.

---

RELATED CONTENT



### Restoring Transparency to OMB Apportionment Decisions

DEFENDING THE RULE OF LAW    LITIGATION
    CASE DOCUMENTS



### Challenging politically-dr science and medical res

DEFENDING THE RULE OF LAW
    CASE DOCUMENTS

← →

RELEVANT EXPERTS

← →

Current United States Authoritarian Threat Index score: **3.3/5 Severe Threat** ●

EXECUTIVE CONSTRAINTS          3.8/5 • SEVERE THREAT

THE SCORE BREAKDOWN →

# It can happen here.
# We can stop it.

Defeating authoritarianism is going to take all of us. Everyone and every institution has a role to play. Together, we can protect democracy.

**Donate**

**JA 372**

# Exhibit 10

JA 373

**The Power of the Purse**

**Princeton Initiati e on Restorin  the Constitutional Powers of Con ress**

Chaired by Nolan McCarty and Tim Penny[1]

Members: Laurel Harbridge-Yong,   evin   osar, Maya MacGuineas, Eloise Pasachoff, Erik Paulsen, Annelise Russell, Richard Swett, James Thurber, Craig Volden, James Wallner, Alan Wiseman

**E  ecuti  e Summar**

Although the United States Constitution grants Congress the power of the purse, executive encroachment and congressional acquiescence require that Congress take action to reassert its power over government spending. With this aim, this report recommends a series of reforms focused on (1) improving transparency and accountability to Congress and (2) enabling expedited congressional review of executive spending.

> _Require increased transparency regarding apportionments_ by developing a more user-friendly apportionment database and by mandating semi-annual reports by the Government Accountability Office (GAO) on apportionments.

> _Require increased transparency regarding expenditures made during government shutdowns_ by mandating that agencies provide program-by-program information on expenditures made during a lapse in appropriations and that agencies report to Congress when GAO determines that they have violated the Antideficiency Act.

> _Require increased transparency regarding the transfer and reprogramming of federal funds_ by mandating that agencies and departments make information on these actions publicly available.

> _Require the expiration of any presidential national emergency declaration after 30 days_ unless an extension is affirmatively authorized by Congress.

> _Require increased transparency regarding the uses and sources of agency generated fees_ by mandating greater disclosure and accounting of the use of agency fees, fines, and penalties.

> _Enact fast track congressional review of executive led spending decisions_ by amending the Impoundment and Control Act to require that the President submit a message to Congress announcing plans to implement policy that rely in significant part on the obligation or expenditure of particular appropriations. A specified period in which Congress may act to overrule these executive actions is further recommended. The

---

[1] With thanks to Alina Dunlap and Annie Shuppy, for their work on this report. This report draws in part from Pasachoff, Eloise. "Modernizing the Power of the Purse Statutes." _Geo. Wash. L. Rev._, vol. 92, 2024, forthcoming.

1

application of such a mechanism of review to reprogramming actions is also recommended, subject to careful consideration of dollar amount thresholds that would trigger congressional review.

_Increased training regarding the budget and appropriations process for both incoming and returning members of Congress_.  Such training should emphasize Congress's constitutional role and authorities as well as the importance of executive accountability to Congress.

These proposals are best understood alongside behavioral reforms on the part of members of Congress and potential reforms to the budget process, both of which could serve to discourage future executive encroachment and undue congressional delegation of authority. A further elaboration of these proposals is accompanied by a brief history of Congress' power of the purse and by a discussion of potential behavioral and budgetary reforms.

**Introduction**

The Constitution unambiguously lodges the "power of the purse" in the Congress.  These prerogatives encompass both the power to levy taxes (Article 1, Section 8, clause 1) and to appropriate funds (Article 1, Section 9, clause 7). While the Constitution vests these powers solely in Congress, it has granted limited discretion and flexibility to the executive branch and its agencies.

However, in recent decades, Presidents and agencies have asserted greater and greater authority over fiscal matters without explicit congressional authorization.  Moreover, Congress has increasingly acquiesced by failing to challenge these assertions.  Consider the following:

> When Congress failed to explicitly appropriate funds for physical barriers on the southern border, President Donald Trump decided to build his Wall with money reprogrammed from the military construction budget.
> President Trump delayed and threatened to withhold   400 million that Congress had appropriated to support the defense of Ukraine.
> President Joe Biden expanded a broad-based loan-forgiveness program through his statutory authority to administer the loan program. The Supreme Court struck down this action, and the Biden administration issued a new rule to alter the program to an estimated cost of   475 billion.

Beyond these headline-grabbing instances of executive encroachment, there are many mundane and routine instances, such as a lack of transparency and accountability in the Office of Management and Budget's instructions to agencies on how to spend money.

In this report, the subcommittee considers some of the reasons for the shrinking Congressional power over the purse and some feasible reforms that should be considered to slow, if not reverse, these trends.

2

There are certain relevant issues that the committee does not address due to our charge to focus on the separation of powers and the balance of power between the executive and legislative branches. First, we do not consider major reforms of the budgeting and appropriations process. While Congress's increasing failure to adhere to the timetables and procedures underlying the Congressional Budget and Impoundment Act is a source of declining congressional influence over fiscal matters, reform is a complex matter.[2] Many ideas on the budget reform agenda shift additional power away from Congress to the executive. The report however does contain an extended discussion of these issues and exhorts Congress to proceed carefully in ways that enhance fiscal governance while mainlining congressional authority.

We set aside the issue of permanent appropriations and so-called entitlements. Congress chose to remove Social Security, Medicare, and the like from the standard annual appropriations process. In doing so however, they diminished both their authority over the purse for these programs and over an increasingly large portion of the annual budget.[3] However, evaluating the difficult policy choices and value tradeoffs associated with reforming these programs is beyond the scope of this sub-committee.

We also do not consider reforms to the debt limit. Clearly, Congress's constitutional prerequisites include a role in managing the federal debt. But the current system has become a tool for brinksmanship and a contributor to extreme fiscal uncertainty. We do recommend that Congress consider alternatives that maintain its role in managing debt, but without the negative consequences of the status quo.

**Part I  Back round on the Power of the Purse**

In granting Congress the power of the purse, the Constitution vests the institution with a powerful tool with which to pursue its priorities and to maintain the separation of powers between branches of government. James Madison, for example, describes the purse as a "powerful instrument" for "reducing … all the overgrown prerogatives of the other branches" and as "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people."[4] Despite its constitutional basis, the ability of Congress to assert this power has required procedural innovation.

In response to developments in the executive and judicial branches, Congress has repeatedly reformed statutory procedures in order to assert its power of the purse. The 1849 Miscellaneous Receipts Statute, for example, required that federal receipts be deposited into the Treasury.[5] In doing so, Congress ensured that these funds would be subject to appropriations, limiting the ability of the executive branch to create special accounts beyond congressional control. The 1870 Antideficiency Act was passed to address "coercive deficiencies," the rapid spending down of

---

[2] See McCarty, Nolan. "The Decline of Regular Order in Appropriations: Does It Matter " *Congress and Policy Making in the 21st Century*, edited by Jeffery A. Jenkins and Eric M. Patashnik, Cambridge University Press, Cambridge, 2016, pp. 162–186; McCarty, Nolan, et al. "The Budget and Appropriations Process" *Congressional Reform Task Force Report,* American Political Science Association, 2019, pp. 23-30.

[3] Lawrence, Matthew B. "Congress s Domain: Appropriations, Time, and Chevron." *Duke L.J.,* vol. 70, 2020, p. 1077; Feld, Alan L. "The Shrunken Power of the Purse." *B.U. L. Rev.,* vol. 89, 2009, p. 494.

[4] Federalist 58.

[5] Ch. 110, § 1, 9 Stat. 398, 398-99 (1849).

3

allocations in order to pressure Congress to cover existing obligations through additional sums. The Act, for example, made it illegal for agencies to spend more than had been appropriated for the given fiscal year.[6]

The 1974 Budget Act[7] was passed in response to growing presidential influence over the budget process and abuses by the Nixon administration. The Act created the Congressional Budget Office and the process of budget resolutions for appropriations. These procedural reforms were intended to bolster the technical capacity of Congress against that of the Office of Management and Budget (OMB) and to counter the influence of the president's budget proposal. In addition, Title    of the 1974 Budget Act, known as the Impoundment Control Act, circumscribed the president's ability to rescind or defer appropriated funds.[8] [9]

More recently, Congress passed several provisions to increase transparency and accountability regarding apportionment. Apportionment involves the distribution by OMB of congressional appropriations to executive agencies over the course of the fiscal year. This process is legally binding and provides an essential tool in the execution of the federal budget, ensuring that agencies do not mismanage the funds allocated to them. Prior to recent reforms, apportionments were not generally disclosed to the public, hindering congressional oversight of the execution of congressional appropriations. The Consolidated Appropriations Act of 2022 required OMB to provide the House and Senate Appropriations and Budget Committees with documentation of apportionments. Furthermore, the Act required the development of a public-facing website to disclose apportionments and provide written explanation for any associated conditions on the use of funds.[10] This website is now active[11] and these reforms were made permanent in the Consolidated Appropriations Act of 2023.[12] Originally included in the Congressional Power of the Purse Act,[13] these reforms were advocated for by a broad, bipartisan coalition.[14]

Congress has repeatedly sought to reassert its power of the purse in response to changing inter-branch dynamics. The reforms proposed below, then, are not anomalous, but rather follow a recurring need to bolster the existing powers of the legislative branch.

**Part II  Proposed Reforms**

---

[6] Ch. 251, § 7, 16 Stat. 230, 251 (1870).

[7] Budget Act, Pub. L. No. 93-344, 88 Stat. 297 (1974).

[8] See Chafetz, Josh. *Congress's Constitution: Legislative Authority and the Separation of Powers,* Yale University Press, 2017, pp. 45-77; Pasachoff, "Modernizing the Power of the Purse Statutes."

[9] Conversely, congressional purse authority was weakened by the 1983 Supreme Court decision that found Congress's use of a "legislative veto" unconstitutional.  INS v. Chadha, 462 U.S. 919 (1983).

[10] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 4459, Div. E, § 204.

[11] The public-facing apportionment website made permanent in the Consolidated Appropriations Act of 2023 can be found here, https://apportionment-public.max.gov/.

[12] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, Div. E., § 204; Pasachoff, "Modernizing the Power of the Purse Statutes."

[13] Congressional Power of the Purse Act, H.R. 6628, 116th Cong. (2020).

[14] See, e.g., Hedtler-Gaudette, Dylan. "Power of the Purse Coalition Applauds House Budget Committee Hearing, Urges Follow-Up Action." *Project on Government Oversight*. 28 April 2021. https://www.pogo.org/letter/2021/04/power-of-the-purse-coalition-applauds-house-budget-committee-hearing-urges-follow-up-action.

4

**JA 377**

1. Improving Transparency and Accountability to Congress

   a) Require increased apportionments transparency through the development of an improved apportionment database and through mandated semi-annual reports by the Government Accountability Office (GAO) on OMB's apportionments.

Congress has delegated substantial authority over the power of the purse to the executive branch through the apportionment process. Beyond the discrete disbursement of funds discussed above, the apportionment process may also be used to condition the use of funds. Footnotes attached to apportionments, for example, may bar agency officials from taking certain actions. As such, apportionments allow for the efficient use of public resources but also provide an opportunity for executive aggrandizement and control over the budget process.[15] [16]

This delegation of authority by Congress to the executive branch has been exacerbated by the lack of transparency in OMB's apportionments. We strongly support the reforms included in the Consolidated Appropriations Acts of 2022 and 2023 requiring OMB to provide the House and Senate Appropriations and Budget Committees with documentation of apportionments and creating a public-facing website disclosing apportionments. However, we believe that further efforts are needed to improve apportionment transparency. These reforms directly affect the ability of Congress to oversee the process by which appropriations are translated into agency expenditures and the ability of the public to hold the executive branch accountable for its spending.

First, Congress should require that the existing apportionment database be made more user friendly. At present the website is unnecessarily difficult to navigate. The website, for example, provides links to apportionments by agency and by Treasury Appropriation Fund Symbol (TAFS), which may not be easily recognized as programs of interest by members of Congress, staff members, or members of the public. Reviewing information from the website also requires downloading discrete data files rather than allowing users to interact with the information directly online. The inclusion of:
   (1) titles that reflect program names,
   (2) clearly identified apportionment footnotes,
   (3) clearly identified changes between apportionments from the same program or activity over the course of the fiscal year,
   (4) and direct links to appropriation language, the President's own budget request, and supporting materials for each program,
would substantially improve the ability of Congress and the public to put disclosures in context. Furthermore, these changes would allow for a systematic assessment of the extent to which apportionment footnotes are used as a source of executive branch policy direction. These

---

[15] See Pasachoff, "Modernizing the Power of the Purse Statutes," pp. 7-8; Office of Management and Budget, Executive Office of the President, OMB Circular No. A-11, 2016.

[16] For example, apportionment footnotes provided the basis for the hold placed on funds to Ukraine. Office of Management and Budget, Executive Office of the President, B-331564, Withholding of Ukraine Security Assistance, 2020, https://www.gao.gov/products/b-331564.

**JA 378**

recommendations are in line with other disclosure requirements that Congress has already undertaken.[17]

Second, Congress should require GAO provide semi-annual public reports on apportionments. GAO is well situated to evaluate apportionment disclosures and to make this information about OMB's actions comprehensible to members of Congress, staff, and civil society organizations. A semi-annual disclosure would allow Congress to have relevant information as it is developing appropriations bills for the subsequent fiscal year. These reports could be provided as an additional resource on the existing apportionment website to improve the transparency of the available information.

The ability of GAO to provide such information to Congress and the public would be enhanced if GAO were added to the list of entities to whom agencies must disclose issues with OMB's delayed or conditioned apportionments. In this way, agency-level concerns about the use of apportionments would be elevated to the GAO, rather than obscured within sub-links on the apportionment website. This reform would also mirror existing disclosure requirements to GAO of Antideficiency Act and Impoundment Control Act violations.[18]

  b) Require that agencies provide program-by-program information on expenditures made during a lapse in appropriations and that agencies report to Congress when GAO has determined that they have violated the Antideficiency Act.

As government shutdowns and associated opportunities for control of federal spending by the executive branch become more frequent, increased transparency is needed to ensure that Congress can adequately oversee the power of the purse. Two exceptions to the Antideficiency Act prohibition on agencies operating in the absence of appropriations are provided for: when the activity is otherwise "authorized by law" and in the case of "emergencies involving the safety of human life or the protection of property".[19] In practice, these exceptions have created opportunities for the manipulation of federal spending by the executive branch, with OMB instructing agencies on the creation of shutdown plans and making determinations about which agency employees and activities should continue during a shutdown.

Congress lacks sufficient information to effectively oversee spending during a government shutdown. Although OMB requires agencies to submit shutdown plans, these plans often lack the level of detail needed to allow for meaningful oversight. Furthermore, formal legal decisions made by the Office of Legal Counsel (OLC) on the permissibility of agency actions are not always made public. To address this informational deficit, Congress should require that agencies provide program-by-program information about any expenditures or obligations made during a lapse in appropriations, including any analysis of the legal authority for such spending. [20]

---

[17] For example, OMB already provides information about the President's Budget Request on its website, and it indicates changes between requests over time. Apportionment documents could be clearly situated among these documents with cross-references.

[18] See, Pasachoff, "Modernizing the Power of the Purse Statutes," pp. 29-32.

[19] 31 U.S.C. §§ 1341(a)(1)(b), 1342.

[20] Pasachoff, Eloise. "The President's Budget as a Source of Agency Policy Control." *Yale L.J.,* vol. 125, 2016, pp. 2232-2235.

6

**JA 379**

In providing oversight of executive branch spending during government shutdowns, Congress often relies on GAO to investigate whether an agency's choices complied with emergency exceptions to the Antideficiency Act. Whether agencies report and explain their actions to Congress when GAO determines that they have violated the Act importantly depends on OMB policy. These reports provide valuable information to Congress, explaining agencies' rationale for why the GAO's determination may be wrong. OMB reporting requirements have changed across recent administrations, leading to variation in the information available to Congress.

Congress should require agencies to report to Congress when GAO determines they have violated the Antideficiency Act. At a minimum, whether Congress has access to valuable information in overseeing executive branch spending should not depend on the determinations of the executive branch.

c)   Require agencies and departments make information on transfer and reprogramming actions publicly available.

The transfer and reprogramming of funds provide agencies and departments with flexibility in the use of available budgetary resources. This shifting of funds may be necessary for enabling agencies to effectively respond to existing needs and unforeseen circumstances. These actions may also, however, allow agencies to spend money in ways contrary to congressional intent and, again, with limited congressional oversight.

Changes in the application of funds by agencies and departments primarily occur through transfers and reprogramming. Transfers involve the movement of funds within an agency from one appropriations account to another or the movement of funds between agencies. For an agency to engage in this form of budget adjustment, authorization must be provided for in authorizing statutes or appropriations acts. Reprogramming involves the movement of funds within appropriations accounts from one program activity to another. This shifting of funds is generally permitted unless otherwise restricted by statute or unless such an action would violate existing law. Notification of these changes in the application of funds generally only extends to the relevant House and Senate Appropriations Committees and some authorizing committees.[21] [22]

To increase access to information on, and opportunities for, oversight of transfer and reprogramming actions, Congress should require agencies make information on these actions publicly available. Information regarding agency and departmental changes in the application of funds is not readily accessible to members of Congress who are not serving on relevant committees and civil society groups engaged in the oversight of government. Some departments, such as the Department of Defense, already make reports of transfers and reprogramming actions

---

[21] Congressional Research Service, Transfer and Reprogramming of Appropriations: An Overview of Authorities, Limitations, and Procedures, No. R43098, June 6, 2013, https://crsreports.congress.gov/product/pdf/R/R43098; U.S. Government Accountability Office, Principles of Federal Appropriations Law, Fourth Edition, Chapter 2, 2016, GAO-16-463SP, https://www.gao.gov/assets/2019-11/675709.pdf.

[22] Reynolds, Molly E., and Philip A. Wallach. "Does the Executive Branch Control the Power of the Purse " American Enterprise Institute, 2020, pp. 1-11.

7

**JA 380**

readily accessible to the public.[23] Most, however, do not, impeding congressional and public opportunities for oversight.

Although this reform would involve an increase in the reporting requirements faced by agencies, it would not substantively alter thresholds for notification of reprogramming actions or expand the set of committees to which notification is required. These types of recommendations have raised concerns in the past of further burdening the oversight capacity of Congress.[24] Requiring that agencies and departments post documentation of transfer and reprogramming actions on pre-existing websites would make crucial information about the use of federal funds more transparent while limiting the potential burden of additional reporting.

    d)  Require the expiration of any presidential national emergency declaration after 30 days unless an extension is affirmatively authorized by Congress.

Congress has delegated substantial emergency powers to the president with only weak checks on their exercise. The Constitution does not grant explicit emergency powers to the president. Instead, these enhanced authorities are derived from Congress and, most notably, the 1976 National Emergencies Act. Since the Supreme Court ended the use of legislative vetoes, congressional termination of an emergency declaration has required passage of a law signed by the president or a veto-proof supermajority in the legislature. This high threshold limits the ability of Congress to respond to potential abuses of emergency powers.

As demonstrated by the controversial manner in which the Trump administration funded the construction of the southern border wall or President Biden extended temporary student debt relief during COVID, these emergency declarations provide opportunities for the president to transfer federal funds in ways potentially opposed by majorities in Congress. Congress should seek to reestablish meaningful checks on presidential emergency powers and to limit opportunities for associated appropriation by the executive branch of Congress's power of the purse by amending the statutes governing national emergencies. Specifically, Congress should require the expiration of presidentially declared national emergencies after 30 days unless an extension is affirmatively authorized by Congress within said period and on a yearly basis thereafter. [25] [26]

---

[23] Documentation of all transfer and reprogramming actions by the Department of Defense from the 1999 fiscal year through the present are available here: https://comptroller.defense.gov/Budget-Execution/ReprogrammingFY2023/.

[24] See, e.g., U.S. Governmental Accountability Office, Ways to Reduce the Reprogramming Notification Burden and Improve Congressional Oversight, NSIAD-89-202, September 21, 1989, p. 11, http://gao.gov/assets/220/211646.pdf.

[25] Reynolds and Wallach, "Does the Executive Branch Control the Power of the Purse "; Goitein, Elizabeth. "Good Governance Paper No. 18L Reforming Emergency Powers." *Just Security,* 2020, https://www.justsecurity.org/73196/good-governance-paper-no-18-emergency-powers/.

[26] This reform has received bipartisan support. See, e.g., United States, Congress, Senate, Assuring that Robust, Thorough, and Informed Congressional Leadership is Exercised Over National Emergencies Act or the ARTICLE ONE Act. *Congress.gov,* 2019. S.764, 116th Congress, https://www.congress.gov/bill/116th-congress/senate-bill/764; United States, Congress, House of Representatives, Protecting Our Democracy Act. *Congress.gov,* 2021. H.R.5314, 117th Congress, https://www.congress.gov/bill/117th-congress/house-bill/5314.

8

e) Require greater disclosure and accounting of the uses and sources of agency generated fees.

Many executive agencies self-fund using revenues generated by license fees, royalties, proceeds from public lands, the sale of ordinary goods and services, and legal fines and settlements. Although government agencies, as a rule, may not spend funds that have not been appropriated by Congress, non-tax revenues can provide exceptions to this requirement.

These self-funding enterprises include government corporations (e.g., Export-Import Bank) and other congressionally chartered entities (e.g., the Federal Reserve).[27] These enterprises are managed by federal employees and treated as government entities for most legal purposes. In some cases, user fees charged by regular federal agencies are remitted to the Treasury. In others, however, fees are retained by the agencies and may or may not be subject to appropriations. In the latter case, agencies are allowed to create a "revolving fund" that continuously collects user fees and spends them on specified purposes. Revolving funds are increasingly used to permit regulatory and enforcement agencies to use fines and settlements to operate their own spending programs.[28]

The use revolving funds and other mechanisms such as the Consumer Financial Protection Bureau's guaranteed funding through Federal Reserve revenues complicate the ability of Congress to exercise its power of the purse.[29] Neither the Office of Management and Budget, the Department of the Treasury, the enforcement agencies, nor Congress publishes systematic accounts of agency revenue-raising and the uses made of these funds.[30] The lack of transparency is such that Congress has been caught unaware of the self-funding status of government agencies and its inability to defund relevant programs in the past.[31] Furthermore, "non-prosecution agreements" with confidential fines and settlements provide enforcement agencies with non-transparent sources of funding outside of Congress's purview. Congress has acquiesced in the expansion of agency self-funding, in part, because doing so involves generating revenues without increasing broad based taxes.

Although government agencies that rely on self-funding are not necessarily immune from congressional direction,[32] greater transparency and reporting would facilitate oversight both by

---

[27] evin R. osar, Federal Government Corporations: An Overview, Congressional Research Service, report RL3365, June 8, 2011, https://sgp.fas.org/crs/misc/RL30365.pdf; evin R. osar, Congressional or Federal Charters: Overview and Enduring Issues, Congressional Research Service, report RS2223, April 19, 2013, https://sgp.fas.org/crs/misc/RS22230.pdf.

[28] DeMuth, Christopher C., and Michael S. Greve. "Agency Finance in the Age of Executive Government." *Geo. Mason L. Rev.,* vol. 24, 2017, pp. 555-594; DeMuth, Christopher C. "Agency Taxation." *Engage*, vol. 16, no. 2, 2015. http://www.fed-soc.org/publications/detail/agency-taxation.

[29] Other examples include the FCCs Universal Access program and the PCAOB's "accounting support fee".

[30] U.S. Government Accountability Office, Fees, Fines, and Penalties: Better Reporting of Government-wide Data Would Increase Transparency and Facilitate Oversight, GAO-19-221, March 2019, p. 27, https://www.gao.gov/assets/700/697345.pdf.

[31] Shabad, Rebecca. "House GOP Panel: Defunding Immigration Order Impossible'." *The Hill,* 20 Nov. 2014. https://thehill.com/policy/finance/224837-appropriations-panel-defunding-immigration-order-impossible/.

[32] osar, evin. "Fees, Fines and Penalties: Has Congress Lost Control of the Purse " *Center for the Study of the Administrative State Working Paper 21-26.* https://administrativestate.gmu.edu/wp-content/uploads/2022/08/ osar-Fees-Fines-and-Penalties.pdf.

9

Congress and by civil society groups. Congress should require greater disclosure and accounting of the use of agency fees, fines, and penalties. Congress should also consider new procedures to increase congressional supervision of confidential sources such as non-prosecution agreements.[33]

2.  Enact fast-track congressional review of executive led spending decisions.

Whereas the Impoundment Control Act was a response by Congress to aggressive executive branch influence over the budget in the form of *non-spending*, recent cases of executive aggrandizement involve presidential *spending* and are inadequately addressed by the statute. Consider, for example, the Obama administration's use of tax credits in the Affordable Care Act,[34] the transfer of funds by the Trump administration for the construction of a wall on the southern border,[35] and the Biden administration's reading of the post-9/11 HEROES Act to provide student debt relief.[36]

Congressional reliance on the legal system to push back against these types of executive actions may also prove insufficient. Judicial review over spending decisions may encounter issues of justiciability (e.g., standing, cause-of-action, and reviewability) and can take years.[37] Moreover, the involvement of the courts on executive spending decisions has not negated an independent role for Congress. Although the courts weighed in on Nixon-era impoundments, Congress still saw a need to develop procedures to respond to presidential non-spending through the Impoundment Control Act. Congress should develop comparable procedures to respond to presidential spending.

We recommend amending the Impoundment Control Act to include "fast-track" authority for Congress to consider potentially improper executive spending.  Such a procedure would define a "Release" as a presidential or agency plan or announcement of a plan to develop or implement a policy choice that relies in significant part on the obligation or expenditure of a particular appropriations account or set of accounts. Under our proposal, the President would be required to submit a special message to Congress describing Releases that involve sums exceeding a

---

[33] See Wallner, James. "Testimony on Examining  Backdoor' Spending by Federal Agencies before the House Oversight and Government Affairs Committee, Subcommittee on Intergovernmental Affairs." (Date: 12/11/2018). https://oversight.house.gov/wp-content/uploads/2018/12/Wallner-RStreet-Statement-Backdoor-Spending-12-11.pdf. Exceptions were included for funds to be paid to a whistle-blower, loan guarantee programs, or insurance programs and the requirements did not apply to the U.S. Postal Service or the U.S. Patent and Trademark Office (PTO). The Department of Commerce and the PTO must report annually to Congress on funds collected by the PTO from a settlement. Offsetting receipts and collections are funds collected by agencies from other government accounts or from the public in businesslike or market-oriented transactions. Under current law, the collections are treated as negative budget authority and outlays rather than revenue and may be used to offset spending for budget enforcement purposes. Similar legislation was introduced in the 118th Congress. See United States, Congress, House, Agency Accountability Act of 2023. *Congress.gov,* 2023. H.R.2368, 118th Congress, https://www.congress.gov/bill/118th-congress/house-bill/2368.
[34] Sohoni, Mila. "On Dollars and Deference: Agencies, Spending, and Economic Rights." *Duke L.J.,* vol. 66, 2017, pp. 1688-94.
[35] Metzger, Gillian E. "Taking Appropriations Seriously." *Colum. L. Rev.,* vol. 121, 2021, pp. 1096-1097.
[36] See, e.g., "Student Debt Cancellation Resources Page." *Committee for a Responsible Federal Budget,* 4 Jan. 2022. https://www.crfb.org/blogs/student-debt-cancellation-resources-page.
[37] Pasachoff, Eloise. "The President's Budget Powers in the Trump Era." *Executive Policymaking: The Role of the OMB in the Presidency*, edited by Meena Bose and Andrew Rudalevige, Brookings Institution Press, 2020, pp. 69–98.

10

**JA 383**

specified dollar amount. Upon receipt of the Release message, Congress would have a specified window (such as 25 calendar days)[38] to overrule such action subject to the Constitution's presentment clause. This procedure would treat presidential funding releases similar to the way rules are subject to congressional override under the Congressional Review Act (CRA).

Use of the CRA model provides a useful balance between requiring affirmative approval of Releases and allowing only expressions of disapproval. Of course, bicameralism and presentment would be formidable hurdles to congressional rejection of Presidential spending releases just as it has been for agency rules under the CRA. Yet, the use of the procedure we propose would greatly enhance Congress's opportunities to weigh in on presidential spending decisions.

We also recommend a similar model for fast-track congressional review of reprogramming actions. As discussed above, the reprogramming of funds can provide agencies and departments with the necessary flexibility to respond to changing circumstances. Where reprogramming actions exceed those warranted by the regular needs of effective governance, however, a mechanism for increased congressional oversight, such as the proposal outlined above, may be appropriate. The dollar threshold at which congressional review of reprogramming actions is triggered requires careful consideration such as to allow for necessarily flexibility in the allocation of budgetary resources.

**Part III  Reformin   the Bud  et and Appropriations Process**

Although reforms discussed in Part II make up the primary focus of this report, such tools for reasserting the power of the purse would likely be less effective if Congress does not first seek to improve internal dysfunction. Gridlock over appropriations and the broader budget process is an impediment to Congress fulfilling its responsibilities over fiscal issues. If the Legislative Branch appears feckless, especially when it comes to the most basic of its constitutionally mandated duties, it can embolden the Executive Branch to take unilateral action.

Congress does not prioritize the appropriations process, frequently relying on omnibus bills and continuing resolutions, essentially relinquishing much of its own power of the purse. The Congressional Budget Act of 1974, part of the broader Congressional Budget and Impoundment Control Act discussed in other parts of this report, established a timeline for the annual budget process that culminates with the beginning of the new fiscal year on October 1. Congress is supposed to adopt a budget resolution by April 15 and pass 12 individual appropriations bills over the subsequent months, but it typically fails to meet these deadlines.

Lawmakers have not passed all appropriations bills individually and before October 1 in more than a quarter century, leading to government funding through lengthy, opaque omnibus laws or series of inefficient continuing resolutions for each year after FY 1995. The budget process was designed such that appropriators and lawmakers give each of the 12 appropriations bills necessary scrutiny and evaluate which discretionary spending programs truly deserve spending

---

[38] This length of time reflects existing language in the Impoundment Control Act.

11

**JA 384**

increases or cuts.  But it has devolved into a vote on a large legislative package negotiated by the president and party leaders– often just days before Congress adjourns for the winter holidays.[39]

Finalizing at least part of the discretionary budget before the beginning of the fiscal year would be better than nothing at all, but Congress tends to also fall short by this standard. Lawmakers have not passed any appropriations bills before October 1 in more than five years, as five appropriations bills were signed into law by the beginning of FY 2019. There were only two fiscal years out of the last 10 years which began with any completed appropriations bills.

Failure to collectively complete appropriations results in the use of continuing resolutions, temporary bills which provide funding for programs based on the previous funding levels, for at least part of the year. While continuing resolutions do not typically provide for large discretionary spending increases and may even keep spending flat, they do not account for changing needs within departments or agencies and can actually waste money.

In addition to neglecting discretionary spending, Congress exercises limited control over mandatory spending and frequently declines to adopt budget resolutions, leading to a failure to confront longer-term budget challenges. Formal budget resolutions are supposed to include estimates for spending, revenues, deficits, and debts over the following decade under the policies that Congress wishes to pursue, as well as providing instructions for the use of budget reconciliation. The last true budget resolution Congress adopted was for FY 2016, although lawmakers have since used the budget resolution process to trigger powerful reconciliation procedures – resulting in so-called "skinny budgets" that served as a vehicle for the majority party to advance favored policy goals.

To prevent Executive Branch encroachment on its power of the purse, Congress should demonstrate its ability to serve as a functional legislative body and best use its authority over spending. Lawmakers should consider budget process reforms that both compel Congress to complete annual appropriations in a timely manner and encourage Congress to reassert its role in shaping the longer-term budget trajectory. Suggestions included below are not exhaustive, and other proposals for budget process reforms could be considered.

Certain bipartisan process proposals discussed by both internal congressional panels and outside groups in the past, such as biennial budgeting and automatic continuing resolutions designed to prevent government shutdowns, may not appeal to true member incentives or must be designed carefully with sanctions for both parties. Understanding the motivation behind behaviors and acknowledging the challenges of political polarization are both key to crafting meaningful budget process reforms.

Congress could implement restrictions to member pay, travel, or August recess adjournment unless the appropriations process meets certain targets, to borrow an idea from recently proposed automatic continuing resolution legislation. Points of order in the Senate for consideration of

---

[39] We do not feel that there is anything magic about 12 appropriations bills.  A case could be made for a smaller number which might facilitate efficient tradeoffs across spending areas.  But we do believe that maintaining the congressional power requires establishing a more orderly and committee-centered process.

12

non-appropriations legislation during certain months – perhaps June or July – could force lawmakers to stay on schedule.

The budget resolution is one of the few procedures forcing members of Congress to acknowledge trajectory of mandatory spending. On the other hand, it is often hard to find tangible consequences of not passing a budget on time. In years in which Congress produces a budget, they typically are no better at passing appropriations bills on time.

A more serious budget process, though, could engage more legislators in the process of fiscal management and create more individual incentives to push back when those prerogatives are violated by the Executive Branch. Congress could require committee chairs to testify in front of the Budget Committee and the Budget Committee to formally present their views and estimates, convincing members of Congress to take the process more seriously and producing a new culture, or implement binding 302(b) allocations for the 12 appropriations bills. Perhaps a process for Congress to formally respond annually or biannually to Congressional Budget Office budget outlooks would force more serious discussions of the long-term fiscal trajectory.

The ongoing debt limit debate still has potential to serve as a vehicle for budget process reforms, as more than a dozen past debt ceiling increases have been accompanied by deficit reduction plans like the Budget Control Act or procedural reforms. Proposed procedural changes have included withholding congressional pay temporarily, reinstatement of statutory pay-as-you-go rules, and certain Presidential line-item veto powers. It is possible that steps could be added in the reconciliation process or debt ceiling process that would strengthen the hand of Congress and go directly to the mission of reclaiming the power of the purse.

The budget process followed by Congress at present makes it unnecessarily difficult for its members to discharge their constitutional duties effectively. Its complexity obscures the real nature of today's dysfunction and inhibits efforts to fix it. Moreover, the closed-door nature of budgeting makes it harder for rank-and-file members of Congress, and the people they represent, to evaluate budgetary decisions as they are made. Reforms aiming to improve the efficiency of federal budgeting without tackling this deeper dysfunction are unlikely to fix the broken process. To be effective, reform efforts should be grounded in a clear understanding of what the act of budgeting entails.

Although this report does not make specific recommendations regarding reform of the budget and appropriations process, we do recommend that member and staff trainings concerning these processes be developed for all incoming and returning members of Congress. For Congress to effectively assert its power of the purse, not only its staff but also its members must be aware of the relevant tools at their disposal. Although written materials and lectures on the budget and appropriations process are available through the CRS, GAO, and civil society groups,[40] these resources could be better targeted to the needs of members themselves.  But most importantly, this training should emphasize Congress's constitutional role and authorities as well as the importance of executive accountability to Congress.

---

[40] See, e.g., GAO Appropriations Law Training, https://www.gao.gov/legal/appropriations-law/appropriations-law-training.

13

**JA 386**

**Conclusion**

We do not place much faith in the idea that the President and executive will ever actively promote congressional fiscal authority or that the courts will be an effective or reliable congressional ally.[41] But we do believe that Congress can reclaim much of the ground it has lost by reasserting its authority over appropriations and using that power to police the executive and punish its encroachments.[42] All that stands in the way is the rebuilding of a commitment to the institution that has eroded over decades of increased polarization and partisanship.[43]

---

[41] But see Metzger (2021) arguing that courts should take appropriations "seriously" by developing interpretative doctrines that reinforces congressional power of the purse.

[42] See Chafetz, Josh. *Congress's Constitution: Legislative Authority and the Separation of Powers,* Yale University Press, 2017.

[43] Levinson, Daryl J., and Richard H. Pildes. "Separation of Parties, Not Powers." *Harv. L. Rev.*, vol. 119, 2006, pp. 2311-2386; McCarty, Nolan. "Polarization and the Changing American Constitutional System." *Can America Govern Itself?*, edited by Frances E. Lee and Nolan McCarty, Cambridge University Press, Cambridge, 2019, pp. 301–328.

14

# Exhibit 11

Case 1:25-cv-01111-EGS    Document 18-14    Filed 04/27/25    Page 2 of 4

The OMB website that provides the underlying data used by OpenOMB is offline. There will be no new apportionments posted on OpenOMB until that site is back online.

## OpenOMB

Search    Explore Agencies ⌄    FAQ    About

# Tracking apportionments just got easier.

Apportionments are legally binding plans issued by the White House Office of Management and Budget that set the pace at which federal agencies may spend appropriated funds. OpenOMB's database makes apportionments easy to find and track.

🔍 Search apportionments

Go

 **Or try using the advanced search.**

## Why are apportionments important?

Apportionments are how the president, acting through OMB, implements Congress's spending laws. Apportionments set the pace at which agencies may spend funds by specifying what money an agency may spend, when, and subject to what conditions. This is the second step in the life cycle of federal funds: Congress appropriates, OMB apportions, and agencies spend. Administrations of both parties have abused this authority to halt or cut off funding for enacted programs, making oversight of apportionments vital.

More apportionment FAQs

**JA 389**

# Apportionments are legally binding plans that show:

✔ **What money an agency can spend and when.**

✔ **Any conditions OMB has put on agency access to funds.**

✔ **Whether OMB is delaying access to, or withholding, funds.**

**0**   New apportionments approved in the last 7 days

**3,521**   Total apportionments approved for FY2025

**1,854**   Total accounts tracked by OpenOMB

# Recently Approved Apportionments

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Missile Procurement, Army

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Missile Procurement, Army

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Research, Development, Test and Evaluation, Defense-wide

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

**JA 390**

Research, Development, Test and Evaluation, Army

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Defense Production Act Purchases

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Missile Procurement, Air Force

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Research, Development, Test and Evaluation, Air Force

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Aircraft Procurement, Air Force

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Procurement of Ammunition, Army

Approved March 21, 2025

**DEPARTMENT OF DEFENSE (MILITARY PROGRAMS)**

Other Procurement, Army

Approved March 21, 2025

Explore apportionments by agency

# Learn More About Apportionments

**JA 391**

# Exhibit 12

INSIGHTS

# Is the president following the law when it comes to spending?

OpenOMB makes it easier to track apportionments



**WILLIAM FORD, MEGAN LYLE, AND ALAN PALAZZOLO**
OCT 02, 2024

♡ 20        💬 2        ⟳ 3                                    Share



When then-President Trump sought to pressure Ukrainian President Zelensky to investigate the Bidens ahead of the 2020 presidential election, he turned to federal funds for his leverage.

In late 2018, Congress had appropriated $250 million in security assistance for Ukraine. So the same day Trump spoke with Zelensky by phone, he had his budget office put a hold on the security funds, freezing them in place. This hold violated federal law and led to the former president's first impeachment.

Is the president following the law when it comes to spending?                    4/22/25, 2:18 PM

| Type your email... | Subscribe |

To halt the funding, Trump relied on a little-known budget mechanism called an apportionment. Apportionments are how the president, acting through the Office of Management and Budget (OMB), carries out Congress's spending laws. But presidents of both parties have abused this authority in defiance of the law. And until recently, they exercised this authority largely out of public view. Neither Congress nor the public had access to apportionments.

In July 2022, because of a law Congress passed and President Biden signed, OMB finally began disclosing apportionments. But OMB did so by putting them on a website that's hard to navigate and has no search function, making it difficult for Congress and the public to see how the president has been using this obscure but important authority.

Today, Protect Democracy is launching OpenOMB.org, a new website that makes it easier to find and track apportionments — and assess whether the president is following federal spending laws or potentially flouting them.

## What is an apportionment?

An apportionment is kind of like the government equivalent of an allowance; it's a way for the president to make sure that agencies don't spend more than they are supposed to by giving them only a little of their yearly budget at a time. An apportionment is, in other words, a legally binding plan that sets the pace at which federal agencies may spend appropriated funds over the course of the fiscal year. It specifies what funds an agency may spend, when, and subject to what conditions.

Apportionment is the second step in the life cycle of federal funds.

First, Congress passes appropriations or other spending laws to fund federal programs, such as those providing medical care to veterans and financial support to lower the cost of home energy bills. But enacting those laws does not immediately send money to federal agencies to spend. Agencies must

**JA 394**

receive an apportionment from OMB making the funds available to them. Only then can agencies spend the funds, following the plan the apportionment lays out.

You can think of OMB's role in this process as like turning the nozzle on a hose.

Congress turns on the faucet to fill the hose with the water an agency needs to do its work. But the agency doesn't get that water until OMB turns the nozzle, letting the water out. OMB's turning the nozzle on or off, or adjusting the nozzle's opening to let more or less water out at a given time, is meant to ensure the agency has enough water to do what it needs but not so much water that it uses up its supply before the end of the fiscal year.

## How have presidents abused apportionments?

Congress created the apportionment process in the Antideficiency Act to help ensure agencies spend within the limits of the law.

But presidents of both parties have abused this process to advance their agendas in defiance of the law. Former President Trump did so by withholding U.S. military aid to Ukraine through a series of apportionments that put a pause on that funding. The Government Accountability Office found that this hold violated the Impoundment Control Act. But Trump and his advisers have called for more of the same if he's reelected. The former president has vowed to impound funds on a massive scale to "crush the Deep State." And Trump's former OMB Director Russell Vought has advocated for the "aggressive" use of apportionment authority "on behalf of the President's agenda."

In the 1970s, President Nixon relied on apportionments, among other tools, to withhold billions of dollars in funds from domestic programs he disagreed with. This led to a thicket of lawsuits against the administration, which it overwhelmingly lost. And President Roosevelt pushed the bounds of this authority during World War II, using it to halt funding for numerous programs that Congress had enacted into law but that the president deemed non-

essential to the war effort. Roosevelt's withholdings prompted blowback from members of Congress, who took to the House floor and used their time in hearings to challenge the legal basis for the withholdings, and lobbied the executive branch to change course.

**Despite the importance of apportionments, until July 2022, OMB exercised this authority largely out of public view. Neither Congress nor the public had access to apportionments.**

## Congress mandates transparency — and so we built OpenOMB

In the Consolidated Appropriations Acts of 2022 and 2023, Congress took action on a bipartisan basis to fix this transparency problem. It required OMB to post its apportionments on a public website. Under President Biden, OMB complied, creating apportionment-public.max.gov.

But that site is hard to navigate and has no search function, making it difficult to find apportionments and oversee OMB's work.

That's why we built OpenOMB — to make oversight of apportionments easier for Congress and the public.

OpenOMB uses a simple process to provide easier access to apportionment files. Each day, OpenOMB pulls the primary source data from OMB's site and stores the files in a database in a manner that allows them to be searched, filtered, and indexed. OpenOMB's search function then provides a means to query that database, searching for information in and across apportionments. The site is, in short, a user-friendly interface that provides access to a store of primary source data that is updated daily and contains searchable and well-organized files. (All apportionment files displayed on OpenOMB reflect the underlying primary source data and documents that OMB discloses on its site.)

Congress created the apportionment process in the Antideficiency Act to reinforce its constitutional power of the purse. By using the authority to apportion funds at times to flout rather than carry out federal spending laws, presidents of both parties have undercut Congress and claimed greater power over federal funds than the law gives them.

OpenOMB aims to make it easier for Congress and the public to find and track apportionments — and identify potential executive abuses of this authority if they are happening.

Don't miss an *Insights* post. Subscribe.

**JA 397**

# Exhibit 13



**TEXT TRUMP TO 88022!**

CONTRIBUTE       SHOP

BACK TO VIDEOS

# Agenda47: Using Impoundment to Cut Waste, Stop Inflation, and Crush the Deep State

**June 20, 2023**

 



Agenda47: Using Impoundment to Cut Waste, Stop Inflation, and Crush the Dee…

**Bedminster, NJ—** Today, President Donald J. Trump announced his plan to restore executive branch impoundment authority to cut waste, stop inflation, and crush the

**JA 399**



PLATFORM    NEWS    EVENTS    GET INVOLVED

| CONTRIBUTE | SHOP |

had the Constitutional power to stop unnecessary spending through what is known as Impoundment," President Trump said.

"Very simply, this meant that if Congress provided more funding than was needed to run the government, the President could refuse to waste the extra funds, and instead return the money to the general treasury and maybe even lower your taxes, although we did give you the biggest tax reduction in history, and the biggest regulation reduction in history, two things I am very proud of."

President Trump's plan will naturally lead the Executive and Legislative Branches to work together to negotiate and gain better control of federal spending.

"I will use the president's long-recognized Impoundment Power to squeeze the bloated federal bureaucracy for massive savings. This will be in the form of tax reductions for you. This will help quickly to stop inflation and slash the deficit."

**PRESIDENT TRUMP'S PLAN TO RESTORE EXECUTIVE BRANCH IMPOUNDMENT AUTHORITY TO CUT WASTE, STOP INFLATION, AND CRUSH THE DEEP STATE**

**PRESIDENT TRUMP WILL RESTORE THE IMPOUNDMENT POWER OF THE EXECUTIVE BRANCH:**

- President Trump will restore the Impoundment Power, reestablishing the balance of power between the Legislative and the Executive branches.

- On Day One, President Trump will direct federal agencies to identify portions of their budgets where massive savings are possible through the Impoundment Power, while maintaining the same level of funding for defense, Social Security, and Medicare.

- President Trump will take action to challenge the constitutionality of limits placed on the Impoundment Power by the **Congressional Budget and Impoundment Control Act of 1974 (CBA)**, the source of Congress's usurpation of Executive Branch powers.

**JA 400**

PLATFORM   NEWS   EVENTS   GET INVOLVED

CONTRIBUTE                    SHOP

spending.

- The CBA dramatically limited impoundment, the power of the president to choose not to unnecessarily spend taxpayer dollars, forcing the executive branch to spend every penny of congressionally appropriated funds.

- Under current law, the president can request rescissions of funds, but those requests must be approved by both houses of Congress. The president can only defer the use of funds in limited instances.

- Leading constitutional scholars agree that impoundment is an inherent power of the president.

- Congress has the "power of the purse," so its appropriations necessarily set a ceiling on federal spending for a particular purpose, but it should not set the floor.

- Article II of the Constitution vests the president with the inherent authority to "take Care that the Laws be faithfully executed," which has historically been understood to mean that the president can impound funds when doing so allows him to enforce the law more effectively and efficiently.

- In defense of the president's impoundment power against attacks from Congress, Joseph Sneed, Deputy Attorney General under President Richard Nixon, explained that the use of executive impoundment "to promote fiscal stability is not usurpation; rather it is in the great tradition of checks and balances upon which our Constitution is based."

- Restoring the Impoundment Power will naturally lead the Executive and Legislative Branches to have to work together to negotiate and gain better control of federal spending.

- Although Congress has the power to appropriate funds, inherent within the president's power to execute the law is a measure of discretion on how funds are spent, because spending decisions often depend on how laws are executed in practice.

**JA 401**

PLATFORM    NEWS    EVENTS    GET INVOLVED

CONTRIBUTE          SHOP

**EXECUTIVE BRANCH'S USE OF ITS CONSTITUTIONAL IMPOUNDMENT POWER DATES BACK TO THE EARLIEST DAYS OF THE REPUBLIC:**

- The Executive Branch Impoundment Power traces its roots to the Jefferson Administration and the earliest days of the American Republic.

- In 1803, after France refused the U.S. access to the Port of New Orleans, Congress appropriated funding for 15 gunboats. President Jefferson refused to spend the money after determining that the purchase of the gunboats would jeopardize negotiations with the French.

- In his third annual message to Congress explaining why he had not purchased the gunboats as authorized by Congress, President Jefferson declared that a "favorable and peaceable turn of affairs on the Mississippi rendered an immediate execution of that law unnecessary." President Jefferson used his power as the Chief Executive to impound congressionally appropriated funds based on his foreign policy and national security judgment that the use of the funds would be unwise and unnecessary.

- For 170 years, from President Jefferson to President Nixon, the chief executive routinely used the Impoundment Power to further national interests.

- In the 19th century, presidents James Buchanan and Ulysses S. Grant used impoundment in the context of domestic policy to prevent the use of funds to build post offices in Illinois and construct river and harbor improvements.

- Democratic administrations, such as those of Franklin Roosevelt, Harry Truman, John F. Kennedy, and Lyndon B. Johnson, also exercised the Impoundment Power.

- Today, the Impoundment Power is regularly used by **43 governors** across the U.S.

**PRESIDENT TRUMP'S RESTORATION OF THE EXECUTIVE BRANCH IMPOUNDMENT POWER WILL BE AN EFFECTIVE TOOL IN FIGHT AGAINST WASTEFUL SPENDING:**

**JA 402**

Case 1:25-cv-01111-EGS   Document 18-16   Filed 04/27/25   Page 6 of 8

PLATFORM    NEWS    EVENTS    GET INVOLVED

CONTRIBUTE    SHOP

- In 1974, the **national debt** was $475 Billion and 31 percent of the GDP. Today, it is $30.8 trillion and 123 percent of the GDP.

- Since the CBA was enacted, the federal debt has never gone below its 1974 level.

- Improper payments, payments made incorrectly by the federal government, cost the U.S. **$247 billion** in 2022.

- The U.S. government has lost nearly **$2.4 trillion** in simple payment errors over the last two decades.

- For 50 years, Congress has used the CBA to force the passage of gigantic, wasteful spending packages.

- Since the CBA, Congress has adopted a **budget resolution** on time only 6 times, missing the deadline by an average of 40 days.

- Congress has almost never met the **CBA deadline** for its 12 annual appropriations bills, often resorting to omnibus spending bills to rush appropriations through.

**TRANSCRIPT**

Crooked Joe Biden, our disgraced president, has wasted trillions of taxpayer dollars in less than three years—causing uncontrolled inflation that is crushing working families.

Reining-in Biden's wasteful and unnecessary spending is vital to stopping inflation and rescuing our economy from ruin. But the pain of the spending cuts must be borne by the special interests and Washington bureaucrats, NOT by American families and American seniors in particular.

For 200 years under our system of government, it was undisputed that the President had the Constitutional power to stop unnecessary spending through what is known as Impoundment.

**JA 403**

TRUMP
VANCE
MAKE AMERICA GREAT AGAIN!
2025

PLATFORM    NEWS    EVENTS    GET INVOLVED

CONTRIBUTE        SHOP

we did give you the biggest tax reduction in history, and the biggest regulation reduction in history, two things I am very proud of. And they still are there, although they are disappearing rapidly under Biden.

Thomas Jefferson famously used this power, as did many other presidents until it was wrongfully curtailed by the Impoundment Control Act of 1974 – not a very good act. This disaster of a law is clearly unconstitutional—a blatant violation of the separation of powers.

When I return to the White House, I will do everything I can to challenge the Impoundment Control Act in court, and if necessary, get Congress to overturn it. We will overturn it.

I will then use the president's long-recognized Impoundment Power to squeeze the bloated federal bureaucracy for massive savings. This will be in the form of tax reductions for you. This will help quickly to stop inflation and slash the deficit.

To prepare for this eventuality, on Day One, I will order every federal agency to begin identifying large chunks of their budgets that can be saved through efficiencies and waste reduction using Impoundment.

Of course, this will not include national defense and, unlike Ron DeSanctimonious, who doesn't really know what is happening, I will not lay a finger on Medicare or Social Security. He wants to destroy Social Security and basically obliterate Medicare. These are benefits for our seniors. We are not going to touch it. There are many other things we can do. We are not going to let Ron DeSanctus do anything to hurt Medicare or Social Security.

On the contrary, some of the funds we save through Impoundment from other parts of the government can be used to strengthen Medicare and Social Security for years to come.

Reasserting the president's historic Impoundment authority will also restore critical negotiating leverage with Congress to keep spending under control. Very simple. We are going to keep spending under control.

**JA 404**



taking in massive amounts of money from the liquid gold that we have under our feet. More than any other nation. And we were going to reduce taxes and pay off debt.

This is the ONLY way we will ever return a balanced budget: Impoundment.

Just as importantly, bringing back Impoundment will give us a crucial tool with which to obliterate the Deep State, Drain the Swamp, and starve the Warmongers –-- these people that want wars all over the place; killing, killing, killing, they love killing --- and the Globalists out of government.

We are going to get the Warmongers and the Globalists out of our government.

With Impoundment, we can simply choke off the money.

This policy is anti-inflation, anti-Swamp, anti-globalist—and it's pro-growth, pro-taxpayer, pro-American, and pro-freedom.

I alone can get that done. I will get it done and Make America Great Again.

Thank you very much.

**JA 405**

# Exhibit 14

JA 406

Services     For Business     Resources     About Rev     Pricing     Get Started     **Request a Demo**

ranscription     Closed Captions     Accessibility     Technology     Explore by Category or Topic ⌄     C

Home  >  Congressional Testimony  >  Russell Vought Confirmation Hearing

# Russell Vought Confirmation Hearing





Russell Vought testifies at Senate confirmation hearing for OMB director. Read the transcript here.

## Hungry For More?

Luckily for you, we deliver. Subscribe to our blog today.

Your Email*

Subscribe

**SHARE THIS POST**

    

### Copyright Disclaimer

Under Title 17 U.S.C. Section 107, allowance is made for "fair use" for purposes such as

Dr. Paul (00:00):

... [inaudible 00:00:00] every six months. Now, for the first time in history, servicing our debt has come at a cost that is more than our entire defense budget. Interest now exceeds our military budget. This isn't sustainable. The Office of Management and Budget, or OMB, is the largest office within the Executive Branch, with the primary responsibility of producing a workable budget for the president. Unfortunately, over the past four years, OMB failed to address our nation's fiscal situation, and in fact took actions that accelerated the country's fiscal crisis.

**JA 407**

follow this law in the future. So my question for you, sir, is, if you are confirmed as OMB director again, do you commit to follow the law and not allow OMB to withhold funding from programs that Congress has appropriated?

Russell Vought (17:29):

Senator, thanks for the question. I will always commit to upholding the law. I disagree with the characterization of the General Accounting Office. My time at OMB, we followed the law consistently and we will continue to do so

Senator Peters (17:43):

So that you can withhold funds that are appropriated by Congress, you think that's within the law?

Russell Vought (17:47):

Again, Senator, we did not hold, inappropriately, funds. We were engaged in a policy process with regard to how funding would flow to Ukraine. We released the funding by the end of the fiscal year.

Senator Peters (18:01):

Do you believe the Impoundment Control Act of 1974 is the law of the land that you must follow?

Russell Vought (18:07):

It is the law of the land. As you know, the President has run on that issue. He believes it's unconstitutional. For 200 years, presidents had the ability to spend less than an appropriation if they could do it for less. And we have seen the extent to which this law has contributed to waste, fraud, and

**JA 408**

abuse. But as it pertains to the parameters of how we would use that, that's something that his team will have to consider when they're confirmed in these roles.

Senator Peters (18:33):

So you know that the Impoundment Control Act has created a process that's been held by courts over and over again. Courts in Train versus City of New York have consistently rejected attempts by presidents to withhold funds unless Congress clearly allows it. And Clinton versus New York also determined that laws which allow the president to unilaterally cancel appropriations are unconstitutional. Correct me if I'm wrong, but is there anywhere in the Constitution gives the OMB director to determine whether or not a law is unconstitutional?

Russell Vought (19:05):

Again, there are 200 years of practice by the presidents of the United States have used this-

Senator Peters (19:10):

So you're saying these courts are wrong? That's fine if they're wrong, but these are the laws of the land right now.

Russell Vought (19:15):

I'm aware that they're the laws of the land and the caseload that is on the books. And this is something that the administration will consider when they're in these roles, if confirmed.

Senator Peters (19:24):

**JA 409**

# Exhibit 15

Case 1:25-cv-01111-EGS    Document 18-18    Filed 04/27/25    Page 2 of 6



WHITE HOUSE

# White House scraps public spending database

Budget office since 2022 has been required to publish "apportionments" data

**JA 411**

Case 1:25-cv-01111-EGS    Document 18-18    Filed 04/27/25    Page 3 of 6



Office of Management and Budget Director Russ Vought is seen during initial meetings with senators on Dec. 9, prior to President Donald Trump taking office and formally submitting his nomination. (Tom Williams/CQ Roll Call)

**By Paul M. Krawzak**
Posted March 24, 2025 at 1:02pm, Updated at 2:50pm

The White House budget office has taken down its website where approvals of federal funding provided in appropriations laws are statutorily required to be posted for public viewing, a move likely to face major blowback from members of Congress and government watchdogs.

As of Monday morning, the Office of Management and Budget was no longer making "apportionments" of previously enacted appropriations available on the website it set up for that purpose after Congress mandated the requirement starting in 2022. The site now simply says: "Page not found."

Sources familiar with the decision said it was made because preliminary information was being disclosed on the site. They added that making apportionments public could include sensitive data that might pose a risk to national security.

**JA 412**

Disclosures of apportionment data can be premature because they represent interim decisions which are subject to change, the sources said. Making the information public could also undermine the OMB's relationships with agencies and ability to supervise federal spending, they said, adding that apportionment data would still be available to lawmakers if needed.

But open government groups seem likely to challenge the decision in court, given it appears to flout the 2022 law.

"This is in direct violation of federal law," said Faith Williams, director of the effective and accountable government program at the Project on Government Oversight, known as POGO. "The apportionments database is a critical tool for Congress and the public to hold the executive branch accountable for its spending."

A House Democratic aide disputed the contention that published apportionments could expose sensitive internal agency deliberations. The aide said those apportionments represent final decisions subject to the statutory disclosure law as well as Freedom of Information Act requirements, as opposed to the back and forth between agencies and OMB before a decision is made, which is not.

Also, if any apportionment data is sensitive enough to be classified, that information is not disclosed on the public site, the aide said, calling Monday's action "deeply suspicious."

## Roots in Ukraine aid fight

**JA 413**

The fiscal 2022 wrapup spending package, signed in March 2022, initially established the requirement for public posting of apportionments, which are how the OMB parcels out available funding to federal agencies to ensure they do not burn through the money too quickly.

The 2022 law required the budget office to establish its apportionments website within 120 days of enactment, with each apportionment document posted within two days, along with any footnotes and an explanation for those footnotes. Any change in the delegation of apportionment authority to different officials within the budget office would also have to be disclosed.

In the fiscal 2023 omnibus package enacted in late 2022, lawmakers inserted language making clear their intent was for the OMB to continue to "operate and maintain the automated system" required under the previous spending law in that fiscal year "and each fiscal year thereafter."

The law was in part a response to actions taken during the first Trump administration, whereby then-Office of Management and Budget Director Russ Vought, through delegation of authority to political appointees at the agency, directed agencies to withhold the obligation of funds to Ukraine using apportionment footnotes. Vought is once again the White House budget office director after his party-line Senate confirmation vote earlier this year.

Democrats first raised the issue as an item they wanted to include in 2020 spending legislation, but President Donald Trump, then in his first term, threatened to veto it. So Democrats bided their time and waited out Trump, getting it over the finish line after the 2020 election, when they controlled both chambers and the White House.

"The American people have the right to know how their tax dollars are being spent, but it is clear that Russ Vought and President Trump do not care about transparency or following the law I authored," House Appropriations ranking member Rosa DeLauro, D-Conn., said in a statement. "You only hide this information if you want to break the law without accountability."

**JA 414**

Advocates for transparency in government hailed the apportionments database as a major step forward at the time. And it's taken on more importance this year, amid the Trump administration's various executive orders and other actions to delay or withhold funds for activities deemed out of step with its priorities.

Earlier this year, CQ Roll Call and later ProPublica used public apportionments data to <u>report</u> on previously enacted funding being freed up for the U.S. DOGE Service — more popularly known as the Department of Government Efficiency.

Through the beginning of March, the White House had apportioned over $40 million to the Elon Musk-led "DOGE," according to data compiled by OpenOMB, a website maintained by the Protect Democracy Project, a nonprofit.

"Congress passed a law to make apportionments public specifically in response to the first Trump administration's illegal impoundment actions," said Charlie Ellsworth, a former top aide to Senate Minority Leader Charles E. Schumer, D-N.Y., now a senior adviser to the Congressional Integrity Project, an advocacy group. "Now, under the cover of darkness, Trump can cut programs serving Americans while awarding contracts to Elon Musk-owned companies."

**You Might Also Like**

**JA 415**

# Exhibit 16



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

March 29, 2025

The Honorable Patty Murray
Vice Chair
Committee on Appropriations
United States Senate
Washington, D.C. 20510

Dear Vice Chair Murray:

I write to inform you that the Office of Management and Budget will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023.

OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.

Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending. Moreover, apportionments may contain sensitive information, the automatic public disclosure of which may pose a danger to national security and foreign policy.

I value OMB's longstanding relationship with the Committee and I am committed to working with you to provide information on apportionments that may be of interest to the Committee.

Sincerely,

Russell T. Vought
Director

**JA 417**

# Exhibit 17

JA 418

Case 1:25-cv-01111-EGS    Document 18-20    Filed 04/27/25    Page 2 of 2



**Home** / **News** / **Press Releases**

# What are They Hiding? DeLauro, Murray Demand OMB Promptly Restore Access to Website Detailing Federal Spending Allocations, As Federal Law Requires

## News

Press Releases

Statements

Appropriators in Print

Fact Sheets

Videos

March 24, 2025    **Press Release**

**Washington, D.C.** — Today, Congresswoman Rosa DeLauro (D-CT-03), Ranking Member of the House Appropriations Committee, and Senator Patty Murray (D-WA), Senate Appropriations Committee Vice Chair, issued the following joint statement after the Office of Management and Budget (OMB) moved to unlawfully hide how the agency directs agencies to spend taxpayer dollars. OMB hid this information by destroying a **website** that publicly displayed all of these decisions, known as apportionments.

**"Federal law is unequivocal: OMB must publish the agency's legally-binding budget decisions. Congress enacted these requirements over a Democratic President's objections on a bipartisan basis because our constituents, and all American taxpayers, deserve transparency and accountability for how their money is being spent. Taking down this website is not just illegal it is a brazen move to hide this administration's spending from the American people and from Congress. We call on OMB to immediately restore access to the website and resume compliance with this most basic, bipartisan transparency requirement."**

Apportionments are legally binding budget decisions issued by OMB under title 31 of the U.S. Code. These documents are final, decisional, and legally binding on agencies, and officials responsible for violating an apportionment may be subject to administrative discipline, including suspension without pay and termination, and the *knowing and willful violation of an apportionment carries with it criminal penalties under the Antideficiency Act*.

The 2022 bipartisan appropriations bills instated a requirement for OMB to publicly post in an accessible format all approved apportionments within two business days, along with any footnotes, and an explanation for those footnotes. The following year, Congress made those requirements permanent. Those bipartisan requirements have been carried out for the last three years without incident—allowing lawmakers and the public to track OMB's legal-binding budget decisions.

As of March 24, however, OMB's apportionments database was taken down with no notice or explanation, and reporting indicates the website was destroyed in defiance of the bipartisan requirements enshrined in federal law that OMB maintain the site.

Importantly, there have never been national security concerns associated with this statutory requirement, and the law requires OMB to make any classified documentation referenced in any apportionment available at the request of the Chair or Ranking Member of any appropriate congressional committee. Classified programs are frequently addressed in public statutory language, including in the recently passed Republican full year continuing resolution, with classified annexes available on a need-to-know basis.

### 

**Subcommittees**

119th Congress

## Appropriations Committee Democrats

1036 Longworth House Office Building

**JA 419**

# Exhibit 18

JA 420

April 8, 2025

Russell T. Vought
Director
Office of Management and Budget

Dear Mr. Vought,

The purpose of this letter is to address issues that have come to the attention of the Government Accountability Office (GAO) regarding the decision of the Office of Management and Budget (OMB) to remove the website that made apportionments available publicly. This is very concerning because of the potential implications for review of such records for federal audits, congressional oversight, specifically with regard to Congress's power of the purse.

We understand that OMB took down the website taking the position that it requires the disclosure of predecisional, and deliberative information. We disagree. As apportionments are legally binding decisions on agencies under the Antideficiency Act, we note that such information, by definition, cannot be predecisional or deliberative. *See* 31 U.S.C. § 1517. OMB also noted that apportionments may contain sensitive information which, if disclosed publicly automatically, may pose a danger to national security and foreign policy. While there may be some information that is sensitive if disclosed publicly, it is certainly not the case that all apportionment data meets that standard. Where there is such sensitive data that should be protected from public disclosure, those would be the exception and should not serve to take down the entire database. We remain committed to engaging with OMB and accommodating situations where sensitive data should not be posted publicly but be made available as required for congressional oversight and federal audits.

Moreover, there is a statutory requirement for OMB to post the apportionment data on a public website. Financial Services and General Government Appropriations Act, 2023. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, §204, div. E, tit. II, 136 Stat. 4667 (Dec. 9, 2022).

As you know, apportionments are a critical part of the legal framework, anchored in the Antideficiency Act, that helps to ensure the responsible use of taxpayer dollars as well as to protect Congress's power of the purse. Apportionments help achieve both of these worthy goals by requiring the President and OMB to apportion, or sub-divide, fixed-year appropriations to executive branch agencies. The apportionment system is intended to achieve the effective and orderly use of taxpayer dollars, and assist government officials and employees of the executive branch so that they do

not over-obligate or over-expend them and create the need for supplemental or deficiency appropriations.  Where officials or employees obligate or expend in excess of apportionments, they violate the Antideficiency Act, and agencies are required to report such violations to the President, Congress, and GAO.

Apportionment transparency facilitates oversight of federal spending.  Because apportionments bind agencies as to both how and when appropriations may be obligated or expended, they provide invaluable insight into agency funding decisions.  Apportionments also provide helpful context for GAO examinations of agency compliance with statutes such as the Antideficiency Act and Impoundment Control Act.

GAO has a number of on-going Impoundment Control Act inquiries and engagement work, many of which rely on apportionment data.  GAO asks that OMB reinstate this apportionment data, consistent with the law and OMB and GAO's responsibilities to protect any information deemed by OMB to be sensitive.  If OMB does not reinstate this apportionment data, please be aware that GAO has a broad statutory right of access to apportionment data under 31 U.S.C. § 716 and will seek such apportionment data accordingly.

As GAO continues its work regarding the Impoundment Control Act and other engagement work, it is essential that we retain access to this apportionment data.  Congress and the American taxpayer depend on GAO to carry out Congress's oversight responsibilities, specifically with regard to its power of the purse.  I would appreciate your immediate attention to this matter.

Sincerely,

Edda Emmanuelli Perez
General Counsel


Cc: Mark Paoletta
General Counsel
Office of Management and Budget

Cc: The Honorable Susan Collins
Chair
Committee on Appropriations
United States Senate

Cc: The Honorable Patty Murray
Vice Chair
Committee on Appropriations
United States Senate

Cc: The Honorable Lindsey Graham
Chairman
Committee on the Budget
United States Senate

Cc: The Honorable Jeff Merkley
Ranking Member
Committee on the Budget
United States Senate

Cc: The Honorable Tom Cole
Chairman
Committee on Appropriations
House of Representatives

Cc: The Honorable Rosa DeLauro
Ranking Member
Committee on Appropriations
House of Representatives

Cc: The Honorable Jodey Arrington
Chairman
Budget Committee
House of Representatives

Cc: The Honorable Brendan Boyle
Ranking Member
Budget Committee
House of Representatives

**JA 423**

# EXHIBIT A

JA 424

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PROTECT DEMOCRACY PROJECT,<br><br>            Plaintiff,<br><br>      v.<br><br>U.S. OFFICE OF MANAGEMENT & BUDGET<br>et al.,<br><br>            Defendants. | Case No. 1:25-cv-01111 |

## <u>SUPPLEMENTAL DECLARATION OF WILLIAM P. FORD</u>

I, William P. Ford, declare as follows:

1.      I am a policy advocate at the Protect Democracy Project (Protect Democracy). The statements made in this supplemental declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at Protect Democracy.

2.      Since Defendants took down OMB's public apportionment website on or around March 24, 2025, Protect Democracy has suffered several harms. These include, but are not limited to, the following:

     a.  Protect Democracy has invested substantial time, resources, and money into building, maintaining, and operating OpenOMB.org (OpenOMB). However, because Defendants have stopped disclosing apportionments, OpenOMB is now of considerably less value because it cannot serve its core function of making it easier to track OMB's apportionments. OpenOMB is now only an archive of

1
**JA 425**

apportionments from a fixed period of time, rather than a tool that "make[s]

oversight of OMB's apportionments easier for Congress, the press, and the

public" on an ongoing basis. *See About OpenOMB*, OpenOMB.org/about (last

visited May 4, 2025).

b.  Protect Democracy pays approximately $175 per month to host OpenOMB on

Amazon Web Services. Since Defendants stopped disclosing apportionments,

Protect Democracy has incurred these costs without enjoying the core benefit of

OpenOMB, which is to make it easier to track ongoing developments in OMB's

apportionments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2025.

/s/ *William P. Ford*
William P. Ford
Policy Advocate
Protect Democracy

2
**JA 426**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PROTECT DEMOCRACY PROJECT    )
    )
    Plaintiff,    )
    )
    v.    )    Case No. 1:25-cv-01111-EGS
    )
OFFICE OF MANAGEMENT AND    )
BUDGET, et al.,    )
    )
    Defendants.    )
    )

**NOTICE OF APPEAL**

Defendants—Office of Management and Budget and Russell T. Vought, in his official capacity as director of Office of Management and Budget—hereby appeal to the United States Court of Appeals for the D.C. Circuit the Court's July 21, 2025 Order (ECF No. 33) and Memorandum Opinion (ECF No. 34), which granted in part Plaintiffs' Motion for Partial Summary Judgment (ECF No. 18) and entered a permanent injunction against Defendants.

Dated: July 22, 2025

Respectfully submitted,

BRETT A.  SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Heidy L. Gonzalez*
HEIDY L. GONZALEZ (FL Bar #1025003)
CARMEN M. BANERJEE (D.C. Bar #497678)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530

**JA 427**

Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| PROTECT DEMOCRACY PROJECT, |
| Plaintiff, |
| v. |
| U.S. OFFICE OF MANAGEMENT AND BUDGET, et al., |
| Defendants. |

Civil Action No. 25-1111 (EGS)

## FINAL JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the Memorandum Opinion and Order docketed on July 21, 2025, it is hereby

**ORDERED** that the Clerk shall enter final judgment in favor of Plaintiff and against Defendants. This is a final appealable Order. *See* Fed. R. App. P. 4(a).

**SO ORDERED.**

Signed:    **Emmet G. Sullivan
United States District Judge
July 25, 2025**

**JA 429**