[ORAL ARGUMENT NOT YET SCHEDULED]

Nos. 25-5266; 25-5267

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,**
Plaintiff-Appellee,
**v.**
**OFFICE OF MANAGEMENT AND BUDGET, et al.,**
Defendants-Appellants.

---

**PROTECT DEMOCRACY PROJECT,**
Plaintiff-Appellee,
**v.**
**U.S. OFFICE OF MANAGEMENT AND BUDGET, et al.,**
Defendants-Appellants.

---

***On Appeal from the United States District Court for the District of Columbia***

---

# BRIEF OF UNITED STATES REPRESENTATIVE ROSA DeLAURO AND UNITED STATES SENATOR PATTY MURRAY AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Rupa Bhattacharyya*
Kelsi Brown Corkran
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
Georgetown Law
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-4036
rb1796@georgetown.edu
*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* United States Representative Rosa DeLauro and United States Senator Patty Murray are the current democratic leaders (Ranking Member and Vice Chair, respectively) and past Chairs of their respective Appropriations Committees. Representative DeLauro was Chair when the transparency mandates at issue in this case were included in House bills and was directly involved in the final, bipartisan and bicameral appropriations bills that became law. Senator Murray was a Senate Appropriations Committee member when the laws were passed.

As Members of Congress involved in the enactment of the laws at issue in this case, and who, in their lawmaking and oversight roles,

[1] No person, other than *amici* and their counsel, authored this brief in whole or in part or contributed funds intended to fund the preparation or submission of this brief.

directly benefit from the information required to be disclosed by those laws, *amici* offer a unique perspective on Congress's power in this area and the purposes for which apportionment information is used when Congress makes appropriations, programmatic decisions, and oversight inquiries about federal programs.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**Parties and *amici*.** As of the date of this filing, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in Appellees' Brief, with the exception of the following *amici* who appeared subsequent to the filing of that brief:

> Constitutional Accountability Center; State of California, State of Colorado, State of Connecticut, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Massachusetts, State of Michigan, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Washington, State of Wisconsin and DC; and Campaign Legal Center.

**Rulings under review.** Reference to the ruling under review appears in Appellees' Brief.

**Related cases.** Reference to any related cases pending before this Court appears in Appellees' Brief.

Dated: May 4, 2026

/s/ Kelsi Brown Corkran
Kelsi Brown Corkran

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING ........ ii
CORPORATE DISCLOSURE STATEMENT ........ iv
CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES v
TABLE OF CONTENTS ........ vi
TABLE OF AUTHORITIES ........ vii
INTERESTS OF *AMICI CURIAE* ........ 1
INTRODUCTION ........ 2

I. SINCE THE FOUNDING, CONGRESS HAS USED TRANSPARENCY MECHANISMS TO PROTECT ITS POWER OF THE PURSE. ........ 6

A. Transparency Is a Historic Tool Used by Legislatures to Control Executive Spending. ........ 6

B. To Enforce Its Spending Priorities, Congress Continued to Impose Transparency Requirements Throughout the 20th Century. ........ 12

II. THE FY 2022 AND 2023 ACTS IMPOSED NEW TRANSPARENCY MEASURES TO FURTHER PROTECT CONGRESS'S POWER. ........ 18

III. NONCOMPLIANCE WITH THE ACTS INJURES CONGRESS BY LIMITING ITS ABILITY TO CONDUCT OVERSIGHT AND EFFECTIVELY LEGISLATE. ........ 26

CONCLUSION ........ 32
CERTIFICATE OF COMPLIANCE ........ 33
CERTIFICATE OF SERVICE ........ 34

## TABLE OF AUTHORITIES

### Cases

*Brock v. Pierce County*, 476 U.S. 253 (1986) .......... 6

*Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977) .......... 25

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) .......... 3

*Kendall v. U.S. ex. rel. Stokes*, 37 U.S. 524 (1838) .......... 3

*Train v. City of New York*, 420 U.S. 35 (1975) .......... 14

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) .......... 2, 3, 9

*United States v. Richardson*, 418 U.S. 166 (1974) .......... 25

### Statutes

2 U.S.C. § 622(2)(A)(i) .......... 3

31 U.S.C. § 702(a) .......... 15

31 U.S.C. § 712 .......... 16

31 U.S.C. § 717 .......... 16

31 U.S.C. § 1301(a) .......... 3

31 U.S.C. §§ 1511-1519 .......... 13

31 U.S.C. § 1512(a) .......... 13

31 U.S.C. § 1513(b)(1) .......... 13

Act of March 8, 1809, ch. 28, § 1, 2 Stat. 535 .......... 10

Act of July 12, 1870, 16 Stat. 230 ........................................................ 11

Act of July 31, 1894, ch. 174, 28 Stat. 162............................................ 10

Act of Mar. 3, 1905, 33 Stat. 1257.......................................................... 12

Act of Feb. 27, 1906, 34 Stat. 48 ........................................................... 12

American Recovery and Reinvestment Act, Pub. L. No. 111-5, 123 Stat. 115 (2009)................................................................................................ 18

Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019)............................................................................................ 22

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49 (2022)...................................................................................... 5, 24

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022).................................................................................. 5, 25

Continuing Appropriations Act, 2020, and Health Extenders Act, 2019, Pub. L. No. 116-59, 133 Stat. 1093 (2019).......................................... 20

Coronavirus Aid, Relief, and Economic Security (CARES) Act of 2020, Pub. L. No. 116-136, 134 Stat. 281 (2020).......................................... 18

Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) ....................... 19

Digital Accountability and Transparency Act, Pub. L. 113-101, 128 Stat. 1146 (2014).......................................................................................... 18

Federal Funding Accountability and Transparency Act, Pub. L. No. 109-292, 120 Stat. 1186 (2006) ............................................................... 18

Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 302 (1974) ..... 17

**Other Authorities**

171 Cong. Rec. H3557 (daily ed. July 23, 2025) .................................... 28

Caitlin Emma & Connor O'Brien, *Trump Holds Up Ukraine Military Aid Meant to Confront Russia*, Politico (Aug. 29, 2019) ..................... 20

Carl Hulse, *Bipartisan House and Senate Leaders Urge White House to Restore Spending Website*, N.Y. Times (May 6, 2025) ........................ 27

Dominic A. Fiorentino & Taylor N. Riccard, Cong. Rsch. Serv., R-INI2538, *Office of Management and Budget (OMB) Reporting on Apportionments* (2025) ........................................................ 27

Exec. Order No. 6,166, § 16 (June 10, 1933)........................................... 15

Exec. Order No. 8,248 (Sept. 8, 1939) .................................................... 15

Financial Services and General Government Appropriations Act 2020, H.R. 3351, 116th Cong. § 204 (2019) ........................................... 18, 22

Financial Services and General Government Appropriations Bill, 2021, H.R. Rep. 116-456 (2020) ................................................................ 23

Financial Services and General Government Appropriations Bill, 2022, H.R. Rep. 117-79 (2021) .................................................................. 24

Financial Services and General Government Appropriations Bill, 2023, H.R. Rep. 117-393 (2022) ........................................................... 24, 25

Financial Services and General Government Appropriations Bill, 2027, H.R. Rep. 119-623 (2026) ................................................................ 28

GAO, *About* ............................................................................................ 15

H. Comm. on Appropriations, 116th Cong., *Provisions Applying to All Divisions of the Consolidated Appropriations Act* (Comm. Print 2020) ................................................................................................. 23

H. Comm. on Appropriations, *About* ........................................................ 9

H. Comm. on the Budget*, Frequently Asked Questions About the Federal Budget (*Dec. 3, 2019) .......... 13

H. Comm. on the Budget, *House Budget Committee Outlines OMB's Use of Apportionment Process* (Dec 2. 2019) .......... 19

James V. Saturno, Cong. Rsch. Serv., R-46260, *Introduction to the Federal Budget Process* (2023) .......... 11, 12, 13, 14, 16, 17

Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......... 9

Katherine Clark Harris, *The Statement and Account Clause: A Forgotten Constitutional Mandate for Federal Reporting¸* 32 Yale L. & Pol. Rev. 505, 512 (2014) .......... 8

Letter from Edda Emmanuelli Perez, General Counsel, GAO, to Russell T. Vought, Dir., OMB (Apr. 8, 2025) .......... 26

Letter from Rep. James Comer, Ranking Member, Comm. on Oversight & Reform, & Rep. Jason Smith, Ranking Member, Comm. on the Budget, to Shalanda D. Young, Acting Dir., OMB (May 3, 2021) .......... 30

Letter from Rep. Jason Smith, Republican Leader, Comm. on the Budget, to Alejandro Mayorkas, Sec'y, DHS, & Shalanda Young, Acting Dir., OMB (July 16, 2021) .......... 29

Letter from Rep. Rosa DeLauro, Ranking Member, Comm. on Appropriations, & Sen. Patty Murray, Vice Chair, Comm. on Appropriations, to Russell Voight, Dir., OMB (May 27, 2025) .......... 29

Letter from Sen. Christopher A. Coons, Sen. Bill Cassidy, & bipartisan group of six other Senators to Russell Vought, Dir., OMB (Aug. 1, 2025) .......... 30

Letter from Sen. Katie Boyd Britt & 13 other Republican Senators, to Russell Vought, Dir., OMB (July 24, 2025) .......... 30

Letter from Sen. Mike Crapo, Sen. Mark R. Warner & bipartisan group of 24 other Senators to Russell Vought, Dir., OMB (July 29, 2025) .......... 30

Letter from Sen. Susan M. Collins, Chair, Comm. on Appropriations, & Sen. Charles E. Grassley, Chair, Comm. on the Judiciary, to Russell Vought, Dir., OMB (Sept. 29, 2025) .................................................. 30

Mem. from Justin H. Brown, Counselor, to Michele Sumilas, Acting Chief of Staff, U.S. Agency for Int'l Dev., *Lessons from USAID's FY 2019 Budget Process Highlight Interagency Constraints and Areas that Require Continued Attention* (Mar. 2, 2021) ................................ 19

OMB–Withholding of Ukraine Security Assistance, B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020) .......................................... 3, 19, 20

Press Release, Joint Statement of Rep. DeLauro and Sen. Murray, What Are They Hiding? DeLauro, Murray Demand OMB Promptly Restore Access to Website Detailing Federal Spending Allocations, As Federal Law Requires (Mar. 24, 2025) ............................................ 27

Press Release, Rep. Brendan Boyle, Boyle Demands White House Comply with the Law, Restore Public Access to Budget Data (Mar. 24, 2025) ................................................................................ 27

*Protecting Congress's Power of the Purse and the Rule of Law: Hearing Before the H. Comm. on the Budget,* 116th Cong., Ser. 116-25 (2020) 6, 7, 8, 9, 21, 22

*Protecting Our Democracy: Reasserting Congress' Power of the Purse: Hearing before the Comm. on the Budget, U.S. House of Representatives*, 117th Cong., Ser. 117-2 (2021) .......................... 21, 24

S. Comm. on the Budget, 105th Cong., *The Congressional Budget Process: An Explanation* 8 (Comm. Print 1998) .................................. 17

The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961) ..... 2

U.S. Congress, *Constitution Annotated: Art. II, Sec. 3* ............................ 4

U.S. Dep't of the Treasury, *Act of Congress Establishing the Treasury Dep't*, ........................................................................................ 10

U.S. Gov't Accountability Off. ("GAO"), GAO-16-464SP, *Principles of Federal Appropriations Law* (4th ed. 2016) ........................ 3, 10, 11, 16

U.S. Sen., *Appropriations Committee Created* ........................................9

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ........................................................................2

U.S. Const. art. I, § 8, cl. 1. ......................................................................9

U.S. Const. art. I, § 9, cl. 1 ...................................................................9, 10

U.S. Const. art. I, § 9, cl. 7 ........................................................................2

## GLOSSARY

ADA – Antideficiency Acts

BOB – Bureau of the Budget

GAO – Government Accountability Office

ICA – Impoundment Control Act

OMB – Office of Management and Budget

## INTERESTS OF *AMICI CURIAE*

United States Representative Rosa DeLauro and United States Senator Patty Murray are the current democratic leaders (Ranking Member and Vice Chair, respectively) and past Chairs of their respective Appropriations Committees. Representative DeLauro was Chair when the transparency mandates at issue in this case were included in House bills and was directly involved in the final, bipartisan and bicameral appropriations bills that became law. Senator Murray was a Senate Appropriations Committee member when the laws were passed.

*Amici* are interested in this case because (1) the Executive Branch is ignoring the requirements of a law enacted by Congress; (2) their constituents are harmed by the Executive's failure to comply with statutory mandates requiring transparency in how taxpayer dollars are spent; and (3) Congress has, by law, assigned its power to apportion appropriated funds to the Executive, and lack of transparency into that statutorily required process harms Congress and frustrates the fulfillment of its constitutional roles of oversight and lawmaking.

## INTRODUCTION

The Constitution gives Congress the authority to impose taxes and to appropriate public funding to be spent in support of the common defense and the general welfare. U.S. Const. art. I, § 8, cl. 1. "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." U.S. Const. art. I, § 9, cl. 7. These constitutional commands enshrine Congress's "power of the purse," ensuring, in our tripartite system of government, that the branch of government closest to the people is the branch that controls how the people's money is spent.[2] As James Madison noted, "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people."[3]

---

[2] *See U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("The Appropriations Clause is … a bulwark of the Constitution's separation of powers among the three branches of government.").

[3] *Id.* (quoting The Federalist No. 51, at 359 (James Madison) (Clinton Rossiter ed., 1961)).

An appropriation is the legal authority to incur obligations and make payment from the Treasury for specified purposes.[4] Appropriations must be spent to fulfill their purpose.[5] "[U]nless Congress has enacted a law providing otherwise, the President must take care to ensure that appropriations are prudently obligated during their period of availability."[6] The Executive Branch may not decline to follow laws that require expenditures, any more than it may decline to follow any other law, whatever its policy preferences.[7] To permit otherwise would mean that the Executive could remake the law by honoring some statutes and ignoring others.[8] But, as the Constitution dictates, the power to make

---

[4] *See* U.S. Gov't Accountability Off. ("GAO"), GAO-16-464SP, *Principles of Federal Appropriations Law* 2-3 (4th ed. 2016) (hereinafter "GAO, *Principles*"), https://www.gao.gov/assets/2019-11/675709.pdf; 2 U.S.C. § 622(2)(A)(i).

[5] *See* 31 U.S.C. § 1301(a); *U.S. Dep't of Navy*, 665 F.3d at 1348.

[6] OMB–Withholding of Ukraine Security Assistance, B-331564, 2020 WL 241373, at *4 (Comp. Gen. Jan. 16, 2020).

[7] *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.").

[8] OMB–Withholding of Ukraine Security Assistance, 2020 WL 241373 at *6 ("Faithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law."); *see also Kendall v. U.S. ex. rel. Stokes*, 37 U.S. 524, 613 (1838) (noting that the Executive's power to take care that the laws are faithfully executed does not include the power to "forbid their execution";

laws lies exclusively with Congress, as does the power to determine how federal funds are spent.

The congressional power over appropriations is fundamental to Congress's power to carry out the will of the people it represents through the enactment of laws. Since the Founding, Congress has carefully guarded this power. Following the example of its English parliamentary forebearers, Congress has given the Executive the authority to spend money but has repeatedly and consistently imposed limitations on how that money is spent. Congress also has insisted on transparency into how the Executive spends appropriated funds so that it can have the information necessary to ensure that its statutory dictates are being followed, to fulfill its responsibilities to oversee the activities of the Executive Branch, and to inform future legislation. The public also benefits from transparency into how federal funds are being spent. When Executives attempt, as they have repeatedly,[9] to further policy interests

---

if it did it would "be clothing the President with a power entirely to control the legislation of congress").

[9] *See*, *e.g.*, U.S. Congress, *Constitution Annotated: Art. II, Sec. 3,* https://constitution.congress.gov/browse/essay/artII-S3-3-7/ALDE_00013376/ (last visited May 1, 2026) (describing Thomas Jefferson's attempted impoundment of appropriated funds in 1803, and

different from Congress's by manipulating spending out of public view, Congress is within its rights to demand transparency and oversight.

The provisions of law at issue in this case, included in the Consolidated Appropriations Acts for fiscal years 2022[10] and 2023,[11] are the latest budget transparency-enhancing measures enacted by Congress. For the reasons explained by Appellees, these provisions are legally sound and serve the laudable purpose of ensuring that the Executive is accountable to the people when spending public funds.

As Members of Congress vested with the constitutional authority to appropriate federal funds, to demand an accounting of their expenditure, and to oversee the activities on which they are spent, we submit this brief to (1) describe how Congress has historically used transparency mechanisms to protect its power of the purse against incursions by the Executive Branch; (2) set out the reasons underlying the apportionment transparency requirements in the FY 2022 and 2023 Acts and the context

---

recounting episodes involving Presidents Ulysses S. Grant, Franklin D. Roosevelt, Lyndon B. Johnson, and Richard M. Nixon).

[10] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257 (Mar. 15. 2022) (hereinafter "FY 2022 Act").

[11] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (Dec. 29, 2022) (hereinafter "FY 2023 Act").

in which they were enacted; and (3) show how critical transparency in apportionment data is to Congress's continued exercise of its powers of the purse, oversight, and lawmaking, and to the ability of the American people to understand how their money is being spent in their name.[12]

## ARGUMENT

## I. SINCE THE FOUNDING, CONGRESS HAS USED TRANSPARENCY MECHANISMS TO PROTECT ITS POWER OF THE PURSE.

### A. Transparency Is a Historic Tool Used by Legislatures to Control Executive Spending.

Congress's power of the purse is enshrined in the Constitution, but its roots trace back to centuries before the Founding. In the 13th century, the English Parliament successfully seized portions of the power of the purse from the Crown, and in the 17th century, Parliament passed revenue bills accompanied by strict conditions on spending.[13] Critical to

---

[12] *See Brock v. Pierce County*, 476 U.S. 253, 262 (1986) ("[T]he protection of the public fisc is matter of interest to every citizen.").

[13] *Protecting Congress's Power of the Purse and the Rule of Law: Hearing Before the H. Comm. on the Budget,* 116th Cong., Ser. 116-25, at 15 (2020) (hereinafter "*Power of the Purse Hearing*"), https://perma.cc/DJ22-XCP2 (statement of Josh Chafetz, Professor of Law, Georgetown L.) (Parliament required, for example, that King Charles II only spend funds appropriated to fight in the Second Anglo-Dutch War on the war itself, and demanded publicly accessible records of how those funds were spent).

the power of the purse, even then, was the need to know where the money was going. Thus, in 1667, Parliament created an "independent auditing board," which inspected royal officials' books and determined whether money was being spent in accordance with law.[14] Spending contrary to legislative will was punishable by impeachment,[15] and in at least one instance, imprisonment in the Tower of London.[16]

In the decades preceding 1788, colonial legislatures used Parliament's control over spending and its oversight mechanisms as a template for their own laws, imposing spending requirements in state appropriations laws and retaining the power to audit spending by governors and other executive officials.[17] The state legislatures' oversight functions were not mere window dressing; state legislators responded to executive malfeasance by zeroing out paychecks of executive officials acting in noncompliance, including governors.[18]

---

[14] *Id.*

[15] *Id.* at 15-16 (The Earl of Danbury and Sir Edward Seymour were impeached by the House of Commons for spending money contrary to the will of Parliament by manipulating funds to maintain a standing army in England longer than Parliament had authorized).

[16] *Id.* at 16 n.6. (Danbury was imprisoned for five years).

[17] *Id.* at 16.

[18] *Id.* at 16-17.

When the newly independent states joined together to form a nation, the Constitution they devised "evinced an unmistakable desire to keep budgetary matters firmly under legislative control."[19] The Constitution grants the House of Representatives the exclusive right to introduce bills for raising revenue,[20] precludes funds from being withdrawn from the Treasury absent an appropriation by Congress,[21] and mandates that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."[22] The Appropriations Clause and the Statement and Account Clause safeguard against the waste of public funds and—in our constitutional

---

[19] *Id.* at 17.

[20] U.S. Const. art. I, § 8, cl. 1.

[21] U.S. Const. art. I, § 9, cl. 1.

[22] *Id.* This latter requirement was included to further public transparency. *See* Katherine Clark Harris, *The Statement and Account Clause: A Forgotten Constitutional Mandate for Federal Reporting*¸ 32 Yale L. & Pol. Rev. 505, 512 (2014) ("The most obvious [objective of the Clause] is that … [i]t allows the people, jointly with Congress, to determine if the expenditures by the Executive reflect the intent embodied in the appropriations [and] provides an opportunity for the people to scrutinize appropriations by Congress and expenditures by the Executive to determine if they were … allowed by the Constitution." (internal quotes and citation omitted)).

structure which prioritizes checks and balances amongst the branches of governments—serve as important checks on Executive power.[23]

Early on, Congress recognized the importance of setting restrictions on the spending of public funds and combatting information asymmetries between itself and the Executive Branch. Accordingly, Congress passed increasingly specific appropriations statutes and established the Ways and Means Committee to "lessen the House's dependence on the Treasury for financial expertise."[24] Congress established the House and Senate Committees on Appropriations in 1865 and 1867 respectively, which centralized budgeting activities previously vested in other committees.[25] To adequately conduct oversight of Executive spending, Congress also

---

[23] *U.S. Dep't of Navy*, 665 F.3d at 1347 (Appropriations Clause is "particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)); *see generally* Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359 (2024).

[24] *Power of the Purse Hearing*, *supra* n.13, at 18.

[25] *See* H. Comm. on Appropriations, *About*, https://appropriations.house.gov/about (last visited May 1, 2026); U.S. Sen., *Appropriations Committee Created*, https://www.senate.gov/about/origins-foundations/committee-system/appropriations-committee-created.htm (last visited May 1, 2026).

established the Office of the Comptroller in the Department of the Treasury to "examine all accounts settled by the Auditor, and certify the balances arising thereon to the Register."[26] Between 1817 and 1894, several comptroller and auditor positions were established within that office to empower it to ensure that spending was done in accordance with law.[27] In 1894, Congress passed the Dockery Act,[28] which restructured the various positions into one Comptroller of the Currency.[29]

Even as Congress developed these mechanisms to secure its oversight function and protect its power of the purse, threats to Congress's ability to regulate the Executive's spending of appropriated funds emerged. A particular problem was agencies running out of money or pledging (or obligating) funds in excess of those appropriated by Congress. Subsequent requests by the Executive Branch for the funds necessary to pay these obligations-in-excess required Congress to pass

---

[26] U.S. Dep't of the Treasury, *Act of Congress Establishing the Treasury Dep't*, https://home.treasury.gov/history/act-of-congress-establishing-the-treasury-department (last visited Oct. 22, 2025) (citing Act of March 8, 1809, ch. 28, § 1, 2 Stat. 535).
[27] GAO *Principles*, *supra* n. 4, ch.1, at 1-10.
[28] Act of July 31, 1894, ch. 174, 28 Stat. 162.
[29] GAO, *Principles*, *supra* n. 4, ch.1, 1-11.

"deficiency appropriation[s]."[30] This scheme—obligating in excess and then requesting money to cover the deficiency created by the committed obligation—could result in Congress being forced to pay for executive spending that intentionally exceeded appropriated funds.[31]

Congress began developing laws to deal with these coercive deficiencies.[32] These laws sought to create guardrails against the obligation of more funds than appropriated, and culminated in the 1870 precursor to the collection of statutes popularly known as the Antideficiency Acts.[33] This new statute prohibited obligations that would result in deficiencies, but lacked any requirement that violators incurring deficiencies or requesting supplemental appropriations report these to Congress. Partly due to the lack of required reporting and penalties, Senators subsequently noted that the law had been ineffective in

---

[30] *Id.,* ch.2, at 2-4.
[31] James V. Saturno, Cong. Rsch. Serv., R-46260, *Introduction to the Federal Budget Process* (2023) (hereinafter "CRS, *Federal Budget*"), https://www.congress.gov/crs-product/R46240 (defining coercive deficiencies).
[32] *See id.* at 8-9 (discussing various measures Congress took to attempt to curb coercive deficiencies).
[33] Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 241.

avoiding deficiencies,[34] and battles over the purse strings continued throughout the 20th century.

### B. To Enforce Its Spending Priorities, Congress Continued to Impose Transparency Requirements Throughout the 20th Century.

As Executive officers devised new ways to substitute their own spending priorities for those mandated by law, Congress responded by enacting greater transparency requirements and spending rules through legislation. In particular, the Antideficiency Acts, the Budget Act, and the Impoundment Control Act remain today the cornerstones of the legislative effort to retain control over the power of the purse and to ensure that the Executive executes the laws as enacted by Congress.

#### 1. The Antideficiency Acts

The Antideficiency Acts ("ADA") of 1905 and 1906[35] prohibited deficiencies absent specific authorization and included criminal penalties for violations thereof.[36] The ADA also established the apportionment

[34] *See* CRS, *Federal Budget*, *supra* n. 31, at 10 (discussing an 1874 Senate floor debate where "senators noted enforcement shortcomings stemming from the lack of penalties from spending violations").
[35] Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 48.
[36] *See* CRS, *Federal Budget*, *supra* n. 31, at 28 (summarizing changes made to the 1870 precursor by the Antideficiency Acts of 1905 and 1906).

process—meant to reduce agency overspending and prevent the need for deficiencies or supplemental appropriations—as a mechanism for protecting Congress's power of the purse.[37]

In the ADA, as currently codified at 31 U.S.C. §§ 1511-1519, Congress delegated its power to control the minutiae of the expenditure of appropriated funds to the Executive. Thus, the ADA provides that "[t]he President shall apportion in writing an appropriation available to an executive agency."[38] The apportionment process is an administrative mechanism intended to ensure that appropriated funding is made available to the federal agencies for the purposes for which it was appropriated on a schedule that allows for prudent obligation but prevents deficiencies.[39] Its goal is "efficient funds management"[40] Today,

---

[37] *Id.*

[38] 31 U.S.C. § 1513(b)(1).

[39] *See* 31 U.S.C. § 1512(a); *see also* H. Comm. on the Budget*, Frequently Asked Questions About the Federal Budget (*Dec. 3, 2019), https://democrats-budget.house.gov/publications/fact-sheet/frequently-asked-questions-about-federal-budget ("The overarching purpose of the apportionment process is to prevent deficiencies—i.e., to make sure agencies use time-limited appropriations at an appropriate pace (so that, for example, a program does not run out of money before the fiscal year is over) and use appropriations available for an indefinite time period effectively and economically.").

[40] Pasachoff, *supra* note 23, at 369.

the Office of Management and Budget ("OMB"), via delegation from the President, approves all apportionments for the Executive Branch.[41]

In performing apportionments, the President is exercising a delegated authority from Congress and is constrained by the appropriations laws that authorize the expenditure of the funding to be apportioned. He is not free to withhold or delay the expenditure of appropriated funds solely to suit his own policy prerogatives.[42] Nonetheless, historically, the apportionment process has been somewhat opaque, making it difficult for Congress and the public to hold the Executive accountable for apportionment actions.

### 2. The Budget Act

In 1921, Congress made major changes to the spending process through the 1921 Budget and Accounting Act ("Budget Act").[43] First, Congress created the Bureau of the Budget ("BOB"), the precursor to

---

[41] CRS, *Federal Budget*, *supra* n.31, at 4.

[42] *See Train v. City of New York*, 420 U.S. 35, 45-46 (1975) (construing a statute that, like the ADA, provided the Executive with discretion to allot appropriated funding, and concluding that where "the legislation was intended to provide a firm commitment of substantial sums within a relatively limited period of time … [w]e cannot believe that Congress … scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from allotment and obligation").

[43] Budget and Accounting Act, 1921, Pub. L. No. 67-13, 42 Stat. 20 (1921).

OMB, in the Department of the Treasury.[44] In 1933, the President gave official management authority over the apportionment process to BOB via Executive Order,[45] and it was moved into the Executive Office of the President as OMB in 1939.[46] As noted above, OMB retains authority over apportionments today.

In addition to establishing BOB, the Budget Act also created the General Accounting Office (now, the Government Accountability Office ("GAO")),[47] an "instrumentality of the United States Government independent of the executive departments," 31 U.S.C. § 702(a), with the authority to investigate and audit federal spending.[48] The Budget Act moved the Comptroller General from the Department of the Treasury to GAO, and vested him with the authority to "audit the financial transactions of most executive, legislative, and judicial agencies" as well as to establish appropriate accounting principles and standards for the

---

[44] *Id.* § 207, 42 Stat. 22.
[45] Exec. Order No. 6,166, § 16 (June 10, 1933) (this authority had been placed in the various federal agencies by the 1905 and 1906 Acts and was consolidated in the BOB through this Executive Order).
[46] Exec. Order No. 8,248 (Sept. 8, 1939).
[47] Pub. L. No. 67-13, § 301, 42 Stat. 23.
[48] *See* GAO, *About*, https://www.gao.gov/about (last visited Oct. 22, 2025).

federal agencies.[49] GAO and the Comptroller General are responsible for issuing legal decisions that evaluate whether Executive Branch activities comply with budget and appropriations laws such as the ADA and the Impoundment Control Act. GAO's legal decisions are an important check on the Executive Branch's spending activities because they help make Congress aware of, and enable Congress to respond to, violations of these laws. The 1921 Budget Act also required Comptroller decisions to be made publicly available.[50] The disclosure of this body of law created additional transparency and provided Congress with information needed to craft appropriations statutes and other legislation.

#### 3. The Impoundment Control Act

Notwithstanding these efforts, Executives throughout the 20th century began asserting their will over that of Congress in spending decisions. The apportionment process was used to "impound," or refuse to obligate or delay spending of, funds appropriated by Congress.[51] The

---

[49] GAO, *Principles*, *supra* n. 4, ch. 1, at 1-18; 31 U.S.C. §§ 712, 717.

[50] GAO, *Principles*, *supra* n. 4, ch. 1, at 1-19 (originally, this publication requirement was somewhat limited, but all decisions are available online as of 1994).

[51] *See* CRS, *Federal Budget*, *supra* n. 31, at 30-31 (describing the history of policy impoundments in the United States).

issue came to a head in the 1970s under President Nixon, who used impoundments broadly to pursue his preferred policies.[52] This incursion into Congress's constitutional authority resulted in passage of the Impoundment Control Act ("ICA") in 1974.[53]

The ICA amended the ADA in major ways to more strictly govern the apportionment process and ensure that the Executive could not abuse the administrative task of apportioning money to supersede the policy goals of Congress. In particular, the ICA set new limits on the Executive's delegated power of apportionment. The law eliminates certain excuses for underspending appropriated funds[54] and limits the authority to establish reserves only for specified purposes.[55] Congress recognized that without greater insight into the apportionment process, it would struggle

---

[52] *Id*. at 18; *see* S. Comm. on the Budget, 105th Cong., *The Congressional Budget Process: An Explanation* 8 (Comm. Print 1998), https://www.govinfo.gov/content/pkg/CPRT-105SPRT52186/pdf/CPRT-105SPRT52186.pdf#page=13 ("By 1973, it was believed that President Nixon had impounded up to $15 billion of spending previously approved by Congress.").

[53] Pub. L. No. 93-344, 88 Stat. 302 (1974).

[54] *See* CRS, *Federal Budget*, *supra* n. 31, at 30-31.

[55] *Id.*

to avoid having its own policy goals subverted by the Executive's. Its solution was transparency.[56]

## II. THE FY 2022 AND 2023 ACTS IMPOSED NEW TRANSPARENCY MEASURES TO FURTHER PROTECT CONGRESS'S POWER.

Even as Congress was considering apportionment transparency reform,[57] a particularly problematic example of the Executive's intrusion into the congressional right to control spending arose in 2019. These events highlighted how troubling it was that Congress could be denied access to timely information on apportionment, which undermined its

---

[56] Examples of transparency and oversight mechanisms built into recent law include the Federal Funding Accountability and Transparency Act (FFATA), Pub. L. No. 109-292, 120 Stat. 1186 (2006) (increasing transparency over more than $1 trillion in federal awards annually); the American Recovery and Reinvestment Act, Pub. L. No. 111-5, 123 Stat. 115 (2009) (creating an independent oversight board to oversee emergency funds appropriated during the Great Recession); the Digital Accountability and Transparency Act, Pub. L. 113-101, 128 Stat. 1146 (2014) (building on FFATA to impose additional transparency requirements on federal award data); and the Coronavirus Aid, Relief, and Economic Security (CARES) Act of 2020, Pub. L. No. 116-136, 134 Stat. 281 (2020) (creating an "accountability committee" to oversee spending of COVID-19 funds).

[57] House Bill 3351, for example, introduced on June 27, 2019, to appropriate funds for FY 2020, contained provisions requiring OMB to share apportionment information with Congress and make it publicly available. Financial Services and General Government Appropriations Act 2020, H.R. 3351, 116th Cong. § 204 (2019), https://www.congress.gov/116/bills/hr3351/BILLS-116hr3351rfs.pdf.

ability to oversee Executive Branch functions and to legislate appropriately.

Starting in July 2019, OMB withheld over $200 million in Department of Defense funding appropriated as part of the Ukraine Security Assistance Initiative;[58] in August 2019, it stalled the disbursement of more than $100 million in funds appropriated to the State Department;[59] and at the same time, it froze billions of dollars in foreign assistance funds appropriated to the United States Agency for International Development.[60] These actions were contrary to law.

In the Ukraine example, in particular, the public and most of Congress was unaware that the Executive halted aid until August 28

---

[58] Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245 § 9013, 132 Stat. 2981, 3044-45 (2018); *see OMB–Withholding of Ukraine Security Assistance*, 2020 WL 241373, at *1.

[59] *See* H. Comm. on the Budget, *House Budget Committee Outlines OMB's Use of Apportionment Process* (Dec 2. 2019), https://democrats-budget.house.gov/hbc-summary-omb-abuse.

[60] *See generally* Mem. from Justin H. Brown, Counselor, to Michele Sumilas, Acting Chief of Staff, U.S. Agency for Int'l Dev., *Lessons from USAID's FY 2019 Budget Process Highlight Interagency Constraints and Areas that Require Continued Attention* (Mar. 2, 2021), https://perma.cc/KY38-DX38.

when it was reported in the press.[61] OMB removed its apportionment freeze on the funds on September 12, just eighteen days before the end of the fiscal year when the funds would be returned to the Treasury if they were not spent.[62] In short order, Congress was forced to rescind the funds and reappropriate them on September 27 (effectively extending their availability), just three days before the fiscal deadline to ensure that they were used for their statutory purpose.[63] Without insight into OMB's apportionment decisions, Congress lacked timely information that recission and reappropriation would be required to ensure that its statutory directives were faithfully executed.

In January 2020, after investigation, GAO concluded that OMB had violated the ICA by substituting its policy preferences for Congress's and impounding funds without lawful justification.[64] Two months later, the

---

[61] Caitlin Emma & Connor O'Brien, *Trump Holds Up Ukraine Military Aid Meant to Confront Russia*, Politico (Aug. 29, 2019), https://www.politico.com/story/2019/08/28/trump-ukraine-military-aid-russia-1689531.

[62] *See OMB–Withholding of Ukraine Security Assistance*, 2020 WL 241373, at *1.

[63] *See* Continuing Appropriations Act, 2020, and Health Extenders Act, 2019, Pub. L. No. 116-59 § 124(b), 133 Stat. 1093, 1098 (2019).

[64] *See OMB–Withholding of Ukraine Security Assistance*, 2020 WL 241373, at *4-7.

House Budget Committee convened the first of two hearings dedicated to shoring up Congress's control over government funds.[65] Highlighting Congress's imperative to protect its prerogatives as well as recent "high-profile executive abuses of budget and appropriations laws, including withholding foreign aid," Chairman John Yarmuth invited expert witnesses to outline potential reforms to protect Congress's powers.[66]

The witnesses included Georgetown Law Professor Eloise Pasachoff who highlighted the withholding of Ukraine funds as an example of the Executive improperly using apportionment as "an independent source of executive policy development."[67] She noted that

> the key legal takeaway from this episode is the importance of transparency. It is only because these apportionments happened to become public that Congress eventually learned about them…. [T]he potential for abuse of the apportionment power is not simply about the current administration. Any future administration, Democratic or Republican, could also try to use the apportionment power as a regular tool of

---

[65] *See Power of the Purse Hearing, supra* n. 13, at 1-161; *see also Protecting Our Democracy: Reasserting Congress' Power of the Purse: Hearing before the Comm. on the Budget, U.S. House of Representatives*, 117th Cong. 1-157 (2021) (hereinafter "*Protecting Democracy Hearing*"), https://www.congress.gov/117/chrg/CHRG-117hhrg44771/CHRG-117hhrg44771.pdf.

[66] *Power of the Purse Hearing*, *supra* n. 13, at 1-3 (statement of Rep. John A. Yarmuth, Chairman, Comm. on the Budget).

[67] *Id.* at 75 (statement of Eloise Pasachoff, Professor of Law, Georgetown L.).

> presidential control. And because apportionments aren't disclosed as a matter of course, it would be difficult for Congress and the American people to know what is going on unless the apportionment at issue happened to hit the news.[68]

Recommending reforms, Professor Pasachoff suggested that Congress "require that signed apportionments be disclosed as a matter of course on OMB's website; they are final decisional documents with the force of law, and it is difficult to justify their current non-disclosed status in a rule of law regime."[69] Congress took her advice.

Congress initially sought to secure OMB's cooperation in reporting on apportionments even before OMB's failure to timely apportion billions of dollars in foreign assistance funds came to light in the late summer of 2019. As noted above, House Bill 3351, introduced in June 2019, contained apportionment transparency mandates.[70] While a different version of the bill became law,[71] in the joint explanatory statement accompanying the enacted bill, the House Committee on Appropriations noted that it was seeking "greater transparency into OMB's

---

[68] *Id.* at 80.
[69] *Id.*
[70] H.R. 3351, 116th Cong. § 204.
[71] *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019).

apportionment process.... OMB is directed ... to develop a process to share information regarding apportionments, including any associated footnotes, electronically in a practicable and timely manner."[72]

In its report accompanying FY 2021 appropriations, the House Appropriations Committee noted its disappointment that "OMB has made little progress towards providing greater apportionment transparency,"[73] despite the 2020 language, and again proposed requiring OMB to "implement a system to make publicly available ... all documents apportioning an appropriation and all relevant delegations of apportionment authority, and to provide [Congress] with such information until the automated system is implemented."[74]

In 2022, Congress tried again, this time successfully. The House Report accompanying FY 2022 appropriations noted and "agree[d] with GAO's recommendation to require OMB to publicly post all

---

[72] H. Comm. on Appropriations, 116th Cong., *Provisions Applying to All Divisions of the Consolidated Appropriations Act* 639 (Comm. Print 2020), https://perma.cc/U623-EU8V.
[73] Financial Services and General Government Appropriations Bill, 2021, H.R. Rep. 116-456 at 38 (2020).
[74] *Id.* at 44.

apportionments of executive branch appropriations…."[75] As enacted into law on March 15, 2022, Public Law 117-103 provided that OMB "shall complete implementation of an automated system to post each document apportioning an appropriation … including any associated footnotes … on a publicly accessible website … [and] also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts."[76]

In considering FY 2023 spending, the House Appropriations Committee was "pleased with OMB's timely implementation of initial deadlines outlined in section 204" of the FY 2022 Act.[77] It noted specifically that "the provision of these documents pursuant to section 204 … has proven critical to the Congress's timely oversight of the executive branch's management of appropriated funds."[78] Accordingly,

---

[75] Financial Services and General Government Appropriations Bill, 2022, H.R. Rep. 117-79 at 11 (2021), https://perma.cc/C24D-LTT9; *see Protecting Democracy Hearing*, *supra* n. 65, at 81 (statement of Edda Emmaneulli Perez, Deputy General Counsel, GAO) ("[W]e recommend that Congress consider requiring [OMB] to publicly post all apportionments of executive branch appropriations").
[76] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 257 (2022).
[77] Financial Services and General Government Appropriations Bill, 2023, H.R. Rep. 117-393 at 11 (2022), https://perma.cc/UYD7-LUX3.
[78] *Id.*

"[c]onsistent with GAO's recommendation, and in furtherance of the Committee's oversight responsibilities, the Committee … would make permanent last year's requirement to make apportionments of appropriations publicly available in a timely fashion."[79] As enacted on December 29, 2022, Public Law 117-328 directed that "[i]n fiscal year 2023 and each fiscal year thereafter … [OMB] shall operate and maintain the automated system required to be implemented by [the FY 2022 Act] and shall continue to post each document apportioning an appropriation, … including any associated footnotes."[80]

The FY 2022 and 2023 apportionment transparency mandates were a response to the long-standing problem of the Executive attempting to use its opaque apportionment process to subvert congressional intent. Congress plainly has the power to impose such requirements.[81] The

---

[79] *Id.*

[80] Consolidated Appropriations Act, 2023, Pub L. No. 117-328 136 Stat. 4459, 4667 (2022).

[81] *See Harrington v. Bush*, 553 F.2d 190, 194 n.7 (D.C. Cir. 1977) (noting, when discussing the Statement and Accounts Clause, that "the Supreme Court has recently recognized that 'Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest'" (quoting *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974))).

provisions ensure that the power of the purse remains firmly where the Founders intended it—with the legislature.

## III. NONCOMPLIANCE WITH THE ACTS INJURES CONGRESS BY LIMITING ITS ABILITY TO CONDUCT OVERSIGHT AND EFFECTIVELY LEGISLATE.

Notwithstanding the clear legal directives in the FY 2022 and 2023 Acts, in March 2025, OMB removed apportionment data from the public website where it had been shared for three years prior. OMB's refusal to comply with the Acts undermines transparency, which stymies both the public's knowledge of where its tax dollars are being directed and Congress's ability to effectively legislate and perform oversight.

Following the removal of the website that sparked this litigation, the GAO General Counsel noted in a letter to the OMB Director that the removal was "very concerning because of the potential implications for review of such records for federal audits, congressional oversight, specifically with regard to Congress's power of the purse."[82] GAO reminded the Director that "apportionments are a critical part of the legal framework … that helps to ensure the responsible use of taxpayer

[82] *See* Letter from Edda Emmanuelli Perez, General Counsel, GAO, to Russell T. Vought, Dir., OMB (Apr. 8, 2025), https://www.gao.gov/assets/880/878943.pdf.

dollars."[83] The Congressional Research Service, noting that the website had been dismantled, indicated that the "change in OMB's public reporting may affect Congress's ability to effectively conduct oversight of OMB apportionments and monitor them for potential impoundments."[84]

The undersigned *amici*, as leaders on the House and Senate appropriations committees, agree.[85] Indeed, Congress's need for and reliance on apportionment data is a sentiment shared on a bipartisan basis. *Amici*, along with Senator Susan Collins and Representative Tom Cole, jointly protested the removal of the website, noting, in the words of Senator Collins, that "it is not optional to do the public website."[86] Should

---

83 *Id.*

84 Dominic A. Fiorentino & Taylor N. Riccard, Cong. Rsch. Serv., R-INI2538, *Office of Management and Budget (OMB) Reporting on Apportionments* 3 (2025), https://perma.cc/8EA4-3M9Z.

85 *See* Press Release, Joint Statement of Rep. DeLauro and Sen. Murray, What Are They Hiding? DeLauro, Murray Demand OMB Promptly Restore Access to Website Detailing Federal Spending Allocations, As Federal Law Requires (Mar. 24, 2025), https://perma.cc/UEE6-ZKAX.

86 Carl Hulse, *Bipartisan House and Senate Leaders Urge White House to Restore Spending Website*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/us/politics/congress-white-house-spending-website.html; *see also* Press Release, Rep. Brendan Boyle, Boyle Demands White House Comply with the Law, Restore Public Access to Budget Data (Mar. 24, 2025), https://perma.cc/Q6U6-5ZNT ("The law is clear: data showing how the administration spends taxpayer dollars must be public. … [T]he administration isn't just avoiding transparency — they're breaking the law.").

OMB be allowed to ignore its legal obligations and dismantle the apportionments database, Congress will suffer a wide range of harms to its ability to fulfill its constitutional mandates; indeed, earlier this year, House appropriators in the Republican-controlled chamber noted that "timely access to apportionment information by Congress has been and continues to be a critical check and balance within our federal system of government."[87] The American public also will be harmed in its ability to monitor and understand the ways in which the Executive Branch is disbursing the taxpayer dollars that Congress has appropriated to it.[88]

Without access to apportionment data, Congress cannot effectively determine whether OMB is exceeding its statutory authority when doling out appropriations to the federal agencies in real time. Congress's ability to determine whether to initiate oversight hearings in response to any problematic or unlawful apportionment actions is impaired, as is its

---

[87] Financial Services and General Government Appropriations Bill, 2027, H.R. Rep. 119-623, at 29-30 (2026), https://perma.cc/NMH2-PE9W.

[88] *See* 171 Cong. Rec. E720-721 (daily ed. July 23, 2025) (speech of Rep. Rosa DeLauro) ("If OMB were obeying [the FY 2022 and 2023 Acts], then not only would Congress and the GAO have critical information we needed to consider the rescissions package before us, but the public would have had the critical information they needed to share their opinions with us about the impact of these cuts and any other funds OMB or these agencies may be withholding in violation of the [ICA].").

ability to determine whether and how to develop and advance legislative responses to prevent harms to programs or constituents if a problematic or unlawful apportionment prevents the dispersal of funding. Congress needs apportionment data to determine how much new funding to appropriate, how much previously appropriated funding to rescind, and how to evaluate the balance between the two.[89] And Congress has repeatedly, vociferously, and on a bipartisan basis, sought to vindicate its interests in obtaining this information, penning letter after letter in successive administrations requesting apportionment data and raising concerns about the timely apportionment of funding appropriated by law

[89] *See* Letter from Rep. Rosa DeLauro, Ranking Member, Comm. on Appropriations, & Sen. Patty Murray, Vice Chair, Comm. on Appropriations, to Russell Voight, Dir., OMB (May 27, 2025), https://perma.cc/ZF6K-NZ3S (OMB's action in "hid[ing OMB's apportionment decisions from the public and from Congress … deprives the public of information they are entitled to under law [and] also undermines Congress's ability to carry out its legislative and oversight functions"); *see also* Letter from Rep. Jason Smith, Republican Leader, Comm. on the Budget, to Alejandro Mayorkas, Sec'y, DHS, & Shalanda Young, Acting Dir., OMB (July 16, 2021), https://perma.cc/8FKD-R3ST ("[I]t is vital for Congress to have detailed information on how this Administration intends to apportion and obligate funds appropriated by Congress, on a bipartisan basis … Moreover, the American people deserve to know how the Administration intends to spend their taxpayer dollars …").

to a myriad of federal agencies.[90] If OMB is allowed to walk away from its legal obligation to publish apportionment data, Congress will be hampered in its ability to assess the use of prior-year funds, develop legislative responses to programmatic needs, propose budget allocations,

---

[90] *See* Letter from Sen. Susan M. Collins, Chair, Comm. on Appropriations, & Sen. Charles E. Grassley, Chair, Comm. on the Judiciary, to Russell Vought, Dir., OMB (Sept. 29, 2025), https://perma.cc/W8F9-BWJ8 (voicing concerns about withholding of funds from two inspector general offices and urging OMB "to promptly apportion funds to CIGIE and PRAC, consistent with congressional intent"); Letter from Sen. Christopher A. Coons, Sen. Bill Cassidy, & bipartisan group of six other Senators to Russell Vought, Dir., OMB (Aug. 1, 2025), https://perma.cc/9GE2-E6JJ (urging the Administration to "release all remaining funding for AmeriCorps as appropriated by Congress under the Full-Year Continuing Appropriations and Extensions Act, 2025 so that [its] important work can continue"); Letter from Sen. Mike Crapo, Sen. Mark R. Warner & bipartisan group of 24 other Senators to Russell Vought, Dir., OMB (July 29, 2025), https://perma.cc/74KY-A5DA (urging "swift[] obligat[ion] … in a timely manner" of $324 million to the CDFI Fund); Letter from Sen. Katie Boyd Britt & 13 other Republican Senators, to Russell Vought, Dir., OMB (July 24, 2025), https://perma.cc/MJE4-XJPP (expressing concern about "the slow disbursement rate of FY25 NIH funds"—"whether formally withheld or functionally delayed"—and requesting that the OMB Director "ensure the timely release of all FY25 NIH appropriations in accordance with congressional intent"); *see also* Letter from Rep. James Comer, Ranking Member, Comm. on Oversight & Reform, & Rep. Jason Smith, Ranking Member, Comm. on the Budget, to Shalanda D. Young, Acting Dir., OMB (May 3, 2021), https://perma.cc/Y5GR-2BM7 (requesting the Biden Administration provide "[a]ll apportionments and reapportionments for FY 2021 that are in effect, including documentation of the approval date of each such apportionment action and any footnotes").

and draft and enact appropriations bills, supplemental appropriations bills, and continuing resolutions.

In short, allowing the Executive Branch to circumvent the legal requirements of the FY 2022 and 2023 Acts would directly harm Congress's ability to perform its two constitutional functions: legislation and oversight. Congress's passage of the FY 2022 and 2023 Acts was a direct response to a long history of Executive efforts to upend the constitutionally allocated separation of powers by abusing the apportionment process. Relieving OMB of its obligations to follow the law will directly undermine Congress's lawmaking authority, limit its effectiveness as a co-equal branch of government, and partially remove control over the purse strings from the branch of government most directly accountable to the American people.

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

Dated: May 4, 2026

Respectfully submitted,

/s/ *Rupa Bhattacharyya*
Rupa Bhattacharyya*
Kelsi Brown Corkran
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
Georgetown Law
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-4036
rb1796@georgetown.edu

*Counsel for Amici Curiae*

*Application for admission forthcoming

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,497 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Century Schoolbook font.

Executed this 4th day of May, 2026.

/s/ Kelsi Brown Corkran
Kelsi Brown Corkran

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on May 4, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 4th day of May, 2026.

/s/ Kelsi Brown Corkran
Kelsi Brown Corkran

*Counsel for Amici Curiae*